IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISIO N


PARENT PLAINTIFF KRISTI DOE and her minor
children, CHRISTIAN DOE and CHASE DOE;
PARENT PLAINTIFF LAKESHA DOE and her
minor child, DENNIS DOE; PARENT PLAINTIFF
EVELYN DOE and her minor child, EDWARD DOE;
PARENT PLAINTIFF CANDICE DOE and her minor
children, JAMES DOE and JADE DOE; and
PARENT PLAINTIFF SONYA DOE and her minor child,
JOHNNY DOE; JOY C. SPRINGER; and JIM ROSS                      PLAINTIFFS

v.                              CASE NO. 4:15cv00623DPM


ARKANSAS DEPARTMENT OF EDUCATION;
TOYCE NEWTON, [Chair]
JAY BARTH
JOE BLACK
SUSAN CHAMBERS
CHARISSE DEAN
MIREYA REITH
VICKI SAVIERS
R BRETT WILLIAMSON
DIANE ZOOK, Members of the ARKANSAS
STATE BOARD OF EDUCATIO N, in their
Official Capacities; JOHNNY KEY, Commissioner
Of Education [and LRSD SCHOOL BOARD],
in his Official Capacity; BAKER KURRUS,
Superintendent of the Little Rock School District,
in his Official Capacity                                       DEFENDANTS


**AMENDED COMPLAINT**

1. This is an action to secure a remedy for the subjecting of black students enrolled

in the Little Rock School District [LRSD] to intentional racial discrimination, in the

1

period after courts held that the LRSD had achieved unitary status. This action also seeks a remedy for the state's takeover of the LRSD and the ouster of the democratically elected LRSD Board of School Directors.  Plaintiffs allege that these actions violated the United States Constitution [denial of freedom of speech, prohibited racial discrimination, conspiracy to violate rights, badge of slavery, and denial of due process of law].

2. The plaintiffs' claims are based upon 42 U.S.C. §§ 1983 and 1985, and the Thirteenth and Fourteenth Amendments to the Constitution of the United States.

3. This Court's jurisdiction is based on 28 U.S.C. Sec. 1343.

<u>Plaintiff Black Parents and Black Students</u>

4. Plaintiffs who are black students in LRSD are referred to by the name "Doe".  They will be identified to the Court in a separate document. Plaintiffs who are parents of or other persons in loco parentis are also identified as "Does". Their names will also be disclosed to the parties and the court. The reason for listing them as Does, except for Claudius Johnson, next friend of minor Plaintiff Christian Doe, is to prevent the minor students who are still enrolled in LRSD from being subjected to adverse treatment from students or district employees because of their participation in this action.

<u>Plaintiff Kristi Doe and Student Plaintiff Christian and Chase Doe</u>

5. Plaintiff Kristi Doe is a resident of the Little Rock School District.  She is the parent of Christian, age 7, and Chase, age 10, who are students enrolled at Baseline Academy.  During the 2014-15 school year, they were students at the LRSD elementary school labeled as being academically distressed.

6. Plaintiff Kristi Doe brings this action to redress wrongs unlawfully perpetrated upon her children during their experiences as students in the public schools of the Little

2

Rock School District and in order to prevent those wrongs from continuing into the future.

7. Minor plaintiff Christian Doe was subjected to discipline due to undocumented reasons at an academically distressed school during the 2013-14 and 2014-15 school year. He was also denied the opportunity to transfer to a school outside the district in a school setting not labeled as being in academic distress.   Adult plaintiff Kristi Doe did not receive written notice regarding many of the disciplinary sanctions against Christian Doe.  Rather than provide Kristi Doe notice that Christian had been moved out of his educational placement of 1st grade, he was arbitrarily placed in 5th grade without proper documentation.

8.  Upon information and belief, there are other students at Baseline who have been moved out of their educational placements and arbitrarily placed in other grades without proper documentation.

9. Minor plaintiff Chase Doe is being subjected to disparate treatment because the Little Rock School District is utilizing his services as an aide to assist in educating his brother, Christian, rather than hiring an aide to provide these services to Christian.

10. Because of the work minor plaintiff Chase Doe is performing on behalf of his brother, Christian, he is losing educational instructional time regarding his own education.

11. Minor plaintiff Christian Doe and Chase Doe claim that they have been subjected to unequal treatment from white students in the Little Rock School District with respect to discipline, terms and conditions of school attendance and being afforded equal opportunity to be educated.

12. Furthermore, the elementary school in which minor plaintiffs Christian and Chase Doe presently attend is an unequal facility to those attended by majority white students in the northwestern parts of the school district.  The deficiencies and inequalities about which he complains that he has suffered and suffers as black students in the LRSD are more specifically detailed in paragraph 75.

13. Minor plaintiffs Christian Doe and Chase Doe seek compensatory education, declaratory and injunctive relief regarding the conditions, denial of education and unequal treatment that they have sustained.

<u>Plaintiff Alice Doe and Student Plaintiff Lisa Doe</u>

14. Plaintiff Alice Doe is a resident of the Little Rock School District.  She is the parent of Lisa, age 16, who is currently assigned to McClellan High School, a LRSD high school labeled as being academically distressed.  She previously attended Central High School.

15. Plaintiff Alice Doe brings this action to redress wrongs unlawfully perpetrated upon her child during her experiences as a student in the public schools of the Little Rock School District and in order to prevent those wrongs from continuing into the future.

16.  For several years, minor plaintiff Lisa attended Central High School, one of Little Rock School District's schools that had not been declared as being academically distressed. Lisa Doe was assigned to Central after completing middle school at Dunbar Middle School.  While at Dunbar, Lisa Doe participated in the gifted and talented programs.

17.  During Lisa Doe's first year at Central, she participated in Pre-AP classes. After her first year at Central, she was advised by her English teacher that she did not

4

need AP classes and was subsequently discouraged from enrolling in AP classes during her 10th grade year at Central.

18.  In January, 2015, Alice Doe's moved to a different address.  When registering Lisa Doe for the 2015-16 school year, Alice Doe was advised that Central High School would be Lisa Doe's assigned school.

19.  Prior to the beginning of the 2015-16 school year, Alice Doe was advised by Lisa Doe's administrator that she should change her address with the student assignment office.  The administrator further assured her that changing her address would not affect her assignment at Central High School nor her transportation from her current residence in southwest Little Rock.

20. Alice Doe went to student assignment and notified them of her address change. Within a couple of days, Alice Doe received notice that Lisa's school assignment would be McClellan.

21.  Rather than sending her a notice extending the opportunity for Lisa Doe to be assigned to a school not labeled as academically distressed, the district gave her notice of being assigned to an academically distressed school.

22.  Upon information and belief, white students from other surrounding districts were allowed to have priority enrollment at the preferred high schools not classified as being academically distressed.

23. Minor plaintiff Lisa Doe claims that she has been subjected to unequal treatment from white students in the Little Rock School District with respect to terms and conditions of school attendance and being afforded equal opportunity to be educated.

24.  Minor plaintiff Lisa Doe claims that she has been subjected to unequal

treatment from white students in the Little Rock School District with respect to assignment to advanced placements classes and being afforded equal opportunity to be educated.

25. Minor plaintiff Lisa Doe claims that she has been subjected to unequal treatment from white students in the Little Rock School District with respect to assignment to McClellan High School where there are seven period days.  Lisa Doe previously attended schools that offered block scheduling designed to afford additional instructional time to students.  Lisa Doe contends that the instructional time she is currently receiving is limited and is unequal to the instructional time being offered to students in schools that are not classified as being in academic distress.

26. Furthermore, the high school in which minor plaintiff Lisa Doe presently attends is an unequal facility to those attended by majority white students in the northwestern parts of the school district.  The deficiencies and inequalities about which he complains that he has suffered and suffers as black students in the LRSD are more specifically detailed in paragraph 75.

27. Minor plaintiff Lisa Doe seeks compensatory education, declaratory and injunctive relief regarding the conditions, denial of education and unequal treatment that they have sustained.

<u>Plaintiff Parent Lakesha Doe and Student Plaintiff Dennis Doe</u>

28. Plaintiff Lakesha Doe is a resident of the Little Rock School District.  She is the parent of Dennis Doe, age 15, who is a student enrolled at Little Rock Central High school.  During the 2014-15 school year, he was a student at a high school labeled as being academically distressed.

29. Plaintiff Lakesha Doe brings this action to redress wrongs unlawfully perpetrated upon her son during his experiences as a student in the public schools of the Little Rock School District and in order to prevent those wrongs from continuing into the future.

30. Minor plaintiff Dennis Doe was subjected to discipline for false reasons at an academically distressed school during the 2014-15 school year. He and approximately 37 other black students were recommended for out of school suspension for three (3) or more days because of accumulated tardies.

31. Adult plaintiff Lakesha Doe did not receive notice of any of the tardies. On information and belief nor did any of the other parents.  In order to set aside her son's suspensions, she was required to engage in multiple appeals.  On information and belief, many of the other parents did not appeal.  Their children lost valuable instructional time which led to diminished time for addressing their children's educational needs.

32. For several years, minor plaintiff Dennis Doe sought to attend one of Little Rock School District's schools that had not been declared as being academically distressed.  White students from other surrounding districts were allowed to have priority enrollment at the preferred high schools not classified as being academically distressed.

33. Minor plaintiff Dennis Doe claims that he has been subjected to unequal treatment from white students in the Little Rock School District with respect to discipline, terms and conditions of school attendance and being afforded equal opportunity to be educated.

34. Furthermore, the high school which minor plaintiff Edward Doe presently

attends and the middle school which he formerly attended are both unequal facilities to those attended by white students in the northwestern parts of the school district.  The deficiencies and inequalities about which he complains that he has suffered and suffers as a black student in the LRSD are more specifically detailed in paragraph 75.

35.  Minor plaintiff Dennis Doe seeks compensatory education, declaratory and injunctive relief regarding the conditions, denial of education and unequal treatment that he has sustained.

<u>Plaintiff Parent Evelyn Doe and Student Plaintiff Edward Doe</u>

36. Plaintiff Evelyn Doe is a resident of the Little Rock School District.  She is the parent of Edward Doe, age 15, who is a student enrolled in a southwest Little Rock High school which has been labeled by the Defendants as being academically distressed. During the 2014-15 school year, he was a student at a middle school labeled as being academically distressed.

37. Plaintiff Evelyn Doe brings this action to redress wrongs unlawfully perpetrated upon her son during his experiences as a student in the public schools of the Little Rock School District and in order to prevent those wrongs from continuing into the future.

38. Minor plaintiff Edward Doe was subjected to physical and verbal abuse by a teacher in a distressed middle school during the 2014-15 school year and as a consequence of his complaining about it, he was suspended for a long period of time and referred to the criminal justice system in the process.  There is a video tape of the incident in the possession of the school district as well as the Adult plaintiff Evelyn Doe. Part of the incident centered around the teacher's effort to destroy the evidence, i.e., the

8

recording on minor plaintiff Edward Doe's cell phone showing the abuse.

39. Minor plaintiff Edward Doe claims that he has been subjected to unequal treatment from white students in the Little Rock School District with respect to discipline, terms and conditions of school attendance and being afforded equal opportunity to be educated.

40. For long periods of time, minor plaintiff  Edward Doe claims that he and his classmates, all of whom were minority, were not taught and were simply left to watch television and play video games and dominos in class.  White students in the district are not so treated.

41. Furthermore, the high school which minor plaintiff Edward Doe presently attends and the middle school which he formerly attended are both unequal facilities to those attended by white students in the northwestern parts of the school district.  The deficiencies and inequalities about which he complains that he has suffered and suffers as a black student in the LRSD are more specifically detailed in paragraph 74.

42. Minor plaintiff Edward Doe seeks compensatory education, declaratory and injunctive relief regarding the conditions, denial of education and unequal treatment that he has sustained.

<u>Plaintiff Parent Candice Doe and Student Plaintiffs James and Jade Doe</u>

43. Candice Doe is a resident of the Little Rock School District.  She is the parent of James Doe, age 15, who is a student enrolled in a southwest Little Rock High school which has been labeled by the Defendants as being academically distressed.  She is also the parent of Jade Doe, age 14, who is a student enrolled in a middle school labeled as being academically distressed.

44. Adult plaintiff Candice Doe brings this action to redress wrongs unlawfully perpetrated upon her children during their experiences as students in the public schools of the Little Rock School District and in order to prevent those wrongs from continuing into the future.

45. During the current school year, minor plaintiff James Doe has been subjected to an out of school suspension as a result of a verbal altercation he had with another student where there was no physical contact between either student. Rather than resolve the situation with the school officials, the administration referred the matter to the police officer on campus. As a result, minor plaintiff James Doe was given a six day suspension. This suspension was upheld upon appeal.

46. Minor plaintiff James Doe and Jade Doe claim that they have been subjected to unequal treatment from white students in the Little Rock School District with respect to discipline, terms and conditions of school attendance and being afforded equal opportunity to be educated.

47. Furthermore, the schools which James and Jade Doe presently attend are both unequal facilities to those attended by white students in the northwestern parts of the school district. The deficiencies and inequalities about which they complain that they have suffered and continue to suffer as black students in the LRSD are more specifically detailed in paragraphs 71 and 73.

48. Minor plaintiffs James Doe and Jade Doe seek compensatory education, declaratory and injunctive relief regarding the conditions, denial of education and unequal treatment that they have sustained.

<u>Plaintiff Parent Sonya Doe and Student Plaintiff Johnny Doe</u>

49. Plaintiff Sonya Doe is a resident of the Little Rock School District.  She is the parent of Johnny Doe, age15, who is currently a student at Parkview High School.  He formerly attended two of the middle school which the Defendants have identified as being academically distressed.  During the 2014-15 school year, he was a student at a middle school labeled as being academically distressed.

50. Plaintiff Sonya Doe brings this action to redress wrongs unlawfully perpetrated upon her child during his experiences as a student in the public schools of the Little Rock School District and in order to prevent those wrongs from continuing into the future.

51. After February, 2015, when the State removed Forest Heights from the list of academically distressed schools, school officials began to purge African American students from the school. The district tried to discourage minor plaintiff  Johnny Doe and other black student from remaining in the school.  A transcription is attached as Exhibit 1 which shows teachers collaborating to cause harm to a black student.  The actual tape recording of one incident will be made available to the defendants.

52. Minor plaintiff Johnny Doe claims that he has  been subjected to unequal treatment from white students in the Little Rock School District with respect to discipline, terms and conditions of school attendance and being afforded equal opportunity to be educated.

53. Furthermore, the middle school which minor plaintiff Johnny Doe  attended is an unequal facility to those attended by white students in the northwestern and western parts of the school district.  The deficiencies and inequalities about which he complains that he has suffered and suffers as a black student in the LRSD are more specifically detailed in paragraphs 63, 66 and 73.

54. Minor plaintiff Johnny Doe seeks compensatory education, declaratory and injunctive relief regarding the conditions, denial of education and unequal treatment that he has sustained.

## Plaintiffs Joy C. Springer and Jim Ross

55. Plaintiff Joy C. Springer, an African-American person, was elected on September 16, 2015, to serve as the member of the LRSD Board of School Directors [LRSD School Board] for Zone 1.

56. Plaintiff Jim Ross, a Caucasian person, was elected on September 16, 2015, to serve as the member of the LRSD School Board for Zone 5.

57. On January 28, 2015, the members of the Arkansas State Board of Education [State Board] voted, 5 to 4, to take over the LRSD and to remove the seven-member LRSD School Board, including Members Springer and Ross. At this time, the LRSD School Board consisted of 4 African American and 3 Caucasian persons.

## The Defendants

58. The Arkansas Department of Education

59. In March 2015, the members of the State Board designated Defendant Johnny Key, Arkansas Commissioner of Education, a Caucasian person to serve, in effect, as the LRSD School Board. He is sued in his official capacity.

60. The Defendant members of the State Board are Toyce Newton [Chair], Jay Barth, Joe Black, Susan Chambers, Charisse Dean, Mireya Reith, Vicki Saviers, R. Brett Williamson, and Diane Zook. They are sued in their official capacities.

61. On May 15, 2015, the members of the State Board selected Defendant Baker Kurrus, a Caucasian person, to serve as acting Superintendent of the LRSD. Mr. Kurrus

is sued in his official capacity.

I. <u>Claims on Behalf of the Student Plaintiffs and Their Parents</u>

62. After the determinations of unitary status, LRSD officials and employees have engaged in acts of intentional racial discrimination, favoring the white student population and other white persons and disfavoring the black student population. Many examples of such conduct are described in Part I. of this Complaint, Sections A. through K, which follow.

A. <u>School Facilities in the LRSD</u>

63. In 2008-09, the total student enrollment of the Cloverdale Middle School, located in the southwest part of the LRSD, was 685, consisting of  79.1% black students, 3.1% white students [21 students], and 17.8% other students.  The setting was marked by disrepair, squalor, and  inadequacy of the facility, as evidenced by the following: cracks in walls; peeling paint; areas needing to be repainted; bathrooms at times inoperative; smelly bathrooms; some student lockers inoperative; many classrooms with limited window area and, therefore, limited natural light; dilapidated window shades, some inoperative; old furniture in classrooms; a very small school library with few books; insufficient overhead projectors; outdated computer capacity; stage used for in-school suspension class; a very small school gymnasium, without air conditioning; outside area for physical education limited to a grassy field.

64. In 2009-10, the total student enrollment of Cloverdale Middle School was 623, consisting of 79.9% black students, 3,0% white  students 19 students], and 19.6% other students. The conditions in the School continued to be as described in the preceding paragraph.

65. In 2009-10, the total enrollment of the Dunbar Middle school was 773, 83.7% black students, 10.5% white students, and 5.8% other students. In 2010-11, the total enrollment of the Dunbar Middle School was 844, 82.9% black students, 10% white students, and 7.1% other students.   In 2011-12, the total enrollment of the Dunbar Middle School was  814, 83.4% black students, 8.0 % white students, and  8.6% other students.

66. Facility and other inadequacies plagued the Dunbar Middle School in each of the three school years cited in paragraph 65. There was noticeable mold in various classrooms, offices, and stairways. There were foul smells from mold. There was peeling paint; some walls were haphazardly painted multiple colors; and promised repainting did not occur. Water dripped from the ceiling. Staff members became ill due to the condition of the building and had to take sick leave. The basement area of the facility contained the cafeteria, classrooms used for electives, a computer lab, and areas for the school nurse and counselors. It was windowless and became flooded from time to time. The auditorium had ragged curtains.  The classrooms in the building were very small, resulting in students' desks touching another desk or desks, and limiting the teaching techniques, which a teacher could employ. Work on asbestos abatement continued for the entire 2011-12 school year, with the school in use. This work produced noxious dust. The School had only a grassy field available for outdoor physical education.

67. In 2010-11, the LRSD opened the Roberts Elementary School in the northwest corner of the school district, near the district line. The Roberts School is on a 46-acre site and the School size is 148,000 square feet, approximately 58,000 square feet larger than the next largest elementary school.

68. The Roberts facility is beyond state of the art. In addition to its huge site with multiple play areas for use of the School, the building is marked by larger classrooms; multiple common areas; a wet lab in every classroom to enhance the study of science; natural light from windows throughout the building; a huge cafetorium with a stage and large screens, facilitating its use for multiple purposes;  two large well-equipped art and music labs; an ample gymnasium with access to technology which has been used for the training of physical education staff and even a climbing wall; a library of such high quality that even the term state-of-the-art does not do it justice and which compares favorably to the nearby branch public library; an "EAST lab" [state of the art computer system to enhance the study of geography]; an area with telescopes; ample offices for administrators, counselors and  school nurses; and  air conditioning of the entire facility. See photographs of the Roberts School, including the library, attached to this complaint, as well as a photograph of the Franklin School. [Exhibit 2]

69. In reviewing the LRSD proposal for the school that became the Roberts Elementary School, the State Bureau of Facilities and Transportation failed to consider whether the proposed expenditure for the facility was consistent with establishing overall equity in school facilities in the LRSD.

70. In 2010-11, the Roberts School had total enrollment of 702; there were 487 white students [69.4%], 148 black students  [21.1%], and 67 other students  [9.5%]. In 2010-11, the total elementary school enrollment in the LRSD was 35 percent white. In 2010-11, the Roberts school had excess capacity of approximately 280 seats.  The LRSD did not utilize this capacity to serve African American students housed at inadequate facilities.

71. In 2012-13, the total student enrollment of the Wilson Elementary School was 296, 72.0% black students, 6.4% white students, and 21.6% other students. At the beginning of the school year, the cafeteria could not be used, by order of authorities responsible for public health requirements. The air condition system failed periodically, including in the warmest part of the school year. Squirrels were able to enter ductwork. Their scurrying around could be heard within the School, and some entered the public portion of the building. Some animals died in the ducts, causing an unpleasant odor.

72. During the 2012-13 school year, the LRSD Operations and Maintenance Department LRSD did not follow up on more than 100 "work orders" concerning facility and grounds problems  at the Cloverdale Middle School, submitted by the School's principal.

73. In 2013-14, the total enrollment of the Cloverdale Middle School was 654; there were 490 black students [74.9%], 22 white students [3.4%] and 142 other students [21.7%]. The setting continued to be marked by disrepair and squalor, as evidenced by: many exposed electrical outlets; bad odors in several areas, including classrooms; noticeable mold in various classrooms; water dripping from ceilings in several classrooms, the cafeteria, and the in-school suspension room on the stage; broken furniture in several classrooms; insects in the halls and classrooms, worms observed on a daily basis in classroom 34 on the floor and on shelves on the rear wall; cockroaches present in many separate locations; missing ceiling tiles exposing insulation and wiring in many classrooms and  hallways; holes in ceiling of breezeway; cracks in walls and ceilings; dirty and non-working lockers in sixth grade building; thick brown liquid dripping from the ceiling down walls in several places in sixth grade building.  See photographs of the

Cloverdale School attached to this Complaint. [Exhibit 3]

74. In 2013-14, the Henderson Middle School had total student enrollment of 727; there were 610 black students [83.9% black students], 32 white students [4.4% white students], and 85 other students [12.2% other students]. Many areas of the school, including classrooms and the library, lacked natural lighting. The interior of the school was dingy and in need of painting. Some restrooms were subject to flooding and in need of renovation. The School did not have an auditorium.

75. Similar facility issues arose at other schools during 2013-14: McClellan High School [3.1% white students] [many classrooms extremely cold during the winter]; Baseline Elementary School [3.5% white students] [all rooms did not have heat and air vents, causing students to experience coldness on a daily basis during the winter]; Washington Elementary School [2.3% white students] [bug and rat issues].

76. On multiple occasions beginning in 2013 the LRSD Superintendent at the time, Dexter Suggs, identified the construction of a new middle school in the far western part of the LRSD as his first priority. The occasions of this advocacy by Dr. Suggs included meetings of the LRSD School Board.

77. The Roberts Elementary School, constructed in the far western area of the LRSD, greatly exceeds in quality all other LRSD schools. The LRSD Superintendent expressed a priority for the construction of another high quality school in the same area of the system. These actions and the condition of schools serving black students show that the LRSD gave greater priority to its white student population and to attracting white students not attending the public schools of the LRSD, than it did to addressing the manifest facility needs of schools with high black and other minority enrollments.

17

78. Federal and Arkansas law have required a program of standardized testing  to assess whether or not students were/are making satisfactory progress in mastering curriculum in several  areas. The results allow this determination to be made for each school and, separately, for different groups of students in each school, for example, racial groups. When test results show a lack of satisfactory progress, a school receives a classification designating this fact, with the particular classification in some instances dependent on the number of years of unsatisfactory test results.

79. In the following instances, LRSD schools, discussed above in paragraphs 63, 64, 65, 66, 72, 73, 74 and 75 received classifications evidencing unsatisfactory test results:

Cloverdale Middle school – 2010-11 ["State -Directed year 8"]; 2012-13 ["State-Directed Needs Improvement -Priority School"]; 2013-14 ["State-Directed Needs Improvement- Priority school"]; 2014-15 ["State-Directed Academic Distressed"].

Dunbar Middle School – 2010-11 ["State-Directed Year 7"];2011-12 ["State-Directed Year 8"]; 2012-13 ["Needs Improvement – Focus School"]; 2013-14 ["Needs Improvement – Focus School"]; 2014-15 ["Needs Improvement- Focus school"].

Henderson Middle School –2010-11 ["State-Directed Year 7 "]; 2011-12 ["State-Directed year 8]";  2012-13["State Directed Needs Improvement  Priority School"];   2013-14  ["State-Directed Needs Improvement – Priority School"]; 2014-15 ["State-Directed Academic Distressed"].

80.  Arkansas law required the LRSD to prepare in 2015 a "Facility Preliminary Master Plan." The required "narrative" section of this Plan [Tab 6] contains the following content [at 1]:

The Little Rock School District recognizes the positive relationship that exists between school conditions and student achievement and behavior. Facility condition may have a

stronger effect on student performance than the influences of family background, socioeconomic status, school attendance and behavior combined. Students are more likely to prosper when their environment is conducive to learning. Well-designed and maintained facilities send a powerful message to kids about the importance a community places on education.

Students and staff thrive in an orderly, clean and safe environment. Classrooms that are well ventilated, suitably lighted, and properly maintained actually facilitate learning. Poor air quality, on the other hand, negatively affects alertness and results in increased student and teacher absences, which can have a corresponding impact on student achievement. Moreover, appropriate facilities maintenance extends the life span of older facilities and maximizes the useful life of newer facilities. Thus, a facilities maintenance plan contributes to both the instructional and financial well-being of an education organization and its community.

B.  The Creation of the "STEM Academy" in the Former Forest Heights Middle School Facility

81. Through the 2013-14 school year, the LRSD operated the Forest Heights Middle School  [grades 6 to 8] at the edge of the Heights neighborhood, north of Interstate Highway 630. This is an upper middle class, mostly white neighborhood.

82. In the period from August 11, 2006 through January 31, 2014, the LRSD completed at least 14 facility projects at this school site. Demolition and construction produced a new building totaling 11,285 square feet in 2007. Construction produced a new building with 11,000 square feet in 2008. The District completed an "Addition/Renovations" project at the site in 2009.

83. In 2013-14, the total enrollment of Forest Heights Middle School was 580, consisting of  84.5 % black students [490], 8.6% white students [50], and 6.9% other students [40].  LRSD reported that there were 169 black students in the sixth grade and 169 black students in the seventh grade. These students would have been able to move on to the seventh and eighth grades in the School in 2014-15, had its longstanding grade structure and mode of organization continued without change.

84. Prior to the 2014-15 school year, the LRSD converted the Forest Heights facility to a "STEM Academy," serving grades kindergarten through eight. The LRSD collected information on applicants to the school from an application form ["Optional Enrollment Request Form" ], a "Recommendation Form," an "Interest-Based Survey" [completed by students applying for entry in grades two through eight], a copy of the student's report card [for applicants for grades two through eight], and "standardized test scores" [for applicants for grades two through eight] . The LRSD used this information, much subjective, to select students to attend the STEM Academy in 2014-15.

85. The LRSD spent an additional $1,800,000 to prepare the Forest Heights building to serve as the STEM Academy in 2014-15.

86. In 2014-15, the total enrollment of the Forest Heights STEM Academy was 696. There were 398 black students [57.2%], 215 white students [30.9%], and 83 other students [12.0%].

87. The enrollment of the Forest Heights facility in 2014-15 was marked by increases of 165 white students  and 43 other students, as well as a decrease of  92 black students – even though the grades housed in the facility increased from three to nine.

88. In 2014-15, there was a total of 139 black pupils in grades 7 and 8 of the STEM Academy.  Therefore, of the 338 black sixth and seventh graders referenced in paragraph 83, enrolled in the Forest Heights Middle School in 2013-14, at least 199 were required to attend other middle schools in 2014-15, rather than the high quality facility now housing the Stem Academy.

89. At least 100 of the black students removed from the Forest Heights Middle School facility were reassigned to Henderson Middle School for the 2014-15 school year.

These were largely students with deficient test scores. On May 1, 2014, during the 2013-14 school year, the Arkansas Department of Education had notified the LRSD that Henderson "met the criteria for being classified in academic distress." On July 10, 2014, the State Board of Education classified Henderson "as being in academic distress."  Thus, to benefit white students, the LRSD enhanced the academic challenge already faced by Henderson's administrators and teachers.

90. The facility housing the Forest Heights STEM Academy is far superior to the Henderson Middle School facility. See paragraph 74.

91. In 2013-14, the enrollment of the Forest Heights Middle School, serving grades 6-8,  included 107 students in need of special education. In creating the STEM Academy, the LRSD reduced the special education population in grades 6 to 8 to 14 students.

92. The STEM Academy is the only K-8 school in the LRSD.

C. The Providing of Computer Capacity in a Racially Discriminatory Manner

93. In 2014-15, the LRSD provided individual computers, without charge, to all students in the following schools: Forest Park Elementary, Jefferson Elementary, Pulaski Heights Elementary,  Roberts Elementary, Terry Elementary, and STEM Academy.

94. When all LRSD schools are ranked by their percentage of white enrollment in 2014-15, from the highest to the lowest percentage of white enrollment, the schools listed in the preceding paragraph had the following ranks: Forest Park Elementary [#1]; Jefferson Elementary [#2]; Roberts Elementary [#3];   Pulaski Heights Elementary School [#4]; Forest Heights STEM Academy [#7]; Terry Elementary [#12].

95. In 2014-15,  only 5 LRSD schools serving grades K-5 or 9-12 were not eligible to receive federal Title I funds due to the income levels of the families of students attending

the schools. Three of these schools were among the 6 schools in which students received a computer at no cost. These schools were Forest Park Elementary, Jefferson Elementary, and Roberts Elementary.

96. At the beginning of the 2014-15 school year, at the Dunbar Middle School, students in classes teaching computer skills had available only cardboard keyboards for use in learning keyboarding skills. When computers were received, they were used, not new. Finally, even these computers remained in boxes until the delayed arrival of LRSD technical staff to activate them. In 2014-15, the Dunbar Middle School enrolled 786 students, 671 black students [85.2%], 48 white students [6.1%], and 67 other students, mostly Hispanic [8.5%].

97. A new technology course was to begin in the Henderson Middle School at the start of the 2014-15 school year. The computers for this course did not arrive until October 2014.  In 2014-15, the total enrollment of the Henderson Middle School was 784; there were 638 black students [81.4%], 47 white students [6.0%], and 99 other students, mostly Hispanic [12.6%].

D. High School Attendance Zones Promoting Segregation of Students

98. In the period addressed in this Complaint, the LRSD has had five high schools offering grades 9 to 12.  In approximately 2004, under the active leadership of Baker Kurrus as school board president, LRSD established attendance zones for its five high schools, Central High School, J. A. Fair High School, Hall High School, McClellan High School, and Parkview High School. Parkview has also been a magnet school, featuring an arts and science program.

99. The LRSD School Board adopted attendance zones gerrymandered to maximize

22

the attendance of white students at Central High School. The attendance zone for Central

High has included an area non-contiguous to the main part of the Central High zone.

This separate area was part of the Hall High School zone before the racial

gerrymandering and home to a minimum of 100 white high school students.

100. In every school year since 2004-05, Central High School has enrolled more

white pupils than the four other high schools combined.

101. In 2014-15, high schools in the LRSD enrolled the following numbers of white

students: Central High School [727]; Parkview High School [261]; Hall High School [63];

J.A. Fair High School [45]; and McClellan High School [28].

102. Since 2004-05,  the LRSD has maintained Central High School with 11

portable buildings, containing 20 classrooms, having a stated capacity of 500 students.

There has been a total of only 9 portable buildings at three other high schools, 3 each at

J. A. Fair, Parkview, and Hall. These buildings have had a total of 16 classrooms, with an

identified capacity of 400 students.

103. The LRSD has maintained a disproportionate number of portable classrooms

at Central High School to facilitate the concentration of white high school students at

that location.

104. The LRSD has utilized portable buildings beyond the allowable period

established by Arkansas Department of Education [ADE] regulations, absent the

securing of a waiver.

E. The Numbers of Advanced Placement Courses Offered at High Schools

105. In 2014-15, high schools in the LRSD offered the following numbers of

advanced placement courses: Central High School [31]; Parkview High School [21]; Hall

High School [17]; J.A. Fair High School [12]; and McClellan High School [12].

106. The LRSD operates Metropolitan Career Technical School. The LRSD allows a student attending one of the five LRSD high schools to travel to Metropolitan to take a course available only at that location. The LRSD provides school bus transportation to facilitate such choices by its high school students.

107. The LRSD does not allow a student enrolled in one of its high schools other than Central High School to attend Central to enroll in an advanced placement course offered at Central High, that is not his/her home school.

F. Participation in Pre-AP and AP Courses at Central High School

108. Central High School offers pre-Advanced Placement courses. In 2014-15, the School offered 24 such courses, in 18 subject areas.

109. In 2014-15, the number and percentage of each group of students enrolled in one or more pre-advanced placement courses at Central High School was 612 black pupils [51.5% of all black females enrolled in the School and 34.2% of all black males enrolled]; 501 white pupils [69.1% of all white females enrolled in the School and 65.2% of all white males enrolled in the School]; and 166 other pupils.

110. In 2014-15, the enrollment of Central High School was 57.0% percent black, 29.2% percent white, 4.3% percent Hispanic, and 7.6% percent Asian.  In that school year, the number and percentage of each group of students enrolled in one or more Advanced Placement courses at Central High School was 255 black pupils [18.9 of all black females enrolled in the School and 11.2% of all black males enrolled]; 393 white pupils [62.3% of all white females enrolled in the School and 53.0% of all white males enrolled]; and 199 other pupils.

111. In the LRSD, some students in elementary grades are identified ["tagged"] as Gifted and Talented and provided some differentiated instruction. In 2014-15, at Central High School the students enrolled included 312 black pupils, 297 white pupils, 39 Hispanic pupils, and 75 Asian pupils, earlier identified as Gifted and Talented.  In 2014-15, in Central High School, the following numbers   of students of each group earlier identified as Gifted and Talented enrolled in one or more AP courses:  205  black students [65.7% percent of the black Gifted and Talented students]; 386  white students [100% of white GT students and 89 white non-GT tagged students];  41 Hispanic students [100% of Hispanic GT students and 2 Hispanic non-GT tagged students]; 184 Asian students [100% go Asian students tagged GT and 106 Asian non-GT students].

G.  The Hamilton Academy

112. Since 2006-07, the LRSD has operated the Hamilton Alternative schools in two sections, one serving grades 6 to 8 and the other grades 9 to 12. It is now described as Hamilton Academy. Students are transferred to Hamilton for discipline reasons for a minimum of 45 days. Almost all students sent to Hamilton are black students.

113. In 2012-13, 40 students were transferred to the middle school section of Hamilton, 35 black students [87.5 %], 3 white students [7.5 %], and 2 other students [5 %].  In 2013-14, 33 students were transferred to the middle school section of Hamilton, 32 black students [97 %] and 1 white student [3 %].

114. In 2012-13, 208 students were transferred to the high school section of Hamilton, 199 black students [95.7 %], 6 white students [2.9 %], and 3 other students [1.4 %]. In 2013-14, 165 students were transferred to the high school section of the Hamilton Academy, 159 black students [96.2%] 4 white students [2.5%], and 2 Hispanic students

25

[1.3%].

115. The LRSD allows Hamilton to operate in a chaotic manner. General standards for attendance at school, tardiness, and exiting a classroom during a lesson are enforced in a lax manner.

116. The Arkansas Department of Education classifies Hamilton as an alternative learning environment [ALE]. The Department's standards set forth program approval criteria. In 2014, the Arkansas Department of Education determined that the LRSD's operation of the Hamilton program did not comply with the Department's standards in the following areas: placement and exit rules; provision of a supportive/non-punitive ALE program; availability of counseling; curriculum and instructional materials; and technology. The Department required the LRSD to redesign its program.

117. One element of the LRSD's response to the ADE's order to remedy the deficiencies found by ADE was to relocate the middle school-level ALE program to system middle schools in 2014-15, including Henderson and Cloverdale. In July 2014, these schools had been classified as in "academic distress". The LRSD's relocation choices enhanced the already challenging circumstances faced by the faculties and staffs of these two schools.

H.  Racial Segregation of Faculty

118. Since 2004, the racial makeup of the faculties of the LRSD has been disproportionately white in those schools having the highest percentages of white students.

119. In 2014-15, the racial make-up of the faculty serving the LRSD's 31 elementary schools consisted of   298 black persons [32.1 percent of the 928 l elementary

level teachers],  618 white persons [66.6 percent],   and 12 other persons [1.3 percent].

120. In 2014-15, the faculty allocation by racial group for the 6 LRSD elementary schools with the highest proportions  of white student enrollment was as follows.

| School | W student % | W Fac.[%] | B Fac.[%] | Other Fac.[%] |
|---|---|---|---|---|
| Fair Park | 47.8% | 8  [88.9] | 1  [11.1%] | -- |
| Forrest Park | 75.5% | 24 [96%] | 1  [4%] | -- |
| Fulbright Elem. | 42.2% | 33 [97.1] | 1  [2.9%] | -- |
| Jefferson Elem. | 70.4% | 20 [80%] | 5  [20%] | -- |
| Pulaski Hts. Elem. | 47.4% | 17 [85%] | 2  [10%] | 1[5%] |
| Roberts Elem. | 55.8% | 46 [93.9%] | 3 [6.1%] | -- |

121. Each of the above schools is located in the North and West sections of the LRSD.

122. In 2014-15, the racial make-up of the faculty serving the LRSD's 6 middle schools consisted of 229 black persons [46.2% of the total pool of 496 persons], 260 white persons [52.4 percent], and 7 other persons [1.4 percent].

123. In 2014-15, the Pulaski Heights Middle School had an enrollment 38.4% white, the highest proportion of white students among LRSD middle schools.  This school's faculty was 68.2% white. In 2014-15, the Forest Heights STEM Academy offered grades 6-8, as well as grades K-5. Its total enrollment was 30.9% white and its faculty 69.5% white. The enrollments of the 5 remaining middle schools ranged from a low of 3.1% white [Cloverdale] to a high of 21.3% white [Mann]. The proportion of white faculty in these 5 schools ranged from a low of 41 % white [Henderson Middle School] to a high of 53.7% white [Mabelvale Middle School].

124. In 2014-15, Central High School and Parkview High School had the highest proportions of white student enrollment among the LRSD's five high school [grades 9 to 12].  The Central High School enrollment was 29.2% white and the Parkview High School

27

enrollment 25.3% white.  In 2014-15, the high school faculty in the LRSD was 59.7% white.

125. In 2014-15, Central High School and Parkview High School had the two faculties with the highest proportions of white faculty members, 69.4% at Parkview and 64.2 % at Central. In 2014-15, McClellan High School had student enrollment only 3.1% white. In that year, McClellan had the lowest proportion of white faculty members of the 5 LRSD high schools, 45.8% white.

126. At each level in the LRSD, the schools with the highest proportions of white student enrollment have had the highest proportions of white faculty.

I. Discriminatory Implementation of the School Improvement Grant Program

127. The budget of the School Improvement Grant program [SIG] for McClellan High School included funds for off-campus activities, designed to improve student motivation to learn and to complete the high school program.  Central office administrators of the LRSD cancelled, in an arbitrary manner, activities which had been planned and publicized to students by the McClellan High School staff.

J.  Discriminatory Aspects of the High School Football Program

128. In the school years 2012-13, 2013-14, and 2014-15, the resources provided to the interscholastic football program at Fair High School were deficient compared to the resources available to support the football program at Central High School, the high school with the largest number of white students. Disparities encompassed: uniforms, equipment, the quality of the home football field, and availability of funds to provide meals to players in instances of games distant from Little Rock.  The high school football programs at Hall and McClellan suffered from the same forms of discrimination.

K.  Racially Discriminatory Discipline

129.  LRSD employees have subjected African American pupils to discipline in circumstances in which white pupils are not disciplined.  LRSD employees subject black pupils to the criminal justice system in which white students are not subjected to that system.

130.  The LRSD referral to the judicial system are virtually all African American and Hispanic students. One of the three Pulaski County Juvenile Court judges, Patti James, has addressed in a public forum the LRSD practice of causing students to be placed in the juvenile justice system for ordinary offenses that the schools should address.

131.  Black and minority students have been subjected to many types of racially discriminatory disciplinary practices. Discipline statistics reveal grossly disparate disciplinary consequences by race in the district. In black and minority schools, teachers often curse students, call them derogatory, insulting names, and make unnecessary referrals for discipline. These students are disproportionately, discriminatorily channeled into special education, alternative learning environments, and ultimately placed in the criminal justice system for concocted reasons.

L.  Racially Discriminatory Allocation of Resources

132.  The school district provides grossly insufficient resources and educational materials for the predominantly black and minority students. Educators are not given timely access to teachers' editions of textbooks or online grade book software.

M.  Racially Discriminatory Assignment of White to Central and Parkview

133.  Black and minority students from within the district are given lower priority for assignment and/or admission to preferred schools of the district than white students from outside the district. One or more plaintiffs have sought to transfer from SW schools labeled needs improvement,

29

priority or distressed, but have not been able to do so. White students from North Little Rock, Pulaski County, Bryant and Cabot School Districts have been allowed to have priority enrollment at Central and Parkview High Schools.

N.  Pervasive Discriminatory Effects

134. In the period addressed in Part I. of this Complaint, intentionally discriminatory actions and their effects have been pervasive in the system, as shown by paragraphs A. through M.

II.  Claims on Behalf of Joy Springer and Jim Ross and the Black Parents and Students Based upon the Takeover of the District and the Ouster of the LRSD School Board

135. Plaintiffs restate the allegations of paragraphs 1 through 118 of this Complaint.

136. In their election campaigns and after assuming office, Plaintiffs Joy Springer and Jim Ross exercised their constitutional rights to freedom of speech by advocating for equal educational opportunity and against the continued operation of the LRSD in a manner favoring white persons and disfavoring black persons. After they took office, changes in the actions of the LRSD school board bearing upon racial equity were observable. An intention to mute their exercise of their Constitutional right to freedom of speech and to frustrate the change in the direction of the LRSD, which their actions had helped to forge, played a substantial role in the decision of the Arkansas State Board of Education to take over the LRSD and to displace the entire LRSD School Board, including Ms. Springer and Mr. Ross, who had been in office for only 4 months and 2 days as of their ouster. The State Board ousted the LRSD School Board, including Plaintiffs

Springer and Ross in a manner violating their right to due process of law, as guaranteed by the Fourteenth Amendment to the United States Constitution. Their ouster will frustrate the rights of the plaintiff students to enjoy equality of educational opportunity in the operation of the LRSD. The State Board's action, known throughout the Little Rock area and the State, created and constitutes a badge of slavery, violative of the Thirteenth, Fourteenth, and Fifteenth Amendments.

A. <u>The Initial Arkansas Standards Concerning "Academic Distress"</u>

137. In 2003, the Arkansas legislature enacted A. C. A.. Secs. 6-15-429 and 430. This legislation described the authority of the Arkansas State Board of Education regarding "[a] public school district in academic distress."

138. Until 2014, by regulation, the State Board defined a "school district in academic distress" as one "in which 75% or more of its students perform at the 'below basic' performance level on the criterion-referenced assessments administered in that district." The LRSD always greatly exceeded that standard. At the time of state takeover, district wide proficiency rates were 65% in literacy and 60% in math.

B. <u>The Opening and Operation of the E-STEM  Public Charter School in Little Rock [2008/2014-15]</u>

139. In 2008, Defendant Vicki Saviers, now a member of the Arkansas Board of Education,  played a lead role in the opening of the E-STEM Public  Charter School located in downtown Little Rock [hereafter ESTEM]. She served on its Board of Directors until she became a member of the State Board  in 2010. The Arkansas Department of Education and the State Board approved three charters applied for by the founders of ESTEM; these charters were for grades K-5, 6-8, and 9-12, with an allowable maximum

enrollment of 856. ESTEM staff actively recruited students enrolled in the LRSD.

140. In 2008-09, the LRSD enrollment was 21.9% percent white students, 68.1%% black students, and 9.9% other students. In contrast, the enrollment of ESTEM was 38.0% percent white students, 53.9% black students, and 8.1% other students. In 2010-11, the enrollment of the LRSD was 21.1% white students, 66.6% black students, and 12.3% other students. In contrast, the enrollment of ESTEM was 40.5% white students, 47.7% black students, and 11.9% other students.

141. In 2008-09, the special education population in the LRSD included 2,542 students, 10.0 % of the total enrollment. The special education population at ESTEM was 8 of 358 students, less than 1%. In 2010-11, the special education population in the LRSD included 2,587 students, 11.0% of the total enrollment. That year, the special education population of ESTEM was 8 of 1,231 students, less than 1%.

142. In 2008-09, the limited English proficient population in the LRSD included 1,455 students, 6.0% of the total enrollment. The limited English proficient population at ESTEM was 4 of 835 students, <1%. In 2010-11, the limited English proficient population in the LRSD included 1,896 students, 7.8%% of the total enrollment. That year, the limited English proficient population of ESTEM was 8 of 1,231 students, <1%.

143. In 2008-09, the free/reduced lunch rate for LRSD was 65.4%.  The free/reduced lunch rate for ESTEM was 39.1%.  In 2010-11, the free/reduced rate for LRSD was 67.4%.  For that same year, the free/reduced lunch rate for ESTEM was 34.0%.

144. Public school systems are required to provide an alternative learning environment for students with discipline issues.  ESTEM requested and the ADE granted

a waiver freeing ESTEM from complying with this requirement.

145. In 2011, following Ms. Savier's appointment to the State Board  she made a motion to approve the ESTEM charter school's application to increase its maximum allowable enrollment by 102. The State Board approved this motion.

146. Under Arkansas law, State funding for education follows a student from the public system to a charter school. The LRSD lost approximately $1,000,000 for each 100 of its students who transferred to ESTEM from the LRSD. This amounted to about $8,350,000 in 2008-09 and $12,310,000 in 2010-11.

147. The operation of the ESTEM Charter School continues to negatively impact the LRSD budget.  For example, the approximate funding loss of the LRSD was $15,000,000 in 2014-15.

148. In 2015, E-STEM was approved by other state actors in concert with the ADE to enlarge its enrollment by 5,000 high school students from the LRSD beginning in the 2016-2017 school year. The LRSD high school enrollment is approximately 6,500 students. Such enrollment would result in closing all Little Rock high schools with the exception of Central. The approximate funding loss will exceed $50 million.

C.  The Period of "State Directed" Schools in the LRSD [2009-10 and Thereafter]

149. In the school years 2009-10 through 2011-12, 11 schools in the LRSD were classified as "state directed, " due to periods in which their enrollees' outcomes on Arkansas criterion-reference tests had failed to satisfy the requirements of the federal "No Child Left Behind" law. These schools included Cloverdale Middle School, Henderson Middle School, J.A. Fair High School, Hall High School, and McClellan High School. ADE later classified these schools and Baseline Elementary School as in "academic

distress.

150. The ADE had the authority to implement a broad range of measures in a school classified as "state directed." These included: replacing all or most of the staff, including the principal; extending the school day or year; creating a school within a school to address a particular need; providing information and direction on best practices; implementing a systematic assessment system; implementing proven academic programs; providing leadership training; analyzing data; providing professional development on analyzing and using data to improve student performance; facilitating a leadership team process; helping to design an instructional coaching plan for deficit areas of math and literacy; designating a school improvement specialist for each school; designating a school improvement director for the district; and many other steps.

151. ADE failed to utilize these measures in the LRSD in a competent and consistent manner.

D. The State Board's Seeking and Securing Waivers of Federal Legal Mandates And Subsequent United States Department of Education Monitoring of Compliance with the Conditions of the Waivers

152. On June 29, 2012, Arkansas received approval of a waiver of certain requirements of federal law adopted to reduce achievement gaps among racial sub-groups by ensuring that all students achieved proficiency on States' criterion referenced testing by 2014. Extensions effective on July 3, 2014 and August 6, 2015 continued the waiver in effect. As a condition of approval of the waiver, Arkansas was to implement plans focused on addressing achievement gaps by improving the quality of instruction. Under the waiver, Arkansas is no longer held accountable for ensuring that African American students and each other racial subgroup makes yearly progress toward a goal of 100

percent proficiency. The waiver only holds the ADE accountable for groups that are not race-specific.

153. Arkansas' waivers included implementation of School Improvement Grants [SIG] as a primary intervention for Priority schools to remediate achievement of non-proficient students. During 2013, on two occasions, US DOE cited the ADE's lack of implementation of SIG grants that negatively affected Priority schools in the LRSD, including 5 of the 6 schools later identified by the State Board as "distressed schools." In January of 2013, a team of US DOE monitors visited the ADE and a sample of SIG school campuses. A monitoring report dated January 28-31, 2013 included three findings of specific areas where the ADE lacked full implementation of the LRSD SIG grant. These three omissions by ADE to fully implement the SIG grant contributed to the lack of progress at the schools.

154. The findings by the US DOE were: [a] The ADE has not ensured that the LRSD is implementing a system of rewards that meets the requirements of the SIG program. At this time, student achievement is not a significant part of a system of incentives for teacher and leader performance. [b] The ADE has not ensured that the LRSD is implementing an evaluation system that includes student achievement growth as a significant factor in evaluating teachers and principals. [c] The ADE has not ensured that schools implementing the transformation model have increased learning time by lengthening the school day, week or year for extra-curricular activities and to allow teacher collaboration as well as for instruction in core content areas per the final requirements of SIG. Later in 2013, during the month of September, US DOE conducted off-site monitoring activities of the ADE's implementation of the ESEA Waiver and again

cited the ADE. This report stated, "ADE is not fully complying with all School Improvement Grants [SIG] requirements. As such ED staff determines that ADE has not demonstrated that this element is carried out consistent   with the principles of and timelines outlined in the document titled ESEA Flexibility."

155. The ADE uses a portion of SIG grant funds to pay salaries of ADE staff members rather than allotting all funds to SIG school activities that would directly impact those students' low achievement.

E. ADE's Delay in Making Available LRSD's Funds from the Federal Title I Program

156. The federal Title I program provides substantial grant funds to local school districts for a wide variety of activities designed to improve the performance of students performing poorly. Title I funds can be used for many supplemental services, such as extended day, week, or year instruction; classroom aides; math, literacy, and behavior interventionists; supplemental reading materials; field trips; and parent workshops.

157. Schools in which 50 percent or more of the students enrolled are eligible for free or reduced price lunch , based upon family income, are eligible to receive Title I funded supplemental services. In 2014-15, only five LRSD schools serving grades K-12 were not eligible for Title I support. Four of these schools were the elementary schools among the LRSD schools with the largest proportions of white pupils, Forest Park Elementary, Jefferson Elementary, Roberts Elementary and Fulbright Elementary. Central High School was the fifth such school.

158. In 2014-15, and in almost all other school years addressed in this Complaint, ADE did not make the LRSD's share of Title I funds available until much of the school year had elapsed. This delay affected adversely the ability of many schools to address the

36

well-documented educational needs of large numbers of black students.

159. The Title I-eligible schools adversely affected by the delayed distribution of Title I funds included the 6 LRSD schools classified as "in academic distress" by the State Board on July 10, 2014. These schools are Baseline Elementary, Cloverdale Aerospace Tech Charter, Henderson Middle School, Hall High School, J. A. Fair High School, and McClellan High School.

160. In 2014-15,  these schools were composed almost entirely of black and other minority students [enrollments ranged from 94% black and other minority at Henderson Middle School to 96.9% at Cloverdale Middle School].

161. The Title I-eligible schools adversely affected by the delayed distribution of Title I funds included many other schools with high proportions of black student enrollment. These schools included all but the five Northwest elementary schools listed in paragraph 120.

162. A Title I program serves as a critical element of a district's effort to reduce racial achievement disparity.

F. The Revised State Statute Concerning Districts and Schools in Academic Distress [2013]

163. In 2013, the Arkansas legislature amended, extensively, A.S.A. Secs. 6-15-429 and 6-15-430. One significant change added the category of "a public school . . . in academic distress . . . ." The legislation mentioned a broad range of steps available for consideration by the State Board in the instance of a district or a school classified as in academic distress, including many actions less sweeping than taking over a school district and/or ousting all of its elected school directors. For example, if the amended

legislation authorized the step of ousting school directors in the instance of schools [but not a district] in academic distress, it authorized replacing some but not all school directors.

G. <u>The Selection of Dexter Suggs as LRSD Superintendent [2013]</u>

164. In March 2013, Dr. Morris Holmes completed his service as Superintendent in the LRSD. The LRSD employed the firm of McPherson-Jacobson to identify candidates worthy of being interviewed for the position of Superintendent. After a vetting process, the consultants identified three persons, all of whom were serving districts with multi-racial populations. They were an Associate Superintendent for Accountability in a Georgia district; a Superintendent in an Illinois school; and a Superintendent in an Ohio district.

165. The consultants did not identify Dexter Suggs as a candidate for the final interview and selection process.

166. Dexter Suggs was one of the four persons interviewed in the final stage of the process for selecting a new superintendent. In the period prior to his selection to be the be the next superintendent, Suggs communicated to the white community in west Little Rock that, regarding facilities, he would give first priority to the construction of a middle school in West Little Rock. He did so before gaining adequate familiarity with the condition of facilities throughout the system.

H. <u>The Approval and Operation of the Quest Middle School of West Little Rock [2013-2015]</u>

167. In 2013, The ADE "Charter Authorizing Panel" approved an application for the operation of the Quest Middle School of West Little Rock [Quest School]. The School was authorized to offer grades 6 to 12, with a maximum enrollment of 490. The school

was to be located in the Chenal Valley, a majority white, upscale section of west Little Rock.

168. On January 10, 2014, the State Board reviewed the approval of the Quest School's application, following appeals of the Panel's approval by the LRSD and the Pulaski County Special School District. Counsel for the two school districts challenged the contention that the school would enroll a significant percentage of minority and low-income students. They noted its location, residential patterns, and the lack of a plan and funds to transport these students to the location of the School. Counsel for the LRSD noted that the possibility of a new public middle school in West Little Rock had not been foreclosed. State Board member Vicki Saviers asked LRSD counsel how long it would take to open a public middle school in west Little Rock. The State Board affirmed the action of the Charter Authorizing Panel by the narrow margin of 5 to 4. The majority included Ms. Saviers and Board member Diane Zook, whose nephew, Gary Newton, had made a presentation supporting approval of the Quest School.

169. The Quest School opened in the 2014-15 school year, serving grades 6 to 8. In 2014-15, the LRSD enrollment was 17.8% percent white students, 65.7% black students, and 16.5% other students. In contrast, the enrollment of Quest School [grades 6 through 8] was 62.6% percent white students, 22.8% black students, and 14.6% other students.

170. In 2014-15, the special education population in the LRSD included 2,669 students, 11.4% of the total enrollment. The special education population at the Quest School was 0 of 166 students.

171. In 2014-15, the limited English proficient population in the LRSD included 2,666 students, 11.4 % of the total enrollment. The limited English proficient population

of the Quest School was 0 of 166 students.

172. In 2014-15, the free/reduced lunch rate for LRSD was 65.4%.  The
free/reduced lunch rate for Quest was 6%.

173. Quest's first year of operation was 2014-15; therefore, no test score data are
available for comparison.

174. Public school systems are required to provide an alternative learning
environment program for student with discipline issues. The Quest School requested and
the ADE granted a waiver, as it had done for E-STEM, freeing the Quest School from
complying with this requirement.

175. Under Arkansas law, State funding for education follows a student from the
public system to a charter school. The LRSD lost approximately $1,000,000 for each 100
of its students who transferred to the Quest School from the LRSD. This amounted to
about $1,660,000 in 2014-15.

176. The action of the ADE and the State Board in approving the Quest School, a
public school, constituted intentional discrimination promoting segregation of students by
race.

I. The Special Committee to Review Chronically Underperforming School Districts
   [March 2014]

177. The minutes of the State Board meeting of March 28, 2014, include the
following content:

Special Committee to Review Chronically Underperforming Districts
Chair Gullett appointed a special committee to study chronically underperforming school
districts. She requested Ms. Saviers, Ms. Newton, and Mr. Ledbetter serve on the special
committee, with Ms. Saviers serving as chair of the committee. Dr. Kimbrell requested
the committee initially focus on the academic distress districts. [Emphasis added]

The special committee will bring a report to the Board meeting in April regarding Lee

County School District and Strong-Huttig School District.

Dr. Barth moved, seconded by Ms. Zook, to approve the appointment of a special committee to review chronically underperforming districts. The motion carried unanimously.

178. The Defendant Vicki Saviers, designated Chair of the Special Committee, had by her active participation in the opening and the operation of the ESTEM charter school and her participation in the approval of the Quest charter school evidenced an intention to favor the white community in the LRSD.

J. The New Definition of "Academic Distress" for a District and a School and the LRSD [2014]

179. At some point before May 1, 2014, ADE and the State Board purported to amend ADE Rules to provide definitions of a school district and a school in "academic distress". ADE and the State Board did not adhere to the requirements for adopting a new standard. Therefore, the new rule was never lawfully in effect. See Part III of this complaint. The purported rule identified a "public school district" in "academic distress" as including one "in which 49.5% or less of its students achieve proficient or advanced in math and literacy on the state-mandated criterion referenced assessments administered in that district for the most recent three (3) year period; . . ." [Sec. 3.02.1 -- 3.02.1.1] Similarly, ADE identified a 'public school" "in "academic distress" as including one "in which 49.5% or less of its students achieve proficient or advanced in math and literacy on the state-mandated criterion referenced assessments administered in that district for the most recent three (3) year period; . . ." [Sec. 3.02.2 -- 3.02.2.1]

180. Under the full text of the Rule proposed by ADE and adopted by the State Board, no school district or school could be identified as in "academic distress" based, alone, on the performance of its African American and other black students. This aspect

of the standards protected and prevented many majority white school districts and schools from being identified as in "academic distress." ADE and the State Board thereby brought forward their definitions of "academic distress," discrimination parallel to that inherent in the 2012 waiver. By eliminating the subgroup rule, school districts no longer had to account for racial disparities in student achievement.

181. On May 1, 2014, the ADE notified Superintendent Dexter Suggs that 6 LRSD schools "met the criteria for being classified in academic distress." The notice letter informed the Superintendent that the LRSD had the right to appeal the identification of these schools as in academic distress. These schools and the proportion of their students meeting the proficiency standard were --- Baseline Elementary School [48.251% of students]; Cloverdale Middle School [41.470%]; Henderson Middle School [46.049%]; Hall High School [40.642%]; J.A. Fair High School [43.304%]; McClellan High School [40.748]; Accelerated Learning Program [9.52%]; W.D. Hamilton Learning Academy [2.31%]. The May 1, 2014 letter from ADE was not mailed to the members of the LRSD School Board by the ADE nor shared with them by Dr. Suggs.

182. All 26 Arkansas schools, which ADE at this time identified as meeting the criteria for being in "academic distress", enrolled a majority of African American and other black students.

183. Regarding the May 1, 2014 letter: [a] The definition of "academic distress' was not adopted lawfully; [b] In developing the individual school percentages, ADE and the State Board gave notice using, in part, 2012-13 test results, well beyond the 30 day period specified in ADE Rule 10.04.2 [ 'within thirty (30) calendar days after the release of the state assessment results by the Department…"];

[c] The ADE could not lawfully identify LRSD schools as meeting the criteria for classification as in "academic distress."

184. The State Board did not classify the Little Rock School <u>District</u> as being in academic distress.  Data for the three school years utilized by the State Board in classifying <u>schools</u> in academic distress shows that the proportion of LRSD students testing proficient or advanced in literacy was 68.12%, 67.0%, and 68.56%; the comparable figures for math were 60.06%, 59.08%, and 61.58%, As shown, the scores in the LRSD well-exceeded those required to identify a district as in academic distress.

185. On May 15, 2014, Superintendent Suggs appealed the designations of "academic distress" for Hamilton Learning Academy.  He did not provide the members of the LRSD School Board a copy of his letter appealing these two "academic distress" designations.

K. <u>The Candidacies and Campaigns of Joy Springer and Jim Ross</u>
   <u>July 2 through September 16, 2014</u>

186. On July 2, 2014, Plaintiffs Joy Springer and Jim Ross each filed to run for the office of School Board member of the LRSD. Public announcements of their actions followed within 24 hours.

187. Plaintiff Joy Springer has been a resident of Little Rock for 38 years. She has worked in the John W. Walker Little Rock law firm as a paralegal for 25 years. During that entire period, she participated in the representation of the Joshua Intervenors in the Pulaski County school desegregation case, involving the LRSD, the PCSSD, the NLRSD, and ADE. In her work involving the LRSD, she spoke to hundreds of parents and students about their experiences in the LRSD; advocated on many occasions for individual students in meetings and individual hearings; visited all LRSD schools, some

many times; attended over 100 meetings of the LRSD School Board and spoke on a number of occasions; reviewed thousands of documents regarding the LRSD; and, generally, monitored policies and actions of the LRSD bearing on racial equity and responsiveness to the educational needs of African American and other black pupils. Plaintiff Springer has a BSBA degree in General Business from Henderson State University, Arkadelphia, Arkansas; a BSE degree in Elementary Education and a Master's degree in Educational Leadership from the University of Arkansas at Little Rock (UALR). She is a certified teacher for the State of Arkansas, grades 1-8.

188. Plaintiff Jim Ross has lived in LRSD for 40 years. He is employed as an Associate Professor of History at the University of Arkansas, Little Rock. He has a PhD from Auburn University and is a specialist in race, class, and religion in U.S. History. Dr. Ross has served as Co-director of the UALR Social Studies Secondary Education Program for nine years. In this position, he supervises student teachers in the LRSD and other Central Arkansas districts. In this work, Dr. Ross has visited, very frequently, all LRSD high schools and the majority of LRSD middle schools. From 2000 through 2007, Dr. Ross taught United States History in the LRSD's Parkview High School. From 2006 until his election to office, Dr. Ross attended almost all LRSD School Board meetings.

189. In her 2014 campaign for office, Joy Springer utilized the following radio commercial:

> "My name is Joy Springer, I am the candidate for the Little Rock School District Board of Directors, Zone One.
>
> Do you support closing schools such as Carver and Rockefeller in Zone 1?
> I don't. . . .
>
> Do you support placing black males in alternative schools for an indefinite period of time rather than teaching them in a regular school setting?

I don't. . . .

Do you want the schools of Zone 1 to be equal and treated as well as those schools in northwest and west Little Rock?
I do!!!

Do you believe that all children can learn?
I do!!!

If you agree with me, I ask for your vote on September 16th!  . . . . I will speak up and speak out for equal treatment of all Little Rock students regardless of where they live or who their parents are. . .".

190. In her 2014 campaign for office, Joy Springer utilized a leaflet including the following content:

When elected to the Little Rock School District Board, I will insist: . . . .
   •      Upon equal facilities in all neighborhoods . . . .
   *      Upon due process for our children and their parents at all levels so they can remain in school and outside of the criminal justice system

191. In his 2014 campaign for office, Jim Ross utilized a leaflet containing the following content:
            Freedom Saturday

At 11 a.m. on Saturday, June 28, we will meet in the parking lot of Henderson Middle School. Back in the spring, I had the opportunity to spend some time in sixth grade classes at Henderson. Despite its reputation , I know from firsthand experience that Henderson has a lot of great teachers and students who want to excel in school. Inconsistent leadership and years of neglect have demoralized teachers and the community. Rather than face the school's challenges, district leaders have largely ignored the school. But Henderson is our school, and we're meeting there to symbolically reclaim it for our students, teachers, and community. …

Fifty years ago this summer, brave African Americans living in Mississippi and white allies from around the nation started Freedom Schools to empower poor men and women to become active citizens and agents of social change. Fifty years later we declare this Saturday to be Freedom Saturday. There is no greater need in our city than to give every child a first class education . . . .

L. The State Board Meeting of September 11, 2014

192. The State Board met on September 11, 2014. The minutes of the meeting

45

state: "Ms. Saviers requested the special committee on academic distress meet to discuss the list of academic distress schools. Mr. Ledbetter encouraged other Board members to join the special committee." There was no specific mention of the LRSD.

M. Joy Springer and Jim Ross Prevail in the Election

193. On September 16, 2014, the voters in their respective zones elected Joy Springer and Jim Ross to the LRSD Board of School Directors [LRSD School Board].

194. Section 6-13-608(a) of the Arkansas code provides:  "All members of a school district board of directors shall be elected to a term of office of not less than three (3) years nor more than five (5) years  in length . . . ." Plaintiffs Joy Springer and Jim Ross each earned this office in the LRSD for a term of three years in the election on September 16, 2014.

195. A Board of School Directors is granted powers and assigned duties "in order to provide no less than a general, suitable, and efficient system of free public schools." ACA Sec. 6-13-620 [----powers and duties described].

196. By virtue of Ark. Code sections 6-13-608(a) and 6-13-620, Plaintiffs Springer and Ross had property and liberty interests afforded protection by the due process clause of the Fourteenth Amendment to the United States Constitution.

N.  The Work Session Held by the Special Committee on Academic Distress
on October 14, 2014

197. After assuming office, new LRSD  School Board member Joy Springer learned from Board President Greg Adams that the State Board's Special Committee on Academic distress  had scheduled a meeting for October 14, 2014, to discuss the six (6) LRSD schools identified as in "academic distress." Ms. Springer contacted State Board member Vicki Saviers, Chair of the Special Committee, and requested a postponement of

the meeting so that she and Jim Ross, LRSD Board members for only a short time could participate in the discussion. The request for postponement was due to a state law requiring that Ross and Springer attend mandatory training sessions as new school board members. Ms. Saviers declined this request and notified Sam Ledbetter, Chairman of the State Board at this time, of Ms. Springer's request. Mr. Ledbetter became offended by Ms. Springer's request and direct contact with Ms. Saviers. Ms. Springer contacted Ms. Saviers only after the President of the Little Rock School Board, Adams, declined to present her reasonable request to Ms. Saviers.

198. On October 14, 2014, the ADE Special Committee conducted a "work session" to discuss the  schools identified as being in academic distress in the LRSD. The special committee conducted this meeting with regard to only six (6) schools mention in the May 1, 2014  notice; the Accelerated Learning Program and the W.D. Hamilton Learning Academy were not mentioned.    The persons speaking during this session included LRSD Superintendent Suggs, Associate Superintendent Dennis Glasgow, the ADE's lead monitor for the LRSD, several members of the State Board, and six of the seven members of the LRSD Board of School Directors. While speaking during this session, Superintendent Suggs made multiple statements intended to lead to the actions ultimately taken by the State Board, his continuation as the superintendent, takeover of the district, and ouster of the entire LRSD School Board.  State Board members did not ask questions to probe the basis, if any, for Dr. Suggs' statements.  The Special Committee determined that LRSD representatives should return to the Committee after three months to report on progress in implementing the LRSD's plans for the six (6) schools. No mention was made by ADE that LRSD had failed to comply with any rule

regarding state takeover of the district.

    O. The LRSD School Board Meeting on October 23, 2014

    199.  On October 23, 2014, at the LRSD School Board meeting, Plaintiff Joy

Springer presented a statement concerning her approach to fulfilling her school board

duties. She reiterated themes voiced in her campaign. These included:

> "Equal facilities and resources in all neighborhoods; That students in all schools
> would achieve equally and at high levels; That due process would be provided to all
> students and their parents at all levels so that students would remain in school
> and outside the criminal justice system."

    200. At the same  LRSD School Board meeting on October 23, 2014, Plaintiff Jim

Ross presented remarks including the following content:

. . . .

> "We have systematically betrayed African American, Hispanic, and poor white kids
> for 60 years. At first it was malicious and involved withholding resources from
> these children and the schools where we placed them. Even after the courts forced
> us to equalize spending, We refused our responsibility to educate every child.
> Sometimes we continued withholding resources, but most of the time we just threw
> money at problems without research-based curriculum or practices. We withheld
> quality teachers and administrators from high needs schools and refused to
> monitor programs or hold people accountable for failures".

. . . .

    201.  At the School Board meeting on October 23, 2014, Plaintiff Joy Springer

initiated a discussion on the LRSD's policy on evaluation of programs with regard to

educational effectiveness. For more than 10 years, the District's policy had required that

the evaluation address among other questions the following:

> "Has this curriculum/instruction program been effective in improving and
> remediating the academic achievement of African American students?"

In accord with this policy, evaluations were conducted by the Program Research and

Evaluation Department (PRE), a Department independent of the LRSD department responsible for implementation of academic programs. The District's revised policy adopted in July 2013 eliminated the express focus on "improving and remediating the academic achievement of <u>African American students</u>" [emphasis added]. The revised policy also eliminated the separate PRE Department and allowed the Department responsible for implementation of academic programs to decide which programs to evaluate, the extent of their implementation, and program effectiveness. Ms. Springer advocated for a return to the prior policy in order to promote transparency, to again include a focus on "improving and remediating the academic achievement of African American students," and to reinstitute the PRE Department to ensure independent evaluations free of conflict of interest.

202. After assuming office on September 26, 2014, Plaintiffs Joy Springer and Jim Ross also spoke out at work sessions attended by LRSD staff and School Board members. They advocated for changes in the policies and practices of the LRSD in order to ensure that in the future the achievement gap would be closed, and that equal educational opportunity would be accessible to students of all racial and national origin groups.

P.  <u>The Second Notice of Schools in Academic Distress [November 25, 2014]</u>

203. On November 25, 2014, the Commissioner of Education sent to Superintendent Suggs a revised letter, giving notice of nine (9) schools in "academic distress". Forest Heights Middle School, with a proficiency percentage of 49.10, was added to the original list.

The letter noted the right of the "school district" to appeal "the determination" within 30 calendar days. It added that if the "school district" did appeal, the State Board

would hear the appeal "within 60 days of the appeal." It concluded "you will be provided separate notice of the time and date of the State Board hearing…."

204. While the "cc" portion of the letter listed 14 other recipients, the LRSD School Board members were not provided notice. Superintendent Suggs did not: inform the School Board members of their notice; that he appealed the State Board's determination regarding the Accelerated Learning Program, W. D. Hamilton Learning Academy, and Forest Heights Middle School; and that he received notice of the date of the State Board hearing on his appeal.

Q. Dexter Suggs' Bad Faith Dealings with State Board Members and Other Persons Evidencing that His Repetitive Admissions Were Intended to Undermine the LRSD School Board

205. On November 30, 2014, Member Jay Barth of the State Board of Education affirmed in an e-mail the following language:

"He [Barth] believes that what Dexter is proposing, where the LRSD maintains control of the transportation and food services and then outsources the curriculum/student achievement services is probably a Conversion Charter model." See Attachment to Complaint, [ Exhibit 4].

206. Dexter Suggs did not inform the LRSD School Board members of his bad faith, back room deal-making.

R. The Actions of the Special Committee and the State Board on January 7 and 8, 2015

207. The Little Rock school district was told to report their progress to the State Board of Education on January 7, 2015. During this session, Superintendent Suggs made several statements intended to lead to State takeover of the LRSD and ouster of the entire LRSD School Board -- conduct fully understandable in the light of the November

50

30, 2014 e-mail from ADE member Jay Barth.  When Suggs made these statements, multiple members of the State Board were aware that  he was deliberately seeking to cause State takeover of the LRSD and ouster of the LRSD School Board, while he remained as Superintendent.  Contrary to remarks by ADE staff, State Board members did not question Suggs on the basis, if any, for these statements. The session ended with a statement by LRSD Board President Greg Adams, who noted that 4 of the 7 members of the LRSD School Board had been members for about one year or less.

208. The State Board conducted this gathering without any reference to the Accelerated Learning Program, the W.D. Learning Academy, or the Forest Heights Middle School.  There was no mention of the November 25, 2014 letter or Superintendent Suggs' appeal.

209.  On January 8, 2015, the Commissioner of Education informed Superintendent Suggs and the members of the LRSD School Board  of an action taken by the State Board that day.  The Commissioner wrote:

> "Pursuant to the State Board's January 8, 2015 directive, please accept this letter as notice that the State Board will hold a special meeting on January 28, 2015 to discuss whether to invoke any of the actions listed in Ark. Code Ann. Sec. 6-15-430. . . .
>
> The State Board will conduct the meeting under the legal authority and jurisdiction of Ark. Code Ann. Secs. 6-15-429,  6-15-430, and the Arkansas Department of Education Rules governing the Arkansas Comprehensive Testing , Assessment and Accountability Program (ACTAAP) and the Academic Distress Program."

The letter identified "actions" "the State Board may decide to take" – in part by enclosing the full text of  Secs. 6-15-429 and 6-15-430. The LRSD was instructed to make any written submission by January 21, 2015 and to have personnel available to answer

51

questions of State Board members.

210. The January 8, 2015 notice of their January 28, 2015 "special meeting" made no mention of the  November 25, 2014 letter to Superintendent Suggs.  Rather, it first relied on the May 1, 2014 letter, stating that on May 1, 2014, ADE had notified the LRSD that six schools met the criteria for classification as in academic distress.  It next relied on the State Board's classifying these schools as in academic distress on July 10, 2014.

211. Neither the ADE on May 1, 2014, nor the State Board on July 10, 2014, had a lawful basis to act as they did.  See paragraphs 179-185.

212. On January 22, 2015, 7 days before the State Board took over the LRSD and ousted the entire local school board, the LRSD School Board approved by a unanimous vote [7-0] the following comprehensive motion offered by Board member Joy Springer:

> In order to act upon our commitment to the community to improve the academic achievement and social development of all students; to maintain an equitable, nondiscriminatory learning environment in all schools; to take positive action to enhance the stability and economic growth in all school zones of the district; and to maintain facilities of equal worth in all areas of the Little Rock School District,  I move that the District make the following specific commitments with respect to school facilities:
>
> [a] To constitute a facilities committee to aide in promoting a millage campaign in order to fund the projects identified in Exhibits A and B;
>
> [b] To submit a bond issue to the voters for approval to address new school construction, additions, and enhancements no later than February 16, 2016;
>
> [c] That the physical standard for all new school construction, at a minimum, shall be Roberts Elementary School;
>
> [d] Construction of a southwest high school shall be the district's first priority. Upon a successful millage, the district shall simultaneously authorize construction of a southwest Little Rock high school and a west Little Rock middle school. (Northwest of Barrow Road and I-630) If for some reason the southwest Little Rock's school construction is delayed, the west Little Rock school construction shall also be delayed pending resolution of the reasons for delay;

[e] That the bond issue shall also include conversion of some facilities, the improvement of others, and the construction of one or more elementary schools. All portables in the district shall be eliminated;

[f] The second priority of the district will be those material improvements, which the Board deems necessary in order to create and maintain relative equal facilities throughout the district; (See Exhibits A and B)

[g] The precept of the district shall be that the resources at all schools shall be allocated upon an equitable basis;

[h] All schools shall be equally accessible to students upon a neighborhood school basis subject to a written geographic school assignment plan; and

[I] The assignment plan referred to in paragraph [h] shall be designed to operate in a manner where school attendance is inclusive, and not intentionally segregated by neither race nor economic status.

213. Exhibits A and B, adopted by approval of Ms. Springer's motion, set forth a 34-page, $370,662,432, program of facilities construction and rehabilitation for the LRSD, prepared by Mr. Wayne Adams, Director of Facilities in the LRSD.  It provided for expenditures for projects in one or more categories at all LRSD schools sites.

214. A review of the televised meetings of the LRSD School Board  after the time that Joy Springer and Jim Ross became Board members evidences Springer and Ross and other members working diligently to address the schools in academic distress and other difficult issues confronting the District. The Board members did have a few disagreements on important matters, a common occurrence in a democracy when elected officials address complex issues.

215. The statements of the three Caucasian members of the LRSD School Board on January 22, 2015, concerning the motion made by Ms. Springer' demonstrate the ability of the Board to work together. Jim Ross described himself as "practically giddy about

this"; he characterized it as eliminating the "east-west divide" in the district. Member Leslie Fisken "thanked all who worked on this" and said, "I support this 100%." She did express a "concern" about the language of one paragraph of the motion. She put her concern aside and joined the unanimous vote of approval. Upon Ms. Springer's reading of the motion, Board President Greg Adams said: "great thought put into it." Before the vote, he said: "I am incredibly encouraged by this." He said this is a "districtwide plan, with the west and the southwest yoked together." He described himself as "excited." After the unanimous vote, Adams said: "that is great".

216. State Board members watched some of the televised meetings of the LRSD School Board.

R. The State Board Meeting of January 28, 2015: The takeover of the LRSD
and the Ouster of the Board

217. On January 28, 2015, with steps as serious as State takeover of the LRSD and ouster of each of its seven, elected school directors under consideration, the State  Board informed LRSD representatives that they had only 20 minutes to present the District's position. Although  Section 6-15-430 referred to the alternative of "[s]uspend[ing] or remov[ing] some or all of the current board of directors,"  the State Board did not designate a specific period for  Joy Springer and Jim Ross,  LRSD School Board members for only four months and two days, to speak or be represented at the hearing as individuals.

218. The hearing was conducted with no reference to two (2) of the schools listed in the May 1, 2014 notice, or the Forest Heights Middle School listed in the November 25, 2014 letter.

219. During the meeting, Superintendent Suggs again made statements intended

to lead to State takeover of the LRSD and ouster of the entire school board. Before and after Suggs made his statements, multiple members of the State Board were aware that Suggs was deliberately seeking to cause State takeover and ouster of the LRSD Board with his remaining as Superintendent.  Again, no State Board member questioned or disputed the basis for his statements.

220. At the outset of the meeting, State Board Chairman Sam Ledbetter asked if any State Board member had a question for the ADE staff. No State Board member had a question.  The State Board members did not discuss or ask questions about the plan submitted by the LRSD to address the schools in academic distress. The State Board members did not address or ask questions of their staff about voluminous documents provided on-line for the meeting. They did not discuss the basis for removing recently elected LRSD School Board members Springer and Ross.  They did not discuss the togetherness exhibited by LRSD School members at the meeting on January 22, 2015 shortly before this meeting. When State Board members did present their views, State Board Chairman Sam Ledbetter said nothing. He later voted in support of the takeover/ouster motion.

221. The ADE staff had monitored the LRSD; that staff did not recommend the takeover of the LRSD, or  the ouster of the School Board.

222. Eight State Board members did speak before the offering of motions. Member Jay Barth then offered a motion, which began as follows:

". . . [B]etween now and the regularly scheduled meeting of the State Board of Education (SBE), appropriate ADE staff, the chair of the SBE, the LRSD superintendent, and a representative of the LRSD School Board shall meet with a goal of developing a memorandum of understanding (MOU) for an ongoing partnership between LRSD and ADE centered on creating positive change in

achievement in the LRSD, with a particular focus on those schools currently in academic distress".

This motion continued, identifying specific areas to be addressed in the MOU to achieve the objective of "positive change in achievement in the LRSD" with emphasis "on those schools in academic distress." The remaining text left open the possibility of State takeover of the District should the MOU approach fail. This motion failed by a vote of 4 to 5.

223. State Board member Vicki Saviers then offered the following motion, thereafter adopted by a vote of 5 to 4. Ms. Saviers "moved, seconded by Ms. Zook, pursuant to Arkansas Code Annotated Section 6-15-430, to remove all of the current board of directors of the Little Rock School District, effective immediately; and in the absence of the board of directors, that the Commissioner of Education assume all authority of the board of directors as may be necessary for the day-to-day governance of the school district; and that the current superintendent of the Little Rock School District remain in place on an interim basis and that he continue to work under the authority and supervision of the Commissioner of Education; and that a formal body of parents, students, community and business leaders, reflective of the Little Rock community and philanthropic  organizations serve as a Civic Advisory Committee to aid in improving the performance of students in all schools."  [emphasis added]

224. Later on January 28, 2015, the State Board communicated in writing to Superintendent Dexter Suggs and the members of the LRSD School Board the actions that had been taken. The communication also stated in part: "Please be advised that the foregoing actions took effect immediately. "  It noted that "[t]he current superintendent of the Little Rock School District will remain in place on an interim basis and continue to

work under the authority and supervision of the Commissioner of Education."

225.  The State Board had no lawful authority to consider the takeover of the LRSD and the ouster of the LRSD School Board on January 28, 2015.  See paragraphs 201-208.

226. The January 28, 2015 communication contained no findings, statement of reasons, or opinions supporting or explaining in specific terms the takeover of the entire LRSD, when the District satisfied the 49.5% rule by a large margin to be in academic distress; and only 6 of 48 schools had been so classified. The State Board never provided any such findings, statement of reasons, or opinion; nor any written findings regarding the failures of the Board members.

227. The January 28, 2015, communication contained no findings, statement of reasons, or opinion , supporting or explaining in specific terms the ouster of short-term School Directors Joy Springer and Jim Ross. The State Board never provided any such findings, statement of reasons, or opinion.

228. By making no findings, the State Board violated A.C.A Sec. 6-30-15 and ADE's implementing Rules. These standards address the circumstances in which the State Board can return control of a school[s] "to the former board of directors or to a newly elected board of directors. " See A.C.A. Sec. 6-15-430(a)(7)(A)(B); (b)(9); Rule 11.02.9; 11.02.10; 11.02.10.1; 11.02.10.2. This process requires a focus on whether "the public school has corrected all issues that caused the classification of academic distress. . . ." The availability of findings or some other specification of the causal issues is necessary to implement this standard.

S. The Minutes of the January 28, 2015 Meeting Approved by the State Board

229. The State Board approved minutes of the January 28, 2015 meeting. The description of the comments of some State Board members before the votes on the two motions was incomplete in important respects.

[a] The minutes describe the statement of State Board member Mireya Reith as follows:

> Ms. Reith said she had spent the last several weeks speaking to families in the LRSD community. She said she believed in democracy. She said she considered capacity in her decision-making. She said the state would be remiss to not take action. She said the school board deserved a chance to work with the department. She recommended a diverse community partnership and that student voices be considered as part of the plan.

The transcript of the meeting includes the following statements by Ms. Reith :

"[Speakers] comments . . . resonated so strongly here with me about democracy." She stated: "If we are suggesting State takeover, then our view should be can we prove that we can do it better. . . . [W]e are in a moment of transition here at the Department of Education. We have a new Governor, who has yet to set his new Commissioner, but we know that a new Commissioner will come. And we do not know with that who will be the team around which will serve this Commissioner . . . .I don't feel comfortable in this environment saying 'Yes, I can guarantee to all the families here and to the Little Rock School Board and to everyone else that we're going to do better."

[b] The minutes describe the statement of State Board member Saviers as follows:

Ms. Saviers said there was a long history of chronic low performance with no bold action to change these schools. She said the superintendent does not have confidence in the current plan. She said she was concerned about the school board's ability to make the best decisions for the students.

[c] The minutes describe the statement of State Board member Toyce Newton as follows:

> Ms. Newton said it was the responsibility of the State Board to facilitate a decision for the students. She said she was concerned about students in a failing system. She said the State Board must speak for the voiceless. She said she could not sit by and do nothing.

The transcript of the meeting includes the following statements by Ms. Newton:

"I think <u>whatever dysfunction has caused us to fail -- and I say 'us' because I think it's a systemic and congregational failure</u> . . . . and I still think it exists." [emphasis added]

230. The new LRSD School Board did not evidence "dysfunction." Less than a week before the January 28, 2015 hearing, its members approved a far-reaching facility/equity plan by a vote of 7 to 0. In contrast the votes by the State Board on January 28th were 4 to 5 and 5 to 4.

231. The ouster of the LRSD School Board stigmatized Joy Springer and Jim Ross as dysfunctional and unworthy of holding office.

232. The State Board did not afford Joy Springer and Jim Ross notice and the opportunity for a hearing to refute the affront to their good names, reputations, and abilities.

T. <u>The Multiple Ways in which the State Board Caused the Problem, Which It Purported to Address</u>

233. State Board members Vicki Saviers and Toyce Newton both mentioned the State's causal role regarding achievement issues in the LRSD. The State 's role was more significant than suggested by their comments. In making its takeover decision, the State Board ignored its role and the role of other state actors [the legislature and ADE] in creating and continuing the problem which it purported to address.

234. Multiple forms of this State role are described in other paragraphs of this Complaint:

[a] Public charter schools authorized by State law and approved by ADE and the State Board in some instances enrolled greater proportions of students stronger academically.

[b] Public charter schools authorized by State law and approved by ADE and the

59

State Board in some instances enrolled limited numbers of students whose circumstances presented greater challenges to educators, such as students with special needs, students who were limited English proficient, and students from families with limited economic means; concomitantly, the proportion of the total LRSD enrollment consisting of students with these characteristics increased.

[c] The existence of these public charter schools caused the LRSD to lose many millions of dollars of State financial support due to State standards for providing financial aid to public schools, including charter schools.

[d] The State's repetitive delays in releasing the LRSD's share of Title 1 funds diminished the ability of the LRSD to address the racial achievement gap.

[e] The ADE's deficient performance during the years of "state directed schools" produced and perpetuated the test score outcomes relied upon by the State Board in its action on January 28, 2015.

[f] The State Board sought and secured from the U.S. Department of Education [DOE] a waiver which had the effect of freeing the ADE, the State Board, and local school districts to focus on the educations and the test score outcomes of the sub-group of black students, the group subjected historically to discrimination in Arkansas school districts, including the LRSD.

[g] The State Board twice sought and secured renewal of this waiver.

[h] The waivers were granted subject to the condition that ADE would ensure that identified programs would be implemented in schools with low outcomes on State assessments, such as the 6 schools later cited by the State Board. In multiple audits, the United States Department of Education found that ADE had not ensured that the

60

identified programs had been implemented.

U. The "Superintendent" and the "LRSD School Board" After the Takeover and Board Ouster

235. On January29, 2015, Superintendent Dexter Suggs held a news conference. He stated during this event that the takeover was "something positive."

236. On February 12, 2015, the State Board considered Superintendent Suggs' appeal of the identification of the Accelerated Learning Program, W.D. Hamilton Learning Academy, and Forest Heights Middle school as in "academic distress."   The "District" succeeded on each challenge.   The Forrest Heights Middle School appeal succeeded because the facility "had been reconstituted under a LEA number as Forest Heights STEM."

237. Defendant Johnny Key, the Commissioner of Education, has not earned any degree in the education area nor does he possess an advanced degree; he does not possess any of the certificates Arkansas awards to qualified educators. He has never taught in a K-12 school and has no academic credentials.

238. Dexter Suggs' application for the LRSD superintendent position reflected the receipt of an Ed.D. degree from Indiana Wesleyan University. In the period after the State takeover of the LRSD, the State Board learned that Dexter Suggs, serving as the Superintendent of the LRSD, had plagiarized his dissertation.  The State Board terminated Dr. Suggs. Later, Indiana Wesleyan University rescinded its awarding of a PhD degree to Dr. Suggs. Although the ADE was on notice that Suggs was an educational fraud, the State Board Chair dismissed the allegations without investigation.

239. Superintendent Suggs made statements to the State Board at three public meetings.  Nevertheless, once his dishonesty was exposed, the State Board did not

reconsider its actions of January 28, 2015.

240. On May 15, 2015, the State Board selected Defendant Baker Kurrus, a Caucasian person, to serve as the superintendent for the LRSD. Like Commissioner Johnny Key, Mr. Kurrus has not earned any degree in the education area; and does not possess any of the certificates Arkansas awards to qualified educators. He has never taught in a K-12 classroom. The State Board's waiving of many statutory and regulatory requirements was necessary in order for the State Board members to designate Mr. Kurrus superintendent.

241. While a member of the LRSD School Board between 2008 and 2010, Defendant Kurrus: [a] had a lead role in the creation of the racially gerrymandered high school attendance zones described in paragraphs 82 and 83; [b] was the lead advocate on the School Board for the lavish expenditures on the site and facility for the Roberts Elementary School, while many schools with high proportions of black students languished in deplorable condition; [c] and aided white persons and organizations in securing lucrative contracts for services provided to the LRSD.  Examples include the establishment of a relationship between the LRSD and the Little Rock Public Education Foundation, which benefitted Ms. Vicki Saviers, now a defendant as a member of the State Board, and landowners of the Roberts Elementary site and real estate brokers who participated in the purchase and sale of that land.

242. The actions of the State Board on January 28, 2015 and May15, 2015, in combination, replaced a majority African American LRSD School Board with an all white governance structure for the LRSD. Their actions were ultra vires, racially motivated, and their reasons for their actions are no credible and thus are pretextual. They are

otherwise in violation of federal law.

V. <u>Events Since the Takeover and Ouster Action</u>

243. In the period since the State Board's action of January 28, 2015, the ADE has not done on-site monitoring of the LRSD to identify the nature and quality of initiatives in the District to improve test outcomes in the 6 schools identified as in "academic distress"  or other schools.

244. On August 13, 2015,  LRSD Superintendent Baker Kurrus  made a report to the State Board. He said that "the district had identified school improvement specialists for the academic distress schools."  [Exhibit 7, page 3] This approach had been employed in the LRSD for several years prior to the January 28th action. The ADE thus continued, through Kurrus, the same process it condemned while under the jurisdiction of the LRSD School Board.

245. On August 14, 2015, by request of the State Board,  the principals of the 6 LRSD schools in "academic distress" reported on educational activities in their schools. The principals described the implementation of activities identified and initiated in the LRSD before the State Board's takeover/ouster action. This time the only difference was that a white school board, Johnny Key, and a white superintendent, Baker Kurrus were in charge.

246.  As of October 4, 2015 Baker Kurrus and Johnny Key have no plan by which to address academic achievement other than to prioritize construction and enhancement of West Little Rock schools and to superimpose upon those schools a plan whereby students in southwest Little Rock can exercise freedom of choice to leave failing schools. Kurrus' freedom of choice plan disregards the case law with respect to the LRSD.

W. <u>The Impending Violation of Arkansas Statutory and Regulatory Standards</u>

247.  A.C.A. Sec. 6-15-430 provides in part:
(a) If a school district is classified as being in academic distress, the state board of education may:

. . . .

(7) Return the administration of the school district to the former board of directors or to a newly elected board of directors if:

(A) The department of education certifies in writing to the state board and to the school district that the school district has corrected all issues that caused the classification of academic distress; and

(B) The state board determines that the school district has corrected all issues that caused the classification of academic distress; . . . .
(b) If a public school is classified as being in academic distress, the state board may:

. . . .

(9) Take one (1) or more of the actions  under subsection (a) of this section concerning the public school district where the school is located; . . .

248. The governing ADE Rules contains the same content as the statute quoted in paragraph 231. See Secs. 11.01.7; 11.01.7.1-2; and 11.02.9.

249. The classification of the 6 LRSD schools as in "academic distress" was based upon student outcomes on the Arkansas "Benchmark Tests", "criterion-referenced" tests geared to Arkansas' "curriculum frameworks."

250. Arkansas adopted for use in the 2015-16 school year a curriculum outline known as "the Common Core", to replace the Arkansas curriculum frameworks. A test known as the PARC is geared-to and utilized to determine student mastery of the grade-appropriate portions of the Common Core, the role previously fulfilled by use of the Benchmark tests. The Common Core is more rigorous than the Arkansas frameworks, leading to test outcomes showing a lesser degree of student mastery than that shown by use of the previous Arkansas system.

251. In 2016-17, Arkansas will move to the use of a third testing system, the ACT ASPIRE. This testing system is not a criterion-referenced test system, geared to

curriculum to which LRSD students have been, or will be exposed.

252. Due to the change in curriculum content, the different periods of exposure to the Arkansas curriculum frameworks and the common core curriculum, and the differences in the three testing systems, it will not be possible to present the test outcomes of LRSD students from year to year in a common manner.  This will prevent the invoking of the statutory/regulatory option allowing return of governance of the LRSD to an elected Board of School Directors. in violation of these legal standards.

253. The members of the State Board were aware of the problem to be caused by the changes in curriculum and testing systems at the time that five members voted for the takeover/ouster action.

X.  <u>The Rights Violated by the Takeover and Ouster Actions</u>

254. By virtue of their actions described in Part II. of this Complaint, the Defendant members of the State Board of Education are responsible for the violation of the rights of the plaintiffs as follows:

[a] the rights of Joy Springer and Jim Ross to serve in the offices to which they were elected without an ouster based upon the exercise of their rights to  freedom of speech;

[b] the rights of Joy Springer and Jim Ross to serve in the offices to which they were elected without an ouster based on racial discrimination/racial considerations;

[c] the rights of Joy Springer and Jim Ross to due process of law;

[d] the rights of the student plaintiffs to be educated in a school system free of racial discrimination and its effects;

[e] the rights of the parent plaintiffs and other caregivers to have their children

and/or the children to whom they act in loco parentis to be educated in a school system free of racial discrimination and its effects;

[f] the rights of all African American and black plaintiff to be free of a conspiracy to violate their constitution rights.

[g] the rights of all African American and black plaintiffs to be free of actions creating and constituting a badge of slavery.

### III. The Defendant State Actors Conspired Through the ADE Rules To Deny the Constitutional Rights of African American and Minority Students of the LRSD, Joy C. Springer and Jim Ross In violation of 42 U.S.C. 1985

255. When Emergency Rules are promulgated by an Arkansas state agency, they remain in place for four months. The emergency rule on which ADE purportedly gave notice thereof is dated April 11, 2014. [Exhibit 5]

256. ADE gave academic distress notification to Dr. Dexter Suggs on May 1, 2014. The letter does not indicate that it was delivered to the Little Rock school board members.

257. The May 1, 2014 notice of academically distressed schools included Hall, McClellan, and Fair high schools; Henderson and Cloverdale middle schools; and Baseline elementary school; the Accelerated Learning Program, and Hamilton Learning Academy.

258. The emergency rule relied upon by ADE expired or should have expired within four months of its announcement, under no circumstances would that have been later than October 11, 2014.

259. ADE did not thereafter promulgate a regular rule, as required by Arkansas

Administrative Procedure Act §25-15-201 et. seq., regarding academic distress. It did, however, develop notice of academic distress for the eight (8) Little Rock schools the month after the emergency rule should have ended (see paragraph 27, infra and paragraphs 269-270).

260. Dr. Suggs did not provide each of the Little Rock school board members nor the public a copy of the May 1, 2014 ADE notice.

261. In the SBE meeting of September 11, 2014 the ADE Academic Distress Committee directed the LRSD to meet "to discuss the" list of academic distress schools [Exhibit 8, SBE board minutes, p. 5, Paragraph 2).

262. On October 14, it was reported by ADE board member Vicki Saviers that the SBE academic distress committee (ADC) would "review" the Little Rock schools, which were classified on July 1, 2014 as "academic distress schools" [ADE state board minutes of special committee, Oct. 14, 2014, P.I.].

263. At the October 2014 meeting:

    a. Ms. Toyce Newton, a black ADE member who resides in the Crossett school district, was quoted as saying that it "was egregious to allow this lack of progress [in Little Rock] to continue".

    b. Ms. Saviers recommended that Little Rock make a "progress report" in three months ( Exhibit 9, p. 3, par. 2). A meeting for that purpose was set for January, 2015.

264. On Nov. 13, 2014, Ms. Saviers gave the ADE board a report of her "recent meeting with the Little Rock school district" ( Exhibit 10, Nov. 13 ADE Bd. Min, p. 8). She did not mention that the Little Rock school district would be given a second opportunity from that in July 2014, in which to appeal the classification of the 8 or 9 schools in academic distress.

67

265. Although non-emergency rules regarding ADE had not been promulgated in order to continue, modify, or make permanent the emergency academic distress rule applied by ADE to Little Rock, which by its terms had expired, commissioner Tony Wood on November 25, 2014 mailed Dr. Suggs, the ADE board, and certain ADE staff, a letter noticing eight schools in "the Little Rock school district as being in academic distress" [Exhibit 6]

266. Wood's November 25 letter was not addressed, copied, or delivered to the individual members of the Little Rock school board (see p. 2). The schools listed in the November letter included Forest Heights Middle School (p. 1), located in the upscale West Little Rock community where ADE chairman Ledbetter, special committee chair Saviers, and complaining Little Rock board member Leslie Fisken lived.

267. When the November 25, 2014 letter was written to Dr. Suggs, there were no ADE board minutes which demonstrated that the emergency academic distress rule was repealed or that a nonemergency or regular rule regarding academic distress was publicly presented to, or approved by, the board or that it was properly promulgated.

268. It is the practice of the ADE to repeal emergency rules of the ADE when they are replaced by or "mirrored the proposed permanent rules" (comments of ADE legal counsel Lori Freno. ADE Board minutes, Dec, 1, 2014, p. 1, paragraph 3).

269. It is also the practice of ADE to allow a "second public comment" period regarding rules presented by ADE first as an emergency rule. Ibid., p. 1, action agenda A. 2. ADE did not follow this practice in its haste to impugn the Little Rock School board members and take over the Little Rock School District. The ADE did not allow a second

public comment period as it allowed for the annual school report cards [Board minutes dated Dec. 1, 2014, Action Agenda A2].

270. At the January 8, 2014 ADE board meeting, Ms. Vicki Saviers recommended that a special ADE meeting be held regarding possible sanctions against the LRSD as authorized by ACA 6-15-430. Ibid, p. 3, paragraph 2.

271. On that same date Commissioner Wood wrote Dr. Suggs and each Little Rock school board member stating:

> "On May 1, 2014 the ADE notified the LRSD that… [6]…schools…met the criteria for being classified in academic distress…The Little Rock school district did not appeal that notification on July 10, the state board classified the…schools as being in academic distress."

He then gave notice of a special ADE board meeting for January 28, 2015. [Exhibit 12]

272. When the ADE staff and board met on January 28, 2015, they made no reference to Commissioner Wood's letter of November 25, 2014 [ see paragraph 11, supra, and Exhibit 6].

273. Neither the ADE staff nor the board mentioned Forest Heights Middle School, which had been referenced in Wood's November 25, 2014 letter to Dr. Suggs.  ( Exhibit 6, ADE board minutes, p. 1, paragraph 1).

274. Forest Heights is the upscale neighborhood school for Ms. Saviers, Ms. Fisken, and Mr. Sam Ledbetter. Forest Heights was promptly taken from the academic distress list after Mr. Woods wrote his letter dated November 25, 2014.

275. The November 25 letter reflects ADE's admission that the earlier May 1, 2014 notice was premature and/or that it did not comport with the requirements of the Arkansas Administrative Procedure Act.

276. Between November, 2014 and January, 2015 the Little Rock school board had Several meetings with the State Board of Education and Dr. Suggs. The State board made no mention of the letter dated November 25, 2014 to members of the Little Rock school board in those meetings.

IV. The Takeover by the State of Arkansas (ADE) of the Little Rock School District was rooted in racial considerations

277. There were powerful interest groups and persons in the community who have favored the interests of white students and the white community who were influencing and cooperating with the members of the State Board of Education to accomplish the takeover of the LRSD and the ouster of the school board.

278. Their goal was to continue the ability to operate the system for the primary benefit of the white students and white community

279. The group and persons involved included the Chamber of Commerce and its affiliate, Fifty for the Future, John A. Riggs and Melanie Fox, former board members of the LRSD among others.

## Conclusion

The foregoing allegations establish illicit racial motives on the part of the State decision makers and private parties with respect to the takeover of the Little Rock School District. The allegations also disclose that the defendants' explanations for their action on January 28, 2015 are pretextual. The allegations further establish that the Little Rock school board, which is now operating as Arkansas Education Commissioner Johnny Key, and the LRSD Superintendent Baker Kurrus, has also acted with racial motivation with respect to addressing the rights, privileges, and immunities of African American children

to enjoy a school system free from badges of slavery and practices of racial discrimination. The defendants have acted contrary to the Fourteenth Amendment of the United States; 42 U.S.C. §§1983 and 1985 and Arkansas State statutes as well. Because of their conduct, this complaint has become necessary in order to secure rights to which the plaintiffs are entitled by law. This action also embraces the First, Thirteenth, and Fifteenth Amendments.

The adult plaintiffs, Springer and Ross are entitled to be restored to their lawfully elected school board positions because they were removed for reasons of race and advocacy protected by the cited amendments. The minor plaintiffs are entitled to have education afforded them as a priority, which causes them to enjoy the same privileges and opportunities as white students who attend schools that are located in the north and western parts of the LRSD.  As a school district, Little Rock has engaged in multiple practices, some of which are set forth above that affect the rights of minor plaintiffs to being provided equal treatment with respect to facilities, school resources, teachers, opportunities, discipline practices and a positive future just as white students who live in the privileged areas of the State.

WHEREFORE,  Plaintiffs respectfully pray that this Court after a hearing or hearings  and identifying violations of Plaintiffs' rights by Defendants, or another basis for relief, grant preliminary and permanent relief as follows:

[a] a preliminary injunction preventing: [I] the opening of an LRSD middle school or high school in west Little Rock and [ii] the opening of a new charter school or the expansion of an existing charter school in west Little Rock, until the adoption and Court approval of a constitutionally adequate facility plan for the LRSD, or other terms

71

specified by the Court;

[b] a preliminary injunction voiding the State takeover of the LRSD and the ouster of the democratically elected LRSD Board of School Directors on the ground that the Arkansas Department of Education and the State Board of Education were without authority under their own Rules to act as they did on May1, 2014, July 10, 2014, and January 28, 2015 [takeover of the LRSD and ouster of LRSD Board of school directors];

[c] an injunction ending the unconstitutional  policies and practices in the LRSD alleged in  this Complaint and providing such other relief as is necessary to overcome the effects  of  these policies  and practices, with relief addressing at least the following areas: school facilities; the  Forest Heights Stem Academy; the providing of computer capacity; high school attendance zones;  participation in pre-advanced placement and advanced placement courses, with relief to include a careful review of the rules and customs bearing on entry to and retention in such courses at Central High School;   the Hamilton Academy or the successor program; faculty assignment; extracurricular activities; student discipline; school resources; and student achievement.

[d] an injunction or other form of relief necessary to provide that upon the return of the ousted School Board members to office, their terms are extended by the number of days of their unlawful ousters;

[e] such other and further relief as the needs of justice may require;

[f] an award of plaintiffs' counsel fees and plaintiffs' litigation costs.


Respectfully submitted,


/s/ John W. Walker

Ark Bar #64046
JOHN W. WALKER, P.A.
1723 Broadway
Little Rock, Arkansas  72206
501-374-3758
501-374-4187 (facsimile)
Email:  johnwalkeratty@aol.com

Robert Pressman
22 Locust Avenue
Lexington, MA  02421
781-862-1955
Email: ehpressman@verizon.net

Austin Porter
PORTER LAW FIRM
323 Center Street
Little Rock, Arkansas
501-244-8200
Email: aporte5640@aol.com


OF COUNSEL:
Gale B. Stewart – AR #76120
1723 Broadway
Little Rock, Arkansas 72206
501-374-3758
501-374-4197 (facsimile)
Email: letchworth1942@comcast.net


Dated: December 17, 2015