IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

LAKESHA DOE, Parent, *et al.*                                    PLAINTIFFS

v.                                No. 4:15-cv-623-DPM

ARKANSAS DEPARTMENT
OF EDUCATION, *et al.*                                    DEFENDANTS

ORDER

1. Did race play some part?  More specifically, did race partly motivate the Arkansas Department of Education, the Commissioner, or the State Board members in expanding the number of charter schools in Little Rock, in administering various federal grant programs, or in deciding to take over the Little Rock School District?  Plaintiffs say it did.  Their amended complaint explains their view in more than seventy pages, and this detailed pleading is helpfully supplemented (from both sides) with many attached public records and documents, which the Court has considered.  *Stahl v. United States Department of Agriculture*, 327 F.3d 697, 700 (8th Cir. 2003).  This case just started.  The State Defendants have moved to dismiss, while LRSD has answered and will address the facilities claims against it in due course on the merits.

The governing legal standard is plausibility: the Plaintiffs must allege enough facts against the State Defendants to show that racial motivation is not merely possible, but plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must look past legal conclusions. And while eloquent arguments, passionately made, such as Plaintiffs' responding brief, have their rightful place, the law here focuses on what John Adams famously called the stubborn things—the facts.

Of course it's possible. It's conceivable that, somewhere in all this, someone had a foul intention—the District should be taken over, or Ms. Springer and Dr. Ross shoved out of office with the rest of the District Board, or charter schools expanded, or federal money mismanaged — to benefit white students and to harm black students, their parents, and citizen servants such as Springer and Ross. It's possible.

And there's no real question about disproportionate effect: more than 65% of LRSD students are black; a majority of the dissolved Board was black; and the students at the growing charter schools in Little Rock are (to generalize) whiter and wealthier than LRSD's students. But the settled precedent is clear; discriminatory effects alone are insufficient to show

discriminatory intentions. *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252, 265 (1977).

What's missing are pleaded *facts* that show the intent to discriminate based on race, facts that show foul thoughts becoming harmful actions. Plaintiffs have pleaded plausibly that those holding the people's power in Arkansas's Executive Branch have decided to shake up public education in Little Rock by various means and, in the borning at least, those decisions have fallen hardest on these Plaintiffs and others similarly situated. Those facts, though, don't offend the Constitution or federal law. The fullness of time will show whether the decisions were wise. That, in any event, isn't what this Court must measure. Letting a doubtful case proceed is often the better course, but not where the governing law is clear and all the facts simply do not measure up. At the threshold, Plaintiffs haven't offered enough facts showing a plausible racial motivation behind any of the challenged decisions. Accepting all the facts alleged as true, and adding all the reasonable inferences from them, the amended complaint fails against the State Defendants.

**2.**  Plaintiffs' allegations cluster in three groups:  the State Board of Education's allowing more and more charter schools in LRSD;  the Board's oversight of federal programs;  and the Board's takeover of LRSD.

• **Charter Schools.**  Plaintiffs say the charters hurt LRSD schools by siphoning the best students and the state funds that follow them.  This leaves LRSD schools poorer and blacker that they'd be without the competing charters.

Things began in 2008.  That year, defendant Vicki Saviers played a leading role in opening E-STEM Public Charter School in downtown Little Rock.  *№ 6 at ¶ 139.*  Saviers served on E-STEM's board until she became a member of the State Board in 2010.  The Arkansas Department of Education and the State Board approved three charter applications by E-STEM's founders with a total enrollment of 856 students.  E-STEM was much whiter than LRSD.  Consider some round numbers:  in the 2008-2009 school year, LRSD was 22% white and 68% black;  E-STEM was 38% white and 54% black;  and in the 2010-2011 school year, LRSD was 21% white and 67% black, while E-STEM was 41% white and 48% black.  *№ 6 at ¶ 140.*  The Department excepted E-STEM from a law requiring public schools to provide an

alternative learning environment for students with discipline issues. *№ 6 at ¶ 144.* In 2011, after Saviers had been appointed to the State Board, she moved to approve E-STEM's application to increase its enrollment by 102 students. The State Board approved. *№ 6 at 145.* And because public money follows the students, LRSD lost more than $8 million in 2008-2009 and more than $12 million in 2010-2011 to charter schools. *№ 6 at ¶ 146.* In 2015, the Department approved another major expansion in E-STEM's enrollment, which will divert more money from LRSD. *№ 6 at ¶ 148.*

E-STEM isn't the only example of charter expansion. In late 2013, the Department's new Charter Authorizing Panel approved a new school, Quest Middle School, in west Little Rock. *№ 6 at ¶ 168.* Quest was approved to serve 490 students in grades 6–12. LRSD appealed the Department's decision to the State Board. In early 2014, the Board approved the Quest application by a vote of five to four. *№ 6 at ¶ 168.* Saviers and Diane Zook voted to approve. Saviers, as noted, had a history with E-STEM; and Zook's nephew, Gary Newton, had made a presentation supporting Quest. *№ 6 at ¶ 168.* Like E-STEM, Quest was much whiter than LRSD. In Quest's first school year, LRSD was, in round numbers, 18% white and 66% black; Quest was 63%

white and 23% black. *№ 6 at ¶ 169.* Plaintiffs say that the Department and the State Board's approval of Quest "constituted intentional discrimination promoting segregation of students by race." *№ 6 at ¶ 176.*

- **Federal Programs.** Certain federal regulations aim to reduce achievement gaps among racial groups by ensuring that all students meet particular testing standards. *№ 6 at ¶ 152.* In June 2012, Arkansas got these requirements waived in exchange for, among other things, implementing plans to reduce these gaps by improving the quality of instruction. The State got the waiver renewed in 2014 and 2015. *№ 6 at ¶ 152.* And under the waivers, the Department is held accountable only for performance standards that aren't race-specific. *№ 6 at ¶ 152.* Plaintiffs say this creates a tendency to ignore low achievement by black students. The waivers also included the use of School Improvement Grants to fix achievement gaps. *№ 6 at ¶ 153.* But Plaintiffs say this grant program wasn't properly followed. The U.S. Department of Education cited the Arkansas Department of Education twice in 2013 for harming certain schools by failing to follow the program. *№ 6 at ¶ 153.* Five of those six schools were later identified as being in "academic distress." *№ 6 at ¶ 153.* This label's significance will become clear.

There was another hangup in the State's application of federal programs. If more than half of a school's students are eligible for free or reduced price lunches, then the school is eligible for Title I funds. Most schools in LRSD receive these funds. *№ 6 at ¶ 157*. But in 2014–2015 and many other recent academic years, the Department didn't make LRSD's share of Title I funds available until much of the school year had passed. This hurt the schools' ability, the Plaintiffs say, to help black students who benefitted from the funds. *№ 6 at ¶ 158*. LRSD schools hurt by the late distribution of these federal funds included all six schools later identified as being in academic distress. *№ 6 at ¶ 159*.

• **State Takeover.** Plaintiffs allege that racial discrimination partly motivated the State's decision to take over the LRSD and that the step violated other constitutional rights. They say that former Superintendent Dexter Suggs was in cahoots with the State Board and various white civic leaders. Here's the story Plaintiffs tell.

In 2003, the General Assembly enacted the "Arkansas Comprehensive Testing, Assessment, and Accountability Program Act." 2003 Ark. Acts 5287, 5295. This was one of the post-*Lake View* reforms. *Lake View School District*

-7-

*No. 25 of Phillips County v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002). The Act gave the State Board authority to classify school districts as being in "academic distress." 2003 Ark. Acts 5287, 5310. Under the Board's implementing regulations, a district was in academic distress if 75% or more of its students performed below a certain level. 005.19.03 Ark. Code R. § 3.02 (August 2003). Since those regulations were passed, LRSD has never met that definition of academic distress. № *6 at ¶ 138*. The Act also authorized several different steps to manage a district in academic distress, including removing the superintendent and the school board. 2003 Ark. Acts 5287, 5314–15.

In 2013, the General Assembly amended the academic distress standards, making them applicable to individual schools as well as whole districts. 2013 Ark. Acts 2274, 2275. The next year, the State Board appointed a special committee to review districts in academic distress. № *6 at ¶ 177–78*. Saviers was appointed chair. In April 2014, the State Board unanimously adopted emergency regulations implementing the new legislation. № *6-1 at 22 & № 25 at 80, 88–89*.* These regulations applied the academic distress

---

*The parties have helpfully put many of the Board's meeting minutes and regulations in the record. The Court uses these docket citations when possible.

threshold—which had since been changed from 75% to 49.5% under-achievement—to individual schools, as the new legislation required. № 6-1 *at 24*. A few days after adopting emergency regulations, the Board also published the proposed final regulations for public comment, as a step toward final adoption. *№ 25 at 104*.

In May, the Department notified LRSD Superintendent Dexter Suggs that six LRSD schools and two other LRSD programs met the new threshold for being in academic distress. *№ 6 at ¶ 181*. Twenty-six Arkansas schools did. All were majority black. *№ 6 at ¶ 182*. Plaintiffs allege several problems with the May 2014 notice: it was based on regulations (the Board's April 2014 emergency rules) that weren't lawfully adopted; the Department didn't mail copies to the LRSD board members; and the Department waited too long to make its distress determination. *№ 6 at ¶ 183*. Superintendent Suggs appealed the determination for the two district programs, but not for the six schools. *№ 6 at ¶ 185*.

In June 2014, the State Board approved the final version of the emergency rules from the preceding April, which by then had gone through the public comment period. *№ 25 at 93, 102, 104*. In early July, the State Board

classified the six LRSD schools listed in the May notice as being in academic distress. № 6-1 at 112.

Later that same month, Joy Springer and Jim Ross filed to run for the LRSD school board. № 6 at ¶ 186. Springer is a longtime Little Rock resident who's been deeply involved in litigation involving the District for many years. She works as a legal assistant for John Walker; and she has been a stalwart monitor for the Joshua Intervenors in the Pulaski County school desegregation case. № 6 at ¶ 187. Ross too is a longtime Little Rock resident who taught in the District for seven years in the 2000s. № 6 at ¶ 188. Springer and Ross ran on a campaign of equal facilities and treatment for all the District's students. For example, Ross organized a "Freedom Saturday" in the summer of 2014 to draw attention to the challenges faced by Henderson Middle School. № 6 at ¶ 191. Voters elected Springer and Ross in September. Their election meant that a majority of the LRSD board members were black. The State Board's special committee on academic distress met a few days before Springer and Ross's election but didn't discuss LRSD. And that month, the Board's final regulations on academic distress became effective. № 25 at 31, 102.

-10-

Springer and Ross learned that the State Board's special committee had scheduled an October 2014 meeting to discuss the six LRSD schools labeled as in academic distress. Their State-required training for new board members conflicted with the meeting date; Springer asked Chair Saviers to delay the meeting so Springer and Ross could participate. Saviers refused and told Sam Ledbetter, the State Board chair, about Springer's request. Ledbetter was offended that Springer went straight to Saviers. № 6 at ¶ 197. The special committee met in October and heard from several people, including Superintendent Suggs and several LRSD school board members. № 6 at ¶198. The committee agreed to reconvene in three months to get a report on LRSD's progress in fixing the six schools. At an LRSD board meeting later in October, Springer and Ross spoke out about LRSD facilities and LRSD's troubled history, and Springer advocated a return to race-specific performance standards for the District. № 6 at ¶ 199–201.

In November 2014, the Department notified Superintendent Suggs that seven LRSD schools and two other programs were identified as being in academic distress. № 6-1 at 78. (The notice listed all the schools that were in the May 2014 notice, plus one more.) The Department didn't send this notice

to the LRSD board members.  And Plaintiffs say that, when this notice was sent, there was no "academic distress" rule in effect, because the April 2014 emergency rules had expired by law and no regular rule was properly promulgated after that.  *№ 6 at ¶ 267–69.*  Superintendent Suggs appealed the November 2014 academic distress determination for one school—Forest Heights, which is in a more affluent part of town than the others—and for the two programs, but didn't tell the LRSD board.  *№ 6 at ¶ 204.*  A few days later, State Board member Jay Barth, in an email, affirmed his interest in charter schools and his understanding that what Superintendent Suggs was proposing for LRSD looked like a "Conversion Charter" model.  *№ 6-1 at 19.*

In early January 2015, LRSD reported its progress to the State Board.  *№ 6 at ¶ 207.*  At the meeting, Superintendent Suggs made several comments "intended to lead to State takeover of the LRSD and ouster of the entire LRSD School Board[.]" *№ 6 at ¶ 207.* The State Board members didn't question Suggs on the basis for his statements.  The three pending academic-distress appeals weren't mentioned at the meeting.

The next day, the Commissioner of Education told Superintendent Suggs and the LRSD board by letter that the State Board planned to hold a

-12-

meeting at the end of January to discuss whether to invoke any of the actions authorized by Ark. Code Ann. § 6-15-430 for schools in academic distress. *№ 6 at ¶ 209; № 6-1 at 112*. The cited code section is the takeover statute. The Commissioner told LRSD to make any written submission by January 21st and to have folks available to answer questions at a January 28th meeting. The Commissioner's letter relied on the May 2014 academic distress letter and the July 2014 State Board action classifying the LRSD schools as being in academic distress—but it didn't mention the November 2014 academic distress notice.

A week before the January 28th State Board meeting, the LRSD school board approved a watershed motion by Joy Springer. LRSD pledged to build a new high school in southwest Little Rock, to build a new middle school in West Little Rock, to improve facilities at other schools, and to equalize facilities throughout the District. *№ 6 at ¶ 212*. The vote was unanimous. The Board had been famously divided on many issues for many years. This ambitious facilities plan contemplated a new millage. Several LRSD board members were enthusiastic about this plan to heal the "east-west divide" in the District. *№ 6 at 215.*

-13-

The State Board met as planned in late January. It gave LRSD folks only twenty minutes to speak. *№ 6 at ¶ 217.* Superintendent Suggs "again made statements intended to lead to State takeover of the LRSD and ouster of the entire school board." *№ 6 at ¶ 219.* None of the State Board members questioned the Department staff who had monitored LRSD; none asked questions about the plan LRSD had submitted to address schools in academic distress; and none discussed the new unity shown by the LRSD board in its January 22nd meeting or in LRSD's comprehensive new facilities plan. *№ 6 at ¶ 220.* The Department staff who had monitored the District didn't recommend a State takeover or the ouster of the LRSD school board. State Board member Jay Barth moved for a new group to address achievement issues in LRSD by developing a Department/LRSD memorandum of understanding before the next State Board meeting. *№ 6 at ¶ 222.* The group would have included Department staff, the State Board chair, the LRSD superintendent, and a representative of the LRSD school board. *№ 6 at ¶ 222.* Barth's motion failed four to five. Saviers then moved to remove the LRSD school board, have the Commissioner of Education assume day-to-day authority for governing the District, and retain Superintendent Suggs on an

interim basis under the Commissioner's authority. *№ 6 at ¶ 223.* Saviers's motion also called for a "Civic Advisory Committee" made up of parents, students, and community leaders to help improve the schools. Saviers's motion carried five to four. The State Board never mentioned the November 2014 notice of academic distress. *№ 6 at ¶ 272.*

In February 2015, the District appeal of the academic distress categorization of the two academic programs and the Forest Heights school succeeded. *№ 6 at ¶ 236.* A few months after the takeover, Superintendent Suggs, who's black, was fired after it was discovered that he'd plagiarized his dissertation. *№ 6 at ¶ 238.* In March, the State Board confirmed Johnny Key as Commissioner of Education. *№ 6 at ¶ 59.* Key, who's white, "has not earned any degree in the education area nor does he possess an advanced degree; he does not possess any of the certificates Arkansas awards to qualified educators. He has never taught in a K–12 school and has no academic credentials." *№ 6 at ¶ 237.* Then, a few months after it confirmed Key, the State Board selected Baker Kurrus as LRSD superintendent. *№ 6 at ¶ 240.* Kurrus, Plaintiffs point out, is like Key: he's white and lacks the

usual superintendent's resume. *Ibid.* The State Board had to waive many of the statutory and regulatory requirements to appoint him. *Ibid.*

According to the Plaintiffs, since the takeover, the State has merely continued the same District policies that it found inadequate before the takeover. *№ 6 at ¶ 244–46.* And Kurrus, according to the Plaintiffs, favors the white, wealthy West Little Rock schools over the poor and majority black schools in southwest Little Rock. *№ 6 at ¶ 246.* On top of all this, Plaintiffs say, the changing curriculum standards each year will make it impossible for LRSD to present test outcomes in a consistent manner, which will prevent a return to an elected LRSD school board. *№ 6 at ¶ 251–52.* Here is Plaintiffs' summary: "There were powerful interest groups and persons in the community who have favored the interests of white students and the white community who were influencing and cooperating with the members of the State Board of Education to accomplish the takeover of LRSD and ouster of the school board. Their goal was to continue the ability to operate the system for the primary benefit of the white students and white community." *№ 6 at ¶ 277-78.*

**3.** Plaintiffs claim that in all these actions, the State Board violated the First Amendment, the Thirteenth Amendment, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the Fifteenth Amendment, and 42 U.S.C. § 1985, which prohibits conspiracies to violate the Constitution. *№ 6 at 65–66, 71.* The Court addresses each claim, starting with race discrimination, the core of the case.

• **Racial Discrimination.** The Plaintiffs haven't plausibly alleged that the State allowed more charters, mismanaged federal funds, or took over LRSD "for the purpose of discriminating on account of race[.]" *Iqbal*, 556 U.S. at 677; *Village of Arlington Heights*, 429 U.S. at 265. Plausibility "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal [discrimination]." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). There's a good reason for this: deficiencies in a pleading "should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558 (quotations omitted). The time-and-money point is powerful in this case; the Pulaski County school desegregation case teaches that constitutional litigation involving LRSD and the State can last decades and cost millions. It's therefore

-17-

important that this case contain plausible claims against the State Defendants before we start down another similar road. That's among the reasons why a "mere possibility" of racial discrimination isn't enough. And it suggests what the Supreme Court has made explicit: that the plausibility/possibility line is found in part through judicial experience and common sense. *Iqbal*, 556 U.S. at 679. This is different from stopping a case at the gate because the judge thinks that, in the end, it will probably fail. *Twombly*, 550 U.S. at 556. In most lawsuits, the prudent course is to wait and see. But not always, and not in this case, because settled law provides clear landmarks for finding the plausibility line.

Precedent controls: a plausible constitutional claim requires an intent or purpose to discriminate against someone based on his or her race. *E.g.*, *Village of Arlington Heights*, 429 U.S. at 265. Racial discrimination doesn't have to be the sole motivation for an act, because people, after all, are complicated creatures; but discrimination must be a motivating factor. 429 U.S. at 265–66. How does this motivation appear, given that it's now rarely explicit? Often in the combined light of several circumstances: whether an action burdens one race more than another; the history behind it; the specific events leading

-18-

up to it, including any break from normal procedure;  and the action's legislative or administrative history.  429 U.S. at 265–66. These aren't all the material circumstances, just the obvious ones.  But racial discrimination isn't something one stumbles into.  "Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences.  It implies that [the Department and the State Board] . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon [black people]."  *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

To be sure, Plaintiffs have alleged the required intent.  *№ 6 at ¶¶ 6, 176, 242.*  But saying the right legal words doesn't make it so.  *Iqbal*, 556 U.S. at 678; *Friends of Lake View School District Incorporation No. 25 of Phillips County v. Beebe*, 578 F.3d 753, 762 (8th Cir. 2009).  The facts do or don't.  And the *Arlington Heights* considerations are a helpful way of looking at those facts.

First, racial effect.  The State's actions affect Little Rock's black population—students, teachers, parents, former school board members—more than the city's white population.  That's math.  Most of LRSD's students are black, so if the State takes over the District, runs it poorly,

-19-

and allows more competing charters to siphon the white students and public money from LRSD schools, all that burdens blacks more heavily than whites. But the racial effects here aren't "unexplainable on grounds other than race [discrimination]." *Village of Arlington Heights*, 429 U.S. at 266. They're explainable by the math: no matter what motivated the State to takeover LRSD, the effect would be felt more by black citizens than white citizens, because the District touches more blacks than whites. This isn't one of those rare cases, then, where racially unbalanced effects reveal racial discrimination. *Ibid.*; *compare Clients' Council v. Pierce*, 711 F.2d 1406, 1409 (8th Cir. 1983).

Second, history. These parties have decades of it, and it's been marked by racial division. *Cooper v. Aaron*, 358 U.S. 1 (1958). But it's also been marked by progress, including LRSD becoming unitary and the State contributing millions of dollars toward achieving that goal and toward maintaining desegregated schools. *Little Rock School District v. Pulaski County Special School District No. 1*, 2007 WL 624054 (E.D. Ark. 2007); № 5063 in case No. 4:82-cv-866-DPM (Consent Judgment and Settlement Agreement). The more direct history is the one surrounding academic distress standards, the takeover statute, and the charter expansion. In 2003, the General Assembly

-20-

passed a district-wide takeover statute. The State Board set a district-wide standard for academic distress: 75% under achievement. LRSD didn't meet it, and still doesn't. Then the Board tightened the standard to 49.5% under achievement, and the General Assembly amended the takeover statute to apply on a school-by-school basis. Those changes made the LRSD takeover possible, but didn't require it. The tougher standard is consistent with demanding better school performance. The State Board seized the opportunity, Plaintiffs say, because its members wanted to discriminate against the District's black citizens—the implication is that the State Board had no intention of improving LRSD and returning it to local control. And here the charter angle matters. The State Board took over an allegedly failing LRSD and then allowed charters to continue to deplete its white students and public money. Charter proponents like Vicki Saviers, moreover, were among those itching for a takeover. This history, though, suggests only possible, rather than plausible, racial discrimination. It is equally consistent with a group of citizens with strong policy views—less public involvement and more private control—wanting a turn at putting their views into practice.

Third, specific events leading to the takeover. "Departures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision to the contrary." *Village of Arlington Heights*, 429 U.S. at 267. Plaintiffs allege many such departures: the way the State Board adopted the academic distress regulations; basing the takeover on the May 2014 notice rather than the more recent November 2014 notice; the lack of meaningful questioning at meetings leading up to the takeover; the rejection of less drastic measures; and the State Board's confirmation of Key and hiring of Kurrus despite their lack of formal education credentials. But all these things don't move the race discrimination claim across the plausibility line. The Arkansas Supreme Court, for one thing, has scrutinized the takeover—in terms of State sovereign immunity—and held that "[t]he State Board operated within its express statutory authority . . . ." *Key v. Curry*, 2015 Ark. 392, at *6, 473 S.W.3d 1, 6. And the Supreme Court held that many of the facts pleaded here—the lack of established criteria for a takeover, the retention of Dexter Suggs as Superintendent after the takeover, the lack of any

plan by the Department that would improve the schools after takeover — did not establish arbitrary or bad faith action by the State.  *Key*, 2015 Ark. 392 at 10, 473 S.W.3d at 8.

The takeover wasn't graceful or perfect.  Bureaucracies always lumber along.  But the deviations Plaintiffs raise don't make a racial motive plausible. The Board seems to have followed the proper administrative course, for example, in passing emergency regulations and following up with final ones. Who knows why the Department issued two notices of academic distress and let one of them go.  And only time will tell whether Key and Kurrus were the right people for the Commissioner's and Superintendent's slots notwithstanding the absence of usual qualifications.  But the State Board's actions as alleged aren't so outside the ordinary course that they plausibly suggest an unconstitutional motive.

Last, the administrative history.  There's Barth's email with positive words about a "Conversion Charter" model.  There's his suggestion that the Board try the memorandum-of-understanding approach before takeover, which seems to mitigate the force of his email.  There's the failed close vote to take the memorandum path.  And there's the alliance between Saviers, the

-23-

charter proponent, and Zook, whose nephew advocated for charter expansion. All this, too, fails to show racial motivation. It shows public officials pursuing their competing policy agendas—with varying success depending on who had the votes.

Plaintiffs don't have to rule out every lawful explanation for the takeover. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). But this Court must ask whether the State Board's actions can "reasonably be explained without reference to racial concerns." *Clients' Council*, 711 F.2d at 1409. They can. And the explanation is politics—politics in the pure sense of that word: ideas and elections have consequences for public policy. Citizens will disagree or agree with the wisdom of what happened here; but all would agree that our political system's translation of votes into power is part of what makes us free and equal self-governing citizens. The State Board's actions show representative government pursuing divisive but not unconstitutional policy. And "[a]s between that obvious alternative explanation for the [State Defendants' actions] and the purposeful, invidious discrimination [Plaintiffs ask the Court] to infer, discrimination is not a plausible conclusion." *Iqbal*, 556 U.S. at 682 (quotation omitted).

• **Federal Programs**. The problems Plaintiffs highlight—the waivers of testing by racial group, the grant program stumbles, and the foot dragging on providing Title I money—are at the margin of their claims. The disproportionate effect on black students is, again, plausibly explained by the demographic math. And the only reasonable inference is that bureaucracies are usually inefficient and often deficient. Nothing in the federal program allegations plausibly shows any intention to harm black students.

For all these reasons, all of Plaintiffs' race discrimination claims fail on the pleadings.

• **Due Process.** Former LRSD board members Springer and Ross allege that the State Board violated their due process rights by taking away their school board seats. *№ 6 at 65*. But they had no legitimate claim of entitlement to them in the face of Ark. Code Ann. § 6-15-430(a)(3) & (b)(9), which made the seats subject to a State takeover. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972); *Sykes v. City of Gentry, Arkansas*, 114 F.3d 829, 831 (8th Cir. 1997). And the procedural requirements surrounding a State takeover don't create property interests in and of themselves. *Bell v. McAdory*,

820 F.3d 880, 884 (7th Cir. 2016).   Springer and Ross's due process claims therefore fail.

• **First Amendment.**   Springer and Ross also allege that the State Board took away their LRSD board seats in retaliation for their having spoken loudly and clearly against racial inequality in the District.  *№ 6 at 65.*  The law requires them to show that "the retaliatory motive was a but-for cause of the harm;  that is, that [they were] singled out for adverse treatment because of [their] exercise of constitutional rights."  *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007) (quotation omitted).  But Springer and Ross weren't singled out — the entire LRSD board was removed.  The State Board could have removed only them, but it didn't.  ARK. CODE ANN. § 6-15-430(a)(2) & (b)(9). Because Springer and Ross were treated the same as those who didn't champion equality issues, they've failed to state a claim for retaliation.  (To the extent Springer and Ross claim that their exclusion from the October 2014 special committee meeting was retaliation, that claim fails too;  being excluded from that meeting wouldn't have deterred someone of ordinary firmness from speaking out.  *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014). And it didn't deter either of them from doing so in the winter of 2014–2015.)

• **Thirteenth Amendment.** This claim fails as a matter of law. It's an open question whether the Thirteenth Amendment itself provides a direct action for challenging "badges of slavery" in addition to slavery or involuntary servitude. *City of Memphis v. Greene*, 451 U.S. 100, 124–26, 128–29 (1981). But the persuasive authority generally says no—one must rely on implementing legislation. *E.g.*, *Channer v. Hall*, 112 F.3d 214, 217 n.5 (5th Cir. 1997); *Alma Society Inc. v. Mellon*, 601 F.2d 1225, 1237 (2d Cir.), *cert. denied*, 444 U.S. 995 (1979); *Goss v. Stream Global Services, Inc.*, No. C14-4033-MWB, 2015 WL 1268192, at *8–*9 (N.D. Iowa 19 March 2015); *Powers v. CSX Transportation, Inc.*, 105 F. Supp. 2d 1295, 1302–03 (S.D. Ala. 2000); *Adams v. Boy Scouts of America*, No. 3CV98-313, 2000 WL 33671779, at *3 n.4 (E.D. Ark. 5 January 2000), *aff'd on other grounds*, 271 F.3d 769 (8th Cir. 2001). This Court agrees. Plaintiffs don't allege that the State Board's actions amount to slavery or involuntary servitude; they say instead that the Board's actions imposed badges of slavery. № 6 *at* ¶ *136.* But the only statute or code provisions they rely on are 42 U.S.C. §§ 1983 & 1985. № 6 *at* ¶ *2.* These provisions require a showing of intentional discrimination, which, as the Court has said, is missing here. *Taylor v. City of St. Louis*, 702 F.2d 695, 697 (8th Cir. 1983) (*per curiam*).

• **Fifteenth Amendment.** Plaintiffs mention this voting rights claim only in passing. *№ 6 at ¶ 136.* Taken as a matter of race discrimination, it fails on the pleaded facts. Taken as part of their allegations about badges of slavery, it fails as a matter of law.

• **Conspiracy.** Plaintiffs' § 1985 conspiracy claim fails as a matter of law for two reasons. The State Defendants are really one government entity, which can't conspire with itself. *Kelly v. City of Omaha, Nebraska,* 813 F.3d 1070, 1078–79 (8th Cir. 2016). Plaintiffs have also failed to plausibly plead intentional discrimination. *Taylor,* 702 F.2d at 697.

**4.** Plaintiffs have amended their complaint once. The original and amended complaints are thorough and fact-heavy. Plaintiffs haven't asked to amend again as a hedge against dismissal. And justice doesn't require it. FED. R. CIV. P. 15(a)(2). Another amendment and possible motion practice would needlessly delay this case against LRSD on facilities, claims which need attention on the merits.

The Court has also considered what recently happened to Baker Kurrus. While the motion to dismiss was pending, the Commissioner decided not to renew Kurrus's contract as LRSD Superintendent. Commissioner Key made

this decision a few weeks after Kurrus led the charge against the latest proposed expansion of charter schools in Little Rock.   All this is an undisputed matter of public record, which Plaintiffs could easily allege in a second amended complaint.   These developing facts, though, don't make Plaintiff's allegations about intentional race discrimination plausible either. On the one hand, the rest of the Kurrus story strengthens the allegation that the pro-charter viewpoint is ascendant.   On the other, it undermines any inference that Kurrus was just a yes man for certain white elites.   There's another important, undisputed, and easily alleged fact of public record:  the outpouring of community support for Kurrus—across racial lines—after his contract wasn't renewed.  So the recent Kurrus events are a wash.  In these circumstances, the Court declines to allow another chance at pleading the failed claims.  *United States ex rel. Lee v. Fairview Health System*, 413 F.3d 748, 749–50 (8th Cir. 2005).

*   *   *

"Facts are stubborn things;  and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence."   That was Adams's point in defending the British soldiers

charged in the Boston Massacre.  The State takeover of LRSD and the State Board's continued expansion of charter schools in Little Rock are facts heavy with possibilities both good and bad.  There are wishes, inclinations, and passions all around.  Plaintiffs' careful amended complaint ably presents the full weight of all the facts.  It does not, however, plausibly show that the State Board's extraordinary steps were partly motivated by racial animus or were otherwise constitutionally impermissible.  The motion to dismiss, № 24, is therefore granted.  Plaintiffs' First Amendment, Thirteenth Amendment, Fourteenth Amendment, Fifteenth Amendment, and conspiracy claims against the State Defendants are dismissed with prejudice.

So Ordered.

_D.P. Marshall Jr._
D.P. Marshall Jr.
United States District Judge

28 September 2016

-30-