```
 1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
 2                     WESTERN DIVISION

 3   LAKESHA DOE, Parent; DENNIS DOE,
     Minor Child; CHASE DOE, Minor
 4   Child,
                              Plaintiffs,
 5
        v.                            No. 4:15CV00623 DPM
 6   ARKANSAS DEPARTMENT OF EDUCATION;   March 22, 2016
     TOYCE NEWTON, In his Official       Little Rock, Arkansas
 7   Capacity as Chair of the Arkansas   9:15 a.m.
     State Board of Education; JAY BARTH,
 8   In His Official Capacity as Member
     of the Arkansas State Board of Education;
 9   JOHNNY KEY, In His Official Capacity as
     Commissioner of Education and the LRSD
10   School Board; BAKER KURRUS, In His
     Official Capacity as Superintendent
11   of the Little Rock School District,
                              Defendants.
12
              TRANSCRIPT OF MOTIONS HEARING - VOLUME 1
13           BEFORE THE HONORABLE D. PRICE MARSHALL JR.,
                  UNITED STATES DISTRICT JUDGE
14
     APPEARANCES:
15
     On Behalf of the Plaintiffs:
16
             MR. JOHN W. WALKER, Attorney at Law
17           MR. SHAWN GARRICK CHILDS, Attorney at Law
               John W. Walker, P.A.
18             1723 Broadway
               Little Rock, Arkansas  72206-1220
19
             MR. AUSTIN PORTER JR., Attorney at Law
20             323 Center Street, Suite 1300
               Little Rock, Arkansas  72206
21
             MR. ROBERT PETER PRESSMAN, Attorney at Law
22             22 Locust Avenue
               Lexington, Massachusetts  02421
23
             MS. GALE BOOTH STEWART, Attorney at Law
24             1 River Oaks Circle
               Little Rock, Arkansas  72207
25                                                  [Continued]
```

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1    APPEARANCES CONTINUED:

2    On Behalf of Defendants Arkansas Department of Education, Toyce
     Newton, Jay Barth, and Johnny Key:

3
          MR. PATRICK E. HOLLINGSWORTH, Assistant Attorney General
4         MS. ROSALYN L. MIDDLETON, Assistant Attorney General
            Office of the Arkansas Attorney General
5           Catlett-Prien Tower Building
            323 Center Street, Suite 200
6           Little Rock, Arkansas  72201-2601

7
     On Behalf of Defendant Baker Kurrus:

8
          MR. CHRISTOPHER J. HELLER, Attorney at Law
9         MR. KHAYYAM MARICE EDDINGS, Attorney at Law
            Friday, Eldredge & Clark
10          Regions Center, Suite 2000
            400 West Capitol Avenue
11          Little Rock, Arkansas  72201-3493

12

13

14

15

16

17
          Proceedings reported by machine stenography and displayed
18   in realtime; transcript prepared utilizing computer-aided
     transcription.

19

20

21

22

23

24

25

1              **INDEX** (Volume 1 - March 22, 2016)

2

3   Opening Statement - Plaintiffs.............................  5

4   Opening Statement - State Defendants......................  8

5   Opening Statement - Defendant Kurrus......................  9

6

7   WITNESSES
    FOR THE PLAINTIFFS:          Direct    Cross   Redirect   Recross
8   **JOHNNY KEY**                  14       45       59        65

9   **JACKIE WHITEHEAD**            66       73       80

10  **MONICA K. NORWOOD**           82      111

11  **CHARLES STEIN**              122      126      128

12  **KAREN DEJARNETTE**           130      181      186

13  **HOWARD BAKER KURRUS**        190

14

15

16

    **EXHIBITS:**                                        **RECEIVED**
17
    Plaintiffs' Exhibit 7.................................... 143
18
    Plaintiffs' Exhibit 1.................................... 165
19
    Plaintiffs' Exhibit 2.................................... 166
20
    Plaintiffs' Exhibit 6.................................... 174
21
    Plaintiffs' Exhibit 3.................................... 175
22

23

24

25

1      (Proceeding at 9:15 a.m., as follows:)

2           THE COURT:  Be seated, everyone, and good morning.

3      This is Doe and others against the Arkansas Department of

4      Education and others, Case No. 4:15CV623 DPM.  We're here for

5      the next couple of days on a hearing covering the plaintiffs'

6      motion for a preliminary injunction.

7           Let me note who is here as counsel and others, and then

8      we'll begin.

9           Starting on this side, we've got Mr. Porter, Ms. Stewart,

10     Mr. Childs, Mr. Pressman, and Mr. Walker, all for the

11     plaintiffs.  Welcome to each of you.

12          MR. PORTER:  Good morning, your Honor.

13          MR. WALKER:  Thank you.

14          THE COURT:  On this side of the courtroom, Mr. Heller

15     and Mr. Eddings representing the Little Rock School District and

16     Baker Kurrus sitting between them.  Welcome to all of you all.

17          And then for the state defendants, Mr. Hollingsworth and

18     Ms. Middleton.  Welcome.  And welcome back, Ms. Middleton.  Good

19     to have you here.  And then Ms. Barnes, Annette Barnes from the

20     State Department of Education.  I can't see you past the

21     monitor, Ms. Barnes, but I know you're there.

22          Counsel, I appreciate your work so far in the briefing.

23     It's been helpful, and I believe I understand the issues that

24     are in play for purposes of the next couple of days.

25          Mr. Walker, you, of course, singling you out as lead for

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1    the plaintiffs, you, of course, have the burden of proof to

2    establish the need for injunctive relief, and I look forward to

3    hearing what evidence you have to offer.

4              MR. WALKER:  Yes, sir.

5              THE COURT:  If any party wants to make a brief

6    opening, that's fine.  I'm not sure it's necessary, given the

7    briefing, but if anyone would like to make one, I'll hear it.

8    We have two days.  Alternatively, we might just head straight on

9    into the proof and start making progress.

10       Mr. Walker, what is your preference on that?

11             MR. WALKER:  Your Honor, I would like to have a brief

12   opening.

13             THE COURT:  All right.  Then we will do that.

14       Officer Gray, I may be wrong, but I expect a fair number of

15   people coming and going, so could I get you to sit back there by

16   the door and keep the door from banging as folks come and go?

17       Good.  Thank you.

18       Mr. Walker, let me get my pencil and paper out.

19             MR. WALKER:  Yes, sir.

20             THE COURT:  Yes, sir.

21             MR. WALKER:  Yes, sir.  If it please the Court, we

22   intend to demonstrate that the harm is great and certain and of

23   such imminence that there is a clear and present need for

24   relief.  The harm is that black schoolchildren in

25   unconstitutionally bad schools will continue to be denied equal

1    education.  The balance of harm is to them rather than to the

2    children who may not presently be enrolled in the Little Rock

3    public schools and who are otherwise better educationally

4    advantaged.

5         The areas of the black community are underserved by poor

6    and inadequate one-race schools.  The area which defendants

7    prioritize is geography as they define as underserved, west

8    Little Rock, where the premier and newest public education

9    facilities exists, Roberts Elementary.  Moreover, the state has

10   opened a new charter school in the same area, known as Quest, to

11   serve the same population.  That's in census tract I think 2223,

12   but we'll correct that if it's not exactly that.

13        Roberts is essentially about the enrollment of three

14   elementary schools and it has never before this year been full.

15   Roberts was intended by Mr. Kurrus when he was on the board to

16   be a K through 8 school, and it was intended that the school be

17   located on property he owned while he was on the school board.

18   That did not come to pass.

19        The majority board did not express approval for the Leisure

20   Arts site, miles and as much as an hour with use of school

21   transportation provided from the core of the black community.  A

22   new middle school opened in west Little Rock last year, a STEM

23   school, new in the respect that the school's middle school black

24   population was emptied, and that's at Forest Heights, to be

25   replaced by disproportionate white students and an almost

1   all-white staff.

2       The public interest favors providing quality education to

3   the neediest of children whose schools are relics of slavery, in

4   substantial disrepair, decrepit, unhealthy, and crowded, who are

5   forced to labor under the label imposed by the state of

6   Arkansas, and those who favor racial separation as being less

7   important and, yes, less equal than those white students who

8   live in west Little Rock who were provided charter and private

9   school choices so that they would be in majority race

10  environments and so that the property, wealth, of their

11  benefactors could be enhanced.

12      The tragedy and irony of the action is a stated plan to use

13  desegregation funds which were committed as a part of a

14  purported comprehensive school settlement for southwest Little

15  Rock schools to construct and enhance the Leisure Arts facility

16  and to further enhance the other schools of the far west where

17  the people are allegedly the best.

18          THE COURT:  I'm sorry, Mr. Walker, what was your last

19  phrase?  Where the people are --

20          MR. WALKER:  The balance of harm, the last page is

21  that --

22          THE COURT:  The last phrase.

23          MR. WALKER:  The tragedy and irony of the action of

24  the defendants is their stated plan to use desegregation funds

25  which were committed for southwest Little Rock schools for the

1   Leisure Arts school and to further enhance the schools of the

2   far west, where the people are allegedly the best.

3          THE COURT:  Got it.  Thank you.

4      Ms. Middleton, does the -- do the state defendants wish to

5   be heard in opening?  Or Mr. Hollingsworth.  I see you moving.

6          MR. HOLLINGSWORTH:  Just real briefly, your Honor.

7          THE COURT:  Okay.

8          MR. HOLLINGSWORTH:  May it please the Court.  Patrick

9   Hollingsworth for the state defendants.

10      I think we've said most of what we need to say in the

11   filings, but I wanted to point out a couple of things before we

12   start today.  One is that based on the plaintiffs' witness list,

13   it does not appear that the plaintiffs will have anyone who can

14   testify that they will be, have been in any way other than

15   speculatively, detrimentally affected.  Therefore, no standing.

16   We'll see how the proof plays out, but it is the plaintiffs'

17   burden to show that at least one of their plaintiffs, none of

18   whom are identified and none of whom are on the witness list,

19   are prejudiced by the opening of this school.

20      The second thing that I would like to note, very briefly,

21   your Honor, is that the plaintiffs' request for relief is that

22   the closing of predominantly black schools or schools in

23   predominantly black areas of Little Rock be enjoined and that

24   settlement funds not be diverted to schools in majority white

25   neighborhoods, and they say these are the only acts to be

1    immediately enjoined, and based on the witness list and exhibit

2    list, it appears that the plaintiffs wish to expand that

3    considerably and we just direct the Court to the plaintiffs'

4    request for relief.

5              THE COURT:  Thank you, Mr. Hollingsworth.

6              MR. HELLER:  Thank you, your Honor.  I won't go into

7    detail in support of our fundamental point in this hearing,

8    which is discussed in our brief, but the fact remains that LRSD

9    does not intend to do either of the two things the plaintiffs

10   seek to enjoin in this proceeding.  Mr. Kurrus will testify that

11   there's no plan to close ten schools.

12        There is a plan to build a west Little Rock middle school,

13   but the way we read plaintiffs' papers, there's no plan to use

14   what they refer to and what the LRSD School Board previously

15   referred to as desegregation funds to do that.  In fact, the

16   west Little Rock middle school will be complete and open before

17   the only restricted funds from the state settlement even arrive

18   in the district's coffers during the 2017-2018 school year.

19   Those funds will address a problem Mr. Walker spoke with the

20   Court about.  He says parts of the black community are

21   underserved by schools in the Little Rock School District.  The

22   district agrees and has had plans, and I think everybody should

23   keep in mind the plans we're going to talk about over the next

24   two days began when a majority African-American school board

25   purchased two building sites, one in west Little Rock and one in

1    southwest Little Rock.  And the plan has always been to build

2    two schools.

3         The focus in the plaintiffs' papers has been on this west

4    Little Rock middle school without saying much at all about the

5    southwest Little Rock high school that's designed to address

6    some significant facility issues in the district.  That school

7    is scheduled to open in the beginning of the 2019-2020 school

8    year.  Architects are hired, plans are underway.  We've got a

9    way to pay for that school, and that will allow us to close

10   McClellan, which our independent facilities study said should be

11   closed, and to close Fair and refurbish McClellan to accommodate

12   the students that are now at Cloverdale.  And you'll hear a lot

13   in the next two days about Cloverdale because it's the building

14   in our district that's in the worst physical condition.  It was

15   built by the Pulaski County Special School District on piers in

16   a lake bed, and it shifts and cracks, and its companion school,

17   Cloverdale Elementary School, has already been bulldozed.

18        So the plans that the district wishes to proceed with

19   include a west Little Rock middle school, a southwest Little

20   Rock high school, and then the closing of Cloverdale Middle

21   School and moving those students into a refurbished McClellan

22   High School.

23        You will see that this isn't something Baker Kurrus just

24   thought up.  The land was purchased by the school board.  The

25   school board also commissioned an independent facilities study

1   which said two of the Phase I top priorities should be west

2   Little Rock middle school, southwest Little Rock high school.

3   So all that has been in place.

4       And the Court knows from another case the Court has

5   presided over for quite some time, even if these were

6   desegregation funds that the Little Rock School District and the

7   other districts in the county are receiving from the state, the

8   Court I think through Judge Woods previously ruled that there

9   were no restrictions on those funds.  Actually, it may have been

10  the Eighth Circuit which reversed Judge Woods on that point.

11  But even when we were in the middle of a desegregation case,

12  there were no restrictions on the use of those funds.  Now

13  there's a settlement agreement that was approved by this Court

14  which places no restrictions on the use of those funds, except

15  those that arrive in 2017-2018.

16      So one other point, your Honor.  Mr. Walker talks about

17  Forest Heights and other white schools in the school district.

18  There are actually three majority white schools in the school

19  district out of about 48 schools, and Forest Heights is not one

20  of them.  The new west Little Rock middle school is not going to

21  be one of them.  The students who are already assigned there are

22  low 40s, maybe 42 percent white, 41 percent African-American,

23  the rest Hispanic and other.  The three school zones that

24  Mr. Walker wants to call the white west Little Rock school zones

25  are the students who are -- those are Fulbright, Roberts, and

1   Terry, which are going -- those are the elementary schools that

2   will flow into the new middle school.  Those schools right now,

3   all of the students in those schools are just about 40 percent

4   African-American, maybe 42 percent white, and the rest Hispanic

5   and other races.

6        Forest Heights isn't a white school.  The west Little Rock

7   middle school isn't going to be a white school.  And when we

8   talk about everything that's going on in west Little Rock, we

9   can't forget that it's tied to what will soon be our most

10  impressive facility, the high school that's going to be built in

11  southwest Little Rock.

12          THE COURT:  Thank you, Mr. Heller.

13          MR. WALKER:  Your Honor, if I may for contextual

14  purposes.  There are 17 percent of the school enrollment is

15  white.  The schools to which I refer as white are schools which

16  have double that percentage, and those are the schools located

17  in the western part of the city.  The Court may take judicial

18  notice that Interstate 630 is more or less the dividing line to

19  Shackleford, and those schools to which I refer as white schools

20  are located to the north of Interstate 630 and to the west of

21  Shackleford.

22          THE COURT:  Thank you, Mr. Walker.

23          MR. WALKER:  Johnny Key.

24          MR. HOLLINGSWORTH:  Your Honor, the state defendants

25  invoke the rule.

```
 1              THE COURT:  Hold on.  Counsel, I appreciate the
 2    openings.  They are helpful.  The rule is useful.  Any witnesses
 3    in the courtroom, prospective witnesses, please stand.
 4         Mr. Key, you're a party, so you can remain.
 5         Who else do we have?  Please identify yourselves.
 6              MR. BAILEY:  Kelsey Bailey, chief financial officer of
 7    the Little Rock School District.
 8              THE COURT:  Thank you, Mr. Bailey.  Yes, sir?
 9              DR. STEIN:  Yes, sir.  Charles Stein.
10              THE COURT:  Yes, sir, Dr. Stein.  Good to put a face
11    with the name.
12         Yes, ma'am?
13              MS. WHITEHEAD:  Jackie Whitehead, Little Rock School
14    District.
15              THE COURT:  Good morning.
16              MS. NORWOOD:  Monica Norwood.
17              THE COURT:  Good morning, Ms. Norwood.
18              MS. DEJARNETTE:  Karen DeJarnette.
19              THE COURT:  Good morning, Ms. DeJarnette.
20         I'd like the rest of y'all, other than Mr. Key, who I
21    believe can stay, but the rest, if you would go with the Court
22    Security Officer into the witness rooms outside the courtroom.
23    I'm going to apply the rule.  We'll hear from --
24              MR. WALKER:  Ms. Springer is a plaintiff.
25              THE COURT:  Ms. Springer, you're welcome to stay.
```

1   You're a party.  And for that reason, I think you can, too,

2   Mr. Key.

3           THE COURT:  All right.  Now, Mr. Walker, who is your

4   first?

5           MR. WALKER:  Mr. Johnny Key.

6           **JOHNNY KEY, PLAINTIFFS' WITNESS, DULY SWORN**

7           THE COURT:  Mr. Walker, would you give me just a

8   second to get things around up here.

9           MR. WALKER:  Yes, sir.

10          THE COURT:  Please proceed.

11                         DIRECT EXAMINATION

12  BY MR. WALKER:

13  Q.   State your name.

14  A.   Johnny Key.

15  Q.   Where do you live, Mr. Key?

16  A.   I live in Little Rock.

17  Q.   What is your education?

18  A.   I have a bachelor's degree in chemical engineering from the

19  University of Arkansas.

20  Q.   What is your training for work in public school K through

21  12 education?

22  A.   I do not have any training to work in K through 12

23  education.

24  Q.   What experience did you have as an educator when you were

25  hired?

1   A.    I had no experience as an educator.

2   Q.    Did you execute a formal application to become Commissioner

3   of the Arkansas Department of Education?

4   A.    Yes, I did.

5   Q.    Was that after you had been selected?

6   A.    Yes, sir.

7   Q.    So you were selected first and then hired, and then filed

8   an application?

9   A.    Yes.

10  Q.    Were you offered the job as Commissioner of Education by

11  the Governor of the State of Arkansas, Asa Hutchinson?

12  A.    Yes, I was.

13  Q.    Did you sponsor legislation known as the Arkansas School

14  Choice Act in 2013?

15  A.    Yes, I did.

16  Q.    Do you agree --

17          MR. WALKER:  And may I treat this witness, your Honor,

18  as a hostile witness since he is a defendant?

19          THE COURT:  You may.  Yes.

20  BY MR. WALKER:

21  Q.    Do you agree that the choice law, Arkansas Code 6-18-206,

22  prevents state law from being utilized by individuals to make

23  private transfer decisions that impermissibly increase

24  segregation or racial imbalance in school districts around the

25  state?

1   A.   I believe that the statute does state that desegregation

2   issues must be considered as part of that.

3   Q.   Let me restate the question again, and you please listen.

4        Do you agree that the state choice law prevents state law

5   from being utilized by individuals to make private transfer

6   decisions that impermissibly increase segregation or racial

7   imbalance in school districts around the state?  And I'd like a

8   yes or no answer.

9   A.   I'm not sure what you mean by private transfer.

10  Q.   All right.  Do you know what a private transfer decision is

11  of a parent?

12  A.   Are you talking about the choice of a parent --

13  Q.   Yes.

14  A.   -- to select a school district or a school setting?

15  Q.   Yes, sir.

16  A.   Yes.

17  Q.   I'll go again, a third time.  Do you agree that the choice

18  law prevents state law from being used or utilized by

19  individuals to make private transfer decisions that

20  impermissibly increase segregation or racial imbalance in school

21  districts around the state of Arkansas?

22            MR. HOLLINGSWORTH:  Objection, your Honor.

23            THE COURT:  Hold on just a second.

24       Mr. Hollingsworth, go ahead.  I need to know the basis of

25  your objection, Mr. Hollingsworth.

1             MR. HOLLINGSWORTH:  I'm sorry.

2             THE COURT:  I was telling Mr. Walker and the witness

3     to hold on.  Sorry.

4             MR. HOLLINGSWORTH:  All right.  The objection is,

5     number one, the question is really asking for a legal

6     conclusion, and the witness has already stated his

7     understanding.  He's not a lawyer.

8             THE COURT:  Overruled.  Of course, the Court will

9     decide what the law is, but I think Mr. Walker can explore this.

10         So you can answer, Mr. Key.

11    A.   I do not agree with your question in the way that you

12    phrased it, no, sir.

13    Q.   All right.  Are you aware that your lawyers in *Teague v.*

14    *Arkansas Board of Education* --

15            MR. WALKER:  If I may approach, your Honor.

16            THE COURT:  You may.

17    BY MR. WALKER:

18    Q.   -- made that statement to the Court?  And I highlighted it.

19    A.   (Document review.)

20            THE COURT:  Mr. Walker, have you identified for your

21    brother Hollingsworth where that paper -- what that paper is or

22    where it's from?

23            MR. WALKER:  No, sir.  I will do so, your Honor.  It's

24    one of their briefs.

25            THE COURT:  Please do.  General rule of the road,

1    counsel, tell your brother or sister across the aisle what

2    you're going to show the witness before you show them.

3                 MR. WALKER:  I apologize, your Honor.

4                 THE COURT:  Mr. Hollingsworth, do you want to come up

5    and look?

6                 MR. HOLLINGSWORTH:  Yes.  And I'm sure the Court knows

7    this, but just to be clear, there are 50-some lawyers in our

8    office, and that doesn't mean I've seen it.

9                 MR. WALKER:  All right.  You can take it.

10               MR. HOLLINGSWORTH:  I will say I've never seen it, but

11   it clearly is a filed, ECF-filed document.

12               MR. WALKER:  By the Attorney General's Office.

13               MR. HOLLINGSWORTH:  Scott Richardson.

14               MR. WALKER:  That's fine.

15   BY MR. WALKER:

16   Q.   Do you have prior work as a school administrator?

17   A.   No, sir, I do not.

18   Q.   Is it fair to say that before you became the Commissioner

19   of Education for all Arkansas children, you operated a daycare

20   center?

21   A.   My wife and I did operate a childcare center.  Three,

22   actually.

23   Q.   Thank you.  Did the governor and state of Arkansas agree to

24   waive all written preexisting, long-standing experience and

25   education requirements so that you may be appointed

1   commissioner?

2   A.    The statute was changed.

3   Q.    Yes.   Did you hire Baker Kurrus as superintendent of the

4   LRSD?

5   A.    Yes.   I appointed him to that position.

6   Q.    Did you post that position before you filled it with Baker

7   Kurrus?

8   A.    No, sir, I did not.

9   Q.    So you selected him pretty much the same way the governor

10  selected you?

11  A.    I'm not sure what thought process the governor used to --

12  Q.    I'm only talking about method.   You selected him because

13  you knew him?

14  A.    No, that's not the reason I selected him.

15  Q.    You didn't know him?

16  A.    Prior to --

17  Q.    That's yes or no.

18  A.    Did I know him at the time I appointed him?

19  Q.    Yes, sir.

20  A.    I did know him, yes.

21  Q.    I see.   Did the governor tell you to appoint him, too?

22  A.    No, sir, he did not.

23  Q.    Did Baker Kurrus have prior work experience as a public

24  school administrator?

25  A.    No, sir, not to my knowledge.

1  Q.   Did you consider that to be an important consideration for

2  filling that position?

3  A.   No, sir, I did not.

4  Q.   That's fine.  Did Kurrus execute a written application for

5  the superintendent of the Little Rock School District before he

6  was hired?

7  A.   Not to me.

8  Q.   Until 2014, were you a resident of an all-white northwest

9  or north central Arkansas community, virtually all white?

10 A.   Virtually all white?  Yes.

11 Q.   Do you have any training and experience to qualify you to

12 make site selection decisions for public schools?

13 A.   No, sir.

14 Q.   Did you select the site now proposed for a new public

15 middle school in Little Rock known as the Leisure Arts Center?

16 A.   No, I did not select that.

17            MR. WALKER:  Just a moment, your Honor.

18            THE WITNESS:  If I may expound on that.  You asked if

19 I --

20            MR. WALKER:  I'll ask the questions.

21            THE COURT:  You'll have a chance, Mr. Key, on

22 redirect, to explain and circle back on things.

23            THE WITNESS:  Thank you, sir.

24 BY MR. WALKER:

25 Q.   Isn't it true that you were informed about the Leisure Arts

1    Center and its availability by Gary Newton?

2    A.   I was informed --

3    Q.   That's yes or no.

4    A.   No.

5    Q.   Did you have communication regarding the Leisure Arts

6    Center with Gary Newton?

7    A.   Yes.

8            MR. WALKER:  If I may use the ELMO, your Honor.

9            THE COURT:  You may.  Mr. Walker, again, if you're --

10   has this been identified for the --

11           MR. WALKER:  No.  It's just for purposes of

12   impeachment.  I don't plan to make it an exhibit, your Honor.

13           THE COURT:  Okay.

14           MR. WALKER:  And I've shared it with learned counsel.

15           THE COURT:  Very good.

16       I think the other way.

17   BY MR. WALKER:

18   Q.   Can you see that, Mr. Key?

19   A.   Yes.

20   Q.   Do you recall that on June 24 of 2015, you had a

21   communication regarding the Leisure Arts Center with Gary

22   Newton?

23   A.   Yes.

24   Q.   Did you know anything about the Leisure Arts Center before

25   that date?

Key - Direct                                            22

1    A.    Yes, I did.

2    Q.    And from whom did you get that information?

3    A.    A Mr. Todd Hart.

4    Q.    And Mr. Hart is a relator representing Baptist Health

5    Center?

6    A.    I know he represents Baptist Health.

7    Q.    Did he call you about it?

8    A.    No, sir.  He sent me an e-mail.

9    Q.    Well, isn't it true that you received from Johnny -- I

10   mean, you received at 8:05, or at least you sent to a Brittany

11   Kincaid at 8:05 a.m. on July 31 a note which says as follows,

12   from Baker Kurrus, regarding the Leisure Arts Building?  And

13   it's the subject:  Leisure Arts Building.  Please move forward

14   with purchase for LRSD.

15         That's on July 28.

16         And then on July 28 at 10:38 a.m., Mr. Kurrus and Mr. Key,

17   you had a note from a parent.  Do you know who that parent was?

18   A.    No, I don't remember.

19   Q.    And it says that my family and I were excited to hear about

20   the possibility of Little Rock purchasing the former Leisure

21   Arts Building on Highway 10 to serve as a middle/high school.

22   Please move forward with this acquisition of this property.

23         And then it went on to explain why they wanted it:  We have

24   a student currently enrolled at Don Roberts, with which we've

25   been very pleased, and we have another enrolled there next year.

1    Our oldest attended Roberts the very first few years it was

2    open, but like so many others, we were forced to move him from

3    the district after fifth grade due to a lack of acceptable

4    middle school options.

5        Did you ever speak with that parent?

6    A.   I don't know what parent that was, Mr. Walker.

7    Q.   You all redacted the name.  Is there any reason you

8    redacted the name?

9    A.   Mr. Walker, I received a number of e-mails from parents.

10   Q.   Is there any reason you redacted the name?

11   A.   Not to my knowledge.

12   Q.   I see.  Well, I guess the reason was that you didn't want

13   me to know about it.  Is that fair to say?  Now --

14            THE COURT:  Hold on, Mr. Walker.  Let the witness

15   answer.

16       Is that why the redaction was done?

17            THE WITNESS:  My understanding, the redaction was done

18   as routine practice by our legal office in protecting personal

19   information.

20            MR. WALKER:  That's fine.

21            THE COURT:  Mr. Walker, can I impose on you to make

22   another run at that microphone?  It does not seem to be working.

23   Would you press the button and bang around on it, be sure to

24   kind of talk into it and see --

25            MR. WALKER:  Hello.  Hello.

1          THE COURT:  Donna, would you turn up the volume on

2     that one?  I think that's better.

3          Mr. Porter, thank you for your help.  I think there is an

4     opening in IT at the court.

5          MR. PORTER:  Probably pays a little bit more than what

6     I'm getting.

7          THE COURT:  I'm just saying.

8     BY MR. WALKER:

9     Q.    Now, according to the document that I have here, Todd Hart

10    got in touch with you after you had spoken with Baker Kurrus.

11    Do you agree or disagree with that?

12    A.    Todd -- please repeat the question.

13    Q.    Did Todd Hart get in touch with you regarding the Leisure

14    Arts Center before or after you had spoken with Baker Kurrus?

15    A.    Before.

16    Q.    I have these e-mail trails, and I'll show them to you in a

17    minute.

18          Did he get in touch with you before Sunday, July 26, at

19    3:49 p.m.?

20    A.    Yes, he did.

21    Q.    What date did he get in touch with you?

22    A.    It was in April.

23    Q.    Oh, in April.

24    A.    Yes.  April 28, I believe.

25    Q.    I see.  How long had you been commissioner?

1    A.    One month and two days.

2    Q.    All right.  And then on this day, is it fair to say that

3    you took the occasion after you received a note from him to

4    drive by the former Leisure Arts property, and you were

5    intrigued by the possibilities?

6          "Now that Baker Kurrus is on board as superintendent, I

7    would like to consult with him to gauge his interest in

8    exploring this option.  Are you still open to a tour?"

9          So you wanted this site; is that right?

10   A.    Yes.

11   Q.    Now, would you tell me where the majority of the population

12   of the Little Rock School District lives?  Of the student

13   population of the Little Rock School District lives.

14   A.    I would not know where the majority of the school district

15   population lives.

16   Q.    You are the Board of Education for the Little Rock School

17   District, are you not?

18   A.    According to statute, I serve as -- in the place of.

19   Q.    I see.  And you don't know where the majority of the

20   students live in the Little Rock School District?

21   A.    No, sir.

22   Q.    All right.  Do you know what the enrollment is of white

23   students in the Little Rock School District?  Percentage-wise or

24   numerically or both.

25   A.    Percentage-wise, I guess less than 20 percent.

1   Q.   I see.  Do you know what the general condition of the

2   physical facilities of the schools in the Little Rock School

3   District are, is?

4   A.   I would say the general facility condition is aged.

5   Q.   Well, have you been to the schools?

6   A.   I have been to some, not all.

7   Q.   I see.  Is it fair to say that the schools in the -- you

8   live in Colony West?

9   A.   Yes.

10  Q.   Is it fair to say that you have a school-age -- you still

11  have a school-age child?

12  A.   I do.

13  Q.   And you live in the Hall High attendance zone?

14  A.   Yes, that's correct.

15  Q.   But your child attends Arkansas Baptist Academy?

16  A.   Yes, sir.

17  Q.   Now, were there any written criteria that you consulted for

18  suggesting that -- to Baker Kurrus that he take the Leisure Arts

19  Center and adapt it to a middle school?  Did you have any

20  written criteria before you did that?  Yes or no.

21  A.   No.

22  Q.   All right.  Were you aware that the demographics of the

23  area -- were you aware of what they were?

24  A.   Of which area?

25  Q.   Of the area where the Leisure Arts Center is located.

1    A.    No, because I don't live in that area.

2    Q.    Isn't it true that you know about the area because you have

3    a department of the Department of Education right across the

4    street from the Leisure Arts Building; isn't that correct?  The

5    building that you all have built for the Arkansas Department of

6    Education, massive building, is located across from the Leisure

7    Arts Building, isn't it?

8    A.    I'm not sure which building to which you're referring.

9    Q.    A big white building in The Ranch.  Arkansas Department of

10   Education.  Do you have another building other than the one

11   right behind the State Capitol in the city of Little Rock?

12   A.    Yes.

13   Q.    Where is it located?

14   A.    It's down on Main Street.

15   Q.    You don't have another one?

16   A.    I'm sorry.  Not Main Street.  It's downtown.  We lease the

17   space.

18   Q.    Where else do you have one?  A new building, ten years old

19   or less?

20         That's fine.

21   A.    I'm sorry, Mr. Walker.

22   Q.    And is Arkansas Baptist across the Street from Leisure Arts

23   Center?

24   A.    It's in the neighborhood.

25   Q.    I see.  Now, you had the role for approving the location of

1    a charter school for that area, too, didn't you?

2    A.    No, I don't.

3    Q.    Did you not approve Quest Charter School?

4    A.    I did not, no, sir.

5    Q.    Didn't the Board of Education do so?

6    A.    Yes.

7    Q.    And is the Quest school located in the same general area?

8    A.    How -- in the same general area as --

9    Q.    Within a few blocks of?

10   A.    No, sir.

11   Q.    All right.  Isn't the Quest school majority white public

12   school, in the sense that it's operated with public funds but by

13   private parties?

14   A.    It's public funds and it's a nonprofit organization,

15   private nonprofit, yes, sir.

16   Q.    And it's located in the same zip code?

17   A.    I don't know the zip code, sir.

18   Q.    That's fine.  But you are aware that the State Department

19   of Education has given support to another public middle school

20   in that area within the last year; isn't that correct?

21   A.    What do you mean, given support to another public middle

22   school?

23   Q.    You have authorized it to open through Gary Newton and

24   other persons on the State Board of Education?

25   A.    Which middle school are you referring to?

1    Q.    Quest.

2    A.    In the past year, I don't believe that's correct.

3    Q.    In the past year and a half?

4    A.    I don't remember when Quest was approved.

5    Q.    That's fine.  Now, I asked you about site selection

6    criteria.  Would you think that a school should be sited so as

7    to be convenient to a large number of students in the city of

8    Little Rock, which is roughly half and half, black and white?

9    A.    I think a neighborhood school is going to be located where

10   it serves the need of that community.

11   Q.    Did you determine that there was a need of that community

12   where the Leisure Arts Building is located?

13   A.    There was no middle school in that area, so, yes, I agreed

14   that there was a need there.

15   Q.    There was a need simply because there was not one there?

16   A.    Not an LRSD middle school.

17   Q.    I see.  But you had just put the Quest school there.  Now,

18   tell me, how did you determine need?  Was there some kind of a

19   demand?

20   A.    Previous action of the LRSD School Board.  They determined

21   the need.

22   Q.    Did you ever make a decision -- a determination of the

23   racial consequences of locating the school there?

24   A.    No, because the decision to locate a school there had

25   already been made.

1    Q.    Well, who made that decision?

2    A.    The local Little Rock School Board.

3    Q.    You say the local school board had made the decision to put

4    a school where the Leisure Arts Building is?

5    A.    Well, they had already purchased property adjacent to it,

6    so yes.

7    Q.    Oh, so they had property adjacent to it.  Now, tell me,

8    what would be the demographics of that school were it to be open

9    on a neighborhood basis?

10   A.    The projections from Mr. Kurrus and his team are about 40

11   percent white, 40 percent African-American, and 20 percent

12   other.

13   Q.    You are aware that the other is 80 percent white?

14   A.    No, I'm not aware of that.

15   Q.    Are you familiar with the zip code 72223, 2010 census

16   demographics which show the population of that area to be

17   24,857, with a white population of 16,184 and a black population

18   of 2,000 and a Hispanic population of 448?  Are you familiar

19   with that?

20   A.    I'm not familiar with it prior to seeing this document.

21   Q.    Were you aware that for the Cloverdale area -- well, before

22   leaving that, were you also familiar with the fact that for that

23   area, the average house value was $331,000 and the average

24   income was $86,000?  Were you aware of that?

25   A.    No, sir.

1   Q.   Were you also aware that for southwest Little Rock, the

2   population was 35,645 in zip code 72209, the average income for

3   the household was $29,000, and the average house value was

4   $79,000?  White population, 6,000, black population 21,000, and

5   Hispanic 5,000?

6   A.   Prior to seeing this document, no.

7   Q.   According to your own rules with respect to school

8   construction -- you are aware of your rules with school

9   construction and approval of school construction?

10  A.   I'm familiar.

11  Q.   Are you aware that your rules, your own rules, require you

12  to make a determination of the impact of a building decision or

13  a site selection decision, the impact that it has upon the race

14  of an environment?

15  A.   That is a consideration that goes into the procedures.

16  Q.   Did you all make a racial -- a decision of the racial

17  impact of this decision at the time you were considering the

18  Leisure Arts Building for renovation?

19  A.   That --

20  Q.   That's yes or no.

21  A.   Did I -- please repeat the question.

22  Q.   Did you require that there be a racial impact statement

23  made by your facilities department regarding that particular

24  site, as you do for all school sites, are supposed to do for all

25  school sites in the state of Arkansas?

1   A.   At the time, no.

2   Q.   Thank you.  Have you done so to this date, in writing?

3   From your facilities department.

4   A.   I would have to refer to the facilities master plan for

5   Little Rock School District to --

6   Q.   No, the master plan doesn't guide your action.  It is your

7   own department and your department has to do it.  Did the

8   department -- did you consult the department?

9   A.   Let me --

10  Q.   Did you consult the department?  Yes or no.

11  A.   That's not my department.

12  Q.   Well, you are in charge of the facilities department within

13  the department of ADE, aren't you?

14  A.   No, sir, I'm not.

15  Q.   Who is in charge of that?

16  A.   That is the Facilities Commission.

17  Q.   That's not controlled by the Department of Education?

18  A.   I am one member of the Facilities Commission.

19  Q.   I see.  But you are aware of the rule, aren't you?

20  A.   I'm not aware of all of the rules in the --

21  Q.   That rule?

22  A.   If you're telling me it's in a rule, Mr. Walker, I'll

23  accept that it's one of the rules.

24  Q.   In terms of trying to put a school in west Little Rock, did

25  you consider any other sites?

1    A.    No.

2    Q.    Did you have knowledge about the deplorable conditions

3    existing in most Little Rock public schools which are located

4    mostly in the southwestern and central parts of Little Rock?

5              MR. HELLER:  Object to the question as containing a

6    fact not in evidence.

7              MR. WALKER:  I'll change the question.

8              THE COURT:  Sustained.  And thank you, Mr. Walker.

9    BY MR. WALKER:

10   Q.    Do you agree or disagree that the conditions of the schools

11   to the south of 630 and east of Shackleford are generally

12   deplorable?

13   A.    Are generally deplorable?  I don't think I would make that

14   broad assertion.

15   Q.    How would you describe those schools in relation to the

16   other ones on the side of that border?

17   A.    Aged and --

18   Q.    Aged.  Because they're aged, they are less satisfactory,

19   would you not agree, than the new schools you're building in the

20   west?

21   A.    Less satisfactory from what?

22   Q.    From an educational perspective, providing education,

23   providing facilities and equal opportunity?

24   A.    I would not make a general statement like that.

25   Q.    When you were selected as commissioner, did you appreciate

1   that buildings and resources provided to students contribute to

2   their educational outcome?

3   A.    Yes.

4   Q.    Did you make the decision to advance construction of a far

5   west Little Rock school ahead of those in southwest in a public

6   meeting?  In other words, did you and Mr. Kurrus meet in a

7   public meeting, announced to the public, so that you could make

8   a decision regarding the Leisure Arts Building?

9   A.    No.

10  Q.    So the public had no -- at least the black public had no

11  input into that decision; right?

12  A.    I don't know the races of the people who had input, that

13  e-mailed me during this process.

14  Q.    Well, only you and Mr. Kurrus met on the decision; isn't

15  that correct?

16  A.    The decision came from --

17  Q.    Just a moment.  Did any -- isn't it true that only you and

18  Mr. Kurrus met to make that decision?  Yes or no.

19  A.    We met, yes.

20  Q.    All right.  And nobody else participated in that decision-

21  making, did they?

22  A.    No.

23  Q.    Thank you.  Do you know the educational and demographic

24  characteristics of the anticipated sixth grade students to be

25  housed in the Leisure Arts Building?

1   A.   The estimates that I've been given have been estimates of,

2   as I've said once before, about 40 percent white, 40 percent

3   African-American, 20 percent other.

4   Q.   Mr. Kurrus give you that estimate?

5   A.   Yes.

6   Q.   Race is only one demographic characteristic.  Do you know

7   the other characteristics of that population and how that

8   population was selected?  Do you know?  First of all, do you

9   know?

10  A.   Do I know?

11  Q.   Yes.

12  A.   Which part?

13  Q.   Do you know how -- first of all, do you know the other

14  demographic characteristics than race of the students selected

15  for the school?

16  A.   They weren't selected for the school.  Students weren't

17  selected for the school, Mr. Walker.

18  Q.   Who told you they weren't selected?

19  A.   There were three feeder schools:  Terry Elementary,

20  Fulbright Elementary, and Don Roberts Elementary, and the

21  students in those schools would have the option of attending

22  that new middle school.

23  Q.   So they were given some kind of freedom of choice?

24  A.   It was the attendance zones that were identified as

25  being -- as who would be -- have the option of attending that

1    middle school, if it's to be opened.

2    Q.   Do you know what the method was used in order to populate

3    that school or at least to get the sixth grade class in that

4    school?  Do you know what it was?

5    A.   Method was identifying the elementary schools that were the

6    natural feeders for that school.

7    Q.   I see.  Now, did you all have a feeder school plan for the

8    rest of the schools in the district?

9    A.   There is a preexisting feeder plan.  Please don't ask me to

10   explain it because it's very confusing.

11   Q.   I see.  Do you intend to build new schools, new public

12   schools, in southwest Little Rock to replace existing schools?

13   A.   There is a plan to build a new high school.

14   Q.   That's not my question.  Do you intend to build new public

15   schools in southwest Little Rock to replace existing schools

16   that are in need of replacement?

17   A.   There is a plan, yes.

18   Q.   Have you seen -- is that plan in writing?

19   A.   It's the plan that we've discussed of a new high school to

20   be built in southwest Little Rock.

21   Q.   What is that plan called?  Do you --

22            THE COURT:  Mr. Walker, please let the witness finish.

23            MR. WALKER:  Your Honor, I apologize.

24   BY MR. WALKER:

25   Q.   Do you recall me asking you to give me all the written

1    plans that you have for school construction in Little Rock?  Do

2    you recall me asking you that?

3    A.   I recall you asking me for a lot of things, Mr. Walker.

4    That may have been one of them.

5    Q.   Do you have a plan that you can describe right now for

6    replacing the new -- with new schools the old schools south of

7    630 and east of Shackleford?

8    A.   There is a plan for one school so far, and that's the high

9    school.  Any further work on planning would probably be best

10   answered by someone from LRSD.

11   Q.   All right.  So you have a plan to build two schools, one

12   for a population that's around the Leisure Arts area, and one in

13   southwest for a high school?

14   A.   Yes.

15   Q.   But you don't have a written plan by which to accomplish

16   that?

17   A.   No, there is a written plan.

18   Q.   Do you have a timetable for the accomplishment of the

19   additional construction?

20   A.   There is a timetable.

21   Q.   What is the timetable?

22   A.   I do not have the details of that in memory.  I have seen

23   it.

24   Q.   What is the cost for that?

25   A.   Again, I don't recall the cost of that.

1    Q.    All right.  Now, you do meet regularly with Mr. Key [sic]

2    as a board, don't you?

3              THE COURT:  I think you met Mr. Kurrus.

4    BY MR. WALKER:

5    Q.    I mean with Mr. Kurrus.  Thank you.  I apologize.

6    A.    I meet regularly with Mr. Kurrus and on an as-needed basis.

7    Q.    Do you give notice of the public meetings, of the meetings

8    that you all have in that official capacity to the public?

9    A.    No.

10   Q.    So when you and he meet, it's basically --

11   A.    The actions that you refer to, Mr. Walker, come in the form

12   of a board packet.  We don't have meetings to go over those

13   packets.

14   Q.    Isn't it true that you and Mr. Kurrus have met very often,

15   one on one?

16   A.    Very often?  I don't know how you would define very often.

17   Q.    Let's say more than once or twice?

18   A.    Yes.

19   Q.    And isn't it true that you didn't give public notice of

20   those meetings?

21   A.    No, we didn't.

22   Q.    Thank you.  Has your office by your delegated staff

23   approved a plan to put approximately 4,000 students into a

24   public charter school near the campus at UALR?

25              MR. HOLLINGSWORTH:  Your Honor, I'm going to object at

```
 1   this stage to this being far beyond the scope of the hearing.

 2   These questions are going into the matter that was the subject

 3   of a TRO on Friday.

 4              THE COURT:  Mr. Walker?

 5              MR. WALKER:  Your Honor, that was to deal with that

 6   particular event.  This goes to the question of the plans for

 7   providing facilities for the black students within the Little

 8   Rock School District, and this also -- this goes to the

 9   district's -- at least to the state department's plans regarding

10   support of the Little Rock School District with respect to new

11   school construction on an expedited basis.

12              THE COURT:  Overruled with a caveat:  I'll let you

13   have some leeway, Mr. Walker, but the papers told me that we

14   were here about two main things.

15              MR. WALKER:  We are.

16              THE COURT:  And so --

17              MR. WALKER:  I understand.

18              THE COURT:  Okay.

19              MR. WALKER:  All right.

20   BY MR. WALKER:

21   Q.   Can you answer that?

22              THE COURT:  Officer Gray -- since we've got an

23   interruption, Officer Gray, is Ms. Shields, our IT person,

24   outside the door?  Do you know?

25              COURT SECURITY OFFICER:  I've seen her while ago.
```

1          THE COURT:  Is she there or not?  As Mr. Walker would

2    say, that's a yes or no question.

3          COURT SECURITY OFFICER:  I don't know.

4          THE COURT:  Okay.  Thank you.

5          COURT SECURITY OFFICER:  No.  She's not out there.

6          THE COURT:  Thank you, Officer Gray.  Thank you.

7    A.   Could you repeat the question, Mr. Walker?

8    Q.   Has your office by your delegated staff approved a plan to

9    put approximately 4,000 students into a public charter school in

10   the near future to be located near the campus of UALR at Little

11   Rock School District expense?

12   A.   No.

13   Q.   Is it at the state department's expense?

14   A.   It is at the state of Arkansas's expense.

15   Q.   So the money will not come from the Little Rock School

16   District?

17   A.   The money comes from the public school fund.

18   Q.   Did your office conduct a study regarding the impact of

19   that approval upon the public schools operated by the Little

20   Rock School District?

21   A.   I'm sorry.  You said that one really fast.

22   Q.   Did your office conduct a study regarding the impact of

23   that approval upon the public schools operated by the Little

24   Rock School District?

25   A.   We did a desegregation analysis.  There was no impact on --

1    specifically on Little Rock School District.

2    Q.    Okay.

3    A.    There was no study on the impact on the Little Rock School

4    District.

5    Q.    There was no study on it?

6    A.    On the impact on the Little Rock School District.  There

7    was an impact of the desegregation component.

8    Q.    Did your office conduct that study?

9    A.    Yes.

10   Q.    Did you make a selection of that site at UALR?

11   A.    No, I did not.

12   Q.    Now, is one of your board members who led the effort to

13   place LRSD in academic distress a member of the eStem board,

14   which seems to have that school placed there?  That's

15   Ms. Saviers?

16   A.    Is she a member of the eStem board?

17   Q.    Yes.

18   A.    I don't know if she continues to serve in that capacity.

19   Q.    Has ADE ever approved new construction for a school located

20   in a black neighborhood which was not under a federal court

21   order, to your knowledge?

22   A.    Not to -- I don't know.

23   Q.    Isn't it true that since you've been there, you have never

24   in the whole state of Arkansas approved for any community where

25   the population is majority African-American any new school

1    construction, only patch-ups and repairs?

2    A.    I don't know if that's true.

3    Q.    Do you know of any new construction that you've approved

4    anywhere where there are a majority black students?

5    A.    Yes.

6    Q.    Where?

7    A.    Helena-West Helena.

8    Q.    This year for the first time, a few weeks ago.  But besides

9    that, anytime?

10   A.    I do not know.  I know that one specifically because I

11   signed off on it.

12              MR. WALKER:  Thank you, your Honor.

13              THE COURT:  Thank you, Mr. Walker.  I think now is a

14   good place to take our morning break.

15              MR. WALKER:  Your Honor --

16              THE COURT:  I'm sorry.  Did you have --

17              MR. WALKER:  I did have another -- I just wanted to

18   ask a couple more questions before we go.

19   BY MR. WALKER:

20   Q.    You have the $37 million that was agreed to in the

21   desegregation plan approved by the state.  Do you recall that?

22   A.    You need to be more specific.  I have the --

23   Q.    Do you remember the settlement agreement between the state

24   of Arkansas, the Little Rock School District, North Little Rock,

25   and Joshua?

1    A.    Yes.

2    Q.    Were you aware that the next year's desegregation funds are

3    to be committed exclusively to southwest Little Rock schools?

4    A.    I'm not aware of that stipulation, no.

5              MR. WALKER:  Thank you, your Honor.

6              THE COURT:  Thank you, Mr. Walker.  Let's take our

7    morning break.  Y'all can keep your seats.  Stand or walk or

8    whatever you want to do.  We'll be back at ten-thirty.

9         (Recess from 10:15 a.m. until 10:33 a.m.)

10             THE COURT:  Mr. Walker, anything else you want to

11   cover?

12             MR. WALKER:  If I may from here.  I'll come forward

13   since I don't talk that loud.  May I begin?

14             THE COURT:  You may.

15   BY MR. WALKER:

16   Q.    Mr. Key, when you say the state's going to pay for the

17   school on the UALR campus, by that do you mean when Little Rock

18   students go into the charter, their ADM will go with them, and

19   therefore the state will pay that money to the charter that

20   comes from them?

21   A.    Yes.  Public school fund, the foundation funding follows

22   the student on a per ADM basis, average daily membership.

23   Q.    So that if you have 4,000 students at $8,000 apiece, that

24   means that would be $24 million annually that the Little Rock

25   School District would lose?

1  A.   No, that's not correct because there are other funding

2  streams involved.

3  Q.   Well, if the students go -- here's my question:  If the

4  students leave Little Rock to go to the charter, their ADM goes

5  with them; is that right?

6  A.   Yes.

7  Q.   And whatever that figure is, Little Rock suffers by that

8  amount?

9  A.   No, sir, because there are other funding streams that have

10 to be taken into account.

11 Q.   Such as?

12 A.   Such as declining enrollment funding, which is paid to

13 school districts that lose enrollment to help them soften the

14 blow of losing funding.

15 Q.   That's for one year, isn't it?  Or two?

16 A.   It's -- it depends on the -- how many years of the decline

17 of the student population.

18 Q.   What other kind of funding?

19 A.   Well, you have -- in the state system, you have categorical

20 funding, you have special ed funding.  There are a number of

21 things that have to be taken into account.  You were only asking

22 about the foundation funding.

23 Q.   Sooner or later, isn't it true that whatever money is

24 attached to the students enrolled in the Little Rock schools,

25 that money, once the charters are open and they go there, then

1  that money leaves the Little Rock School District, doesn't it?

2  Sooner or later?

3  A.    Sooner or later.

4         MR. WALKER:  Thank you.

5         THE COURT:  Thank you, Mr. Walker.

6     Mr. Hollingsworth, do you have questions?

7         MR. HOLLINGSWORTH:  Yes, I do.  Thank you, your Honor.

8                        CROSS-EXAMINATION

9  BY MR. HOLLINGSWORTH:

10 Q.    Commissioner Key, I'd like to clarify a few things and then

11 talk about some additional matters so that we can get you out of

12 here today.

13     First I want to clarify the different roles in construction

14 and construction funding that was discussed.  Does the

15 Department of Education actually have a role in approving

16 construction of school facilities?

17 A.    The Division of Public School Academic Facilities and

18 Transportation does have a role, yes.

19 Q.    And that's under the umbrella of a different -- of a

20 commission that's separate from the -- is it separate from the

21 State Board of Education?

22 A.    Yes, it is.

23 Q.    And you're one of three commissioners; correct?

24 A.    Correct.

25 Q.    And that division has a separate staff; correct?

1   A.   Yes.

2   Q.   We talked about Helena-West Helena.  Just to be clear, what

3   was the Commission -- and I always get this wrong -- on Academic

4   Facilities and Transportation's role in this Helena-West Helena

5   school?

6   A.   The commission approves the projects from a list, and the

7   projects for that funding cycle that come on that list, the

8   commission looks and approves or rejects those.  They don't take

9   each one, you know, project by project.

10  Q.   Okay.

11  A.   If they're approved from the list, then they get approved

12  by the commission or approved on the list.

13  Q.   So using Helena-West Helena as an example, is this

14  partnership funding?

15  A.   Yes.

16  Q.   So the state pays a percentage and the district pays a

17  percentage; is that right?

18  A.   Yes, based on a wealth index that each district has,

19  depending on the conditions, the financial conditions, the

20  property values and assessments in that district.

21  Q.   And just to be clear, the project that's been funded in

22  Helena-West Helena, is that a new building?

23  A.   It's new construction to an existing building.

24  Q.   Does Little Rock School District participate in the

25  partnership program?

1    A.    No.

2    Q.    Does the Department of Education or the Commission on

3    Academic Facilities and Transportation provide facilities

4    funding apart from the settlement agreement, which we'll talk

5    about in a minute, facilities funding for the Little Rock School

6    District?

7    A.    No.

8    Q.    Now, you've been commissioner how long?

9    A.    Almost a year.

10   Q.    So when Mr. Walker asked you has the ADE ever approved

11   construction of a new school in a black neighborhood, what you

12   know of that is based on the last year and a half; is that

13   correct?

14   A.    Yes.   Not quite a year.

15   Q.    Okay.   And the Department of Education does not control, or

16   does the Department of Correction -- the Department of Education

17   control the spending priorities of the Little Rock School

18   District?

19   A.    No.

20   Q.    I'd like to talk to you for a minute about the Leisure Arts

21   Building, and I think I understood your testimony to be that the

22   construction of a school in that site had already been approved

23   by the Little Rock School District Board; is that correct?

24   A.    Yes.

25   Q.    Before the state assumed authority over the Little Rock

1    School District Board?

2    A.    That's correct.

3    Q.    And so I want to just briefly, to make sure that it's

4    clear, look at a document that Mr. Walker showed you, an e-mail

5    from Todd Hart.

6          There we go.  All right.

7          Based on what we're looking at on the screen, what was --

8    what's your recollection of the first date that Mr. Hart

9    contacted you about the possibility of purchasing the Leisure

10   Arts Building?

11   A.    April 28.

12   Q.    How long had you been commissioner at that point?

13   A.    One month and two days.

14   Q.    And Baker Kurrus was not on board at that point; correct?

15   A.    He was not.

16   Q.    Dexter Suggs was the superintendent?

17   A.    Dr., now Mr., Suggs was, yes.

18   Q.    Do you recall that Mr. Hart also contacted Mr. Suggs?

19   A.    I believe that's correct, yeah.

20   Q.    Now, why is it that you as proxy for the Little Rock School

21   District Board voted in favor or decided to purchase the Leisure

22   Arts property rather than develop a school on the property that

23   had already been purchased adjacent to Leisure Arts?

24   A.    The purchase of that existing facility was simply a

25   financial benefit to the district.  I think the purchase price

1    is $11.5 million for a facility that previously served partly as

2    an office complex, but then a lot of extra space that was --

3    that is warehouse space, and that warehouse space can be

4    converted, but it gave a very large building that the district

5    would not have to build from the ground up.

6         In my conversation with Mr. Kurrus, I said I'm not sure if

7    it will work or not, but I did ask him to get folks to look at

8    it to see if it could work for the purposes of a school before

9    we moved forward.

10   Q.   Did Mr. Kurrus and his people do some sort of a financial

11   analysis to see whether that was beneficial to the district?

12   A.   Yes.

13   Q.   What's your understanding of whether there was an advantage

14   to buying the building versus building a new one?

15   A.   I recall a figure in the neighborhood of for a middle

16   school that size maybe somewhere between 30, $35 million that

17   would have been the cost to the district.  And the timing it

18   would have taken, the number of years to get there, and the

19   purchase of this building, 11.5 million, the plan to rehab it

20   and make it usable for a school could be done -- one, it could

21   be done quickly to get students in there this coming school

22   year.  Two, it could be done in stages so that eventually that

23   warehouse space could be converted into classroom or other type

24   of space for school use.

25   Q.   From your perspective as the proxy for the Little Rock

1  School Board, is the progress of the Leisure Arts project

2  slowing or changing in any way the progress of the plan to build

3  a new high school in southwest Little Rock?

4  A.   Oh, absolutely not.

5  Q.   I'd like to show you what we've marked as ADE Exhibit 2.

6       Can you tell us, please, sir, what ADE Exhibit 2 is.

7  A.   These are the minutes, would be the board minutes with me

8  serving as board, decisions that were made for that month.

9  Q.   And if we look at page -- at the second page, we see the

10  approval of the purchase of the Leisure Arts property?

11  A.   Yes.

12       MR. HOLLINGSWORTH:  Your Honor, move to admit ADE

13  Exhibit 2.

14       THE COURT:  Mr. Walker, any objection?

15       MR. WALKER:  No, sir.

16       THE COURT:  Received.

17     (Defendant ADE's Exhibit 2 received in evidence.)

18  BY MR. HOLLINGSWORTH:

19  Q.   Now, I want to talk to you briefly about the settlement

20  agreement between the Little Rock School District, the Joshua

21  Intervenors, and, actually, I believe, all the parties to the

22  Little Rock School District v. North Little Rock, et al., case.

23  Do you recognize what we've marked as ADE 3 as a copy of the

24  consent judgment with the settlement agreement attached?

25  A.   Yes.

1          MR. HOLLINGSWORTH:  Your Honor, move to admit ADE 3.

2          MR. WALKER:  No objection.

3          THE COURT:  ADE 3 will be admitted without objection.

4      (Defendant ADE's Exhibit 3 received in evidence.)

5   BY MR. HOLLINGSWORTH:

6   Q.   Mr. Key, what is your understanding of the state's payment

7   obligations under the settlement agreement represented in ADE 3?

8   A.   At the point of this agreement, there were four years of

9   continued desegregation payments, and the last year of that

10  four-year period, those payments would be for facilities.

11  Q.   And are the first three years' payments conditioned in any

12  way in terms of the manner in which the Little Rock School

13  District can use the money?

14  A.   No.

15  Q.   You heard Mr. Walker's question about whether this money --

16  whether the agreement is to use some of this money to build a

17  school in southwest Little Rock or to replace unequal

18  facilities.  Are you aware of any such agreement?

19  A.   No.

20  Q.   To your knowledge, does ADE 3 represent the entire

21  agreement between the state of Arkansas and the parties to this

22  agreement?

23  A.   To my knowledge, yes.

24  Q.   Mr. Walker asked you about aged facilities and whether

25  they're less desirable.  Do you have any knowledge of how old

1  Central High School is?

2  A.    Not the specific date, no.

3  Q.    60 or 70, probably?

4  A.    It's very old.

5  Q.    Is it fair to say that Central High School is desired by

6  many parents and students?

7  A.    It is certainly one of the premier, if not the premier high

8  school in the district.

9  Q.    So is it possible to say as a generality that an old school

10 is --

11             MR. WALKER:  Your Honor?

12             THE COURT:  Yes, sir.

13             MR. WALKER:  Pardon me for interrupting.  I remind

14 Mr. Hollingsworth that he may not lead the witness, while I can.

15             THE COURT:  I'll take that as a leading objection, and

16 it's sustained.

17             MR. WALKER:  Thank you.

18 BY MR. HOLLINGSWORTH:

19 Q.    Is it your opinion as a proxy for the Little Rock School

20 District Board that every old school in Little Rock School

21 District --

22             MR. WALKER:  Objection, your Honor.

23             THE COURT:  Basis?

24             MR. WALKER:  He's leading the witness, giving him the

25 answer.

1          THE COURT:  Sustained.  Mr. Hollingsworth, try again.

2          MR. HOLLINGSWORTH:  I will try again.  I apologize.

3  BY MR. HOLLINGSWORTH:

4  Q.   Mr. Key, do you have an opinion about whether the age of a

5  facility -- how the age of a facility affects its desirability

6  as an educational facility?

7  A.   The age of a facility really is not the determining factor,

8  in my opinion, of its suitability or desirability, and I can

9  point to a number of educational facilities on university

10  campuses that are very desired.  And it depends on the upkeep,

11  it depends on the maintenance of those older buildings.  I can

12  cite specifically an old what we call WPA project in Flippin,

13  Arkansas, that was very effective and was used for a number of

14  years, just up until recently when they built a new facility.

15          It depends on how well they are kept, maintained, and

16  upgraded through the years to accommodate the changing student

17  needs.

18  Q.   Is the State Board of Education charged with assuring that

19  all facilities in the Little Rock School District meet a

20  particular standard?

21  A.   The State Board of Education?

22  Q.   Yes, sir.

23  A.   No.

24  Q.   Or the Department of Education?

25  A.   There are guidelines that the Division of Public School

1    Academic Facilities and Transportation, they are required to go

2    out and do inspections, there are safety components, there are

3    other state agencies that are involved in those inspections.  So

4    there is a level of safety, security, and usability that must be

5    maintained that the state does have a role in confirming that.

6    Q.    Does the Department of Education have the power to control

7    the Little Rock School District's spending priorities for

8    facilities?

9    A.    The local boards are -- they are responsible for making

10   those determinations and those spending priorities.  So up until

11   the time of January of 2015, no, the state did not have a role

12   in directing how those monies would be spent.

13   Q.    And since that time, what is the state's role?

14   A.    Well, my role as commissioner is to work with Mr. Kurrus

15   and his team to make sure decisions are made, the proper

16   decisions are made, to address facilities needs, maintenance

17   needs, and to make sure that those school facilities are usable

18   for the purposes of educating the children in the Little Rock

19   School District.

20   Q.    Is there more than one role for you here?

21   A.    Yes.

22   Q.    Can you explain the different hats that you wear?

23   A.    I'll certainly try.  Of course, as commissioner, my

24   responsibility is to all of the students, all of the schools,

25   all of the districts, all of the charters, in the state of

1    Arkansas, and in my role as commissioner under the statute, for
2    every district that the state board places in state control
3    because of either academic distress, fiscal distress, or
4    facilities distress, my role is to serve in the place of the
5    local school board.  That role was placed upon the commissioner
6    following the *Lake View* case that there was the accountability
7    component that the General Assembly chose to create a situation
8    where if a local board -- and this was directly from the *Lake*
9    *View* ruling.  If the local community was not doing what it
10   needed to do to meet the needs of the students, the state was
11   responsible.  Made it very clear.  So if the state was
12   responsible, there had to be a mechanism to exercise that
13   responsibility.  That's the role that I now have with Little
14   Rock School District, Pulaski County School District, Dollarway
15   School District, and the Helena-West Helena School District.
16   Q.    In the Little Rock School District, for example, when you
17   act as proxy for the board, who all are you acting on behalf of?
18   A.    I'm acting on behalf of the schoolchildren in the
19   community.
20   Q.    Do you consider when you're acting as the proxy for the
21   school board that you're acting on behalf of the Department of
22   Education or the state board?
23   A.    In the role of that accountability measure, yes.
24         MR. HOLLINGSWORTH:  Thank you.  Pass the witness.
25         THE COURT:  Thank you, Mr. Hollingsworth.

1          Mr. Heller?

2               MR. HELLER:  Thank you, your Honor.

3                         CROSS-EXAMINATION

4    BY MR. HELLER:

5    Q.   Commissioner Key, you discussed briefly with Mr. Walker the

6    Quest charter middle school.  Is that school located within the

7    boundaries of the Little Rock School District?

8    A.   It's on Rawling Road, and I think that's actually outside

9    the LRSD boundary.

10   Q.   Is there a geographic zone for that school?  Is that

11   school --

12   A.   No.  It's an open enrollment charter school.  So by

13   definition in the statute, it means an open enrollment charter

14   school can accept students from anywhere.

15   Q.   Is there even a preference for students in the western or

16   northwestern parts of LRSD?

17   A.   No.

18   Q.   Mr. Walker spoke with you about zip code 72223, apparently

19   affluent zip code.  Do you know how that zip code might overlay

20   with the assignment zones for the three schools you mentioned

21   that feed the new west Little Rock middle school?

22   A.   No, I don't know.

23   Q.   Let me show you something on the overhead.

24        This is LRSD Exhibit 1, facilities master plan from 2014.

25   Have you seen that document before?

1    A.    I've seen it, yes.

2    Q.    Are you aware that it's a facilities plan prepared

3    independently for LRSD by a team of engineers and architects?

4    A.    Yes.

5    Q.    Did you know that the plan was approved by the LRSD School

6    Board before the state takeover?

7    A.    That's my understanding, yes.

8    Q.    Let me show you page 99 of LRSD Exhibit 1.

9              THE COURT:  What page was that, Mr. Heller?

10             MR. HELLER:  Page 99 of LRSD Exhibit 1, your Honor.

11             THE COURT:  Thank you.

12   BY MR. HELLER:

13   Q.    Can you see, Commissioner Key, the two scenarios set forth

14   by the facilities master plan, there's a cost assigned for a,

15   quote, new middle school in west Little Rock?

16   A.    Yes.

17   Q.    And the total cost there is $54 million?

18   A.    Yes.  I undershot a few minutes ago.

19   Q.    That's what I wanted to ask you about.  You suggested that

20   the cost of building the school, in addition to the purchase

21   price for the Leisure Arts Building, might be 35 -- well, I'm

22   sorry.  The cost for building a new school if we had not

23   purchased the Leisure Arts Building you suggested might be 35

24   million.  Are you --

25   A.    I was a little low.

1   Q.   So you agree that the projected cost would have been closer
2   to $54 million?
3   A.   I'll take the engineers and architects at their estimates.
4   Q.   So by -- you approved the purchase of the Leisure Arts
5   property for $11.5 million?
6   A.   Yes, I believe that's the amount that we agreed upon.
7   Q.   And the plan for that property, the longer-term plan, two
8   years from now, is to convert a warehouse into usable school
9   space; correct?
10  A.   That's right.
11  Q.   So at the beginning of the 2017-2018 school year, the
12  facility west Little Rock middle school students will attend
13  will be what's presently a warehouse at the Leisure Arts
14  facility.
15  A.   Right.
16  Q.   And the building permits are already in place?
17  A.   That's my understanding.
18  Q.   As far as you're concerned, all the approvals are in place
19  for Mr. Kurrus to move forward with the rehabilitation of that
20  building in preparations for school at the beginning of the next
21  school year?
22  A.   Very important to get moving on those because of the
23  need -- I think there are well over 200 students already
24  registered to attend sixth grade there.
25          MR. HELLER:   Thank you.

```
 1              THE WITNESS:  And your Honor said I would have an
 2   opportunity to clarify something, if I may.
 3              THE COURT:  Sure.
 4              THE WITNESS:  Mr. Walker asked if I selected that
 5   location, and what I wanted to clarify was that Mr. Kurrus and I
 6   worked together on that process.  I did not do that in a vacuum,
 7   nor would I.  In my role, it's very important that I would get
 8   the feedback and the information and the expertise from
 9   Mr. Kurrus and his Little Rock team.
10   BY MR. HELLER:
11   Q.   And when you -- I think you mentioned to Mr. Walker that
12   really the Little Rock School Board selected that location in
13   the sense that the board had already purchased property directly
14   adjacent to the Leisure Arts property?
15   A.   Yes, that's correct.
16              MR. HELLER:  Thank you.
17              THE COURT:  Thank you, Mr. Heller.
18        Mr. Walker.
19              MR. WALKER:  Thank you, your Honor.
20                        REDIRECT EXAMINATION
21   BY MR. WALKER:
22   Q.   What is the maximum enrollment the Leisure Arts Building
23   can be adapted to accommodate?
24   A.   I don't know the answer to that, Mr. Walker.
25   Q.   You don't know whether it will be 300, 400, 500 students?
```

1    A.    No.   When it's fully converted?  No, sir, I don't know.

2    Q.    So you have no plan that we can see regarding that; right?

3    A.    I don't have a plan.  Mr. Kurrus has a plan.  I just don't

4    know the numbers.

5    Q.    If that school can be adapted for use in September, is

6    there any reason the students from Cloverdale who are entering

7    the seventh grade, the sixth grade, could not be assigned to it

8    and transported to it?

9    A.    I don't know the answer to that question.

10   Q.    If those students are in a decrepit, inadequate facility,

11   why should not they have the equal opportunity to attend that

12   school as the other kids who live nearby?

13   A.    You're asking about attendance zones, and I don't know the

14   answer to that because I'm not fully aware of all the attendance

15   zone issues.

16   Q.    What's more important?  What's more important?  Students or

17   an attendance zone?

18   A.    Students.

19   Q.    And you do concede that the Cloverdale schools are -- the

20   Cloverdale students are in dismal facilities?

21   A.    I've never said that.

22   Q.    You haven't?  But do you agree that they are?

23   A.    I don't know how you define dismal, Mr. Walker.

24   Q.    Now, does their situation require or cry out for urgent,

25   immediate attention?

1    A.    Does the situation at Cloverdale --

2    Q.    Yes, sir.

3    A.    -- cry out for immediate attention?

4    Q.    Yes, sir.

5    A.    Not from the time that I spent there last spring with

6    students and teachers in Cloverdale.  It appeared to be a usable

7    building until such time as we can convert and remodel the

8    McClellan campus.

9    Q.    Tell me this:  What's your plan for the earliest date that

10   the Cloverdale students will have a new school, Cloverdale

11   Middle School students will have a new school?  What is your

12   plan?

13   A.    I don't know the dates.  I can tell you the plan is that

14   once the new high school is built, McClellan will be renovated

15   to accommodate those middle school students.

16   Q.    Did I hear you say that that would be in 2020?

17   A.    You didn't hear me say a date, no, sir.

18   Q.    What year will it be?

19   A.    I don't know the dates.

20   Q.    All right.  Well, it has to await, according to your plan,

21   the accommodation of the Cloverdale students will have to await

22   the closing of McClellan, will it not?

23   A.    That's the plan, yes.

24   Q.    And then it will have to be renovated, will it not?

25   A.    Yes, that's -- that's correct.

1  Q.   So that the earliest those students in Cloverdale can get

2  some relief will be 2021 or thereabouts; isn't that correct?

3  A.   I don't know if that's correct or not.

4  Q.   Well, you're the superintendent and you're the school

5  board.  What is your conclusion as to the earliest time those

6  children will get some relief?

7  A.   Relief from what?

8  Q.   From their present circumstances.

9  A.   They're in a building that is usable now.  And I don't know

10 what present -- you've used the word "deplorable."  I don't know

11 how to put that in technical terms to be able to respond to your

12 question.

13 Q.   But you've told the Court that you plan new facilities for

14 them; right?

15 A.   I plan new facilities.  Renovated McClellan is the plan

16 for --

17 Q.   And you plan that sometime in the future; right?

18 A.   Yes.

19 Q.   But you can't tell the Court when?

20 A.   I don't personally have knowledge of the dates on the

21 timeline.

22 Q.   Will it be this next year?

23 A.   No.

24 Q.   Will it be the year after next?

25 A.   It will be at the point that the McClellan -- or McClellan

1    and Fair are combined into the new high school and the Little

2    Rock team can get in there and renovate the McClellan existing

3    campus to accommodate those students.

4    Q.    Did you earlier testify that the earliest time for the

5    McClellan students to be in a new school would be 2019?

6    A.    I don't recall ever giving a date.

7    Q.    Tell me, what is your best conclusion now that you as a

8    school board and the superintendent of schools, Mr. Kurrus, have

9    determined that that will happen?

10   A.    If I had the document, I could tell you.  I don't have that

11   committed to memory, Mr. Walker.

12   Q.    But whatever it is is going to take more time beyond the

13   finishing of McClellan, so those students have to wait for at

14   least two to three years, don't they?

15   A.    I don't know what the timeline is for the renovation of

16   that McClellan campus.

17   Q.    You're going to put these kids in the Leisure Arts Building

18   and undergo construction for the rest of it beginning this year,

19   aren't you?

20   A.    Yes.

21   Q.    So that that Leisure Arts facility will be open and running

22   for all three grades if it is -- if the Court approves the plan.

23   A.    No, sir, that's not correct.

24   Q.    In two years, wasn't it?

25   A.    In two years.  If the plan goes according to our schedule.

1    Q.    But the Cloverdale children will still be where they are in

2    two years, won't they?

3    A.    Yes, because the new school won't be completed by then.

4    Q.    Now, in terms of just a few things you said.  On the Quest

5    funding, the Quest students take from the Little Rock School

6    District funds, don't they?

7    A.    No.

8    Q.    Aren't the number of the students who go to Quest students

9    who are eligible to attend the Little Rock public schools?

10   A.    They're eligible to attend.  That doesn't mean they were

11   attending Little Rock schools.

12   Q.    But they get the ADM from the state that would be, due to

13   their residence, going to Little Rock if they attended schools

14   in Little Rock, don't they?

15   A.    Assuming they attended schools in Little Rock.

16   Q.    Now, are you telling the Court that you are not aware of a

17   stipulation that the Little Rock School District entered into

18   with the Joshua Intervenors as a condition of settlement of the

19   case between Joshua, Little Rock, the state of Arkansas, North

20   Little Rock, and Pulaski County that the final year's money of

21   $37 million would not be used for southwest Little Rock school

22   construction?  You're not aware of that?

23   A.    No.

24             MR. WALKER:  Thank you.

25             THE COURT:  Thank you, Mr. Walker.

1    Commissioner Key, you can step down.  Talk to your lawyers

2    about whether you can go or not, though.

3           MR. HOLLINGSWORTH:  Your Honor, may I clarify?  Two

4    questions?

5           THE COURT:  Sure.  I'm sorry, Mr. Key.

6       Make it quick, please, Mr. Hollingsworth.

7                        RECROSS-EXAMINATION

8    BY MR. HOLLINGSWORTH:

9    Q.   Mr. Key, you've asked about what your plan is.  Can you

10   explain who you rely upon to -- as proxy for the Little Rock

11   School Board to handle the details of planning and dates and

12   dollars?

13   A.   Mr. Kurrus.

14          MR. HOLLINGSWORTH:  Thank you.

15          THE COURT:  Thank you, Mr. Hollingsworth.

16      Mr. Walker?

17          MS. MIDDLETON:  Ms. Jackie Whitehead.

18          THE COURT:  Ms. Whitehead.

19          MR. HOLLINGSWORTH:  Your Honor, Mr. Key has been

20   subpoenaed and has a funeral to go to this afternoon.  May he be

21   excused?

22          THE COURT:  Mr. Walker, can Mr. Key be excused?

23          MR. WALKER:  I have no objection to him going to the

24   funeral, but I'd like to have him available for on call.

25          THE COURT:  All right.  Can you get a cell phone,

 1    leave a cell phone with your lawyers, Mr. Key?  Good.  Thank

 2    you.

 3              **JACKIE WHITEHEAD, PLAINTIFFS' WITNESS, DULY SWORN**

 4              THE COURT:  Mr. Walker?

 5                         DIRECT EXAMINATION

 6    BY MR. WALKER:

 7    Q.    Would you state your name, please.

 8    A.    Jackie Whitehead.

 9    Q.    What is your education, Ms. Whitehead?

10    A.    I have a BS degree from the University of Arkansas at Pine

11    Bluff, a master's from the University of Arkansas at Little

12    Rock, an Ed.S. from the University of Arkansas at Little Rock.

13    Q.    Do you have any special certifications?

14    A.    Special education, K-12 specialist, and all areas of

15    leadership administration.

16              THE WITNESS:  Oh, you can't hear me?

17              THE COURT:  That's worse.  Hold on.

18              THE WITNESS:  Hello.

19              THE COURT:  There we go.

20         Thank you, Mr. Walker.

21              MR. WALKER:  Thank you, your Honor.

22    BY MR. WALKER:

23    Q.    Are you employed by Little Rock School District?

24    A.    I am.

25    Q.    When did you begin your employment with the district and in

1    what capacity?

2    A.    August of 2005 as a special education teacher.

3    Q.    And have you worked continuously in the district since that

4    time?

5    A.    I have.

6    Q.    Tell the Court the schools in which you have worked.

7    A.    I have worked at Dunbar Middle School, Pulaski Heights

8    Middle School, McClellan High School, Wilson Elementary.  And

9    Mabelvale Middle School is where I'm currently employed.

10   Q.    Would you describe to the Court when you worked at Dunbar

11   and what your observation of the condition of the facility at

12   Dunbar was when you were there.

13   A.    I worked at Dunbar from April of 2006 until June of 2014.

14   I was a split assignment between Pulaski Heights and Dunbar.  I

15   was the compliance support teacher, and our name changed several

16   times, but my responsibility was to oversee the services for

17   students eligible to receive special education and 504 services.

18   Q.    In that capacity, were you in a position to observe the

19   physical condition of the Dunbar Middle School?

20   A.    I was.

21   Q.    Can you describe that to the Court, please.

22   A.    My office was originally stationed on the first floor.  It

23   was adjacent to a classroom, and in that adjacent room, I

24   immediately noticed mold on the walls, ceiling tiles was water

25   stained.  And I complained that that area was making me ill.  It

1    did not have any ventilation.  It had windows, but no air-

2    conditioning unit or heating and air.

3         So eventually, I was given a window unit, but throughout

4    the building on the first floor, there was mold along the walls,

5    along the stairwells, in the office facilities.  And around

6    about 2010, I was moved to the basement.  And that's where, for

7    me, things really got really rough.

8         Every day there was a stench of mold that was prevalent.

9    The office flooded every time it rained.  In one year alone, my

10   office area flooded five times within a three-month time period.

11   Mold -- we had to be relocated to another area until the mold

12   could -- the water could be drained and dried up and the mold

13   could be exacerbated [sic] by an outside agency.

14        The stench was still there, the mold was still prevalent.

15   Rodents was in the basement a lot.  You could smell the mold

16   throughout the entire basement area.  And I believe it was in

17   2008 to 2010, we didn't know what was going on, but there was a

18   company came in and --

19             THE COURT:  Ms. Whitehead, can I interrupt?

20             THE WITNESS:  Yes.

21             THE COURT:  Mr. Walker, questions and answers, please.

22   We need to get it focused down as opposed to just an ongoing

23   what we lawyers call a narrative.

24             THE WITNESS:  Okay.

25             THE COURT:  The trouble is, you're covering ground a

1    little too quickly for us.

2            THE WITNESS:  Okay.

3            THE COURT:  Mr. Walker.

4            MR. WALKER:  Thank you, your Honor.

5    BY MR. WALKER:

6    Q.   Were students in the basement when you were down there?

7    A.   Yes.

8    Q.   Approximately how many classes were in the basement?

9    A.   About nine.

10   Q.   All right.  And when it -- did those classes all experience

11   the same thing that you observed or just stated?

12   A.   Pretty much.  The special education classroom and the

13   keyboarding classroom as well as Room 10 and 11 received a lot

14   of it.

15   Q.   Now, how long were you at Dunbar?

16   A.   I was there ten years.

17   Q.   Did the conditions ever improve?

18   A.   No.

19   Q.   All right.  Are there other conditions at Dunbar that were

20   deleterious, in your opinion?

21   A.   Yes.  And when you asked me the question did it improve,

22   there was repair work done, but the building continued to flood.

23   So even with the repair work, the mold was still prevalent due

24   to the flooding continuous.

25   Q.   Did you have occasion to leave Dunbar and go to -- is it

1    Wilson?

2    A.    I left Dunbar at my request to -- not to return because I

3    became very ill.  And they were -- I was assigned then to

4    McClellan High School.

5    Q.    Would you describe the conditions at McClellan that you

6    observed and experienced?

7    A.    I was only there for about a week.  I immediately began to

8    demonstrate medical issues that I informed the administration as

9    well as HR, but in the area that they had housed me, when we

10   opened the door, there was mold along the walls.  I mean running

11   completely up and down the wall.  You could smell it.  The

12   special education supervisor came to the building and told the

13   principal not to place me specifically in the annex building

14   because of the mold.  So I sat in the library for four days

15   because they didn't know where to place me.

16   Q.    All right.  Did you leave that school and go to another

17   building?

18   A.    I left that school because I had a severe asthma attack

19   November 7 after being in the building for a week and having

20   three nosebleeds and continuous headache.  As I was leaving that

21   day, I continued to have shortness of breath and ended up having

22   a severe asthma attack in the school parking lot and was only

23   able to get assistance by blowing my car horn because I could

24   not get to my inhaler, which had fallen on the floor, and I was

25   transported by ambulance from McClellan High School to Baptist

1    Health.

2    Q.    What was your next school assignment?

3    A.    My next school assignment, they re-placed me back at

4    Pulaski Heights from November 13 until March.  While there, I

5    seemed to improve, had no problems.  Swelling was reduced,

6    breathing got on track.  And then because my position was

7    eliminated, I was assigned to Wilson Elementary.

8    Q.    Now, Pulaski Heights is located -- is that north of 630?

9    A.    It's over by UAMS.

10   Q.    Between 630 and the Arkansas River?

11   A.    Yes.

12   Q.    Was the population largely white?

13   A.    It was.  It started to change --

14   Q.    That's fine.

15   A.    Oh, okay.

16   Q.    Now, you then were assigned to Wilson?

17   A.    Wilson Elementary.

18   Q.    All right.  What were your experiences at Wilson?

19   A.    Wilson Elementary, in the classroom, the minute I opened

20   the door, I could smell the mold.  Actually, when I walked down

21   the hallway, I could smell the stench of the mold, but upon

22   entering the classroom, it was really, really awful, horrendous

23   odor.  There were rat feces along the window bases, the window

24   sills.  The ceiling tile was wet.  Water was dripping from the

25   ceiling onto the students' desks.  I had to rearrange the

1    classroom because of it.

2        The room was packed with old books that smelled of mold.

3    The window -- the tile on the floor on the -- there was half

4    carpet and half tile in some areas.  It was -- the tile was

5    cracked.  And the room, horrendous smell.  You could smell the

6    mold throughout that entire wing, but I noticed the other wings

7    did not smell like that.

8                THE COURT:  When was this?

9                THE WITNESS:  This was March of 2015.

10               THE COURT:  Thank you.

11   BY MR. WALKER:

12   Q.   Have you any similar experiences in any other school?

13   A.   No.

14   Q.   Now, I appreciate your coming.  You're here under subpoena?

15   A.   I am.

16   Q.   And you're fearful that you may be retaliated against?

17   A.   I am because I've already experienced some of the

18   retaliation.

19   Q.   All right.

20   A.   So I am concerned about my testimony today.

21   Q.   Now, you have a doctor's appointment, surgery within the

22   hour?

23   A.   I do.

24               MR. WALKER:  Thank you for coming, and I pass the

25   witness, your Honor.

```
 1              THE COURT:  Thank you, Mr. Walker.

 2         Mr. Eddings?

 3                        CROSS-EXAMINATION

 4    BY MR. EDDINGS:

 5    Q.    Good afternoon, Ms. Whitehead.

 6    A.    Good afternoon.

 7    Q.    I'd like to start where you left off and go backwards.

 8         Mr. Walker asked you if you had any similar experiences in

 9    any other schools that you worked in.  Do you recall that?

10    A.    Yes.

11    Q.    And you've also worked at Mabelvale; correct?

12    A.    I am.

13    Q.    Isn't it true that you complained about mold at Mabelvale?

14    A.    I did.

15    Q.    And Mr. Walker asked you about the list of schools that

16    you've worked in, and I've got Dunbar, McClellan, Pulaski

17    Heights, Wilson, and Mabelvale; correct?

18    A.    Yes.

19    Q.    And you've also complained about the conditions at Pulaski

20    Heights, didn't you?

21    A.    I didn't know which school was making me ill.  I knew it

22    was Dunbar the most because I split my time between Dunbar and

23    Pulaski Heights.  I was at Pulaski Heights on Mondays and

24    Tuesdays, Dunbar Wednesdays and Thursdays, and half days on

25    Fridays between the both.  And whenever I walked in Dunbar
```

1  school, I immediately by the end of the day left with a raspy

2  voice, headaches.  And when I went back to Pulaski Heights, they

3  would also ask me on Friday morning, "What happens to you

4  between Tuesday and Friday?  You always come back sick."

5  Q.   Have you ever represented in writing that you didn't know

6  whether or not Dunbar or Pulaski Heights or neither of them were

7  causing your medical symptoms?

8  A.   I told them I was split between the two and requested not

9  to go back to both.

10 Q.   Okay.  My question is a little different.  Have you ever

11 represented in writing that you weren't sure what school was

12 causing your medical condition, if any?

13 A.   I did.  I think I did in an e-mail that I sent to the

14 superintendent on June 23, 2014.

15 Q.   Okay.  And did you represent that you weren't sure, and I'm

16 talking specifically about Dunbar and Pulaski Heights, that you

17 weren't sure if either of those schools were causing your

18 illness?

19 A.   I didn't say either one wasn't.  I said I was split between

20 the two.  I know Dunbar made me ill.  I wasn't the only one.

21        MR. EDDINGS:  Your Honor, may I approach the witness?

22        THE COURT:  You may.

23 BY MR. EDDINGS:

24 Q.   Ms. Whitehead, I've just handed you what I'll mark as

25 Defendant's Exhibit No. 14.

1  A.    Okay.

2            THE COURT:  LRSD 14?

3            MR. EDDINGS:  LRSD 14.  That's correct, your Honor.

4  BY MR. EDDINGS:

5  Q.    Can you identify this document as an e-mail chain between

6  you and various members of the administration of the Little Rock

7  School District?

8  A.    I can.

9  Q.    Okay.  I'd like you to turn over to page 2 of that e-mail.

10 A.    Okay.

11 Q.    Specifically, the e-mail that you wrote to Mr. Robert

12 Robinson on December 18, 2014.  Do you see that?

13 A.    Yes.

14 Q.    And the second paragraph there at the top, you say:  "Well,

15 I could not state that Pulaski Heights contributed to my illness

16 at the time."

17        Do you see that?

18 A.    Yes.

19 Q.    And then in that next paragraph, you wrote:  "As early as

20 June 2014, I sent a request to Superintendent Suggs requesting a

21 transfer from both buildings."

22 A.    Yes.

23 Q.    "Since I was not sure if one or both contributed to my

24 illnesses."

25 A.    Yes.

1    Q.    Do you see that?

2    A.    Yes.

3    Q.    Okay.  And then down there at the bottom of that same

4    paragraph, you indicate that you were removed from your office

5    at Dunbar until the mold and the mildew was cleaned from the

6    walls, furniture, and et cetera.

7    A.    Uh-huh.

8    Q.    Okay?

9    A.    Uh-huh.

10   Q.    Does that indicate that any mold or mildew that was present

11   was cleaned from the walls at Dunbar?

12   A.    They did have a company come in and wash it down, but it

13   came right back.

14   Q.    Okay.  Are you aware that there were air quality samples

15   taken at McClellan, Mabelvale, and at Pulaski Heights?

16   A.    I am.

17   Q.    Okay.  And are you aware that as a result of each of those

18   air quality tests, the rooms that you were assigned to were

19   deemed safe?

20   A.    I know that that's what the paper reads.

21   Q.    Okay.  Now, going back to Dunbar, isn't it true that Dunbar

22   is a building that's been designated as -- on the National

23   Registry of Historic Places?

24   A.    It has been.

25   Q.    Now, with respect to Dunbar, I'd like for you to take a

1   look at what's been marked as LRSD Exhibit No. 1.  Can you read

2   for the Court the facilities condition index for Dunbar Middle

3   School.

4              THE COURT:  What page of LRSD 1 are we on?

5              MR. EDDINGS:  Page 22 of LRSD Exhibit No. 1.

6   A.   You said read the facilities condition?

7   Q.   The facilities -- the column entitled, "Facilities

8   Condition Index."

9   A.   Okay.

10  Q.   I'm looking specifically for Dunbar Middle School at this

11  point.

12  A.   Uh-huh.

13  Q.   What does page 23 indicate the facility condition index for

14  Dunbar Middle School to be?

15  A.   I'm looking at a number?

16  Q.   Yes.

17  A.   Okay.  $4,609,209.  Am I correct?  Is that what you're

18  asking me?

19             MR. EDDINGS:  Your Honor, may I approach?

20             THE COURT:  You may.

21             THE WITNESS:  0.13.  0.13.

22  BY MR. EDDINGS:

23  Q.   And you also have worked at Pulaski Heights?

24  A.   I did.

25  Q.   I'd like to show you -- let's see.  I'm a little

Whitehead - Cross                                          78

 1  technologically -- here we go.
 2      All right.  And the same number for Pulaski Heights.  What
 3  does that indicate?
 4  A.   0.43.
 5  Q.   Okay.  Now, Ms. Whitehead, I'd like to show you page 31 of
 6  that same exhibit.
 7  A.   Okay.  That's --
 8  Q.   And going back to Dunbar Middle School, if you'll look at
 9  the chart here that talks about the FCI score --
10  A.   It needs to rotate.
11  Q.   All right.
12  A.   Okay.
13  Q.   Now, according -- do you see that chart there that says
14  schools by FCI score?
15  A.   Yes.
16  Q.   And going back to Dunbar, if we use this chart here, what
17  would it indicate Dunbar's FCI score to be?
18  A.   Good.
19  Q.   Okay.  Now, looking at Pulaski Heights, again using this
20  same chart, what would it indicate Pulaski Heights facility
21  condition index score to be?
22  A.   Critical.
23  Q.   Pulaski Heights?
24  A.   Poor, critical.  When was the report taken?  Before or
25  after they removed asbestos and mold from Dunbar?  When was this

Whitehead - Cross                                    79

1    report taken?

2    Q.    So if Pulaski Heights had an FCI score of .43 --

3    A.    Yes, that's what the paper reads.

4    Q.    And you said your symptoms subsided when you were in

5    Pulaski Heights?

6    A.    They did.  And it may have been the location that I was in

7    because I am aware that there are some areas that was in the

8    building that was not conducive for me to be there.

9    Q.    Did you complain about going to McClellan before you even

10   set foot on McClellan's campus?

11   A.    I did.  It has a history of being --

12   Q.    Did you also indicate to --

13            THE COURT:  One at a time, please.

14   BY MR. EDDINGS:

15   Q.    Did you also indicate to the LRSD HR department that you

16   would not work in a school in the Little Rock School District

17   that was built before 1998?

18   A.    I did.

19   Q.    And in response to that, weren't you offered a special ed

20   teaching position at Roberts Elementary School?

21   A.    I was offered a position at Roberts.  I didn't know what it

22   was.

23   Q.    Did you decline that position?

24   A.    I did because they wouldn't tell me what it was, and based

25   on their history, where I am now is not the position I applied

1    for.

2    Q.   Well, you did, in fact, decline a position in a school that

3    was built after --

4    A.   Because they did not tell me what the position was.

5              THE COURT:  One at a time, please.  Okay.

6    BY MR. EDDINGS:

7    Q.   Ms. Whitehead, you did decline a position that was offered

8    to you at Roberts Elementary School, which was built after 1998.

9    A.   I did.  I declined a position, not a teaching position.

10             MR. EDDINGS:  Thank you, Ms. Whitehead.

11        May I approach, your Honor?

12             THE COURT:  You may.

13        I'm sorry, Mr. Eddings.  I was writing.  I missed it.  Are

14   you done?

15             MR. EDDINGS:  Yes, sir, I am.

16             THE COURT:  Okay.

17             MR. EDDINGS:  I thank Ms. Whitehead for her testimony.

18             THE COURT:  All right.  Mr. Hollingsworth or

19   Ms. Middleton.

20             MS. MIDDLETON:  We have no cross, your Honor.  Thank

21   you.

22             THE COURT:  Mr. Walker?

23             MR. WALKER:  Yes, sir, very briefly.

24                         REDIRECT EXAMINATION

25   BY MR. WALKER:

Whitehead - Redirect                                              81

1  Q.    Ms. Whitehead, he made reference, Mr. Eddings made

2  reference to page 31 of the Fanning Howey report.  I would like

3  to call your attention to page 81.

4          MR. WALKER:  If I may approach, your Honor, just for a

5  second.

6          THE COURT:  Sure.

7  BY MR. WALKER:

8  Q.    This is a report -- I'm just asking you to show what it

9  says.  With Cloverdale in terms of the schools, Cloverdale,

10  Pulaski Heights, Henderson, Mabelvale, Fanning Howey related the

11  conditions at Pulaski Heights as what?

12  A.    Poor.  Poor.

13  Q.    But at Cloverdale Middle School --

14          MR. HOLLINGSWORTH:  I'm sorry, your Honor.  We cannot

15  hear the questions.

16          MR. WALKER:  Fanning Howey rated the conditions at

17  Pulaski Heights Middle School, and she said poor.

18  BY MR. WALKER:

19  Q.    And the next question is, and how did they rate Cloverdale

20  Middle School?

21  A.    Critical.

22          MR. WALKER:  No more questions.

23          THE COURT:  Thank you, Mr. Walker.

24      Can Ms. Whitehead go?

25          MR. WALKER:  Yes, your Honor.

```
 1              THE COURT:  All right.  Thank you, ma'am.

 2              THE WITNESS:  Yes.

 3              THE COURT:  Mr. Walker?  Who is your next?

 4              MR. WALKER:  Just a moment, your Honor.

 5              MR. PRESSMAN:  Ms. Norwood.

 6         MONICA K. NORWOOD, PLAINTIFFS' WITNESS, DULY SWORN

 7              THE COURT:  Mr. Pressman, you may examine.

 8                        DIRECT EXAMINATION

 9    BY MR. PRESSMAN:

10    Q.   Would you please state your race for the record, please.

11    A.   African-American.

12    Q.   And would you please describe for us your education after

13    high school.

14    A.   I have a bachelor's degree in elementary education and

15    African-American studies from Washington University in St.

16    Louis.  I have a master's of education with reading emphasis

17    from the University of Arkansas at Little Rock, and education

18    specialist degree from Harding University in education

19    administration.  And ESL endorsement from Henderson State

20    University.

21    Q.   In the past, did you work in the Little Rock School

22    District?

23    A.   I have done two tours of duty in Little Rock.

24    Q.   What is the first year you worked in the Little Rock School

25    District?
```

1    A.    1994.

2    Q.    And what was your position at that time?

3    A.    I was a first grade teacher.

4    Q.    And what is the last date you worked in the Little Rock

5    School District?

6    A.    August 29, 2014.

7    Q.    And in the 2013-14 school year, what position did you have

8    in the Little Rock School District?

9    A.    I was an assistant principal at Henderson Middle School.

10   Q.    What entity was your next employer after the Little Rock

11   School District?

12   A.    I was employed with the Arkansas Education Association as

13   of September 2, 2014.

14   Q.    What is the Arkansas Education Association?

15   A.    It's a professional organization for educators, both

16   teachers and support personnel, as well as administrators.  Some

17   people just refer to it as the teachers' union.

18   Q.    And when you worked for the AEA, where actually were you

19   located?

20   A.    I was housed out of the Little Rock Education Association's

21   offices at 119 South Izard.

22   Q.    Who else was located there?

23   A.    My co-worker Tim Greene, as well as the LREA president,

24   Cathy Koehler, and the secretary, Rhonda Furlough.

25   Q.    What is the LREA?

1    A.    LREA is the Little Rock Educators Association.  It's a

2    local association of the AEA for the Little Rock School

3    District.

4    Q.    Generally, what were your job duties?

5    A.    A lot of my time was spent dealing with personnel matters,

6    dealing with employee grievances as well as disciplinary

7    matters.  But we also engaged with legislators in various ways

8    in the community organizing efforts, educational efforts, and

9    membership.

10   Q.    In the current calendar year in that job, did you have any

11   particular training?

12   A.    I actually just returned from a training February 3 through

13   February 11 in Leesburg, Virginia, outside of D.C., the UniServe

14   Academy.

15   Q.    What generally was the nature of that training?

16   A.    It was a UniServe Academy, something we were required to

17   participate in within the first three years of our employment.

18   It focuses on moving us from a service model to an organizing

19   model.  It's just -- it's training for the performance of our

20   duties as UniServe directors.

21   Q.    The date you returned from that training?  Well, who paid

22   for the training?

23   A.    NEA, and I'm not sure how much AEA paid for.  Between the

24   two entities.

25   Q.    You didn't pay for it.

1    A.    Oh, no.

2    Q.    The type of training you received over -- you continued on

3    your job, for what period would that training be useful?

4    A.    For the duration of the job.

5    Q.    So you returned on February 11?

6    A.    Yes, sir.

7    Q.    After that time, did you do something related to this case?

8    A.    An affidavit was submitted for me on February -- regarding

9    this case on February 12, the following day, that Friday.

10   Q.    Submitted to?  No, I mean there was an affidavit.  What was

11   the content of the affidavit?

12   A.    It was related to my experiences and what I observed about

13   facilities in the Little Rock School District during the time,

14   most of the time I was an employee.

15   Q.    Okay.

16   A.    Of the district.

17   Q.    From whom did you get the proposed affidavit?  Did you get

18   it from an attorney?

19   A.    John Walker.  It came from John Walker's office.

20   Q.    So what is the last date you worked on that affidavit?

21   A.    I believe it was that Friday, February 12.

22   Q.    Okay.

23   A.    It may have been Thursday.  It was Thursday or Friday.  I'm

24   not sure which.

25   Q.    So at the beginning of the next week, what happened in

1   terms of -- you were back in town.  What happened?  Did you go

2   to work?

3   A.    Well, Monday was a holiday for AEA, and I returned to work

4   on Tuesday, the 16th.  That was my first day back to work after

5   the training.

6   Q.    Where did you go to work that day?

7   A.    I went to work at the Arkansas Education Association

8   headquarters office.

9   Q.    Was that the place you normally went to work?

10  A.    Not normally.  From time to time I would go there to work

11  if I needed some real quiet time to concentrate.  But I was

12  actually directed to go there on that particular day.

13  Q.    Now, I've put on the screen the plaintiffs' proposed

14  Exhibit 8.  Could you look at that, please.

15  A.    Yes, sir.

16  Q.    And did that have something to do with where you went to

17  work on that date?

18  A.    Yes, sir.  Shall I elaborate?

19  Q.    Yes.  Please explain.

20  A.    Actually, I received a text message around seven, a little

21  bit after seven o'clock that evening from my supervisor, Connie

22  Hutchinson, asking me if I had seen an e-mail from her.  So I

23  told her, no, I'll check it, and I went back and this e-mail

24  dated -- for that Monday, February 15, from her directing me to

25  work in the AEA offices rather than LREA, and also noting that

1   she had just received the affidavit from John Walker's case and

2   we needed to talk prior to me having contact with people from

3   LREA.

4   Q.    Okay.  Now, the next day, February 16, 2016, did something

5   occur?

6   A.    A couple of things.  I went into work at AEA, and my first

7   opportunity to make contact with my supervisor since she had

8   asked to talk to me, when I approached her, she said -- I asked

9   her if she -- you know, if she had something she needed to talk

10  to me about.

11        She said, "No.  Tracey-Ann is going to take care of it."

12  Q.    Who is Tracey-Ann?

13  A.    Tracey-Ann is the executive director of AEA.

14  Q.    What's her full name?

15  A.    Tracey-Ann Nelson.

16  Q.    Did you have occasion to meet with her that day?

17  A.    Yes.  Later on that day, I was called into a meeting in her

18  office at three o'clock, where I was terminated.

19  Q.    And this is the second page of Plaintiffs' Exhibit 8.

20  Could you please look at that?  Tell us whether you're familiar

21  with it.

22  A.    Yes, sir.  This is the letter I received from Tracey-Ann

23  Nelson.  This is one of the two documents that I received from

24  her on February 16 in her conference room.

25  Q.    What does this inform you?

1   A.   That my employment was being terminated as of that day.

2   Q.   About how many days was this after you provided your

3   affidavit for this case?

4   A.   It was my first day back to work, so if you count the

5   weekend, Saturday, Sunday, Monday, it was four literal days,

6   calendar days, but it was actually my first day returning to

7   work.

8   Q.   You said that earlier in that day, a supervisor had said

9   that Ms. Nelson would speak with you.  Had any appointment with

10  Ms. Nelson been scheduled before that day?  Had you learned that

11  you would be meeting with her before that day?

12  A.   No.  I learned from Alice Canady somewhere around 12, one

13  o'clock.  I don't know.  I received a phone call.

14  Q.   Okay.  Let me show you -- this begins the third page of

15  Plaintiffs' Exhibit 8.  Do you recognize this first page?

16  A.   Yes, sir.  I actually received two of these, one on the day

17  that I was terminated and then one -- another one came later in

18  the mail.  It's a noncompete/nondisclosure agreement from AEA.

19  Q.   Did you -- it has several pages.  Did you ever sign that?

20  A.   No, sir, I did not.

21  Q.   Did you submit a grievance about your termination?

22  A.   I did.

23  Q.   Is this the first page of your grievance, which is also

24  part of Exhibit 8?

25  A.   Yes, sir.

1  Q.   And is this the second page of your grievance?

2  A.   Yes, sir.

3  Q.   Now, next page of Exhibit 8.  Do you recognize this?

4  A.   Yes.

5  Q.   And what is this?

6  A.   This is Executive Director Tracey-Ann Nelson's response to

7  my grievance.

8  Q.   And is there a place where you can -- is there a particular

9  sentence which indicates her response, if any, to your

10 grievance?

11 A.   Well, all of it does, but in particular, the last line

12 says, "Accordingly, I am not answering or otherwise processing

13 this level II grievance."

14 Q.   Were you employed in the Little Rock School District for

15 the 2008-2009 school year?

16 A.   Yes, sir.

17 Q.   And where were you employed?

18 A.   Cloverdale Middle School.

19 Q.   What position?

20 A.   I was an assistant principal.  My first year.

21 Q.   Okay.  And approximately how many days in that school year

22 were you at that site?

23 A.   Probably about 200 or so.

24 Q.   And did you just stay in your office as part of your work,

25 or what was your movement in the building?

Norwood - Direct

1   A.   Oh, no.  Where was my what?  I'm sorry.

2   Q.   Your movement in the building?

3   A.   Everywhere.  I worked with middle school kids.  Everywhere.

4   I mean, the gym, the cafeteria, the bathrooms, the hall.  Well,

5   some of the areas didn't have hallways.  The corridors, the

6   courtyard, the fields, all of it.  Back parking lot.

7   Q.   Tell us about your observations about the facility that

8   year.

9   A.   Some of the rooms had windows that were up high and the

10  shades were torn or ripped or not functional, so if the sun was

11  beaming in, the teachers weren't able to, you know, divert the

12  sunlight sometimes because the shades didn't work.

13       There were cracked walls.  There was one area -- I don't

14  know my directions, north, south, east, west, unless I'm at my

15  mother's house, but there was one corridor where there was some

16  smell of gas that was pretty pungent.

17       A lot of the lockers were inoperable, and actually only the

18  eighth graders were allowed to use lockers.  Restrooms smelled,

19  but some -- the gym was very small and didn't -- it had kind of

20  old -- didn't have any air-conditioning in it.  It's very hot,

21  one of the hotter ones.

22       One of the things that I remember, we were in 2009 and we

23  were still getting -- we were still on Windows 2003 and a lot of

24  the rest of the district was on 2010, and so whenever we'd get

25  documents from Central Office, we had trouble opening them or

1    they'd always convert and change, and it was a big hassle

2    because we weren't upgraded.

3        Let's see.  Some of the other things.  Our labs, science

4    labs, weren't labs.  Some of them didn't even have water in

5    them.  Didn't have, you know, the capabilities to actually have

6    labs unless you brought in your own buckets of water.

7        There was some issues in the new addition.  I don't know

8    how close previously, before I came, they had added in the sixth

9    grade area.  It was the newest part of the building, I think it

10   was an enclosure, and it was having some foundational issues and

11   shifting.  There was one room in particular that I think of that

12   had been a teacher's classroom, but water -- I don't know if it

13   was water coming through the windows or condensation or up from

14   the ground through foundational cracks, I don't know, but it was

15   a pungent smell of mold.  The carpet was very moldy and the

16   smell in that room was noxious.

17   Q.   Did you notice anything about furniture in the building?

18   A.   There were heaps of broken furniture, especially in that

19   corridor across from the gym, just a little past where the east

20   lab was.  It was like a little dumping ground for old foul

21   cabinets and desks and random things.  Chairs.  It pretty much

22   stayed there throughout the year.

23   Q.   What would you say about the status of painting in the

24   building?

25   A.   Horrific.  There's a lot of peeling paint.  In fact, one of

1    the first things I did when I came in, I asked if I could have

2    my office painted, and they were like, "If you paint it

3    yourself."  And so I painted it myself, which is what a lot of

4    the teachers had to do if they wanted their rooms painted at

5    all.  They had to paint them.

6    Q.   So what was the overall status about painting in the

7    building?

8    A.   It was inconsistent.  It was -- there was a lot of peeling

9    paint.  So you might have two or three colors in one room.

10   Definitely a need for rejuvenation.

11   Q.   How did you get to the school?

12   A.   I drove.

13   Q.   Did you notice anything when you brought your car to the

14   site?

15   A.   It was hard to find a parking spot.  The parking spots were

16   limited, and, actually, there was an area in the back of the

17   building, back behind the sixth -- well, back of the building,

18   and a lot of the teachers had to park in that area and it would

19   flood when it would rain.  That area would become like a mud

20   pool and it would flood a lot back there.  But there was very

21   limited parking for parents and staff.

22   Q.   Was there any discussion about the district doing painting?

23   A.   I remember more discussions -- we would discuss why there

24   wasn't painting, you know, because I would inquire because my

25   teachers would complain to me and, you know, we had that chain

1    of command we had to follow.  So I would report concerns and the

2    teachers would fill out those forms at certain points of the

3    year to report maintenance needs, and then we'd come back the

4    next year and nothing had changed.  So people expressed their

5    frustration.  I was only there for one change of a year, so I

6    don't recall multiple issues with -- besides the complaints.

7    Q.    Let's go to the 2009-10 school year.  Where were you at the

8    beginning of that year and in what position?

9    A.    I was assistant principal of instruction at Cloverdale

10   Middle School through October.  I can't remember the exact date.

11   Q.    How did the conditions that you've described for the

12   previous year compare at the beginning of the next year?

13   A.    Same.  They were the same as they had been the year before.

14   Q.    So you were --

15   A.    I think they changed the furniture in the office.

16   Q.    Pardon?

17   A.    I think the furniture was changed in the office.

18   Q.    In your office?

19   A.    No.  Well, I did get a table, but -- to have conferences

20   on.  But, no, in the main office, they changed furniture.

21   Q.    After your assignment at Cloverdale, what was your next

22   assignment?

23   A.    I went to Dunbar Middle School as assistant principal of

24   instruction.

25   Q.    And approximately when did you start there in the 2009-10

1  school year?

2  A.   At the beginning of the second nine weeks.  So it was

3  sometime in October, I think.  I don't have a calendar in front

4  of me.

5  Q.   And your position was?

6  A.   Assistant principal of instruction.

7  Q.   Okay.  What observations did you make about the facilities

8  at Dunbar?

9  A.   I was -- had been a student at Dunbar, so one of the things

10 that struck me was that the seats in the auditorium were the

11 same ones that I had sat on as a student, and they were peeled

12 and ragged and some of them were broken and missing.  That

13 actually -- that actually got changed in 2011-12.  But the

14 curtains, whenever we tried to have functions, we had to use

15 clothespins or other things to try to hold them up because, you

16 know, they were ripped and hanging and you could see light

17 through them.  Sometimes you couldn't get them to open and

18 close.  So it got to the point we just stopped using the

19 curtains.  And there were a lot of broken furniture and things,

20 like it was an old dump site in the back of the stage.

21     On the walls, especially like in the stairwells, it's like

22 a lot of moisture built up behind the walls, behind the paint.

23 So you had these buckling, lumpy nodules along the walls.  And

24 we didn't know whether that was mold or what that was back

25 behind there.

1           Then a lot of the ceiling tiles were missing.  In other

2    places, particularly like the stairwells where there were -- it

3    would leak during -- when it would rain and there would be

4    garbage, we'd have to put out garbage pails to catch the water

5    from time to time.  There was -- the basement would flood when

6    it would rain and --

7           THE COURT:  Is this the basement of the auditorium?

8    We're still in the auditorium?

9           THE WITNESS:  No.  I'm out of the auditorium.  The

10   auditorium was on the first floor.

11          THE COURT:  Okay.

12          THE WITNESS:  But the basement would flood as well.

13   The basement had a number of classrooms, a cafeteria, the

14   counselors' area.  But it would flood, and I remember one of the

15   special ed teachers, ADE actually I think said that they had

16   to -- that she needed to be removed from that room.  She was

17   pregnant and I think she still has concerns that the language

18   delays her child has experienced were related to being in that

19   classroom.

20   BY MR. PRESSMAN:

21   Q.   Okay.  Let me ask you about the basement.  What was the

22   condition about lighting?

23   A.   There were a few rooms on one side that had some windows up

24   near the top, but they had those metal wires, I guess to keep

25   people from breaking into them.  So there was some light that

1    came in through there, but a lot of the rooms didn't have any

2    natural sunlight exposure at all.

3    Q.    Approximately how many rooms are you talking about?

4    A.    To the best of my recollection, one -- let's see.  It was

5    the computer lab, Ms. Watson's room, literacy coach's room, G/T

6    room, counselors' area.  I don't know if you want to count the

7    counselors' area, nurse's area, art room, the career orientation

8    lab.  So all those areas, about eight or so.

9    Q.    The lighting condition was --

10   A.    None.

11   Q.    Did you make any observation about the technology

12   classrooms?

13   A.    Not so much at Dunbar.  It wasn't as disparate at Dunbar.

14   There were some complaints that there weren't computers for --

15   you know, enough computers in every room, that kind of thing.

16   But the real issue that I noticed with technology came actually

17   after I left, in 2014.  There was a new computer course, and I

18   can't remember the name of it, but it was -- it was a

19   requirement, it was a new requirement, and there was so much

20   focus on Forest Heights STEM and making sure they were up and

21   running and had all their technology in those schools, that

22   certain schools had that one-to-one technology that were

23   identified that they failed to make sure that the schools with

24   required courses received their technology in a timely manner.

25        So I actually went into Dunbar for something, I can't

1    remember why I was in there that particular day, but there were

2    all these boxes.  And I actually have a picture of it, but there

3    were all these boxes that were up and tables that were in the

4    process of being set up in the main hallway because they were

5    just now getting their equipment and getting it set up.  And

6    this was, again, November 14.  So that's like the end of the

7    first semester.  Excuse me.  First nine weeks, moving into the

8    second.  They had gone all that time for a required course

9    with -- and they had been using paper -- paper keyboards to

10   pretend that they were working instead of having their actual

11   equipment.

12   Q.   Let me ask you, at any point when you were at Dunbar, did

13   you make any observation about the size of a room used for

14   technology?

15   A.   There was one room -- oh, I probably shouldn't call her

16   name, but one teacher's room in the basement, and it was a

17   little bitty room, and it couldn't -- you know, there are

18   certain -- you have certain class number requirements, and she

19   was a keyboard teacher and her room was very small.  She

20   couldn't fit all the computers she needed for a full load of

21   students into that room.  So when kids failed that course and

22   had to repeat it, there was a lot of difficulty with kids

23   actually being able to meet their required -- requirements

24   because you couldn't even have enough kids in that room to take

25   the class.

1              THE COURT:  Mr. Pressman?

2              MR. PRESSMAN:  Yes.

3              THE COURT:  I need to interrupt.  I have a court

4    obligation at noon, so we're going to take our break.

5              MR. PRESSMAN:  Okay.  Thank you, your Honor.

6              THE COURT:  Ms. Norwood, you're still under oath.

7    When you come back, you'll be right there.  Okay?

8              THE WITNESS:  Yes, sir.

9              THE COURT:  I will see you all at 1:15.  We're in

10   recess.

11        (Recess at 12:01 p.m., until 1:15 p.m.)

12             THE COURT:  You may continue.

13   BY MR. PRESSMAN:

14   Q.   Would you please begin by stating your name for the record.

15   A.   My name is Monica Norwood.

16   Q.   Ms. Norwood, when we concluded in the morning, you were

17   testifying about your observations about Dunbar.  Did you make

18   other observations about which you haven't testified?

19   A.   Yes.  Earlier --

20   Q.   Please continue.

21   A.   Earlier you were asking me about painting.  Paint was also

22   an issue at Dunbar.  Since I was there longer, I had more

23   experience dealing with that.  Again, there were a number of

24   classrooms, some more so than others, where there's a lot of

25   peeling paint.  And then there was a lot of places, like, on the

1    third floor, where there were columns in the classrooms where

2    there was a lot of graffiti that children had written over the

3    years on those columns.  And you'd come back and it was still

4    there.

5         A lot of times, the principal would tell the teachers,

6    "Okay, we are supposed to get our rooms painted this summer.

7    Clear your walls."

8         And then we'd come back, and everyone was frustrated.

9    "What happened?"

10        "We don't know."

11        And there was always that frustration.  That happened a

12   couple of different times, to the point, again, some of the

13   teachers would just paint their rooms themselves.

14        Some of the more serious issues, I know in my office, I had

15   an office on the second floor, which -- and, again, some of the

16   side roofs would leak.  So we had those garbage pails out in the

17   hallways where kids could slip and fall, and if a trash can

18   would move, it wasn't in quite the right spot as it continued to

19   leak.  Some of the steps, plastic or rubber guards on the steps,

20   and a lot of them would be broken.  So you could trip going up

21   or down the stairs.

22        But in my office itself, I had an issue with mice.  I would

23   come back sometimes, especially over a weekend, and there would

24   be little presents waiting for me on my desk, turds, and

25   sometimes little urine stains on my papers.  As well, I cleaned

1    out my closet and found petrified mice in there.

2        So I had the mouse traps often put in my room behind the

3    hutch and behind my ficus tree and come in and have that odor of

4    dead animal in my office as well.  Sometimes we couldn't find

5    the animal, but we knew it was in there because we could smell

6    them.

7        Also I had an issue with mold in my office because the

8    air -- I don't know if it was air and heat or -- the unit would

9    leak, and because there are only so many -- small office.  Only

10   so many connections for internet, there were only so many places

11   you could put your desk.  So I was having to kind of put my desk

12   at a very crooked position to try to avoid the condensation from

13   hitting my desk, but if it didn't hit my desk, it was hitting

14   the carpet and that stench from the mold would permeate the

15   room.

16              THE COURT:  Let me interrupt, please.

17              THE WITNESS:  Yes.

18              THE COURT:  Mr. Pressman, questions and answers, not

19   so much narrative.

20       Ms. Norwood, I want you to respond pointedly to the

21   questions and answers.  Okay?  All right.

22   BY MR. PRESSMAN:

23   Q.   Do you recall any issue about the outer surface of the

24   building?

25   A.   Yes.  In that last year there, '11-12, I believe it was,

1   they were doing renovations and they were doing -- I call it --

2   I don't know the official name, but they were grouting out the

3   mortar in the brick.  And so there was this dust, this toxic,

4   noxious dust that would get into the building through the

5   ventilation system.  And children and adults alike were getting

6   sick.  Their throats were burning, mine included, eyes burning.

7        When they would power wash, it would turn into this goop

8   that would get in through the windows, and it would get on the

9   computers and get on the tables and desks and things.  And at

10  lunchtime, that's -- that would be particularly disconcerting

11  because the area that the kids had to stand at when they were

12  outside at lunch was near the building, and there is this --

13  whenever the wind would blow, they'd be covered with this

14  asbestos-filled, toxic dust.  And there would be days when there

15  would be several kids would have to go home sick.

16  Q.   Which school year are you talking about?

17  A.   This is Dunbar, '11-12.  And eventually moved the kids out

18  further on the field.  But still the dust was there, it was

19  getting in the building, and they were still being exposed to

20  it.

21  Q.   Did you have occasion in the 2012-13 school year to be at

22  the Wilson Elementary School?

23  A.   Yes, sir.

24  Q.   Did you make observations about the facility there?

25  A.   One observation, the heating and air unit would go out

1  periodically in the summer months, in the hot months, and class

2  would have to remain in session.  They wouldn't call off school.

3  They'd be in there 90 degrees or more with fans.

4       There were -- sometimes rodents would die up in the ceiling

5  and you could smell them.  There was --

6  Q.   Did you observe anything relating to squirrels at that

7  school?

8  A.   Yes.  There was one particular day I was in the lounge and

9  I heard something, and I looked off near the windows, I looked

10  up and there was a squirrel tail hanging from some -- I don't

11  know exactly how the ceiling -- it wasn't just a flat, flush

12  ceiling, but there was literally a squirrel tail hanging down.

13  And it would hang down so far and it would ease up.  It would

14  come back down a little bit, it would ease up.  And I was like,

15  "Oh, my God," and I went and I reported it to the principal.

16       It wasn't long after that, I heard one of the staff members

17  let out this blood-curdling scream because the squirrel had

18  apparently jumped out of the ceiling and was running around the

19  lounge, and she went running down the hall screaming, "Squirrel,

20  squirrel."

21  Q.   Can you relate anything that year about the food service

22  area?

23  A.   Just that it was closed because of -- well, I don't have

24  firsthand -- I know that it was closed and they said that -- the

25  words they used were "condemned," and they had to go and

 1    actually receive food from a truck or something at Hamilton and

 2    bring it in for quite a few weeks, if not months.  I know the

 3    time -- I think during the time that I was there working.

 4    Q.    Where did you work in the Little Rock school system in the

 5    year 2013-14?

 6    A.    2013-14, I was at Henderson.

 7    Q.    And your position was?

 8    A.    Assistant principal of instruction.

 9    Q.    Did you make any observations about the facility there?

10    A.    That was better than the other ones I had been to.  I

11    personally didn't deal with the issues with mold in that

12    building, but it was -- I think a big issue there would be the

13    lack of natural lighting, for example.  The classrooms, except

14    for a few on one side that had a door with windows, with glass

15    in it, they didn't have windows.  So there was at least one

16    occasion, maybe two, where we had what we call a brownout where

17    a transformer blew and the emergency lights weren't working, so

18    we were in pitch black over the whole building.  So we had to go

19    stand out in the hallway because there were courtyards in the

20    center of the building, and we had to go stand in the hallway to

21    get some light.

22    Q.    Could you approximate how many classrooms there did not

23    have natural light?

24    A.    It would be easier to approximate how many did.  I would

25    say out of all of the building, there may have been two or three

1   with those doors that had blinds on them.  I'm trying to think

2   of the other side.  Yeah, because on this other side they had

3   these little -- I don't know, foyer areas, and they weren't in

4   the room, they were outside of the room.  So, yeah, there's just

5   two or three.  It was a science room and there was a -- it was a

6   couple of science rooms.

7   Q.    Okay.  Did you make any observation about the floors in the

8   building?

9   A.    They were concrete and they were murder on their knees and

10  feet.  I know I started having additional problems.  There were

11  a number of people who went out with knee surgeries the year I

12  was there.

13  Q.    Did you have occasion to visit the library?

14  A.    Yes.

15  Q.    What did you observe about the library?

16  A.    It wasn't the smallest I've seen.  That would have been

17  Cloverdale.  But it wasn't the largest or the nicest.  The

18  librarian worked to try to keep it as nice as possible.  There

19  was no natural light or anything like that, but it was average.

20  Not a lot of books, but, you know, she did the best she could.

21  Q.    Did you say it did not have natural light?

22  A.    No.  Not unless you count the doors with glass that led out

23  to the hallway, but that's not leading out to the sun.

24  Q.    So I understand, did it or did it not have natural light?

25  The library.

Norwood - Direct

1    A.    No, no.  There is one other issue that -- regarding Dunbar

2    that I would like to share, if possible.

3    Q.    Okay.  Go ahead.  Just go ahead, please.

4    A.    There was one classroom on the first floor in particular,

5    since you talked about what I personally observed, the teacher

6    complained often about mold in her room, and eventually they

7    removed the carpet and put tile in, but she continued to

8    complain.  They said they checked the vents and there's nothing

9    wrong.  Continued to complain.  She even would ask me to come in

10   her room, and I said, "Oh, my God."  My throat would get sore

11   and burn when I would enter the room.  I said, "Yeah, there's

12   definitely a problem here."

13         She said, "Thank you.  I know I'm not the only one.  It's

14   not my imagination."

15         I said, "No, it's not."

16         Eventually, they probed a little further and pulled back

17   her bulletin boards, and we witnessed black mold spores that

18   large [indicating] around behind those boards.

19   Q.    Now going back to Henderson.  Did you notice anything about

20   restrooms?

21   A.    Two things in particular.  Two particular restrooms.

22   There's a girls' restroom, I think it was a girls' restroom on

23   the seventh grade hallway, seemed to flood -- you know, there

24   was always some issue with flooding.  Then there was a lot of

25   graffiti and things.

1    But the thing that disturbed me probably the most would

2   have been the boys' restroom on the eighth grade hall near the

3   back, because the boys would go in and I was stationed at lunch

4   right outside there, and they'd go in the bathroom and I'd hear

5   a flush and come right out.

6    I'd say, "Hold it.  You didn't wash your hands."

7    They'd say, "There's no water."

8    I'm like, "What?"

9    There was no water running in the boys' restroom so they

10  could wash their hands, even before -- even after they went to

11  the restroom, went up to eat their lunch.  And it was -- and I

12  pushed with that issue myself.  They had sensors and they just

13  hadn't changed the batteries.

14  Q.   Did you notice anything about locker rooms in the school?

15  At Henderson.

16  A.   I didn't go in there often, but the time or two I had to go

17  in there, they were dank and smelly.  But it seems to me a lot

18  of things in disrepair, lockers didn't work, and just --

19  Q.   Did you notice anything about painting in that building?

20  A.   The classrooms for the most part were okay.  Most of the

21  issues with painting dealt with maybe in the hallways and the

22  cafeteria, just dingy and peeling paint in those areas.  Nothing

23  about the classrooms in particular really stand out to me in

24  terms of their painting.

25  Q.   Now, you testified about Tracey-Ann Nelson terminating you.

1    Prior to the time she terminated you, had you had feedback from

2    her about your work?

3    A.    She had told me that she likes the way I think and she

4    called me into her office, or actually she sent me an e-mail at

5    one point asking me to meet with her.  I had made some

6    suggestions about some things after we had had a staff meeting,

7    and she wanted me to come in and brainstorm some ideas with her.

8    You know, there were a couple different times she did that.

9    Q.    Had you had any negative feedback from her?

10   A.    No.

11   Q.    The affidavit you made for the case, what was the general

12   subject matter of that affidavit?

13   A.    The vast majority just dealt with my experiences, the

14   things that I had observed, the things that I've provided

15   testimony to today.  The things I observed during my time

16   working in the Little Rock School District.

17   Q.    Did the subject matter of your affidavit relate to the

18   mission of the Arkansas Education Association in any way?

19   A.    Well, the mission of Arkansas Education Association, AEA,

20   is great public schools for all students.  And I would think

21   that that would pertain to facilities and making sure that the

22   schools were safe and healthy environments in which to learn.

23   Q.    Prior to coming to the Little Rock School District for the

24   2008-9 school year where you came to Cloverdale Middle School as

25   an administrator, what type of position had you had in the

1    education field?  What category of position?

2    A.    I had two.  I'd been a literacy specialist for the

3    Department of Ed, but for the most part -- also I'd been a

4    classroom teacher and instructional coach.

5    Q.    As a classroom teacher, had you received any particular

6    award?

7    A.    A couple.

8    Q.    Well, any one that stands out to you?

9    A.    A couple.

10   Q.    Please relate.

11   A.    I received National Board Certification in literacy, and I

12   also received a Presidential Award of Excellence in math and

13   science teaching.

14   Q.    Did you bring your certificate for that award here?

15   A.    Yes.  I was --

16   Q.    Could you read what it says, please.

17   A.    "The Presidential Award of Excellence in mathematics and

18   science teaching is presented with the gratitude of your fellow

19   citizens by the President of the United States of America for

20   Monica K. Norwood for embodying excellence in teaching, for

21   devotion to the learning needs of students, and for upholding

22   the highest standards that exemplify American education at its

23   finest."  Signed by Barack Obama.

24   Q.    Did you -- in your work in the Little Rock school system,

25   did you have occasion to visit schools that had greater

1   proportions of white students than the schools about which

2   you've testified?

3   A.    Yes, sir.

4   Q.    Did you make any observation about comparison of

5   facilities?

6   A.    Night and day.

7   Q.    Could you be specific in terms of what you mean by that?

8   A.    Well, one that stands out to me is Roberts.  You know, I

9   think back to Cloverdale, they had this itty bitty library that

10  had all these empty shelves where there should have been books,

11  and then you go to Roberts, which was an elementary school, and

12  it's two stories.  It's plush.  It's got all this natural light.

13  I mean, just all the light, the sun beaming in, the energy that

14  that provides, just having all that sunlight.

15         The cafeteria was humongous, you know.  They even had a

16  nice little area for little cozy conversations in the back.

17  Again, windows that were actually clean, and you could see

18  through them, unlike Henderson's, dingy Plexiglass with tape

19  marks on it.

20         Just the classrooms, we didn't really spend a lot of time

21  in the classrooms, but they were so neat and tidy and large,

22  compared to a lot of the places that I had been.  I didn't smell

23  any mold and I didn't see any chipped paint and I didn't have

24  any mice jump over my feet.

25  Q.    In your experience in education and teaching and as an

1   administrator during the period you have worked in education,

2   has any change in the standard for classroom size come to your

3   attention, for an adequate classroom size over the years?

4   A.    I can't quote the exact standards, but I do recall

5   something -- I just recall at one point there was talk about in

6   particular special ed classrooms and the requirements for

7   storage space and all of that.  But I can't say that I'm an

8   aficionado on that.

9   Q.    Can you, for example, compare the size of the classrooms at

10  Wilson and Roberts?

11  A.    I would say that the ones at Roberts are safely [sic]

12  larger than those at Wilson.  But I didn't have a tape measure.

13  Q.    Besides the Roberts school, did you visit any of the other

14  schools that have larger proportions of white students than the

15  schools about which you've testified?

16  A.    The only other one that I personally -- I've been to Terry,

17  but maybe one time, and I don't remember enough about that to

18  speak on it.  The only other one really that I can think of that

19  fits that bill that I've been to, I've never been to Forest

20  Park, would be -- I've driven by it.  But would be Fulbright.

21  Again, I didn't go into all of the classrooms, but just more of

22  a view of the office areas and that kind of thing.  And I've

23  been to the new Forest Heights STEM.  I've been there.

24  Q.    How does that compare to Cloverdale?

25  A.    I'd say it's definitely cleaner, more well-maintained.  I

1    didn't get any smells of mold when I entered.  Nicer facilities.

2    I see windows.  They have windows.

3              MR. PRESSMAN:  No further questions.

4              THE COURT:  Thank you, Mr. Pressman.

5         Mr. Heller?

6              MR. HELLER:  Thank you, your Honor.

7                        CROSS-EXAMINATION

8    BY MR. HELLER:

9    Q.   Ms. Norwood, did you just testify that the cafeteria was

10   closed while you were at Dunbar?

11   A.   No.

12   Q.   What did you say about the period of time when a cafeteria

13   was closed at one of the schools you worked at?

14   A.   I said that the cafeteria was closed at Wilson.

15   Q.   Okay.

16   A.   For a period of time.

17   Q.   Now, you talked about the problems at Dunbar that weren't

18   fixed and the problems at Dunbar that were caused when the

19   school was being renovated.  Isn't it true that during the

20   2012-13 school year when you complained about the dust, the

21   entire school was being -- the outside of the school was being

22   renovated in a year-long project?

23   A.   I believe that was '11-12 school year.  That may be a typo.

24   And that is true, and I think that's problematic for something

25   like that to be done during the school year when there are

 1   children there.  It's unhealthy.

 2   Q.   Didn't the project take almost the entire year to complete,

 3   to totally seal and renovate the outside of the building?

 4   A.   Yes.  You had us breathing in fumes the entire year.

 5   Q.   And who told you that had anything to do with asbestos?

 6   A.   One of the teachers actually took some of it and had it

 7   tested.

 8   Q.   Who did that?

 9           THE WITNESS:  Do I have to --

10           THE COURT:  Yes.

11   A.   My understanding was --

12           THE COURT:  I'm sorry.  I didn't hear a name.

13           THE WITNESS:  I don't want her to get in trouble.

14           THE COURT:  It's a proper question because you've

15   testified that --

16           THE WITNESS:  I understand.  Christy Ward.

17   BY MR. HELLER:

18   Q.   What was her job?

19   A.   She's a science teacher, the one that had the black mold in

20   her class.

21   Q.   Who did you report that to?

22   A.   I did not hear about the -- I suspected it was asbestos.  I

23   did not know at that time.  I actually reported the concern --

24   well, wasn't for me to report the concern at that point.  I

25   didn't know at that time, and I don't have firsthand knowledge

Norwood - Cross                                              113

1    that it was asbestos, no.  But what I did do was, when there

2    were concerns, I reported them to the principal.  We had a chain

3    of command.  She dealt with the work orders and those type of

4    things.  But there was a period of time the week before

5    Christmas in that year where because the principal was out on

6    medical leave, and I was along with -- I can't remember the

7    name.  Howard?  Mr. Howard.  We were standing in as principal at

8    that time, and I did call Dr. Whitehorn and expressed a concern

9    because at that point then, I was in the leadership role and I

10   wasn't going to just sit and ignore it.

11        So I did call him.  So I reported it to Dr. Whitehorn, to

12   answer your question.  And then he put me in touch with the

13   contractors that were involved, and I don't remember their

14   names.  I got their card and I called them and we got -- I had

15   them halt the work in that area where they were making people

16   sick.

17   Q.   So they stopped the work at your request?

18   A.   At that point.

19   Q.   You were in touch directly --

20   A.   I don't know how long they stopped it, but --

21   Q.   Why don't you know how long?

22   A.   We went into Christmas break.

23   Q.   So did you talk -- do you know what the purpose of that

24   renovation work was at Dunbar?

25   A.   I'm not sure I understand your question.

1  Q.   Do you know what the school district was trying to

2  accomplish by all the work that you've complained about at

3  Dunbar?

4  A.   Have you told me what it's about?  No.

5  Q.   I'm asking you if you know why they were doing the

6  renovation?  What was the purpose of it?  What were they trying

7  to achieve?

8  A.   I assume the purpose of a renovation is to renovate.

9  Q.   Okay.  Do you know whether or not that renovation was

10 intended to address any of the problems that you've complained

11 about today?

12 A.   I would say one of the things I complained about was what

13 happened as a result of the renovation, so I would say that one

14 was not the intent.  It wasn't an intent to improve.  It

15 actually caused harm.

16      The other areas that I spoke on, dealing with the mold -- I

17 don't recall changing out the chairs in the auditorium, which

18 was a good thing.  I don't think that impacted the mold.

19 Q.   Do you know whether or not one of the purposes of the

20 renovation was to seal the building to prevent water intrusion?

21 A.   I would hope that that would have been something that was

22 part of that.

23 Q.   And wasn't there at Dunbar in the 2012 -2013 school year a

24 remediation contractor hired to clean up all the problems in the

25 basement?

1    A.    '12-13, I was not there.

2    Q.    Do you know whether or not that happened?

3    A.    I do understand that asbestos tile was lifted up during

4    school hours, and my understanding is that that's actually

5    dangerous.  And it took several months to complete.

6    Q.    Does that statement you just made have anything to do with

7    remediation contractors working in the basement?

8    A.    Well, you're asking me for hearsay.  Is that what you're

9    wanting me to continue and --

10   Q.    Several times you've mentioned you've gone back to

11   different schools and observed different things even when you

12   didn't work there.  So my question is, do you know whether or

13   not during the 2012-2013 school year, from your own knowledge,

14   that remediation contractors cleaned up the basement at Dunbar?

15   A.    I can speak with certainty that the -- that the tile in the

16   cafeteria was purple when I returned to Dunbar in 2012-2013, and

17   it had not been purple before.

18   Q.    So you did return to Dunbar in 2012-2013?

19   A.    I visited the building.

20   Q.    Okay.  But you don't know whether or not a remediation

21   contractor had cleaned up the basement?

22   A.    Again, I was told that it was observed -- I was told from

23   others that asbestos tile was lifted and they did it during

24   school hours.  I've already spoken to that.

25   Q.    That's just something you were told?

Norwood - Cross

1    A.    Yes, by people who worked there.

2    Q.    Now, you talked about painting at Dunbar and your fellow

3    teachers getting ready for some scheduled painting that didn't

4    happen.  Was the painting delayed during the year, the 2011

5    school year that the renovation work was going on?  In other

6    words, was the painting delayed because of the renovation?

7    A.    I was never told a reason for the delay.

8    Q.    Okay.  And was the whole school, in fact, painted the

9    following year, the '12-13 school year, for $17,000?

10   A.    I don't have any first-hand knowledge of that.

11   Q.    You mention that there's very few classes that have any

12   natural light at Henderson.  That's the way the school was

13   designed, isn't it?

14   A.    Apparently so.

15   Q.    That's not something the school district did to shut out

16   natural light after the fact, is it?

17   A.    No.  I would say it was an intentional act.  It was part of

18   the design.

19   Q.    And isn't that a feature of all the schools, all of the old

20   schools across the school district that were built around the

21   same time?  They have less natural light than new schools do

22   today?

23   A.    In the older schools.

24   Q.    And while we're talking about Henderson, I think you

25   mentioned that Cloverdale doesn't have an air-conditioned

Norwood - Cross

1    gymnasiums?

2    A.    They certainly did not at the time I worked there.

3    Q.    What's the only school in the district that has an

4    air-conditioned gymnasium?

5    A.    Well, I haven't researched all of that.  My understanding

6    is Roberts has one, but the only other school that I recall

7    working at that had one was Henderson.  In terms of middle

8    schools.

9    Q.    When you talked about your time at Cloverdale, I think you

10   said you were there from 2008 to 2010.  Were you aware of

11   $22,000 worth of painting that happened at Cloverdale in 2010?

12   A.    At what point in 2010?  Was it after I left?

13   Q.    Well, that's what I'm wondering, whether you're aware of it

14   or not.  Did it happen while you were there?

15   A.    No, not to my knowledge.

16   Q.    Were you at Cloverdale when the roof was replaced in 2010?

17   A.    I would have to ask you what month that occurred in 2010.

18   Q.    Well, I'm asking whether or not you saw that happen or were

19   aware that that had happened.

20   A.    You know what?  You know what?  I'm going to have to say no

21   because I left at the beginning of that school year, so it was

22   still '09 when I left.  I think I heard about it.

23   Q.    Pardon me.  Did you have something you wanted to add?

24   A.    I said I think I may have heard about a roof, but no

25   firsthand knowledge.

Norwood - Cross

1  Q.   Were you at Cloverdale when the gym floor was resurfaced in

2  2010?

3  A.   That actually occurred in 2009.

4  Q.   Okay.

5  A.   So, yes, I was there.  It was beautiful.

6  Q.   I think you mentioned that the old seats you had once sat

7  in as a student at Dunbar were replaced in the auditorium.  The

8  lights were replaced as well, weren't they?

9  A.   Which lights would that be?

10 Q.   In the auditorium.

11 A.   I'm not sure.

12 Q.   I would like to ask you a few questions about your

13 affidavit, and I want to put that on the screen so you can see

14 it.

15       You mention in paragraph 3 that the middle school that

16 minor plaintiff Edward Doe attended has facilities that are

17 unequal.  What middle school is that?

18 A.   Here it -- the third line, it says Henderson.

19 Q.   Okay.  So the first line is a reference to Henderson in

20 paragraph 3?

21 A.   Yes.

22 Q.   You say in paragraph 4 with respect to Forest Heights

23 middle school, quote:  School officials began to purge

24 African-American students from the school.

25       What do you mean by that?

1 A.   That is making reference to the movement of students who

2 were basic and below from Forest Heights and rerouting them to

3 Henderson, as well as other middle schools.

4 Q.   How do you know that that happened?

5 A.   Because, number one, they are no longer at Forest Heights.

6 Forest Heights at the time had, I think, the highest special ed

7 population.  They had over a hundred students, I believe.  I

8 should have brought my binder on that.  But -- and then their

9 numbers decreased and the special ed numbers in other schools

10 increased.

11      There was something interesting that occurred, though,

12 because initially we were scheduled at Henderson to get over

13 1,000 students, which was more than we had capacity for, but at

14 the last minute, somehow some of them got rerouted temporarily

15 to Dunbar and to Pulaski Heights.

16      But our special ed numbers did increase, and those

17 students, some of them did come from that school even though

18 Mr. Suggs did say that he was going to keep special ed kids in

19 that building.  And I actually talked to one parent who was very

20 disappointed because Henderson had garnered such a bad

21 reputation that a parent was very unhappy about being there.

22 And so I asked her --

23 Q.   I don't want you to repeat what a parent had to say.

24 A.   Okay.

25 Q.   I want to talk to you about some particular questions with

Norwood - Cross

1   respect to Forest Heights.

2   A.   Well, her son was one of the purged ones, so --

3            THE COURT:  One at a time, please.

4        Mr. Heller?

5   BY MR. HELLER:

6   Q.   Isn't it true that every student who was in the seventh

7   grade when Forest Heights became a STEM school had the

8   opportunity to stay for the eighth grade if they chose to do so?

9   A.   It was true that you all said that that would happen, but

10  this particular parent that I talked to, and I wish I had kept

11  her name and her child's name, actually told me that they had

12  wanted to stay and they were told that they had to move.

13  Q.   So you understand that the policy was, at least, and you

14  may argue about the practice, that any student, any student who

15  was in the seventh grade had the opportunity to stay for the

16  eighth grade year?

17           MR. PRESSMAN:  Objection.  That fact is not in the

18  record.

19           THE COURT:  Overruled.  But I'm not sure how far we

20  need to get down this road, Mr. Heller.

21           MR. HELLER:  Okay.

22  A.   I understand that that's what was openly stated.

23  Q.   Forest Heights STEM school is not a majority white school,

24  is it?

25  A.   I would have to see what their numbers are currently.

1    Q.    Okay.

2    A.    But I do believe there's a disproportionate number of

3    Caucasian students there when compared to the district.  But you

4    can correct me if I'm wrong.

5    Q.    So the year the STEM school opened, there was an increase

6    in the number of students at Dunbar and Henderson who would have

7    otherwise been at Forest Heights?  Is that what you're saying?

8    A.    I didn't quite understand.  Could you repeat that question,

9    please?

10   Q.    I think you mentioned that you were at Henderson when the

11   Forest Heights STEM school opened and that you got additional

12   students at Henderson that came from Forest Heights and that the

13   same thing happened at Dunbar.

14   A.    And I believe Pulaski Heights as well.

15           MR. HELLER:  That's all I have, your Honor.

16           THE COURT:  Thank you, Mr. Heller.

17       Mr. Hollingsworth, any questions?  Or Ms. Middleton?

18           MR. HOLLINGSWORTH:  I only have one, your Honor.

19           THE COURT:  Promise?

20           MR. HOLLINGSWORTH:  Your Honor --

21           THE COURT:  Okay.  I thought so.  Go ahead.

22                        CROSS-EXAMINATION

23   BY MR. HOLLINGSWORTH:

24   Q.    Ms. Norwood, you've testified about Cloverdale, Dunbar,

25   Wilson, and Henderson schools.  How many schools are there total

1    in the Little Rock School District?

2    A.   They open and closed -- somewhere around 43, 48, somewhere

3    in there.

4              THE COURT:  All right.  Thank you, Mr. Hollingsworth.

5        Mr. Pressman.

6              MR. PRESSMAN:  No more questions.

7              THE COURT:  May Ms. Norwood be excused?

8              MR. PRESSMAN:  Yes, your Honor.

9              THE COURT:  Thank you, ma'am.

10             THE WITNESS:  Thank you.

11             THE COURT:  Mr. Hollingsworth, if I had a gold star,

12   I'd give it to you.

13             MR. HOLLINGSWORTH:  Thank you, your Honor.  That's a

14   rare occasion, by the way, but I kept it to one.

15             THE COURT:  Mr. Pressman, who is next?

16             MR. PRESSMAN:  Dr. Stein.

17             THE COURT:  Dr. Stein.

18       Good afternoon, Dr. Stein.

19         **CHARLES STEIN**, **PLAINTIFFS' WITNESS**, **DULY SWORN**

20                      DIRECT EXAMINATION

21   BY MR. PRESSMAN:

22   Q.   Dr. Stein, until the end of June 2015, what position did

23   you have?

24   A.   I was the director of the state facilities plus --

25   Q.   Transportation?

```
1   A.   Transportation.  Yes, sir.

2   Q.   And did you begin that position in 2003?

3   A.   2010.

4   Q.   Okay.  Is there something called an academic facilities

5   manual that's used by that division?

6   A.   Yes, sir.

7   Q.   And does it have standards for size of classrooms?

8   A.   Size of classrooms, yes.

9   Q.   Libraries?

10  A.   Yes, sir.

11  Q.   Gym facilities?

12  A.   Yes.

13  Q.   And would you agree that over the years, standards in terms

14  of the size of classrooms have favored larger classrooms than in

15  past years?

16  A.   Yes.

17  Q.   Would that be the same for a library?

18  A.   My perception would be yes.

19  Q.   So from the time that the Cloverdale Middle School was

20  built, the standard for size of a classroom has increased in

21  size; is that right?

22  A.   Yes, sir.

23  Q.   How about for a library?

24  A.   Library, I'm not as certain.

25  Q.   How about a gym facility?
```

1    A.    Same way.  I'm not certain.  Those spaces there are based

2    on per student, so many square feet per student.  And those

3    standards may have changed, maybe not.

4    Q.    When a district in Arkansas wants to build a facility of --

5    is it $300,000, they need to submit that to the division where

6    you used to work, whether it's a partnership funding request or

7    whether it's self-funding; is that right?

8    A.    Yes, sir.  That's right.

9    Q.    So if Little Rock did its construction by self-funding for

10   something like the Roberts school, they would have to submit

11   that to your division?

12   A.    Yes, sir.

13   Q.    And they did submit for Roberts; right?

14   A.    Uh-huh.  Yes, sir.

15   Q.    And part of what they submit tells you the amount they

16   propose to spend on the facility?

17   A.    Yes, sir.

18   Q.    Now, when the Roberts facility was submitted to your

19   division, the division did not consider whether the amount they

20   were proposing to spend for Roberts was equitable in terms of

21   the total facility needs in the district; is that right?

22   A.    Yes, sir.

23   Q.    In other words, that was not considered; right?

24   A.    Yes, sir.  That's right.

25   Q.    It was not considered?

1    A.    Well, part of the construction approval process, though,

2    is, school districts must submit a statement as far as

3    segregative practices.  And so Little Rock School District

4    submitted the statement.  The school would have no impact.

5    Q.    That was -- that would be no impact in terms of promoting

6    segregation of students; is that right?

7    A.    Yes, sir, that's right.

8    Q.    Now, in the statute that deals with partnership funding,

9    there's a description of what a proposal for a particular school

10   should contain; is that right?  Like a detailed narrative, a

11   description of what they want to build, justification for it?

12   That's part of what they have to submit; right?

13   A.    Right.

14   Q.    And they also have to submit in their narrative something

15   that explains how the new construction supports the prudent and

16   resourceful expenditures of state funds and improves the school

17   district's ability to deliver an adequate and equitable

18   education to public school students in the district.  Right?

19   A.    Yes, sir, that's right.

20   Q.    And then in the statute, there are criteria for your

21   division to use in considering the particular proposal, and that

22   same criterion that I just read is part of what your division is

23   supposed to include; is that right?

24   A.    Yes, sir.

25   Q.    And do you agree that in the law that created the division

Stein - Cross                                          126

1    in which you used to work, that the law says that the division

2    was created in order to ensure that substantially equal -- okay.

3    In order to ensure that substantially equal access to adequate

4    education facilities and educational equipment is provided for

5    all public students in Arkansas?  That was a --

6              THE COURT:  I'm sorry.  Before you answer,

7    Mr. Hollingsworth, was that an objection?

8              MR. HOLLINGSWORTH:  I changed my mind, your Honor.

9              THE COURT:  Okay.  Do you remember what's in the

10   statute, Dr. Stein.

11   A.   It sounds right.

12             THE COURT:  Okay.

13             MR. PRESSMAN:  I have no other questions.

14             THE COURT:  Thank you, Mr. Pressman.

15        Mr. Hollingsworth?

16                      CROSS-EXAMINATION

17   BY MR. HOLLINGSWORTH:

18   Q.   Good afternoon, Dr. Stein.

19        You were just asked about partnership funding and criteria

20   for partnership funding of projects.  Are the criteria for

21   partnership programs somewhat different than self-funded?

22   A.   In terms of standards, no, sir.  As far as new schools,

23   self-funded plus a partnership still have the same standards.

24   Self-funded projects, though, submit none of those statements,

25   though.  Self-funded does not have to send in the same verbiage.

1  Q.   Okay.  And is it true that the language that was read to

2  you about efficient and wise use of state funds relates to

3  partnership program funding?

4  A.   Uh-huh.  Yes, sir.

5  Q.   And does Little Rock School District receive any

6  partnership funding?  I'm sorry.  You wouldn't know, now, but as

7  of the time -- at least as of the time that you resigned.

8  A.   They have never submitted submissions for funding.

9  Q.   Okay.  And is it correct that for self-funded projects,

10 that the law says that the commission shall approve a self-

11 funded project that complies with state codes and standards?

12 A.   It sounds right.

13 Q.   Sounds familiar.  And what exactly is it that the

14 commission or the division looks at in whether or not to approve

15 a self-funded project?

16 A.   It's several steps, of course, and one that I mentioned was

17 the impact statement.  It's mainly, though, satisfying

18 standards, though, as far as based on the overall school size,

19 space size.  In other words, your plans and specs in all your

20 spaces must satisfy standards.

21 Q.   Are you looking at construction and safety standards?

22 A.   Yes, sir, that's right.  Space standards and standards as

23 far as normal structural systems, electrical and those systems.

24 Q.   Okay.  And then these assurances that you get from the

25 district about the effect on segregation, does the division look

1    behind those or do you take the district's word for it?

2    A.    We use their word.

3    Q.    Okay.  In the academic facilities manual standards, those

4    are for new construction?

5    A.    Yes, sir, that's right.  New construction.

6              MR. HOLLINGSWORTH:  Okay.  I will pass the witness,

7    your Honor.

8              THE COURT:  Thank you, Mr. Hollingsworth.

9         Mr. Heller, anything?

10             MR. HELLER:  No questions, your Honor.

11             THE COURT:  Very good.  Mr. Pressman?

12                       REDIRECT EXAMINATION

13   BY MR. PRESSMAN:

14   Q.    In terms of when you receive a self-funded proposal, is it

15   your position that the statute allows you to ignore, not

16   consider whether the particular expenditure that's being

17   proposed is equitable and nondiscriminatory in terms of all the

18   facilities in the district?

19   A.    To my knowledge, there's no place in the statute tasking

20   that process past the statement I mentioned.

21   Q.    About impact on students?

22   A.    Right.  Yes, sir.

23   Q.    And basically your division just didn't do its own work on

24   impact on students; you just accepted whatever the district

25   said?

1    A.    Yes, sir.

2              MR. PRESSMAN:  Okay.  Thank you.

3              THE COURT:  Thank you, Mr. Pressman.

4         May Dr. Stein be excused?

5              MR. HOLLINGSWORTH:  As far as the state defendants are

6    concerned, yes, sir.

7              THE COURT:  Okay.

8              MR. PRESSMAN:  Yes.

9              THE COURT:  Very good.  Thank you for your testimony.

10             THE WITNESS:  Yes, sir.

11             THE COURT:  Who is next?

12             MR. WALKER:  Dr. DeJarnette.

13             THE COURT:  Dr. DeJarnette, Officer Gray.

14             MR. WALKER:  Your Honor, before I call her, may I

15   inquire of the Court, Mr. Hollingsworth wanted to make sure that

16   we had the parents and other live bodies here who could attest

17   to these matters.  This is not our order of proof, but I wanted

18   to let the Court know that we have some of the parents and

19   plaintiffs in the courtroom, for whatever it's worth.  I don't

20   think that it's necessary for us to make -- to do what he says,

21   but I did want them to come so that there would be live bodies

22   here so that he wouldn't think that this is just a Walker

23   contrivance.

24             THE COURT:  Thank you, Mr. Walker.  Understood on the

25   parents and others present.

1          MR. WALKER:  Yes, sir.  Do you mind if they stand,

2    your Honor?

3          THE COURT:  No.  That's fine.

4          MR. WALKER:  Would you all stand, please.

5          THE COURT:  Very good.

6          MR. WALKER:  Thank you.

7      **KAREN DEJARNETTE, PLAINTIFFS' WITNESS, DULY SWORN**

8          MR. WALKER:  May I begin, your Honor?

9          THE COURT:  You may.

10                       DIRECT EXAMINATION

11   BY MR. WALKER:

12   Q.   State your name, please.

13   A.   Karen DeJarnette.

14   Q.   Where do you live, Dr. DeJarnette?

15   A.   In Little Rock, Arkansas.

16   Q.   Would you tell the Court what your education is.

17   A.   I have a bachelor's from Pratt Institute college in

18   Brooklyn, a master's from Columbia University, and a Ph.D. in

19   education policy from UCLA in Los Angeles, California.

20          THE COURT:  Mr. Walker, let me interrupt.

21      Dr. DeJarnette, I want you to grab that microphone by the

22   bottom and pull it closer to you.  You have a soft voice.

23          THE WITNESS:  Is that better?

24          THE COURT:  That is better.  Thank you.

25   BY MR. WALKER:

1    Q.    Are you a native of Pine Bluff, Arkansas?

2    A.    Yes.

3    Q.    Just like Mr. Baker Kurrus?

4    A.    I think so.

5    Q.    He went to Harvard, you went to UCLA?

6    A.    Sir?

7    Q.    You went to UCLA?

8    A.    I went to UCLA.

9    Q.    Okay.  Did you have occasion to work for the Little Rock

10   School District?

11   A.    Yes.

12   Q.    Did you have occasion to work for the Little Rock School

13   District when Mr. Kurrus was a member of the board of directors

14   of that district?

15   A.    Yes.  He was on the board when I was hired in 2004.

16   Q.    All right.  What year were you hired?

17   A.    2004.

18   Q.    Was that right after Judge Wilson had released the Little

19   Rock School District from court supervision, except for program

20   evaluation?

21   A.    Yes, sir, that's when I was hired.

22   Q.    All right.  Now, tell the Court something about your work

23   experience before you got to Little Rock, please.

24   A.    I worked -- when I lived in Los Angeles, I worked with a

25   national school reform organization called the Galeb Institute

1   as research director.  And we worked with schools across the

2   country.  I evaluated the partnership work with that institute

3   and the schools.

4        I also worked with Education Development Center, a national

5   school reform organization out of Newton, Massachusetts, and I

6   directed the work of Arkansas, Louisiana, and Mississippi,

7   specifically for middle schools.

8        And I worked for Mr. Ray Simon, Commissioner of the

9   Arkansas Department of Education, as a consultant, and I

10  monitored for him the takeover of Altheimer School District.  I

11  reported directly to Mr. Simon.

12       And I've worked in various consulting capacities with

13  different school districts over the years as well.

14  Q.   I see.  When did you end your employment with the Little

15  Rock School District?

16  A.   I began employment -- I think it was September 27, 2004.

17  Q.   When did you end it?

18  A.   End it.  June 30, 2015.

19  Q.   In that time, did you take on a position of being a

20  consultant to Mr. Kurrus?

21  A.   I was retained as a consultant upon my leaving an employee

22  status at LRSD.

23  Q.   I see.  What do you do now?

24  A.   I'm an educational consultant with school districts.

25  Q.   Thank you.  When you worked for the Little Rock School

1    District and you had the Ph.D. degree, was that significant?

2    A.   My Ph.D. is in education policy analysis, and I believe

3    that helped me become employed because Judge Wilson in the

4    desegregation case had written a job description that required a

5    Ph.D., and it was helpful in program evaluation as well as

6    policy analysis.

7    Q.   Were there any other persons in the Little Rock School

8    District who had the Ph.D. degree as distinguished from the

9    Ed.d. degree?

10   A.   I do know a person who had a Ph.D., but it was not in

11   education.  I think Dr. Ed Williams had one in work force

12   education.  But the other people with doctorate degrees in

13   education to my knowledge were Ed.d. specialists.

14   Q.   Thank you.  Were you working for the Little Rock School

15   District during the 2010-11 and school years thereafter?

16   A.   Yes.

17   Q.   To whom did you report in the 2013-14 school year?

18   A.   I reported -- that year I was on a special project assigned

19   by Dr. Dexter Suggs, and I reported to Dr. Suggs and to

20   Mr. Glasgow, who was an assistant or associate superintendent.

21   Q.   Would you describe to the Court your assigned duties by

22   Dr. Suggs and/or Mr. Glasgow?

23   A.   Dr. Suggs wrote the description of the special project.

24   The first semester, I was to visit all of the middle schools and

25   report on a variety of variables related to school

 1   effectiveness.  And the second semester, I was to report for a

 2   two-week period to each school that was labeled priority status

 3   by the Arkansas Department of Education and, again, report to

 4   Dr. Suggs and copy Mr. Glasgow on a variety of variables.

 5   Q.   Did you have occasion to prepare reports in that role?

 6   A.   Yes.  I reported every week, but I typically stayed at the

 7   school two weeks, sometimes two and a half weeks if there was a

 8   holiday.  So I reported every Friday.  I observed in classrooms

 9   and the whole school, and then the last three hours of the week,

10   on Friday afternoon, I would prepare a report and send it to

11   Dr. Suggs and Mr. Glasgow.  And at the end of the two-week

12   period, I spent about a half a day on each of those reports and

13   sent them to them by five o'clock that afternoon.

14   Q.   I see.  Before then, were you the director of the program

15   research and evaluation department for the district?

16   A.   Planning research and evaluation.

17   Q.   Planning research.  Until what year?

18   A.   Until that year.

19   Q.   Until that year.  At some time --

20   A.   I was still under that title, but Dr. Suggs termed it I was

21   managing a special project because he was interested in middle

22   schools the district had deemed a priority, across middle and

23   priority schools.

24   Q.   While you were there, did the board develop an evaluation

25   agenda?

1    A.    Every year except for that year, '13-14.

2    Q.    At that time, did Dr. Suggs determine that since he was

3    there, there was no longer a need for an evaluation agenda?

4    A.    He said he would evaluate the programs.

5    Q.    I see.  So that program evaluation ended upon Dr. Suggs

6    becoming the superintendent of the district?

7    A.    I don't know of any program evaluations, formal evaluations

8    that were conducted past that point.

9    Q.    I see.  First of all, did you have an office in the

10   district?  In 2013.

11   A.    Every year except 2013-14.

12   Q.    So when he came, you no longer had your office?

13   A.    No.

14   Q.    So what did you do for an office?

15   A.    I didn't have an office.  I resided in schools.

16   Q.    You did?  Did there come a time when you also had residence

17   for a short time in the Central Office?

18   A.    Yes.  The last year that I was there, I was in the

19   administrative building.

20   Q.    All right.  Now, in going into the schools in order to do

21   your work and your assigned duties by Dr. Suggs, tell the Court

22   what you did in order to prepare the reports which you presented

23   to Dr. Suggs and Mr. Glasgow.

24   A.    I spent a lot of time observing classrooms, making

25   classroom observations, formal observations, using a prescribed

1    protocol.  You know, looking at different variables with

2    teaching and learning and effective instruction.  I also

3    observed the school building and made reports sectioned on the

4    climate in the school in terms of student behavior and teacher-

5    student reactions.  And I also as part of the environment, I

6    looked at the facility and observed, you know, in the cafeteria

7    and the library, outside.  You know, the whole building.  I

8    talked with teachers, interviewed teachers, interviewed

9    principals extensively, and sometimes interviewed students.

10   Q.    All right.  Did you have occasion to take pictures of

11   facilities?

12   A.    I did take some pictures of facilities and student

13   activities occasionally, activities.

14   Q.    Did you determine in your work whether there was a

15   correlation between student achievement and the quality of the

16   physical facilities and the resources which were provided to

17   those students?

18   A.    Yes, sir.  I spoke about that and learned about that even

19   before the '13-14 school year.  I spoke at board meetings

20   quarterly and extensive presentations annually when the student

21   test scores would come in.  And I also spoke at community

22   meetings about test scores annually.  I tried to always draw the

23   correlation between all of those things.  Whether it be

24   facilities or resources or teacher professionalism, all of those

25   things impact student achievement.

1          So there were many reports when I would point out that our

2     lowest-achieving schools had the least resources and that we

3     should look at the correlation of those.  If we wanted to change

4     the student outcome, we had to change the inputs.

5     Q.    All right.  Did you have occasion to ever be assigned to

6     the schools in the southwest part of the Little Rock School

7     District?

8     A.    Yes, yes.

9     Q.    At all grade levels?

10    A.    The semester that I observed the priority schools, three of

11    them were in southwest:  Baseline, Cloverdale, and McClellan.

12    But also I observed on the middle school semester Mabelvale,

13    which is in southwest, and Fair High School was a priority

14    school.  So over my 11 years with LRSD, I was in all of the 50

15    campuses many times, but that particular year, just the middle

16    schools and the priority schools.

17    Q.    I see.  Did you have occasion to make any report to

18    Dr. Suggs with respect to the Cloverdale school?

19    A.    In the '13-14 school year, I visited Cloverdale for the

20    first two weeks of the school year and two weeks at the end of

21    the school year, because they were a middle school as well as a

22    priority school.  So I went there two times that year.

23    Q.    Will you tell the Court what you shared with Dr. Suggs, and

24    if you shared it with Mr. Glasgow as well, do that as well.

25    A.    Each time I shared with them the report broken into the

1    different variables that I mentioned.  Each time I also gave a

2    set of photographs.  And I actually made three reports on

3    Cloverdale because when I went there the first two weeks of

4    school, after about four days as I made my way through the whole

5    campus, I sent an additional e-mail report with additional

6    photographs because I felt like Dr. Suggs was new and that he

7    would really want to know the condition of Cloverdale because it

8    was quite different than the other schools in terms of the

9    appearance of it.

10   Q.   Would you tell the Court what you shared with Dr. Suggs and

11   your findings with respect to the differential between

12   Cloverdale and the rest of the schools.

13   A.   Cloverdale had the most extreme disrepair and

14   uncleanliness.  Hazards that I saw were exposed wiring coming

15   out of the walls in many places, electrical sockets not

16   existing, hallways with surplus furniture stacked to the point

17   that it seemed to be a fire hazard.  Extreme heat conditions in

18   the gym.  One day when students were having PE, it was well over

19   a hundred degrees inside.

20        Broken walls, broken chairs.  Many classrooms with ceiling

21   tiles missing and insulation exposed.  Cracks in walls in the

22   sixth grade building and in the breezeway near the sixth grade

23   building.

24        There was one room there, a Room 34, that had -- it seemed

25   to be a gas leak or something that had just really bad fumes,

1    and the teacher and the students complained.  I couldn't stay

2    and observe in that classroom because it burned my eyes.  That

3    room also had the most extreme cracks in the walls.  I went

4    there several days, and there were worms that came out of the

5    walls and sat on the floor next to the wall that the students

6    and the teacher had to constantly sweep up.

7         Mold in the sixth grade building where it had flooded a

8    number of times over the years.  The teachers reported that fans

9    had been placed so that it would dry, but the carpet and the pad

10   underneath was moldy, or seemed to be.  You could smell it.

11        In the hallway in the sixth grade building, several

12   occasions from the ceiling coming down the hall was just a brown

13   sludge, and there were two classrooms that particular fall that

14   had tape across the doors, and the teacher in the class and

15   students had been moved out and there was some sort of work

16   going on and there was tape so that no one could go in those

17   classrooms, though the other classrooms in that building were

18   still being used.

19   Q.   All right.  You shared that with Dr. Suggs?

20   A.   I sent the reports to Dr. Suggs and Mr. Glasgow, yes.

21   Q.   Do you know if they took any action to redress or

22   ameliorate the conditions that you described in your report?

23   A.   I received no feedback in that fall semester on those

24   reports.  In the spring when I went back at the end of the year,

25   I went back to a variety of those specific issues and took

1    pictures again of the existing conditions still and compiled

2    them and sent them to them again.  This was at the end of the

3    school year.  The same conditions.  And a few things had been

4    fixed.  They had replaced the glass in the cafeteria window.

5    But the ceiling still leaked water from the vents onto the

6    tables and the floor in the cafeteria.

7         They had painted Room 34.  They had puttied up the cracks

8    and painted Room 34 with a new coat of paint.  But the smell of

9    the gas was still there.

10        One of the classrooms that had a lot of mold in the sixth

11   grade building, they had cleaned it and put in new carpet and

12   whatnot, but -- you know, the walls still smelled, but the

13   appearance was better.

14        So I took a number of pictures of the things that were

15   repaired and looked better as well as the things that remained

16   the same, and I wrote a comparison report saying from fall to

17   spring -- not just facility.  I compared classroom observations

18   across both time periods.  I compared student discipline

19   infractions from both time periods.  So I had this comparison

20   report, and I sent it to Dr. Suggs and Mr. Glasgow.  Mr. Glasgow

21   responded and said, "Thank you for the report."

22        I e-mailed back and said, "Well, I didn't know if anyone

23   was reading them.  I haven't had any feedback all year."

24        And he said, "Well, I read all of them.  Cloverdale

25   Elementary had been demolished and Cloverdale Middle needs to

1  be, and we are aware of it."  So he did acknowledge, Mr. Glasgow

2  acknowledged that report.

3  Q.  I see.  Did you have occasion to go to or to take anyone

4  representing the district to Cloverdale with you at any time?

5  A.  I was there with other Central Office administrators.  I

6  was on that campus once when Dr. Suggs and I believe it was

7  Mr. Burton came, and they came into the office, but they didn't

8  go into the campus.

9      I was there many days when school improvement specialists

10 employed by the Arkansas Department of Education were on campus,

11 and I talked with the ADE staff about the facility and the

12 conditions.  And Ms. Roxie Browning was one that I talked to.

13 The previous year to that, Andrea -- I can't remember the last

14 name.  I think it's Kelly.  She was the district school

15 improvement specialist, and I saw her on the campus and I talked

16 to her about the condition of Cloverdale as well.

17     I saw various Central Office, Little Rock District Central

18 Office people there over the years, and we talked about the bugs

19 and how hard it was to observe in classrooms because of the

20 conditions.

21 Q.  Was that a sufficient or adequate learning environment for

22 children who are classified as being in great need of academic

23 attention?

24 A.  I believe every child deserves better than that, and I

25 believe that there is a true correlation between what children

1   experience in their school day and how they perform on

2   standardized tests and other measures.

3   Q.   I see.  I am putting on the ELMO Exhibit 7, which has been

4   shared with the Court and with counsel.

5        You made reference to Mr. Dennis Glasgow.  Can you tell the

6   Court what this document is, please.

7   A.   This is the e-mail that I was just reviewing a little bit.

8   And you have to read from the bottom up of the times if you want

9   to follow the conversation.  But this is my last report of

10  Cloverdale that I sent to he and Dr. Suggs and copied to

11  Dr. Whitehorn, the principal.  I always copied the principal of

12  any school that I wrote a report on.

13       And then Dennis responded back that he saw some improvement

14  academically in terms of the classroom observations and that the

15  building, you know, had problems and he knew that.

16       And then I responded to him, "Thanks for reading the

17  report."

18       And then he answered that he had read all of the reports

19  and he's sorry that he didn't give me feedback.

20  Q.   On May 24, 2014, at 9:52 p.m., apparently Mr. Glasgow wrote

21  you a note of thanks.  Would you just read just for the record

22  and for the --

23  A.   He says, "Thanks, Karen.  I'm happy to see that some

24  improvement was made academically.  The building is right next

25  to where Cloverdale Elementary sat.  Earth settling issues

1    doomed the elementary.  The district is certainly aware that the

2    middle school will need replacement in the near future."

3    Q.   So as of that date, he acknowledged a need to replace that.

4    A.   Yes, but over the years as I served on cabinet for various

5    superintendents, we had that discussion at cabinet level.  I was

6    there when Cloverdale Elementary was demolished.  We had that

7    conversation about Cloverdale Middle then.

8              MR. WALKER:  Move the admission of Exhibit 7.

9              MR. HELLER:  No objection, your Honor.

10             MR. HOLLINGSWORTH:  No objection.

11             THE COURT:  Good.  Plaintiffs' 7 is in.

12        (Plaintiffs' Exhibit 7 received in evidence.)

13   BY MR. WALKER:

14   Q.   Dr. DeJarnette, did you have occasion to ever visit that

15   school while Mr. Heller was there?

16   A.   Yes.  In the '13-14 school year, I'm trying to recall if it

17   was in the spring -- I mean the fall or the spring semester,

18   Mr. Heller asked me to meet with him about some charter school

19   data.  I told him I was assigned to Cloverdale.  I asked him if

20   he could come there.  He and Mr. Fendley came to Cloverdale.

21        Before we talked about the charter school data, we walked

22   through the building and I showed him specifically some of my

23   most concerns about the building:  Classroom 34, missing parts

24   of wall in the breezeway, the flooded library that was, you

25   know, messing up the books on the shelves as they absorbed the

1    water.

2        So he and Mr. Fendley walked with me through the building.

3    We went into Room 34 and observed the horrible conditions there

4    in terms of the cracks in the wall and the open pipe in the

5    ceiling and the bugs and all of those things.

6    Q.   Did Mr. Heller share with you his view regarding the

7    quality of the building and what he would do about it?

8            THE COURT:  Before you answer, Mr. Heller?

9            MR. HELLER:  I object that it calls for hearsay.

10           THE COURT:  Hearsay and perhaps relevance --

11           MR. HELLER:  And relevance.

12           THE COURT:  -- on what the lawyer thinks.

13           MR. WALKER:  Well, your Honor, let's see how I may

14   satisfy the Court.  I would like to ask whether Mr. Heller made

15   any promises with respect to having the district officials

16   address the matter.

17           THE WITNESS:  I asked --

18           THE COURT:  I'm sorry, Dr. DeJarnette.  Mr. Walker and

19   I need to have a conversation first.

20       So is your argument that he's an agent of the district?

21           MR. WALKER:  Yes, your Honor.

22           THE COURT:  And can speak?

23           MR. WALKER:  Yes, he is, and he was not serving in an

24   attorney -- this was not an attorney -client relationship at

25   that time.  He was not there for that purpose, had nothing to --

1    and this was not an issue of any kind.  He was there in a

2    building and she was sharing with him something, and he made --

3    I mean, he has a fiduciary relationship, anyway, to protect the

4    resources and assets of the district and the children in the

5    district.

6              THE COURT:  I'm sorry, Mr. Walker.  I was -- I'm

7    trying to follow this down.  Mr. Heller -- the real objection

8    here is hearsay.  That's what Mr. Heller has made.

9              MR. WALKER:  Yes.

10             THE COURT:  I was trying to pull you toward an

11   objection -- or an exception to that.

12             MR. WALKER:  Yes, I understand.

13             THE COURT:  But you're disclaiming.

14             MR. WALKER:  I'm going further away.

15             THE COURT:  So which is it?

16             MR. WALKER:  Well, I think that because he's an agent

17   of the district, it survives the hearsay rule.

18             THE COURT:  Mr. Heller?

19             MR. HELLER:  Your Honor, it's also an attorney-client

20   privilege issue because my clients are the administrators of the

21   district.  And if I'm talking with Dr. DeJarnette about an

22   issue, especially one that could lead to litigation, then

23   there's an attorney-client privilege at stake here, too.  But I

24   am not an administrator or agent of the district.  My -- the

25   things I say don't bind the district.  I'm not authorized to

 1    contract on behalf of the district or anything like that.

 2           THE COURT:  I'm going to sustain the objection,

 3    Mr. Walker.  Let's move on.

 4           MR. WALKER:  Thank you, your Honor.

 5    BY MR. WALKER:

 6    Q.    Now, you indicated that you went to other schools as well?

 7    A.    Yes.

 8    Q.    Did you go to the schools that were located in the north of

 9    Interstate 630 and the west of Shackleford?

10    A.    I went to all the schools.

11    Q.    Did you find any marked difference in the facilities

12    between the schools to the north and west than the schools to

13    the south and east, in a general sense?

14    A.    Well, Roberts Elementary is very different from the schools

15    in the southwest.  It is not really comparable to the schools in

16    the southwest.  It is so vastly different in terms of size and

17    what the building is made of and the -- you know, the glass and

18    marble and chrome inside, as well as the size of the building

19    and the property.  It just --

20    Q.    Excuse me.  Did you say marble?

21    A.    Yes.  Yes.  It's -- it's one of the nicest schools I've

22    ever been in.

23    Q.    All right.

24    A.    But there are other schools north of 630.  Forest Heights

25    is -- the newer building is quite amazing with, you know, tall

1    windows and big open bay areas for, say, the art instruction

2    room and that sort of thing that are very incomparable to

3    Cloverdale's or Mabelvale's art rooms.

4         Mann, parts of Mann, there are new buildings in Mann.

5    There are music labs that are in no way able to be compared to

6    the music room at Cloverdale or Mabelvale.

7    Q.   Explain that, please.

8    A.   At Cloverdale, the music room is a small classroom.  The

9    '13-14 school year, I observed there several times, and a small

10   classroom with a few maybe ten chairs and a teacher desk and a

11   chair and one keyboard that was broken.  The week after I

12   observed at Cloverdale in the fall semester, I was assigned to

13   Mann for two weeks and --

14   Q.   Before you go further, Cloverdale, does it have white

15   students from west of Shackleford and north of 630?

16   A.   Cloverdale?

17   Q.   Yes.

18   A.   Cloverdale that year had 22 white students out of 700.  600

19   or so.

20   Q.   That's fine.

21   A.   At Mann, the music labs, for example, keyboard --

22   Q.   Well, before you go, did Mann have white students there in

23   some numbers?

24   A.   Less that year than before, but, yes, they are more -- one

25   of the schools that has more -- a higher percentage of white

1   students than most of our schools.  And many years they were

2   50/50 because they were a magnet school.

3   Q.   What did Mann have in comparison to Cloverdale with music?

4   A.   Well, Mann has buildings, you know, they have a brand-new

5   full building for performing arts with huge dance studios and

6   jazz classrooms.  And they had a piano lab.  They didn't have a

7   broken keyboard.  They had, I think, 12 Steinway pianos,

8   brand-new, where each student had their own piano, and the

9   teacher had headphones she could plug in and listen to each

10  student individually.  It was not comparable to Cloverdale in

11  terms of the music classroom.

12  Q.   Did the students at Mann participate in competition and

13  events and have separate bands and everything?

14  A.   Yes.  They are quite proud, and I believe I wrote that in

15  the report.  They are quite proud of their performing arts.  The

16  dance classes perform at World Fest, and the band students make

17  all region and all state.  And they have quite a resume of

18  accomplishments in the arts.

19  Q.   What were the comparable accomplishments of the students at

20  Cloverdale?

21  A.   I don't know of any accomplishments of Cloverdale students.

22  Q.   Did they in your opinion have comparable opportunity and

23  resources and support?

24  A.   No.

25  Q.   All right.  You talked about art as well.  Could you

1    address the art in the middle schools and how the rooms and the

2    facilities were set up to address those?

3    A.    Forest Heights facility has the most amazing visual arts

4    labs in their new building, you know, rooms with tall windows,

5    lots of natural light, the most, you know, up-to-date tables

6    with the drop-down electrical outlets so that they can plug in

7    lamps or different tools that they would use.

8         Mann has quite a few art labs as well, all with water and,

9    you know, well lit.

10        Cloverdale's classrooms, not just art, but all of their

11   classrooms have maybe one window, but there was typically a

12   window unit air-conditioner in that window, so there wasn't

13   natural light.

14        Mabelvale really may be the worst classroom for visual arts

15   that I saw because those classrooms were actually in a portable

16   building, and the teachers had to carry water in in five-gallon

17   buckets.  They didn't have water for paints and that sort of

18   thing unless they carried it in.  The portables typically have

19   one tiny window, often, too, with an air-conditioner attached to

20   it.  So there was no comparison in terms of lighting and natural

21   light and space to move around the tables.

22        At Forest Heights, the art lab rooms are four times the

23   size of the art class at Mabelvale or Cloverdale.

24   Q.    Do Forest Heights and Roberts have portable buildings?

25   A.    No.  Roberts -- and it's an elementary school, but that

1    building has a wet lab for science and art areas in every single

2    classroom.  All the classrooms have natural light.

3    Q.    You say every single classroom?

4    A.    Every classroom that I've ever been in in Roberts had a wet

5    lab for science experiments and/or art activities.

6    Q.    All right.  Now, what is a wet lab, for the record?

7    A.    With sinks so that brushes could be washed or paints could

8    be mixed or sand could be used for a science experiment or that

9    sort of thing.  It's an area of the classroom that is for wet

10    activities.

11    Q.    All right.  Did you find those features in any school south

12    of 630 and east of Shackleford?

13    A.    Some of the science classrooms at the schools, for example,

14    at Mabelvale, there is a wing of that school that has several

15    science classrooms with a sink, but the art classrooms did not

16    have a sink.  And all of the classrooms did not have a sink.  So

17    there were some classrooms at the other schools -- at

18    Cloverdale, I don't remember seeing any classroom -- I saw

19    classrooms with sinks, but not working sinks.  In fact, one

20    classroom had, like, poster board taped over the sink.  And I

21    did ask the teacher about that, and she said the sink had not

22    worked in a couple years, so she covered it so that she could

23    use it as a counter.

24    Q.    Did you observe technology and things like telescopes and

25    those kinds of resources in any of the schools?

1    A.    At Roberts, you can observe telescopes on the second floor

2    with windows everywhere, large windows, so there are telescopes

3    set up where individuals or classrooms can go, open kind of

4    areas where they can look at stars or the sun or whatever.

5    Large telescopes at Roberts.  I don't remember seeing telescopes

6    at any other school.

7    Q.    I see.  Was Roberts contemplated initially as a K through 8

8    school?

9    A.    The board had debates about whether it should be K through

10   8 or K through 5 in the first few years when I was employed in

11   the Little Rock District before they started designing it.

12   Q.    Was that when Mr. Kurrus was on the board?

13   A.    Mr. Kurrus was on the board.

14   Q.    During that time, was there a clamor for another west

15   Little Rock middle school?

16   A.    I'm sorry.

17   Q.    Was there a clamor, public clamor for another west Little

18   Rock middle school?

19   A.    Well, there was a lot of talk about Roberts should be K-8

20   because west Little Rock needed an elementary and a middle

21   school.

22   Q.    Were there differences on the board regarding that, in your

23   observation?

24   A.    Yes.  It was a very split conversation.

25   Q.    Those differences, could you describe whether they were

1  along racial lines?

2  A.    The board members' differences?

3  Q.    Yes.

4  A.    I do remember Dr. Mitchell, who I believe was board

5  president through at least part of that conversation, and other

6  black board members feeling that it should be elementary because

7  the other schools in the district were elementary, not K-8.

8  Q.    All right.  Now, let's go to some other schools.  Are there

9  some other dismal schools?  And I'm calling Cloverdale dismal

10 pursuant to your description.  That's my label.  It's not yours.

11 And I'm not asking the Court to adopt it.  It's just shorthand.

12 But are there some other schools that fit pretty much close to

13 Cloverdale in the Little Rock School District based upon your

14 study for the whole year or so under Dr. Suggs?

15 A.    To me, Cloverdale was the most extreme in that I can't tell

16 you that I felt in any classroom -- and I have observed in all

17 of them -- that any classroom was really adequate or above

18 adequate.

19      We do have other schools -- Dunbar comes to mind.  There

20 are other schools that had problem areas and some many problem

21 areas, but I didn't feel that there was not even, you know, one

22 or two classrooms that were adequate like I did at Cloverdale.

23 Q.    I see.  At Dunbar, do you -- are you aware of the original

24 building size for student enrollment at Dunbar?

25 A.    Yes.  When I was at Dunbar in the fall semester, my biggest

1    concern there at that time was the smallness of the classrooms

2    because the Common Core standards had just come down and

3    teachers were being really counseled to implement instruction

4    based on Common Core standards.  And this meant a lot of

5    collaborative grouping, active instruction, hands-on,

6    experiential-type activities.  At Cloverdale the classrooms were

7    so tiny, I had to stand up to observe.  There was not an extra

8    seat.  But they were so small with 30 students packed in, and

9    the teacher would sometimes have to stand by -- they would stand

10   by the Smart Board and lecture instead of doing the type of

11   instruction they should be doing in terms of activities.

12   Students were shoulder to shoulder.

13        I asked one teacher, you know, "Can you walk around the

14   classroom and even see the students' work?"

15        And he said, "No, unless I step over their backpacks and

16   their legs."

17        It was so small.  So after a couple of observations like

18   that, I went to Ms. Thrasher, and she allowed me --

19   Q.   You said Cloverdale.  Did you mean Dunbar?

20   A.   Dunbar.

21   Q.   Go ahead.

22   A.   I went to Ms. Thrasher, and she allowed me to look into the

23   Dunbar alumni area, which is on the campus with a room with,

24   like, the history of Dunbar.  And so I looked up the square

25   footage, and that's how I learned that it was a college as well

1    as a high school when it was built, and then it was converted to

2    a junior and senior high school.

3         So I saw some numbers that I put in my report about Dunbar.

4    I believe the school was built for 400-plus students, and at the

5    time that I was observing, there were closer to 700.

6         So she was saying to me that the rooms weren't always this

7    small.  It looked to me like -- I looked at some of the floor

8    plans.  It looked to me like the classrooms were pretty much cut

9    in half so that they could house almost twice as many students

10   as the original amount of students assigned there.  And they had

11   added portable buildings.  There were three pretty large

12   portable buildings out behind the school, and each of those

13   portables housed two classrooms.  So they'd cut the portables in

14   half and they'd house two classrooms in each of the portables.

15        So I believe I wrote in my report that that was one of the

16   biggest concerns for me there given the Common Core instruction

17   requirements and that the larger classrooms were actually in

18   those portables, although they didn't have the natural light and

19   other things that you would hope for in a classroom.

20        But that was a concern.  And when they cut the classrooms

21   into half size, I talked with her about when the bell would ring

22   and the students, 30 students in a -- I think I measured a

23   couple of the classrooms, and they were -- I can't recall

24   exactly, but I wrote it in the report.  But when the students

25   would file out of the doors, it seemed like it would be a fire

DeJarnette - Direct                                                    155

 1    hazard because the door was not big enough for that many

 2    students to get out, you know, like you would have in a regular

 3    classroom.

 4          So those were the concerns I mentioned to Ms. Thrasher.

 5    Q.    Did you have occasion to address any of the other schools

 6    besides Dunbar and Cloverdale in the center city and southwest?

 7    A.    Would you say that again?

 8    Q.    Did you have occasion to address to Dr. Suggs any of the

 9    other schools in the southwest and central parts of the city?

10    A.    Well, I wrote reports on all of the middle schools.

11    Q.    All right.

12    A.    And all of the priority schools.  So the priority schools

13    would have included Baseline and Hall and Fair and Henderson.

14    Q.    McClellan?

15    A.    McClellan.

16    Q.    I see.  Would you describe to the Court the condition of

17    McClellan.

18    A.    I spent two weeks at McClellan in January, and it was

19    extremely cold.  The building is built to where the classroom

20    doors open to the outdoors because, you know, there are

21    breezeways rather than hallways.  And it was so exceptionally

22    cold in the classrooms, the students, the teachers, myself, we

23    wore coats and sometimes hats, et cetera.

24          In addition to the coldness there, the facility was not

25    like Cloverdale, but it was certainly not like Hall or Forest

1    Heights or one of those buildings in terms of the age of the

2    building and the visual appearance, the aesthetics of it.  The

3    classrooms are pretty small.  It's not one of the nicer

4    buildings in the Little Rock School District.

5    Q.   I see.  I call your attention to some of your exhibits that

6    we have highlighted.  I call your attention to Plaintiffs'

7    Exhibit 1.  Can you identify this document, please.

8    A.   This is a page from the comparison report about Cloverdale

9    where I was showing the type of concerns from the fall semester

10   that I also saw in the spring semester at the end of the year.

11   Q.   All right.  And that's page one.

12        Then on page two, would you describe this to the Court,

13   please.

14             MR. WALKER:  Your Honor, you have this in your packet.

15   A.   It's the same report, and you'll see, like, the ceiling

16   where it says August 2013, May 2014, these are two times that I

17   observed the exact same problem in that ceiling.

18        So if I could go back to that exact same problem, I did.

19   If not, I showed the same type of problem, but it might have

20   been a little further down the hallway.

21   Q.   Then page three.

22   A.   The same thing.  It's a comparison of the conditions at the

23   beginning of the school year and end of school year.

24   Q.   Page four, I notice on page four there are a number of

25   lockers there.  Do those lockers have any significance?

1   A.   Well, the students at Cloverdale can't use lockers because

2   they were in such disrepair.  So I'm not sure I wrote it in the

3   report, but I talked to Ms. Ruffins, the principal there, about

4   creating some sort of space so that students didn't have to

5   carry everything all day.

6        For example, in the lunchroom, if you observe the lunches

7   in the cafeteria, the students had to wear their backpacks with

8   all of their books all day long, even during lunch.  So I talked

9   to her about maybe creating a space at least where they could

10  set their things.  Some students may not want to because they

11  couldn't lock them up.  I mean, at Mann and at Forest Heights,

12  there are nice lockers, and students go to them between classes

13  and get what they need.  At Cloverdale, they had to carry

14  everything all day in a backpack.

15  Q.   There's another page here which I guess is five.

16  A.   Yes.

17  Q.   Can you tell the Court the significance of the bottom

18  picture?  It says --

19  A.   This is a hallway between a computer lab class on the left,

20  and the gym is on the right.  And these are surplus desks and

21  shelves and things like that that were stored there.  You know,

22  when I went to that school, the first week of the school year,

23  and I said to Ms. Ruffins, "Why are these hallways blocked?

24  They seem to be a fire hazard."

25       And she said, "Well, that stuff has been there since the

1    previous school year.  It just wasn't picked up from the surplus

2    department."  And she made -- she said to me -- I went to her

3    about a number of that type of issue and the disrepair of the

4    school.

5        And I said, you know, "Was there an inspection of the

6    school before you opened this school year, since the first week

7    of school?"

8        She said, "No."

9        And I said, "Well, have you reported these things on a work

10   order?"

11       And she said, "Yes," and she turned around and picked up

12   and put on her desk a stack of work orders.  And she said, "Here

13   are work orders that I turned in last school year that still

14   have not been tended."

15       And I asked her if I could see them.  So I looked through

16   them and I counted them, and she was sitting there, and there

17   were more than a hundred.  I think there were, like, 104 or 105.

18   And so I pushed her to call someone, to push the issue and not

19   just wait for the work orders to be tended.

20   Q.   I see.  Did you bring those things to Dr. Suggs 's

21   attention and Mr. Glasgow's?

22   A.   I wrote it in the report and -- but she called.  She did.

23   She called Mr. Wayne Adams there then, and she turned around to

24   her computer which was behind her desk and wrote an e-mail and

25   cited these things.

1      And so the comparison report from May, you know -- and I

2  talked with her about it.  I was just shocked that a number of

3  those issues still had not been taken care of from August to May

4  of that second school year.  Some of the same work order issues

5  were not tended.

6  Q.   All right.

7  A.   The hallway was cleaned up by the end of the school year.

8  Q.   All right.  I call your attention --

9  A.   And City Year, the students with City Year who volunteer at

10  schools, she called a group with City Year, and they came to the

11  school.  Between the fall visit and the spring visit, the

12  students had come on a weekend and painted and cleaned up the

13  whole -- the breezeways, and some volunteer things had happened.

14  Q.   I see.  Now, with respect to the next exhibit, there's a

15  wording which says, "suggestions," dash, "science."  Do you see

16  that document?

17  A.   Say that again.

18  Q.   Can you look at the ELMO and you'll see -- maybe it doesn't

19  show up on yours, but there appears to be a trash basket.

20  A.   Yes.

21  Q.   And it says "suggestions," slash, "science."  Where was

22  that in Cloverdale?

23  A.   This was the breezeway between the computer lab on the left

24  and the gym wall is on the right.  And this is the breezeway

25  between the two.

1   Q.   And the suggestions for science was on a -- right above the

2   trash can?

3   A.   I think all of these things were stored there, and there

4   were trash bins like that in most of the breezeways.  You know,

5   they didn't have, like, the covered trash bins like some of the

6   schools have.

7   Q.   I see.  Now, the other exhibits, I'll just go to the next

8   page and you'll see a wastebasket, it appears, and a yellow

9   desktop.  What is the significance of that?

10  A.   This is the in-school, quote, classroom.  So when students

11  misbehave in a regular classroom, they were taken to in-school.

12  Well, the in-school didn't really have a classroom.  They were

13  in the cafeteria.  There was a stage and the in-school classroom

14  was the stage of the cafeteria.  And the cafeteria, as well as

15  the stage area, had a lot of leaky spots in the ceiling.  Some

16  were condensation, and I think I have pictures in there of the

17  ceiling with the big rust spots around them -- you can tell it

18  had been going on for some time, it wasn't just when I was

19  there -- where the ceilings dripped water.

20       And so in that particular area where the in-school students

21  who had misbehaved sat for several days, they would sometimes

22  have to come in and wipe the water out of the seat and off of

23  the desk and sit beside the trash can that was collecting the

24  water.  That's what this is.  And I saw that both times when I

25  was at Cloverdale observing an in-school.

DeJarnette - Direct

1       But that water leakage also happened in the cafeteria.

2  Water fell onto the tables.  I saw water fall into trays,

3  including mine as I ate.  There was water on the floors.  And

4  one of the administrators slipped one day from the puddle on the

5  floor.  If the air-conditioner was on, the water dripped.

6  Q.   All right.  The next page says, "Leaks in cafeteria

7  ceiling, water falling on tables."  So that relates --

8  A.   Yes.  This was the kind of vent that leaked.

9  Q.   All right.  And then the next page says, "Liquid draining

10  from ceiling onto walls in eighth grade hall."

11  A.   Sixth grade hall.  In the back building.  Apparently from

12  the outside rain or whatever through the roof, the water would

13  leak down the walls of that building.

14          MR. WALKER:  Excuse me, your Honor.

15          THE COURT:  I think -- Mr. Walker, are you almost

16  done?

17          MR. WALKER:  I'll need a few more minutes, but this

18  would be a good time to break, if you would allow it.

19          THE COURT:  We're going to take our afternoon break.

20  We'll be out until 3:15.  Y'all can keep your seats.

21          MR. WALKER:  Thank you.

22       (Recess from 3:00 p.m. until 3:17 p.m.)

23          THE COURT:  Mr. Walker.

24          MR. WALKER:  Yes, your Honor.  That was a timely

25  break, your Honor.  I appreciate it.

1          THE COURT:  You're welcome.  It was a good idea.  I

2     appreciate you suggesting it.

3          MR. WALKER:  Your Honor, I'd like to move the

4     admission of Plaintiffs' Exhibit 1.

5          THE COURT:  Mr. Heller?

6          MR. HELLER:  Your Honor, I've got two objections to

7     Plaintiffs' Exhibit 1, and -- well, maybe one objection and one

8     concern.

9          The objection is that it doesn't show anything relevant to

10    this proceeding.  There's nothing on Exhibit 1 that has anything

11    to do with what Cloverdale or any other school looks like today

12    or is relevant at all to the question of whether there exists an

13    imminent threat of irreparable harm.

14         My other concern is that if it's admitted, Dr. DeJarnette's

15    testimony referred to this being part of some sort of presumably

16    larger report, and I think if that's the case, the whole report

17    should be admitted, if anything is admitted, under Rule 106.  We

18    don't have it and we weren't prepared to bring it, to supply it.

19    So that would be something that I think we could do later.

20         THE COURT:  Okay.  Mr. Walker?

21         MR. WALKER:  Well, your Honor, I'm perfectly fine with

22    giving this as a full report, and the exhibits were attached,

23    and we'll be happy after court to provide the Court with the

24    full reports from Dr. DeJarnette.

25         THE COURT:  You have them?

1          MR. WALKER:  I don't have them in court with me.  We

2    only were trying to limit ourselves to -- just a moment.

3          We don't have them in court with us, your Honor, but we can

4    get them and have them here in the morning.

5          Now, the reason we didn't bring them is because we did not

6    wish to put all of those reports -- the reports contain

7    something other than the pictures and the comments that she made

8    about specific things, and it goes into other kinds of issues.

9    But in order for it to be complete, we'll be happy to do that.

10         THE COURT:  Last word, Mr. Heller.

11         MR. HELLER:  Well, Mr. Walker hasn't addressed the

12   relevance issue, and just to be clear on the second issue, we're

13   not asking for all of Dr. DeJarnette's reports, just a complete

14   report.  To the extent these photos are part of a report, we

15   want that report to be complete.  We're not arguing that we

16   should have in the record every report she ever made.

17         THE COURT:  Understood.  The objections are overruled,

18   with a couple of caveats.  Mr. Walker, if you would supplement

19   one with the report that the photographs were attached to.

20         Mr. Heller, you may well be right at the end of the day,

21   but I feel like I'm looking through a glass darkly on the

22   potential relevance of this, and so I'm going to overrule and

23   let it come in for now.  But I'll do my best to give it the

24   weight that it deserves at the end of the day.

25         MR. WALKER:  Thank you, your Honor.  Your Honor, I

1    would like to make a further observation which had slipped my

2    mind, and that's due to -- I mean, Mr. Pressman helped clear it

3    up.  We will possibly ask the Court for the immediate relief of

4    having the children who live in the Cloverdale zone, if that

5    school is to be opened, to be assigned to that school, because

6    they are -- they certainly have been waiting for 13 or more

7    years in order to have some modicum of equal schools, and that

8    has never happened.  So if the -- and I want to make it very

9    clear that we want good schools for everybody.  It's not just

10   for the black kids.  And there are good schools in one place,

11   but there are not good schools in the other place.  And we'd

12   like to have all of the schools be substantially equal, if not

13   equal, and that's part of the -- it goes to the relief we'll be

14   asking for.

15          THE COURT:  I note your observation, Mr. Walker, and

16   we'll see where we are tomorrow afternoon at the end of our two

17   days.

18          MR. WALKER:  Thank you.

19          THE COURT:  I'll hear from both sides about what

20   relief is requested.

21          MR. WALKER:  All right.  If I may, your Honor.

22          THE COURT:  You may.

23          MR. WALKER:  Now, the court reporter tells me that

24   this is not showing up on her ELMO.

25          THE COURT REPORTER:  It's okay now.

1           MR. WALKER:  Is it okay?

2     BY MR. WALKER:

3     Q.   Dr. DeJarnette, I call to your attention --

4           MR. WALKER:  Before I do that, your Honor, did I move

5     the admission of Plaintiffs' Exhibit 1?

6           THE COURT:  You did, and I think I overruled the

7     objection, but I did not formally receive it.  It is received

8     with the supplement of the covering report to be provided.

9           MR. WALKER:  Thank you.  Yes, sir.

10         (Plaintiffs' Exhibit 1 received in evidence.)

11    BY MR. WALKER:

12    Q.   Now I show you Plaintiffs' Exhibit 2, Dr. DeJarnette.

13    Would you describe Plaintiffs' Exhibit 2.

14    A.   This is an exterior photograph of Roberts Elementary.  This

15    is not a photograph that I took myself.  This is a photograph on

16    the Little Rock School District's website.

17    Q.   All right.  That's page one.  And page two, would you tell

18    the Court what that is.

19    A.   This is a portion of the inside of the Roberts Elementary

20    School building.  And the first and second floor room you see

21    there to the right, that's the library.  It's two floors and

22    it's glass, you know, inside as well as glass to the outside.

23    Q.   And page three.

24    A.   This is the upper level portion of the elementary school

25    library at Roberts.

1   Q.   And page four.

2   A.   This is a photograph that I took, and it shows the back of

3   the Roberts Elementary School and the grounds, though you can't

4   see it because it's taken from the very back portion of the

5   playground area.  And it's the cafeteria on the left, and all

6   the way to the right are classrooms.

7              MR. WALKER:  I move the admission of Plaintiffs'

8   Exhibit 2, subject to the same caveat, your Honor.

9              MR. HELLER:  No objection, your Honor.

10             THE COURT:  It will be received.

11        (Plaintiffs' Exhibit 2 received in evidence.)

12  BY MR. WALKER:

13  Q.   When you went to Roberts, did you find that Roberts had,

14  for example, two cafeterias, one that served a salad bar and the

15  other regular food?

16  A.   Yes.  I wouldn't call it two cafeterias, but certainly

17  choices within -- it's not really a cafeteria.  It's more like a

18  huge, vast multipurpose room, an auditorium and a cafeteria and

19  a stage.  It's huge.  But there were separate choice areas so

20  you could have a traditional tray like a lot of schools have, or

21  you could make your own salad, yes.

22  Q.   Did you find those situations -- did you find those choice

23  options in the other schools in the southwest part of Little

24  Rock?

25  A.   No.  I know at Romine Elementary, the students could choose

DeJarnette - Direct                    167

1    to have a salad or a tray in the '13-14 school year, but it

2    wasn't like a salad bar where you choose the toppings.  You

3    could just choose a salad going through the line, you could pick

4    a tray or a salad.  But that's the only other elementary school

5    where I believe I observed salad options.

6    Q.    I see.  Was there anything lacking in Roberts that you

7    would expect to find in a high school?

8    A.    I can't think of anything.  I think Roberts has everything

9    that I've ever seen in any school, high school included.  The

10   gym is not as large as some of the high school gyms, but it

11   certainly was more modern in that Roberts's gym is wired with

12   Wi-Fi technology and has a big Smart Board.  The professional

13   development for the PE teachers is held at Roberts's gym over

14   any other gym in the district because it's so modern and has

15   such technology capabilities.

16         It has a rock climbing wall, and I don't remember seeing

17   that at any other of the 50 campuses.

18   Q.    Excuse me.  Pardon me.  You said rock?

19   A.    Rock climbing wall.  On the wall there are these grabbing

20   things, it looks like rocks, and you can climb the wall, like

21   mountain climbing kind of training or something like that.

22   Q.    Do any of the other schools in the district have that?

23   A.    I don't remember seeing that in any school ever that I've

24   been in, Little Rock or otherwise.

25   Q.    Are you aware that -- are you aware of the school called

1    Forest -- is it Forest Park?

2    A.   Elementary school in the Heights.  It's called Forest Park.

3    Q.   Were you aware that the district allowed citizens to build

4    an elementary gymnasium or some kind of a "nasium" at their

5    expense?

6              MR. HELLER:  Object to leading question, your Honor.

7              MR. WALKER:  I'll withdraw it.

8              THE COURT:  Good.

9    BY MR. WALKER:

10   Q.   Are you aware of the facilities that are available at

11   Forest Park in comparison to those on the south side of 630?

12   A.   I am aware of the facilities at Forest Park, and it is a

13   different kind of building in that it has upstairs and

14   downstairs.  And that's not real typical for elementaries,

15   though Roberts has a second floor as well.  But Forest Park did

16   receive while I was in the district a pavilion, outdoor pavilion

17   for, like, outdoor classroom area, was built -- I believe the

18   community built that for the school.

19        And I do know that Roberts, even before the state law -- I

20   mean Forest Park before the state law required art and music

21   teachers to be provided for elementary schools, the Forest Park

22   PTA had spaghetti suppers and raised money, like, 18, $20,000,

23   to hire art specialists to provide art instruction there.

24        So there were some differences about Forest Park than the

25   other elementary schools that I can think of.

1    Q.    Do you know whether black persons objected to this money

2    that was spent on those resources going to the particular

3    schools rather than to the district as a whole?

4    A.    I'm sorry?

5    Q.    I'll withdraw the question.  All schools didn't have the

6    same opportunity; is that right?

7    A.    No.  Forest Park's PTA did a number of things that I'm not

8    aware of PTAs at other Little Rock schools did.

9    Q.    Now, we haven't said much about McClellan and Central and

10   Hall.  Did you have occasion to go into those schools?

11   A.    Yes.

12   Q.    Were you aware of the attendance zone for Central High

13   School?

14   A.    Yes.

15   Q.    Were you aware that it ran from one end of the district to

16   the other and it had a satellite zone of basically white middle-

17   class children?

18           MR. HELLER:  Object again to the leading questions,

19   your Honor.

20           THE COURT:  Sustained.

21           MR. WALKER:  All right.

22   BY MR. WALKER:

23   Q.    Do you know, were you there when the attendance zones were

24   set by the school board for Central High School?

25   A.    When I came into the Little Rock District, it took a while

1    to understand the attendance zones because of the -- what the

2    district called stipulated magnet schools.  So I was not

3    familiar with that in previous work with districts.  So I had to

4    kind of study them to understand those.  Magnet zones and shadow

5    zones I became aware of for the first time, and I was aware

6    throughout the years of some of the zones changing.  For

7    example, when Roberts was built, it dramatically changed the

8    zone of Fulbright and Terry.  So over the years, there were

9    changes in zones that I was aware of.

10   Q.   Now, let's use Fulbright, for example, and Roberts and

11   Terry.  What was the racial composition of those three areas

12   when you lock them together?  Are they contiguous zones,

13   contiguous school zones?

14   A.   Fulbright served the students who live in the Roberts

15   neighborhood before Roberts existed.

16   Q.   All right.

17   A.   And Terry was a bit south of that on Shackleford, and it

18   did not -- it served part of the St. Charles neighborhood, I

19   believe it's called.

20   Q.   Yes.

21   A.   But it didn't go as far north.  Fulbright served the

22   northern part.

23   Q.   All right.  So when you look at the Terry, Roberts, and

24   Fulbright area, what in your experience is the predominant

25   racial population of the people who live in that area and the

1   children who attend the schools?

2   A.   When I started --

3            MR. HELLER:  Excuse me, your Honor.  I'm going to

4   object unless they can establish a foundation for her knowledge

5   to testify about that subject.

6            THE COURT:  Sustained.

7   BY MR. WALKER:

8   Q.   Have you had occasion, Dr. DeJarnette, to be aware of the

9   population of where people live in Little Rock by race?

10  A.   Yes.  I mean, I live in Little Rock, so I'm pretty aware.

11  I live in the Terry/Fulbright area.

12  Q.   Did your child attend that area?

13  A.   I'm sorry.

14  Q.   Did your child attend that area?

15  A.   My daughter attended Fulbright at elementary level.

16  Q.   Can you tell the Court what the predominant racial

17  population is of the geographic attendance area of Fulbright?

18  A.   It was largely white students enrolled in Fulbright when

19  she started there at kindergarten.  And when she left there at

20  fifth grade, it had changed some.  Roberts was not yet open, but

21  it had changed a bit demographically to where there were more

22  Hispanic and black students enrolled.

23  Q.   At this time in terms of -- are you familiar with Roberts

24  at this time?

25  A.   Yes.

1  Q.   Is it fair to say there are more white children in those

2  three schools than in the other schools of the district?

3  A.   Well --

4  Q.   Except Jefferson?

5  A.   Well, Terry and Fulbright were some of the -- I guess if

6  you want to call them whiter schools in the Little Rock School

7  District.  But when Roberts opened, those zones were rezoned, so

8  a large portion of the white students in those schools went to

9  Roberts, and so those two schools became less percentage of

10  white students.

11  Q.   All right.  Now, I call your attention to the Forest

12  Heights exhibit, which is still a part of two, I think.

13         THE COURT:  I think it may be three.  Photographs of

14  Forest Heights?

15         MR. WALKER:  Yes.  It's three.

16         THE COURT:  Proposed three.

17  BY MR. WALKER:

18  Q.   Can you describe what this document is, Dr. DeJarnette?

19  A.   These are not my documents, but I recognize this photograph

20  as being of Forest Heights Middle School, STEM school.

21  Q.   All right.  Pages one, two, three, four.  Do you know whose

22  documents these are?

23  A.   No, I don't know whose documents these are, but I

24  recognize -- I mean, that's one of the art classrooms, the

25  fourth page, I believe it was.

1   Q.   Did you have occasion to observe the conditions that are

2   depicted in these pictures?

3   A.   I'm sorry.  The question?

4   Q.   Did you have occasion to observe the conditions that are

5   depicted in these pictures?

6   A.   Yes.  I spent a couple weeks in the '13-14 week in Forest

7   Heights on Dr. Suggs's special project, but I'd also been to

8   Forest Heights even before that new building was built.

9   Q.   I see.  Now, on page -- Exhibit 6, these are entitled:

10  Observation notes prepared by Dr. Karen DeJarnette.  Are

11  these -- how would you describe these notes, Dr. DeJarnette?

12  Other than that they are notes.

13  A.   These look like a part of the report that I prepared for

14  Dr. Suggs and Mr. Glasgow on -- it says DMS, so it's Dunbar

15  Middle School.  But all of the middle school reports look

16  similar because they had the same components in them in terms of

17  what I reported.  This looks like Dunbar.

18       MR. WALKER:  Your Honor, you'll notice there are some

19  circles around the numbers.  Those are mine.  So you can

20  disregard them and look at your document for the accurate ones

21  so there won't be any undue influence by my marking.  That's on

22  page 1.

23  BY MR. WALKER:

24  Q.   Now, you talk about Dunbar Middle School on page 2; is that

25  right?

1    A.   Yes.  I was talking about the magnet classes and -- the

2    previous magnet classes and that they had to some extent

3    vanished by the '13-14 school year.

4    Q.   At Dunbar.

5    A.   Across the district.

6    Q.   All right.  Now --

7    A.   But, yes, at Dunbar.

8    Q.   Did Dunbar become less white?

9    A.   Yes.  When the magnet programs left schools, the

10   demographics changed considerably.

11   Q.   All right.  You did share this with Mr. Glasgow and

12   Dr. Suggs?

13   A.   Yes.  This is part of the Dunbar report.

14            MR. WALKER:  All right.  I move the admission of

15   Exhibit 6, your Honor.

16            THE COURT:  Mr. Heller?

17            MR. HELLER:  No objection, your Honor.

18            THE COURT:  Plaintiffs' 6 will be received.

19       (Plaintiffs' Exhibit 6 received in evidence.)

20            MR. WALKER:  Your Honor, did we admit -- pardon me for

21   asking you, but did we admit Exhibit 7?

22            THE COURT:  Seven?  One, two -- one, two, six, and

23   seven are in.

24            MR. WALKER:  All right.

25            THE COURT:  I think that's a no -- or I don't remember

1    your question.  I'm sorry, Mr. Walker.  But one, two, six, and

2    seven are in.

3           MR. WALKER:  That's fine, your Honor.  Let me go back

4    to make sure.  Five was the one that I didn't proffer because

5    she didn't take the picture.

6           THE COURT:  I think it's three, Forest Heights.  She

7    identified the pictures, but did not take them, but it's not

8    been offered.

9           MR. WALKER:  Well, since she identified them, your

10   Honor, I'm going to try to present them.  I move their

11   admission.

12          THE COURT:  Mr. Heller, what about Forest Heights

13   photos?

14          MR. HELLER:  No objection.

15          THE COURT:  They're in then.  Three is in.

16          MR. WALKER:  Thank you, your Honor.

17      (Plaintiffs' Exhibit 3 received in evidence.)

18   BY MR. WALKER:

19   Q.   Now, how urgent is it that the children in Cloverdale and

20   in southwest have equal facilities insofar as attaining better

21   education is concerned?

22   A.   There are significant bodies of research that correlate or

23   discuss the impact of facilities and lack of resources to

24   student achievement, and given Cloverdale is an academically

25   distressed school at this point, if you want to change that

1    outcome, I think you would have to start to look at changing the

2    facility and the resources and the conditions and the

3    environment that the students have to exist in when they're

4    learning.

5         There is research that shows that deteriorating buildings

6    and certainly mold and foul odors hinder cognitive ability or

7    slow it down.  There's quite a body of research.  If you're

8    interested in that, I can give you a bibliography.

9    Q.   Since you've been in and out of the schools for several

10   years, have you yourself experienced consequences as a result of

11   being in and out of those schools?

12   A.   I had bad reactions at times, especially at Cloverdale,

13   especially in that Room 34.  I couldn't observe in there.  The

14   teacher couldn't stay in there long.  The students change

15   classes every 45 minutes, so they only had 45-minute doses of

16   that air per day.  But the teacher was there all day, and she

17   had concerns.  I couldn't go there often.

18        But, yes, I had some issues at Dunbar, especially in the

19   basement.  It's very moldy and musty.  I experienced severe

20   issues at the instructional resource center where my office was

21   housed for a while with asbestos particles falling from the

22   ceiling.  And a number of the people housed there, Central

23   Office administrators, experienced issues.  The Health

24   Department closed that building at one point when Dr. Holmes was

25   the superintendent, told us we shouldn't be in there.  We moved

1    to Stephens Elementary School, which was a newer building.

2        Yes, I had issues while I was employed with LRSD with

3    buildings.

4    Q.   I see.  Except for the Court orders in the Little Rock

5    case, do you know of any school in the black community that has

6    been built since you've been in the district?

7    A.   In Arkansas?

8    Q.   No, in Little Rock.

9    A.   In Little Rock?  The schools that were built since I've

10   been there, Stephens --

11   Q.   I'm saying except for court order.

12   A.   Oh, except for court order.

13   Q.   Yes.

14   A.   Wakefield -- Roberts is the only new school.  Forest

15   Heights had a large new section built.  But Roberts.

16   Q.   Is it fair to say that Roberts and Forest Heights are the

17   only schools, new schools that have been built other than under

18   court order?

19   A.   Mann had a new performing arts wing.

20   Q.   But that was not a new school.

21   A.   Yeah.  No.

22   Q.   Now, with respect to that Mann wing, were you aware that

23   when they built that 10,000-square-foot facility, they didn't

24   have a bathroom in it?

25   A.   Yes.  I observed there quite often.  You have to go to

1    another building.

2    Q.    All right.  Mann is now attended primarily by black

3    children?

4    A.    Yes.

5    Q.    And those construction events took place in the last two to

6    three years?

7    A.    Yes.  As the magnet programs left, the white students

8    diminished across the board in the LRSD schools.  Parkview, and

9    Mann being the most recent that's suffered a severe decline.

10   Q.    Are you in a position to say whether as they left, the

11   attention to those schools by the district diminished as well?

12   A.    I can say that the schools that have the best facilities

13   and the most resources inside of the facility are schools that

14   have a higher percentage of white students.  That was my

15   observation.

16   Q.    Are you in a position to say whether the schools that are

17   west of Shackleford and north of 630 have their students -- have

18   their populations pumped up or enhanced due to transportation of

19   black students from elsewhere in the district, being transported

20   from across the freeway or into Jefferson, Forest Park, Pulaski

21   Heights, and sometimes Terry?

22           MR. HELLER:  Your Honor, I object to that as leading

23   as well.

24           MR. WALKER:  All right.

25           THE COURT:  Sustained.

DeJarnette - Direct                                    179

1              MR. WALKER:  All right.

2    BY MR. WALKER:

3    Q.    Where do the students -- well, first of all, are you aware

4    of the home base residential attendance patterns of white

5    students within their home zones?

6    A.    Yes.

7    Q.    And are any of those home zone enrollments sufficient to

8    maintain a school with more than 250 students?

9              MR. HELLER:  Your Honor, I object to that question

10   until she can lay a foundation for the basis of her knowledge to

11   answer it.

12             MR. WALKER:  I'll be happy to do that.

13             THE COURT:  Sustained.

14   BY MR. WALKER:

15   Q.    Are you aware of the general enrollment of the schools at

16   the elementary level in north and west Little Rock?

17   A.    Well, my daughter attended Fulbright, so I'm very aware of

18   that one.

19   Q.    I see.

20   A.    And I'm pretty aware of the other schools.

21   Q.    Where did the black students who attended Fulbright come

22   from?

23   A.    Well, when she started there, at kindergarten, there were

24   fewer black students, and as she matriculated up the grade

25   levels, portable buildings were moved into that campus and more

```
 1    black students were enrolled.  And I believe there was some
 2    correlation with other schools in the city closing.
 3    Wrightsville had closed, Mitchell had closed, Cloverdale
 4    Elementary had closed.  So I don't know -- I can't tell you that
 5    I know the certain number of students who came from those
 6    schools to Fulbright, but the demographic changed.
 7         And then when Roberts opened, the demographic changed again
 8    because students from McDermott and Reservoir Road area were
 9    pushed into Fulbright, and Fulbright students, the whiter
10    population pushed out to Roberts.  And that happened as well
11    with Terry.
12         So in the LRSD over the years, there were less and less
13    every year of white students, but white students that remained
14    in the district were rezoned to certain schools, it seemed.
15              MR. HELLER:  Your Honor, I object to the testimony,
16    the continued testimony.  She said herself it's speculation.
17    She doesn't -- she hasn't produced any evidence that she knows
18    what the assignment zones are or what caused students to attend
19    certain schools at all.
20              THE COURT:  Sustained.  I'm going to receive the
21    testimony about Dr. DeJarnette's own experience with her
22    daughter at Fulbright.  It was a daughter; right?
23              THE WITNESS:  Yes, sir.
24              THE COURT:  But not beyond that, Mr. Walker.
25              MR. WALKER:  I see.  That's fine, your Honor.  Now,
```

1    I'm offering it to show, your Honor, that there was one-way

2    bussing from the black neighborhoods into Fulbright in order to

3    desegregate it and into the other schools of the west for the

4    proposition that if it was done for those kids, it can be done

5    at Leisure Arts if Mr. Kurrus intends to go forward.  And if

6    you're going to have a school facility at the Leisure Arts

7    Building this next year, that those kids who can attend that

8    school are the ones in the district, just like -- who are

9    eligible to attend the district, and if they transport black

10   kids in order to keep schools open in the white community, they

11   can do it in order to give these kids a good education.

12        Just a moment.

13             THE COURT:  Okay.

14             MR. WALKER:  Thank you, Dr. DeJarnette.

15        Thank you, your Honor.

16             THE COURT:  Thank you, Mr. Walker.  And I'll take that

17   last bit as argument.

18             MR. WALKER:  Yes, sir.

19             THE COURT:  And an explanation.

20        Mr. Heller, cross?

21             MR. HELLER:  Yes, your Honor.  Thank you.

22                          CROSS-EXAMINATION

23   BY MR. HELLER:

24   Q.   Dr. DeJarnette, good afternoon.

25   A.   Good afternoon.

1    Q.    During the period of time you testified about the

2    conditions of various facilities in the Little Rock School

3    District, let's just take the last four or five years, what was

4    the race of the LRSD superintendent?

5    A.    The race of --

6    Q.    The LRSD superintendent.

7    A.    All of the superintendents have been African-American, with

8    the exception of Mr. Kurrus.

9    Q.    Okay.  So until last May, all of the superintendents who

10   were in charge of the school district during the time you

11   testified about were African-Americans?

12   A.    Yes.

13   Q.    And during that same period of time, what was the race of

14   the majority of the members of the Little Rock School Board?

15   A.    They were majority Caucasian when I started in the

16   district, and then it switched to be majority African-American,

17   but I can't recall the year.  Maybe 2007.

18   Q.    I would like to turn your attention to your November 2013

19   report about Dunbar, which is Exhibit 6, on page 4.  You

20   compared Cloverdale to Forest Heights and Roberts, but you

21   didn't mention Stephens.  You did mention Stephens in this

22   report in 2013; right?

23   A.    I did.

24   Q.    And described Stephens as one of the, quote, newer schools

25   that have classrooms four times larger than Dunbar?

1    A.    Yes.

2    Q.    And with respect to Dunbar itself, you noted on page 7 of

3    your November 2013 report, Exhibit 6, that although the building

4    was obviously old and worn, each day of the site visit, the

5    building was observed to be clean.

6    A.    Yes.   Dunbar.

7    Q.    Right.   And you had some nice things to say about the

8    auditorium and a few other areas of the building?

9    A.    Yes.

10   Q.    You mentioned -- when we're talking about newer school

11   buildings, isn't it true that the last school to be built or

12   rebuilt, I'd say, before Roberts was Wakefield?

13   A.    Yes.   When it burned -- I believe Stephens and Wakefield

14   opened in a near time frame.

15   Q.    Okay.

16   A.    Shortly after I began in the district.

17   Q.    My records say Stephens was 2001, Wakefield was 2004.

18   A.    Okay.

19   Q.    So Wakefield is south of I-630 and east of Shackleford,

20   isn't it?

21   A.    Yes.

22   Q.    Isn't the same true of Stephens?

23   A.    Yes.   Yes.

24   Q.    Was the Chicot school also rebuilt after a fire?

25   A.    I'm not aware of Chicot being rebuilt.   It may have been.

1    Q.   But at least the two newest school buildings before Roberts

2    were both located south of I-630 and east of Shackleford, were

3    they not?

4    A.   Yes.

5              MR. HELLER:  That's all I have.

6              THE COURT:  Thank you, Mr. Heller.

7         Yes.  Mr. Hollingsworth.

8              MR. HOLLINGSWORTH:  Thank you, your Honor.

9                          CROSS-EXAMINATION

10   BY MR. HOLLINGSWORTH:

11   Q.   Ms. DeJarnette, my name is Patrick Hollingsworth.  I

12   represent the various state defendants.

13        Looking at your report, Exhibit 6, which talks about

14   Dunbar, you seem to be concerned about the small size of the

15   classrooms.  Would it be fair to say that Dunbar had more

16   students in the facility than it was designed to hold?

17   A.   Yes.

18   Q.   And is that fair to say also about Pulaski Heights Middle

19   School?

20   A.   I don't know the original number Pulaski Heights was

21   designed to hold.  It could be.

22   Q.   Okay.  So would you have any reason to disagree with the

23   Little Rock School District's facilities study that tells us

24   that in 2013, Pulaski Heights had an enrollment of 813 and a

25   capacity of 539?

DeJarnette - Cross                                              185

1    A.   I mean, I would take them at their word.  When I observed

2    at Pulaski Heights, and I spent four weeks there that same

3    school year, I didn't feel the crowdedness except in the

4    hallways at Pulaski Heights.  And the way that school is built

5    with multiple level, the stairways when students had to go

6    downstairs were crowded, and so they often went outside of the

7    building and around to enter another building.  But the

8    classrooms I don't remember being small like Dunbar.

9    Q.   Okay.  And so Dunbar is over capacity.  Was Mabelvale

10   Middle School over capacity when you were there?

11   A.   Not to my knowledge.

12          MR. HOLLINGSWORTH:  Thank you.  Pass the witness, your

13   Honor.

14          THE COURT:  Thank you, Mr. Hollingsworth.

15      Mr. Walker?

16          MR. WALKER:  Yes, sir.

17          THE WITNESS:  May I clarify something on that last

18   question?

19          THE COURT:  Sure.

20          THE WITNESS:  About Mabelvale.  They have a number of

21   portable buildings.  So when I'm saying they're not over

22   capacity, I'm saying they weren't all crammed in the building

23   because they had a number of portable buildings on the campus.

24          THE COURT:  Anything further, Mr. Hollingsworth, on

25   that?

1          MR. HOLLINGSWORTH:  No, your Honor.

2          THE COURT:  Okay.  Mr. Walker.

3                    REDIRECT EXAMINATION

4    BY MR. WALKER:

5    Q.    In terms of the superintendents, you remember one was named

6    Roy Brooks?

7    A.    Yes.

8    Q.    And was there considerable consternation with Mr. Brooks by

9    the majority black board --

10   A.    Yes.

11   Q.    -- for giving priority attention to the white community and

12   west Little Rock schools?

13   A.    Yes.

14   Q.    And are you familiar with -- did that board terminate

15   Dr. Brooks?  Mr. Brooks.  Yes, Dr. Brooks.

16   A.    He left -- I think there was a buyout or something like

17   that.

18   Q.    Was he the person who left there to become head of eStem?

19   A.    I read that in the newspaper.

20         MR. HELLER:  Object to the leading question, your

21   Honor.

22         THE COURT:  Sustained.

23         MR. WALKER:  I'll ask it another way, your Honor.

24   BY MR. WALKER:

25   Q.    Do you know where he went immediately upon leaving the

1    Little Rock School District?

2    A.   I read about it in the newspaper.  He did go to eStem

3    charter school.

4    Q.   I see.  And you were aware or were you aware that Dr. Linda

5    Watson was also terminated by the school board?

6            MR. HELLER:  Object to the leading question.

7            THE COURT:  Sustained.

8            MR. WALKER:  All right.

9    BY MR. WALKER:

10   Q.   Do you know whether Dr. Linda Watson left the district of

11   her own volition?

12   A.   I believe she was terminated or asked to leave.

13   Q.   I see.  And do you know whether Roberts was built during

14   her tenure?

15   A.   I believe Roberts was built between 2008 and 2010 and

16   opened in 2010, if my memory is correct.

17   Q.   That's right.  Do you know the year Mr. Kurrus left the

18   school board?

19   A.   Mr. Kurrus was there when I started in the district.  He

20   would have left about 2010.

21   Q.   Okay.  Now, in terms of Stephens being built, do you know

22   whether that school -- do you know whether that school was

23   required to be built by Judge Wright pursuant to a court order?

24   A.   No, I don't know, but your question to me was about schools

25   not court ordered.  That's why I didn't mention Stephens.

1   Q.   I see.  In terms of Chicot and Wakefield, they were

2   replacement schools due to fires?

3   A.   Wakefield I do know that is true.  I don't recall that

4   being the case with Chicot, but maybe I just don't know that.

5   Q.   All right.  Now, in terms of Wakefield, is Wakefield

6   anywhere comparable to Roberts?

7   A.   No, no.

8   Q.   Is Chicot anywhere comparable to Roberts?

9   A.   No.  I don't think we have any school comparable to

10  Roberts.

11  Q.   Now, in terms of the middle school --

12          MR. HELLER:  Your Honor, I'm going to object that this

13  has gone well beyond the scope of either cross-examination.

14          MR. WALKER:  I'll honor that, your Honor, and I'll

15  finish.

16          THE COURT:  All right.  Thank you, Mr. Walker.

17      Can Dr. DeJarnette be excused?

18          MR. WALKER:  Yes, your Honor.

19          THE COURT:  Mr. Heller, Mr. Hollingsworth?

20          MR. HELLER:  Yes, your Honor.

21          MR. HOLLINGSWORTH:  Yes, your Honor.

22          THE COURT:  Good.  Thank you.

23          THE WITNESS:  Thank you.

24          THE COURT:  Thank you, ma'am.

25          THE WITNESS:  Thank you.

1          THE COURT:  Mr. Walker, who is next?

2          MR. WALKER:  Mr. Baker Kurrus.

3          THE COURT:  Okay.

4          MR. WALKER:  Your Honor, before we begin with this

5    witness, Mr. Pressman would like to bring something to the

6    Court's attention if it's all right with the Court.

7          MR. PRESSMAN:  Your Honor, we would like to

8    specifically call the Court's attention to paragraph 80 of the

9    amended complaint and the answer of the Little Rock School

10   District to paragraph 80.

11         THE COURT:  Mr. Pressman, that's coming -- that's a

12   fly ball for me.  What's that all about?

13         MR. PRESSMAN:  Paragraph 80 we quoted from their

14   master facility plan, which discussed the importance of

15   facilities for student achievement.  That was part of their

16   plan.  And in their answer, they admitted that that was part of

17   their plan.

18         THE COURT:  Okay.  Thank you.

19      Mr. Kurrus.

20      (Mr. Kurrus was sworn in.)

21         THE COURT:  You take a minute and gather up your

22   arrows.

23         MR. WALKER:  I heard something about arrows.  I'm not

24   going to get shot, am I?

25         THE COURT:  No.  You gather up your arrows.  You do

1    the shooting.  This is cross.

2         MR. WALKER:  Oh, I saw a movie the other night,

3    *Avatar*, and I wondered how they could use those.  I was

4    impressed.

5         **HOWARD BAKER KURRUS, PLAINTIFFS' WITNESS, DULY SWORN**

6                    DIRECT EXAMINATION

7    BY MR. WALKER:

8    Q.   Would you state your name, please.

9    A.   I'm Howard Baker Kurrus.

10   Q.   Mr. Kurrus, how long have you been an educator?

11   A.   Well, I -- I've been a superintendent since May 6, 2015.  I

12   served on the school board from 1998 through 2010.

13   Q.   You were on the board from 2002?

14   A.   No, sir.  It was 1998 when I was first elected, and I

15   served 12 years, until the fall of 2010.

16   Q.   I see.  During that time, did you find yourself often at

17   odds with the black board members with respect to school

18   construction and location of schools?

19   A.   No, sir, not in particular.  Not that I recall.

20   Q.   Do you recall arguing for, along with the other white board

21   members, more school facilities in west Little Rock during your

22   entire time on the board?

23   A.   No, sir.  I didn't do that.

24   Q.   Isn't it true that you urged in 2004 the creation of a

25   new -- along with two white board members, the creation of a

1  middle school in west Little Rock?

2  A.   '04, I was concerned about building a new school in west

3  Little Rock, which I was -- and I think it was still '04, but

4  actually when the debate really got started, whether it would be

5  elementary or K-8.  But I'd be subject to your correction if

6  you've got the minutes.

7  Q.   Well, that's -- at that time, were you aware of

8  Cloverdale's dismal condition, as it has been described here?

9  A.   Well, I haven't described it as dismal, and, frankly, I

10 don't agree that it is.  So, no, I'm not aware today that

11 Cloverdale is in a dismal condition, and it wasn't in my

12 experience back then.

13 Q.   I see.  Is it your experience today that it's dismal?

14 A.   No, sir.  It's not.

15 Q.   Have you had repairs made to Cloverdale that are

16 substantial in the last year?

17 A.   Yes, sir, and that's -- actually, they were made before

18 this last year.  I've been in Cloverdale quite a lot, and the

19 conditions there today are not dismal.

20 Q.   Can you tell me whether you have any plan for causing the

21 schools in the southwest part of Little Rock to be equal to

22 those in the other parts of the district?

23 A.   Well, the -- I don't know which parts of the district and

24 which schools you're talking about, but I can address every

25 single school in the district in particular, if you like.

1   Q.   Let me try to lead you.  Is it not true that you have been

2   a fervent advocate for attracting the easier-to-educate

3   population back to the Little Rock schools?  And "easier to

4   educate" is your term, is it not?

5   A.   I've used that term.  That's not the term I'd use today,

6   but I've used that term.

7   Q.   Have you not used the term that you want to attract the

8   easier-to-educate population back to the schools?

9   A.   I want a community-based school district.

10  Q.   Did you ever use the term "easier to educate"?

11  A.   I did, yes, sir.  Excuse me, and I apologize.

12  Q.   Now, who are the easier to --

13          THE COURT:  Whoa, whoa.  Gentlemen, this is important

14  and it needs to be clear.  So, please, both of you slow down a

15  little bit and be patient.  Otherwise, my court reporter is

16  going to get mad at all of us.  Okay?

17          THE WITNESS:  Understood.

18          MR. WALKER:  Yes, sir.

19          THE COURT:  All right.  Mr. Walker.

20  BY MR. WALKER:

21  Q.   Who are the easier-to-educate children, when you use that

22  term?

23  A.   Well, they're typically students whose parents are college

24  educated or who value education.  They're typically students who

25  speak English.  They're typically students who are supported at

1    home and who have the things they need in order to be

2    successful.  It's a wide variety of things.  It's health, it's

3    wellness.  It's stability, lack of mobility.  All of those

4    things combine to make a student slightly easier to educate.

5    That doesn't mean that other kids are not valuable; it just

6    means there is a real difference between students within our

7    district with regard to poverty and to the factors that many of

8    us have talked about that make a challenge different in

9    different areas for different students.  That's just well known

10   to me.

11   Q.   Do you have any idea, Mr. Kurrus, what that population of

12   students was at any particular time in the city of Little Rock?

13   A.   I have some benchmarks in mind, yes, sir, about the -- are

14   you talking about the poverty levels based on free and reduced

15   lunch?  I can give you some information on that.

16   Q.   How many of the children in the Little Rock School District

17   would you have described in 2007 as easier to educate?

18   A.   I never quantify that, Mr. Walker.  I don't have a number

19   of students in mind.

20   Q.   I see.  When you were saying to the board and later as

21   superintendent that you wanted to attract students to the

22   district who were easier to educate, did you seek to figure up

23   how many there were who fit that description?

24   A.   I don't recall saying that to the school board, Mr. Walker,

25   that I was trying to attract students who were easier to

1    educate.  I've always wanted a community-based district that

2    served kids where they lived, and I still think that's

3    critically important.  But I've never crusaded for any

4    particular part of town, much less students who are easier to

5    educate.  I've never done that.

6    Q.   Mr. Kurrus, I'm asking now, did you ever try to figure up

7    how many of these easier-to-educate children were no longer in

8    the district that you wished to re -- to attract to the

9    district?

10   A.   No, sir.

11   Q.   Did you while you were on the board advocate the

12   construction of any new school facility in southwest Little

13   Rock?

14   A.   No, sir.  I don't think so.  I advocated for the

15   construction of Stephens when I got on the board, but that

16   wouldn't constitute southwest Little Rock.

17   Q.   That was also court ordered by Judge Wright, wasn't it?

18   A.   Well, I don't recall that specifically, and I'm subject to

19   correction on that, but I don't believe that was court ordered.

20   I certainly wanted to do it as an article of faith, but I don't

21   recall it being court ordered.  You may be right.  I simply

22   don't recall.

23   Q.   You do not recall that Stephens was being closed and it was

24   being put there in part near the freeway so that it could

25   attract white students whose parents would be going into town?

1    A.    No, I really don't recall that.

2    Q.    All right.  Now, did you also say that you wanted to make

3    sure that the schools don't become like the Detroit schools?

4    A.    I've said that recently.

5    Q.    Have you said that throughout your life on the board and

6    even brought to the board descriptions of what was happening in

7    Detroit?

8    A.    I have said, and I don't recall specifically --

9    Q.    That's yes or no.

10              MR. WALKER:  I'd like to approach him, your Honor, as

11   a hostile witness.

12              THE COURT:  You may, but I think it would be in

13   everyone's interest for the Court to hear something beyond yes

14   or no.  I'm not going to let him run off on you, Mr. Walker.

15              MR. WALKER:  Thank you.

16              THE COURT:  But a bit of explanation.  And please

17   minimize the compound questions so we can get targeted answers,

18   please.

19              MR. WALKER:  All right.

20   BY MR. WALKER:

21   Q.    I was asking you about your comments about the people in

22   Detroit and how you did not want the Little Rock schools to

23   become like the Detroit schools.  Do you remember those

24   comments?

25   A.    I recently made those comments at a Rotary Club speech.  I

1    don't recall them back in my tenure on the board specifically,

2    no, sir.

3    Q.    All right.  And how are the schools in Detroit?

4    A.    Well, I don't want to run on, but if you start with

5    *Milliken v. Bradley*, which is a desegregation case which is very

6    similar to Little Rock's, you can track the course and the arc

7    of Detroit's public school system and you'll see a whole series

8    of actions that have resulted in a very, very disappointing

9    situation in Detroit.  I could go on and on about that, but

10   that's where it all started, with *Milliken v. Bradley*.

11   Q.    Are you saying that because of the court order, the schools

12   became one race?

13   A.    No, sir.  I'm not saying that that's what occurred in

14   Detroit.

15   Q.    Well, what is --

16   A.    Or here.

17   Q.    What is wrong with Detroit?  Are they one-race schools?

18   A.    They have a wide variety of schools in Detroit, Mr. Walker.

19   They have numerous charter schools.  They have numerous public

20   schools.  They have a lot of outlying schools where white flight

21   occurred, and now they have black flight.  They have a very

22   confusing, very demoralizing situation in Detroit, as far as I'm

23   concerned.  But that's what's happened.  It's very complex.  But

24   it does involve a great many charters, a great many public

25   schools, some of which are successful and some of which are not.

1   Q.   And you attributed that to *Milliken* rather than to the

2   economic conditions brought about by the plans to relocate

3   industry to Mexico through NAFTA and other things?

4   A.   No, sir.  I can attribute -- I don't, no.  I'll stop there,

5   and if you ask me what, I can answer further.  But, no, I don't

6   attribute it to that.

7   Q.   You have proposed, have you not, to close ten schools in

8   Little Rock at one time or another?

9   A.   No, sir, I have not.  I've spoken at length about the

10  situation in Little Rock, and I'll be happy to elaborate.  But,

11  no, I have not proposed to close any schools.  In fact, we're

12  making plans not to close any schools next year and we are

13  assigning students and assigning staff right now.  So there is

14  no plan to close any school next year.

15  Q.   Mr. Kurrus, have you told people in the community, in

16  public meetings and in your advisory committee, that you planned

17  to close Carver at one time or another?  And I'll go through

18  them, and all you have to do is say yes or no.

19  A.   No.

20  Q.   Have you told anybody that you plan to close Rockefeller?

21  A.   No.

22  Q.   Have you told anybody you plan to close Wilson?

23  A.   No, sir.

24  Q.   Booker?

25  A.   No, sir.

1   Q.   It's your testimony that you have never told anybody that

2   you plan to close any school in the black community?

3   A.   No.  I've never told anyone anything about closing a

4   particular school in any particular place.  I've talked a great

5   deal about facilities.  Starting on June 15, in writing, I made

6   a lot of comments about school facilities, and it is a very huge

7   issue in our school district for the simple reason that we have

8   48 schools and many, many small schools.  But I haven't proposed

9   to close anything.  I've asked for advice from the civic

10  advisory committee and I'm waiting on that advice.

11  Q.   Do you have a written plan for school construction?

12  A.   A written plan?

13  Q.   Yes, sir.

14  A.   We have plans for school construction.

15  Q.   No, sir.  My question -- I'm sorry.  Do you have a written

16  plan for school construction?

17  A.   For the district as a whole?

18  Q.   Yes, sir.

19  A.   No, I do not.

20  Q.   Do you have a budget for school construction?

21  A.   Yes, for the west Little Rock school and the southwest

22  school, that is indeed true.

23  Q.   Do you have a budget for school construction for all of the

24  schools in the Little Rock School District?

25  A.   No, sir.

Kurrus - Direct

1   Q.   All right.  Do you have a budget for the Leisure Arts

2   school?

3   A.   Yes, sir.  We have a preliminary budget.

4   Q.   When was that budget set?

5   A.   Well, when we priced the property, of course, we knew what

6   the purchase price was, which was heavily negotiated and I think

7   a very attractive price.  That's 11.5 million.

8   Q.   Just a moment.  Mr. Kurrus, my question was, when was that

9   budget set?

10  A.   I was just answering the question.

11  Q.   When, was my question.

12  A.   I'm trying --

13  Q.   When was it set?

14  A.   Well, we contracted for the property on -- almost nine

15  months ago.  I mean six months ago.  We have 180 days to do the

16  work.  And then shortly after we put the property under

17  contract, I began to talk to contractors and others, and I have

18  budget estimates, but we do not have final budget numbers either

19  for the refurbishment of the office building for sixth grade,

20  nor do we have a final budget number for the contract on the

21  rest of the buildings.

22  Q.   So you have no budget for that school.  It's as you go,

23  you're developing a budget?

24  A.   Well, we don't have the contractors' pricing, Mr. Walker,

25  so I cannot tell you exactly what it's going to cost.

1    Q.    How much --

2    A.    But I have estimates.

3    Q.    I'm sorry.  How much have you budgeted for that school?

4    A.    Well, we've budgeted the $11.5 million to buy it, and there

5    will be some other costs associated with closing.  And I think,

6    based on the estimates that we've got so far, we're hopeful that

7    we can refurbish the office building, which it's a 70,000-

8    square-foot class A office building, which can be refurbished

9    for something in the range of 350 to $400,000.

10            MR. WALKER:  If I may, I'm asking for a summary figure

11   of a budget that has been reflected in some writing, rather that

12   in his head.  And this is part of my concern here and I think

13   the public's concern.  We can't get anything out of Mr. Kurrus

14   that is definitive.  And I'd just like him to answer the

15   question about where we can find his numbers for a budget for a

16   large school expense, where it's --

17            MR. HELLER:  I'm going to object to the statements

18   Mr. Walker is making.  He's gotten reams of documents out of us,

19   including everything he's ever asked for.  And Mr. Kurrus was in

20   the process of answering his question.

21            THE COURT:  Counsel, it's the Court's admonition to

22   all counsel to stop making your closing arguments early, please.

23            MR. WALKER:  Yes, sir.

24            THE COURT:  Let's do the proof.

25            MR. WALKER:  All right.

 1            THE COURT:  Now, Mr. Kurrus, how about you give us a

 2    total and then break it down, break it out.  What's the total

 3    for Leisure Arts, best estimate?

 4            THE WITNESS:  The total estimated cost for Leisure

 5    Arts is in the approximate range of $32 million.

 6            THE COURT:  Now, go back, you had said 11.5 to buy it,

 7    some closing costs, 350 to 400,000 for refurbishment of the

 8    office building.  Keep -- finish the list, please.

 9            THE WITNESS:  Well, the rest of the work will be done

10    on the warehouse, which is a 170,000-foot -- 170,000-square-foot

11    warehouse, excuse me, and I think it will cost approximately $20

12    million, give or take.  We've got some pluses or minuses.  And

13    that will go out for bid, but only if we buy the property, which

14    we are prepared to do, but we haven't done yet.

15            THE COURT:  Thank you.

16       Mr. Walker?

17            MR. WALKER:  Thank you, your Honor.  I appreciate your

18    help.

19    BY MR. WALKER:

20    Q.   Now, did you already own property near the Leisure Arts

21    Building?

22    A.   The school district owns property, approximately 40 acres,

23    immediately east of that site.

24    Q.   How much did you all pay for that property?

25    A.   I think it was in the range of $4 million, but I'm -- it

1    was bought before I was involved and closed before I was

2    involved.

3    Q.   Can you explain to me what the cost -- what the amount of

4    the budget is for other school construction for this coming

5    year?  Anything?

6    A.   No, sir.  There's repair and maintenance, but not any new

7    construction for the balance of this year.

8    Q.   Do you know what your repair and maintenance budget is for

9    the rest of the year?  Do you know?

10   A.   Well, of course we -- may I ask a -- we're in our fiscal

11   year, of course.  Our year runs from July 1 through June 30, and

12   in any given year, it's approximately $7 million.

13   Q.   Is it your plan to spend most of that $7 million on the

14   schools that are identified as in greatest need in southwest

15   Little Rock?

16   A.   No, sir, not necessarily.

17   Q.   All right.

18   A.   We have need everywhere.

19   Q.   I see.

20   A.   And we'll meet those needs with the money, and that's

21   delegated authority.  I don't make those decisions daily.

22   Q.   Do you know how much you have spent on updating Cloverdale

23   since you became superintendent sometime around March or April

24   of 2015?

25   A.   Well, I actually became superintendent on May 6, a date

1    I'll always remember.  But I couldn't tell you how much we spent

2    at Cloverdale.

3    Q.    The same answer would be true for the rest of the schools

4    within the district, would it not?

5    A.    I've tracked that number and I couldn't tell you where we

6    spent it, but I think we've spent about $5 million.  But, you

7    know, there's a better person to answer those specific questions

8    about exactly what we've spent and where we've spent it this

9    fiscal year.  We're on track, I think, about $5 million.  But

10   that's subject to check.  I would have to check on that.

11   Q.    Let's talk about Leisure Arts, and I'll come back to this.

12   Is the Leisure Arts Building in proximity to the Arkansas

13   Department of Education west Little Rock office?

14   A.    I don't believe they have a west Little Rock office.  Now,

15   I think they used to, but I don't think it's there anymore.

16   Q.    I see.

17   A.    I believe it's gone.

18   Q.    Is it in the subdivision known The Ranch?

19   A.    It is in The Ranch, yes, sir.  It's on Ranch Drive.

20   Q.    Is it in close proximity to Arkansas Baptist High School?

21   A.    It is.  It's across the Street.

22   Q.    And how far is it from the Quest Charter School?

23   A.    I don't know.  I know exactly where the Quest Charter

24   School is, but I haven't driven it.  I could give you an

25   estimate of several miles, but not much further than, say, two

1    miles.

2    Q.   I see.  Now, do you have a budget for McClellan High School

3    other than in your head?

4    A.   For the existing McClellan High School?

5    Q.   To replace McClellan.

6    A.   Well, that's a budget for the new school in southwest,

7    which is the McClellan replacement, planned for McClellan and

8    Fair.  That's what the board had previously decided to do.  Is

9    that what we're talking about?

10   Q.   I'm asking you, do you have other than in your head a

11   budget for that school as a replacement facility?

12   A.   I do.  I have it in my head, too.

13   Q.   Where is it in writing?

14   A.   Well, it's on my desk in my office.  It's -- but I don't

15   have a detailed budget, Mr. Walker, on exactly what we're going

16   to do.  We're still in the planning stages and we've retained

17   architects, but there's a long planning process that will result

18   in a detailed budget, but we're at the very beginnings of that.

19   So if you're asking me if I -- I'm trying to answer the

20   question, but, no, I do not have a budget for the construction

21   of a particular school in southwest, but I have the numbers in

22   mind.

23   Q.   You've indicated that you're going to make that the best

24   school in the city, meaning you're going to spend more money on

25   it than any other school in the city; is that right?

1    A.   We're going to spend whatever it takes and all we can

2    gather to make it a world-class facility.  Yes, sir.

3    Absolutely.

4    Q.   Were you aware that the majority black board's

5    determination was that the facilities would be built except for

6    a southwest high school with -- pursuant to a millage after an

7    election and all schools would be simultaneously addressed?

8    Were you aware of that?

9    A.   I'm aware of the board's minutes and the things they've

10   said, yes, sir.

11   Q.   All right.  You are aware that their condition for a west

12   Little Rock school was upon a millage; is that correct?

13   A.   I'm aware that the board had prepared a millage campaign

14   preliminarily and that they had discussed conditioning the

15   construction of two new schools on a millage.  I'm aware of

16   that, yes, sir.

17   Q.   All right.  Do you plan to have a millage election in order

18   to address school construction?

19   A.   Not for those two, no, sir.

20   Q.   No, for anything.

21   A.   Not right now, but I think longer term, Mr. Walker, I think

22   if we demonstrate a number of things to this community about

23   cooperation and trust and thrift and genuine desire to do the

24   right thing across this whole community, we'll have a fighting

25   chance to get a millage.  But to answer your question

1    specifically, no, we will not need a millage in order to

2    construct these two schools that the board had desired to

3    construct.  We can do it without a millage.

4    Q.    Were you not aware that the board wanted to have a

5    comprehensive school replacement plan rather than just to have

6    two schools addressed?

7    A.    I'm not specifically aware of that.  I read everything that

8    they had written, or I thought I did, about the millage.  But

9    that wouldn't be my only concern about that, frankly.

10   Q.    Did you not state that a millage could not be passed in

11   Little Rock because of white opposition?

12   A.    I never said white opposition.

13   Q.    Well, because of opposition?

14   A.    My view in -- when I took this job was that it would be

15   very, very difficult politically to pass a millage in this

16   community.  That's just one man's opinion.

17   Q.    Why would that be, Mr. Kurrus?

18   A.    Well, primarily because the county had just had a very

19   difficult time with their millage campaign, and I think they

20   lost about 70 percent to 30 percent.  And I also think that

21   there was a lot of turmoil in this community about Little Rock

22   School District.  Frankly, it's just -- again, it's one man's

23   opinion, but my guess would be it would be difficult to do.

24   Q.    Now, if you were to begin a school in southwest Little Rock

25   to replace McClellan and possibly Fair, when would you expect

1    that the planning for that school would be completed?

2    A.    Planning?  We have a timeline.  I haven't committed it to

3    memory, but it's one of our exhibits, I believe.  I would have

4    to reference that.

5    Q.    And when, according to your best information, would it be

6    ready for occupancy?

7    A.    Well, I think it would be the fall of 2019.  It's as soon

8    as we can do it, as fast as we can do it and do it prudently.

9    And I think that's 2019.

10   Q.    So that's -- we're in the '16-17 year.  So that means two

11   and a half years?

12   A.    We're actually in the '15-16 year, but --

13   Q.    So it would be three years.

14   A.    Yes, sir.  It would be -- it's going to be -- and that's

15   very aggressive.  We need to get started right now.

16   Q.    I see.  So that if you were going to replace Cloverdale,

17   the earliest you could replace Cloverdale would be 2020.  Is

18   that fair to say?

19   A.    That's a fair approximation.  That's what the board had

20   outlined, I think.

21   Q.    Where was your information that the board, the majority

22   black board, was going to wait for that long of a time to

23   replace Cloverdale?  Do you have anything in writing that states

24   that?

25   A.    That's in the Fanning Howey plan that we commissioned, and

1    it's all over that Fanning Howey plan and it's also in the

2    documents, that $348 million budget that they put together.  I

3    don't have it with me, but I read it.  And that was their plan.

4    It was to build a new west Little Rock school, a southwest

5    school, and then roll quickly to McClellan.

6    Q.    Mr. Kurrus, do you understand that that was a facilities

7    study that was commissioned by Dr. Suggs with people who came

8    from Indianapolis with the premise that there was a school

9    needed, according to Dr. Suggs, in west Little Rock, which he

10   told Fanning Howey?  Now, is it your position that Fanning Howey

11   can make site selection decisions for the Little Rock School

12   District?

13   A.    Well, frankly, Mr. Walker, I don't know anything of the --

14   the predicate to that question is beyond my knowledge.  And I

15   would not expect Fanning Howey to make a decision such as that,

16   no, sir, I wouldn't.

17   Q.    That's right.  So they were employed to address the

18   physical condition of the facilities, not to recommend new site

19   selections.  Isn't that correct?

20   A.    Well, I don't think they did recommend the site selection,

21   no, sir.  I don't think they did.

22   Q.    All right.

23   A.    I do know they recommended the replacement of McClellan and

24   they did recommend Cloverdale as being a critical need.  And

25   then they did recommend that -- and they've referenced in their

1    plan frequently, if you look at it, that that would be the plan,

2    to build a new southwest Little Rock school, to rehab McClellan

3    as a middle school, and then to move Cloverdale into that

4    McClellan facility.

5    Q.   And their plan was going to require between 400 and $900

6    million; isn't that correct?

7    A.   I don't think that's -- I don't know what all their total

8    plan required, but certainly the first few steps that we're in

9    right now had nothing to do with that much money.

10   Q.   But if you take the Fanning Howey report, that's a multi-

11   hundred-million-dollar plan, isn't it?

12   A.   It is.

13   Q.   And you have not embraced that Fanning Howey plan, have

14   you, except the portions that you want?

15   A.   Not necessarily the portions I want.  I have not committed

16   to do anything other than what I've told you today, Mr. Walker.

17   Q.   Did Fanning Howey suggest that you build as a priority a

18   school for white, predominantly white children in west Little

19   Rock for the easier-to-educate population?

20   A.   Of course that's not what we're doing, but if you're asking

21   me if Fanning Howey did that, no.  They would never do that.

22   Q.   All right.  Now, were you aware that as a condition of

23   resolving the deseg case, the $37 million in facilities funding

24   that will come from the state next year was to be devoted to

25   southwest schools?

1    A.    That's not in the agreement, Mr. Walker.  I don't know what

2    you're referring to, but the agreement I read doesn't say that.

3    Q.    What is your understanding of that agreement?

4    A.    Well, let's get paragraphs three and four out and read it.

5    It says that the first three installments are not restricted,

6    the fourth installment must be used for facilities, and you can

7    actually get a credit against that fourth installment if you use

8    any of the first three for facilities.  That's my recollection

9    from having read it some time ago.

10   Q.    There is a document that's attached to our motion for

11   preliminary injunction that I will share with you.  I'll put it

12   on the ELMO.

13   A.    Thank you.

14   Q.    Are you familiar with this document which has below it

15   Exhibit C, and that's to a court document, a court filing?  Are

16   you familiar with this resolution?

17   A.    I am, yes, sir.

18   Q.    I see.  Have you shared this with your school board,

19   Mr. Key?

20   A.    Not in -- no, sir, I have not.

21   Q.    Is there any particular reason you didn't share this with

22   him?

23   A.    No, there's no reason.  We're actually going to use that

24   money for the southwest school.  That's exactly where we're

25   going to put that money is in that southwest school.

1   Q.    The $37.3 million?

2   A.    Absolutely, yes, sir.

3   Q.    Then where are you getting the money for the Leisure Arts

4   Building?

5   A.    Well, again, I didn't come prepared to -- I can tell you.

6   Let me just tell you.  We have about $55 million in the bank

7   right now.  We're doing very, very well on our budget.  We'll

8   take -- and I think we'll finish the year with at least 55

9   million, maybe just a little bit more.

10          And I don't have a piece of paper, but I'll do this in my

11  mind.  I think we can take 30 million of that 55, or 25 to 30

12  million, and leave a sufficient fund balance to clear our checks

13  and to have a little base from which to operate, typically 10

14  percent.  But let's just say we take 25 million of the 55

15  million on July 1 of this coming year.  Then we're going to have

16  positive cash flow during this next year of at least another 20

17  million, probably 25.

18          We have about $5.9 million in refinancing proceeds that we

19  have in the bank right now that don't -- that aren't a part of

20  that 55 million.  So if you take the 5.9 million, you take

21  approximately 25 million from the existing fund balance that

22  we'll have on June 30.  We have positive cash flow for next year

23  for another 25 million.  Then we have revenue growth of at least

24  1 percent through the funding formula.  It's really not quite 1

25  percent.  And another 1 percent for two years through our

1    property tax revenues, which should go up at least that much,

2    maybe a little bit more.  That's about a third of what they

3    normally go up.  That's another -- it's a total of 12.5 million.

4         You add those two numbers with -- and then we get the

5    third -- we don't even get the money, this $37,347,429, which is

6    the exact amount of that fourth installment, until the Leisure

7    Arts Building is complete.  So we won't have that money

8    available and won't need it for Leisure Arts.  We'll have

9    sufficient funds.  It's about 107 million by my estimation.

10   Mr. Bailey has got a different budget that's -- and he's

11   normally more conservative than I am, but he thinks we're going

12   to do better than that.  But that will give us enough money to

13   do those two projects and get started down the road of fixing

14   Cloverdale.

15   Q.   Well, let me ask you, Mr. Kurrus.  Is there any more

16   critical need than to replace Cloverdale?

17   A.   Yes.  There's two, at least two.

18   Q.   All right.  Did Fanning Howey say there was any more

19   critical need than to replace Cloverdale in the facilities

20   study?

21   A.   They list it as critical.  I think there are other

22   critical --

23   Q.   Now, just a moment.  Fanning Howey said that it was

24   critical.  It did not say building a new school in west Little

25   Rock was critical, did it?

1   A.    That's what the board said, Mr. Walker.

2   Q.    No.  Please answer my question, please.

3         MR. WALKER:  Your Honor --

4   A.    I think Fanning Howey did say that.  I think that's in the

5   report.

6   Q.    Well, I have the report.  I'm going to give it to you, and

7   then I want you to tell me not only whether it's here, but why

8   is it critical to build a school for students who are not even

9   enrolled in the school district at this time?

10  A.    That's not what we're doing, Mr. Walker.

11  Q.    All right.  You're not building the school to attract the

12  easier-to-educate children?

13  A.    We're building the school to keep the kids we've already

14  got, and I hope to attract the easiest, the hardest, everybody

15  in between, special ed kids, kids who speak Spanish.  Anybody

16  who wants to come is going to be welcome.

17  Q.    So it would be just as easy to take the kids from

18  Cloverdale zone and put them there; is that correct?

19  A.    No.  It would be very difficult to do that.

20  Q.    Why wouldn't it?

21  A.    Well, because people like you think that crosstown bussing

22  where blacks bear the burden of it is unfair, and I would agree

23  with that.

24  Q.    But you have crosstown bussing going into the other

25  schools, such as Jefferson, such as Forest Park, such as Pulaski

1    Heights.

2    A.    No, sir.  That's simply not true.

3    Q.    You don't have crosstown bussing?

4    A.    No.  We do bus a lot of kids from west to east voluntarily,

5    but we do not bus kids to Forest Park.  That zone provides the

6    vast majority of the kids who go to Forest Park.  I've got the

7    data to prove it.  I didn't bring it here, but I can tell you

8    that's a fact.

9    Q.    Mr. Kurrus, isn't it true that many of your students at

10   Jefferson are bussed in from areas far outside of Jefferson?

11   A.    A small number, but not many, no.  It's -- the vast

12   majority of that school is composed of kids who live within the

13   contiguous attendance zone which surrounds Jefferson.

14   Q.    Now, that's your testimony.  Do you have any proof of that?

15   A.    I do.  I can bring it.  I didn't bring it with me today.  I

16   may have something back there.  But I can bring it tomorrow and

17   show you exactly where every single kid who goes to every single

18   school is bussed in this school district.  And I'm the first

19   person who ever pulled that together.

20            MR. WALKER:  If I may approach.

21            THE COURT:  You may.

22   BY MR. WALKER:

23   Q.    Can you draw my attention in the Fanning Howey report where

24   it says it is critical to have a new school in west Little Rock

25   for middle school children?

1    A.    No, sir, I can't do that.

2    Q.    That's fine.

3    A.    I didn't think that's what you wanted me to do.

4    Q.    That was my question.

5    A.    No, I cannot show you where it says that it's critical to

6    build a -- to do what you just said.

7    Q.    All right.  Now, if it has been -- if it is critical

8    according to Fanning Howey and it has been regarded as critical

9    according to Mr. Glasgow and other persons representing the

10   district for years, how can you prioritize opening the Leisure

11   Arts Center as a school for children other than addressing the

12   needs of the children from southwest Little Rock?

13   A.    We address those kids' needs every day, Mr. Walker.

14   Q.    All right.

15   A.    We do.  We have school every day.  We have clean buildings

16   there.  We work very hard to be sure that they're that way.  And

17   it's not a reflection on those kids that we're trying to

18   serve -- to build a new school in southwest Little Rock nor a

19   west Little Rock school.  Those were the priorities established

20   by this board before I took the position, and that's what I'm

21   trying to do.  But we're not overlooking any child anywhere.

22              THE COURT:  Mr. Kurrus, too far on the answer.

23              THE WITNESS:  I'm sorry.

24              THE COURT:  Shorter and sweeter.

25              THE WITNESS:  Yes, sir.  I'm sorry.

1   BY MR. WALKER:

2   Q.   Were you aware that before *Brown v. Board of Education*, the

3   argument was that the schools are nice and clean and they're

4   adequate for the black kids, while the white schools were not

5   only nice and clean, but superior?  Were you aware that those

6   same arguments were being made?

7   A.   *Plessy*.

8   Q.   Not *Plessy*.  Before *Brown*.

9   A.   Yes, I'm aware of the history, if that's what you're

10  asking.

11  Q.   Were you aware of Dr. DeJarnette's reports to Dr. Suggs?

12  A.   No, sir.  I don't -- not specifically, no.

13  Q.   Did she not talk to you and tell you that she had made

14  these reports to Dr. Suggs and explained to you the condition of

15  the schools as she had found them in southwest Little Rock?

16  A.   She may have.

17  Q.   I see.

18  A.   I don't recall.

19  Q.   Did you tell her that you weren't interested?

20  A.   No.  I would never have said that.

21  Q.   Well, did you ever read her reports?

22  A.   I beg your pardon?

23  Q.   Have you ever read her reports?

24  A.   No.  I have not read her reports.  I've been to all those

25  schools before.

1  Q.   Have you read any reports that have addressed the schools

2  other than Fanning Howey, portions of Fanning Howey?

3  A.   No.

4  Q.   All right.  Now, do you know anything about site selection

5  criteria for new schools in a biracial school district?

6  A.   I'm sorry.  I interrupted you, Mr. Walker.  I apologize.

7  If you'd say that again.

8  Q.   Are you familiar with what's called site selection criteria

9  for schools in a biracial district?

10  A.   No, sir, I don't -- not by reference to that.  I don't know

11  what that is.

12  Q.   The area southwest where Cloverdale is has demographics

13  that are grossly different from those in west Little Rock in

14  terms of average income, house size, and other things.  Is there

15  any reason you cannot accommodate those children whose apparent

16  needs are greater than the students who already are in achieving

17  schools?

18  A.   We are accommodating those students, Mr. Walker.

19  Q.   You are aware that Cloverdale is what you call a school in

20  academic distress?

21  A.   I am indeed.

22  Q.   And the schools that you are pulling together and pulling

23  from to create this new school, none of them are in academic

24  distress?

25  A.   They are not.

1   Q.   So you are giving the kids who are already achieving an

2   opportunity to continue achieving at a higher rate than the ones

3   who are in academic distress, are you not?

4   A.   No, sir.

5   Q.   I see.  Isn't it true that if you took those kids from

6   Cloverdale, who are black, and you put them in with a mixed

7   population, those schools -- those students would immediately

8   have their test scores materially changed?

9   A.   The schools, you mean?

10  Q.   The students in the schools.

11  A.   The students in the schools.

12  Q.   Yes.

13  A.   The individual students in the schools would have their

14  test scores changed immediately by being in a different school

15  with different students?  I don't know about that.

16  Q.   You are aware, Mr. Kurrus, that when you have mixed

17  schools, the school numbers are different than when you have

18  one-race schools, one minority race schools; is that correct?

19  A.   I believe in desegregated education.  I think it lifts up

20  every child.  Yes, sir.

21  Q.   I see.  Now, let me ask you, do you have any idea or can

22  you confirm to the Court and to the community that the

23  Cloverdale school will be ready and up in 2022, six years from

24  now?

25  A.   The new Cloverdale, at McClellan?

1    Q.    Wherever it is.

2    A.    Yes, sir, I think that's true.

3    Q.    You think that's true.  But you have nothing in writing

4    making that commitment, do you?

5    A.    I'll commit to that and I'll do my dead-level best to do

6    that.  I'll commit to that right here and now.

7    Q.    I'm not asking you to make commitments on the stand.  The

8    question is, before today, you've never made that commitment.

9    A.    Well, I --

10   Q.    I'd like to ask you, why is it that these children must

11   wait another six years in order to have the same kind of

12   opportunities that you have for the kids who are going to be

13   going to the new Leisure Arts school?

14   A.    Those children have an opportunity every single day,

15   Mr. Walker.

16   Q.    Which children?

17   A.    At Cloverdale.  They have an opportunity every day, and I'm

18   working as hard as I can to make that the best opportunity that

19   I can.  But I'm not willing to say that we stop and don't do

20   anything else anywhere.  Because part of this whole plan is not

21   to fix Cloverdale, it's not to repair Cloverdale, it's in a

22   situation where it is critical.  But it's -- to repair

23   Cloverdale would be -- or to build a new school at Cloverdale

24   would be nearly impossible while the school is going on.  So am

25   I missing the point?  If that's the question, the answer is, I'm

1   not approaching it from that standpoint.

2   Q.   Well, you're going to be building the Leisure Arts school

3   while the school is going on, aren't you?

4   A.   We're going to do --

5   Q.   Yes or no?

6   A.   We're going to be building the Leisure Arts school as soon

7   as we can, unless this injunction is granted.

8   Q.   Okay.  But you are -- you're going to be building the

9   Leisure Arts school during the next school year, aren't you?

10  Because you have only one grade in the Leisure Arts school this

11  next year, according to your mental plan; right?

12  A.   Yes, sir.  We'll start construction on the warehouse after

13  we --

14  Q.   Which means that --

15          THE COURT:  Hold on.  I'm sorry, Mr. Walker.  You're

16  moving too quickly for me.

17          MR. WALKER:  All right.

18          THE COURT:  Mr. Kurrus, when are you going to fix the

19  warehouse?  When are you going to renovate that?  Will it be

20  during the school year or when?

21          THE WITNESS:  It will be immediately.  We'll start

22  work as soon as we possibly can.  When we close on the building,

23  we'll let the contract on the office building, and then we'll

24  move quickly.  We have a little more design work to do, but not

25  much, and we'll move quickly to start the work in the warehouse

 1   itself.  So those will be simultaneous while school is going on.
 2          THE COURT:  Okay.
 3          MR. WALKER:  All right.
 4   BY MR. WALKER:
 5   Q.   Well, if you can have construction underway at Leisure Arts
 6   during the school year, why not at Cloverdale?
 7   A.   It's not -- we don't have a 70,000-square-foot building
 8   next to Cloverdale, Mr. Walker, within which to put the
 9   students.  And even if we could, that site is not conducive to
10   further construction, as we've learned the hard way.
11   Q.   What is the anticipated ultimate enrollment for Leisure
12   Arts?
13   A.   I think it will be between a thousand and 1,200.
14   Q.   Oh, it's going to be a middle school?
15   A.   Yes, sir.  It's a middle school.
16   Q.   So it will become your largest middle school?
17   A.   Well, let's see.  It will be -- if it hits 1,200, it will
18   approach the size of -- it will be.  It will probably be the
19   largest middle school.  It's where the most kids are and the
20   greatest demand is.  I would expect it to be.
21   Q.   Well, tell me, do you have any other middle schools that
22   have a population approaching 1,000?
23   A.   Yes, sir.
24   Q.   Which school?
25   A.   Mann and Dunbar would both push up into the high 800s.

1    Pulaski Heights has had as many as 875, although that's crowded.

2    Q.   We're talking about for this year?

3    A.   Yes, sir.  Those are the numbers for this year.  There

4    would be about 900 kids at Henderson.  Mabelvale and Cloverdale

5    would be slightly less, but not -- I've got those numbers.  I

6    just haven't committed them to memory.

7    Q.   Well, have you considered making that a school for the

8    students from west Little Rock in the zip code right where

9    Leisure Arts is and the zip code where Cloverdale is, having

10   those students attend the same school?

11   A.   No, sir.  The zones that we've planned out will give us a

12   very diverse population, both economically, racially, and

13   they're contiguous.  And they make sense to me.  Somebody's got

14   to decide some of these things based on that, and that's what

15   we've always done.  So it looks really good on paper.  But we'll

16   see how it goes, and if we have extra room in the school, we'll

17   adjust.

18   Q.   Mr. Kurrus, are you aware that in that attendance zone,

19   according to census data, the black population is 2,366 and the

20   white population is 16,184?  Now --

21   A.   Are you saying that the school's attendance zone is this

22   zip code?  Because that's simply not the fact.

23   Q.   Well, you can put whatever attendance zones you want into a

24   school, can't you?

25   A.   Well, I guess you could.

1    Q.    Well, what is the attendance zone for that particular

2    school?

3    A.    For the west Little Rock middle school will be the current

4    Fulbright zone -- not the kids who go to Fulbright, the kids who

5    reside in the Fulbright zone -- the kids who reside in the Terry

6    zone, and the students who reside in the Roberts zone.  And that

7    will be a very diverse group of about 42 percent white, about

8    40, 41 percent black, and the rest will be Hispanic and Asian

9    and other.  So it will be a very diverse group.  I live in 72212

10   and I'm in the Fulbright zone.  So I don't know where that zip

11   code is.

12   Q.    Mr. Kurrus, is it your testimony -- and we'll come back to

13   this tomorrow if you testify.  Is it your testimony that the

14   area in northwest Little Rock in the school district beginning

15   around Shackleford, coming down to Reservoir Road and going all

16   the way to the river and then to the end of the district, is it

17   your testimony that that's a racially diverse area?

18   A.    Well, I really don't know, Mr. Walker, exactly what you're

19   asking me.  I don't have the science -- I know how many people

20   are there, but I don't have the racial breakdown.  I do have it

21   in every school, but I don't know the general racial breakdown

22   of that --

23   Q.    Isn't it true that all of the subdivisions out there,

24   Pleasant Valley, Chenal, the ones on the highway to the right,

25   and Palisades, and the one for which you created a satellite

1   zone that goes to Central, all of those zones are majority

2   white, all of them?

3   A.   Well, Chenal is not in our school district, for one thing.

4   Secondly, I didn't create the Central school zone.  I had

5   nothing to do with that, not the first thing.  And I really

6   don't know, if you're asking me -- I can tell you Fulbright is a

7   diverse school with a majority black population.  I can tell you

8   that Terry, the zone that's going to feed this school, has 86

9   percent kids on free and reduced lunch.  And it's a very, very

10  diverse group, but it's majority black by a great amount.  And

11  then Roberts has a diverse population.  And when you mix them

12  all up, it makes for a pretty good school zone.  That's all I

13  really know.

14  Q.   But it is still substantially less than it is in southwest

15  Little Rock, isn't it?

16  A.   Yes, sir.  It's much less.

17  Q.   So what you're doing is trying to create a zone where

18  you'll have upper income people, for the most part, that you say

19  are racially diverse.

20  A.   Well, that's not what I'm trying to do, Mr. Walker.  I'm

21  trying to create a school zone that has a sufficient population,

22  and there are lots of people in that zone.  It's growing at

23  about 38 percent.  The Roberts zone has grown 38 percent since

24  2000.  And I don't want to run on too long, but I can tell you,

25  there are lots and lots of people there.  It's growing very,

1    very rapidly, and we don't have a middle school anywhere near

2    there.  And it will have a diverse population if the people that

3    are currently enrolled in the feeder schools show up.  That's

4    what I know.

5    Q.    Just a moment.  It is very clear, isn't it, that Forest

6    Heights is closer -- Forest Heights is closer to the people on

7    Reservoir Road than the new school?

8    A.    Well, Reservoir Road, depending on how you come up

9    Reservoir Road, is not in the Fulbright zone.

10   Q.    Well, here's the point:  If you look at west Little Rock,

11   Reservoir Road is to the east of Henderson, isn't it?  And

12   Forest Heights.

13   A.    Reservoir Road is to the west of Forest Heights, and it

14   would be almost even with Henderson if you struck that line on

15   further south.

16   Q.    Okay.  Well, I'll just deal with Henderson then.

17         Now, are any of those schools that you're putting together

18   top priority schools?

19   A.    Priority schools classified by the state?  No, sir.

20   They're high-performing schools.

21   Q.    Are any of them in academic distress?

22   A.    No, sir.

23   Q.    Are the schools in southwest generally in academic

24   distress?

25   A.    Generally there is no elementary school in academic

1    distress.  I can tell you the ones that are.  Mabelvale,

2    Cloverdale, Fair, Hall, McClellan, and Henderson are all in

3    academic distress.

4    Q.    And those are all in southwest Little Rock?

5    A.    Well, perhaps, if you call Henderson southwest Little Rock.

6    I don't know.  But those are the schools.

7    Q.    Do not the students who attend Henderson come from

8    southwest Little Rock?

9    A.    A good many do.

10   Q.    All right.  Do they get there by bussing?

11   A.    Some do.  A great many do.

12   Q.    A great many do?

13   A.    Yes, sir.

14   Q.    So they're being bussed from southwest Little Rock across

15   630 -- and his Honor can take notice of where Henderson is.

16   It's right there at 630 and John Barrow Road.  As you come off

17   John Barrow going west, it's the school right to your right.

18   A.    But they're not -- they're bussed from their contiguous

19   attendance zone, Mr. Walker.  That zone does not go down to the

20   Mabelvale zone or the Cloverdale zone or -- so I don't -- it's

21   really not fair to say that we bus kids from southwest Little

22   Rock, meaning that Mabelvale or Cloverdale area, up to

23   Henderson.  We just don't do that.

24   Q.    All right.  Well, what you do is not reduced to writing

25   anywhere, is it?  We've asked you for many writings -- let me

1    ask the question.  I've asked you for all your writings with all

2    your plans with respect to student assignment.  Is it fair to

3    say that you do not have a written student assignment plan?

4    A.   No, that's not fair to say that.

5    Q.   Where may I find it?

6    A.   The Student Registration Office has student assignment

7    plans, and all those are designed and written down and they're

8    in the SRO office.  And we'll be happy to provide them to you if

9    we haven't already done so.

10   Q.   I have sought that information from you and from

11   Mr. Fields.

12        Now, do you have any plans to address Hall High School?

13   Are you aware that in Hall High School --

14   A.   I have some ideas about that.

15   Q.   -- the district has put all of the Hispanic kids from

16   southwest Little Rock into Hall; is that right?

17   A.   This is the newcomers' center.  It's not nearly all of the

18   kids, but it's kids who speak English as a second language.

19   There are approximately 300 of them out of 2,800.

20   Q.   But they come from southwest Little Rock.

21   A.   They do.

22   Q.   And they come all across attendance zones to get to Hall,

23   where they are met with one-race classes, one race meaning black

24   and Hispanic; is that right?

25   A.   Yes, sir.  There are very few Caucasian people at Hall High

1   School.

2   Q.    I see.

3   A.    Practically none.

4   Q.    But Hall is in this same area where you want to build the

5   Leisure Arts area, isn't it?  It's, like, seven miles from

6   there.  Six miles.

7   A.    Seven miles?  It is what it is, Mr. Walker, but most people

8   wouldn't say that's the same area.

9   Q.    Well, you get on Cantrell and you go straight to it, don't

10  you?

11  A.    Well, it's approximately the same distance, I guess, as it

12  is from the Capitol to the airport, maybe, or from -- I don't

13  know.  It is what it is.  I wouldn't quibble with you about what

14  area is what area.  But I don't think people normally think of

15  the Hall High School and Leisure Arts as being in the same area.

16  But --

17  Q.    Now, I would like to know if you are of the view that the

18  Fanning Howey report said that you should defer school

19  equalization for six years.  Did anybody, the black board or

20  Fanning Howey, say that you should defer equalization of

21  facilities for six years?

22  A.    Did anybody say that or Fanning Howey say that?

23  Q.    Did either Fanning Howey or the black board members?

24  A.    No.  I don't know what you mean by school equalization, or

25  if you're implying that schools are unequal based on race.  If

1   that's your implication, I would tell you that's not simply my

2   view.

3   Q.   Well, Mr. Kurrus, you're not a school person, are you?

4   A.   Well, for now I am.

5   Q.   Well, you never were an administrator before?

6   A.   No, sir.

7   Q.   You have no training in educational administration?

8   A.   No, sir, I do not have a degree in --

9   Q.   And you didn't apply for this job.  It was given to you.

10  A.   I wouldn't say given.  I took it.  They offered it and I

11  accepted it.

12  Q.   And as of now, the only thing that can be said is that you

13  are applying your best judgment and your best work trying to

14  improve educational opportunity for somebody and to operate a

15  school system; is that correct?

16  A.   For somebody, yes, sir.  Our students.  I would agree with

17  that.

18  Q.   Now, are there any criteria by which your work performance

19  will be measured?

20  A.   Not that I know of.  I think I'll be evaluated.

21  Q.   Well, do you have any evaluation instrument by Mr. Key or

22  from Mr. Key?

23  A.   No, sir.

24  Q.   I see.  So you can basically do what you want to with these

25  schools.

1    A.    No, sir.

2    Q.    And without any oversight from Mr. Key because he says you

3    can do what you want to.

4    A.    No, sir.  He never told me that and I wouldn't -- I

5    wouldn't agree with that, no.

6    Q.    Do you have regular board meetings with Mr. Key?

7    A.    I have a once-a-month submission and I talk to him about

8    that and we don't -- it's not formal, no.  But I do that.

9    Q.    Do y'all talk on the phone often?

10   A.    We do.

11   Q.    Do you give the public notice of those telephone

12   conversations?

13   A.    No, sir.

14   Q.    I see.  Are you aware that whenever you speak as a

15   superintendent with the school board, it should be in a public

16   session under the Arkansas Freedom of Information Act?

17   A.    I don't think that's true, but if it is, that's what I'll

18   start doing.  That's never been my interpretation, but I'll be

19   pleased to ask the AG.  If that's the case, that's exactly what

20   I'll do.

21   Q.    Well, the AG suggests you go through a third person instead

22   of going directly, and that way you can sort of camouflage your

23   indirectness.

24   A.    I don't believe the AG ever said that, Mr. Walker, but if

25   they did, I wouldn't do it.  I will be happy to comply with the

1  law.  But it's my understanding I can talk to Mr. Key without

2  calling the press.  If that's not true, I will change my

3  practice immediately.  And I can ask the AG for that opinion.

4  Q.    Now, do you have an idea of how many floors you will have

5  at this new school that you're going to create at Leisure Arts?

6  A.    How many floors?

7  Q.    Yes.

8  A.    Yes, sir.

9  Q.    How many classrooms?  Do you have an idea?

10  A.    I've got the plans.  But I don't have it committed to

11  memory.  I've seen it.

12  Q.    I see.  Do you have any idea of what courses you're going

13  to teach?

14  A.    There is a planning committee, Mr. Walker, that's put that

15  together and I've delegated that.  But, yes, we've hired a

16  principal and he is doing community meetings and is coming

17  forward with a proposed plan through a logistics group that I

18  put together, and they're working very hard on that.  But I'm

19  not fully aware of exactly what they're doing, but I know

20  they're working on it.

21  Q.    Is it fair to say that as of right now, if the Court wanted

22  to know what you were going to do so as to be open in September

23  of this year, you couldn't tell the Court specifically?

24  A.    No, I could tell them.

25  Q.    Other than there would be 270 students enrolled?

1    A.   Well, it's 226 if you roll up the kids who are in the zone.

2    May be more, may be less.  But the number is 226 based on the

3    latest number I saw, and I can --

4    Q.   What is the capacity -- what is the capacity for the sixth

5    grade class this year at that school?

6    A.   300 is what we're building for.

7    Q.   So you have space for at least 75 more students?

8    A.   Yes, sir.

9    Q.   And if you wanted to, you could expand that by another

10   hundred for this year, could you not?

11   A.   I don't think so.

12   Q.   Okay.

13   A.   We would try if we had the students, but it would be a --

14   it's getting to be a real push.

15   Q.   Now, Mr. Kurrus, there was a time -- and this is what my

16   notes show.  There was a time when you proposed building another

17   school, another middle school, in this same area, and that's

18   while you were on the board in about 2007 or '8.  Do you recall

19   that?

20   A.   A middle school?

21   Q.   Yes, sir.

22   A.   I remember the K-8 discussion, Mr. Walker, but I don't

23   really remember.  You'll have to help me there.

24   Q.   Was that to be on property -- do you remember you had

25   property that you were offering to the school district but did

1  not initially disclose along with an investment group for the

2  school site?

3  A.   That's nonsense, Mr. Walker.  You tell me exactly where the

4  property was and the name of the investment group because that's

5  simply not true.

6  Q.   Mr. Kurrus, did you not state to Dr. Katherine Mitchell and

7  the others that you owned property, the property on this big

8  hill that you were trying to sell the district for a middle

9  school?

10  A.   No, sir.  I never owned any property anywhere near here.

11  Never have, still don't.

12  Q.   Well, did you have any property on a school site that was

13  being recommended for a K through 8 school at any time?

14  A.   I know what you're talking about now.

15  Q.   Well, then explain it.

16  A.   Well, what happened was, Stuart Mackey found a tract, and

17  it wasn't anywhere near here.  It was down off Kanis Road and it

18  was on a steep hillside that was owned by an investment group

19  that I was in.  I read the paper one morning and saw that they

20  had identified that site.  I was on the board at that time but

21  knew nothing about it.

22       That very morning I sent an e-mail saying that property is

23  not available for sale and it would not make a school site even

24  if you wanted to.  And that was -- and you knew that at that

25  time, and I told you that as soon as you made this wild

1    accusation against me.  I've never offered anything for sale,

2    and the only time it ever came up, I immediately said, no, that

3    property is not for sale for a school.  And it never was sold

4    for a school, never was offered to anybody for a school.  It

5    wasn't even zoned right.

6    Q.    Isn't it true that Dr. Katherine Mitchell told you that you

7    could not use your property for this school in west Little Rock?

8    A.    No.

9    Q.    That's fine.

10   A.    I don't have any property for a school in west Little Rock

11   and I never did.

12   Q.    But you were part of the investment group that owned the

13   property which Mr. Stuart Mackey, the relator for Little Rock

14   School District, came up with for a site for a west Little Rock

15   school; is that right?

16   A.    No, sir.  Stuart Mackey came up with that on his own, and

17   the property -- if you know where Woodlands Edge subdivision is,

18   that's where the property was.  I guess he found it on a map,

19   and he offered it to somebody, but not me.  The moment I heard

20   about it, I told him, no, that's not school property.  It's not

21   for sale for that.  We're going to make residential lots out of

22   that.  And that was the end of that.  And I've never profited a

23   dime from anything like that and I never would, never will.

24   Q.    I want to finish now.  You've indicated and I asked you

25   about these schools, but you said you never have stated to

1    anybody an intent to close nine or ten schools?

2    A.    No, sir.  We have no plans to do that.

3    Q.    And you have no school closing plan at this time or in the

4    foreseeable future?

5    A.    Well, what I've said --

6    Q.    That's yes or no.

7    A.    The answer is, I guess, in the foreseeable future, let me

8    tell you exactly what we intend to do, if you'd like.  But I

9    have no plan to close any school for '16-17.  I can tell you

10   that, if that is responsive.

11   Q.    Do you have any plan to close any school in '17-18?

12   A.    No plan, no, sir.  We've got a process that we're involved

13   in right now that's going to inform some of that, but there is

14   no plan to close anything right as we sit here today.

15   Q.    How many students are there -- how many white students are

16   there in the entire district at this time?

17   A.    4,004, last time I looked.

18   Q.    And how many black students are there?

19   A.    Well, I'd have to guess at that number.  I can tell you how

20   many Hispanic students off the top of my head.  But it's about

21   two-thirds black, about 17.54 percent white, district-wide.

22   Q.    All right.  So you're saying to me that the needs of those

23   white children for a middle school in west Little Rock outweigh

24   the needs of the black children for new facilities in southwest

25   Little Rock?

1  A.   No, sir.  I'd never say that.

2  Q.   What do you offer to the white community by having a school

3  located in the white community other than convenience and

4  majority white presence?

5  A.   It won't be majority white, and I don't look at the world

6  that way, Mr. Walker.  We're building a school -- we're

7  losing -- this last year we lost 19 kids out of Terry

8  Elementary's fifth grade that went to charters and private

9  schools.  I think that's the right number.  And they're black

10 kids.  I mean, this is not a situation where I'm doing anything

11 other than putting a school where a school belongs to serve the

12 population that's going to be diverse, and it will be minority

13 white, and that's just the way it turned out.

14 Q.   Mr. Kurrus, is it fair to say that all of the schools in

15 west Little Rock have at least 35 percent white population?

16 A.   Well, we can just go through them.  I know there are three

17 schools that are majority white.

18 Q.   Which ones?

19 A.   That would be Fair Park -- no, Forest Park.  Excuse me.

20 Jefferson and Roberts.  Three out of -- those would be majority

21 white.  Now, if you're asking me who has 35 percent white, I

22 can't do that off the top of my head.  I could think about it a

23 minute.

24 Q.   None of those schools in west Little Rock have a population

25 of 17.9 percent white, do they?

A.    In west Little Rock?  Would you include Terry?  Is that

west Little Rock?  It would have fewer than that.

Q.    Take Terry out.

A.    West Little Rock.  Otter Creek.  It would have fewer than

that.

Q.    Otter Creek is southwest Little Rock, or however you look

at it.

A.    The answer is no, if Terry is not in the group.  There

aren't any schools.  There's Roberts, Fulbright.  Those are the

two schools that are in School Zone 4.  So those two schools

would both be, by de facto, the kids that go there would be --

at Fulbright, it's majority black, but it's not 35 -- it's

probably between 35 and 45 percent white.  So it wouldn't meet

your definition, but it's majority black.  Fulbright is majority

black.  Roberts is not.  Roberts is majority white.

Q.    Do you remember your discussions wherein you thought that

40 percent was the tipping point in Little Rock for white kids

to stay in the school district?

A.    Well, what I recall --

Q.    Do you remember that or not?

A.    No, I don't remember that.  I do remember what I said.

Q.    Have you taken that position publicly?

A.    I beg your pardon?

Q.    Have you taken that position at any time publicly?

A.    Oh, I don't think so, Mr. Walker, but I've been at it a

1    long time.  If I have, I may have done so.  But what I said was,

2    if we can get back to what you agreed and what most people

3    agreed was a fair way to do things, which was to try to hit

4    60/40 either way, then you begin to build a community-based

5    school district, and that's my desire.

6    Q.   Do you have any plans to bring that about?

7    A.   I'm doing the best I can every day.

8    Q.   Well, no, do you have any written plans for that?

9    A.   No, I don't have a written plan other than to build the new

10   school out west and the school southwest and then to go from

11   there.

12               MR. WALKER:  All right.  Excuse me, your Honor.

13   BY MR. WALKER:

14   Q.   Will you be able to provide before this hearing is over

15   tomorrow the documents that demonstrate how the Leisure Arts

16   Building is going to be situated and its schedule for

17   completion?

18   A.   I can -- we gave you the other day the plans.  I don't know

19   if you have those with you.  Big roll of documents Mr. Bolden

20   picked up.  So we have those plans.  And then since that last

21   FOIA, we've gotten a detailed set of plans.  So I can bring you

22   those plans.

23   Q.   You mean in the last two or three days?

24   A.   Yes, sir.  In the last day or two, I've just gotten a more

25   detailed set of plans for the warehouse, and I'd be happy to

1    provide those to you.

2    Q.    All right.  Now, what are you going to do for the children

3    who are in academic distress schools in terms of their physical

4    facilities?

5    A.    We've got a -- the main thing we're doing is addressing the

6    academic distress, among other things, and I guess you're not

7    really wanting me to -- I'm not going to go into that.  It would

8    be a long afternoon.  But we're going to maintain those

9    buildings and do all we can to replace two of them as quickly as

10   we can, actually.  Repurpose Fair.  That's part of the long-

11   range plan, if you want to talk about that.  And then Henderson,

12   of course, it is what it is.  It was built without windows, but

13   I hope some day to make a move there.  But that's in the distant

14   future.

15            MR. WALKER:  Thank you, Mr. Kurrus.

16        Thank you, your Honor.

17            THE COURT:  Thank you, Mr. Walker.

18        Mr. Walker, before you step back, do the plaintiffs have

19   any other witnesses besides Mr. Kurrus?

20            MR. WALKER:  Well, you gave us until today.

21            THE COURT:  I did.

22            MR. WALKER:  And you usually will end the court by

23   four-thirty to five.  So we tried to operate within that time.

24   So to answer your question, I must be brief, too, your Honor,

25   and the answer is no.

1          THE COURT:  Okay.  Thank you, Mr. Walker.  I

2   appreciate the update.

3       We've made good progress today and I appreciate counsel's

4   work, all of you.

5       Mr. Heller, why don't you take Mr. Kurrus to start with in

6   the morning and do your entire examination then.  Okay?

7          MR. HELLER:  I will, your Honor.

8          THE COURT:  Good.  We'll be in recess until nine

9   o'clock in the morning.  Y'all can keep your seats.

10      (Overnight recess at 5:07 p.m.)

11                   REPORTER'S CERTIFICATE

12      I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

13

14                             Date:  February 3, 2017
    /s/ Christa R. Jacimore, RDR, CRR, CCR
15      United States Court Reporter

16

17

18

19

20

21

22

23

24

25