```
 1                  IN THE UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF ARKANSAS
 2                          WESTERN DIVISION

 3   LAKESHA DOE, Parent; DENNIS DOE,
     Minor Child; CHASE DOE, Minor
 4   Child,
                               Plaintiffs,
 5
          v.                             No. 4:15CV00623 DPM
 6   ARKANSAS DEPARTMENT OF EDUCATION;    March 23, 2016
     TOYCE NEWTON, In his Official        Little Rock, Arkansas
 7   Capacity as Chair of the Arkansas    9:04 a.m.
     State Board of Education; JAY BARTH,
 8   In His Official Capacity as Member
     of the Arkansas State Board of Education;
 9   JOHNNY KEY, In His Official Capacity as
     Commissioner of Education and the LRSD
10   School Board; BAKER KURRUS, In His
     Official Capacity as Superintendent
11   of the Little Rock School District,
                               Defendants.
12
              TRANSCRIPT OF MOTIONS HEARING - VOLUME 2
13          BEFORE THE HONORABLE D. PRICE MARSHALL JR.,
                    UNITED STATES DISTRICT JUDGE
14
     APPEARANCES:
15
     On Behalf of the Plaintiffs:
16
          MR. JOHN W. WALKER, Attorney at Law
17        MR. SHAWN GARRICK CHILDS, Attorney at Law
            John W. Walker, P.A.
18          1723 Broadway
            Little Rock, Arkansas  72206-1220
19
          MR. AUSTIN PORTER JR., Attorney at Law
20          323 Center Street, Suite 1300
            Little Rock, Arkansas  72206
21
          MR. ROBERT PETER PRESSMAN, Attorney at Law
22          22 Locust Avenue
            Lexington, Massachusetts  02421
23
          MS. GALE BOOTH STEWART, Attorney at Law
24          1 River Oaks Circle
            Little Rock, Arkansas  72207
25                                              [Continued]
```

1    APPEARANCES CONTINUED:

2    On Behalf of Defendants Arkansas Department of Education, Toyce
     Newton, Jay Barth, and Johnny Key:

3

          MR. PATRICK E. HOLLINGSWORTH, Assistant Attorney General
4         MS. ROSALYN L. MIDDLETON, Assistant Attorney General
             Office of the Arkansas Attorney General
5             Catlett-Prien Tower Building
              323 Center Street, Suite 200
6             Little Rock, Arkansas  72201-2601

7

     On Behalf of Defendant Baker Kurrus:

8

          MR. CHRISTOPHER J. HELLER, Attorney at Law
9         MR. KHAYYAM MARICE EDDINGS, Attorney at Law
              Friday, Eldredge & Clark
10            Regions Center, Suite 2000
              400 West Capitol Avenue
11            Little Rock, Arkansas  72201-3493

12

13

14

15

16

17

18        Proceedings reported by machine stenography and displayed
     in realtime; transcript prepared utilizing computer-aided
19   transcription.

20

21

22

23

24

25

                    Christa R. Jacimore, RDR, CRR, CCR
                       United States Court Reporter

```
 1                      INDEX (Volume 2 - March 23, 2016)

 2    WITNESSES
      FOR THE DEFENDANTS:         Direct   Cross    Redirect    Recross
 3    HOWARD BAKER KURRUS          244     290

 4    WAYNE ADAMS                  346     370

 5    TERRY GRANDERSON             396     420      432        436
                                           435
 6    WITNESSES
      FOR THE PLAINTIFFS:
 7    JOHNNY KEY                   442

 8

 9    EXHIBITS:                                              RECEIVED
      Defendant LRSD's Exhibit 20................................  246
10    Defendant LRSD's Exhibit 4.................................  250
      Defendant LRSD's Exhibit 15................................  252
11    Defendant LRSD's Exhibit 16................................  252
      Defendant LRSD's Exhibit 17................................  255
12    Defendant LRSD's Exhibit 18................................  256
      Defendant LRSD's Exhibit 19................................  257
13    Defendant LRSD's Exhibit 1.................................  258
      Defendant LRSD's Exhibit 6.................................  271
14    Defendant LRSD's Exhibit 7.................................  272
      Defendant LRSD's Exhibit 8.................................  273
15    Defendant LRSD's Exhibit 5.................................  275
      Defendant LRSD's Exhibits 12 and 13.......................  280
16
      Plaintiffs' Exhibit 9......................................  298
17    Plaintiffs' Exhibit 10.....................................  343

18    Defendant LRSD's Exhibit 21................................  395

19    Defendant ADE's Exhibit 5..................................  402
      Defendant ADE's Exhibit 4..................................  412
20

21
      Closing Argument - Plaintiffs..............................  446
22    Closing Argument - Defendant Kurrus........................  455
      Closing Argument - State Defendants........................  459
23    Closing Argument - Plaintiffs..............................  464

24

25    Court's Rulings............................................  468
```

```
 1          (Continuing at 9:04 a.m.)

 2              THE COURT:  Mr. Kurrus, even though the night has

 3    passed, you're still under oath.

 4              THE WITNESS:  Yes, sir.

 5              THE COURT:  Mr. Heller, are you ready to go?

 6              MR. HELLER:  I am, your Honor.

 7              THE COURT:  Go.

 8        HOWARD BAKER KURRUS, DEFENDANTS' WITNESS, DULY SWORN

 9                       DIRECT EXAMINATION

10    BY MR. HELLER:

11    Q.   Mr. Kurrus, yesterday Mr. Walker showed this census

12    information from zip code 72223.  Do you recall that?

13    A.   Yes, sir.  This may be a point of order, though.  I'm not

14    seeing that on the ELMO.

15              THE COURT:  I don't think our witness screen is

16    working.

17          We're having some technical difficulties, ladies and

18    gentlemen.  I appreciate your patience and bearing with us.

19    We'll try to get it together.

20          If my brother Wilson still had the case, he would be

21    telling y'all a good story, but I don't have any stories.

22    Mr. Walker, do you have a story you could share with us?

23              MR. WALKER:  I have plenty of them, your Honor, but I

24    don't deliver them well.

25              THE COURT:  Oh, okay.  Fair enough.
```

1          THE WITNESS:  I can probably work my way through that

2     exhibit if need be.

3          THE COURT:  Mr. Heller, how much -- could we do it the

4     old-fashioned way with a set of paper with Mr. Kurrus or do you

5     really need the electronics?

6          MR. HELLER:  We could, your Honor.  It would take a

7     minute to assemble that.  That includes the Fanning Howey

8     report, but we've got a set.

9          THE WITNESS:  Here we go.

10          THE COURT:  Let's do this:  We'll take a short break

11     and we'll see if we can't get the electronics up and going, and

12     if not, be prepared to do the other.

13        I have the big report up here that Mr. Kurrus could use and

14     I can just make notes about what page things are on, so --

15          MR. HELLER:  We have enough copies to have one for the

16     Court and one for Mr. Kurrus.

17          THE COURT:  All right.  We'll stand easy for just a

18     second.

19        (Recess from 9:07 a.m. until 9:11 a.m.)

20          THE COURT:  All right.  Mr. Heller.

21     BY MR. HELLER:

22     Q.   Mr. Kurrus, the document that Mr. Walker discussed with

23     witnesses yesterday, which shows the demographics in the 72223

24     zip code with, I think it's fair to say, the implication that

25     that was the area served, to be served by the new west Little

1    Rock school, did you check to see whether that zip code, in

2    fact, overlays with the proposed west Little Rock school zone?

3    A.    I did.  I did check it.

4    Q.    Let me put up a document that I've marked as proposed

5    Little Rock Exhibit, LRSD Exhibit 20.  Can you tell the Court,

6    please, what that is.

7    A.    That's a Google map that you can get on Google that shows

8    zip codes.  It also shows the city limit boundary.  It doesn't

9    have the school district boundary as such, but it shows the

10   72223 zip code out west, as well as that red line, which is the

11   city limits of the city of Little Rock.

12   Q.    Can you tell from Exhibit 20 what part of zip code 72223 is

13   even in the Little Rock School District?

14   A.    Yes, sir.  It's -- and I don't want to estimate it, but the

15   school is on the very far eastern part of 72223.  So the school

16   is actually in that zip code, but the school, Roberts is on the

17   western edge of the school district, and the vast majority of

18   72223 is not within the school zone for Roberts nor Terry nor

19   Fulbright.

20            MR. HELLER:  Your Honor, I move the admission of LRSD

21   Exhibit 20.

22            MR. WALKER:  No objection.

23            THE COURT:  LRSD 20 will be received.

24        (Defendant LRSD's Exhibit 20 received in evidence.)

25            THE COURT:  Mr. Heller, help me just a second because

1    I only have through proposed 14 of LRSD exhibits.

2            MR. HELLER:  Your Honor, we marked some other exhibits

3    that we've distributed to the parties that we consider to be

4    rebuttal exhibits or clarifying exhibits, including most of the

5    gap between 14 and 20 is filled with minutes from LRSD board

6    minutes, minutes and resolutions that -- one of which was

7    attached to Mr. Walker's papers, but we thought it would be

8    helpful to have a clean record of the actions the board took

9    before Mr. Kurrus's arrival.

10           THE COURT:  Okay.  I appreciate the heads up on that.

11   Does my Courtroom Deputy have copies of all of the proposed?

12   We'll do it at the first break, if not.  But I need her to have

13   the originals and I need an updated list as well, if I could.

14           MR. HELLER:  Okay.  We'll do that, your Honor, at the

15   first break.

16           THE COURT:  So this is 20, and it will be admitted

17   without objection.  It's the map with zip codes.

18       Go ahead.

19   BY MR. HELLER:

20   Q.   Mr. Kurrus, I've got on the screen and in front of you

21   proposed Defendants' Exhibit 4.  Can you identify that document?

22   A.   Yes, sir.  This is a map of the Little Rock School District

23   boundaries with each school noted by a red square, and it also

24   includes the school district election zones.  There's seven

25   members of the school board, and each zone is numbered.  So

1    these are the election zones as well as the schools that are

2    located in each of those seven election zones.

3    Q.    Okay.  Let's look at the area where the west Little Rock

4    school, middle school, is proposed to be located, planned to be

5    located.  Let's say zone -- let's take Zone 4, for example.  How

6    many schools are in Zone 4 compared to the other zones in the

7    Little Rock School District?

8    A.    Well, as the map reflects --

9              MR. WALKER:  Objection to the question.

10             THE COURT:  Hold on, Mr. Kurrus.

11             MR. WALKER:  That's a multi question.  I would like

12   for it to be separated.

13             THE COURT:  Overruled.

14        So how many schools are there in Zone 4 compared with other

15   zones, Mr. Kurrus?

16             THE WITNESS:  You can see from the map in the red

17   squares where the schools are located, and then the key to the

18   map is the writing on both sides.  But you can see in Zone 4,

19   for example, there are actually three schools:  Roberts to the

20   far west, and, actually, it -- the western edge of the Roberts

21   property borders the school district boundary.  Then moving

22   east, you see Fulbright.  Moving far to the southeast in Zone 4,

23   that's McDermott Elementary, which is located on Reservoir Road.

24   I won't go all the way through that, but each of the zones has

25   the schools within that zone listed.

1    BY MR. HELLER:

2    Q.   So zones 4 and 5, the northwest and western zones of LRSD,

3    have fewer schools than any other zone?

4    A.   Yes, sir.

5              THE COURT:  Before we leave the map, I find it very

6    helpful -- you all know this much better than I do.  This is

7    revealing to me or illuminating to me.  Where is the proposed

8    new school in the Leisure Arts Building, Mr. Kurrus?

9              THE WITNESS:  The proposed new school is just to the

10   northwest of the D where it says Don Roberts.  That heading up

11   there that's above the red square describes Don Roberts

12   Elementary, which is across Cantrell Road.  The red line is

13   Cantrell Road.  So right across Cantrell off of Ranch Drive,

14   just to the very northwest of that D on Don Roberts is where the

15   new school, the west Little Rock school property is located.

16             THE COURT:  Thank you.

17   BY MR. HELLER:

18   Q.   You were for, I think, 12 years a representative on the

19   school board from Zone 4?

20   A.   Yes, sir.

21   Q.   Are there any middle schools in Zone 4?

22   A.   No, sir.

23   Q.   So Mr. Walker talked about an area south of 630 and east of

24   Shackleford as unequal, but if we look at north of 630 and west

25   of Shackleford, how many total LRSD schools are in that area?

1    A.    I think there's four.  Only four.  It would include

2    Terry -- or three, actually.  I'm sorry.  There's two in the

3    Zone 4.  That's Fulbright and Roberts, and then Terry would be

4    north and west of Shackleford and 630 extended.

5    Q.    So we've talked about schools with high African-American

6    populations.  Are there a greater number of schools in the zones

7    that have high African-American school populations?

8    A.    Yes, sir.  Zone 1 has the most schools, obviously.  You can

9    see them there.  One is Metro, which is ACC, Accelerated

10   Learning Center.  Woodruff is Early Childhood Center.  The rest

11   of the schools are typical schools.  But there are far more

12   schools in Zone 1, obviously, than Zones 4 or 5 and 4 or 5 put

13   together.

14              MR. HELLER:  Okay.  Your Honor, I move the admission

15   of Defendants' 4.

16              MR. WALKER:  No objection.

17              THE COURT:  Defendants' 4 will be received without

18   objection.

19        (Defendant LRSD's Exhibit 4 received in evidence.)

20              THE COURT:  Mr. Heller, can I hijack your examination

21   again?

22              MR. HELLER:  Sure.

23              THE COURT:  Mr. Kurrus, on this map, where is the

24   proposed new southwest Little Rock high school going to be?

25              THE WITNESS:  Well, it's down in the southwest corner

1    of the school district, and if you go down -- it's south of

2    I-30, and the intersection is not shown, but it would be south

3    of I-30.  You see where Mabelvale Magnet Middle School is, if

4    you kept traveling southwest on I-30, there's an interchange

5    there and Vimy Ridge Road comes in.  It's approximately in that

6    quadrant right there.

7         The street map doesn't show RichSmith Drive, which is one

8    of the streets, and the other is another street that's not

9    shown.  But it would be right in that vicinity just west of that

10   little loop that kind of goes around I-30.  That's as good as I

11   can see it on here.

12             THE COURT:  Up near the interstate?

13             THE WITNESS:  Yes, sir.  It's right behind the Home

14   Depot that fronts the interstate, and there's an apartment

15   complex there as well.

16             THE COURT:  All right.  Thank you.

17             MR. HELLER:  Did the Court rule on the admission of

18   Exhibit 4?

19             THE COURT:  I think I did, but if I didn't, I'll do so

20   now.  Four is in without objection.

21             MR. HELLER:  Thank you, your Honor.

22   BY MR. HELLER:

23   Q.   Mr. Kurrus, I've placed on the screen Defendants' Exhibit

24   15.  Can you identify that document?

25   A.   Yes.  That's a copy of the resolution authorizing the

1  purchase of the 55 acres located east of Mabelvale Pike and

2  north of Mann Road.  That's the property we just described in

3  southwest Little Rock.

4           MR. HELLER:  Move the admission of Defendants' 15,

5  your Honor.

6           MR. WALKER:  No objection.

7           THE COURT:  Defendants' 15, resolution, will be

8  admitted.

9      (Defendant LRSD's Exhibit 15 received in evidence.)

10 BY MR. HELLER:

11 Q.   Up next, Mr. Kurrus, proposed Defendants' Exhibit 16.

12 Could you identify that document, please.

13 A.   Yes, sir.  That's another resolution from the board of

14 directors of the Little Rock School District.  It's dated

15 October 24, 2013.  And that's the resolution that authorized the

16 acquisition of the 40 acres that's immediately adjacent to the

17 property where the new west Little Rock school will be located.

18 This property is just across and north of Cantrell Road from

19 existing Don Roberts on that map.

20          MR. HELLER:  Move the admission of Defendants' 16,

21 your Honor.

22          MR. WALKER:  No objection.

23          THE COURT:  It will be admitted.

24     (Defendant LRSD's Exhibit 16 received in evidence.)

25 BY MR. HELLER:

1   Q.   Can you identify proposed Defendants' Exhibit 17, please,
2   Mr. Kurrus.
3   A.   Yes, sir.  That's again another resolution of the board of
4   directors, which I think was signed immediately prior to the
5   execution of the settlement agreement, which resulted in these
6   desegregation payments.  But that's what that one is.
7   Q.   And can you tell from Exhibit 17 what the status of the
8   board's facility study is as of November 18, 2013?
9   A.   Well, I'm not going to try to read this right now because
10  I'm having a little trouble, but at this point I don't think the
11  study was quite complete.  And I could take a moment and read
12  that.
13  Q.   Does that help?
14  A.   Yes, sir.  I can see now.
15       This was right before -- the study was not completed, as I
16  recall, and -- I'm scanning right now.  "The board remains
17  committed," et cetera.  But I think this resolution in the
18  facilities study is in the last, "Now therefore be it resolved."
19  That's where it talks about the facilities study.
20  Q.   Does the first premise to that resolution set forth what
21  the purpose of the facilities study is going to be?
22  A.   Yes, sir.  That's really what I was looking for.  The
23  purpose is going to be to identify facilities needs in LRSD.
24  Q.   Okay.  In order to make a fair determination of those
25  needs?

1    A.    Yes, sir.  It's a resource and a tool.  I've read it, of

2    course, but -- and exactly as it says here, it's something the

3    board decided they needed.  It was very expensive, and they

4    acquired it and this discusses how they were going to use the

5    $37.3 million in facilities funding, which is the last

6    installment of the desegregation settlement proceeds.

7    Q.    Now, this resolution says that the settlement will provide

8    $37.3 million in facilities funding; correct?

9    A.    Exactly right.  That's --

10   Q.    And that's only one year of the payment, the year you

11   discussed yesterday?

12   A.    Yes, sir.  Under that settlement agreement in paragraph

13   three and four, it makes it perfectly clear that there's

14   $37,347,429.  They used 37.3 million.  It's the same number.

15   But that's what's going to be used for facilities funding from

16   the settlement proceeds.

17   Q.    At this point, even before the facilities study has been

18   completed, does the board -- we've seen from the previous

19   exhibits that the board has already purchased property for a

20   southwest Little Rock high school and a west Little Rock middle

21   school.

22   A.    Yes.  That occurred in the previous month, I believe.

23   Q.    Does the resolution mention those schools?

24   A.    Yes, it does.  The previous resolutions make it clear that

25   they had already bought the land, and this comes after that.

1           MR. HELLER:  Okay.  Move the admission of Defendants'

2    17, your Honor.

3           MR. WALKER:  No objection.

4           THE COURT:  It will be admitted.

5        (Defendant LRSD's Exhibit 17 received in evidence.)

6    BY MR. HELLER:

7    Q.   Defendants' proposed Exhibit 18 is on the screen,

8    Mr. Kurrus.  Can you identify that document?

9    A.   Yeah.  That's a copy of the board minutes from the regular

10   board meeting of the Little Rock School District Board of

11   Directors from August 28, 2014.

12   Q.   And I want to turn your attention to page 7.  Do those

13   minutes reflect any action with respect to the Fanning Howey

14   facilities master plan?

15   A.   Right.  What they do is, they reflect that by this time,

16   the facilities study had been completed.  It's extensive and

17   voluminous, as everyone knows, and it's been completed.

18   Ms. Fisken made a motion to accept the report with the

19   understanding modifications may be necessary, and Ms. Johnson

20   seconded.  Several people spoke in favor.  And the motion

21   carries unanimously.

22          MR. HELLER:  Move the admission of Defendants' 18,

23   your Honor.

24          MR. WALKER:  No objection.

25          THE COURT:  Received.

1          (Defendant LRSD's Exhibit 18 received in evidence.)

2    BY MR. HELLER:

3    Q.    Proposed Defendants' Exhibit 19 is on the screen now,

4    Mr. Kurrus.  Would you please identify that document.

5    A.    Yes.  Those are minutes from the January 22, 2015, meeting

6    of the Little Rock School District Board of Directors.

7    Q.    And beginning on page 6 of that document, there's a board

8    resolution I want to discuss with you.  First of all, what

9    action was taken with respect to the resolution concerning

10   facilities plan?

11   A.    Well, they made this resolution, it appears to be -- to

12   have been read into the record and it was passed unanimously.

13   And it deals with millage campaigns and facilities,

14   improvements, bond issues, and such.

15   Q.    This was Ms. Springer's resolution?

16   A.    Yes, sir.  It was introduced by Ms. Springer and passed

17   unanimously, as I recall.

18   Q.    Did the resolution establish the board's first priority for

19   school construction?

20   A.    Yes.  It does indeed.  It says that the first priority is

21   going to be the construction of the southwest -- I mean of

22   the -- yes, of the southwest school.

23   Q.    Okay.  Does it establish any connection between that

24   priority and the proposed west Little Rock middle school?

25   A.    Yes.  It says that essentially -- and I won't read it.  It

1   says what it says.  But it says essentially that they'll move

2   from -- at the same time into the construction of the west

3   Little Rock school, the land for which had already been

4   acquired.

5   Q.   It says southwest high school is first priority, but the

6   board, quote, shall simultaneously authorize construction of a

7   southwest Little Rock high school and a west Little Rock middle

8   school.

9   A.   Right.

10  Q.   Does the resolution establish a second priority?

11  A.   Yes.  It says that the district will be -- the second

12  priority will be those material improvements which the board

13  deems necessary in order to create and maintain relatively equal

14  facilities throughout the district.

15          MR. HELLER:  Move the admission of Defendants' 19,

16  your Honor.

17          MR. WALKER:  No objection.

18          THE COURT:  Received.

19      (Defendant LRSD's Exhibit 19 received in evidence.)

20  BY MR. HELLER:

21  Q.   I'm going to place carefully Defendants' Exhibit 1 on the

22  screen.  Can you identify that binder?

23  A.   Yes, sir.  What you're holding and what I'm holding is the

24  Fanning Howey study, the facilities master plan which was

25  commissioned by the board and then ultimately approved by the

1    board, or accepted, I think is the term they used.  It was

2    accepted by the board unanimously.

3    Q.   So the resolution which is in evidence as Exhibit 17

4    accepted Defendants' Exhibit 1 as the board's facilities study?

5    A.   Yes, sir.

6            MR. HELLER:  Your Honor, I move the admission of

7    Defendants' 1.

8            MR. WALKER:  No objection.

9            THE COURT:  Defendants' 1, the Fanning Howey study,

10   will be received without objection.

11       (Defendant LRSD's Exhibit 1 received in evidence.)

12   BY MR. HELLER:

13   Q.   Mr. Kurrus, I'd like to turn your attention to page 3 of

14   Exhibit 1.  What does that tell us about the qualifications of

15   the people who prepared what I'll refer to as the Fanning Howey

16   study?

17   A.   Well, the study was commissioned by the board, but it was

18   done by outside consultants.  And it was a team approach with

19   architects and engineers.  The team members are listed on the

20   front of the study.  But it was an independent, third-party

21   review by experts of, I guess, virtually every single school

22   building in the school district.

23   Q.   And the purpose was, at least in part, to conduct, quote,

24   facility condition assessments, close quote?

25   A.   Yes, sir.  That's what they did.  They looked at every

1    building and with a rating system determined what they call an

2    FCI, facilities condition index, which is just a ratio of the

3    repairs that they prioritized in three groups, priorities one,

4    two, and three, by the replacement cost of the building itself.

5    So the lower the FCI or facilities index, the better condition

6    the building.

7    Q.    And did they make a general comment about the maintenance

8    of LRSD's buildings?

9    A.    Yes, they did, and they say this several times in the

10   report, but highlighted on this page or what they said on page 3

11   was that overall the buildings have been very well maintained

12   with most needs simply a result of age.

13   Q.    Let's look at page 87 of the Fanning Howey study.  Is there

14   a recommendation with respect to McClellan High School?

15   A.    Yes, sir.  They made the recommendation that it be replaced

16   because it -- again they reference the facilities index and the

17   replacement index, which is really not as important to me, but

18   that's a phase one project pursuant to Fanning Howey's

19   conclusions.

20   Q.    What does phase one mean with respect to the Fanning Howey

21   study?

22   A.    Phase one means that that will be accomplished earliest in

23   the process of this -- again, it's a process, but there are

24   certain phases.  They can't do all this work at once, so that

25   was a top priority, and that's my term.  But phase one is

1    something that needs to be done quickly.

2    Q.    Let's look at page 89 of the study.  Does that say anything

3    about the need for additional middle school capacity?

4    A.    Yes, sir.  They concluded that we lack capacity in the

5    middle schools, which is -- and the numbers show that.  They

6    reflect it not only in this study, but elsewhere, and they say

7    additional permanent seats are required to achieve an 85 to 90

8    percent utilization, which is apparently a standard and one we

9    need to aim for.  We are much crowded at the middle school level

10   right now.

11   Q.    So if we turn over to page 90, is there a recommendation

12   concerning a middle school?

13   A.    Yes.  What they said was that we needed to construct a new

14   middle school in west Little Rock, and, of course, by then they

15   knew we had the land.  I guess that's fair to say.  But that's

16   in phase one as well.

17         And then this is what I was thinking about yesterday.  They

18   also talked about what --

19              MR. WALKER:  Your Honor, objection.  This is his

20   witness and these are questions and answers, but I ask that the

21   witness just answer the question instead of making a speech.

22   This is what I was thinking about yesterday is in the nature of

23   a speech rather than responsive to the question.

24              THE COURT:  I'll sustain.

25         Mr. Kurrus, if you would, just answer the questions.

1              THE WITNESS:  Yes, sir.

2              THE COURT:  You have a little rope, but not a lot.

3              THE WITNESS:  Okay.  Thank you.

4              THE COURT:  Okay.

5    BY MR. HELLER:

6    Q.    Mr. Kurrus, what was the priority assigned by Fanning Howey

7    to the west Little Rock middle school?

8    A.    It was likewise a phase one priority.

9    Q.    Did Fanning Howey make any other middle school

10   recommendations?

11   A.    They did.  In furtherance of this --

12             MR. WALKER:  I object to leading questions.

13   Mr. Heller cannot lead.  And I ask that the witness just give

14   responses, period.  That's all.

15             THE COURT:  Overruled.  I don't think the, "Did

16   Fanning Howey make any other middle school recommendations," is

17   leading, or it's not too leading, so --

18             MR. WALKER:  Your Honor, I did not object to that, but

19   that is -- that's fine, but I just am objecting to the general

20   leading.

21             THE COURT:  Okay.  Counsel, y'all know the rules.

22   You're all experienced lawyers.  A little leading on immaterial

23   things is fine, and then when we get down to the core, don't

24   lead.  Let the witness talk.

25        I have a very basic question now that we're interrupted.

1    May I, Mr. Heller?

2              MR. HELLER:  Sure, your Honor.

3              THE COURT:  Mr. Kurrus, help me on understanding

4    exactly what a middle school is.  I'm a little muddled

5    between -- on middle school and junior high school, what grades

6    are covered.

7              THE WITNESS:  Yes, sir.  In Little Rock School

8    District, middle school means a school that serves grades six,

9    seven, and eight.  We went to that configuration some years ago,

10   and there are a couple of exceptions.  One notably is FH STEM,

11   which carries from kindergarten through eighth grade.  But all

12   the middle schools we're talking about now, Henderson,

13   Cloverdale, Mabelvale, Mann, Dunbar, Pulaski Heights, are all

14   traditional schools which serve grades six, seven, and eight.

15             THE COURT:  And nine through 12, that's high school.

16             THE WITNESS:  Yes.  We have a high school

17   configuration in all of our high schools.  Traditional high

18   school is nine, ten, 11, and 12 now.

19             THE COURT:  Okay.  Thank you.

20        All right.  Mr. Heller.

21   BY MR. HELLER:

22   Q.   Back to the question, Mr. Kurrus, about whether Fanning

23   Howey made any other middle school recommendations.

24   A.   Yes, sir, they did.  They talked in terms of this phasing,

25   and what they described in their report is that the southwest

1    Little Rock school, high school, would be built, then McClellan

2    would be rehabilitated and Cloverdale would be moved to the

3    rehabilitated McClellan site, and that's described on page 90 of

4    the report.

5    Q.   What's the priority for that project?

6    A.   The priority is -- it's all under priority one, as I

7    understand the report.  It's all a process, but it starts with

8    the priority one of building the southwest school, the west

9    Little Rock school, and then McClellan follows in furtherance of

10   that, all as part of a priority one exercise.

11   Q.   Let's look at the paragraph about Cloverdale Middle School.

12   A.   It says phase two, following the relocation of McClellan

13   High School into its replacement facility.  So I guess if you're

14   talking phases versus priorities, that is phase two, but it

15   follows from the first priority, the way I look at this thing.

16   Phase one is the conversion of the McClellan facility and the

17   refurbishing of it, and then it is true, that's a phase two of a

18   master plan, goes from there.  That's mostly the athletic

19   fields, as I recall.

20   Q.   If you decided today to make plans to tear down the current

21   Cloverdale building and build a new one, could you do it much

22   faster than what Fanning Howey recommends?

23   A.   No, sir.  Even if you could locate real estate, put it

24   under contract, do the due diligence, we've spent 180 days

25   getting ready on the west Little Rock school, and that's a

1    reasonable period of time.  You might be able to shave a few

2    months, but it's going to take longer to build a school from the

3    ground up than it will be to rehab that other facility.  The

4    timelines are uncertain, but I don't think you could actually

5    save much time if you could find the real estate, locate it, do

6    the due diligence, design and engineer a building, and then

7    complete it.  You wouldn't save a tremendous amount of time.

8    You might save a year.

9    Q.    I'm going to put up page 23 of the Fanning Howey report,

10   which shows -- well, let me ask you, does that page show

11   facilities condition indexes for all of our middle schools?

12   A.    Yes, sir.  This is a page that has that calculation under

13   facilities condition index.  And what that is is what I

14   described a moment ago.  It's the priority activities at various

15   schools divided by the -- the first three, divided by the

16   replacement cost, and that yields that ratio of, say, the very

17   top one is Terry, .27, which means if you -- it gives you an

18   indication of the priority work that needs to be done and how

19   much that work will cost relative to the total replacement cost

20   of the facility itself in each case.

21   Q.    So Woodruff is the last elementary school shown on that

22   page; right?  Then we move on to middle schools?

23   A.    Yes, sir.  You do.  And I'll wait until you ask me a

24   question.  I don't want to --

25   Q.    Well, how many middle schools do we have in the district?

1    A.    Well, we have six under current configurations.  I'm sorry.

2    Seven.

3    Q.    Okay.  And then according to Fanning Howey's facilities

4    condition assessment, can you name the top three in terms of

5    being in the best facilities condition?

6    A.    I can.  Let me just say the only reason I stammered about

7    the numbers, Forest Heights covers the middle school grades but

8    is a K-8 school.  But if you look at the FCIs on the right for

9    the various schools, you can see Cloverdale with a .71, and that

10   flows from the fact that there are very expensive priority

11   projects that would need to be completed if you were going to do

12   that.  It would be an interesting process.  But then the next

13   two, .43 is Pulaski Heights.  That's its index.  It's the second

14   most needy school with respect to this rating.  And third would

15   be Henderson with a .30.

16   Q.    Okay.  What are the three best schools in terms of Fanning

17   Howey's assessment of facility condition?

18   A.    Well, if you look here, you'll see Dunbar is actually the

19   best with .13.  The next best is Mann.  And then Henderson I

20   think -- no, it's Mabelvale comes in slightly ahead of

21   Henderson.

22   Q.    And how many of those schools are south of I-630 and east

23   of Shackleford?

24   A.    Every one of them.  Every single one of them.

25   Q.    Now, let's talk about your own experience, since you've

1    been a board member and particularly since you've been the

2    superintendent.  You heard the testimony yesterday about the

3    condition of various schools, I think particularly focusing on

4    the comparison of Roberts and Cloverdale.

5         Have you been to Cloverdale recently?

6    A.   Yes, sir.  I've been to Cloverdale recently and frequently

7    prior to my most recent trip.

8    Q.   And what -- can you respond to the criticisms you heard

9    yesterday from various witnesses about the condition at

10   Cloverdale?

11   A.   I can.  Cloverdale is an older building.  It was built in

12   1956.  It has an architecture that's -- that was probably

13   cutting edge in 1956, but it's not what we would be looking for

14   today.  The building is serviceable.  It is clean.  The

15   cafeteria is clean.  The bathrooms work.  I could tell you about

16   specific pictures that we've seen yesterday.  I won't get into

17   that.  But those conditions do not exist today.  And it's a

18   serviceable school.  It's not what we're looking for long term

19   and it has problems associated with shifting in the ground that

20   are evident in the school if you know what to look for, and I

21   do.

22   Q.   Which school in your view is the best facility we have

23   currently in the district?

24   A.   I think Roberts is the best facility.  It was built in

25   2013.  It's a modern facility.  It's very large.  It's

1    beautiful.  It's everything that we could do at that time.  It's
2    a very, very nice school.
3    Q.    What would you say is the worst facility?
4    A.    I think Cloverdale is the worst facility that we have.
5    Q.    Have you been to Dunbar recently?
6    A.    I have.
7    Q.    Can you respond to the testimony you heard yesterday about
8    Dunbar?
9    A.    Well, I can.  Dunbar is an old building.  It's a very
10   historic building.  It means a great deal to a number of people,
11   including myself.  It's a beautiful building.  It's on the
12   National Register.  It's a different kind of school building
13   than one would build today.  It has lots of stairs, multiple
14   levels.  It's clean, serviceable.  It has smaller rooms, no
15   doubt.  But it's a clean school and it has a history of strong
16   performance, both -- really, dating way, way back.  The facility
17   is older, but it's serviceable, it's neat, it's clean.  The
18   bathrooms are clean.  The kitchen is clean.  The school works.
19   Q.    Is Dunbar as old as Pulaski Heights Middle School?
20   A.    Not quite, I don't think.  I think Dunbar was built in '29,
21   wasn't it?  I'd have to be subject to check on that.  I didn't
22   memorize those.  Pulaski Heights I think was a little bit before
23   that, maybe 1910.  I can refresh my recollection on that.
24   Q.    And there's some testimony about Mann Middle School.  Have
25   you been to Mann this year?

1    A.    I have indeed.

2    Q.    Could you respond to the -- or just describe for the Court

3    what the facility is like at Mann Middle School.

4    A.    Well, Mann is much nicer than -- it's modern.  Because of

5    some foundation issues that existed there, much of the school

6    was rebuilt, and I wouldn't venture to say the date, but within

7    the last ten to 15 years.  I'm guessing a little bit on that.  I

8    recall; I just don't remember the date.  It's got a big, nice

9    auditorium.  It's older, but it's very nice.  And it's a modern

10   building with nice entryways, nice classrooms.  It's spread out

11   a little bit differently, it's on a larger-size lot, but it's a

12   very nice, attractive school building.

13   Q.    Let's talk some more about the proposed west Little Rock

14   middle school, and I don't want to repeat too much of what you

15   said yesterday about the status quo, but could you just quickly

16   bring us up to date on what's going on right now and what needs

17   to happen in the next few months in order for school to open

18   there at the beginning of the coming school year.

19   A.    Yes, sir.  Yes, sir.  What we need to do, we need to

20   exercise our right to buy that real estate.  We've completed our

21   due diligence.  We've determined that the facility and the real

22   estate is something that we want to purchase, and we have to

23   give notice to the seller by the close of business on March 28.

24   That's coming right up.  We would have done that already were it

25   not for this injunction.  But we didn't want to do that in the

1    face of this matter.

2         But that's -- we need to go ahead and close on the real

3    estate.  I've hired a principal -- not I, a committee

4    interviewed and recommended that we hire Jay Pickering, and we

5    did so.  He's going to be the principal.  We've determined, he

6    has, and he's still in the process of this, but we've got

7    facilities teams that are working, logistics teams that are

8    working, we've got students who are enrolling in that school,

9    expecting us to open that school this fall.  We are prepared to

10   let the contracts.  We've got bids coming in.  I don't know the

11   exact dates they'll be ready, but I think they'll be ready the

12   next few days to commence construction immediately on that

13   office building.  We do need to get to work.  We're going to be

14   working weekends and overtime probably already.  But we have to

15   be open and ready for business this fall.  We have students

16   enrolled and we need to get started immediately.

17   Q.   Let's talk about the need for that school.  What's

18   happening now with students who matriculate out of the three

19   schools in the proposed west Little Rock school zone?  Do they

20   continue on in the Little Rock School District?

21   A.   Some do, but a great many do not.  We actually did the

22   study of that to pull our records to see.  Of fifth graders last

23   year, where did they end up?  Where did they go?  Did they stay

24   in Little Rock School District?  Did they leave our district?

25   We tracked them as best we could.

1        A great many of these students from all three of the

2    elementary schools, Roberts, Fulbright, and Terry, leave in

3    their fifth grade year.  I should also say, though, that it's

4    equally troubling that a great many students leave in their

5    third, fourth, and fifth grade year.  In other words, they don't

6    wait until the fifth grade to go to a different school; they are

7    pressured by others who have other schools, middle schools, to

8    leave earlier in order to secure a seat in an alternative

9    environment.  Frequently we have a great many students leave in

10   the third, fourth, and fifth grade years, and I could give you

11   the data on that if you'd like.

12   Q.   Would you review our proposed Exhibit 6 and identify that

13   document, please.

14   A.   Yes.  That's a spreadsheet that we've prepared and I'm very

15   familiar with that deals with -- and I'm not seeing the top part

16   of that.  It's Fulbright, I can tell that without question

17   that's Fulbright.  Okay.  I can see it now.  It's Fulbright.

18        That shows you students by demographic who were in the

19   fifth grade in 2014-15, and now we're in the '15-16 year, and

20   this tells you as best we can determine where they went.  And

21   that shows, for example, African-American or black fifth graders

22   from Fulbright, 19 of them are no longer in our school district.

23   The rest of them went to various places that we know that are

24   school district schools, Mann, Dunbar, Forest Heights STEM,

25   Pulaski Heights, Mabelvale, and then Stephens.  Which that would

1    be an anomaly, related to repeating a grade, probably.  But

2    that's what this shows for both African-American or black

3    students, white students, and then nonwhite and nonblack fifth

4    graders, everybody else.

5           MR. HELLER:  I move the admission of Defendants' 6,

6    your Honor.

7           MR. WALKER:  No objection.

8           THE COURT:  It will be admitted.

9        (Defendant LRSD's Exhibit 6 received in evidence.)

10          THE COURT:  Will you leave it up there a minute,

11   Mr. Heller?

12          MR. HELLER:  Sure.

13          THE COURT:  I'm trying to understand the chart.  The

14   total of the chart is not the total of the subpop categories

15   listed below; is that correct?

16          MR. HELLER:  Correct.  There's not a total.  The top

17   number is just the students who are no longer in the district,

18   and then the numbers below that are the students who remain in

19   the district, and it shows where they are in the district.

20          THE COURT:  Got it.  All right.  LRSD 6 is admitted,

21   without objection.

22       (Defendant LRSD's Exhibit 6 received in evidence.)

23   BY MR. HELLER:

24   Q.   Mr. Kurrus, could you identify, please, Defendants'

25   Exhibit, proposed Exhibit 7.

1  A.   Yes.  This is the same data set for Roberts Elementary

2  School, and it reflects, again to be clear, that of the students

3  who were at that school in '14-15, we tracked them, and we see

4  that 18 African-American or black students are no longer in the

5  school district.  The rest are -- remain in our school district

6  at the schools which are noted.  Of white fifth graders at

7  Roberts, 70 are no longer in our school district, and nonwhite

8  and nonblack, 21.  If you added those up, that would be 88 and

9  21, which would be, what, 109 students who were there at Roberts

10  in '14-15 exited our school district the following year.

11         MR. HELLER:  Move the admission of Defendants' 7, your

12  Honor.

13         MR. WALKER:  No objection.

14         THE COURT:  Admitted.

15     (Defendant LRSD's Exhibit 7 received in evidence.)

16  BY MR. HELLER:

17  Q.   Mr. Kurrus, would you please identify defendants' proposed

18  Exhibit 8.

19  A.   Yes, sir.  This is a data sheet that reflects the number of

20  fifth graders from Terry Elementary School who were enrolled in

21  '14-15 and reflects where those students went in the following

22  year, the current year that we're in, '15-16.  And it reflects,

23  again, of the black students at Terry, 12 of them executed

24  the -- exited the district.  Of white fifth graders at Terry,

25  four exited the district.  Nonwhite and nonblack, five exited

1    the district, which means a total of 21 students exited the

2    school district from Terry.

3        Again, the thing I need to add -- if I may?

4    Q.   Sure.

5    A.   -- is that Fulbright as an example, by the time we get to

6    the fifth grade class, the fifth grade class this year is half

7    as large as the kindergarten class at Fulbright.  The Fulbright

8    kindergarten class is 132 students.  The fifth grade class has

9    62 students.  Which tells you that many of the students who are

10   exiting the school district don't wait until the fifth grade

11   year.  They leave earlier because they're pressured by private

12   and charter organizations to accept seats when they become

13   available.  And it's a lot of pressure on a parent.  So that's

14   important to keep in mind.

15              MR. HELLER:  Okay.  Move the admission of Defendants'

16   8, your Honor.

17              MR. WALKER:  No objection.

18              THE COURT:  Eight will be received.

19        (Defendant LRSD's Exhibit 8 received in evidence.)

20   BY MR. HELLER:

21   Q.   So is it fair to say, Mr. Kurrus, from Exhibits 6, 7, and 8

22   that more students in the three attendance zones for the

23   proposed west Little Rock middle school leave the school

24   district each year rather than attend another LRSD middle

25   school?

1   A.   Yes, sir.  That's a fact.

2   Q.   You testified yesterday that the new school would be

3   located in a growth area of the school district.  Let me ask you

4   to identify defendants' proposed Exhibit 5.

5   A.   Yes, sir.  That's a data sheet that we obtained, I

6   obtained, with the help of school district personnel, but I was

7   involved personally as well in dealing with Metroplan to get

8   some data on growth within the zone that's to be served.  At

9   this point when I got this information and began to assemble it,

10  I was trying to figure out a lot about those zones.  And this is

11  the final compilation after I got the latest data from Metroplan

12  in March.

13       It shows growth in the Fulbright zone -- I conflated these

14  numbers because I think I mixed up in my mind, I think I said 36

15  percent yesterday is the growth in Roberts.  I think that's the

16  weighted growth average of the growth in the three.  This is a

17  better exhibit.  It shows in the Fulbright zone between 2000 and

18  2010 -- which, of course, is the latest census.  Now it's 2016.

19  Roberts, 48.3 percent.  30.1 percent in Fulbright.  This

20  reflects the school-age growth, the final number on the right,

21  which is where we're really concerned.  And then, last, Terry

22  also reflects growth, not as much, but 6.1.  But that zone is

23  also still growing in school-age population.

24            MR. HELLER:  I'll move the admission of Defendants' 5,

25  your Honor.

1           MR. WALKER:  No objection.

2           THE COURT:  Five will be admitted.

3       (Defendant LRSD's Exhibit 5 received in evidence.)

4   BY MR. HELLER:

5   Q.   Mr. Kurrus, you testified yesterday about the cost of

6   acquiring the land, rehabbing the office building short term and

7   rehabbing the warehouse long term for the west Little Rock

8   school.  Could you just summarize that for our purposes today

9   and come to a total expected cost of all of the work that's

10  needed to have that school open as a six, seven, eight middle

11  school.

12  A.    Surely.  The land cost is by contract $11.5 million.  We'll

13  have some additional costs of -- with respect to due diligence,

14  but let's just call that $200,000.  Various things that relate

15  to soft costs associated with that.

16      Then we know that we're going to spend -- we've got solid

17  preconstruction estimates, and that's all they are.  We don't

18  know exactly what we'll spend because the way these projects

19  come together, until you open the bids, you don't know what

20  you're going to spend.  What you do is, you consult architects

21  and engineers and you get preconstruction estimates, and the

22  preconstruction estimates that I've gotten from people who know

23  that building pretty well, to do the rehab on the office

24  building, to open the sixth grade, range up to about $400,000.

25  Could be a little bit more.  Could be a little bit less.

1    That includes furniture, I think.  I need to get some

2  clarity on that.

3    But then on the other side, when we get over to the big

4  warehouse, it's 170,000 square feet under roof.  That's a very

5  large building.  The cost that I'm working from, and maybe I'm

6  negotiating, because I know this number is public, I think we

7  can rehab the building, build a gym inside the building, which

8  is going to save us some money, and then have a play field for

9  about $20 million.  I think others think it's going to range

10  upwards to 25, but we won't know until we open the bids.  I just

11  don't want to throw that 25 -- we're going to negotiate very

12  hard on that, but if it's 25, then you add -- if that's what it

13  turns out to be, then you add those numbers I just gave you, say

14  400,000 in the office building, 11.7 million in the -- with

15  respect to the land acquisition, and then 25, and that will give

16  you the total.

17         THE COURT:  What's the total?

18         THE WITNESS:  Let me do the math.  If we go with the

19  25 and add 11.7, that's 36.7.  And then if you add 400,000 to

20  that, that would be 37.4.  I think it's going to be slightly

21  less than that.

22         THE COURT:  And the plan for -- I'm sorry, Mr. Heller.

23  May I?

24         MR. HELLER:  Please.

25         THE COURT:  You're got my curiosity piqued because

1    this is the first I've heard about what's going to happen to the

2    big building or what the thought is.  Say some more about that,

3    please, Mr. Kurrus.

4              THE WITNESS:  Okay.  The big building will be

5    repurposed into a 1,200-seat middle school.  That will be

6    ultimately the middle school.  The middle school will not be in

7    the office building.  We're just temporarily opening in the

8    office building to get started.  We have tremendous demand, as

9    you've seen, and it was my decision that if we could get open

10   immediately, that was the smartest thing we could do.

11        So we're going to repurpose -- the building has movable

12   walls.  It's relatively inexpensive to get started in that

13   facility.  It's real money, but the long-range plan is to have

14   all of the middle school in the repurposed warehouse facility,

15   and that will be roughly a 1,200-student middle school.  Then

16   we'll take the office building, which is a 70,000-square-foot

17   Class A office building, and we will -- again, everything we do

18   over there is going to be designed to undo, and then we'll have

19   that available for office space if necessary.  Frankly, we could

20   use some office space.

21             THE COURT:  The gym and play field, that's the first

22   I'd heard about that.  Is that in the warehouse, too, or will be

23   in the warehouse, too?

24             THE WITNESS:  Yes, sir.  The way the warehouse is --

25   you'd almost have to see it.  It's a huge building.  The gym

1   itself will be inside of the current building envelope, which is

2   a big cost savings.  We don't have to go outside and build a new

3   gym.  We can build it inside this building.

4         Now, the play field itself will be outside, and then we

5   have the additional 40 acres for future expansion.  But the net

6   result is that we do have a really first-class facility.  Now,

7   it is repurposed.  It's not going to be exactly what we would

8   build from the ground up, but we save something in the order of

9   $17 million by doing it this way, and we end up with a

10  $70,000 -- 70,000-square-foot Class A office building as a

11  bonus.  So we spend about $17 million less than we would under

12  the initial board's calculations in some of this Fanning Howey

13  stuff, which is in the range of 55 million, depending on where

14  you look.

15        We're going to spend, say, even on the high side, 38.  We

16  end up with a 1,200-student middle school and a 70,000-square-

17  foot office building.

18               THE COURT:  Thank you, Mr. Heller.  That's helpful.

19               MR. HELLER:  Yes, your Honor.

20  BY MR. HELLER:

21  Q.   Mr. Kurrus, you mentioned the Fanning Howey estimate of the

22  cost of building the new west Little Rock middle school from the

23  ground up.  Would you look at page 99 of Exhibit 1.

24  A.   Yes, sir.  I'm there.  That's -- let me let you ask.  I'm

25  sorry.

1   Q.   What did Fanning Howey estimate the cost of building a new
2   middle school from the ground up at?
3   A.   Well, I'm sorry.  I'm on the wrong page.  It's page 91?
4   Q.   Yes.  It should be on the screen.
5   A.   Well, it is, it's just I'm not getting quite the whole -- I
6   don't believe that's page 91, but --
7   Q.   I'm sorry.  It's page 99.  Exhibit 1, page 99.
8   A.   I'm sorry.  Let me get there.
9        Yeah, this is their scenarios where they were working
10  through numbers on the new west Little Rock school, and what
11  they came up with was $54,753,000 price tag for the new school
12  in -- new middle school in west Little Rock.  That's the number
13  on the far right of this page.  54,598,961 is their number.
14  Q.   So you end up with about a $17 million savings, plus a new
15  office building.
16  A.   Exactly right.
17  Q.   What's the new office building worth?
18  A.   Well, if you have a -- if you need it, it's worth a great
19  deal.  I have to be -- without being flippant about that.  If
20  you need office space, Class A office space would cost between
21  200 and $250 a square foot to construct.  So you do the math.
22  It's a really valuable piece of real estate.
23  Q.   Let's talk about the current status of the southwest Little
24  Rock high school.  Could you explain to the Court, please, where
25  we are right now and -- well, let me show you a document which

1    might facilitate this.

2         Can you identify, Mr. Kurrus, what we've marked as

3    Defendants' 12?

4    A.   Yes, sir.  This is the schematic work plan or the design

5    timetable.  It includes design, planning, and construction for

6    the new southwest high school, and that's been prepared by the

7    architects that we've retained.

8    Q.   And Defendants' 13.

9    A.   Yes.  What Polk Stanley did here was just basically expand

10   that timetable and graphically demonstrate on a calendar the

11   various items of work.  You can see various kickoffs to define

12   concepts and all that sort of thing.  And it comes across the

13   page and reflects the timing and scheduling for various things

14   that ultimately result in the construction of the southwest

15   Little Rock high school.

16        MR. HELLER:  Your Honor, I move the admission of

17   Defendants' 12 and 13.

18        MR. WALKER:  No objection.

19        THE COURT:  12 and 13, the southwest high school plans

20   or timetable, will be admitted without objection.

21        (Defendant LRSD's Exhibits 12 and 13 received in evidence.)

22   BY MR. HELLER:

23   Q.   Now, Mr. Kurrus, back to the status report, could you tell

24   us, please, what's going on right now and are we on track to

25   open a southwest Little Rock high school in accordance with

1    Exhibit 12, the design work plan?

2    A.    Yes, sir.  We are full throttle on that project right now.

3    We hired the architects actually on the same day for both

4    projects, and we are working as hard as we can.  I have teams

5    assembled and people assigned who are working on this project

6    and we are moving out.  The architect has been participating in

7    a number of meetings, community meetings and that sort of thing,

8    and we're moving out to get started on this as fast as we can.

9          There's a lot of -- you'll see this various -- if we could

10   go back to the other exhibit, you can see where we are and we're

11   tracking.

12         You can see it on here.  It's just not quite as easy to

13   see.  But we're looking at these things that are in Item No. 4.

14   People are assigned and they're doing those things.

15   Q.    Do these two construction projects involve any minority

16   contractor commitments?

17   A.    Yes, sir.  When we started this, I pulled our policy, and

18   we're going to adhere strictly to our policies, which are, as I

19   recall, 30 percent minority, 30 percent women, and we're going

20   to adhere to that.

21   Q.    How do you plan to pay for the southwest Little Rock high

22   school?

23   A.    Well, I went through the numbers yesterday, and I won't go

24   all the way through them again, but we can save enough money,

25   which is really the part of this whole thing that's missing, and

1   I'm going to elaborate just a bit.  I won't make it long.

2       But under the old plan with the board, which is not exactly

3   what we're doing now, but we're not going to pass a millage to

4   build a southwest Little Rock school, nor to build the west

5   Little Rock school.  We are aggressively reengineering our

6   school district and making it more efficient, cutting costs as

7   far away from the classroom as possibly we can.  It's a very

8   difficult process, but we're making a lot of progress.  And that

9   was all outlined in -- this was the plan I came up with and

10  posted, it's on the website still, on June 15.  I'm following

11  along with this plan.  Everybody wonders what's the plan.  It's

12  on the website.  And it's dated June 15.

13      What we've done, with a tremendous amount of teamwork, and

14  I'm very proud of our team, we're cutting costs aggressively,

15  we're moving as fast as we can to become more efficient and

16  effective, and we're saving this money during these periods that

17  we can and we're putting that money back in a capital fund.

18  That capital fund will approximate conservatively $107 million

19  or so by the time we get -- and the cash flow is such that we

20  can build schools for that amount of money based on conservative

21  estimates right now.  And that's without freeing up any

22  additional monies for bonding.

23      Again, to understand the complete plan, you have to

24  understand how we finance schools.  I won't get into that too

25  completely, but we have 12.4 mills of our 46.4 mills that are

1    taxed in our school district.  Those 12.4 are dedicated debt

2    service mills.  They don't have to be spent for debt service.

3    They can be spent for operations.  We currently spend four of

4    those mills -- four mills on a tax base of $3.2 billion is a lot

5    of money.  But we spend that on debt service already, about 4

6    mills worth.  But we've still got dedicated debt service mills

7    that we can spend for bonding up to the 12.4.

8            And if we can continue to become more efficient and

9    effective and do all the things that we need to do to bring

10   ourselves within state standards, then we'll have money in the

11   out years, based on our current millage, and, again, that's a

12   primer on where we are.  That's in the out years.  It's harder

13   to predict out three to five years.

14               THE COURT:  Mr. Heller, may I interrupt?

15               MR. HELLER:  Sure, your Honor.

16               THE COURT:  I should have given you a heads-up on this

17   yesterday and I forgot.  It's like the best point in oral

18   argument.  You think about it when you're on your way home.

19   Right?

20         Mr. Kurrus, when you ran through the numbers yesterday on

21   how -- your plan to save this $107 million capital fund, how to

22   create it, it went too quickly for me.  Could I ask you to go

23   through that again more slowly?

24               THE WITNESS:  I'm sorry.  Yes, sir, I will.  And I'll

25   do it the same way I did it yesterday.

1        Some of these numbers are estimates, I should tell you up

2    front.  But I do know a couple of the hard numbers.

3        If you look in our bank account today, I think we've got

4    around $55 million.

5               THE COURT:  Okay.

6               THE WITNESS:  I will also tell you if you looked at

7    our February financial statement, February 29 this year, it's a

8    leap year, you would see that this year, we've spent $16 million

9    less on personnel, that's direct costs and benefits, than we

10   spent the year before.  Amazing.  We've spent $16 million less

11   this year than we did the year before without cutting any

12   classroom -- anything inside a classroom.

13       We're proceeding to do that and continuing to do that.  But

14   what that tells you is -- and we're tracking this year to have

15   at least $55 million in the bank on June 30.  We operate on a

16   fiscal year.  First day of the year is July 1.  Last day of the

17   year is June 30.  But on June 30 of this year, we can project at

18   least $55 million in the bank.

19              THE COURT:  And the reason that money will be there,

20   you think, is because of the continued savings on personnel as

21   well -- are there other efficiencies or no?

22              THE WITNESS:  Yes, sir.  There are other efficiencies

23   within that, but it's primarily -- we are a personnel-driven

24   institution.  We spend almost in the 70s in terms of percentages

25   of our money goes direct to people.  We hire a lot of people,

1    and that's where the money goes, to people.

2        So when you look at cutting costs, you have to determine

3    how to become more efficient with use of your personnel.  But

4    we're making other cuts as well, in areas such as

5    transportation.  We're reducing the number of contract days that

6    our people work.  For example, again, just to give you the

7    context and the color of the whole process that's so important

8    is that my contract is an annual contract, this year.  Next

9    year, if I'm under contract, and I'm not presently, but if I

10   were, I would have five fewer contract days, which would result

11   in a reduction in my pay of $3,000 next year.

12       Our teachers have agreed so graciously, it's hard, but

13   they've agreed to work 190 days next year rather than 192.  None

14   of that money is counted by these figures I've given you.  But

15   that's the sort of thing we're doing.  We're becoming more

16   efficient.  And that's in essence a salary cut.  People work

17   fewer days.  But that's the kind of savings we're doing.  We're

18   analyzing transportation.  We're analyzing utilization of staff

19   with respect to safety and security.  All these things go into a

20   lot of hard work that results in spending less money this year

21   than last and less money next year than this year.

22            THE COURT:  Okay.  So we're -- I'm at 55, and you say

23   we're going to get to 107 on that capital fund.  What are the

24   other pieces?

25            THE WITNESS:  Well, let me tell you, take -- we need

1    to leave about $25 million in the bank at all times.  So we're

2    only going to take -- of that 55, we're not going to put it all

3    in the capital fund.  We're going to have a cushion, you know,

4    just operating capital, and if you leave -- let's just leave 30

5    million in the bank, which the benchmark is 10 percent of your

6    budget.  That will be more than 10 percent of our budget.  So

7    we'll have an ample reserve, a rainy day fund of 30 million.

8         So you take 25 million and put it in your capital fund.

9    Then for the '16-17 year, we're going to add another 25 million.

10   We're going to surplus $25 million next year, next fiscal year,

11   and so by -- on July 1, 2017, we'll put another $25 million in

12   this capital fund.

13             THE COURT:  So now we're up to 50.

14             THE WITNESS:  We're up to 50.  Now, what we did

15   already is we refinanced some bonds that we had that were at a

16   high rate of interest, and we refinanced those and netted $5.9

17   million in cash.  We've got that money, or the first

18   installment.  We'll get the next installment soon.  But we'll

19   get $5.9 million in refinancing proceeds.  And I should add that

20   we did not extend the term of the bonds; we simply lowered the

21   rate.  So we didn't stretch the debt out over more time or

22   borrowed more money.  We simply realized that due to reduction

23   in interest rates in the low rate environment we're in.  So

24   refinancing bonds, that's another 5.9.

25        Then the way the tax system works, we all get assessments,

1    and there is some growth in our school district and we've got

2    growth projections both based on our tax base -- you know, we

3    tax at 46.4 mills we discussed, a mill being a thousandth of a

4    dollar.  So every time somebody builds a house in our school

5    district, we get 46.4 mills times the value of that house times

6    20 percent.  But to make a long story short, our revenues are

7    going to grow every year by the natural growth in our valuation

8    in our tax base.

9         Over this two-year period, I anticipate that growth, plus

10   the growth from the school funding formula, which is meager, and

11   perhaps -- I won't say any more about it, but it's slightly less

12   than 1 percent this year.  We receive in foundation funding

13   $6,646 this year.  That's a basic amount of money under *Lake*

14   *View* that you need to start with to start figuring out how to

15   have efficient, effective education in Arkansas.  But that

16   number goes up slightly every year, and it will go up a total

17   this year of just less than 1 percent, and it's anticipated

18   again to go up.  But when you add the increase in our tax base

19   as well as the basic increase in the amount of funding that

20   we're going to get through the state in that foundation funding

21   increase, I think that's $12.5 million more that we'll have

22   through that apparatus.

23        Then finally you get to the 37 million 347 -- I'm mixing

24   the number.  The last one is 429.  It's $37,347,429 is the

25   amount of that last installment, if I'm correct.

1           MR. HELLER:  Pretty close.

2           THE WITNESS:  Somebody look at me.

3       Anyway, just call it 37.3.  When you bundle all that up,

4    that gets you to about $107 million, I believe.  56, 76, 78, and

5    it's a little bit more, but that's how you get there.

6           THE COURT:  Okay.  That's helpful, and I appreciate

7    you walking me through it.

8       Mr. Heller, back to you.

9    BY MR. HELLER:

10   Q.   One last topic, Mr. Kurrus.  Could you talk about whether

11   there will be any harm to the Little Rock School District if the

12   requested injunction is granted.

13   A.   I think we'll really suffer a great deal.  The direct harm

14   is that we lose the opportunity to close on the real estate, and

15   it's a whale of a buy.  It's -- I think we're getting a very

16   square deal.  I know that the listing price of the property was

17   $14 million, and we negotiated hard.  I think we got a real good

18   deal on that land.  Maybe we could renew that or extend it.  I

19   don't know.  But if we don't give notice to close, we are at

20   risk of losing the benefit of acquiring that real estate.

21       But what's worse is that we've proceeded along as we should

22   have, I think, to enroll students, to hire staff, to devote

23   effort and thought to the curriculum and everything that goes

24   along with opening a school.  We've got kids that are wanting to

25   go there, parents that have counted on us to open as we said we

1    would.  The damage not only to their families but to our

2    reputation will be immense, and I think that will be very

3    damaging.

4         I think it's likewise damaging to, I guess, call a halt on

5    our work in southwest.  I put these projects on parallel tracks

6    and we're pushing just as hard on one as the others, but if we

7    have to stop right now on the southwest Little Rock school, that

8    pushes us further down the road to fixing what I consider to be

9    a priority one problem, and that's Cloverdale.  We're going to

10   keep Cloverdale like it should be and we're going to do it

11   whether the injunction is issued or not.  But every day that

12   goes by puts us further down the road to ultimately solving

13   Cloverdale, the critical one issue.

14        And the competition is getting ahead of us.  If we don't

15   compete in this world now, whether we think it's fair or not, we

16   have to do what we have to do, and our competitors are running

17   hard at us.  They run hard at our kids.  We see our kids

18   leaving, our middle school kids leaving.  Our enrollment numbers

19   are down.  We cannot continue to passively sit back and wait for

20   other people to take our kids.  They're taking African-American

21   kids, Asian kids, and white kids.  They don't care who they are.

22   We've got to get aggressive and we just don't have the time to

23   waste, and we lose great opportunity for next year, which we

24   need to seize the day.  And I think it's critical, and if we

25   don't, I think our school district will be harmed in general,

1  our students will be harmed in particular, and I think it would

2  cause great damage to our district's reputation, which is the

3  most important thing that we own.

4          MR. HELLER:  Pass the witness, your Honor.

5          THE COURT:  All right.  Thank you, Mr. Heller, and I

6  particularly appreciate your tolerance of me asking questions.

7  Even though you don't have any choice in that, do you?  You bear

8  it with good humor.

9      Counsel, let's take our morning break, and then we'll go on

10  with other examinations of Mr. Kurrus.

11      We'll come back at 20 till.  Y'all can keep your seats.

12  We're in recess.

13      (Recess from 10:24 a.m. until 10:45 a.m.)

14          THE COURT:  Y'all can be seated.

15      Mr. Walker, before you begin, Ms. Middleton or

16  Mr. Hollingsworth, do either of y'all have any questions?

17          MR. HOLLINGSWORTH:  No, your Honor.

18          THE COURT:  Okay.  Mr. Walker.

19          MR. WALKER:  Thank you, your Honor.

20                      CROSS-EXAMINATION

21  BY MR. WALKER:

22  Q.   Mr. Kurrus, isn't it true that on August 14, 2015, you

23  informed the public that you did not intend to add a new school

24  in west Little Rock without a comprehensive building plan for

25  the entire district?

1   A.   That would not surprise me, no.  I think that's probably

2   true.  Was that in a speech, Mr. Walker?  I don't recall

3   specifically.  But, yeah, that would be my statement at that

4   time.

5   Q.   Do you have a comprehensive building plan for the entire

6   district?  That's yes or no.

7   A.   No.

8   Q.   Thank you.  Did you say on August 14, 2015, that you

9   wouldn't even look at the former Leisure Arts Building until the

10  district can also address the very severe needs we have in south

11  central Little Rock and southwest Little Rock?  "Before I step

12  out on west Little Rock, I want to be able to tell the

13  community, the friends I live with, this is what we are doing

14  everywhere"?

15  A.   Yes, sir.  That's a true statement.  Yes, sir.

16  Q.   You have looked at the Leisure Arts Building without a

17  comprehensive plan; right?

18  A.   Well I looked at the --

19  Q.   Yes or no?

20  A.   No, that's not quite true, Mr. Walker.  What I've done is

21  exactly what I said I was going to do, address those two needs.

22  That was my view in August of 2015.  There's been a lot of water

23  over the dam since then, but, yes, sir, I think we're doing the

24  right thing by southwest and northwest, and that's what I

25  intended by that statement.

Kurrus - Cross                                    292

1    Q.    Did you also say on August 14, 2015, you have already

2    formulated in your mind a plan for closing small and inefficient

3    schools and building modern schools that can accommodate

4    students' needs in regard to technology, laboratory,

5    instruction, art, and music?

6    A.    Yes, sir.

7    Q.    Do you have such a plan?

8    A.    I have the same plan then as I -- today as --

9    Q.    Just yes or no.

10   A.    Yes, sir.  I have that plan in my head.

11   Q.    It's in your head?

12   A.    It is.

13   Q.    That's right.  You do not have a written plan and it's not

14   one that's been approved by the superintendent, or at least the

15   school board, Mr. Key, is it?

16   A.    No, sir.

17   Q.    All right.  Did you say to the -- is it the Kiwanis Club?

18   A.    I think you're talking about my Rotary speech.

19   Q.    Rotary.

20   A.    Yes, sir.

21   Q.    Did you say to the Rotary Club this year that Little Rock

22   School District is losing students in the middle and upper

23   middle classes?

24   A.    Yes, sir.  That's a fact.

25   Q.    Did you say that the Little Rock School District will not

1   survive if all the kids it serves are children of great need?

2   A.   Yes, sir.  That's a fact, too.

3   Q.   Did you also say:  "Don't think for a minute that we can

4   continue to have students leave our district who are easier to

5   educate, more fluent, and without special needs and still have

6   the good old Little Rock School District.  It won't be there for

7   you"?

8   A.   That was my statement, yes, sir, and it's true today.

9   Q.   Do you recall yesterday saying that you didn't remember

10  saying anything about trying to retain the easier-to-educate

11  children?  Do you remember saying that?

12  A.   No, I don't remember saying that yesterday and I don't

13  believe I did.

14  Q.   You don't remember saying that yesterday?

15  A.   I don't remember saying that -- and I'm not going to fuss

16  with you about it, but I don't remember saying that yesterday,

17  Mr. Walker, no.

18  Q.   You indicated, did you not, that this was a community

19  decision?  It's important for the community to make the

20  decision, leaving it to the community to decide what to do?

21  Isn't that what you said?

22  A.   That's the process we're undergoing right now.  Yes, sir.

23  Q.   How are you leaving -- how are you leaving this process of

24  school construction and replacement, how are you leaving it to

25  the community now?

1   A.   Well, it's not the whole process, no.  But what we're doing

2   now -- may I answer?

3   Q.   My question, how are you leaving it to the community?

4   A.   Well, you've attended the community civic advisory

5   committee meetings.  I think you may or may not have read my

6   June 15 report.  And what we're doing at the present time and

7   what we can talk about at length, if you'd like, is the fact

8   that we have -- I've asked the community -- as early as June 15,

9   it's in writing on the website -- a series of questions about

10  schools, school replacement, whether we want to continue to

11  operate schools which are below the state standard for funding.

12  That's all in the record, Mr. Walker, and I don't dispute or

13  deny any of it.

14  Q.   Isn't it true that you have told them, however, that

15  whatever their opinions or points of view, you make the

16  decisions?

17  A.   Well, I think it's an advisory committee.

18  Q.   Yes or no?

19  A.   I have not used those words to them, no, sir.  Not in such

20  words.  But they are an advisory committee and I intend to

21  listen to their advice.  But I don't know what it's going to be,

22  so I can't -- and I'm not going to commit to take anybody's

23  advice until I know what it is.

24  Q.   Did you also tell the Rotary Club -- that's a group of

25  virtually all white people in this town, isn't it?

1    A.    I don't know.

2    Q.    When you were at that meeting, where was it held?

3    A.    It was held at the Clinton Center, as I recall.

4    Q.    Oh.  Is it not true --

5    A.    I was invited.  I'm not a member of the club, but I don't

6    know who is in it.

7    Q.    Is it not true that virtually all of the people who were

8    present were members of the white community?

9    A.    I think that's probably true, but I don't really know.

10   Q.    "If you like Detroit, you're going to love Little Rock," he

11   said.  "It's that simple.  I would be lying to you if I didn't

12   tell you what I know and what I've learned from my studies,

13   which is we don't -- if we don't change this community, it's

14   going to be like Detroit."

15         Do you remember saying that?

16   A.    I said every word of that.  Yes, sir.

17   Q.    And I asked you yesterday about the comparison to Detroit

18   and you had a different memory.

19   A.    No, I did not.  I told you yesterday about Detroit and I

20   can talk about Detroit today if you'd like.  But it's very

21   serious business we're in, Mr. Walker, and it's a very serious

22   time, and that was point of that speech.  And it rang true then

23   and it's still true now.  And I don't regret saying it.

24              THE COURT:  Mr. Kurrus?

25              THE WITNESS:  I'm sorry.  Excuse me.  I apologize.

1          THE COURT:  I'm pulling in the rope a little bit.  Get

2   another drink of water and please respond as pithily as you can.

3          THE WITNESS:  I will.  Thank you, sir.

4   BY MR. WALKER:

5   Q.   Did you tell the Kiwanis Club -- let me make sure of the

6   date of this -- November 4, 2015:  "The district will now have

7   to find ways to cut 37.3 million in state aid from its $319

8   million budget and find $10 million more to help finance a bond

9   issue to pay for a new high school in southwest Little Rock and

10  a middle school in the northwest part of the city"?

11  A.   No, I don't think I said that.  That was actually the

12  Rotary Club speech again, but --

13         MR. WALKER:  Your Honor, I've provided the Court a

14  copy of a document we've marked for identification as No. 9.

15      May I approach Mr. Kurrus?

16         THE COURT:  You may.  Mr. Heller, do you have it?

17         MR. HELLER:  I do, your Honor.  I think I do.

18         THE COURT:  Okay.

19         MR. HELLER:  I've got one.

20  BY MR. WALKER:

21  Q.   Does that refresh your memory, Mr. Kurrus?

22  A.   That's not what I said.  I see that's where it's written,

23  but I didn't say that.  I can tell you what I said.  It's the

24  same thing I said today.

25  Q.   That's all right.  Mr. Kurrus, you're quoted there, but if

1    you say you didn't say it, that's fine.

2    A.   I did not.

3    Q.   Have you ever told a group of people that as late as

4    November or December of last year that in order to build a

5    school in southwest Little Rock and to address the other

6    problems of construction, that you need to have a millage?

7    A.   No, sir.

8    Q.   That's fine.

9            MR. WALKER:  Move the admission of No. 9, your Honor.

10           THE COURT:  Mr. Heller?

11           MR. HELLER:  No objection, your Honor.

12   BY MR. WALKER:

13   Q.   You were aware of Mr. Suggs, Dr. Suggs -- he was Dr. Suggs

14   for a long time, until we brought to the attention of the public

15   through Mr. Campbell that he was no longer Doctor.  Were you

16   aware that it was the plan of the district under his leadership

17   to submit the millage -- the facilities plan to a millage vote?

18   A.   I think that was the board's plan, and I guess it was his

19   as well.

20   Q.   I see.  Well, you understood that the board intended to do

21   that and this was a comprehensive plan rather than just picking

22   and choosing what you wanted?  You understood that, didn't you?

23   A.   No, sir.  I'll take your word for it, but that wasn't my

24   understanding.

25           MR. WALKER:  May I approach, your Honor?  I do not

1    have a copy of this.

2           THE COURT:  You may, and I'm going to admit nine given

3    that there's no objection.

4           MR. WALKER:  Thank you.

5       (Plaintiffs' Exhibit 9 received in evidence.)

6    BY MR. WALKER:

7    Q.   I show you what is entitled:  Overview of Steps to LRSD

8    Facilities Plan and Successful Millage Vote, from the desk of

9    Superintendent Dr. Suggs.  Would you look at that, please.

10   A.   Sure.

11          THE COURT:  Do you have a copy, Mr. Heller?

12          MR. HELLER:  I do not, your Honor.

13          MR. WALKER:  Your Honor, that's the only one I found

14   this morning and I didn't have time to copy it.

15          THE COURT:  All right.  Mr. Heller, why don't you

16   approach so you can look at it up here.

17       Mr. Hollingsworth, you as well.

18   BY MR. WALKER:

19   Q.   Mr. Kurrus, have you seen this document before?

20   A.   I'm not sure.  I really can't recall seeing it.

21   Q.   Isn't it true that the board contemplated a millage for

22   approximately $800 million or more in order to address all the

23   urgent needs of the district?

24   A.   The millage wouldn't have been 800 million.  You may be

25   discussing the amount of the bonds that would be issued.

1    Q.    Yes, the amount of the bonds.  Millage election.

2    A.    That was my understanding, yes, sir.

3    Q.    Do you contemplate at any time expending $800 million or

4    more, as Fanning Howey recommended, in order to address the

5    needs set forth in the facilities study?

6    A.    Do I contemplate it at any time?

7    Q.    Yes, sir.  Do you have a contemplation that you will spend

8    that much money to address the facilities needs identified in

9    Fanning Howey?

10   A.    No, not -- that wouldn't be a fair statement, no, sir.

11   Q.    Thank you.  So you have no plan at all for a millage, do

12   you?

13   A.    No.  I have a plan and I can recite it to you, but it's not

14   a plan for a defined millage.

15   Q.    I see.

16   A.    Would you like to hear it?

17   Q.    No, sir.

18   A.    I shouldn't ask you a question.  I do have a plan, yes,

19   sir.

20   Q.    Do you have it in writing?

21   A.    No.

22   Q.    All right.  So all of your plans are in your head and

23   you've sort of spotted them out to the various people with whom

24   you've talked from time to time; is that correct?

25   A.    No, that's not right.

1    Q.    Well, you talked to the Kiwanis Club and you told them

2    about your plans, didn't you?

3    A.    That was the Rotary Club and --

4    Q.    Rotary.

5    A.    Yes, sir.  I told them what I told them, yes, sir.

6    Q.    And you talked to Mr. Key and you told him what was in your

7    head, didn't you?

8    A.    I don't quite know what that means, Mr. Walker, that I told

9    him what was in my head.  I talk to Mr. Key frequently and

10   openly about what I hope we can accomplish in our school

11   district.  That's a fair statement.  Beyond that, I don't talk

12   to him about necessarily everything in my head, but --

13   Q.    Well, let me not go there.  But you say you talk to Mr. Key

14   frequently.  That means, since you talk to Mr. Key about Little

15   Rock School District business, you're not doing it in compliance

16   with the law, are you?  Because the law requires that whenever

17   you all meet, it's a public meeting, and it's got to be given

18   notice to the public and we can participate as members of the

19   public.  So these frequent meetings have not been participated

20   in by the public, have they?

21              MR. HELLER:  I object to the compound --

22   A.    Yeah, I don't know what that --

23              THE COURT:  Hold on.

24              THE WITNESS:  I'm sorry.

25              THE COURT:  Mr. Walker, questions, please.  Save the

```
 1   argument.
 2           MR. WALKER:  Thank you.
 3           THE COURT:  Okay.
 4           MR. WALKER:  Thank you.
 5           THE COURT:  But there was a question in there at the
 6   end.
 7           THE WITNESS:  Yes, sir.  I do not give notice to the
 8   press or the public when I talk to Mr. Key.
 9   BY MR. WALKER:
10   Q.   All right.  Now, do you have a steering committee to
11   address -- to address school construction?
12   A.   There's a committee on each school.
13   Q.   No.  My question is, do you have a steering committee to
14   address school construction and facilities as set forth in
15   Fanning Howey?
16   A.   I don't, no, sir.  We have a committee for each of the two
17   schools that we're working on, but I don't have a general
18   committee to do that, no.
19           MR. WALKER:  All right.  Your Honor, I can get this
20   document in through Ms. Springer, who I will call.
21           THE COURT:  All right.
22   BY MR. WALKER:
23   Q.   Now, yesterday you indicated that you don't plan to close
24   any schools this year; right?
25   A.   This year, meaning this calendar year or this --
```

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

1    Q.   This coming year.

2    A.   The '16-17 school year, no, we have no plans to close any

3    schools in '16-17.

4    Q.   Isn't it true you've already decided to close Geyer Springs

5    STEM school?

6    A.   We did not close that school.  We repurposed the school,

7    but we did not close the school, no, sir.

8    Q.   Let's let the Court know what you did.  At the time you set

9    up Forest Heights as a STEM school in the west, you also set up

10   Geyer Springs in the southwest as a STEM school, didn't you?

11   A.   I had nothing to do with that, Mr. Walker.  As you may

12   recall, I was not on the board then.  That was done by others,

13   including your clients.  But I had nothing to do with setting up

14   either one of those schools.

15   Q.   That's fine.  But you inherited a STEM school in the

16   southwest, didn't you?

17   A.   No, sir.

18   Q.   Wasn't Geyer Springs a STEM school when you became the

19   superintendent?

20   A.   Geyer Springs --

21   Q.   That's yes or no.

22   A.   -- is a gifted and -- the answer is no.  It's not a STEM

23   school.

24   Q.   Well, it's a G/T school; right?

25   A.   That's true.

1   Q.   All right.  And that was set up, according to your

2   information, at the same time as Forest Heights STEM?

3   A.   I wasn't on the board.  I think it was contemporaneously,

4   but I'm not certain.

5   Q.   Now, you have decided to close grades one through five for

6   G/T after the board -- you've decided to do that, haven't you?

7   A.   Yes, sir.  That's been done.

8   Q.   I see.  That's been done.  Did you get any input from the

9   community before you made the decision to close the school in

10  the black community?

11  A.   I talked to staff, I talked to principals, I talked to

12  parents.  I talked to a lot of people.  But I did not have a

13  formal process of community input, no, sir.

14  Q.   So you closed that school for how many students in K

15  through -- in 1 through 5?

16  A.   Of course, we didn't close the school, Mr. Walker.

17  Q.   1 through 5, how many students were affected?

18  A.   How many G/T students or total students?

19  Q.   Total students in grades 1 through 5.

20  A.   Well, I'd have to do -- I don't know the exact number.  I

21  do know how many kids were enrolled in the school at the time,

22  but if I may answer, a great many of those kids were pre-K

23  students, and a lot of those kids were not G/T students.  So

24  there were only a -- it seems like about 65 to 70 G/T students

25  out of a total of about 167.

1   Q.   There were 167 children in the school?

2   A.   That's counting the pre-K program.  I think that would

3   be -- that's my recollection, yes, sir.

4   Q.   So you caused those children, other than the kindergarten

5   children, to be assigned to other schools; is that right?

6   A.   They will be assigned for the next year, yes, sir.

7   Q.   They will be.  Where are they now?

8   A.   That school continues to operate through the balance of

9   this year.  It's not closed and it's not going to be closed.

10  Those kids are -- I'm sorry.

11  Q.   Where will they be assigned?

12  A.   They'll be assigned to their zoned schools.

13  Q.   I see.  Did you give each one of those students an

14  opportunity to be considered for the new school you contemplate

15  opening in the Leisure Arts Building?

16  A.   Well, they're not old enough to go.

17  Q.   Okay.

18  A.   They're not middle school students, Mr. Walker.  Those

19  kids -- just so you'll know, there's pre-K students down there

20  who weren't G/T, and a great many of them, I think 40 or maybe

21  just 20, I don't remember, but -- there were a total of 167

22  students there.  Less than half of them were actually G/T

23  students, and they were reassigned for the coming year.  They

24  could either go to magnet schools, and we gave them a magnet

25  school preference, or they could go back to their zone school.

1    Q.    You had a fifth grade there, didn't you?

2    A.    We did.

3    Q.    And those fifth grade students would be eligible to go into

4    middle school?

5    A.    They could.

6    Q.    Did you give them the option of being considered for the

7    new school?

8    A.    No, sir.

9    Q.    Thank you.

10   A.    Let me just say this:  They could go if they live in the

11   Fulbright, Terry, or Roberts zones, but that's how it works.  If

12   you live in the zone, you can go to the school.  It doesn't

13   matter where you go to school now; it's where you live.  And I

14   would be surprised if any of those kids actually live in that

15   zone, but there could be some.  But that's how it works.

16   Q.    All right.  Now, the attendance at that school is virtually

17   all black, isn't it?

18   A.    It is.

19   Q.    So the black kids who live in that area are precluded from

20   going to Leisure Arts?

21   A.    Well, yes, sir, they would be.  Sure.

22   Q.    All right.  Now, you indicated yesterday --

23              MR. WALKER:  One moment, your Honor.

24              THE COURT:  All right.

25              MR. WALKER:  I'm looking for an exhibit I know I have.

1            THE COURT:  I know the feeling, Mr. Walker.  It's

2    okay.

3            MR. WALKER:  Right in front of me, your Honor, and I

4    apologize.

5    BY MR. WALKER:

6    Q.   Yesterday, Mr. Kurrus, you indicated that you had no

7    involvement in property on Rawling Road with respect to the

8    Roberts school.

9    A.   That's absolutely true.

10           MR. WALKER:  If I may approach, your Honor.

11           THE COURT:  You may.

12   BY MR. WALKER:

13   Q.   (Hands document to witness.)

14   A.   All right.

15           MR. WALKER:  Your Honor, I have before me the minutes

16   of the November 16 board meeting.  I have excerpts, but I'll

17   share this with Mr. Heller.

18           MR. HELLER:  I've got the minutes.  Thanks.

19           MR. WALKER:  And I will make this Exhibit 10.

20           THE COURT:  These are minutes from November of what

21   year, Mr. Walker?

22           MR. WALKER:  2006.  And this is a copy for the Court.

23           THE COURT:  Thank you.

24           MR. WALKER:  And a copy for Mr. Kurrus so he won't

25   feel mistreated.

1   BY MR. WALKER:

2   Q.   Mr. Kurrus, would you go to the minutes where it deals with

3   suspension of the rules, and that should be three pages down.

4   Where it says, "Mr. Berkley made a motion to suspend the

5   rules --"

6   A.   Yes, sir, I'm there.

7   Q.   "-- to reorder the agenda, moving the west Little Rock

8   schools item in this point in the agenda.  Ms. Fox seconded the

9   motion and it carried unanimously.  Discussion and action on the

10  purchase of property for a west Little Rock school was conducted

11  at this point in the meeting.  Mr. Kurrus made a motion to place

12  a Rawling Road property under contract to purchase for 180 days

13  at a specified price in order to study the property and

14  determine if it is suitable for the building of a school,

15  including a study on engineering, zoning, and enrollment, and to

16  determine how building the school will impact the district as a

17  whole.  Mr. Berkley seconded the motion, and after a lengthy

18  discussion and a period of comments, the motion carried

19  unanimously."

20        Now, did you have occasion at that time to -- first of all,

21  did you at that time have an interest in that property on

22  Rawling Road?

23  A.   No, sir.  Not a single, solitary interest whatsoever.

24  Q.   Were you in an investment group that had an interest in

25  that property?

1    A.    No, sir.  Not a single, solitary dime of my money was

2    invested in that real estate.  Not a penny.  No interest of any

3    sort whatsoever.

4    Q.    During the discussion, the page right before D:

5    "Mr. Kurrus expressed optimism as the district moves forward to

6    build a first-class facility in west Little Rock and to then go

7    forward to build more schools.  He discussed the impact of

8    attractive facilities on the community."

9          So it was your intention at that time to build a facility

10   in west Little Rock and then thereafter to build facilities in

11   other parts of the district; isn't that correct?

12   A.    Speaks for itself.  Yes, sir.

13   Q.    Thank you.

14   A.    Whatever I said then is what I believed.  But I didn't own

15   any interest in the real estate.  I think that's point A.

16   Q.    "He noted that there will be similar needs in School Zone 7

17   then, with new housing and the schools in that area enrolling

18   more students."

19          Is that where the village -- at that time, was Zone 7 the

20   Villages of Wellington?

21   A.    Parts of the Villages of Wellington would be in zone -- I

22   don't have the zone map, but they --

23   Q.    The zone at that time -- Zone 7 at that time is not the

24   redone --

25   A.    I don't know, Mr. Walker.  I did the real estate work on

1   Villages of Wellington, but I never had any ownership interest
2   in it, if that's what you're asking.
3   Q.   Weren't you a party in managing the resources of
4   Mrs. Rockefeller, who was one of the investors in that property?
5   A.   No, sir.  She has no interest in the Villages of
6   Wellington.  You're conflating Winrock Development Company,
7   which the Rockefeller family had zero interest in -- neither Win
8   nor Mrs. Rockefeller own any interest in Winrock Development
9   Company.  And I explained that to you back in '06, although
10  you've forgotten it.
11  Q.   Do you recall Dr. Mitchell saying in a public meeting that,
12  Mr. Kurrus, you did not disclose to us that you had an interest,
13  and you explained to the public at that time that you were an
14  investor in a group that had bought this hill to be torn -- to
15  be addressed and that you had given up your interest in the
16  property?
17  A.   No.  I never had any interest on any property that's owned
18  by Winrock Development Company.  That company is owned by a
19  completely different family, not the Rockefeller family.  I have
20  never had any interest in it.  And the property on Rawling Road
21  is completely different from anything I've ever had a party of
22  ownership in, and Mr. and Mrs. Rockefeller never owned any of
23  that property, not the first square inch of that property.
24  Q.   We'll address that with Dr. Mitchell.
25       Now, with respect to the operation of the schools, are you

1    familiar with the ADE rules with respect to school assignment?

2    A.    With respect to student assignments to schools?

3    Q.    Yes.

4    A.    I'm familiar with those to some extent, Mr. Walker, but not

5    in particular, no.

6    Q.    Are you aware of what's known as ACTAAP Rule 12.01?

7    A.    No, sir, not in particular, I'm not.

8    Q.    Are you aware that students in distressed schools have the

9    first option for any new school spaces?

10   A.    I'm aware that they have the option to --

11   Q.    That's just yes or no.

12   A.    No, I don't think that's true.  No, I'm not aware of that.

13   That's not my understanding.

14   Q.    Have you given the students in southwest Little Rock first

15   option to attend the school that you contemplate at Leisure

16   Arts?

17   A.    Well, we're going to reserve seats as the law requires,

18   Mr. Walker, in every school, as we've done in years past, and

19   that's something we do.  We comply with that statute.  I'm not

20   the one that does that, but I'm familiar with it only in a

21   general way.  It's my understanding that's what we do.

22   Q.    Do you have a plan for the remaining seats in the Leisure

23   Arts Building to be offered to the current middle school

24   students who are enrolled in distressed schools?

25   A.    Yes, sir.  We'll comply with the state law, as we always

1    have, with respect to students in distressed schools, yes.

2    Q.    My question is, do you have a plan?

3    A.    Yes, sir.  We have a plan.

4    Q.    Where is it?

5    A.    It's at the Student Registration Office, where it belongs.

6    Q.    All right.  Now you've already gotten the population for

7    that school, haven't you?  You said that you have 220-some-odd

8    students already for it, you'd be losing faith to them if the

9    Court didn't go forward with this.  So you already have an

10   assignment plan.  Before you got those students together, did

11   you say to the students who are in distressed schools, schools

12   in school improvement, that they would have first priority to

13   leave their schools and go there?

14   A.    No, I would not have said that to them.

15   Q.    Thank you.  And you have never read ACTAAP rule -- do you

16   know what ACTAAP means?

17   A.    I do.

18   Q.    What is it?

19   A.    It means Arkansas -- no, I don't.  I'm going to let you

20   tell me the acronym.

21   Q.    That's fine.  I just want to point out the difficulty of

22   being a superintendent when you come from without the

23   educational community.

24   A.    Well I --

25   Q.    ACTAAP --

1           MR. HELLER:  Your Honor --

2           THE COURT:  Mr. Walker?

3           MR. WALKER:  I apologize again.  You cautioned me

4    yesterday, and I promise not to do it again.

5           THE COURT:  Thank you.

6      Mr. Heller, your --

7           THE WITNESS:  Arkansas Comprehensive Testing and --

8    let me see, Mr. Walker.  You've got me under pressure.  Arkansas

9    Comprehensive Testing and -- tell me the rest of it so I don't

10   have to worry with it.

11     You don't know it either then?

12          THE COURT:  Accountability Program maybe?

13          THE WITNESS:  Yeah, that's it.

14          THE COURT:  I'm drawing on my *Lake View* knowledge.

15     Mr. Heller, your objection that you started to make is

16   sustained, from earlier.

17          MR. HELLER:  Thank you, your Honor.

18   BY MR. WALKER:

19   Q.   Now, Mister -- you have gone about making staff decisions.

20   Isn't that true?

21   A.   Yes, sir, that's true.

22   Q.   Do you recall my inquiring of why the ratio of black

23   teachers was declining since you have been superintendent?

24   A.   I got your e-mail.

25   Q.   I see.  Have you studied to make a determination of whether

1    that's correct?

2    A.   Yes, sir.  It's not correct.

3    Q.   We'll address that.  But we do know that as of now, you

4    have made three decisions for your schools.  One, you've placed

5    Ms. Barbara Halford as your special assistant; is that correct?

6    A.   Right.

7    Q.   Did you do that with a posting?

8    A.   No, sir.  It's Halford actually is how you pronounce her

9    name, but, no, sir, we did not post the position.

10   Q.   You did not post the position.  Now, Ms. Halford as your

11   special assistant -- she's here in court with you; is that

12   right?

13   A.   It's Halford.  Yes, she's here.

14   Q.   I'm sorry.  And you just selected her notwithstanding your

15   nondiscrimination requirements of the district; right?

16   A.   Well, I selected her under the policies that exist,

17   Mr. Walker.

18   Q.   Well, isn't it true that --

19        MR. HELLER:  Your Honor, I'm sorry.  Excuse me,

20   Mr. Walker.  I'd like to make a relevance objection to this line

21   of questioning.  We're on notice to be here to talk about two

22   issues, and one has to do with spending money for a middle

23   school and one has to do with closing ten schools.  And this

24   is not in any way I can see related to either of those issues.

25        MR. WALKER:  We do have --

1            THE COURT:  Mr. Walker?

2            MR. WALKER:  We do have to put in a racial context,

3    your Honor, and we also have to show how the money is not being

4    properly spent.  And that's a lead-in question to my next one.

5            THE COURT:  Well, I'm going to sustain the objection,

6    and I'm going to make one of my own.  I also think we're beyond

7    the scope of Mr. Heller's examination.

8            MR. WALKER:  All right.

9            THE COURT:  And I want to -- I want to be fair, of

10   course, to both sides, but -- but we also need to keep the

11   proceeding focused, Mr. Walker.

12           MR. WALKER:  All right, your Honor.  Well, this goes

13   to Mr. Kurrus's statement yesterday that the district has plenty

14   of money.

15           THE COURT:  Has plenty of money?

16           MR. WALKER:  Yes.

17           THE COURT:  Well, he said that again today, so you can

18   ask about that.

19           MR. WALKER:  And here's the point, your Honor:  It all

20   relates to race.  There are these people that are being hired at

21   big salaries at a time when teachers are told that they have to

22   cut days in their salaries, and I would like to inquire about

23   that.

24   BY MR. WALKER:

25   Q.   If the district has plenty of money, why did you tell the

```
1   public -- that's my question.  Why did you tell the public that
2   you had to cut the budget in terms of school operations?
3   A.   Well, first off, the district has a high millage, 46.4
4   mills, and we have a lot of money in the bank.  But we also are
5   going to lose $37 million in revenue, Mr. Walker.  So what we
6   have to do is plan ahead.  So we're working out in the planning
7   stages of how to survive with less revenue.  We do have plenty
8   of cash now.
9        With respect to Ms. Halford, I eliminated a position, and
10  she came from the eliminated position at the same salary.  So
11  there was no net cost to the school district by moving her to an
12  administrative position where I'd already cut several other
13  people out of my office administratively.  So the net cost to
14  the school district was zero by moving her, and I'd already
15  reduced staffing in the superintendent's office and I'm
16  continuing to do that.
17            MR. WALKER:  May I inquire further, your Honor?
18  Briefly.
19            THE COURT:  Two questions, Mr. Walker.  Then let's get
20  back to the closing of the schools and the proposed Leisure Arts
21  school, which is really the focus.
22            MR. WALKER:  I'll go directly there.
23  BY MR. WALKER:
24  Q.   If you would go to page 31 of Fanning Howey.  Isn't it true
25  that Fanning Howey regarded all of the schools in the southwest
```

1  as fair to poor?

2  A.   I think that's true.  I'm not exactly sure what you mean by

3  southwest, but I think that's true, Mr. Walker.

4  Q.   Did not Fanning Howey also say that according to the FCI on

5  page 31, that that was the only district -- the only school in

6  the district which was in critical shape?

7  A.   Speaking of Cloverdale -- which I think is what they were

8  talking about?

9  Q.   Yes.

10 A.   I think that's true.

11      MR. WALKER:  I'm not sure of Mr. Heller's exhibit

12 number, your Honor, so I'll just put the Fanning Howey report on

13 the ELMO.

14      THE COURT:  It's No. 1.  And we're on page 31?

15      MR. WALKER:  Yes, sir.

16 BY MR. WALKER:

17 Q.   Now, their definition was that buildings with an FCI

18 greater than 60 percent, meaning it will take more than 60

19 percent of the cost of a new building to correct the immediate

20 physical needs, were graded as critical.  So that you had one

21 school that --

22      THE COURT:  Mr. Walker, I'm sorry to interrupt.  Could

23 I impose on you to move it a little -- look at the screen.

24 There we go.  Couldn't see it all.

25      MR. WALKER:  That better?

Kurrus - Cross

1          THE COURT:  Yes.

2     BY MR. WALKER:

3     Q.   There was only one school, Cloverdale Middle School, that

4     created a critical rating.  Now, you agree with that; right?

5     A.   That's true.  Yes, sir.

6     Q.   Does it say that the need for a school, a middle school in

7     west Little Rock, is more critical than replacing Cloverdale?

8     A.   Well, we went through that already.  What it says is that

9     there is a process, and what they've suggested and what the

10    board had decided to do was to proceed along the lines that we

11    discussed, meaning to rehab McClellan and then move Cloverdale

12    over there.  That's in this report as well as what the board had

13    planned on doing.

14         So, yes, Fanning Howey noted it's critical and then they

15    set forth -- I think is it on -- I don't know the page.  I

16    haven't memorized this book.  But somewhere later on, they talk

17    about that.

18    Q.   Well, I'd like a direct answer.  It does not say that the

19    west Little Rock school is more critical than it is to address

20    Cloverdale, does it?

21    A.   Well, that's an apples and footballs comparison.  One is a

22    critical note of an existing school building.  There was no

23    building to compare.  So Fanning Howey didn't do a critical

24    rating on a west Little Rock school.  It's not a similar thing.

25    They did put construction of a new school as a first priority

 1   under phase one.

 2   Q.   What makes the Leisure Arts Building and a west Little Rock

 3   school more critical than addressing quality facilities for the

 4   children in Cloverdale?

 5   A.   Well, it's exactly what we're doing.  It's not any more

 6   critical, one to the other.  We're doing both simultaneously.

 7   Q.   Well, when will -- according to your plan, which is, I

 8   guess, still in your head, when will a new Cloverdale be

 9   completed?

10   A.   It's not -- the plan is not just in my head, Mr. Walker.

11   Let me just tell you, the new Cloverdale will be the old

12   McClellan, which is the plan that the board put into motion,

13   it's what Fanning Howey recommends, and I don't know a better

14   way to do it.  It's the shortest distance between two points.

15   And, you're exactly right, it will take less time to open up the

16   west Little Rock school than it will be to complete the board's

17   general idea as well as Fanning Howey's.  That's just the fact

18   of the matter.

19             THE COURT:  Mr. Kurrus, I want you to resist the

20   temptation to argue with Mr. Walker and to push back.  And he

21   asked a direct question.  Please answer.  It was when.

22             THE WITNESS:  I'll do better.

23             THE COURT:  And so that was a date, and I think it's

24   already been covered.  Wasn't it 2021 or '22 when you -- isn't

25   that the date that you agreed yesterday?

1          THE WITNESS:  Yes, sir.  The date of the -- when

2     Cloverdale can move out would be the date when McClellan is

3     rehabbed.  And if the new school is built by the 2019 school

4     year, then we can immediately commence the refurbishing of

5     McClellan.  And that will take a little time, and we don't know

6     how long because we don't have the precise details of that, but,

7     yes, it will be sometime after 2019.  And the only thing I

8     wanted to say, which I -- I won't say anything else.

9          THE COURT:  Thank you.

10    BY MR. WALKER:

11    Q.   Does that mean that none of the students currently assigned

12    to Cloverdale will be able to have a new facility that is not in

13    critical shape?

14    A.   That's true.  The kids that go to Cloverdale will be going

15    to Cloverdale.

16    Q.   And I go back to my FCI question.  Do you plan at any time

17    to give them opportunity to attend Leisure Arts?

18    A.   They can transfer, Mr. Walker, and I think it's 10 percent

19    of the reserved seats, but the policy is what the policy is, and

20    I'm no expert on it.  But I think a child in a distressed school

21    can transfer, and we reserve a limited number of seats for those

22    transfers.  But I'm not an expert on that.  And they will be

23    given that opportunity, yes, sir.

24    Q.   So that under your rules, if the Court were to determine,

25    you could not assign all of the students from Cloverdale to

1    Leisure Arts?

2    A.    That's not what the board said they wanted to do anyway,

3    but, no, we have no rule where we can wholesale assign kids from

4    one attendance zone to the other.  We could change the zones.

5    There are a lot of things we could do.  But the policy of the

6    board is enunciated and their own minutes that we've got in the

7    record today talk about attending schools in their own zones.

8    So that's a fundamental precept of the previous board, and

9    that's still the policy of this school district.

10   Q.    Is it your representation to the Court that you are trying

11   to implement the policies of the old board?

12   A.    Not in -- I'm implementing the policies of the school

13   district, which are clearly in a book, and we have a policy book

14   and I am trying to implement those, yes, sir.

15   Q.    You're trying to comply with the wishes of the old board by

16   your frequent references to it?

17   A.    No, that's not true either.

18   Q.    All right.  Thank you.

19        Now, you indicated today that McClellan is in phase one at

20   this time; is that correct?

21   A.    Of the Fanning Howey report, yes, sir.

22   Q.    At this time do you have a comprehensive budget for that

23   school?

24   A.    No, sir, we do not have a budget for the rehab.  We've got

25   some estimates that are in the Fanning Howey report and that's

1    what we're working off of.

2    Q.    Are you aware that you have Southwest Junior High School

3    now being used as an alternative school; is that correct?

4    A.    Yes, sir.

5    Q.    You have it within your power to just convert that back to

6    a middle school, don't you?

7    A.    I guess I could.

8    Q.    That's right.  And that would give you exceeding middle --

9    that would give you exceeding capacity in west Little Rock,

10   wouldn't it?

11   A.    Well, if you'll define your geographic area, I can answer

12   your question.  But not --

13   Q.    University Avenue being the dividing line.  That's what

14   people usually call it.

15   A.    West Little Rock, that school, Bale, is just west of

16   University Avenue.

17   Q.    That's right.  And that's not -- it's not being used as a

18   school at this time, is it?  It's being used as an alternative

19   learning center.

20   A.    That's -- it's being used as an alternative learning

21   center, but the full building is being utilized, yes, sir.

22   Q.    But if you reused it as a middle school, you would have

23   capacity of another thousand students, wouldn't you?

24   A.    No, sir.

25   Q.    Well, at least 700.

1  A.    No, sir.

2  Q.    Well, what's the capacity of Southwest Middle School?

3  A.    Well, it's --

4              MR. HELLER:  Your Honor, excuse me.  My objection

5  again is to the relevance of all of this because there's -- the

6  question is whether Mr. Kurrus should be enjoined from doing

7  what he plans to do.  The fact that Mr. Walker can think of

8  several alternatives doesn't really bear on that issue.

9              THE COURT:  Mr. Walker?

10             MR. WALKER:  Your Honor, our position is to

11 demonstrate that Mr. Kurrus's position is not reasonable and

12 it's not something that requires urgent attention.  There are

13 other alternatives that are clearly available.

14             THE COURT:  I will let you explore them briefly,

15 Mr. Walker.

16             MR. WALKER:  That's my only question on that.

17 BY MR. WALKER:

18 Q.    You have an alternative, if you chose, to use Southwest as

19 a middle school, didn't you?  Or don't you?

20 A.     No, sir, not without a lot of other things having to occur,

21 which would mean closing the Hamilton Learning Center.  I guess

22 if we closed it and built another building for it or found a

23 place for it, then we could begin to reuse that school.  But the

24 fact of the matter is is that the kids from this part of town

25 who would be served by the west Little Rock school would have to

1  travel a great distance, Mr. Walker, to get to that school.  But

2  I guess among many things we could consider, that would be one

3  thing we would consider.  But it wouldn't seem to be prudent.

4  Q.    I'll follow up on that, if you will allow me.  This is

5  Defendants' Exhibit 4.

6       You have identified the Leisure Arts Center as being at the

7  extreme end of the Little Rock School District; is that correct?

8  A.    Yes, sir.

9  Q.    All right.

10  A.    That's where it is.

11  Q.    Which means that all of the students who are assigned to it

12  will have a long distance to go if they are around Terry and

13  other places; is that right?

14  A.    No, that's really not quite true.  I don't know how you

15  define a long distance, but some of the kids will have a very

16  short distance and others will have a longer distance.

17  Q.    All right.  Have you determined the distance that's

18  reasonable for children to travel to get to middle school?

19  A.    I think the art of the real, Mr. Walker, is such that, no,

20  I don't have a benchmark number in mind.  But I can tell you

21  this, that it's about eight and a half miles from that site back

22  to Henderson, and I know that's too far.

23  Q.    All right.  Now, look at the other side of the district in

24  Zone 7.  You've indicated that the new school which you all

25  contemplate is up around 630; is that right?  Interstate 30.

1    A.    Where the board bought the property is close to Interstate
2    30, yes, sir.
3    Q.    So all of the children who live in southwest Little Rock
4    and in the present zone, which would include downtown Little
5    Rock, would have to go there; isn't that correct?
6    A.    No, sir.
7    Q.    All the way from Zone 1 to Zone 7 to the end of the
8    district.  Is that right?
9    A.    No, sir.  That's not true.
10   Q.    Where would the kids in Zone 1 go?
11   A.    Well, they would go to high school where they go now.
12   Q.    Which is where?
13   A.    Which is mostly Central.
14   Q.    Isn't it true that the students -- isn't it true that
15   students within ten blocks of Central are not zoned into
16   Central?
17   A.    I don't have the -- if you'll provide me with the map, we
18   can look at the zones.  I don't know exactly.  But the Central
19   zone was designed -- I didn't design it.  It was designed a
20   long, long time ago, and it -- but I'd have to be looking at the
21   zone to tell you how many blocks away from Central the zone
22   would exist.  But I don't think the McClellan zone or the Fair
23   zone, either one, goes into Zone 1, which I thought was your
24   question.
25   Q.    Well, are you saying that the students from Zone 1 do not

1    attend school at McClellan?

2    A.    No.  We have students who could choose to attend McClellan

3    from Zone 1 if they drove themselves out there.  That would be

4    their prerogative under our current policy.  But I don't have

5    the zones in front of me, Mr. Walker.  I apologize.

6    Q.    Are you aware of court cases that caution against locating

7    schools on the perimeter of a school zone where the core of the

8    community is otherwise?

9    A.    No.

10   Q.    The core population is otherwise?

11   A.    I'm not familiar with those.

12   Q.    Did you ask your counsel to remind you of the case *Swann v.*

13   *Charlotte-Mecklenburg*?

14   A.    Mr. Walker, I did not.  I actually did not.  I'm familiar

15   with the case.  I took the property where I found it, and that

16   was -- I'm going to quit right there.

17            THE COURT:  Thank you, Mr. Kurrus.  You're two steps

18   ahead of me.

19   BY MR. WALKER:

20   Q.    Is there anyplace in the district further from the core of

21   the black community than the Leisure Arts Building?

22   A.    Well, where is the core of the black community, Mr. Walker?

23   Q.    Well, you're the superintendent.  You know where the

24   schools are.

25   A.    Well it's your term, not mine.  So if you'll define it,

1    I'll be happy to try to answer your question.  But I don't know

2    where the core of the black community is.

3    Q.   Where most of the black students live and attend school.

4    A.   I will say this:  I think it is fair to say that the new

5    school will be very far west in our Little Rock School District

6    zone as currently configured.  That's a fact.  And that's a long

7    way from central Little Rock.

8    Q.   And isn't it fair to say that on the western part of that

9    district, there are no more students; right?  On the other side

10   of this school, there are no more students?

11   A.   No more Little Rock School District students as currently

12   configured.  That's exactly right.

13          MR. WALKER:  All right.  Your Honor, Mr. Key is also a

14   defendant here as the superintendent, so I'd like to just

15   indulge the Court for a question with respect to the other

16   school in the district which he also superintends, which is

17   Pulaski County.  Mr. Key as the superintendent for Little Rock

18   has approved, he said, the Leisure Arts Building.  He also has

19   acknowledged that the Quest school is somewhere nearby, and

20   that's a charter school.  And I'd like to ask Mr. Kurrus if it

21   isn't true that planned a couple of miles away is a new Robinson

22   High School, all in west Little Rock, all right there together.

23   Isn't that true, if I may ask?

24          MR. HOLLINGSWORTH:  Your Honor, for the state

25   defendants, I'm going to object to the argument and ask that he

1    ask an actual question.

2                MR. WALKER:  I can make it a question, your Honor.

3                THE COURT:  The objection is sustained for reasons

4    that I previously indicated.  That one question, Mr. Walker, and

5    then we're moving on.  We're not trying the other schools issues

6    today.

7                MR. WALKER:  Well, your Honor, I'm trying to address

8    the urgency for the school because that's -- I'm not going to --

9    you're right, your Honor.  Okay.

10               THE COURT:  So what about this other school,

11   Mr. Kurrus?  Do you know anything about that?

12               THE WITNESS:  I know a little bit about what I've read

13   in the paper with respect to the county's plans, but I'm

14   certainly -- I'll try to answer questions about it, but I'm not

15   the authority on what the county is planning to do.  I'm just

16   not.

17               THE COURT:  Okay.  I think it's more a matter of

18   argument, Mr. Walker, for you to make when we close.

19               MR. WALKER:  All right.  Your Honor, I would like to

20   establish that it's within a mile to two miles of this

21   particular facility.

22               THE COURT:  Mr. Kurrus, do you know that, where it is?

23               THE WITNESS:  I know where Robinson Elementary is and

24   I know where Robinson High School is, and I think they plan at

25   this point a junior high school.  I don't think it's a high

```
 1    school and I don't know if it's a middle school, but I think
 2    it's somewhere on that Robinson campus.  I don't know the
 3    distance.  No.  I'm sorry.  I can't be of help to you.
 4              MR. WALKER:  That's fine.
 5              THE WITNESS:  It's several miles.  It's down the road.
 6    That's about all I can say.
 7              MR. WALKER:  That's the point, your Honor.
 8    BY MR. WALKER:
 9    Q.   You have Exhibit 5 before you?
10              THE COURT:  LRSD 5?
11              MR. WALKER:  LRSD 5.  No.  It's Exhibit 2.  I'm sorry.
12    Exhibit 2.
13    BY MR. WALKER:
14    Q.   Do you have it, Mr. Kurrus?
15    A.   Yes, sir, I can see it.
16    Q.   What are these little round dots?
17    A.   That's a one-mile radius around existing elementary
18    schools, I believe.  Yeah, it's elementary.
19    Q.   And what's the purpose of having this radius around the
20    schools?
21    A.   Well, I wanted to see graphically, and I used it in a
22    speech about where are our schools and how do they exist, how
23    close are they to one another.  And this is just a way to depict
24    it.
25    Q.   So other than that, it has no purpose?
```

1   A.    Is that a question to me?

2   Q.    Yes, sir.  Yes.

3   A.    Other than that, it has no purpose.

4   Q.    Other than --

5          MR. HELLER:  Your Honor --

6   BY MR. WALKER:

7   Q.    Other than for you to see where they are, it has no

8   purpose?

9          THE COURT:  Hold on, Mr. Walker.

10      Mr. Heller?

11         MR. HELLER:  The Court's objection I would like to

12  join at this point, too.  Beyond the scope of our examination.

13  These two exhibits, two and three, we didn't discuss or offer

14  into evidence.  So this is a totally new area.

15         THE COURT:  Mr. Walker?

16         MR. WALKER:  Well, I stand corrected if he did not

17  offer them.

18         THE COURT:  He did not offer.  Two and three are not

19  in.  So the objection is sustained.

20  BY MR. WALKER:

21  Q.    Would you tell the Court at this moment which schools you

22  have in your mind about closing?

23  A.    Well, I don't have any schools in particular in mind about

24  closing, but I can tell you that I've asked the civic advisory

25  committee for advice with respect to that.  And I have some

1    guidelines in my mind and some things that are impacting our

2    school district that I could discuss.  But I do not have any

3    particular schools in mind about closing.

4    Q.    All right.  I call your attention to your Exhibit No. 5.

5    Does Metroplan make this determination or did your staff make

6    this?

7    A.    Could you scoot that -- actually, it's Metroplan's work

8    done at my request.

9    Q.    Did you request Metroplan to give you the demographic

10   characteristics of this particular census?  In other words, the

11   black population, white population?

12   A.    No, I didn't.  I just wanted to know how many people.  I

13   don't think I have that broken down by white and black.

14   Q.    I see.  So you're not in a position to determine what the

15   racial impact would be based upon the growth regarding the

16   assignment of students to that particular school?

17   A.    I know -- I know the racial impact of the kids who are in

18   these three schools, but -- and if that's your question, the

19   answer is, I do know that.  But I don't know, you know, the

20   racial impact or the races of other people in that area, by any

21   degree of certainty.

22   Q.    Who compiled the information on Exhibit 6?

23   A.    That's -- several people participated in the preparation of

24   that, all at my direction.  It included people in our -- well,

25   we have an office where people do certain reports.  But, yeah,

1   that's all -- that all came from the school district, this one

2   did.

3   Q.   Tell me, since you can tell that some of the students are

4   still in your district, can you tell me where the students who

5   are no longer in your district are going to school?

6   A.   No, sir.  That's something that's very difficult to

7   determine.  And I've worked on that, but, no, I do not know

8   where all those kids went.

9   Q.   Isn't it true, Mr. Kurrus, that you knew when you were on

10  the board that white students left at the middle school level

11  after they left a school where they had reasonable numbers of

12  their own race and attendance, and they did not go into the

13  middle schools located in the black community?  You knew that,

14  didn't you?

15  A.   No, that's really not quite true, Mr. Walker, based on what

16  I recall back -- I got off the board in 2010, but a lot of

17  students from out west did attend Mann and Dunbar for many

18  years.  Those were desegregated schools in the black community.

19  If I understand your question correctly.  So, no, that wouldn't

20  be true.

21  Q.   Exhibit 7, Mr. Kurrus.  Seven is students who are no longer

22  in the district.  Is it your testimony to the Court that you

23  could not determine where any one of those went?

24  A.   Well, let me tell you what we confront.  When students

25  leave our district --

1           MR. WALKER:  Your Honor, if I -- my question was

2   pretty direct and --

3           THE WITNESS:  No, sir.  I do not know where those 70

4   students went exactly.  I do not.

5   BY MR. WALKER:

6   Q.   Did you make an effort to do that?

7   A.   Yes, sir.  We worked on that extensively.

8   Q.   And the same would be true for Defendants' Exhibit 8?

9   A.   Yes, sir, the same sort of -- I didn't do it in particular

10  with respect to any one of these exhibits.  We've done it in the

11  context of where are students going, and we have some

12  information, but it's very incomplete.

13  Q.   It's fair then to say that white students who leave Roberts

14  don't -- generally don't stay in the public schools?

15  A.   They don't go to our schools.  They go to charters, I

16  think, and they go to these other schools that we've listed.

17  But I don't know exactly where they go.

18  Q.   Is the Quest school near Roberts?

19  A.   I'll tell you where it is.  It's on Rawling Road.  It's at

20  the top of that hill in that shopping center on the left.

21  Q.   Is that near Roberts?

22  A.   Well, I don't know.  How far is near, Mr. Walker?  It's

23  several miles, but it's not across town.

24  Q.   Well, several miles?

25  A.   It's several miles.  It's actually in the county school

1    district.

2    Q.    Do you mean two or three?

3    A.    I beg your pardon?

4    Q.    Do you mean two or three?

5    A.    I don't know.  It's something in that range, maybe a little

6    bit further than that.  From Roberts it would be a little

7    further than that, but I'm not for sure.  It's actually in the

8    county.

9    Q.    Yesterday you heard testimony and talked about the

10   condition of the buildings.  You said all the buildings were

11   fine, Cloverdale was fine, several of the others were fine.  Do

12   you recall saying that the buildings were fine?

13   A.    I didn't use the term "fine," no, sir.  I think --

14   Q.    You did use the term -- maybe you didn't use the word, but

15   you did indicate they were adequate for now.  Did you say

16   something to that effect?

17   A.    I didn't use those terms.

18   Q.    Well, are they adequate for now, the schools in the

19   southwest?

20   A.    The buildings in our school district that I attend almost

21   every day are serviceable.  That is a good term that I like to

22   use, meaning we're having school, they're safe, they're clean,

23   they're dry.  The kitchens are clean.  The bathrooms work.

24   They're not everything I wish they were, but they are

25   serviceable buildings, many of which have been in use for long,

1   long periods of time in worse conditions than they are today.

2   Q.   All right.  Can you dispute Ms. Whitehead's testimony about

3   the hazardous effects of old buildings insofar as she and the

4   students under her were concerned?

5   A.   Well, with respect to Ms. Whitehead, I received an e-mail

6   from her, which I went to her classroom, actually, and I

7   inspected her classroom the day or the day after I got her

8   e-mail.  And I had the air quality tested in the classroom, and

9   the results of that test were that there were half as many mold

10  spores in that classroom as there were in the air immediately

11  outside of the building.  And there is no mold standard, but I

12  can tell you that I've been in her classroom personally, and,

13  no, it is not everything I wish it were, but it is not a

14  hazardous area.

15  Q.   You have 40 -- 55 acres, according to Exhibit 15, that the

16  district authorized to be purchased.  That's in Exhibit 15.

17  What is the present value of those 55 acres?

18  A.   I don't know.

19  Q.   Do you have any reason to believe with the growth in

20  southwest Little Rock that those acres are no longer of the same

21  value as $1,372,000?

22  A.   I haven't done any study on that, Mr. Walker.  I don't

23  know.

24  Q.   So how would it harm the district to leave that property

25  unused for the time being in order to address Cloverdale?

1  A.   Well, I don't know that it would harm the district or help

2  the district.  It just -- I don't know the answer to that.

3  Q.   I see.

4  A.   But if you're asking me about the value going up or down, I

5  simply don't know.  I know it was acquired for the purpose to

6  which we've intended to put it to use, but beyond that, I

7  haven't considered anything else about it.

8  Q.   So it wouldn't harm the district to delay or defer

9  passing -- relating to this until a millage is passed, would it?

10  A.   Well, when you say harm the district, if you mean the

11  students at Cloverdale, I think it harms the students at

12  Cloverdale and the students all over the school district to wait

13  to do something very good for them that we could do now.  So

14  that's where I see the harm.  The district as a whole to me is

15  the students, and it would harm the students to procrastinate

16  further when we can make bold moves now.

17  Q.   Well, tell me, do you have a plan to spend a large sum of

18  money to rehabilitate any school in southwest Little Rock

19  between now and September?  That's yes or no.

20  A.   Well, I don't know what you mean by rehabilitate, but we do

21  not have any rehabilitation or -- if you're talking about normal

22  maintenance, yes, we have a maintenance budget and we intend to

23  follow it.  But we have no plans to rehabilitate, reconstruct

24  schools in southwest, no, sir.

25  Q.   I see.  Now, I'd asked you earlier about Geyer Springs, and

1  Mr. Heller introduced Defendants' Exhibit 18.  I call your

2  attention to page 4, item B, where Dr. Mitchell reported on the

3  opening of Forest Heights STEM and the work that took place over

4  the summer to prepare.  She stated that they were encouraged by

5  the transformation of the schools and were looking forward to a

6  remarkable year.

7       Does that mean that you all spent a lot of money to get

8  Geyer Springs into a use position for the 2015-16 school year?

9  A.   I think the date of this would have been the year before,

10 would it not?  I don't know the date, but --

11 Q.   This is August 28, 2014.

12 A.   August --

13 Q.   In the last year, have you spent money in a substantial

14 amount to make Geyer Springs gifted and talented school a

15 first-rate academy like Forest Heights?

16 A.   I don't know the amount of money spent down there,

17 Mr. Walker, no, and I don't know the time frame, but I think

18 it's a year sooner than what you might be implying.  But I don't

19 know, honestly.

20 Q.   All right.  But it was converted in 2014-15; is that right?

21 A.   I think that's true, although I wasn't on the board or in

22 my position at the time.  I think it's been -- it was converted

23 so that it was opened in the '14-15 school year.  Is that

24 correct?  I think that's right.

25 Q.   And now you're taking kids out of there and sending them

1    elsewhere, except for the kindergarten kids, the pre-K kids?

2    A.   We're going to have a pre-K center and fill it up with

3    kids, actually.

4    Q.   You're taking the kids out of there and sending them

5    elsewhere, is my question?

6    A.   Yes.  We're going to repurpose the building as a pre-K

7    center and reassign the students who are not pre-K students.

8    That's what we intend to do.

9    Q.   Can you tell the Court the cost of that refurbishing?

10   A.   Are you talking about back when it was --

11   Q.   No, sir.  You said you are going to do a thing.  Are you --

12   A.   Oh, we're not going to spend any appreciable money by going

13   to a pre-K center.  The building is in good shape, so we don't

14   have a big budget.  We're moving a playground over there that

15   we've already got, but that's -- we're not spending a ton of

16   money to establish the pre-K center.  We're funding it with

17   Arkansas Better Chance dollars.  So it's just a win for our

18   kids.

19            THE COURT:  Mr. Walker, let me interrupt for a minute.

20   I've been lenient about the scope issue, but we're drifting back

21   into essentially -- pardon me.  Somebody is leaving the

22   courtroom.  I want to -- okay.

23       I understand and I admire your lawyering skills, but your

24   day was yesterday, Mr. Walker, and so please wrap up your cross-

25   examination of Mr. Kurrus before we take our noon -- our lunch

1    break at noon.

2              MR. WALKER:  Yes, sir.  Yes, sir.

3              THE COURT:  Okay.

4    BY MR. WALKER:

5    Q.   I'll call your attention to Defendants' Exhibit 19.

6              THE COURT:  Mr. Pressman?

7              MR. WALKER:  Thank you.

8    BY MR. WALKER:

9    Q.   Page 7.  It says, No. 4:  "Construction of a southwest high

10   school shall be the district's first priority.  Upon a

11   successful millage, the district shall simultaneously authorize

12   construction of a southwest Little Rock high school and a west

13   Little Rock middle school.  (Northwest of Barrow Road.)  If for

14   some reason the southwest Little Rock's school construction is

15   delayed, the west Little Rock school construction shall also be

16   delayed pending resolution of the reasons for delay."

17        Now, how do you claim that opening a school in west Little

18   Rock in the fall is not the district's first priority?

19   A.   Well, it's going to happen before the other, but I've

20   prioritized them equally and am working just as hard on one as I

21   am on the other.  But, you're right, the west Little Rock school

22   will open first.  But we're charging full bore ahead with the

23   southwest Little Rock school, without a millage.

24   Q.   Mr. Kurrus, you heard testimony yesterday from Ms. Monica

25   Norwood regarding her giving an affidavit in this case.  Did you

1    have a discussion with anybody at the LREA, specifically

2    Ms. Koehler, right after you saw the -- you got the complaint?

3    And did you go to the AEA office and express your

4    dissatisfaction with Ms. Norwood having given an affidavit?

5              THE COURT:  Hold on just a second, Mr. Walker.  Your

6    brother Heller has risen behind you.

7         Mr. Heller?

8              MR. HELLER:  My objection, your Honor, is that this is

9    beyond the scope of the direct examination and unrelated to the

10   issues we're here to resolve.

11             THE COURT:  Mr. Walker?

12             MR. WALKER:  Your Honor, I think it is very much

13   related because it shows the importance of the injunction, in my

14   opinion.  In this situation, we had Ms. Norwood giving testimony

15   about the condition of the facilities.  She gave testimony about

16   the condition of the facilities in an affidavit.  Mr. Kurrus

17   retaliated immediately.  I think that it's always important

18   for -- it's always important for that matter to be addressed.

19             THE COURT:  Hold on.  I'm going to allow two or three

20   questions about this.  So your objection is -- well, you're

21   right on the objection, and so I'm sustaining it, but I'm going

22   to allow the questions because of the nature, Mr. Walker, of

23   what you have just said.  That is, the air needs to be clear

24   about that.

25             MR. WALKER:  All right.

Kurrus - Cross

1          THE COURT:  But, counsel, as I think y'all can tell,

2  it's about time for our noon break for all of us, including me.

3          Mr. Kurrus, the question was, did you have a conversation

4  with someone at the AEA, whose name I don't remember, when you

5  got the Norwood affidavit?

6          THE WITNESS:  No, sir.  Absolutely not.  I didn't even

7  know the people on that e-mail.  No.  I had nothing to do with

8  that.

9          THE COURT:  Mr. Walker, follow-up?

10  BY MR. WALKER:

11  Q.   Did you ever talk to Ms. Cathy Koehler about that

12  affidavit?

13  A.   I talked to her, I think, after the AEA had dismissed her.

14  But, actually, I got the complaint without the exhibits.  The

15  first copy I had didn't even have the exhibits on there.  I

16  didn't know Ms. Norwood had signed an affidavit and I never said

17  anything to anybody unkind about Ms. Norwood.  I don't even know

18  the people that she worked for and I had never met them until --

19  I actually met them since then at a meeting.  But before that

20  happened, I didn't even know who they were.  So, no, I had

21  absolutely nothing to do with that, Mr. Walker.

22          I wouldn't retaliate against Ms. Norwood.  I have a high

23  regard for Ms. Norwood.  I worked with her pleasantly and I hold

24  no grudge against her.  I did not retaliate against her, as

25  you've said.

1          MR. WALKER:  Thank you.

2          THE COURT:  Okay.  Thank you, Mr. Walker.

3     Counsel, I appreciate y'all's patience with me.  Like a

4  toddler, when it gets close to lunchtime, I'm ready for my lunch

5  and a little break.

6     Let's come back at 1:15.  Y'all can keep your seats.

7     (Recess from 12:00 p.m. until 1:18 p.m.)

8          THE COURT:  Counsel, I understand y'all have done some

9  work on the exhibits during the break, and I appreciate that,

10  cleaning things up.

11     Where is Mr. Kurrus?  Oh, there he is.  Come on back up.

12          MR. HELLER:  Your Honor, we don't have any questions

13  for Mr. Kurrus.

14          THE COURT:  Oh, do you not?  Well, I apologize for

15  making you get up and come halfway.

16          MR. KURRUS:  That's all right.

17          MR. HELLER:  One thing I did want to bring up with the

18  Court is, we've now got the complete Plaintiffs' Exhibit 1, and

19  since the witness is gone, I wanted to point out a couple of

20  things.  It's very different from what was represented to the

21  Court as the report.  If we look at this from Exhibit 1, it

22  shows these rooms with cracked walls and peeling paint.  If we

23  look at what we've now -- and the next picture on that page is a

24  bunch of junk in a hallway.

25     But if we look at what we've now been provided, same

1    pictures of the cracked walls and peeling paint, and then at the
2    bottom from the actual report, a photograph, cracks filled and
3    room painted that wasn't included in the original report.
4        There's another example, your Honor, stained windows in
5    cafeteria.  That wasn't in the original report, the picture that
6    shows, May, window replaced.  So the report we have now is
7    different in some material ways.
8        Just one more I'll point out.  Here is the mess of stuff
9    blocking the hallway, and then in May, breezeway cleared, city
10   volunteers painted walls.
11       So the actual report shows a number of those problems were
12   addressed, and that wasn't included in the exhibit that was
13   offered to the Court.
14           THE COURT:  As I recall my ruling on Plaintiffs' 1
15   without objection at your request, I admitted the pictures that
16   the witness testified about with the covering report to be
17   provided.
18           MR. HELLER:  Yes, your Honor.
19           THE COURT:  And I'm not sure if I have that covering
20   report yet in my Court's courtesy copy of documents or not.
21           MR. HELLER:  I've got a copy from the plaintiffs.  I'm
22   not sure whether they've provided any copies to the Court or
23   not.
24           THE COURT:  Ms. Black?
25           MR. CHILDS:  Your Honor, a copy was provided to your

1    deputy.

2         THE COURT:  Okay.  Thank you.

3         THE COURTROOM DEPUTY:  This is what I have for

4    Plaintiffs' 1.

5         THE COURT:  If you'd make me a copy for my binder and

6    three-hole punch it.  Thank you, Sherri.

7         MR. HELLER:  So what I remember, we were taking a part

8    of a report and requesting that the complete report be provided,

9    and it turns out there are two different things.  What was

10   presented as part of the report is different from the report

11   itself that is going to be, I suppose, the substitute Exhibit 1.

12   I just wanted to point out that the report itself shows a lot of

13   problems being fixed that were left out of the original exhibit

14   presented to the Court.

15        THE COURT:  Understood.  Before we leave the exhibits,

16   Plaintiffs' 10 -- Mr. Walker, my notes are not clear.  These are

17   board minutes from November 16, 2006, that you marked as

18   Plaintiffs' 10.  I don't remember if you offered those, and if

19   you did, whether I ruled on them.  Do you offer those minutes?

20        MR. WALKER:  I would like to offer them, your Honor.

21        THE COURT:  Any objection, Mr. Heller?

22        MR. HELLER:  No, your Honor.

23        THE COURT:  Okay.  Plaintiffs' 10 will be in.

24      (Plaintiffs' Exhibit 10 received in evidence.)

25        THE COURT:  Admitted without objection.

1        MR. WALKER:  Your Honor, I didn't understand

2   Mr. Heller to be objecting to the entry of the exhibit just

3   before this one.  He was simply saying, I thought, that there

4   was some inconsistencies.  But we have submitted the document as

5   it was presented, and you heard Dr. DeJarnette's testimony.

6        THE COURT:  I think you're right on both counts.  It

7   was a preliminary version or a preview of closing argument.

8   Right, Mr. Heller?

9        MR. HELLER:  Well, it was a clarification of my

10  objection, because I thought all I was doing was adding to

11  something that had actually been presented to the school

12  district when it, in fact, had not.

13       THE COURT:  Okay.

14       MR. HELLER:  And so rather than completing the

15  document pursuant to Rule 106, my new objection is that the

16  entire thing should be replaced with the document that the

17  plaintiffs have now provided, which is different, not just

18  larger, but different.

19       MR. WALKER:  Your Honor, I think Dr. DeJarnette

20  testified that there had been changes made and she had been to

21  the place on different occasions.  I think both of them should

22  remain in.  And it goes to the weight of her testimony rather

23  than the admissibility.

24       THE COURT:  Counsel, I think we're spending our time

25  on a minor matter.  Mr. Heller, I understand -- as I understand

1    your point, it's that there are more pictures and a covering

2    report, not just a covering report.  Right?

3              MR. HELLER:  There are more pictures and different

4    pictures.

5              THE COURT:  Yes.

6              MR. HELLER:  Okay.

7              THE COURT:  Yes.

8              MR. HELLER:  Some of the ones that were presented in

9    the original Exhibit 1 are not in the report, and others that

10   are not in Exhibit 1 are in the report.

11             THE COURT:  I didn't realize that point you just made

12   about some pictures being there that were not included.  I

13   thought it was just a matter of more.  Am I mistaken on that?

14        Hold on just a second.

15        Officer Gray, we've got a witness in the room out there,

16   but the witness is not staying in the room.  They keep peeking

17   in the window at me.  It's distracting.

18             COURT SECURITY OFFICER:  Okay.

19             THE COURT:  Thank you.  Mr. Heller?

20             MR. HELLER:  Your Honor, there are photographs in what

21   was originally presented to you as Exhibit 1 that are not a part

22   of the report that was provided to the school district.

23             THE COURT:  I see.  Okay.  So it's not only more, it's

24   different.

25             MR. HELLER:  Right.

1          THE COURT:  Got you.  In that circumstance, I think,

2     Mr. Walker, you're right that what ought to happen is that

3     Plaintiffs' 1 is both; that is, it's what was offered and what

4     your witness testified about, and then the report, the actual

5     report that has now been offered that was received by Dr. Suggs.

6          MR. WALKER:  Yes, sir.

7          THE COURT:  Okay.  Mr. Heller, fair?

8          MR. HELLER:  That's fair, your Honor.

9          THE COURT:  Okay.  Good.  We'll have it all in, and

10    Ms. Black will give me my copy so I can compare it here in a

11    minute.

12        Okay.  Mr. Heller, it's your turn.  Next witness?

13         MR. HELLER:  Wayne Adams, your Honor.

14         THE COURT:  Okay.  Wayne Adams.

15         MR. HELLER:  That's right.  He was probably anxious

16    and looking into the courtroom.  He knew he was up next.

17         THE COURT:  He knew he was next.  All right.

18        Come on up, Mr. Adams.  You knew something I didn't, that

19    you were about to get called, didn't you?

20         THE WITNESS:  I had that feeling.  Yes, I did.

21         **WAYNE ADAMS, DEFENDANTS' WITNESS, DULY SWORN**.

22         MR. EDDINGS:  May it please the Court.

23         THE COURT:  Mr. Eddings.

24                    DIRECT EXAMINATION

25    BY MR. EDDINGS:

Adams - Direct                                              347

1    Q.    Good afternoon, Mr. Adams.  Go ahead and state your name
2    for the record.
3    A.    Wayne Adams.
4    Q.    And how are you employed, Mr. Adams?
5    A.    Director of operations and maintenance for the Little Rock
6    School District.
7    Q.    How long have you held that position?
8    A.    I believe '05 I took over the director's job, and with the
9    district, quite a bit longer.
10   Q.    Mr. Adams, do you know Jackie Whitehead?
11   A.    Who?
12   Q.    Jackie Whitehead?
13   A.    I don't know her.
14   Q.    Have you heard the name before?
15   A.    I've heard the name.
16   Q.    And how did you come to hear that name?
17   A.    I believe that she had requested some air quality sampling
18   be done because of her contention that mold existed in her work
19   space.
20   Q.    Where was her work space?
21   A.    If my memory serves me, she worked at Dunbar and McClellan
22   and, I believe, Mabelvale.
23   Q.    As a result of Ms. Whitehead's contentions, did you conduct
24   air quality samples at those three schools?
25   A.    I did.

Adams - Direct                                    348

1    Q.   Okay.  Let's start with Dunbar first.  What were the

2    results of those tests?

3    A.   I'm not sure that it was her work area in the basement, but

4    we did -- we were requested to look in the basement area, and we

5    did, in fact, find a small room in the basement that I believe

6    was assigned to the nurse that had a high quality of mold

7    existed in that room in the air sampling.  We had our

8    environmental consultant, Morris & Associates, investigate that

9    and do the air sampling.  And when we found that out, we

10   proceeded to clean the room and find out what the cause was.

11   Q.   Okay.  So the cause of the mold was found and it was

12   remediated?

13   A.   Yes.

14   Q.   Okay.

15   A.   We found that above the ceiling there was an opening into

16   the steam chases at the school that had been previously closed

17   off, and the material they closed it off with had failed.  We

18   replaced the covering over that steam tunnel and cleaned the

19   room with an environmental remediation company.

20   Q.   Okay.

21   A.   And did subsequent air sampling to determine that that room

22   was clean.

23   Q.   All right.  And how many times have you done air sampling

24   in that room since then?

25   A.   Since we completed it, we've sampled twice and found no

1    excessive contaminants of mold in the air.

2    Q.    All right.  Now, we'll come back to Dunbar later, but I

3    want to talk now about McClellan.  Tell us about the air quality

4    testing you did at McClellan.

5    A.    There were no high levels of mold found at McClellan in the

6    air sampling.

7    Q.    Okay.  And let's move on to Mabelvale.  Tell us about what

8    you found at Mabelvale.

9    A.    In that room that was being occupied by Ms. Whitehead, we

10   found no excessive levels of mold.

11   Q.    All right.  Now, let's go back to Dunbar.  What else, if

12   anything, did you do in the basement at Dunbar?

13   A.    With regard to mold?

14   Q.    With regard to mold.

15   A.    We had some complaints about odor and mold in the other

16   classrooms, and the only problem we found there was in one of

17   the first floor classrooms, we found that an HVAC system had

18   dripped condensation on the ceiling tile and created some dark

19   stains which could have, in fact, had mold on it.  And we

20   proceeded to reinsulate the air handler device, and actually the

21   chill water was a little too cold and we turned the temperature

22   up a little bit on that so it wouldn't be so prone to

23   condensation.

24   Q.    Okay.

25   A.    And we replaced the carpet ultimately and air sampled and

Adams - Direct                                                    350

1    found that that room was clean after we had completed that work.

2    Q.    Have you had issues related to the HVAC unit causing

3    condensation at any other schools, any elementary schools, for

4    example?

5    A.    Yes.  That's not terribly unusual to occur in schools that

6    have doorways open into unconditioned spaces.  Sometimes the

7    custodians will go in and clean the carpet and have the doors

8    open, have the air turned down, so we get a lot of condensation

9    on the grills and duct work on occasion.  That's happened

10   several times that I'm aware of.

11   Q.    Are there any elementary schools in particular that you

12   recall that happening?

13   A.    At Dunbar?

14   Q.    No, no, no.  Where --

15   A.    Oh, yeah, it could happen, you know, at any time.  I've

16   heard comments from the HVAC department about finding that

17   issue.  Personally I know that it happened at Jefferson because

18   we were called to Jefferson at one point in time and found that

19   the HVAC had caused mold actually to build up on the wall that

20   adjoined where the discharge was.  And at Pulaski Heights once

21   upon a time --

22   Q.    Let me stop you for one second.  Where is Jefferson

23   located?

24   A.    In Cammack Village, adjacent to it.

25   Q.    Adjacent to Cammack Village?

Adams - Direct                                              351

1    A.    Yes.   I forget the address.

2    Q.    Okay.  Tell us about Pulaski Heights, if you would.

3    A.    I remember coming in there, being called there to look at a

4    problem at Pulaski Heights where the ceiling tiles in a room had

5    darkened from moisture and had mold on them because the duct

6    work was sweating and the air-conditioning had been left turned

7    low after the carpet was cleaned.  Moisture had condensed on the

8    duct work and caused the ceiling tiles to be -- to be wet and

9    damp for a long period of time.  Over the summer, apparently it

10   wasn't checked.  We replaced all the ceiling tile, reinsulated

11   the duct work, got rid of the problem.

12   Q.    I want to go back to Dunbar and we're going to stay there

13   for a minute.  Has there been any flooding in the basement at

14   Dunbar that you recall?

15   A.    Any --

16   Q.    Any flooding in the basement at Dunbar?

17   A.    Dunbar has light wells on the face of the building that

18   provide lighting to some of the basement rooms.  From time to

19   time in the past, the drain system in the light wells would not

20   adequately relieve the water from hard rains, and the water

21   level is not too far from the bottom of the light well.  Water

22   would infiltrate the basement on occasion.  I know we removed

23   the carpet in those rooms at one point in time and put tile

24   down.

25         Ultimately, about two years ago, we created a sump in the

Adams - Direct                                       352

1    bottom of the light wells and put a pump in there with a float

2    on it and waterproofed the exterior of the building in that

3    location and haven't had any more water intrusion in that area

4    since then.

5    Q.    All right.  Let's talk about the waterproofing of the

6    exterior of that building.  Specifically what did that work

7    entail?

8    A.    Waterproofing the exterior of Dunbar requires the mortar

9    joints to be cleaned up and tuck pointed and replaced.  And then

10   waterproofing the exterior of the masonry, which was a lengthy

11   process at Dunbar.

12   Q.    Approximately how long did that process take?

13   A.    It took place over about an eight-month period.

14   Q.    Okay.

15   A.    Longer than we anticipated.

16   Q.    Related to that incident, was there any report of that

17   project causing asbestos dust to be expelled into the air?

18   A.    Yeah.  That project had nothing to do with asbestos.  We

19   have done a minor abatement project at Dunbar in the last few

20   years.

21   Q.    Now, answer my question.  Was there any report during the

22   waterproofing project of any asbestos dust being expelled into

23   the air?

24   A.    We had some of the staff concerned about the white powder

25   that was a result of grinding the mortar joints out and coming

Adams - Direct                                             353

1   in their open windows, and we assured them and had our
2   environmental consultant assure them that that had nothing to do
3   with asbestos.
4   Q.   Was there any report made to you that a teacher at Dunbar
5   had taken a sample of this dust and had it checked for asbestos?
6   A.   I don't know that.
7   Q.   All right.  Is that the same thing as saying, no, no report
8   being made to you?
9             MR. WALKER:  Objection.
10            THE COURT:  Basis?
11            MR. WALKER:  Leading.  Is that the same thing?
12            THE COURT:  Try again, I think, Mr. Eddings.
13            MR. EDDINGS:  I'll rephrase the question, your Honor.
14            THE COURT:  Good.  Sustained.
15  BY MR. EDDINGS:
16  Q.   Mr. Adams, related to the waterproofing, sealing the
17  exterior of Dunbar, has there been any report made to you by a
18  staff member at Dunbar that a teacher at Dunbar had taken this
19  dust and had it tested for asbestos?
20  A.   I don't specifically recall the details, but it was called
21  to our attention that teachers had identified the material
22  coming from the waterproofing project as being asbestos.  And I
23  don't recall that they had shown that it was tested to be
24  because it couldn't have been.  You know, it wasn't asbestos.
25  Q.   Okay.  Now, you mentioned some asbestos remediation work at

Adams - Direct                                                354

1    Dunbar.  When do you recall that project taking place?

2    A.    Probably summer before last we had a minor abatement take

3    place in what used to be the teachers' eating area adjacent to

4    the cafeteria.  I'm not sure it still is.  We had to remove some

5    carpet and found that there was a floor tile that contained

6    asbestos underneath the carpet and we had that floor tile abated

7    by an environmental abatement company.

8    Q.    Have you ever done any asbestos abatement work at Dunbar

9    while students were present?

10   A.    That doesn't occur.  We don't do abatements when students

11   are present.

12   Q.    Let's talk about painting at Dunbar now.  Has that school

13   been painted in the recent past?

14   A.    Has it been what?

15   Q.    Painted.

16   A.    Oh, yeah.  In the last few years, we've had some color

17   variations in the hallways.  We painted.  A couple of years ago,

18   we painted Dunbar, pretty much all the hallways and all the

19   classrooms as needed.

20   Q.    Do you recall about how much money was spent on that

21   project?

22   A.    It strikes me that we were in the $75,000 range on that.

23   Q.    Okay.  Now, moving on to the -- still at Dunbar, the

24   auditorium.  Have there been any upgrades made to the auditorium

25   at Dunbar recently?

1    A.   Yes.  In the last five or six years, we replaced all the

2    seating and painted the walls and did some work on the rigging

3    to the stage, and the lighting was upgraded or improved or

4    replaced.  All the seats were replaced.

5    Q.   Okay.  How about the curtains, the auditorium stage?

6    A.   I've not been asked to replace the curtains by the staff.

7    Q.   Have you undertaken replacing curtains in any auditorium in

8    any school in the district recently?

9    A.   We're in the process of doing stage curtains at Hall in

10   conjunction with a lot of other work that we did on the stage,

11   and also at McClellan.  We're replacing the stage curtains

12   there.

13   Q.   Okay.  I want to now move on to Cloverdale Middle School.

14   Have you been to that school lately, Mr. Adams?

15   A.   What?

16   Q.   Cloverdale Middle School.  Have you been to that school

17   lately?

18   A.   Yes.

19   Q.   When is the last time you've been to Cloverdale?

20   A.   Would you repeat that?

21   Q.   When is the last time you were at Cloverdale Middle School?

22   A.   Oh, I was there Monday and Tuesday of this week.

23   Q.   Mr. Adams, I'd like you to take a look at what's been

24   marked as Plaintiffs' Exhibit 1.  Have you seen this picture

25   before?

Adams - Direct                                              356

1   A.    I have seen them.

2   Q.    How about this picture?  Same exhibit.

3   A.    Yes, I've seen those.

4   Q.    Have you seen that picture?

5   A.    Yes, I've seen them as well.

6   Q.    Have you seen that picture?

7   A.    I have.

8   Q.    And how about that picture?

9   A.    I have seen that one.

10  Q.    All right.  Let's go back to this first picture I showed

11  you, Mr. Adams.  And that -- well, let me ask you one more.  Let

12  me show you one more picture before I do that.  Have you seen

13  that picture?

14  A.    Yes, I have.

15  Q.    All right.  Now, in that picture, it looks like we've got

16  some exposed electrical outlets at Cloverdale.  Do you have

17  knowledge as to whether the issues reflected in this picture

18  have been repaired?

19  A.    I don't know where these pictures were made specifically,

20  but when I looked at the school, I saw very few outlets that

21  were uncovered, and the ones I did see were not -- did not

22  contain any wiring that was still in use.  It looked like where

23  something had been removed, maybe a cover plate or a light

24  fixture, and I directed my electrician to replace those plates

25  that I saw were missing.

1    Q.    Do you know whether or not that has been done?

2    A.    It has been.

3    Q.    I believe your testimony was that you've seen this --

4    what's represented to be a pipe near the opening of the ceiling

5    in Room 34.

6    A.    Yes, it was.  I saw it.

7    Q.    You've been to Room 34 at Cloverdale?

8    A.    I did.

9    Q.    And would you tell the Court, first of all, did you inspect

10   that pipe?

11   A.    I looked at it to see what it was.

12   Q.    And what did you determine it was?

13   A.    It's in the old section of the building, and that

14   construction was built so that there's a ledge about six inches

15   below the ceiling in those classrooms, and different mechanical

16   devices were originally installed on that ledge.  In this case,

17   it was a water line that eventually turned and went to the

18   outside wall of the building.  And it had been disconnected and

19   capped.  It still served something in the room in another

20   location, but that's -- that was just an abandoned water line

21   that was disconnected because the faucet on the outside was

22   either no longer in use or required or had been removed.

23   Q.    Okay.  And when you went to Cloverdale, did you visit

24   what's known as the sixth grade hall at Cloverdale?

25   A.    What?

Adams - Direct                                    358

1    Q.    The sixth grade hall at Cloverdale, have you been there?

2    A.    Yes.  I looked at it.

3    Q.    I believe your testimony was that the last time you were at

4    Cloverdale was yesterday?

5    A.    Yeah.  The ceiling tiles in the sixth grade hall are all in

6    good shape presently.

7    Q.    All right.  So do those conditions as reflected in what's a

8    portion of Plaintiffs' Exhibit 1 exist today?

9    A.    No.  They're fine now.

10   Q.    All right.  Let's look at the bottom half of that.  How

11   about the decaying ceiling in the breezeway?

12   A.    I'm not sure exactly where those pictures were made.  In

13   the last addition we did, we replaced some of the breezeway

14   ceiling in the old section with metal panelling, and I'm not

15   sure whether this is the exact same location or not.  But I

16   didn't see this.

17   Q.    Let me ask the question this way:  In the past few days

18   when you visited Cloverdale, did you notice any decaying

19   ceilings in the breezeway at that school?

20   A.    No, I didn't see anything.

21   Q.    Let's look at this picture and talk about Room 34.  And

22   you've been to Room 34; correct?

23   A.    I was.

24   Q.    Does what's reflected in Plaintiffs' Exhibit 1 indicate

25   what Room 34 looks like today?

1    A.    No.    There's no evidence, very little evidence of any

2    cracking there because the painters have been in there and

3    repaired the cracks and painted the walls some time ago, I

4    believe.

5    Q.    Okay.   And down there at the bottom half of the page, have

6    you visited that hallway by the science classroom near the gym

7    at Cloverdale?

8    A.    Yes, I did.   I looked at it.

9    Q.    Okay.   And --

10   A.    There was nothing in the hallway.

11   Q.    All right.

12   A.    Apparently the custodians had used that as a place to store

13   broken furniture until it was picked up.

14   Q.    Let's talk about lockers at Cloverdale.   Do you know

15   whether or not the lockers are in use at Cloverdale or any

16   middle school in the Little Rock School District, for that

17   matter?

18   A.    I am under the impression from information from the school

19   that they no longer use the lockers.

20   Q.    Okay.   Mr. Adams, I'd like for --

21            MR. EDDINGS:   Your Honor, may I approach the witness?

22            THE COURT:   You may.

23   BY MR. EDDINGS:

24   Q.    Mr. Adams, I'd like you to take a look at what's been

25   marked as Little Rock School District's Exhibit 21.   Can you

1    tell the Court what that is.

2    A.    That's Room 34, in the same location that the crack

3    occurred.

4    Q.    How about the rest of these documents that are a part of

5    Defendants' Exhibit 21?

6    A.    Yeah, that's Room 34 as well, as of this week.

7    Q.    I'd like for you to take a look at the rest of the

8    documents that are a part of Defendants' Exhibit 1 and tell the

9    Court what those are.

10   A.    Uh-huh.  There's the orange wall where the crack was

11   originally in Room 34 which was repaired some years ago.  And --

12   do you want me to keep going?

13   Q.    I would.

14          THE COURT:  Mr. Eddings, could you flip through them

15   as well on the ELMO so I can see them?

16          MR. EDDINGS:  I'm sorry.

17   A.    Yeah.  That's Room 34.

18   Q.    Okay.  Is this next picture also taken at Cloverdale?

19   A.    Yes.  That's an area in the new addition that had some

20   stained ceiling tiles when I was out there, and I had the

21   roofing trade specialists meet me out there to determine if

22   there was still a leak in that room because the ceiling tiles

23   had been stained.  And that's after we replaced them.  He

24   assured me and showed me a picture of the flashing problem on

25   the roof that had been repaired some time ago, and I had him

Adams - Direct                                        361

1    replace the ceiling tiles.

2    Q.    Okay.  The next page.

3    A.    That's Room 34 where the crack was.

4          That is the cafeteria ceiling, which is in good shape.  No

5    leaking in the cafeteria.

6    Q.    Have you had leaking at some point in the cafeteria over at

7    Cloverdale?

8    A.    Well, the roofing trade specialist reminded me that we had

9    a storm come through at Cloverdale maybe four years, five years

10   ago, perhaps, and it damaged the gym roof and also it blew a

11   ventilation device off the cafeteria, and there was some leaking

12   at that point in time in the cafeteria.  That's probably the

13   only time we know of that there was a leak in the cafeteria.

14   But we replaced it.

15   Q.    Okay.  And when is the last time the roof has been replaced

16   at Cloverdale?

17   A.    Monday and Tuesday of this week.

18   Q.    No, no.  When was the last time the roof at Cloverdale has

19   been replaced?

20   A.    No.  The roof at Cloverdale was replaced in stages.  Every

21   new addition that we put in was done in standing seam.

22   Cafeteria, for example, and the north wing, which was the

23   science room when it was built, was done in standing seam metal,

24   which is probably as good a quality roof as you can build.  And

25   after that, the new wing that we built in the courtyard was

Adams - Direct                                            362

1    standing seam, and we replaced all the shingled roofing with

2    standing metal seam roof as well.  So the entire facility as of

3    2010 was standing metal seam roof as well.  So the entire

4    facility as of 2010 was new standing seam, or relatively new.

5    Q.    Okay.  And I'd like to go to the next page of Defendants'

6    Exhibit -- well, the district's Exhibit 21.

7    A.    Yeah.

8    Q.    What does this picture reflect?

9    A.    Those are the sixth grade hallway lockers, which look to be

10   in good shape.  They were new when that wing was built.

11   Q.    Did you see any damage to the ceiling in the sixth grade

12   hallway?

13   A.    There was none.

14   Q.    And what does this picture here reflect?

15   A.    That's in the cafeteria against the wall.  It seemed like

16   there was some pictures in that area.  There's a flat screen TV

17   up there now.

18   Q.    Do you see any --

19   A.    I don't see any problem there.

20   Q.    -- damaged ceiling tile or evidence of leaking in the

21   cafeteria at Cloverdale?

22   A.    What?

23   Q.    Did you see any damaged ceiling tile or any evidence of --

24   A.    No, there was no damaged tile in the cafeteria.

25   Q.    And the next page, what does this picture here reflect?

1   A.   That's a breezeway adjacent to an area we created, and in

2   the last renovation, we took out some of the damaged wooden

3   ceiling and replaced it with metal.

4   Q.   And in this next pictures, what does it illustrate?

5   A.   That's the new wing.

6   Q.   What part of the school was this?

7   A.   What?

8   Q.   What part of Cloverdale Middle School is this?

9   A.   That's in the new addition, I believe.  Yeah.

10  Q.   Any damaged ceiling tile there?

11  A.   No problem with ceiling tiles, other than that one room

12  that we talked about earlier.

13  Q.   Okay.  And this next picture?

14  A.   That's where the broken furniture was stored.  At some

15  point in time before spring break or during the summer, they put

16  some broken furniture there, and then they have either us or

17  procurement pick it up and dispose of it.  There's none there

18  now.

19  Q.   Okay.  Do you know about when that ceiling there to that

20  breezeway was installed?

21  A.   Yes.

22  Q.   When was that?

23  A.   Monday and Tuesday.

24  Q.   No, no, no.  Do you know when the ceiling there to the

25  breezeway was installed?

1    A.    In 2010, I believe, when we did the last renovation.

2    Q.    Okay.  And this next picture, what does it reflect,

3    Mr. Adams?

4    A.    Yeah, that's the new wing that we built more recently.

5    Q.    Is that the sixth grade hallway?

6    A.    Yes.  That's the sixth grade hallway there in the addition

7    we did.

8    Q.    Did you see any ceiling tile damage in that hallway?

9    A.    I did not see any damaged ceiling tile.

10   Q.    And this next picture, Mr. Adams, what is it?

11   A.    Those are the lockers, the more recent lockers that were

12   put in in the last addition that went in the courtyard.  They

13   all look to be in good shape.  That's another picture of more

14   lockers on the other side of the hall.

15   Q.    And is this -- what part of the building is this?

16   A.    It's adjacent to some old construction in a courtyard on

17   the north wing of the building.

18   Q.    Did you notice any ceiling damage in this wing of the

19   building?

20   A.    No.

21   Q.    And what does this reflect here, Mr. Adams, this next

22   picture?

23   A.    It's an area where something was removed and a cover plate

24   was put back on it after it was removed.  I'm not sure what was

25   there.

1    Q.    And --

2    A.    Same.  That's another -- something was taken out and a

3    plate put back in place of it.

4    Q.    Okay.  And, Mr. Adams, when were these pictures taken that

5    are a part of the district's Exhibit 21?

6    A.    What?

7    Q.    Do you know when these pictures were taken?

8    A.    Yeah, that was taken in Room 34.

9    Q.    Do you know when they were taken?

10   A.    Monday and Tuesday.

11   Q.    All right.

12   A.    And/or.

13          MR. EDDINGS:  Your Honor, at this time I move

14   admission of Little Rock School District's Exhibit 21 into

15   evidence.

16          THE COURT:  Mr. Walker?

17          MR. WALKER:  Your Honor, may I reserve until I inquire

18   of him by way of voir dire?

19          THE COURT:  You may.  But don't let me forget about

20   this exhibit.

21          MR. WALKER:  Right.

22          THE COURT:  Anything else, Mr. Eddings?

23          MR. EDDINGS:  Yes, your Honor.

24   BY MR. EDDINGS:

25   Q.    Mr. Adams, have you ever received any reports of mold at

Adams - Direct                                    366

1    Cloverdale?

2    A.    No.  I haven't been asked to do any air sampling at

3    Cloverdale.

4    Q.    Okay.  To your knowledge, when was the last time the

5    bathrooms at Cloverdale have been inspected?

6    A.    Asbestos?

7    Q.    Oh, no, the bathrooms at Cloverdale?

8    A.    When were they renovated?

9    Q.    No, when were the bathrooms inspected?

10   A.    Oh, I had them inspected Monday by the plumber.

11   Q.    What were the results of that inspection?

12   A.    They were all operational.

13   Q.    Okay.  Have you received any communication from the

14   principal at Cloverdale, Ms. Wanda Ruffins, regarding

15   outstanding work orders?

16   A.    No, not specifically.  She will ask for a specific thing

17   from time to time, but not with regard to work orders that were

18   outstanding.

19   Q.    So have you ever had any conversation with anyone in the

20   school district, particularly anyone at Cloverdale Middle

21   School, regarding a hundred or more work orders that have not

22   been fulfilled related to that school?

23   A.    No, I don't recall anything like that.

24   Q.    All right.  I'd like to move on to Wilson Elementary School

25   now, Mr. Adams.  Have you had any reports of the cafeteria

Adams - Direct                                           367

1   having to be closed at Wilson Elementary School?

2   A.    I'm not aware that it was closed, no.

3   Q.    All right.  How about reports of rodents being in the

4   building?

5   A.    That has happened from time to time, and we sent the pest

6   control to deal with it.  Above the ceiling, usually, if

7   something gets in.  We try to find out where -- we close off all

8   the openings we can find once we have a problem.

9   Q.    Okay.  Is Wilson Elementary the only school that that's

10  happened?  Is that a situation that's unique to Wilson

11  Elementary?

12  A.    No.  That happens from time to time at other schools.

13  Western Hills had a problem, and I recall squirrels getting into

14  Western Hills and into McClellan.  I know that.  We try to block

15  off any openings we can.

16  Q.    Were you able to fix that problem at Wilson?

17  A.    As far as I know, we did.  I haven't heard another -- of

18  any further incident with that occurring.

19  Q.    How about at Western Hills?

20  A.    Mabelvale?

21  Q.    Western Hills.  Were you able to fix the problem at --

22  A.    No.  We corrected that as well the best we could.

23  Q.    All right.  I'd like to talk to you about Henderson Middle

24  School now.  Have there been any remodel projects at Henderson

25  Middle School in the recent past?

1    A.    In the recent past?

2    Q.    Yes.

3    A.    Renovation-wise?

4    Q.    At Henderson.

5    A.    We did the bathrooms, completely renovated the bathrooms,

6    probably in '08-09, perhaps.

7    Q.    Okay.

8    A.    And did some other renovation work to the school as well.

9    And we also more recently modified the gymnasium participant

10   bathrooms to accommodate ADA accommodations.  That was done a

11   couple years ago.

12   Q.    All right.  Excuse me for jumping around, but I failed to

13   ask you a question about Wilson Elementary School.  Has there

14   been any recent work done on the heating and air at that school?

15   That's Wilson Elementary School.

16   A.    Yeah, the chiller failed or was in the failure mode, and we

17   made it through to October and managed to keep it going, then

18   initiated a project, design and bid, to replace that chiller,

19   which is now operational.

20   Q.    And when was that?

21   A.    It started last fall, around September or so, we started

22   having continuous problems with the chiller, and managed to get

23   through to the end of cooling season, pretty much.

24   Q.    Have you had any reports of mold at Wilson?

25   A.    No, I don't recall any.

Adams - Direct                                            369

1    Q.    I'd like to move to McClellan High School now, if you
2    would.  Has there been any work done on the heating and air at
3    McClellan?
4    A.    I would say about three years ago in, I think, the first of
5    December-ish, we had some concerns about a couple of the package
6    units not functioning and I had work orders turned in.  When we
7    investigated, we found that the heat exchangers had cracked on
8    the two units that were not operational and they had shut
9    themselves off.
10         Consequently, we inspected the remaining package units,
11   which was around 28 of them, and found that most of the rest of
12   those units had cracks in the heat exchangers as well.  And it
13   was just prior to the Christmas shutdown, and we did an
14   emergency work order request and had Middleton, our term
15   contractor, began to replace the heat exchangers as quickly as
16   possible.  We had it all completed in January, probably by the
17   second week or so.
18   Q.    And you said that was in December?  You said that that
19   happened in December?
20   A.    Yes, it did.  It was prior to the Christmas shutdown, and
21   certainly when we find cracked heat exchangers, we have to shut
22   the units off.  So we provided space heaters for the school for
23   the remainder, until Christmas break.
24   Q.    And why is it that you have to shut the units off when you
25   find a crack in the heat exchange?

1  A.   Well, you don't want flue gas flowing into the classroom,

2  and that's what happens if you had a sufficient crack in there.

3  The flame and flue gas would be going out into the return air

4  system that goes over the heat exchanger.  You don't want CO

5  going into the classrooms.

6  Q.   Okay.  And what year was this project?  December of what

7  year was this project?

8  A.   That was probably about three years ago.

9        MR. EDDINGS:  Your Honor, if I have a moment, I think

10  I may be done.

11        THE COURT:  You may.

12        MR. EDDINGS:  I don't have any more questions for

13  Mr. Adams.

14     Thank you, Mr. Adams.

15        THE COURT:  Thank you, and thank you in particular for

16  the helpful sign posting.  It was seamless.

17        MR. EDDINGS:  Thank you.

18        THE COURT:  Mr. Walker?

19        MR. WALKER:  Yes.  May I begin?

20        THE COURT:  You may.

21                    CROSS-EXAMINATION

22  BY MR. WALKER:

23  Q.   Mr. Adams, how are you?

24  A.   Fine.  You'll have to speak up.

25  Q.   When you talked about what we did, are you referring to

Adams - Cross

1   what you did, or what was reported to you that was done?

2   A.    What I did with --

3   Q.    In terms of making repairs.

4            THE COURT:  Mr. Walker, can I interrupt?

5            MR. WALKER:  Yes, sir.

6            THE COURT:  I need you to speak as loudly as you can.

7   We're going to turn up that volume.

8            THE WITNESS:  All right.

9            THE COURT:  And slowly.  Go ahead.

10  BY MR. WALKER:

11  Q.    When you make reference to what we did in the department,

12  are you making reference to what you personally did or what was

13  reported to you by someone else that was done who worked for

14  you?

15  A.    That was work that was done by either contractors or

16  employees of the district, maintenance department.

17  Q.    So those people made reports to you.  They told you things

18  that they had done; is that correct?

19  A.    Yes.

20  Q.    All right.  Now, who is your next in line until about a

21  year ago?

22  A.    In our department, we have two maintenance supervisors, one

23  Mike Ellis, and one James Taggert.  Mr. Ellis is in charge of

24  mechanical issues, and the mechanical contractors work under his

25  supervision as well.  And Mr. Taggert handles everybody else,

1    the carpenters and so forth.

2    Q.    Do you remember having a person who reported directly to

3    you who was neither one of those but who was over both those

4    persons?

5    A.    When what was done?

6    Q.    Well, at a time between 2010 and the present?

7    A.    Oh, in 2010, I am not sure that Mr. Taggert was in charge

8    of maintenance at that time.

9    Q.    May I refresh your memory?

10   A.    Then Kevin Yarberry was there before him.

11   Q.    Kevin Yarberry?  And do you have a person who left your

12   office and went to work for Middleton air-conditioning?

13   A.    Mr. Yarberry at one point in time in his career worked for

14   Middleton.  That's true.

15   Q.    I see.  Was that in recent years?

16   A.    That was about two years ago, I believe.

17   Q.    Yes, sir.  He left your department and went to work for

18   Middleton?

19   A.    No, he went to work for some people that managed the

20   downtown high-rise buildings, and then later on, after he left

21   the maintenance department, he worked there and, I'm not sure,

22   Quinn, Flake, and Anderson or something.  And then later he went

23   to work for Middleton for a while.

24   Q.    I see.

25   A.    And then he left Middleton and went back to work for

1    another maintenance operation before.

2    Q.   Was Mr. Yarberry involved in any of these inspections?

3    A.   When he was maintenance supervisor, most certainly.

4    Q.   So much of your information comes from Mr. Yarberry?  It's

5    Yarberry, isn't it?  Y-a-r-b-e-r-r-y; right?

6    A.   Right.

7    Q.   All right.  Now, do you know Ms. Jackie Whitehead?

8    A.   Do I know what?

9    Q.   Do you know the lady known as Ms. Jackie Whitehead?

10   A.   No, I don't know her.

11   Q.   So you've never met her or visited with her?

12   A.   No.

13   Q.   Do you know who in your department ever spoke with her?

14   A.   I don't recall ever speaking with her.

15   Q.   Do you know if anybody in your department did?

16   A.   I don't know that, no.

17   Q.   All right.  Do you know how many different complaints she

18   made about mold and other things that were injurious to her

19   health?

20   A.   I don't know how many times she complained.

21   Q.   Do you know whether your department addressed each one of

22   them, of your own knowledge?

23   A.   We addressed overall complaints from the school

24   administration.

25   Q.   I see.  But of your own knowledge, can you say that you

 1    addressed each one of her complaints with respect to mold and
 2    other health injurious circumstances?
 3    A.    Well, we addressed her work space.
 4    Q.    All right.  How many complaints do you understand that she
 5    made?
 6    A.    I don't have any idea.
 7    Q.    Do you know how many she made at Dunbar?
 8    A.    I don't know.
 9    Q.    So your answer would be the same for each of the schools
10    where she worked; is that correct?
11    A.    I don't know how many times she complained and to who.
12    Q.    When you say she requested mold studies, you have no
13    knowledge of that, do you?
14    A.    No.  I don't think I know directly that she did.
15               MR. EDDINGS:  I object.
16               THE COURT:  Hold on.  I'm sorry.  Mr. Eddings?
17               MR. EDDINGS:  The question assumes a fact that's not
18    in evidence.
19               THE COURT:  Mr. Eddings, did your witness not testify
20    that there were mold studies requested?
21               MR. EDDINGS:  I think Mr. Walker's question was when
22    Ms. Whitehead requested mold studies, and I don't think that's a
23    fact that's in evidence.
24               THE COURT:  Didn't the administrator there request
25    studies?

```
 1              MR. EDDINGS:  That's correct.
 2              THE COURT:  Okay.  All right.  Mr. Walker, if you'd
 3    ask again.
 4              MR. WALKER:  All right.
 5    BY MR. WALKER:
 6    Q.   Do you recall testifying that she, without identifying the
 7    person, requested mold studies?  Do you remember saying?
 8    A.   You mean while ago?
 9    Q.   Yes, sir.
10    A.   That would have been the principal that actually requested
11    the mold to be --
12    Q.   Do you know who the principal was?
13    A.   Eunice Thrasher.
14    Q.   Do you know how many different mold studies she requested?
15    A.   I don't know.  I know that when it was brought to my
16    attention, we sent our environmental consultant out there.
17    Q.   I see.  Now, these complaints from Mrs. Thrasher didn't
18    come directly to you, did they?
19    A.   Not necessarily.
20    Q.   All right.  And your modus operandi is that when work
21    orders come to your department, they go to either Mr. Yarberry
22    or to Mr. Taggert or some other person; is that correct?
23    A.   If it was done by work order, it would go to them directly,
24    and they would probably go out and look at it to see if there
25    was any evidence of mold.
```

1  Q.   Well, you don't know whether they went or not, though, do

2  you?

3  A.   Not exactly.  I do at Dunbar.  I know that they did because

4  we saw a problem there.

5  Q.   You know that they did at Dunbar because they told you they

6  did?

7  A.   I knew that they did because they told me that they had

8  seen some issues there.

9  Q.   Did you ever go to Dunbar yourself to see if there were

10 issues?

11 A.   I went there as a follow-up when we had determined a

12 problem existed.

13 Q.   What date was that?

14 A.   To make sure it was rectified.

15 Q.   What day did you go to Dunbar?

16 A.   I don't know what day it was.

17 Q.   What year was it, Mr. Adams?

18 A.   What?

19 Q.   What year was it?

20 A.   I didn't understand you.

21 Q.   What year did you go there?

22 A.   Oh, when the problem occurred, and it was probably, you

23 know, like, probably three, four years -- maybe three years ago

24 when that issue occurred.

25 Q.   So that would have been in 2012-13 school year?

Adams - Cross                                                   377

1    A.    It could have been, yes.

2    Q.    Did you speak with Ms. Thrasher at that time?

3    A.    I don't know that I visited her.  I looked at the areas

4    that were giving us a problem and was explained to me how we had

5    corrected the problem.

6    Q.    Who explained that to you?

7    A.    What was your question?

8    Q.    Who?  Can you identify the person who explained that to you

9    as to how you corrected the problem?

10   A.    Morris & Associates was the one who determined what the

11   problem was, and we had our own people correct it.  And a

12   contractor.  Actually, the contractor corrected the issue.

13           THE COURT:  Mr. Adams, you said Mr. Morris is the one

14   who told -- Mr. Adams, you said Mr. Morris?

15           THE WITNESS:  Mr. Morris, Morris & Associates, our

16   environmental consultants.

17           THE COURT:  Okay.  Good.

18           THE WITNESS:  Rex Morris.

19   BY MR. WALKER:

20   Q.    Just a moment.  Mr. Rex Morris does not correct problems,

21   does he?  He's there in Scott, Arkansas, and he's an analyst;

22   isn't that correct?

23   A.    Yes, he's a consultant.

24   Q.    But he doesn't make corrections, does he?  He just

25   determines what the mold level is?

1  A.   He doesn't personally make corrections.  He identifies the

2  problem, and then we direct either our in-house people or our

3  contractor to make that correction.

4  Q.   I see.  Now, how many different corrections did you make at

5  Dunbar in 2010?  Do you know?

6  A.   How many?

7  Q.   Yes, sir.

8  A.   I know of two specific problems that we corrected in the

9  room that we identified as having a mold issue, one with the --

10 well, we had a contractor completely clean the room, and we had

11 this opening above the ceiling into the steam tunnels closed and

12 sealed.  And then we made some modifications to get more air

13 exchanges through the air-handling device for that room.  So

14 those three things that we did.

15 Q.   Now, did Mr. Morris do those things?

16 A.   No, Mr. Morris didn't.

17 Q.   Did you oversee their being done?

18 A.   I knew that it was completed because Mr. Morris did a

19 follow-up to see that it was done.

20 Q.   You knew that it was done because Mr. Morris told you that

21 it was done; is that correct?

22 A.   That's correct.  And I was invoiced for the work.

23 Q.   All right.  You never went to check or inspect his work or

24 his word, did you?

25 A.   I can't see mold because it wouldn't have been anything for

1    me to look at to see, but I did see that the opening to the

2    steam tunnel was closed off.

3    Q.    Have you ever seen mold?

4    A.    Well, you can see it in some cases, like, a wet ceiling

5    tile will grow mold on it.  But mold spores in the area, you

6    don't see.

7    Q.    Did you say that you'd never seen mold at Dunbar?

8    A.    No.  I never saw any mold growing -- growing mold at

9    Dunbar, no.

10   Q.    Is there a difference between mold which is dormant and

11   mold that is growing?

12   A.    Mold spores in the air are not visible, but mold will grow

13   on a wet surface if it's left wet long enough, like carpet or

14   ceiling tile.

15   Q.    Now, you don't know how many complaints came from Dunbar

16   regarding unhealthy, unsanitary conditions by way of work orders

17   from Ms. Thrasher to your department in 2010, do you?

18   A.    How many?

19   Q.    You do not have that information with you as you're there;

20   right?

21   A.    No.  I can --

22   Q.    I'm not asking you to guess.

23   A.    I know of two particular instances that we have sent our --

24   Q.    All right.

25   A.    -- consultant out to look at mold, for mold.

1    Q.    Do you remember each and every work order you get, sir?

2    A.    I don't see the work orders, normally.

3    Q.    You don't normally see them?

4    A.    No, I don't.

5    Q.    Now, is a work order normally a complaint?

6    A.    It's a request to do some repair or some improvement.

7    Q.    All right.  Is it fair to say that since you didn't see the

8    work orders from Dunbar, you didn't see the work orders from the

9    other schools either?

10   A.    I did not see them, huh-uh.

11   Q.    I see.  Now, when you said that you didn't see any

12   excessive mold there, you're going to the basis of what somebody

13   told you they didn't see; is that correct?

14   A.    As far as being corrected, yes.

15   Q.    Yes.  And do you know the persons who told you they didn't

16   see any mold there?

17   A.    At which school?

18   Q.    At Dunbar still.

19   A.    You're talking about after the correction was made?

20   Q.    No, sir.  In 2010, at any time, do you know --

21   A.    There was no obvious mold growing in this room, but as a

22   result of the concerns, we did air sampling and determined that

23   there was some spores in the air in excess of what we would

24   consider normal.

25   Q.    Do you know what the duration of those spores in the air

1   was at Dunbar, both before -- well, before you conducted your

2   studies?

3   A.    What level?

4   Q.    Do you know how long they had been there?

5   A.    Oh, I do not.

6   Q.    Do you have any way of figuring it out?

7   A.    I don't know that -- when the covering to the chase came

8   loose, it had been covered with Visqueen, so I don't know when

9   that occurred, no.

10  Q.    I see.  Now, would your answers be the same for Dunbar with

11  respect to -- from McClellan with respect to mold?

12  A.    This --

13        MR. EDDINGS:  Your Honor, I'm going to object.  I'd

14  ask Mr. Walker to rephrase the question.

15        MR. WALKER:  I'll do that.  I was trying to just

16  shortcut it, but I'll go through it, your Honor.

17        THE COURT:  Thank you, Mr. Walker, and I think we do

18  need to shortcut and get to meatier matters.

19        MR. WALKER:  All right.

20  BY MR. WALKER:

21  Q.    Let me ask you, with respect to Wilson and Cloverdale, do

22  you have personal knowledge about the problems there?  Except

23  through work orders that were communicated to you by one of your

24  subordinates?

25  A.    At which site?  Either one?

1   Q.   No, let's just deal with Wilson.  Wilson.

2   A.   Wilson.  Which problem?  I mean --

3   Q.   Do you have personal knowledge of any of them based on your

4   own observation?

5   A.   No.  I was, you know, told about the cafeteria air-

6   conditioner going out.  It was in '14, not in 2013.

7   Q.   Do you remember who told you?

8   A.   The foreman identified the fact that we had a -- needed to

9   replace a package unit in the cafeteria.

10  Q.   I see.  You never talked with the principal at the school?

11  A.   Oh, I talked to Ms. Cox when she was there about some

12  issues that she had.

13  Q.   Well, I understand --

14  A.   That wasn't one of the issues.

15  Q.   Did you talk to Ms. Cox about this particular problem that

16  Mister --

17          MR. WALKER:  I forget your name.

18  A.   I didn't talk to her about that specific problem.

19  Q.   Mr. Eddings.

20  A.   Ms. Cox had some desires when she moved to Wilson.  One of

21  them was a chair lift that we had to put in.

22  Q.   Was a what?

23  A.   She was concerned about the steps to the lower level, as a

24  matter of fact, and we added a chair lift to help accommodate

25  her needs for not wanting to climb the steps and as an ADA

1    compliance.

2    Q.    Did you ever go to Jefferson to look at -- to determine

3    whether or not there was mold?

4    A.    I did.

5    Q.    Did you go personally?

6    A.    I was concerned about --

7    Q.    Did you go personally, is my question.

8    A.    I did.

9    Q.    How many times did you go?

10   A.    I think at least twice.  It --

11   Q.    That's fine.  Did you ever go to Dunbar personally to

12   observe the mold?

13   A.    Well, it wasn't determinable, but --

14   Q.    That's yes or no.

15   A.    But I was there after the remediation.

16   Q.    All right.  But you went to Jefferson when the problem

17   presented itself; right?

18   A.    It was observable there.

19   Q.    I see.  Jefferson is in west Little Rock.  Did you go to

20   any other schools that are in southwest Little Rock personally

21   to observe anything?  Or in central Little Rock?

22   A.    To observe mold?

23   Q.    Observe mold or flooding or anything.  Did you observe the

24   flooding yourself at Dunbar?

25   A.    I observed a lot of things at Dunbar, but I can't observe

1    mold when it's in the air.

2    Q.   My question was, did you observe flooding?

3    A.   Say it again.

4    Q.   Did you observe flooding at Dunbar?

5    A.   No.

6    Q.   All right.  Now, you did indicate that there was a minor

7    abatement of asbestos at Dunbar?

8    A.   There was a small abatement, probably summer before last,

9    very small.

10   Q.   So that means that Dunbar has a lot of asbestos in it; is

11   that correct?

12   A.   Many of the older schools have asbestos tile underneath the

13   carpet in some places that we haven't abated.

14   Q.   And when the carpet is affected by way of a breach of some

15   kind, the carpet --

16   A.   Floor tile is not -- does not release asbestos fibers,

17   normally.  It's encapsulated within the tile.  So there's no

18   requirement to remove the floor tile until it comes loose.  And

19   then you obviously need to remove it with an abatement company

20   because it has to be disposed of.

21   Q.   But you did have an abatement company go there; is that

22   correct?

23   A.   Yes, sir.

24   Q.   So that means that it had been released, doesn't it?

25   A.   What?

1   Q.   That means that the asbestos had been released at Dunbar,

2   doesn't it?

3   A.   No.  The floor tile is removed in a containment, and it all

4   follows EPA regulations and it's done by a licensed abatement

5   contractor for asbestos.

6   Q.   Have you done just basic, normal, maintenance at Dunbar in

7   the last four years?

8   A.   Masonry?

9   Q.   Have you done normal maintenance at Dunbar here in the last

10  four years?

11  A.   Yes.

12  Q.   In the same manner that you've done it at the other

13  schools?

14  A.   Absolutely.

15  Q.   Have you done normal maintenance at Cloverdale in the last

16  four years in the same manner that you've done it at other

17  schools?

18  A.   Absolutely.

19  Q.   So that your maintenance is consistent across the board?

20  A.   We operate on the work order system, and as work orders

21  come in, they're dispatched to the employees and taken care of

22  as quickly as possible.

23  Q.   Did you ever make a determination that Cloverdale was in

24  gross need of being replaced?

25  A.   Need of being repainted?

Adams - Cross                                            386

1    Q.    Replaced.

2    A.    Oh, replaced.  That's an interesting question.  I'm not

3    sure how to answer that.  We had discussed the possibility of

4    renovating McClellan into a middle school to replace Cloverdale.

5    That's the only discussion I've had with regard to replacing

6    Cloverdale.

7    Q.    Did you have much discussion on that subject?

8    A.    What?

9    Q.    Did you have much discussion on that subject?

10   A.    We haven't done any scheduling of that as well.

11   Q.    Now --

12   A.    I haven't been asked to.

13   Q.    So you haven't been involved in anything by way of

14   replacement of McClellan?

15   A.    Replacing McClellan?

16   Q.    Yes, sir.  Do you know of any plans to replace it?

17   A.    You're talking about building a new high school to replace

18   McClellan?

19   Q.    Yes.  Do you know of any plans underway for that purpose?

20   A.    We're in the process of looking at doing that right now.

21   Q.    You're looking at doing it.  All right.

22         Now, did you ever recommend that Cloverdale be rebuilt?

23   A.    In its existing location?

24   Q.    No, sir.  Did you ever recommend that it be rebuilt in

25   any -- at any place at any time, anywhere.

1  A.   I haven't recommended that, other than the fact that if we

2  abandon McClellan, we should probably -- we could convert it

3  into a good middle school.

4  Q.   I see.  Does it take six years or five years to build a new

5  middle school, in your opinion?

6  A.   We're not -- where now?

7  Q.   No.  In your experience with the district, would it take

8  three years -- I mean six years to build a new middle school

9  anywhere?

10  A.   From start to finish?

11  Q.   Yes, sir.

12  A.   I would think three years would be good.

13  Q.   All right.  Did it take three years to build Roberts?

14  A.   Roberts was built in two and a half years, from start to

15  finish.

16  Q.   So that if a new Cloverdale were constructed, you could

17  have that constructed in two and a half years.  So it would be

18  ready for use in the 2018-19 school year?

19  A.   If we had a location established for it, you could probably

20  build a school in two and a half years if you really got after

21  it.

22  Q.   All right.  Now, did you receive -- at Cloverdale, you were

23  questioned extensively about that.  Now, you indicated that you

24  were there last Monday.  Why were you there last Monday?  That

25  means yesterday, doesn't it?  Day before yesterday.

Adams - Cross                                          388

1   A.   I looked at the pictures that were sent to me and I wanted
2   to determine if any of that was still present.
3   Q.   I see.  Now, did you -- can you say that the conditions
4   that are depicted in those pictures that are shown to you by
5   Mr. Eddings were not the conditions at Cloverdale at some time
6   during 2010, between 2010 and 2015?
7   A.   I don't know exactly when those pictures were made, but at
8   some point in time, obviously, that existed.
9   Q.   All right.  Now, would you have known about those things of
10  your own volition or your department's volition without a work
11  order coming to you?
12  A.   I wouldn't have known about them personally, no.
13  Q.   I see.  Now, is it possible for work orders to come into
14  your office and you never know about them?
15  A.   I don't see the work orders, no.
16  Q.   So it is possible for a hundred work orders to have been
17  sent to your department without your knowledge coming from
18  Cloverdale?  Yes or no?
19  A.   It is possible.
20  Q.   Thank you.  Now, in terms of Room 34, was Monday of this
21  week the first time you'd ever been in Room 34?
22  A.   I've looked at Room 34.
23  Q.   Was that the first time you'd ever been in Room 34?
24  A.   I don't remember being in there ever before.
25  Q.   I see.  Now, you talked about rodents and other things in

1   buildings.  Did you find those generally prevalent in the

2   buildings that were older?

3   A.    At Cloverdale.

4   Q.    At Cloverdale.  You saw them at Cloverdale; right?  You

5   were aware of them at Cloverdale?

6   A.    Yeah, older buildings.

7   Q.    All the older buildings.  Now, you didn't have those -- did

8   you have rodents at Forest Park?  Forest Heights?

9   A.    Rodents?

10  Q.    Yes, sir.

11  A.    At Forest Heights.  I don't recall any.  I mean, there

12  could be a work order turned in for something like that, and the

13  pest control guys, the contractor would get the work order and

14  automatically take care of it without me knowing.  I don't

15  recall any rodents.

16  Q.    Isn't it true that from your understanding, most of the

17  problems with respect to rodents and things like that were in

18  the schools in southwest Little Rock or in central Little Rock,

19  the older schools?

20  A.    Not necessarily.  We've had problems with mice at Roberts

21  after it was built, for some reason.

22  Q.    Mice at Roberts?

23  A.    Uh-huh.

24  Q.    After it was built?

25  A.    Field mice, I guess.  We turned it over to the pest control

1    and they have dealt with it.

2    Q.    Was that after the school was populated?

3    A.    Yes, it was.

4    Q.    Is it --

5    A.    Unusual.

6    Q.    Was it an ongoing problem or was it a one-time problem?

7    A.    It seemed to be taken care of by our contractor, as are the

8    other problems.

9    Q.    With respect to the lockers, you never knew that there was

10   a locker problem in the schools like Cloverdale, did you, until

11   Tuesday or Monday of this week?

12   A.    I didn't know there was a locker problem.

13   Q.    So much of what you had to say about what you knew about

14   the problems is all just what somebody told you, without it

15   being -- without it coming to you through any official chain of

16   command before Monday?

17             MR. EDDINGS:  Your Honor, I'll object to the compound

18   question.

19             MR. WALKER:  I'll change it, your Honor.

20             THE COURT:  Sustained.  Please rephrase.

21   BY MR. WALKER:

22   Q.    Much of your testimony relates to what you were told at

23   some point by a subordinate working for you?

24   A.    You're referring to the lockers at Cloverdale?

25   Q.    Well, we can just use the lockers.  Yes, sir.

1    A.    I was told that they were -- they had asked us if we could

2    remove the lockers, and that's how it came to my attention that

3    they weren't using them anymore.  And we declined to remove them

4    because of the problems we would have with the walls being

5    unfinished behind them.

6    Q.    Well, were there lockers to replace the lockers that were

7    not in use?

8    A.    The lockers, we haven't had any request to do any locker

9    repair.

10   Q.    Well, let me understand this.  You do acknowledge that the

11   lockers are not in use at Cloverdale?

12   A.    To the best of my knowledge.

13   Q.    Well, what do the students do without lockers?

14   A.    I don't know.

15   Q.    Thank you.  Now, you addressed Western Hills.  Western

16   Hills, for the Court's understanding, is located in proximity to

17   Wilson, isn't it?

18   A.    Located where?

19   Q.    In proximity to Wilson in southwest Little Rock?

20   A.    It is.  It's located in proximity to Wilson.

21   Q.    I see, and you also mentioned problems with Mabelvale, and

22   if you go a couple of miles up from Wilson, three or four miles,

23   you'll go into Mabelvale; is that correct?

24   A.    What kind of problem are you --

25   Q.    Well, you indicated that there were problems in Mabelvale,

 1    too, that you were aware of.  The chiller failed, which is now

 2    operational.

 3              MR. EDDINGS:  Your Honor, I'm going to object.  The

 4    question assumes a fact that's not in evidence.

 5              MR. WALKER:  Well, I'll change it, your Honor.

 6              THE COURT:  All right.  Please do.

 7    BY MR. WALKER:

 8    Q.    Did you testify that there were problems that you all

 9    addressed as a department with respect to Mabelvale Elementary

10    School?

11    A.    Problems at Mabelvale Elementary?

12    Q.    Yes.

13    A.    What are you referring to me testifying?

14    Q.    If you didn't testify about it, fine.  Just say you didn't.

15    A.    I know of an issue we're dealing with over there, but I

16    don't recall testifying about it.

17    Q.    What is that issue?

18    A.    There was some water intrusion in a room that we're in the

19    process of sealing on the south end of the building from ground

20    water getting into the wall, and we're in the process of

21    correcting that problem.

22    Q.    All right.  Have you had that problem with respect to

23    Jefferson or Fulbright?

24    A.    Water intrusion?

25    Q.    Yes, sir.

1    A.   There actually has been, you know, in my recollection, a

2    problem at Jefferson on the front of the building with water

3    getting into -- they put a planter out there that elevated the

4    ground above the floor level of the classroom, and we had to dig

5    that all out and waterproof the wall to keep the water from

6    getting in.

7    Q.   But that wasn't from the ground itself.  That wasn't from

8    underneath the ground.  That was from something that people,

9    that man made; is that correct?

10   A.   Yes.

11   Q.   Now, you've had quite a few problems with McClellan,

12   haven't you?

13   A.   What?

14   Q.   You've had quite a few problems at McClellan, haven't you?

15   A.   Not more than normal.  That problem with the HVAC was

16   significant.

17   Q.   Did that go on throughout the school year, pretty much

18   throughout the school year?

19   A.   That's the one where the heat exchangers were all cracked

20   on the units that were only 12 years old.

21   Q.   So that happened at McClellan, and you replaced those units

22   with space heaters.

23   A.   We replaced the -- well, we brought space heaters, probably

24   about 30 or 40 space heaters to put them out there to assist

25   them in providing some heat while we were in the process of

1   trying to find the exchangers.

2   Q.   I see.  So you all did work on the facility while students

3   were in class?

4   A.   We started work -- the units are all on the roof.  We were

5   working on the roof units.

6   Q.   All right.  Now, did you participate in the Fanning Howey

7   study?

8   A.   I was involved with them from time to time as they had

9   questions.

10  Q.   Were you aware of Fanning Howey's report that the school of

11  most critical need was Cloverdale?  For replacement was

12  Cloverdale?

13  A.   I saw that that was the -- at the bottom of the list.

14  Q.   Do you agree that that's the area of most critical need?

15  A.   In the manner in which they provided the study, I think

16  that's probably -- they had many factors to consider in coming

17  up with that rating, and basically they compared the schools to

18  the perfect school.  And that certainly caused that to be --

19  Q.   Do you agree that that's the school with the highest

20  priority of attention?

21  A.   It would appear by the way they rated the school to be that

22  way.

23  Q.   Do you know of anything that says that building a brand-new

24  school in a particular section of the state is of greater

25  priority or greater need than the -- than a new school for

1    Cloverdale?

2    A.   I don't set priorities for things like that.

3              MR. WALKER:  Thank you.

4              THE COURT:  Mr. Adams, these photographs that

5    Mr. Eddings went through with you, do you remember at the

6    beginning, the photographs?

7              THE WITNESS:  Yes.

8              THE COURT:  Did you take those pictures or did

9    somebody take them who was with you?

10             THE WITNESS:  I had someone with me that took them.

11             THE COURT:  Okay.  Mr. Walker, any objection now to

12   them, to the photographs?

13             MR. WALKER:  No, sir.

14             THE COURT:  Okay.  They're admitted.

15        (Defendant LRSD's Exhibit 21 received in evidence.)

16             THE COURT:  Thank you, Mr. Adams.

17             THE WITNESS:  Yes, sir.

18             THE COURT:  Mr. Eddings, any redirect?

19             MR. EDDINGS:  No more questions for Mr. Adams.

20             THE COURT:  Okay.  Mr. Adams, you're excused.

21             THE WITNESS:  Appreciate it very much.

22             THE COURT:  Thank you very much.  Be careful.

23        Ladies and gentlemen, I think this is a good point for our

24   afternoon break.  We'll be out about 15 minutes.  Come back at

25   ten till.  Y'all can keep your seats.

1          (Recess from 2:38 p.m. until 2:56 p.m.)

2               THE COURT:  Everybody can be seated.

3          Mr. Heller?

4               MR. HELLER:  Little Rock School District rests, your

5     Honor.

6               THE COURT:  Thank you, Mr. Heller.

7          Mr. Hollingsworth?

8               MR. HOLLINGSWORTH:  Your Honor, the state defendants

9     call Terry Granderson.  Mr. Granderson is right here.

10               THE COURT:  All right.  Come forward, please, sir.

11          **TERRY GRANDERSON, DEFENDANTS' WITNESS, DULY SWORN**

12               MR. HOLLINGSWORTH:  Your Honor, if I may, to save the

13     back and forth, I'd like to go ahead and hand him the two

14     exhibits I'm going to ask about.

15               THE COURT:  Very good.

16               MR. HOLLINGSWORTH:  I'm handing the witness what's

17     marked as ADE Exhibits 4 and 5.

18                         DIRECT EXAMINATION

19     BY MR. HOLLINGSWORTH:

20     Q.   Tell us your name, please, sir.

21     A.   Terry Granderson.

22     Q.   And what do you do for a living, Mr. Granderson?

23     A.   I'm the assistant director of the Division of Public School

24     Academic Facilities and Transportation.

25     Q.   How long have you been at the Division of Public School

1    Academic Facilities and Transportation?

2    A.    Since 2005.

3    Q.    Is that about the time the division was founded?

4    A.    Yes.  The division was founded in July of 2005, and I

5    started work in August.

6    Q.    What did you do initially in the division?

7    A.    Started off as an area manager for one of the four areas

8    that we had divided the state into for planning purposes.

9    Q.    What's your present position?

10   A.    Assistant director.

11   Q.    Did you serve as interim director for a while?

12   A.    From July 1 of last year until February 19 this year.

13   Q.    Can you explain the primary functions of the Division of

14   Public School Academic Facilities and Transportation?

15   A.    Well, it's twofold.  The primary mission is to direct the

16   districts in their master planning for their facilities, and

17   then to work with the districts in their applications to fulfill

18   that master plan, to guide them in the proper procedure for the

19   application, in order to achieve funding from the state to build

20   the facilities they say they need.

21   Q.    Okay.  You've mentioned master plans.  What is a facilities

22   master plan?

23   A.    It's a six-year rolling forecast, basically, of what they

24   need over the period of the next six years.  They take the

25   projects that are coming up in the upcoming biennium and decide

1    at the time that the master plan is to be presented or the

2    application is to be presented to -- whether or not they want to

3    proceed with that project.  It may be a new building, it may be

4    a new roof, it may be air-conditioning for a building.  And then

5    they will submit those, the master plan on February 1 of the

6    even-numbered year, and March 1 of the even-numbered year, they

7    will submit the project applications.

8    Q.   Would it be fair to say that at the time a master plan is

9    submitted, that it's a snapshot?

10   A.   Yes.

11   Q.   Do the facilities master plans that are submitted to you

12   represent firm construction plans or are they something from a

13   higher level than that?

14   A.   Well, it's only a plan.  The districts in consultation with

15   the division during the preliminary master planning cycle will

16   make decisions or suggestions or desires to go with a certain

17   project, but circumstances change, you may lose an industry in a

18   town, a small town, that affects your enrollment, and all of the

19   sudden you don't need a new classroom addition or new building

20   or something.  So they're allowed to change that at any time.

21   Q.   Are the districts bound at all to any of the commitments,

22   the project commitments they make in the master plan?

23   A.   To the extent that they are working towards adequacy for

24   the amount of space they need, the right type of buildings they

25   need, we attempt to monitor that.  Theoretically, if they don't

1  proceed with achieving the ultimate goal or accomplishing what

2  they say in their master plan, then we could have some discourse

3  with them.

4  Q.   Assuming in the scenario you just described, what would be

5  the division's authority?

6  A.   Repeat the question.

7  Q.   Sure.  In the scenario you just described where a district

8  is not moving towards a goal that they've set that appears

9  important to achieve adequacy -- and I assume you're talking

10 about adequacy as in the *Lake View* sense?

11 A.   Yes.

12 Q.   Assuming that you see that a district has made some plans

13 and is not -- you're looking at their facilities master plan and

14 they're not moving towards that, what authority does the

15 division have to take action against the district?

16 A.   Well, ultimately it could lead to facilities distress, but

17 prior to that we would have issued them a letter of indicators

18 of facilities distress and then try to work that out.  Sometimes

19 it's a change of leadership, either the superintendent or the

20 board or both, and they kind of lose focus on where they need to

21 be going.  But that's a rarity.  They generally apply for what

22 they need.

23 Q.   Has a -- has the Little Rock School District -- let me back

24 up.

25      What is facilities distress?

Granderson - Direct                                          400

1    A.   Well, facilities distress is caused by a number of factors.
2    It could be caused by a number of factors.  One would be state
3    procurement violations.  I don't have my list in front of me.
4    One could be failure to maintain facilities.  One could be
5    failure to achieve the goals of the master plan.  And there's a
6    couple more.  I don't remember off the top of my head.
7    Q.   To your recollection, has any district ever been placed in
8    facilities distress?
9    A.   There was one district in 2006, I believe it was, was
10   placed in facilities distress, not due to facilities condition
11   or anything, but there were some state procurement violations
12   and some criminal charges brought against some school staff.
13   Q.   Which district was that?
14   A.   Hermitage.
15   Q.   Has the Little Rock School District, has there ever been
16   any threat of the Little Rock School District being in
17   facilities distress?
18   A.   No.
19   Q.   Now, when you approve the facilities master plan of a
20   district, what does it mean?  What does the approval signify?
21   A.   Well, basically just means they have a plan.
22   Q.   Okay.
23   A.   The state law says we shall approve their plan, but that's
24   generally after we've discussed it with them so we know what
25   they intend to do, not necessarily what they're going to do.

1    You could get up to the end of the sixth year and think you need

2    a new roof on a building and your maintenance person says, no, I

3    can get another four years out of it, and they can remove it.

4    So it's a plan, but it's not, you know, tied down -- locked in

5    permanently.

6    Q.    Okay.  Does the planning -- does your interaction with

7    districts -- is your interaction with districts that get

8    partnership funding more intensive than your interaction with a

9    district like Little Rock School District?

10   A.    Yes.  There are districts out there who do not receive

11   funding based on their wealth index.

12   Q.    Is Little Rock one of those?

13   A.    Yes.

14   Q.    Now, for the -- can you explain briefly what partnership

15   funding is?

16   A.    Partnership funding is a method by which the state partners

17   with the schools to provide money for facilities.  It is

18   distributed trying to achieve an equitable distribution based on

19   the wealth index of that district, or all the districts, and

20   with the aim of going to the districts with the lowest wealth

21   index.

22   Q.    Okay.  And I take it that the wealth index determines the

23   amount of the state's participation?

24   A.    Yes.  It determines the amount of state's participation,

25   and then the district has to provide their portion as well.

1    Q.    Okay.  And in that partnership planning process, does your

2    division have some say over what the district does and does not

3    spend its money on?  Its partnership money.  I'm sorry.

4    A.    We are the public school academic facilities and

5    transportation division, so it can only be for academic space,

6    not administrative or athletic or anything like that.

7    Q.    Now, I'd like to show you or I think you have in front of

8    you, actually, a copy of ADE Exhibit 5.  Should be a two-page

9    document.  Do you recognize ADE Exhibit 5 as two pages out of

10   Little Rock School District's facilities master plan?

11   A.    I presume that is correct.  I've not looked at it directly

12   myself.

13   Q.    Is this what the capital projects committed information

14   looks like in the Little Rock School District facilities master

15   plan?

16   A.    That's correct.

17   Q.    All right.  According to --

18            MR. HOLLINGSWORTH:  Your Honor, move to admit ADE

19   Exhibit 5.

20            MR. WALKER:  No objection.

21            THE COURT:  It will be received.

22       (Defendant ADE's Exhibit 5 received in evidence.)

23   BY MR. HOLLINGSWORTH:

24   Q.    Mr. Granderson, the first page of ADE Exhibit 5 titled

25   Capital Projects Committed, and the first block reads:  West

1   Little Rock middle school.  Do you see that?

2   A.   Yes.

3   Q.   What does this document, the first page of this document,

4   tell us about the project, the beginning date of design and

5   anticipated construction for this west Little Rock middle

6   school?

7   A.   Well, it's a description of what they intend to do.

8   They're talking about acquiring the land and where it will be

9   built, feasibility study for it, cost of the feasibility study.

10  The more important information we would look at would be the

11  blocks at the bottom where they propose to build it, the square

12  footage of the building.  The funding code is partnership.  With

13  the restructuring of the wealth index formula here recently

14  after the mistake was made with the assessor's office regarding

15  North Little Rock, North Little Rock does now qualify for

16  approximately 6 percent state participation, where before they

17  didn't.

18  Q.   North Little Rock or Little Rock?

19  A.   Little Rock.

20  Q.   Okay.  So Little Rock could potentially qualify for some

21  partnership funding.

22  A.   Small amount, but some money, yes.

23  Q.   Okay.  So go ahead.  The blocks, we have design start date.

24  What does that signify?

25  A.   Well, they've started design on that with their architects,

1    you know, in the planning stages to get that design started and

2    get prepared once they get ready to build.

3    Q.    And what did the Little Rock School District indicate the

4    proposed construction start date was?

5    A.    It's proposed for June 1, 2014.

6    Q.    But you never -- you've only recently received construction

7    plans for that project; correct?

8    A.    That's correct.

9    Q.    Now, let's look at the second page of ADE Exhibit 5, and at

10   the top of the top block is southwest Little Rock high school.

11   Is this the same type of information with respect to a different

12   proposed facility?

13   A.    That's correct.

14   Q.    And what does the second page of ADE Exhibit 5 indicate

15   about the design start date for the southwest Little Rock high

16   school?

17   A.    May of 2013.

18   Q.    And what does it indicate the proposed construction start

19   date would be?

20   A.    May of 2015.

21   Q.    Now, we see the date at the top of ADE 5 is February 2,

22   2015.  Prior to February 2, 2015, would your office have had

23   meetings with the school district about its facilities master

24   plan?

25   A.    Yes.  In the summer of 2014, we conducted preliminary

1    master plan meetings with all 236 districts.

2    Q.    Okay.  And you would have had that meeting with the Little

3    Rock School District?

4    A.    That's correct.

5    Q.    Is there any reason to believe that the dates indicated for

6    design and construction start on ADE 5 were changed after your

7    preliminary meeting in 2014?

8    A.    I'm not aware that they have been.

9    Q.    Okay.  I think we've talked a little bit about the

10   partnership program.  If Little Rock School District is to build

11   a facility without partnership funding, what is the approval

12   process from your office?

13   A.    Without partnership funding?

14   Q.    Yes, sir.

15   A.    Every district has to submit plans for any construction

16   project over 20,000 square feet.  They have to submit a

17   construction approval form, signed and basically asking for

18   permission to do the project, and we receive that, review it,

19   and then send back -- at the same time they will send in their

20   drawings, schematic drawings, at least, of what they propose.

21   And we will review that to see that it meets -- actually,

22   they'll send in a full set of drawings and we'll make sure it

23   fits our facilities standards requirements and then we'll send

24   back an approval letter or a correction letter.

25   Q.    What are the principal components that you're looking at in

1    terms of whether or not you approve the plans?

2    A.    Well, primarily that it's notated in the specifications and

3    on the plans that they meet all state agency codes, fire code,

4    building code, seismic code, energy code, mechanical plumbing

5    codes, any other state agencies that do plan review, have to

6    send us a copy of their plan approval, plan review approval.

7    And then there are a few elements that we check for to meet our

8    standards, certain strength of concrete, certain types of wall

9    finishes that cannot be used in a school.  Just different

10   elements of the building itself.

11   Q.    Would it be fair to characterize those as construction

12   standards?

13   A.    Yes.

14   Q.    And then are part of those included in your academic

15   facilities manual?

16   A.    Yes.

17   Q.    What other components does your academic facilities manual

18   authorize you to approve or disapprove?  And just big picture.

19   A.    Everything from the concrete up to the roof.

20   Q.    Okay.  Do you consider that the division has the authority

21   or even the assignment to determine whether a nonpartnership

22   funded project is something the district needs or does not need?

23   A.    Yeah, I think we do.  We have to look at adequacy and

24   suitability.  If they're a growing district and they have

25   suitability needs, then we still have to okay the size of the

1    project.  They can exceed that, but we still -- if it was a

2    funded project, we would give them a certain size they could

3    build that we could fund.  They can actually build whatever they

4    want if they can afford it.  But a nonfunded project, we still

5    would look to see that it's meeting their enrollment growth

6    projections.

7    Q.    Okay.

8    A.    Is my speaker on?

9    Q.    Yeah, it's -- you might pull the microphone a little closer

10   to you.  You may be able to just pull it up across the table

11   there.  Grab the bottom of it.

12   A.    Okay.

13   Q.    There you go.  Let me make sure that I'm clear, and I

14   apologize if I lead, but I want to make sure I understand.  You

15   were saying that you could withhold approval if you think the

16   facility is not large enough for the projected enrollment?

17   A.    Well, we could, but it -- well, it would depend also if

18   they're working towards -- if your highest enrollment is ten

19   years out, there's no need to build a building that big now.

20   You could build it for five years out and then plan to add to

21   it.  So it's kind of a mutual agreement that we do.

22   Q.    Does the division in, again, a nonpartnership program like

23   the project that Little Rock School District has just submitted

24   on the west Little Rock middle school, do you judge whether or

25   not the geographic location of the building within the city is

1    appropriate?

2    A.    No, sir.  We do not get involved in site selection.

3    Q.    Does the division get involved in nonpartnership programs

4    in guiding the -- directly guiding the district's choices in how

5    to spend its facilities money?

6    A.    Not directly.

7    Q.    Indirectly, how would you be involved?

8    A.    Well, they're required to maintain 9 percent of their

9    foundation funding to go towards facilities, maintenance, and

10   operations.  And then, of course, the money, if it was a funded

11   project, we would make sure it actually went to that building.

12   But as far as a district not receiving funds, about the best we

13   could do is make sure that they spent their minimum of 9 percent

14   of their foundation funding for facilities maintenance.

15   Q.    Okay.  Now, in self-constructed or self-funded

16   construction, your rule and your form have a provision, don't

17   they, for the district to -- and I don't remember the exact

18   wording, but to essentially assure you that the project will not

19   have a segregative effect.  Does that sound right?

20   A.    That's correct.  There is a statement of assurance

21   requirement on that form.

22   Q.    Okay.  Does your form or do your form or your rules require

23   any information beyond that?

24   A.    No.

25   Q.    Does your rule provide for you to further investigate the

1   district's assurance that's given to you?

2   A.   No.

3   Q.   Are you aware of any authority to withhold approval based

4   on whether or not the project might have a segregative effect if

5   the district assures you that it does not?

6   A.   I don't know of any authority we would have to make that

7   determination.

8   Q.   Now, I'd like to talk, turn now to inspections.  Another

9   one of your, if I may use the term -- and I'm not sure this is

10  right.  Another one of your departments inspects academic

11  facilities.  Is that correct?

12  A.   That's correct.

13  Q.   Is it called a department or --

14  A.   It's a section.

15  Q.   Okay.  Section.  And what do you call that section?

16  A.   Maintenance and operations.

17  Q.   How many individuals do you have assigned as inspectors in

18  maintenance and operations?

19  A.   Six.

20  Q.   For what area?

21  A.   Well, for the entire state, 236 districts, eleven hundred

22  and 50-something campuses, 6,500 buildings, approximately.

23  Q.   How many inspectors are assigned to the area that includes

24  Little Rock?

25  A.   Well, there's only one assigned to this area, which would

Granderson - Direct                                    410

1   include Pulaski County, and then the great river -- I mean the

2   Arkansas River Co-op, which is in Pine Bluff; districts in

3   Jefferson County, Grant County, and Arkansas County.

4   Q.   What exactly do these inspectors do?

5   A.   Primary goal is to go out and walk through the facility and

6   with a common sense approach, because we're not architects or

7   engineers and we do not have code authority, with a common sense

8   approach to go through after training, to look for things that

9   need -- that are broken, need to be fixed, you know, regular

10  maintenance items, anything that looks like a potential code

11  violation and where we would then contact the appropriate state

12  agency to follow up on that, or have the district follow up on,

13  get it fixed.

14  Q.   If your inspector finds, for example, a code violation,

15  what is your division's enforcement power?

16  A.   We can within the statute call in other agencies, and it's

17  their authority to make that determination.  We will not call

18  something a code violation.  We will say it appears to be a code

19  violation and then have the appropriate agency check that out.

20  Q.   Does your division, for example, have the power to withhold

21  funding from a district that you find -- in which you find these

22  deficiencies that are not cured?  And, I'm sorry, let's talk

23  about nonpartnership.

24  A.   Well, maintenance issues are not directly related to the

25  funding for new facilities or construction projects.

1    Q.    Okay.

2    A.    So we would -- if it was a chronic problem, then it would

3    be coming back to that indicators of facilities distress for

4    failure to maintain their buildings.

5    Q.    Okay.

6    A.    And we could that way.

7    Q.    I'd like for you to look at what we've marked as ADE

8    Exhibit 4, Mr. Granderson, which is a compilation of reports

9    that you provided us.  Can you explain what ADE Exhibit 4 is.

10   A.    This is -- these are -- all of these are copies of our

11   actual maintenance reports that are filled out by the inspectors

12   as they walk through the facility.  They look a little bit

13   different because we've evolved through the years and improved

14   and changed the format a little bit.  But basically it's showing

15   what the inspector actually looked at when he went through.  And

16   then his comments at the bottom and recommendations at the end

17   of the report.

18   Q.    Does ADE Exhibit 4 represent the most recent inspection

19   reports for Cloverdale, Dunbar, Baseline, Henderson, McClellan,

20   Wilson, and Booker?

21   A.    I would say they're not the most recent.  I don't -- well,

22   should be all of them if we go through the whole thing.

23   Q.    Okay.  All right.

24   A.    But that's what we were asked to run.

25         MR. HOLLINGSWORTH:  Your Honor, move to admit ADE

1    Exhibit 4.

2          MR. WALKER:  No objection.

3          THE COURT:  ADE 4 is in.

4       (Defendant ADE's Exhibit 4 received in evidence.)

5    BY MR. HOLLINGSWORTH:

6    Q.   Mr. Granderson, I just want to ask you about four of these

7    that we've talked about.  The first -- and this is a little bit

8    confusing.

9          MR. HOLLINGSWORTH:  And, Judge, I apologize as we move

10   through these.  They're not well indexed.

11   BY MR. HOLLINGSWORTH:

12   Q.   The first page, Mr. Granderson, appears to be a report for

13   Cloverdale Middle School and cafeteria dated November 18, 2009.

14   And then somehow in the middle of it, we have a Dunbar report.

15   But let's -- which is about four pages back.  Let's start with

16   the Cloverdale Middle School and cafeteria.  Can you tell us

17   what this inspector reviewed, roughly, and what was found?

18   A.   Well, all of the items marked with an X are what he did

19   check, indicated by these -- it's indicated he checked these.

20   Then his comments at the bottom involving fire extinguishers,

21   ungrounded receptacles, the stage ramp has a loose railing.  You

22   know, just everything there is, you know, typical of what we

23   find in buildings all the time.

24   Q.   In the Little Rock School District or --

25   A.   In all, all schools.

1   Q.   And then the next page has an item called custodial, and

2   what does the inspector say, November 18, 2009, about the

3   general condition of the facility?

4   A.   Well, in the opinion of this inspector, and he had been a

5   former custodian at the Little Rock School District when we

6   hired him, in his opinion, this is -- the general condition is

7   good given the fact that it's as old as it is.

8   Q.   Now, immediately following the first two pages, we have

9   something that says under item 5, and this is on -- it's labeled

10  page 3.  This is a follow-up report.  Does this mean that --

11             MR. WALKER:  Objection.  Leading.

12             THE COURT:  Sustained.

13  BY MR. HOLLINGSWORTH:

14  Q.   Can you tell us what the third page of ADE Exhibit 4 is,

15  please, Mr. Granderson.

16  A.   Well, it's stated that it is a follow-up report and they

17  still had some items that needed to be corrected.

18  Q.   What is it a follow-up to?

19  A.   It's a follow-up to the report on November 18, 2009.

20  Q.   What's the date of this follow-up report?

21  A.   February 26, 2010.

22  Q.   Can you explain the purpose of a follow-up visit?

23  A.   At that time, the follow-up was necessary to go and be sure

24  that what we had asked them to correct got corrected.

25  Q.   What's your recourse if the items are not corrected?

Granderson - Direct                                                    414

1    A.    Well, depending on what it is, if it's a -- what looks like

2    maybe a code issue, then we bring in the appropriate state

3    agencies.   If it's anything at all relating to ADA accessibility

4    requirements, anything like that, we might bring in a state fire

5    marshal.

6    Q.    Would you turn now two more pages over to a document titled

7    Division of Public School Academic Facilities and

8    Transportation, Cloverdale Middle School?

9    A.    Okay.

10   Q.    Do you have that in front of you?

11   A.    Yes.

12   Q.    Dated April 23, 2015.

13   A.    Yes.

14   Q.    What are we looking at here?

15   A.    This is an updated version of the inspection report, that

16   it indicates it's -- the copy is a little bit faint, but in the

17   top box on most of those things, starting with the roofs, it

18   says NC.   That means he did not check the roof that day.   It may

19   have been raining or it may have been -- if it's a metal roof,

20   we don't get on metal roofs, sloped roofs.

21       If the top box is checked, everything is just -- everything

22   in that system or component appears to be okay.   And that's

23   basically it.

24   Q.    Okay.   And somehow magically the next two pages have --

25   does it appear that a report from Dunbar has gotten slipped in

1    the middle of this Cloverdale report?

2    A.    Okay.

3    Q.    Well, let's flip over three more pages to the page that

4    says revised 4/11/14, page 2, at the bottom.

5    A.    Okay.

6    Q.    Does this appear to relate to the 2015 Cloverdale report we

7    were just looking at?

8    A.    Yes.

9    Q.    Okay.  And so to be clear, which items were checked out as

10   okay?

11   A.    Well, everything appears to have been checked -- well, not

12   everything, but just about everything.  The only item I see that

13   was checked that needed some attention would be the suppression

14   system on the second -- on page 3, on the kitchen hood.  Unless

15   I missed one.  But it seems like everything checked okay.

16   Q.    Okay.

17   A.    Well, there is one comment, too, on the fire alarm, on page

18   2.  It says to see the comment, and there's a notation there

19   about fire alarm main panel shows a trouble light.

20   Q.    Okay.  And then let's go back, go to page 4 of that report.

21   Can you tell us what the custodial comment is about the

22   condition of the building?

23   A.    He marked everything as okay.  "Building is clean and in

24   nice shape overall."

25   Q.    All right, sir.  Let's flip to the next page, dated

1    September 17, 2010, at the top.  What are we looking at here?

2    A.    September 17, 2010?

3    Q.    Yes, sir.

4    A.    Again, this is another inspection form, reverting back to

5    the older style because of the date.  But it has the items

6    checked and in the comments based on what was observed.

7    Q.    And what school is this for?

8    A.    Dunbar Middle School gym.

9    Q.    All right.  And then let's flip two more pages back, titled

10   September 17, 2010, Dunbar Middle School.  Do you see that?

11   A.    Yes.

12   Q.    And is this a similar report for the school itself?

13   A.    Yes.

14   Q.    Sir, then let's flip back two more pages.  Do you see

15   Baseline Elementary School?

16   A.    Yes.

17   Q.    And when was Baseline inspected, according to this?

18   A.    Well, the date says December 12, 2013.

19   Q.    Let's flip back several and we'll skip by Baseline and skip

20   back six pages to a document that reads April 2, 2014, Henderson

21   MS at the top.

22   A.    Okay.

23   Q.    Can you tell us what this document is.

24   A.    Again, it's an inspection form from our office for

25   Henderson Middle School in the Little Rock School District.

1    Q.    What's the date?

2    A.    April 2, 2014.

3    Q.    Now, there's some corrective maintenance items in paragraph

4    9.  Could you look at those, please.

5    A.    Yes, sir.

6    Q.    Do you see anything out of the ordinary there?

7    A.    My inspectors don't normally say please, but this one did.

8    Q.    As far as the items that are identified as requiring

9    attention, do you see anything that's not -- that's out of the

10   ordinary?

11   A.    No.  It looks typical for --

12   Q.    Pardon me?

13   A.    It looks typical.

14   Q.    Okay.  Thank you.  Let's flip back from there.  We're going

15   to go six -- maybe we'll flip all the way back here.  There's a

16   large portion of this that's McClellan High School that we're

17   going to skip and go back to Wilson Elementary, if you can find

18   that.

19   A.    Go past McClellan.

20   Q.    Past McClellan.  Yes, sir.  The next item past McClellan.

21   A.    You said Wilson Elementary?

22   Q.    Yes, sir, Wilson Elementary.  This report appears to have

23   a -- the logo or the division at the top of the page.

24   A.    Okay.  Yeah.

25   Q.    Got it?  Can you tell us -- we're looking at a document

Granderson - Direct                                418

 1    dated May 24, 2012.  Says building and facilities, Wilson

 2    Elementary School.  Again, tell us what we're looking at here,

 3    please.

 4    A.    Again, it's just our form at the time that we were using

 5    for an inspection, inspection form.  It appears to be -- nothing

 6    is -- well --

 7    Q.    I was going to ask you, can you explain why there are no

 8    checks on most of the boxes?

 9    A.    Let me see who the inspector was and I can probably tell

10    you.  No.  I don't have an explanation for that.  It looks like

11    he may have been on a single-purpose mission maybe to inspect

12    the kitchen hood.

13    Q.    Okay.  There are a few comments for corrective action, are

14    there not, on the third page?

15    A.    Okay.

16    Q.    Do you see those?

17    A.    Yes.

18    Q.    Is there anything out of the ordinary about those

19    correction or maintenance items?

20    A.    No.

21    Q.    And then let's, if you would, look at page 3 of the report.

22    What does the report tell us about the summary of the general

23    condition of the facility?

24    A.    General condition is good.  Once the item below is

25    addressed.  And that's to enter some work orders.  Let's see.

1    I'm trying to see which one he's talking about.

2        Basically it's -- general condition is good and there's a

3    couple of items he wanted addressed.

4    Q.   Apart from these inspection reports, how would your

5    division, people in your division, know of maintenance or

6    building deficiencies in the Little Rock School District?

7    A.   Well, we get calls from parents, teachers, generally

8    anonymous, but we go on a regular basis as best we can to get

9    around to all the schools, but in the meantime, we stop and

10   respond to anybody that files a complaint or if we have anything

11   from another state agency that's been brought to their attention

12   and they notify us about something we need to look into.  Other

13   than that, it's just random chance.

14   Q.   Do you have a system for keeping up with complaints that

15   you receive about school facilities issues?

16   A.   We log our inspection reports by the type of report that it

17   is.  It could be a regular maintenance report or inspection.  It

18   could be a site visit report that looks at construction

19   completion.  If it's a complaint or any kind of a special

20   investigation, we log that.

21   Q.   Do you log the call or the complaint or do you log the

22   inspection to follow up?

23   A.   Well, only the actual inspection.  If we get complaints or

24   suggested special investigation, we generally contact the

25   district to let them know that we've had a complaint or a

1    requested special investigation.  Sometimes in that

2    conversation, we can resolve the issue and not go, or they say

3    that they already have an environmental company that's checking

4    out a mold complaint or they're already running a test, which

5    was going to be our recommendation to them anyway.

6         So sometimes we do go, if we don't get a hold of anybody,

7    we feel like we owe the superintendent the respect to show that

8    we're coming to his district unless he can explain to us why we

9    shouldn't.  But we'll follow up on anything that someone lets us

10   know about.

11   Q.   Do you have any record of complaint-originated inspection

12   for the Little Rock School District for the last two years?

13   A.   I could not find any.

14            MR. HOLLINGSWORTH:  Pass the witness, your Honor.

15            THE COURT:  Thank you, Mr. Hollingsworth.

16        Mr. Heller, anything?

17            MR. HELLER:  No, your Honor.

18            THE COURT:  Okay.  Mr. Walker?

19            MR. WALKER:  Yes, your Honor.

20                         CROSS-EXAMINATION

21   BY MR. WALKER:

22   Q.   Mr. Granderson, you have a staff of six people, you say?

23   A.   Yes, sir.

24   Q.   Or at least it used to be your staff.  It's now the staff

25   of Mr. Brad Montgomery.

1  A.    That's correct.

2  Q.    And you report to Mr. Montgomery?

3  A.    That's correct.

4  Q.    And Mr. Montgomery was in charge of maintenance of

5  buildings in Pulaski County until about three weeks ago or four

6  weeks ago, so --

7  A.    Until February, yes.

8  Q.    All right.  Now, and he was never in charge of construction

9  or anything like that down in Pulaski County, was he?

10  A.    Not that I know of.

11  Q.    All right.  So you're the person in the department who has

12  the experience with construction, as far as you know?

13  A.    Well, we have other people in our department who have

14  construction experience.  The majority of our people are former

15  construction managers.  I'm the only one that has any code

16  background, but we have one architect that's not -- a degreed

17  architect, but not a licensed architect.

18  Q.    I see.  And you say you had a sanitation engineer or

19  something like that going and doing inspections?

20  A.    No.

21         THE COURT:  Former custodian.

22  BY MR. WALKER:

23  Q.    Custodian.  I'm sorry.

24  A.    Custodian.  A former custodian with Little Rock School

25  District, but prior to that, he was facilities manager for

1    Eastern Illinois University.

2    Q.    All right.  Now, let me ask you about your Exhibit 4.  When

3    you all inspect, do you have a particular standard you are

4    seeking, particular standard you are seeking to implement when

5    you do your inspections, or do you just do the checklist?

6    A.    Well, we want everything clean, smelling good, and looking

7    good and safe.  And if it doesn't meet any of that, then it goes

8    on this list.  But anything that appears to be broken or out of

9    order or anything like that, we try to write up.

10   Q.    All right.  So you basically are implementing the *Lake View*

11   standard of safe, warm, and dry schools?

12   A.    Trying to, yes, sir.

13   Q.    That's right.  You're not trying to deal with the concept

14   of equal schools for all children, are you?

15   A.    Well, we're trying to make every school as safe, warm, dry

16   as it can be.

17   Q.    But not equality.  So you all stay away from the concept of

18   having schools equal; is that right?  We've had this discussion

19   before.

20   A.    Yes.  Well, you're not going to have -- equality, you know,

21   that's not our purview.  That's something we can only take care

22   of the building as it is.  In 2005, we inherited buildings that

23   were 80 years old in some cases and they're still there.

24   Q.    I see.  Now, in your experience, you grew up in Stuttgart,

25   didn't you?

1    A.    Pine Bluff.

2    Q.    In your experience in the department, are you aware of the

3    condition of schools in black neighborhoods as over against

4    white neighborhoods?

5              MR. HOLLINGSWORTH:  Objection, your Honor.  The

6    meaning of black neighborhoods and white neighborhoods is

7    ambiguous at best.

8              THE COURT:  The objection is sustained.  I think it's

9    also beyond the scope, Mr. Walker.

10             MR. WALKER:  All right.  All right, your Honor.

11   BY MR. WALKER:

12   Q.    Did you have occasion to determine the condition of the

13   building such as page 2 of ADE 4?  You said that Cloverdale was

14   a good building given the age of the building?

15   A.    Well, that was the opinion of the inspector who wrote the

16   report, yes.

17   Q.    And you said Dunbar was good given the age of the building.

18   A.    Yes.

19   Q.    McClellan was good once all actions addressed are achieved;

20   is that correct?

21   A.    That's correct.

22   Q.    And Wilson was good, same circumstances, given the age of

23   the building.

24   A.    Yes.

25   Q.    Now, you submitted some documents and they are reflected

1    several places.  ADE 5.  In ADE 5, would you tell the Court

2    again what this is supposed to be.

3    A.   Well, it's a printout of what they have listed for

4    committee capital projects off their master plan.  Two different

5    projects, one for the west Little Rock middle school and one for

6    the southwest Little Rock high school.

7    Q.   All right.  Now, you recall that Dr. Suggs was at Little

8    Rock until some point in time in 2015?

9    A.   I remember Dr. Suggs being there.  I don't remember when he

10   left.

11   Q.   According to ADE Exhibit 5, which is listed at the bottom

12   page 31 of 47, there's a design date for starting May 9, 2013.

13   A.   That's correct.

14   Q.   And that's for the west Little Rock school?

15   A.   Yes.

16   Q.   And on the next page, 42 of 47, is a design date, starting

17   date May 9, 2013.

18   A.   Yes.

19   Q.   All right.  Is the construction date while Dr. Suggs was

20   there, June 1 construction start date, June 1, 2014?

21   A.   Yes.

22   Q.   And on page 2, which would be the southwest school, is that

23   May 1, 2015?  A year later?

24   A.   Yes, sir.

25   Q.   So is the conclusion to be drawn from this that the intent

1   of Dr. Suggs was to start the McClellan after he started the

2   west Little Rock school?

3   A.   I presume so, yes.

4   Q.   All right.  Now, the completion date for the west Little

5   Rock school here was July 1, 2015; is that correct?

6   A.   That's correct.

7   Q.   And for the southwest school, the completion date was June

8   18, 2016.

9   A.   That's correct.

10  Q.   So it's a fair conclusion that he expected to open the west

11  Little Rock middle school before he did McClellan?  The

12  southwest school?

13          MR. HELLER:  I'm going to object to that question,

14  your Honor.  He can't testify about what Dr. Suggs intended.

15          THE COURT:  I think that's a good point, Mr. Walker.

16  I think you can ask about the dates.

17          MR. WALKER:  All right.

18          THE COURT:  Then argue the inference.  But I don't

19  think Mr. Granderson knows.

20          MR. WALKER:  All right.

21  BY MR. WALKER:

22  Q.   Now, do you see that the area of a west Little Rock school

23  is to be, square feet, 250,000 square feet?

24  A.   Yes.

25  Q.   And do you see the one for the southwest high school is to

1    be 270,000 square feet?

2    A.    That's correct.

3    Q.    Is it your experience that middle schools and high schools

4    of the same population have the same basic square footage?

5    A.    Well, no.  That depends on -- square footage is based on

6    enrollment.

7    Q.    I understand.  But if the enrollment is approximately

8    1,200, the square footage for the high school would be

9    considerably more than it would be for the middle school under

10   normal operation; is that correct?

11   A.    That's correct.  The high school would be more square

12   footage than the middle school.

13   Q.    Now, I call your attention to page -- well, these numbers

14   are not good, but the fourth pages of exhibit -- yeah, the fifth

15   page of Exhibit 4.  It's the maintenance inspection report.

16   This addresses Cloverdale.

17           THE COURT:  April of 2015.  Am I on the right one,

18   Mr. Walker?

19           MR. WALKER:  Yes, sir.  April 23.

20   A.    Cloverdale Middle School.

21   Q.    Yes, sir.

22   A.    Okay.

23   Q.    Is it fair to say that the square footage of the Cloverdale

24   facility is 114,497 square feet?

25   A.    That's probably the number listed in the district report,

1    yes.

2    Q.   That's right.  And yet the new middle school for west

3    Little Rock is to be 250,000 square feet.

4    A.   That's correct.

5    Q.   Are you aware that in the report you have here with respect

6    to the elementary schools, the elementary schools are all under

7    a hundred thousand square feet?

8    A.   I haven't looked at the square footage, but I'm assuming

9    that's correct.

10   Q.   Well, let me go to the last page, I think it's the last

11   one, Wilson.  It says page 1, but it's near the back and it's

12   just page 1 of Wilson, I guess, but it's encompassed within

13   Defendants' Exhibit 4.

14             THE COURT:  Is that the one with the kind of seal

15   symbol at the top?

16             MR. WALKER:  Yes, sir.

17             THE COURT:  All right.

18   A.   Okay.

19   Q.   Is it fair to say that this school was built in 1927?

20   A.   That's the information we have, yes.

21   Q.   And it has the square footage of 38,839?

22   A.   Yes, sir.

23   Q.   So the proposed west Little Rock school is seven times the

24   size of this?

25             MR. HELLER:  I object to the form of the question,

1    your Honor.

2            MR. WALKER:  I'll withdraw the question.

3            MR. HELLER:  No longer the proposed west Little Rock

4    school.

5            MR. WALKER:  Your Honor, it's proposed until his Honor

6    rules as far as we're concerned for right now.

7            THE COURT:  I'm sorry, Mr. Heller, I don't understand

8    the objection.

9            MR. HELLER:  Well, the objection is that he's talking

10   about the proposed west Little Rock school.  The one at issue

11   here is different from the one described in these papers.  This

12   was from the time the district was proposing new construction,

13   not the current plan.

14           THE COURT:  I -- I've got it.  Now it's clear.

15   BY MR. WALKER:

16   Q.   All right.  Mr. Granderson, do you have another plan that

17   addresses a west Little Rock school other than this one?  Other

18   than this one that is listed here as ADE 5, page 31 of 47, that

19   is on this form?

20   A.   Do we have another plan or --

21   Q.   Have you had one submitted to you on a form like this --

22   A.   The plans, the building plans?

23   Q.   Yes, sir.  No, they're not building plans.  This is called

24   capital project detail.  Do you have another capital project

25   detail which sets out the square footage of the west Little Rock

1    school that's proposed?

2    A.   I'm not aware of anything else.  This is what they're

3    proposing that we would -- I mean, the only other thing we might

4    have would be if it's been on that master plan for a number of

5    years and has moved up now to the submittal date.  I don't know

6    what -- I guess I don't understand what you're asking.

7    Q.   Well, I'm just asking insofar as the first page of ADE 5,

8    which says capital project detail, is this capital project

9    detail form always submitted and reviewed by your department

10   before you all give approval for a project?

11   A.   Yes, sir.

12   Q.   All right.  But you don't have a subsequent one to this, do

13   you?

14   A.   No, sir.

15   Q.   Thank you.  The present McClellan school has a square

16   footage -- well, let me let you tell me how much it is.  Would

17   you go to the McClellan document?

18        MR. WALKER:  Your Honor, this is another one, it's all

19   in the compendium, but for your benefit, it's midway in the

20   pages.

21        THE COURT:  November 5, 2012, Mr. Walker?

22        MR. WALKER:  It appears to be that.  No, this one is

23   October 26, 2012.

24   A.   October 6?

25   Q.   26.

1   A.   Okay.

2        MR. WALKER:  Did you find it, your Honor?

3        THE COURT:  Yes.

4   BY MR. WALKER:

5   Q.   Now, for McClellan, the square foot of the facility at

6   McClellan, would you read it just into the record.

7   A.   Okay.  For that particular building, the square footage is

8   124,270 square feet.

9   Q.   All right.  Now, you have indicated that the North Little

10  Rock district was found to be entitled to some partnership

11  funds; is that correct?

12  A.   North Little Rock?

13  Q.   Yes, sir.

14  A.   Yes, sir.

15  Q.   All right.  Initially you all took the position that they

16  were not entitled to partnership funds; isn't that correct?

17  A.   Well, I think North Little Rock has always -- yeah, at one

18  time they -- I don't remember their wealth index right now off

19  the top of my head, so --

20  Q.   All right.  But you all had a conflict with North Little

21  Rock; isn't that correct?  And North Little Rock somehow or

22  another got you all to review the matter, and now you all have

23  agreed to have them share partnership funds; isn't that correct?

24  A.   I don't really understand the question.  The -- we haven't

25  had a conflict with North Little Rock.  The only conflict North

1    Little Rock had was with the assessor's office who was assessing

2    part of Pulaski County's territory into North Little Rock, and

3    it was giving a false wealth index number.  When they made that

4    correction, as I told Mr. Hollingsworth earlier, it made Little

5    Rock available.  Little Rock previously did not get any money or

6    was not eligible for more than a half of one percent, but when

7    we made the change on the assessed values and changed the wealth

8    index of all the districts in the state, then Little Rock became

9    eligible for approximately 6 percent, and North Little Rock

10   basically stayed about where they'd always been.

11   Q.   So Little Rock does participate in partnership funding, to

12   the extent of 6 percent.

13   A.   They can.  They haven't yet.

14   Q.   All right.  Now, did Little Rock give you what is required,

15   which is a desegregation impact statement pursuant to your own

16   rules?

17   A.   What we received was a statement of assurance on a

18   construction approval form that the project in effect was not

19   going to interfere with any -- have any segregative effects on

20   the surrounding schools.

21             MR. WALKER:  All right.  One moment, your Honor.

22             THE COURT:  Certainly.

23   BY MR. WALKER:

24   Q.   Do you have any way of knowing who signed the form which is

25   reflected -- the forms which are reflected in ADE 5?

1    A.   Well, there's not a signature.  It would be the district

2    would have submitted these electronically.

3    Q.   I see.  But you have not -- now, I want to make it clear.

4    You have not received any forms like this for any new project in

5    Little Rock, in west Little Rock, or for southwest Little Rock

6    to this date since this?

7    A.   No, not that I'm aware of.

8         MR. WALKER:  Pass the witness.

9         THE COURT:  Thank you, Mr. Walker.

10   Mr. Hollingsworth?

11                    REDIRECT EXAMINATION

12   BY MR. HOLLINGSWORTH:

13   Q.   Mr. Granderson, the forms that we were just looking at I

14   think is ADE 5.  Is that right?

15   A.   Correct.

16   Q.   And that's an electronic submission; correct?

17   A.   Correct.

18   Q.   If Little Rock had updated that submission, would you

19   necessarily know about it?

20   A.   Well, it's not capable to be updated right now.  The web

21   tool has been turned off.

22   Q.   For how long?

23   A.   Until we get through reviewing projects.

24   Q.   Okay.  Now, the date that we see on the top of ADE 5 is

25   February 2015, is it not?

Granderson - Redirect                                        433

1   A.    Correct.

2   Q.    Could there have been another submission by Little Rock

3   School District of a change in its master plan after February of

4   2015?

5              THE COURT:  Hold on.  Mr. Walker.

6              MR. WALKER:  Objection.

7              THE COURT:  Basis?

8              MR. WALKER:  It's leading and it calls for

9   speculation, could there have been.

10             THE COURT:  It is leading.  Just ask straight out.

11  BY MR. HOLLINGSWORTH:

12  Q.    Is the master plan a static document?

13  A.    Static?  Well, we open it before the submittals and then

14  close it right after the deadline so that there can't be any

15  changes after that February 1 deadline.

16  Q.    February 1 of which year?

17  A.    I'm sorry.  This is '15.  We would close it in even number

18  years, which is '16.  This is a preliminary master plan

19  submittal for '15.  If that's the date it was submitted, we ran

20  the report.

21  Q.    And in the normal course of things, when would the most

22  recent master plan submittals have been made by the Little Rock

23  School District?

24  A.    February of 2016.

25  Q.    Okay.  Thank you.  Now, just to be clear that we're all

1    talking about the same thing, you're not aware of another

2    document like --

3              MR. WALKER:  Objection, your Honor.  Leading.

4              THE COURT:  Sustained.

5              MR. HOLLINGSWORTH:  Preliminary question.  I'm sorry.

6    I'm just trying to lead my way into --

7    BY MR. HOLLINGSWORTH:

8    Q.   You testified earlier that you weren't aware of another

9    document like ADE 5 for those two schools; correct?

10   A.   That's correct.

11   Q.   Has your division received construction plans for the west

12   Little Rock middle school?

13   A.   I believe so.

14   Q.   Are the construction plans the same thing as what we see

15   in -- I'm sorry.  That's not a clear question.  Is there a

16   difference between the construction plans and the forms we see

17   on ADE 5?

18   A.   I don't do the plan reviews, so I've not seen them.  I

19   wouldn't be able to answer the question.

20   Q.   What's typically required in a plan to be reviewed?

21             MR. WALKER:  Objection, your Honor.  That's beyond the

22   scope of my examination.

23             THE COURT:  I'll allow it, Mr. Walker.  Overruled.

24             MR. WALKER:  Okay.

25   A.   Will you repeat?

Granderson - Cross                                          435

1    Q.    What's submitted for review?

2    A.    Well, the schematic plan is what we ask for.  It's not the

3    full working set of plans.  What we want to see is square

4    footage and size of rooms to determine the proper square footage

5    and, therefore, eligibility for funding or that they meet

6    standards for, for instance, our 850 square foot minimum size

7    for classrooms.

8    Q.    Is all that information contained on ADE 5?

9    A.    No.  The only thing here is gross square footage.  It

10   doesn't say anything about room sizes.

11   Q.    Okay.  And do you have any knowledge, any personal

12   knowledge of the details of the plans that have been submitted

13   for the west Little Rock middle school?

14   A.    No, not me personally.

15             MR. HOLLINGSWORTH:  Okay.  Thank you.  Pass the

16   witness.

17             THE COURT:  Thank you, Mr. Hollingsworth.

18                       CROSS-EXAMINATION

19   BY MR. HELLER:

20   Q.    So, Mr. Granderson, is it possible that LRSD submitted

21   plans to convert a 170,000-square-foot warehouse to school space

22   at the former Leisure Arts Building in west Little Rock and you

23   would not have seen those plans?

24   A.    That's correct.

25             THE COURT:  Thank you, Mr. Heller.

Christa R. Jacimore, RDR, CRR, CCR
United States Court Reporter

Granderson - Recross                                    436

1          Mr. Walker?

2                         RECROSS-EXAMINATION

3    BY MR. WALKER:

4    Q.   Mr. Granderson, did I hear you say that the deadline for

5    filing -- that there are deadlines for filing papers and the

6    deadline for filing -- for each year is February 1 of alternate

7    years?

8    A.   Well, the -- this document, I may have missed the point a

9    minute ago.  This document was printed or received for the

10   February 2015 submittal, which is a preliminary master plan.

11   The actual document that we would look for for this year would

12   have been submitted this past -- first of this month.  February

13   1 of this year, in the even-numbered year.

14   Q.   It would have been submitted the first of this month.

15   A.   Yes.

16   Q.   In preparation for your testimony, did you see such a

17   document having been signed the first of this month?

18   A.   I have not seen it.  Our staff takes those and works with

19   them and starts to review them.

20   Q.   I see.  But to your knowledge, none has been filed?  Yes or

21   no?

22   A.   I don't know.

23             MR. WALKER:  Thank you.

24             THE COURT:  Thank you, Mr. Walker.

25        Can this witness be excused?

1          MR. WALKER:  Just a moment, your Honor.  I did have

2    one question.

3    BY MR. WALKER:

4    Q.   Can you tell me who signed the document for the Little Rock

5    School District on the papers you received which said that there

6    would be no segregative effect?

7    A.   I'd have to see the document.  I don't know who signed it.

8    It would depend on when it was done.  Whoever the superintendent

9    was at the time.

10   Q.   So the only thing that you have is something that came in

11   2015.

12   A.   Correct.

13   Q.   And that would have been Dr. Suggs?

14   A.   I presume so.

15          MR. WALKER:  Thank you.

16          THE COURT:  Thank you, Mr. Walker.

17      Mr. Hollingsworth, may this witness be excused?

18          MR. HOLLINGSWORTH:  Yes, your Honor.

19          THE COURT:  Thank you, sir.

20          THE WITNESS:  Thank you.

21          THE COURT:  Mr. Hollingsworth, anyone else for the

22   state?

23          MR. HOLLINGSWORTH:  No further witnesses, your Honor.

24          THE COURT:  Mr. Walker?

25          MR. WALKER:  Yes, sir.  Mr. Key.

```
 1              THE COURT:  Hold on.  By way of rebuttal?
 2              MR. WALKER:  Yes, sir.
 3              THE COURT:  And what are the issues you want to cover?
 4              MR. WALKER:  Your Honor, I think that a clarification
 5     as far as covering -- I want to establish by Mr. Key that the
 6     defendant has approved three schools within three miles of each
 7     other for west Little Rock around the Quest school.
 8              THE COURT:  These are the other schools, whether it's
 9     county or charter or --
10              MR. WALKER:  Yes, sir.  All new schools.
11              THE COURT:  Okay.  Any other areas?
12              MR. WALKER:  That's all.
13              THE COURT:  Let's do that.  And then we're going to
14     take a short break and then I'd like counsel to present short
15     closing arguments to me.  All right?
16              MR. WALKER:  Yes, sir.  Your Honor, I was wondering if
17     you would allow us until in the morning to just give our
18     arguments by brief so that we can have them to you by ten in the
19     morning, each side?
20              THE COURT:  I was hopeful that I could rule from the
21     bench, Mr. Walker.
22              MR. WALKER:  I understand that, your Honor, but we
23     have a lot of documents and a lot of things were given to us
24     since there was no preparation.  We would like to have an
25     opportunity to organize our thoughts rather than have either
```

1    Mr. Pressman or myself or one of the other lawyers come and make

2    a statement without any kind of coordination.

3              THE COURT:  Let's do this:  We'll go ahead and take a

4    break here.

5              MR. WALKER:  All right.

6              THE COURT:  And I'll think about that and then come

7    back and we'll certainly do Mr. Key and maybe the closing and

8    maybe the break.  But let me think about that.

9              MR. WALKER:  Thank you.

10             THE COURT:  All right.  Mr. Heller, did you want to be

11   heard on that?

12             MR. HELLER:  I just wanted to say, your Honor, there

13   are only two issues, they've asked to enjoin two things.

14             THE COURT:  I know.

15             MR. HELLER:  And there is a very simple legal

16   structure that's 35 years old.  So these are not complicated

17   arguments.

18             THE COURT:  Okay.

19             MR. HOLLINGSWORTH:  And I might add that I think some

20   of the parties might have other plans for the next two days and

21   don't have our briefs already prepared, as I'm sure Mr. Walker

22   does.

23             THE COURT:  I don't know about that, but I'll chew on

24   this while we take a break for about 15 minutes.  But, counsel,

25   be prepared in the event that I decide to go forward with

1    closing argument, please.

2         We're in recess.

3         (Recess from 4:08 p.m. until 4:23 p.m.)

4         THE COURT:  Counsel, if you'll put your heads together

5    for a minute and work with me on this.

6         I look forward to hearing the brief rebuttal from

7    Commissioner Key.  I have been working for several days to get

8    ready for the hearing and doing my best to pay attention and

9    absorb this as we have gone through it, much like I know a jury

10   focuses on things as we're in trial.

11        My preference and my plan was to hear closing argument from

12   counsel and do my best with a ruling from the bench when we got

13   done so that everyone can move on one way or the other on this.

14        I'm happy, Mr. Walker, to take an extended break so that

15   you can circle up with all of the lawyers on your side and put

16   your heads together in terms of an outline for that argument.  I

17   do not believe that it would be useful or that it's necessary to

18   have briefs after the hearing.  I think this is a proceeding

19   much more like a trial where I've just got to do the best that I

20   can with it.

21        I have one alternative to offer.  I've had a matter drop

22   out for after lunch tomorrow, and so I would be available in the

23   early afternoon to come in and have closing arguments and then

24   I'll do my best then, but one way or another, my view is -- not

25   to turn into my brother Wilson on you on this, but this case

1    needs a good deciding.  I just need to make the best ruling that

2    I can, for the benefit of all concerned.

3        Mr. Walker, as between those two, that is, taking an

4    extended break, close to an hour to prepare, and then coming

5    back tonight to argue, or -- we would all stay here, of course.

6    There's room in the courthouse for you all to meet and work.  Or

7    tomorrow after lunch.  Which would you prefer?

8            MR. WALKER:  May I consult?

9            THE COURT:  Sure.

10       (Brief recess in place.)

11           THE COURT:  Okay.  Time out over.  I didn't really

12   mean to have an extended visit about that.

13       Mr. Heller, does the district have a position on this?

14           MR. HELLER:  We do, your Honor, for two reasons:

15   Mr. Kurrus cannot be here tomorrow afternoon, and we prefer a

16   decision as soon as possible because we have stopped a process

17   that had been underway for some time.  So we would prefer to

18   argue as soon as possible this evening.

19           THE COURT:  Thank you.  Mr. Hollingsworth?

20           MR. HOLLINGSWORTH:  Your Honor, we prefer this

21   evening, too.  I think Mr. Heller states good reasons, and,

22   frankly, while it's fresh in my mind, it's probably easier.

23           THE COURT:  I appreciate your candor,

24   Mr. Hollingsworth.

25       Mr. Walker or Mr. Pressman, someone from the plaintiffs'

1  side?

2          MR. PRESSMAN:  We'll make the argument today.

3          THE COURT:  Good.  Well, I'll hear Mr. Key and then

4  I'll take a break so everyone can collect their thoughts, and

5  then we'll come back and argue.

6      All right.  Thank you, counsel.  This is not a democracy,

7  but I do better when I have input from everyone.

8      Commissioner Key, come on back.

9          **JOHNNY KEY, PLAINTIFFS' WITNESS, DULY SWORN**

10         THE COURT:  Go ahead, Mr. Walker.

11                      DIRECT EXAMINATION

12 BY MR. WALKER:

13 Q.   Mr. Key, isn't it true that you have given your approval to

14 three school sites within four miles of each other in the

15 extreme western part of the Little Rock School District adjacent

16 to Pulaski County in the Pulaski County School District?  The

17 three schools being Quest Charter School, Robinson Middle and/or

18 High School, or both, and the Leisure Arts location?

19 A.   No.

20 Q.   And my question is in whole or in part.  I understand

21 you're not the deciding person on the Facilities Commission,

22 committee, or whatever, but you do participate in those

23 decisions.  So I want to know, I want you to answer my question

24 as a participant in those proceedings.

25         MR. HOLLINGSWORTH:  Your Honor, I'm not sure the

1    question -- I don't understand the question.  There were several

2    parts.

3              THE COURT:  All right.  I'm going to sustain the

4    objection.  Mr. Walker, let's take it a piece at a time.  Just

5    march through and then give me the whole at the end if you get

6    there.

7              MR. WALKER:  That's fine.

8    BY MR. WALKER:

9    Q.   Has the ADE or any of its departments approved the location

10   for the Quest school in west Little Rock?

11   A.   Yes.

12   Q.   Is that Quest school located in -- within several miles'

13   proximity of the Leisure Arts Building?

14   A.   I don't know how many miles.  It's not far.  It's a few

15   miles.

16   Q.   Have you given approval to what Judge Marshall has

17   described as plan B, and I guess Mr. Guess, Dr. Guess has

18   described as plan B, to a new Robinson High School and/or middle

19   school for the Pulaski County School District?

20   A.   Yes.

21   Q.   Is that within several miles of the Quest school?

22   A.   Yes, it is.

23   Q.   And have you given approval to the Leisure Arts location?

24   A.   Yes.

25   Q.   And is that within -- is that within several miles of both

```
 1    Quest and Robinson?
 2    A.    Yes.
 3    Q.    So all three schools are within perhaps three miles of each
 4    other?
 5    A.    I wouldn't guess the actual mileage, but they are within
 6    relative vicinity, yes.
 7              MR. WALKER:  May I ask one more question?
 8              THE COURT:  Sure.
 9    BY MR. WALKER:
10    Q.    Isn't it true that all of those areas are very high-income
11    areas that are very heavily populated with Caucasian people and
12    not heavily populated with African-American people?
13    A.    I do not know that.
14              MR. WALKER:  All right.  Thank you.
15              THE COURT:  That was very brief rebuttal, Mr. Walker.
16    Thank you.
17              MR. WALKER:  Thank you, your Honor, for allowing it.
18              THE COURT:  You get one of those gold stars, those
19    elusory gold stars that I offered to Mr. Hollingsworth
20    yesterday.
21              MR. WALKER:  I'll take it.
22              THE COURT:  Okay.  Mr. Hollingsworth?
23              MR. HOLLINGSWORTH:  No questions, your Honor.
24              THE COURT:  Mr. Heller?
25              MR. HELLER:  None, your Honor.
```

1          THE COURT:  Okay.  You can step down.  Thank you,
2   Commissioner Key.
3      All right.  Counsel, what's your pleasure?  30 minutes?  45
4   minutes?  How much prep time?
5          MR. WALKER:  30 minutes, your Honor.
6          THE COURT:  All right.  Mr. Heller, is that
7   acceptable?
8          MR. HELLER:  Yes, your Honor.
9          THE COURT:  Mr. Hollingsworth?
10         MR. HOLLINGSWORTH:  Yes, your Honor.
11         THE COURT:  Ms. Black, are our witness rooms down our
12   hall unlocked and opened?
13         THE COURTROOM DEPUTY:  Yes.
14         THE COURT:  Counsel, y'all know the small courtroom I
15   normally preside in, there's a series of small rooms down the
16   hallway and they are unlocked and open for you to use and circle
17   up in as you need to.
18      We'll be in recess until five.  Y'all can keep your seats.
19      (Recess from 4:33 p.m. until 5:05 p.m.)
20         THE COURT:  Mr. Walker, I was thinking 15 minutes and
21   five for rebuttal.  Is that sufficient?
22         MR. WALKER:  Your Honor, I'm always hesitant to say
23   that any amount of time you give me is sufficient, but I'll have
24   to work within it.
25         THE COURT:  Okay.  Good.  There's going to be equal

1    pain on the other side, if it's any consolation.

2         Ten minutes each, Mr. Heller, Mr. Hollingsworth.  Or,

3    Mr. Hollingsworth, if you want to give some to Mr. Heller, he

4    might appreciate that, but --

5         And then you'll have the last word, a five-minute rebuttal,

6    Mr. Walker.

7         Okay.  Let me get my papers situated here.

8         Mr. Walker?

9              MR. WALKER:  Thank you, your Honor.  In this motion it

10   is not necessary for the Court to address the closing of schools

11   because Mr. Kurrus has said he has no plans to close schools.

12   So, therefore, that is not imminent and therefore no reason to

13   issue an injunction.

14        We do note that it would be appropriate to keep the G/T

15   school where it is rather than to have those children dispersed

16   into other schools at great inconvenience after they were

17   promised that they would be given a G/T school.

18        That leaves the issue of whether to enjoin the Leisure Arts

19   school from becoming a middle school in the next year, ahead of

20   any other school that would be located in what we call the black

21   community.  That's not in west Little Rock.

22        In 2007 or '8 when Mr. Kurrus was on the board, the board

23   was persuaded that by building Roberts Elementary School,

24   students who would be easier to educate would be attracted to

25   that school and the white population would be increased.

1    There's no showing that Roberts has resulted in an increase in

2    the white enrollment.  All of the evidence is that the white

3    enrollment has continued to go down, even with Roberts having

4    been constructed.

5        Therefore, there is no showing that adding the Leisure Arts

6    facility will get more white students.  It may temporarily get a

7    few, but to reverse the pattern of white students not coming

8    into the district, there is no evidence that that will happen.

9        The matter is presented as one of urgent necessity by

10   Mr. Kurrus, and it's his position that it's necessary to build a

11   school in order to attract students who will help provide more

12   income to the school district, and they're more likely to be

13   white, more likely to be easy to educate, and they have certain

14   socioeconomic factors that will militate in favor of them

15   coalescing together in a single environment, in a single place

16   near where they live.

17       What Mr. Kurrus is suggesting is that there is no urgent

18   necessity for replacement of the schools in southwest Little

19   Rock, and certainly there's no urgent necessity of replacing

20   Cloverdale.  Cloverdale has been recognized by all for many

21   years, going back to the time Mr. Kurrus was on the board in

22   2002, as a school that was in need of replacement.  And for

23   whatever the ills are, that's been known forever, but the board

24   which was displaced by Mr. Key and by the state, by the

25   governor, really, the board had decided that they would put --

1    they would replace Cloverdale and schools in southwest, and as a

2    compromise, they came up with the notion they'd put a middle

3    school in west Little Rock and one in southwest, but the

4    southwest school had to go first.  They were removed, and

5    therefore there is a serious question as to whether Cloverdale

6    will ever be built.

7         The serious question is this:  If the other plans of

8    Mr. Key and the state materialize and you have 5,000 charter

9    spaces in the Little Rock School District, that means Little

10   Rock will have a declining fund balance which will be made up by

11   the state for two years, and then, because they will have that

12   declining fund balance, then it will be placed into fiscal

13   distress, the state will take it over, and when the state takes

14   it over, there's no requirement for the state to do anything.

15   So that those schools then, whatever the commitments are, those

16   schools then will be subject to the discretion of Mr. Key.

17        The rights of black students have been deferred at

18   Cloverdale to have equal facilities for at least six years, and

19   I don't think that there is any issue about the rights, your

20   Honor.  *Plessy v. Ferguson* has not been overruled insofar as the

21   requirement of equal facilities and resources for black and

22   white students without regard to race is concerned.  It's been

23   overruled as a general proposition, but the concept is still

24   embraced in *Brown v. Board of Education*, which is still the law

25   of the land, and the facilities and resources have to be equal,

1    irrespective of race.

2         Now, you can't have -- for the students who are more

3    advanced, you cannot have better facilities for them and for the

4    ones who struggle, lesser facilities for them.

5         Under the circumstances, especially in view of the fact

6    that the facilities index shows that Cloverdale is the worst

7    school in the district, however you look at it, it's .71, by the

8    index study by Fanning Howey.  The state of Arkansas has called

9    it that, notwithstanding the fact that they say it's good in the

10   sense that they're using the standard warm, safe, and dry.  But

11   the state standard of warm, safe, and dry is not the equal

12   protection of the law standard.  Warm, safe, and dry means you

13   just have anything out there, one-room schoolhouse.  But the

14   facilities in the black community have to be just as good as

15   those in the affluent parts of the white community.

16        There is no question that Cloverdale suffers and those

17   students -- there's no plan to ever have those students who

18   enroll in Cloverdale this year to have equal facilities.  But

19   the students who go to Roberts under the plan in Mr. Baker

20   Kurrus's head will have this next year superior facilities and

21   they'll have them for all of the years of their lives.

22        His plan is racial, and I didn't know about this, but he's

23   got a cluster plan where you cluster basically four white

24   schools, and then they become, in effect, feeder schools.  So

25   those cluster elementary schools feed into the middle school,

1    and then by having the school of 250,000 square feet where

2    McClellan has only 125,000 square feet, that means that the plan

3    is not being fully disclosed, but it is to build the school for

4    a high school, too.  And in that sense, you'll be dealing with

5    what the schools around do.

6          You have an elementary school nearby, that's Roberts, and

7    then it feeds into a junior high school like Robinson out there,

8    and then it feeds into a high school, and that's Robinson Senior

9    High in the county, and that would be a feeder school out there.

10   So you would have a cluster of schools in the western part of

11   the city where you would be able to have from kindergarten to

12   12th grade education, and that means the demise of Central High

13   School because the students who come to Central High School from

14   the affluent areas -- who are white, they come from the affluent

15   areas of Little Rock.  From Palisades all the way up to Pleasant

16   Valley to Chenal and the satellite zone, and then they come into

17   Central.  So this is a bigger thing than just simply a school

18   for Leisure Arts.

19         The hypocrisy here is that you're going to have 250,000

20   square feet.  We know that a 250,000-square-foot school is going

21   to be more than $30 million.  The testimony is that basically

22   it's between 200 and $300 per square foot to fix up a school.

23   They'll have to spend that much money in rehabilitating whatever

24   it is, so instead of -- if it's $300 a square foot, it's going

25   to be $75 million.  It's represented to you by Mr. Kurrus that

1    it's going to be about $35 million.

2        Now, why is it necessary that the school that they're

3    contemplating as a middle school to be twice the size of

4    McClellan, twice the size of a high school?  And it is

5    recognized generally that high schools cost a whole lot more

6    money than middle schools.  There are far more things that you

7    have in them.  The state is also making sure that white students

8    have options that black students don't have, and it's certainly

9    those in that high influence -- that high-income area, they're

10   giving them the choice of going to a charter school, they just

11   built a school this last year for Quest, and it's going to go

12   into the high school, too, and then Robinson is going to be

13   underway, and the state for all of this has come up with a

14   choice plan that allows students to go by choice to whatever

15   school they want, provided they provide their own

16   transportation.

17       So what we have will be the kids in west Little Rock having

18   a choice of four schools at public expense, all drawing from the

19   Little Rock School District funds.

20       Now, we are asking that the Court take into account the

21   resolution of the board before it was removed -- Ms. Springer

22   had been on the board only two months, three months before she

23   was removed.  She was elected in September and took office in

24   October, and then there she was removed in January.  Had no

25   opportunity to do any service, and the black people -- and the

Closing - Plaintiffs                                         452

1    thing was, you had a white man on the board who said we need to

2    educate our children and have equal resources for them, and at

3    that point they took them over under what I'll call in another

4    context before you as well a pretext of saying that they were in

5    academic distress.

6         So with respect to our motion, we ask that you order that

7    Cloverdale be closed and that they be assigned to some facility

8    while Cloverdale is being rebuilt on a suitable site that is a

9    middle school.  If by chance you allow the district to have

10   limited use and no more than 125,000 square feet of the Leisure

11   Arts Building for a school, we ask that those students from

12   Cloverdale have that as their home school and that they be given

13   priority for that both under ACTAAP Rule 12.01, but also for

14   reasons of equity so that their educational opportunity to be

15   educated in adequate facilities with adequate resources will not

16   be denied.

17        I ask the Court also to recall *Swann v. Charlotte-*

18   *Mecklenburg*, which has not been overruled.  It is still the law

19   of the land.  And I understand that there are some people who

20   would like to have it overruled just as they would like to have

21   *Brown* overruled, but it hasn't been overruled now.  And while

22   there are some limitations, those limitations were a 5 to 4

23   decision, which decisions are going to be under some

24   considerable strain because of the present composition of the

25   Court.  It is now 4-4, and those decisions were 5-4.

1        In the past, choices according to *Swann*, 404 U.S. 19, in

2   the past, choices in this respect, and they're relating to

3   location of schools that influence the patterns of residential

4   development, which is like 1957 all over again.  Remember 1957,

5   this school board decided that in order to desegregate, they had

6   to build two new schools.  So what they did was, they built Hall

7   High School out west where there were no people, no people at

8   South University then, no people.  Then they took the black

9   people who lived in that area and put them over in the east and

10  they built Horace Mann.  The blacks went to Horace Mann, east,

11  and the whites went to Hall.  Now the whites have moved beyond

12  Hall and the blacks are still east.  So I'm saying, it's just

13  1957 all over again.  This is what the Court, what *Swann v.*

14  *Charlotte-Mecklenburg* said:  "In the past choices in this

15  respect have been used as a potent weapon for creating or

16  maintaining a state-segregated school system.  In addition to

17  the classic pattern of building schools specifically intended

18  for Negro or white students, school authorities have sometimes,

19  since *Brown*, closed schools which appeared likely to become

20  racially mixed through changes in neighborhood residential

21  patterns.  This was sometimes accomplished by building new

22  schools in the areas of white suburban expansion farthest from

23  Negro population centers in order to maintain the separation of

24  the races with a minimum departure from the formal principles of

25  'neighborhood zoning.'  Such a policy does more than simply

1   influence the short-run composition of the student body of a new

2   school.  It may well promote segregated residential patterns,

3   which, when combined with 'neighborhood zoning'" -- and, I might

4   add, school choice that Mr. Key sponsored when he was in the

5   legislature -- "further lock the school system into the mold of

6   separation of the races."  Upon a proper showing, a District

7   Court may consider this in fashioning a remedy.

8        We believe that this is one of those situations where the

9   school district should not be allowed in this district, Little

10  Rock, *Cooper v. Aaron*, to use the same processes that were

11  placed -- that they used in 1956, to resegregate the schools in

12  the district.

13       Now, the argument is that, well, the schools are already

14  resegregated.  Whites live, they go to neighborhood schools and

15  blacks go to neighborhood schools.  Well, the point is is that

16  the state should not promote it and the school district should

17  not promote it and it's to the detriment of the black children.

18  That detriment is felt very harshly because all -- most all of

19  the schools in the southwest are in some kind of distress,

20  indicating that those schools are in great need for some kind of

21  other attention simply other than facilities.  But these things

22  work together, your Honor.  When the facilities are bad, the

23  education is bad.  Teachers don't want to go into the

24  facilities.  People don't want to stay there.  The worth of the

25  neighborhood declines.  It is regarded as an area not to be

1    traversed.  And one would wonder why when you talk about Little

2    Rock you now talk about not Little Rock, when you talk about the

3    people who live west of university, you talk about, "I live in

4    west Little Rock," and that is because it's a badge of pride,

5    and the pride relates to race.

6        I live in an area where there are only a few black people

7    and they're mostly the -- the people there are mostly well to

8    do, and I think that part of what's happening here is

9    reinforcing that notion.

10       I ask that his Honor give serious consideration to our

11   motion and do not let the school district put schools -- a

12   school at the far western perimeter of this district where

13   nobody lives other than a number of white people.  We've shown

14   you the exhibit.  It's, like, nine to one white.

15           THE COURT:  Thank you, Mr. Walker.

16       Mr. Hollingsworth?

17           MR. HOLLINGSWORTH:  Your Honor, I'm going to let

18   Mr. Heller go first, and whatever is remaining, I've asked him

19   if I can have at least five minutes if he uses more than ten.

20           THE COURT:  Understood.  Mr. Heller.

21           MR. HELLER:  Thank you, your Honor.

22       The plaintiffs seem to have wandered quite a distance from

23   their injunction papers and from the evidence that's been

24   presented to this Court.  We came here to defend a charge that

25   the defendants have engaged in purposeful race discrimination,

1    and that's a strong charge, and it hasn't been proven.

2         There has not been evidence of purposeful race

3    discrimination on the part of Mr. Kurrus or anyone else in the

4    Little Rock School District.  Their papers are clear, the

5    plaintiffs' papers, about what they want to enjoin, and now that

6    one issue has been dropped from the case, the remaining issue is

7    whether the plaintiffs should be allowed to enjoin, quote,

8    spending funds -- spending desegregation funds on a new middle

9    school in an almost entirely white area of the Little Rock

10   School District.

11        Plaintiffs have the burden of proving that that kind of

12   thing will cause them irreparable harm and that it's imminent

13   and certain.  Mr. Walker acknowledged that standard in his

14   opening statement.  Failure to show irreparable harm alone is a

15   sufficient reason to deny an injunction.  So I'll start with

16   that.

17        Mr. Kurrus testified that we're not spending any

18   desegregation funds, as the plaintiffs define those funds, to

19   build the west Little Rock middle school.  The Court approved

20   the settlement agreement that's really at the core of this

21   discussion, and that settlement agreement, the only restriction

22   in that settlement agreement is that the funds, $37.3 million

23   approximately that comes to LRSD from the state in the 2017-18

24   school year is required to be used for facilities.  There are no

25   other limitations anywhere.

1        Mr. Kurrus testified that the new west Little Rock school

2   will be completed without the use of those funds before those

3   funds even became available.  There's no evidence to the

4   contrary.  So there's no evidence of irreparable harm by LRSD

5   spending any funds or diverting any funds from any purpose for

6   which they're required.

7        So I think the evidence on that issue alone is sufficient

8   to cause the Court to deny the injunction, but I want to talk

9   about two of the other *Dataphase* factors, the first one being

10  the likelihood of success on the merits.

11       There's been a lot of debate over two days about the best

12  way to tackle LRSD's facilities issues, but no showing of

13  intentional race discrimination anywhere, not even a showing

14  that somebody else's idea might cause the Cloverdale students to

15  get a better situation sooner, but certainly no showing that

16  Mr. Kurrus, by planning to build two schools on property at

17  locations purchased by an African-American superintendent and

18  approved by an African-American school board, somehow following

19  the path set by the African-Americans who were in charge of the

20  school district before Mr. Kurrus, constitutes race

21  discrimination.  That's an absurd notion.

22       Not only did the -- did Mr. Kurrus's predecessors approve

23  the two locations, they also passed several resolutions.  They

24  talked about doing both of these schools in concert with each

25  other.  And Mr. Kurrus intends to continue to follow that path.

1        Beyond that, this was a recommendation that the district in

2    phase one of its facilities would build these two schools, and

3    the recommendation came in our Exhibit 1 from independent

4    consultants and recommended both the west Little Rock middle

5    school project and the southwest Little Rock High School project

6    in its phase one project and said that Cloverdale should be

7    moved into a renovated McClellan building as part of phase two.

8        Mr. Walker made an argument based on what Mr. Granderson, I

9    think, testified were last year's numbers, not this year's

10   numbers, the previous plan, the idea that LRSD was going to

11   build a brand-new school in west Little Rock.  So Mr. Walker is

12   arguing about square footage numbers that simply don't exist.

13   And Mr. Kurrus testified about what the real plan is, and it's

14   rehabilitating a warehouse, 70,000 square feet, I think.

15       The last thing I want to talk about, your Honor, is the

16   balance of harm.  Mr. Kurrus testified about that as well.  The

17   first aspect of it is really the status quo.  We've come a long

18   way towards opening a west Little Rock middle school for the

19   coming school year, including our commitments to the public, our

20   assignment of students, our assigning of a principal, and I

21   think Mr. Kurrus said appropriately that it's the -- besides the

22   disruption to the students, which is the most significant harm,

23   the district's reputation is at stake, our relationship with the

24   community, and this case was filed in October.  There was an

25   amended complaint in December, all asking for the same relief.

1    But it wasn't until last month that the plaintiffs asked for an
2    injunction.  All this time the district has been making promises
3    and signing agreements and moving forward to open school at a
4    west Little Rock school next year.  The plaintiffs didn't say
5    anything until all that was done.  And that tips the balance of
6    harm in favor of the Little Rock School District.
7         There is no evidence that plaintiffs are going to suffer
8    any harm related to the expenditure of 2017-2018 money in this
9    project in any way, and, in fact, that money, Mr. Kurrus
10   testified, is committed, in his view.  It's part of the math he
11   gave to the Court about how we're going to pay for the southwest
12   Little Rock Middle School.  So that money will not only be used
13   for facilities, as is required by the settlement agreement, but
14   it will be used in southwest Little Rock in a way that will
15   ultimately benefit McClellan students, 88 percent African-
16   American, J. A. Fair students, 80 percent African-American, and
17   Cloverdale students, primarily African-American and Latino
18   students.
19        Thank you, your Honor.
20            THE COURT:  Thank you, Mr. Heller.
21        Mr. Hollingsworth?  He left you some time.
22            MR. HOLLINGSWORTH:  Ms. Middleton has instructions to
23   warn me if I try to use any of Mr. Heller's remaining time.
24        Your Honor, we started out this case in our response
25   pointing out to the Court that the state defendants, which are

1    the Commissioner of Education, members of the State Board, and

2    the Department of Education, really have no role in this

3    dispute.  We've heard testimony that the facilities and

4    transportation division has no power to control the school

5    district's priorities or the location of its new facilities.

6    Neither do the Department of Education or the board have any say

7    in what or where the Little Rock School District builds or when

8    it builds.

9         Mr. Heller has already pointed out that the money that

10   the -- that's paid by the state under the settlement agreement

11   is unrestricted in its uses until the final payment, which is

12   due -- which is to be used for facilities.  But it does not, as

13   the plaintiffs say, control the manner in which those facilities

14   monies may be spent.  It simply says facilities.

15        The inspection reports to the facilities and transportation

16   division don't tell it, or the other state defendants, that any

17   of these schools were in the conditions that we've heard the

18   plaintiffs' witnesses describe.  There's simply no testimony

19   that puts the state defendants in a position that they have any

20   control over the current circumstances.

21        Now, I'd like to address principally the probability of

22   success on the merits, notwithstanding that the state defendants

23   don't have a concrete role in this dispute.  This sets the tone

24   for the rest of this case.  And Mr. Heller alluded to it.  The

25   equal protection claim is what gives this Court jurisdiction,

1    and the law is not -- the law is different, as we know, than it

2    is in the desegregation case.  Liability has got to be

3    established all over again.  That means the plaintiffs have to

4    prove that the board's action or that the action of the

5    defendant or defendants at issue was motivated by discriminatory

6    intent or purpose.

7         Now, the plaintiffs have tried through primarily questions,

8    but a little bit of evidence here to suggest that, well, there

9    are demographic effects.  These actions benefit what they call

10   the white community more than what they call the black

11   community.  But the *Feeney* case, the U. S. Supreme Court,

12   *Personnel Administrators v. Feeney* which we've cited in our

13   filings, tells us that discriminatory purpose implies the

14   decision maker selected or affirmed a course of action, at least

15   in part, because of, not in spite of its adverse effect upon an

16   identifiable group.

17        And that leads to the next point, which is what is the

18   identifiable adverse effect on an identifiable group?  We have a

19   proposal to build a middle school.  The evidence is undisputed

20   that several of the middle schools are over capacity, that an

21   independent firm has recommended construction of a school of

22   this nature in west Little Rock.  We have evidence that the

23   plaintiffs have put on that suggests that some children, not

24   necessarily the plaintiffs' children, but some children are in

25   what they believe are poor facilities.  There's no evidence that

1    whether we build or whether the school district builds or does

2    not build this school will have any effect on the conditions of

3    those children.

4         In fact, the testimony is, there is a hope that this will

5    be the first step in a path to improve conditions for all

6    children in a long-term path.

7         And that leads, your Honor, back to the equal protection

8    issue, which is -- and I want to address something Mr. Walker

9    talked about.  He suggests that there's some sort of pretext,

10   but there's been no witness that testified to a single act or a

11   statement of any member of the -- any of the state defendants or

12   of anybody with the Little Rock School District that suggests

13   that their actions were motivated in any way by race.

14        What we've heard the last two days is discussions about

15   what's the best way to treat an acknowledged problem.  It's a

16   question of policy and of management.  Plaintiffs treat it as a

17   question of demographics, but the proof is that the students at

18   this new school will be fairly representative of the racial

19   demographics of the city at large.

20        Mr. Walker said the state is making sure white students

21   have more choice by allowing them to go to a better school.

22   There's no proof of that, your Honor.  The proof is simply that

23   the State Board of Education or its charter approval panel has

24   approved a charter school that's actually in the Pulaski County

25   District, as I understood the proof, and that the Pulaski County

1    District has approved improvements to Robinson, which has been

2    there for years, and I understand that issue is before this

3    Court in another case.  The state is not making sure -- that's

4    not evidence that the state is making sure white students have

5    more choices.

6          Mr. Walker criticizes a statute that provides choice.  That

7    statute is not at issue in this case.  He hasn't even talked

8    about it in the proof.  There's no proof in the record that that

9    statute has any identifiable racial effect, much less a

10   discriminatory purpose.

11         And in passing, Mr. Walker said there's a pretext of

12   academic distress.  That's an issue for another day.  There's no

13   evidence of that in the record here today.

14         Finally, your Honor, an issue that we briefly mentioned in

15   opening, and that is standing.  It's a basic jurisdictional

16   issue.  The plaintiffs' burden of proof includes showing that

17   they have, one of them, and there are many of them, but that at

18   least one of these plaintiffs have or will suffer an injury, in

19   fact, that is concrete and particularized, that there's a causal

20   connection between the injury and the conduct that is fairly

21   traceable to the challenged action of the defendant and it's

22   likely the injury will be redressed by a favorable decision.

23         We have not heard from a single plaintiff or from any other

24   witness who can -- who has established that one of these

25   plaintiffs will be in a concrete and particularized way harmed

1    by the opening of a middle school that has been in the works for

2    some time.

3         Your Honor, the state defendants ask that the Court deny

4    the motion for preliminary injunction.

5              THE COURT:  Thank you, Mr. Hollingsworth.

6         Mr. Walker.

7              MR. WALKER:  Yes, sir.  If it please the Court.

8         The harm is irreparable when students are forced to go to

9    schools that are well below the standard of the normal within a

10   school district, and it is very clear that, as some of our

11   plaintiffs have set forth in the complaint, that they will be

12   subjected to irreparable harm by having to attend schools that

13   are grossly inferior and have all other kinds of problems, as

14   their teachers have attested.

15        In terms of the likelihood of success on the merits, the --

16   that's the question that we think we prevail on and we think

17   that *Swann* says that you cannot do what you did in 1957.  You

18   cannot just locate schools and take other actions and disregard

19   the status of children if that has a racial impact and it's done

20   with a likely racial purpose.  The racial purpose here is to

21   favor white students and to cause them to have good advantage by

22   having schools located near their homes and in proximity to

23   other people of wealth.  It's to favor the students who are

24   easier to educate.  Easier to educate is a euphemism for race.

25   Who else is easier to educate?  The kids who have already been

1    taught, the ones who have been taught for the most part in the

2    Little Rock School District, according to our allegations, are

3    the ones who have had access to the schools west of Shackleford

4    and north of 630.

5           Now, with respect to the race of the actor argument, the

6    argument being that since the black superintendents were

7    involved, that there could be no discrimination, but I think the

8    case law is very clear that the race of the actor does not

9    prevent the actor from being a race discriminator.  And I think

10   in this case we have shown that in this case Dr. Suggs was here

11   to do the bidding of a dominant white community.  And what he

12   did when he submitted that report for new schools in west Little

13   Rock, he submitted it for 250,000 -- I mean 250,000 square feet.

14   Why do you build a school with 250,000 square feet for a high

15   school unless you have some other purpose?  The purpose is to --

16   I mean, the Court may infer that there has to be another purpose

17   and it has to be a larger school that is twice as large as --

18   either twice as large as the existing middle schools or it has

19   to be for a high school.

20          If it's twice as large for middle school students, there is

21   no showing that you have any kind of a need for a middle school

22   that's going to accommodate 2,500 students in that district, in

23   that particular location, the point being that every school in

24   this district, at least the two schools that are high schools

25   that are contemplated, the one that's contemplated is McClellan.

1    It has an intended population of 1,200.  This school has an

2    intended population of 1,183.  You put the two together, you'll

3    have 2,300 students.  It's larger than even the McClellan and

4    Roberts school combined or contemplated.

5        We've known about this for all the time.  Bear in mind,

6    your Honor, that the state has kept the public from knowing

7    about its plans.  Mr. Kurrus said that he talked to the people

8    at the citizen advisory committee, but that's not the public.

9    Those are people that he pulled together.

10       But the point is, they don't have any plans there.  All the

11   plans are in his head.  When you have everything in your head,

12   that's sort of like making judgments on a whim.  The question of

13   education is too important to be determined on the basis of a

14   whim, which can be changed at any time.  Mr. Kurrus could decide

15   tomorrow that, well, he's not going to do it.  Or he can decide

16   tomorrow that he's going to close all the schools.  And there is

17   no recourse unless we come to this Court.

18       Now, with respect to the state's role, the state's role

19   now, we believe we can demonstrate sooner or later, if not

20   today, that the state's role now is one where it engages -- it

21   has an explicit policy of racial segregation, and what they've

22   done is allowed the -- they've allowed choice to be combined

23   with charters, and then to have schools in competition with each

24   other.  So what the school is -- what Mr. Kurrus is keenly aware

25   of is that now he's got to have a school system operate so that

Closing - Plaintiffs                                                467

1    they can compete for these students that will come into the --

2    otherwise go into the charter schools.  And he's in an awkward

3    position.

4        He says that the plan will have no adverse impact upon the

5    children of the southwest.  I don't know how you can have

6    anything more adverse upon the children of the southwest section

7    of town, those who are eligible to go to Cloverdale, than

8    schools that are just regarded by all as just historically

9    unequal and they have become more unequal since the Court

10   released jurisdiction in this case in 2002.  Bear in mind that

11   this is not a res judicata issue.  In 2002, Little Rock was

12   released from court supervision with respect to everything

13   except program evaluation, so this matter could not have been

14   brought up nor could it have been addressed by these students.

15       These students now stand alone on their own.  They were not

16   in school at that time, but they now are in the sixth grade,

17   seventh grade, and eighth grade, and they are in schools that

18   are grossly inferior.  They will be in schools that are grossly

19   inferior to the students who have yet to even enroll in a school

20   in the western part of the city.

21       They've been asked, as we said earlier, to wait six years,

22   after they get into high school -- so in six years, if they're

23   entering middle school now, in the sixth grade, they will be

24   graduating seniors by the time six years comes around.  So they

25   will never have the benefits in their neighborhood in you're

1    going to have feeder plans of having equal educational

2    opportunity.

3          THE COURT:  Mr. Walker, I've been lenient on the time,

4    but you're much over.  Do you have a --

5          MR. WALKER:  I will ask the Court to consider the

6    equity of the matter and to enjoin them from spending money,

7    desegregation funds, for a west Little Rock school or building a

8    school in west Little Rock that is grossly in excessive of what

9    is at Cloverdale now.  And then I will ask that the Court make

10   sure that the kids from Cloverdale have equal educational

11   opportunities and new facilities simultaneously as Mr. Kurrus

12   said that he wanted to do by taking the action that he did.

13         Thank you.

14         THE COURT:  Thank you, Mr. Walker.

15         Counsel, I need y'all to indulge me in a slight break while

16   I let my mind come to rest on this.  So I think maybe at least

17   five minutes, maybe ten.  Give me just a bit.

18         (Recess from 5:46 p.m. until 5:58 p.m.)

19         THE COURT:  I appreciate everybody's patience with me

20   and I appreciate counsel's work throughout a long couple of

21   days.  I know this is harder on y'all than it is me.

22         Let me address a preliminary issue, Mr. Hollingsworth, the

23   standing issue that you have continued to press, and then the

24   injunction issue proper.

25         I reject the state's arguments that there is a standing

1   problem here.  I think the Court has jurisdiction.  The

2   combination of what the Doe plaintiffs have alleged in their

3   complaint and what has been shown in the course of the last two

4   days has in my view made a sufficient showing of each part of

5   the -- each of the three -- each of the legs in the stool on

6   injury, causation, and redressability.  The showing doesn't have

7   to be conclusive.  It doesn't have to be certain.  But the Doe

8   plaintiffs have gotten past that point.

9          The motion for preliminary injunction, though, is denied,

10  Mr. Walker.  Doing my best to balance all of the equities in the

11  case and applying the governing law, I believe that the balance

12  is decidedly in favor of allowing the LRSD to proceed with its

13  plans.

14         Let me take a slight detour into the law and then I'll come

15  back to the facts and the particular parts of the standard, how

16  I weigh them.

17         The parties have well argued the governing law in their

18  briefs.  It's *Dataphase* as clarified by *Rounds*.  The plaintiffs

19  don't have to show, for example, that there's a 51 percent

20  chance that you're going to win.  It's a fair chance in terms of

21  likelihood.  I think the Supreme Court's recent decision in the

22  whale case, *Winter*, is also important for what it says about the

23  standard for an injunction.

24         Back to now the balance of the equities and the various

25  factors that the Court has to consider.  The Doe plaintiffs'

1   brief in terms of irreparable harm was primarily about the

2   closure of the ten schools.  We now know that as a matter of

3   fact, and it's beyond doubt, that there are going to be no

4   schools closed in the -- either the remainder of this school

5   year or the next school year.  Mr. Kurrus's testimony on that is

6   unrebutted, and the Doe plaintiffs recognize this and the Court

7   appreciates their candor in stepping back from that part of the

8   argument based on the evidence that was presented.

9        So what then about the irreparable harm alleged involving

10  the students at Cloverdale in particular or in some of the older

11  schools south of 630?  This was a new issue, at least on the

12  Cloverdale point, but I'm persuaded that the LRSD has met proof

13  with proof and that there is, at least as things currently stand

14  and what the Court knows, there is no sufficient problem or

15  there is nothing so terribly wrong in those schools that would

16  justify the Court's intervention.

17       I suppose this means that I agree, Mr. Kurrus, with your

18  characterization of them as serviceable as opposed to,

19  Mr. Walker, your view of them as dismal.  I have no doubt that

20  they need to be improved and that that is in prospect in longer

21  term, but in terms of an immediate and pressing situation, for

22  example, to close Cloverdale and move those students, the proof

23  has not borne that out.

24       I think we would probably all agree after hearing the

25  evidence over the last few days that there were problems at

1   those schools, particularly Cloverdale, Wilson, over the last

2   several years, but, as best I can tell, those problems have been

3   reasonably addressed and it's not a situation currently of moldy

4   walls and flooding rooms and leaky roofs, that kind of thing.

5       More generally, still on the -- this notion, I think, of

6   irreparable harm, the Court has been helped by the evidence

7   that's presented of what the LRSD board was thinking and

8   planning before the state takeover.  And even setting aside,

9   Mr. Walker, your argument about various superintendents, it is

10  clear to me that a board with significant black and white

11  representation on the board and these neutral experts had

12  concluded that the district needed to build the new high school

13  in southwest Little Rock and have a new middle school in west

14  Little Rock.  It was both, with the southwest high school to be

15  on top of this bunk bed, if you will.  It was first.

16      As I view the state of the proof as to what happened, the

17  Leisure Arts facility was a bolt of lightning that was

18  unexpected, and I believe that Mr. Kurrus has responded to that

19  in a fair and wise fashion.  That is, the plan that he has laid

20  out to refurbish that facility, meanwhile moving full steam

21  ahead, as he says, on the southwest Little Rock high school,

22  seems to me a perfectly reasonable one and it tracks this

23  preexisting plan of the district, validated by the experts.  The

24  only difference is the west Little Rock school is accelerated.

25  But there is a substantial savings, I think, the proof

1    establishes that there's approximately $20 million that will be

2    saved by doing that as opposed to building a new school.  And

3    that's $20 million that can be spent where it's needed in the

4    district as a whole.

5         The school case, what I call the school case, the long-

6    running Pulaski County school case that's over here to one side,

7    the settlement in that case, the settlement in that case is no

8    impediment -- presents no impediment or bar to what LRSD is

9    proposing to do and planning to do at this point.  The -- first

10   of all, the background, as I believe the lawyers will concede,

11   the background is that there was no limitation on the state

12   desegregation payments to the districts to begin with.

13   Mr. Walker, you reminded me that my brother Wilson so held that,

14   I believe.  And in the new settlement, the only limitation was

15   on last year dollars, the fourth-year dollars, and the proof is

16   that all of this will be done before those fourth-year dollars

17   flow in.  They're supposed to go just to facilities issues.  And

18   Mr. Kurrus has testified that that money is earmarked for the

19   southwest Little Rock high school.  It's a big chunk of that

20   project.  And three cheers for doing that.

21        In terms of the irreparable harm versus injury from a

22   standstill to LRSD, again I think the harm on the students' side

23   is not irreparable or significant, and I agree that the injury

24   to the district and those -- the interests on that side of the

25   equation more generally are significant.  I believe there's the

1   prospect of losing the Leisure Arts Building and the disruption

2   to the lives of the students and parents who are planning to go

3   to school there.

4        I also credit Mr. Kurrus's testimony in terms of the

5   district's reputation and the momentum that is building toward

6   renovating an LRSD that can serve all of the children, whatever

7   their race may be.  And so I believe that balance weighs against

8   an injunction.

9        In terms of the Doe plaintiffs' likelihood of succeeding on

10  the merits, let me be clear here that what's presented in the

11  injunction, as I view it, is one slice of this case.  It's the

12  facilities slice.  There is also the state takeover slice and

13  the charter school slice, and those other two slices are not

14  before the Court.

15       I'm going to speak now on the facilities slice, which I

16  believe is before the Court in this injunction request.

17       It is possible for the Doe plaintiffs to succeed, but based

18  on the evidence that I have heard to date, there is not a great

19  possibility that they will succeed.  I say that because of

20  Washington against Davis.  That is, the plaintiffs' burden here

21  is to show purposeful discrimination, an intent on the part of

22  the LRSD in making these decisions to favor white children over

23  black children.  And at least based on what has been presented

24  so far, the plaintiffs have not made a strong showing on that

25  issue.

1          Here I would also instance the undisputed fact that the

2     proposed new school -- I'll call it the Leisure Arts middle

3     school, though I sure hope y'all come up with a much better name

4     for it than that -- this proposed new school is going to serve

5     in the next year children of all races.  Y'all know that math is

6     not my strong suit, but in my rough take at the math, it's --

7     the school will be -- the sixth graders that will be there will

8     be roughly 40 percent white, 40 percent black, and 10 percent

9     Asian, Hispanic, everything else.  That's -- that is a mosaic,

10    and for those who believe that that is what we should aspire to,

11    it is -- I don't know how much closer to attaining that goal of

12    diversity one could get than that, than that mosaic.

13         I understand, Mr. Walker, I hear you on what I'll call the

14    location issues or the west Little Rock issues as to where the

15    school is going to be physically, but the -- when I look at the

16    maps, in particular the LRSD Exhibit 4 with the various zones in

17    it, which I found particularly helpful and colorful, what I see

18    is the new school drawing students from all over the city and

19    being a melting pot.  And so this is why the Court has expressed

20    some skepticism on that third factor of success on the merits.

21         The public interest, this pulls in both directions in the

22    case because Mr. Walker is right about the public's interest in

23    seeing that there is an equal educational opportunity for all

24    children.  At the same time, my sense of the proof, having

25    watched the people come and go here these last two days and read

1   the papers, is that this city and this school needs -- this

2   school district, pardon me, needs renovation and needs a new

3   birth, if you will, and I must say that I am hopeful after

4   hearing what has been said here in the court over the last two

5   days that that is in prospect under Mr. Kurrus's leadership.

6          So for all of those reasons, long story short, the motion

7   for preliminary injunction is denied.

8          Mr. Walker, any request for clarification, or is there an

9   issue that I have not touched on that you want me to make the

10  record on?

11                 MR. WALKER:  No, sir.

12                 THE COURT:  All right.  Mr. Heller, same question.

13                 MR. HELLER:  No, your Honor.

14                 THE COURT:  Mr. Hollingsworth?  Same question.

15                 MR. HOLLINGSWORTH:  No, your Honor.

16                 THE COURT:  Okay.  Counsel, I thank you again for your

17  work.  I will enter a very short order tomorrow and the press of

18  other business is going to prevent me from writing up a formal

19  order, but the parties will have the benefit of the transcript.

20         Thank you again for your work in the case.

21         We're in recess.

22         (Proceedings adjourned at 6:17 p.m.)

23                          REPORTER'S CERTIFICATE
        I certify that the foregoing is a correct transcript from
24  the record of proceedings in the above-entitled matter.
                                      Date:  February 6, 2017
25  /s/ Christa R. Jacimore, RDR, CRR, CCR
        United States Court Reporter