IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

PARENT PLAINTIFF LAKESHA                                    PLAINTIFFS
DOE and her minor child
DENNIS DOE; et al.

v.                          CASE NO. 4:15-CV-0623 DPM

JOHNNY KEY, ET AL.                                         DEFENDANTS

## BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION TO JOHNNY KEY'S MOTION FOR SUMMARY JUDGMENT

More than 14 years ago, the district court determined that the LRSD had achieved unitary status in all but one area and ended court jurisdiction and oversight in the areas of compliance. Court oversight in the single area of initial non-compliance ended more than 10 years ago. During the course of the considerable period after 2002, officials and employees of the LRSD have by varied and continuing policies and practices, the effects of which are readily perceivable to the community, recreated a racially discriminatory system of public education.   Plaintiffs demonstrate that their claims present genuine issues for trial and that Mr. Key is not entitled to judgment as a matter of law.

[A.] The Timing of Unitary Status and the Propriety of Plaintiffs' Claims

In 1991, the Supreme Court described the standard governing a desegregating school district's achievement of unitary status. Board of Education of Oklahoma City v. Dowell, 111 SCt. 630, 638 . In 2002, the LRSD moved for a declaration of unitary status concerning its then-current Plan (Doc. 3107 in Case 4:82CV0086), a document agreed to by LRSD and the Joshua Intervenors and approved by Judge Wright on April 10, 1998. LRSD v. PCSSD, 237 F.Supp. 2D 988, 993-94, 995 (E.D.Ark. 2002).

In a decision effective on October 11, 2002 (at 988) Judge Wilson ruled that the LRSD had achieved unitary status regarding all areas of the Plan with the exception of Section 2.7.1 concerning assessment each year of academic programs to determine their effectiveness in improving African-

1

American achievement. <u>LRSD</u>, 237 F.2d at 1086. The Court set forth a "Compliance  Remedy"

respecting Section 2.7.1. (At 1087) Accordingly, the Court declared LRSD to be "partially unitary"

and observed that "going forward, the court will continue to monitor and supervise LRSD only in

connection with its implementation of the Compliance Remedy . . . ."  (At 1089) In 1992, the Supreme

Court had approved the incremental determination of unitary status approach in <u>Freeman v. Pitts</u>, 503

U.S. 467, 489-93. Judge Wilson's unitary status Order was not the subject of a stay.

In an Order on February 23, 2007, Judge Wilson ruled that the LRSD had achieved unitary

status regarding Plan Section 2.7.1. (Doc.  4103 at 49) A portion of Justice Wilson's closing comments

is somewhat ironic (at 49):  "LRSD's Board can now operate the district as it sees fit; answerable to no

one except LRSD's  students, patrons and the voters who elected them to office. While the road has

been long and at times frustrating – for LRSD and for me – I want to express my heartfelt best wishes

as LRSD begins to operate, as our framers intended, under control of the citizens of the City of Little

Rock." This Order was not the subject of a stay.

The dates of unitary status are then October 11, 2002 and February 23, 2007 (for the subject

matter of Section 2.7.1). LRSD's uniform reference to February 23, 2007 is in error. (Doc. 131 at 5)

The Supreme Court, Judge Wilson, and the Eighth Circuit in affirming Judge Wilson's 2002

ruling did not stop with unitary status. Rather, each court alluded to the future obligations of a former

dual system found to be unitary and released from court supervision. The Supreme Court wrote that  "a

school district which has been released from an injunction imposing a desegregation plan . . . of course

remains subject to the mandate of the Equal Protection clause of the Fourteenth Amendment." The

Court cited <u>Washington v. Davis</u> and <u>Arlington Heights</u> as relevant precedent.  <u>Dowell</u>, 111 S.Ct.  at

638. Judge Wilson wrote (237 F.2d at 1089): ". . . I want to caution the Board that it must be careful in

how it uses its newly restored wings. . . . [T]he Board must keep the Constitution in sight at all times in

making future decisions regarding the Little Rock school system.  . . ." The Court of Appeals wrote: "It

goes without saying, but we say it anyway, that LRSD remains fully subject to the Constitution and all other applicable laws, and that these obligations are enforceable by appropriate legal action. " LRSD v. Armstrong, 359 F.3d 957, --- (8thCir. 2004).

   The relevant portion of the Amended Complaint shows that Plaintiffs plead the potential claim recognized by the three courts and proceed on fresh facts arising in the 15 year period after Judge Wilson's initial ruling. Plaintiffs also note two points as to the earlier proceedings. First, the 2002 determination of unitary status was based on consideration of evidence regarding six of the many areas of system operations addressed in the 1998 Plan; these did not include Section 3.6 discussing "school construction." LRSD, 237 F.Supp. 2D at 1022.  Second, the text of that 1998 Plan regarding the construction of new school facilities was very brief. It read:  "LRSD shall construct at least two new area elementary schools, one in west Little Rock and one at the site of the former Stephens school." (Doc.  3107 at 11, Sec. 3.6)

   The Supreme Court articulated the right of each plaintiff at issue in this case in Brown v. Board of Education, 349 U.S. 294, 299 (1955). It is to be educated in "a system of public education freed of racial discrimination"; see also at 301 ("a racially nondiscriminatory school system"). This brief demonstrates sufficient and systemic racially discriminatory conduct post-unitary status to implicate the right identified in Brown II. With respect to the alleged denial of this right, plaintiffs' factual and legal presentations establish that there are genuine issues of material fact and that defendant Johnny Key is not entitled to judgment as a matter of law.

   Plaintiffs are the non-moving party. Therefore,  "the evidence is [to be] viewed in the light most favorable to the (plaintiffs) with all reasonable inferences being drawn in (their) favor." Borgman v. Kedley, 646 F.3d 518, 522 (8th Cir. 2011).

   Plaintiffs' factual presentation draws, to a limited extent, upon the standards for judicial notice of facts heretofore established by the court in this action. The court referred to a fact, not insignificant

in its analysis, "famously" known. (Doc. 72, at 13).  The court cited, in general terms,  the position taken by Mr. Kurrus at a State Board of Education meeting,  characterized as "undisputed matters of public record, " and, again regarding Mr. Kurrus, what it viewed as  "another important, undisputed, and easily alleged fact  of public record . . .  ."  (Doc. 72, at 28-29)

[B.] <u>The Statute of Limitations Argument Lacks Merit</u>

[1.] <u>Equitable Tolling Applies to Plaintiffs' Claim</u>

Although Poore is correct that three years is the statute of limitations for Sec. 1983 claims, he neglects to mention in his brief that the statute of limitations may be tolled for such claims. Federal courts apply the tolling laws of the same states (the place of injury) as they apply statutes of limitations. See <u>Board of Regents of the University of the State of New York v. Tomanio</u>, 446 U.S. 478, 484 (1980) (Section 1983 claim); and under Arkansas law there is a savings statute that is applicable to the present case. A statute of limitations may be tolled equitably under the following circumstances:

(a) If any person entitled to bring action under any law of this state is under twenty-one (21) years of age or insane at the time of the accrual of the state action that person may bring the action within three (3) years next after attaining full age, or within three (3) years next after the disability is removed. Ark. Code Ann. 16-56-116(a).

It is undisputed that the minor plaintiffs are all under 21 years of age. The earliest incident of racial discrimination that plaintiffs allege in their Amended Complaint occurred on ----. Plaintiffs allege other acts of discrimination such as ----. Therefore, because of equitable tolling, Plaintiffs are not time barred from seeking relief from any of the incidents of race discrimination alleged in this lawsuit.  See <u>Hankins v. Selig</u>, 2009 U.S.Dist. LEXIS 93787*14-15 (E.D.Ark., October 7, 2009) (applying Ark. Code Ann. 16-56-116 to Section 1983 claims).

[2.] <u>The Continuing Violations Doctrine Applies to Plaintiffs' Claims</u>

Considered to be an exception to a statute of limitations, the continuing violations doctrine is applied when a civil rights claim arises from not a single act, but multiple acts in which the same violation is repeated. The limitations period starts again with each new violation. The clock starts to run

not from the earliest act, but from the latest act in the continuing violation. See Rural Water System 1 v. City of Sioux Center, 967 F.Supp. 1483, 1508 (N.D. Iowa 1997) (citing Varner v. National Supermarkets, Inc., 94 F.3d 1209, 1214 (8thCir. 1996)).

In the present case, Plaintiffs allege that Defendants committed a series of discriminatory acts from 2004 to the date of the filing of the Complaint (and thereafter), all within the three-year statute of limitations.  These allegations include, *inter* alia, the following: (1) starting in 2004, the Central High School attendance zone was gerrymandered and this school was permitted an excess of portable classrooms (Doc. 6, paras. 98-104); (2) beginning in 2004, white faculty were assigned disproportionately to schools with the highest percentages of white students (Doc. 6, para. 118); and (3) from 2008 to the present, the facilities of Cloverdale Middle School were allowed to deteriorate until they were considered to have the worst school facilities within the LRSD (Doc. 6, paras. 63-64). Because genuine issues of material fact exist as to whether Plaintiffs have presented evidence of continuing violations, the Court should deny summary judgment. Rural Water System 1, 967 F.Supp. At 1508 (declining to grant summary judgment for untimeliness even though first alleged violation of federal law occurred nine years prior to assertion of Section 1983 claim).

[C.] Elements of the Racially Discriminatory System in the LRSD

[1.] School Facilities

The LRSD admitted that its State-required 2015 "Facility Preliminary Master Plan" contains the following content (Doc. 6, para 80; Doc.  26, para. 80)

The Little Rock School District recognizes the positive relationship that exists between school conditions and student achievement and behavior. Facility condition may have a stronger effect on student performance than the influence of family background, socioeconomic status, school attendance and behavior combined. Students are more likely to prosper when their environment is conducive to learning. Well-designed and maintained facilities send a powerful message to kids about the performance a community places on education.

Students and staff thrive in an orderly, clean and safe environment. Classrooms that are well ventilated, suitably lighted, and properly maintained actually facilitate learning. Poor air quality, on the other hand, negatively affects alertness and results in increased student and teacher absences, which can have a

corresponding impact on student achievement. Moreover, appropriate facilities maintenance extends the life span of older facilities and maximizes the useful life of newer facilities. Thus, a facilities maintenance plan contributes to both the instructional and financial well-being of an education organization and its community.

In the earlier Pulaski County school case, Judge Miller had occasion in a May 2011 decision to evaluate the more recent construction of schools undertaken in the Pulaski County Special School District.  While the context involved compliance with an agreed upon desegregation plan, consideration of the discussions by Judge Miller  and the Court of Appeals in affirming his judgment on the point are of  value here. The facts plainly show intentional discrimination and there are several parallels with the post-unitary facility facts here, from Don Roberts Elementary School onward through facility implications of STEM Academy, Pinnacle View Middle School, Southwest High School, and McClellan High School/Cloverdale Middle School. The citations are Doc. 4507, 5-19-11 at 73-78 and LRSD v. State of Arkansas, 664 F.3d  738, 751-53  (8thCir. 2011).

The Court of Appeals drew upon Miller's findings. It discussed: construction of "Bates [Elementary] located in a predominantly black area"; more generous funding of construction of  two new schools "in predominantly white areas"  – with one of these "Chenal [elementary] . . . built to 'Mercedes-Benz' standards while Bates was not";  construction of  a $58 million  high school "in a predominantly white area" despite a study finding that the area high school would be adequate with renovations";  and "several  schools in predominantly black areas that were identified as in need of replacement by the 1999 study continu[ing] to 'languish in relatively poor condition . . . ." LRSD, 664 F.3d at 752.  The court found no clear error in the findings "that PCSSD has devoted a disproportionate share of its facilities spending to predominantly white areas."  (At 753)

Again, the context differs. Yet light is shed on the significant elements of the LRSD picture.

[1a.] The Don Roberts Elementary School

LRSD notes that as mentioned in the 1998 Revised Plan "the Stephens (Elementary School) was rebuilt and the Don Roberts Elementary School was eventually constructed in west Little Rock."

(Doc.131 at 9) The Plan had not addressed the size, cost, or amenities of either school, or the precise location of the school in the west. (Doc. 3107 at 11)

Stephens opened in 2000; construction cost was $9,053,316 and square footage 77,987. (Exhibit 63, DF 000625)  Enrollment totaled in that year 327 and 545 in 2001-02, 94% African American each year. (Exhibit 64, ODM Enrollment Report, Dec. 20, 2012 at 21) ODM identified its capacity as 646. (At 29)

A west elementary school was identified as a project in the LRSD's year 2000 millage campaign.  LRSD documents provided cost estimates as follows: "West Ele. $10,770,000" 3/10/2000 (Exhibit 65 at 1); "West Elementary Total"  "$10,500,000"  3/17/00." (Exhibit 65 at 2); "Land Purchase West Ele." "$460,000" 3/17/00 (Exhibit  65 at 3)

Subsequent documentation shows the following regarding the Don Roberts  Elementary School: completion date: 8/16/2010; area 148,000; Total Cost $28,744,373 (Exhibit 66, DF 000548); see also Exhibit 67  ("Cost of construction is estimated at $30,000,000"; also showing  State approval) The cost of the land for the 18.7 acre Roberts site was $5,288,438. (Exhibit 68, DF 000258 [calculation made for largest parcel])--- not $460,000. The cost to equip the School for its opening was $2,605,419 (Exhibit 69, DF 000259-262) Its capacity is 895  (Exhibit 64, ODM Report at 29) Don Roberts' enrollment in 2010-11 was 702,  including 69.4% white and 21% African American  pupils (Exhibit 64, ODM at 20) White pupils were 22.2% of LRSD elementary level pupils in 2010-11. (Exhibit 64, ODM Report at 22)

 LRSD answered that it "generally agrees with the description of the Don Roberts Elementary School set out in paragraph 68 of the Amended Complaint." (Doc.26, para. 68) Plaintiffs there alleged:

The Roberts facility is beyond state of the art. In addition to its huge site with multiple play areas for use of the School, the building is marked by larger classrooms; multiple common areas; a wet lab in every classroom to enhance the study of science; natural light from windows throughout the building; a huge cafeteria with a stage and large screens, facilitating use for multiple purposes; two large well-equipped art and music labs; an ample gymnasium with access to technology which has been used for the training of physical education staff and even a climbing wall; a library of such high quality that

even state-of-the-art does not do it justice and which compares favorably to the nearby branch public library; an 'East lab'(state of the art computer system to enhance the study of geography); an area with telescopes; ample offices for administrators, counselors and school nurses; and air conditioning of the entire facility. See photographs of the Roberts School, including the library, attached to the complaint, as well as a photograph of the Franklin School. (Exhibit 2)

The Don Roberts school is located "in the northwest corner of the school district, near the district line." (Doc. 6, para. 67; Doc. 26, para. 67)  This is a white neighborhood. (Exhibit 46, Dr. Karen DeJarnette Dec., para. 5) See <u>Swann v. Charlotte-Mecklenburg Board of Education,</u> 419 U.S. 1, 20-21 (1971) (impact of location of new schools on racial make-up of enrollment and neighborhoods). The racial make-up of the Don Roberts School faculty has been as follows:  2014-15  49 white teachers, (93.8%) 3 African American teachers;  2015-16  47 white teachers (94%)) 3 African American teachers;  2016-17  49 white teachers (96.1%),  2 African American. (ADE on-line compilation of data submitted each year by LRSD) See <u>Keyes v. School District No.1</u> , 413 U.S. 189, 196 (1973) ("What is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors such as the racial and ethnic composition of faculty and staff and the community and administration attitudes toward the school, must be taken into consideration.")

[1b.]  Substantial Reduction of Black Enrollment in the Excellent Forest Heights Facility and Increase In  White Enrollment upon Change to Unique K-8 STEM Academy Program

Conversion to the STEM Academy Program

Through 2013-14, the LRSD operated the Forest Heights Middle School (grades 6 to 8) at the edge of the Heights neighborhood, north of  I- 630.  (Doc. 6, para. 81; Doc. 26, para. 81 ) ("located north of Interstate 630")  This neighborhood is predominantly white. (Exhibit  46, DeJarnette Dec. para. 5)  "In the period from August 11, 2006 through January 31, 2014, the LRSD completed at least 14 facility projects at this school site." (Doc. 6,, para. 82; Doc. 26, para. 82)  LRSD's Answer "states that the construction and renovation projects at Forest Heights Middle School between 2006 and 2014 resulted in everything being replaced except the cafeteria, gymnasium and music room." (Doc. 26,

para. 82) An LRSD compilation of data on facility projects identifies the cost of projects completed at the Forest Park site between 2006 and 2014 to be approximately $7,666,372.  (Key Exhibit 16 at DF 000578-79); see also Michael Poore deposition, Exhibit  57  at  107 (second best middle grade facility; only new Pinnacle View facility ranked as superior).

In 2013-14, the total enrollment of Forest Heights Middle School was 580, 490 African American students (84.5%), 50 white students (8.6%), and 40 other students (6.9%).  There were 169 African American students  in each of the sixth and seventh grades. (Doc. 6 , para. 82 ; Doc. 26, para. 83) "These students would have been able to move on to the seventh and eighth grades in the school in 2014-15, had its longstanding grade structure and mode of organization continued without change" (Doc. 6 at 83), absent one or more students not being promoted.

"Prior to the the 2014-15 school year, the LRSD converted the Forest Heights facility to a 'STEM Academy,' serving kindergarten through (grade) eight." (Doc. 6, para. 84; Doc. 6, para.84) Superintendent Dexter Suggs, an African American,  was the initial proponent of this action. (Exhibit 70 at 2-3)  The change was  later approved by a 4 to 3 vote of the School Board, with 3 white members and one African American member in support, and 3 African American members opposed. (Exhibit 70 at 5)

With the conversion, the number of grades served in the facility increased by six. However, in 2014-15, the total African American enrollment decreased by 92 (from 490 to 398). In contrast, the total white  enrollment increased by 165 (from 50 to 215). The number of African American pupils in grades six and seven  in 2013-14 totaled 338. Yet, the African American enrollment in grades seven and eight in 2014-15 totaled only 139, a reduction of 199 students.  (Exhibits 71)  "The LRSD spent an additional $1,800,000 to prepare the Forest Heights building to serve as the STEM Academy in 2014-15." (Doc. 6, para. 85;  Doc.26, para. 85) (admitting that "roughly correct"))

In 2014-15, the total enrollment of the STEM Academy was 696, 398 African American

students (57.1%),  215 white students (30.9%), and 83 other students (12.0%). In grades 6 through

eight, there were 196 African American students (66%), 72 white students (24.2%), and 29 other

students (9.8%). (Exhibit 71)

In the next two school years, the number and the proportion of white students in  the STEM

Academy as a whole, and in grades 6 to 8 separately, grew and  those for African pupils fell. By 2016-

17, the total enrollment  was 687,  349 African American students (50.8%),   241 white students

(35.1%), and 97 other students (14.1%). In grades 6 through 8, there were 133 African American

students (47.2%), 114 white students (40.4%), and 35 other students (12.4%).  (Exhibit 71)

<u>The Selective Admission System Employed for Admitting Students to the Program</u>

The LRSD employed a selective admission system for the STEM Academy, requiring that

students "qualify." (Exhibit 58 at  1-2; see also  at 5 ["Your child <u>MUST</u> meet all criteria for placement

in Forest Heights STEM Academy."]; and  Doc. 26, para. 84)  The process at all grade levels required

completion of an "Optional Enrollment Request Form." (Exhibit  58 at 3-4)  Completion of a separate

STEM Academy form was also required. (Exhibit 58 at 5)

"All children applying for admission to Kindergarten . . . [must]l participate in a screening

process for kindergarten. . . . Students (were) expected to demonstrate gross motor, listening, and

speaking skills, as well as age appropriate behaviors. "  The process required a one-to-one, twenty

minute session with a district staff member, with a waiting area  available for parents.  (Exhibit 58 at 8)

The screening  consisted of "counting, dots, blocks, standing on one leg, those kind of things . . .

developmental screening." (Exhibit 56, Linda Young Dep. At 20)

The process above the kindergarten level was more extensive. LRSD's Answer states that "(the

District) considered applicants based on their interest in attending such a school, their grades, their

standardized test scores and their report cards. . . ." (Doc. 26 at 84; Exhibit 58 at 6-7) LRSD gauged

student interest based upon responses to a 10-part "Student Interest Survey, " developed by District

administrators. (Exhibit 58  at  9;  L. Young dep. At  43) The LRSD also utilized information from a

"Recommendation Form," to be completed by a Principal, teacher, or counselor." (Exhibit 58 at 10-13)

A "shadow zone" played a role in selection for the program. "It's an area around a school that is used in

the student assignment process." A "certain number, a certain percentage" of  students living within the

zone "were given preference in the computerized selection process." (Exhibit 58, [L. Young dep. At 33-

34)

Superintendent Suggs "provided a list of criteria that were to be used" in the selection

process.(Exhibit 58, L. Young dep. At 39; at 27 (decision to use Benchmark test made by Mr. Suggs))

There was no "rubric" for  use in evaluating student-applicants' responses in the interest survey in a

consistent manner. (At 44)  There was no written guidance on how to combine evaluation of each

category of information to make a decision as to an applicant.  (Exhibit 58, L. Young dep. At 50)

The number of special education students in Forest Heights Middle School in 2013-14 was 107.

Special education students in the "middle grades" of the STEM Academy totaled 14 in 2014-15.

(Exhibit 72; see also Exhibit 46, para. 11)

Superintendent Suggs, an African American, initiated the process yielding the STEM Academy

in the Forest Heights facility. He identified one of the  two middle school locations with the highest

concentrations of white residents in the surrounding area (with Pulaski Heights being the other) – not

the location of Cloverdale, Dunbar,  Henderson,  Mablevale,  or Mann. He urged selective admission

for the program and provided standards for evaluating applicants, some amorphous and some likely to

have a racial impact (test scores and the "shadow zone.") The result: a very large reduction in the

number of African American students attending one of the system's best facilities, accompanied by a

very large increase in the number of white students enrolled.

Superintendent Suggs' initiatives regarding the reading recovery program and the LRSD's

program evaluation efforts were also adverse to African American students. (Exhibit 46, Dec. of Dr.

DeJarnette , paras. 3, 6-7)

[1c.] Pinnacle View Middle School, "Southwest High School,"  and McClellan/Cloverdale

It is worthwhile briefly summarizing  the current status of this aspect of the facility matter; and considering  the sharp contrast between current circumstances and  the rosy picture painted in March 2016. Elements of the record supporting this summary are detailed in the following text.  The Pinnacle View facility is in a white neighborhood. Phase I opened on schedule and the same result is anticipated regarding Phase II.  The pledge that the Pinnacle View projects, Southwest High School, and the McClellan/Cloverdale work could be done without voter approval of more funding proved to be erroneous.  At best, the Southwest High School project will be delayed. The prospects for the essential McClellan/ Cloverdale work are even bleaker. With the projects in the minority community in such doubt, the balance promised in March 2016 has evaporated. This summary and the Don Roberts and STEM Academy facts show the racial discrimination present in major post-unitary facility endeavors, as a totality.

Events Through the March 2016 Hearing

Fanning Howey studied LRSD school facilities and made recommendations. See LRSD Exhibit 19 in the March 2016 hearing.  Recommended "Phase I" work included a new high school facility to replace McClellan  (cost – from $74 million to $81 million) and a west middle school (cost $55 million). (At 107) Cloverdale Middle School was the only LRSD  school to be given a condition ranking of  "critical." (At 81-83)  As later renovating  the McClellan facility to replace Cloverdale was deemed more advantageous than "tearing down and rebuilding the Cloverdale facility" (at 90) , a Phase 2 project included $24 million for the renovation. (At 107)

LRSD writes (Doc. 131 at 37):  "On January 22, 2015 the LRSD board of directors unanimously approved a motion which stated that : 'construction of a southwest high school shall be the first priority', that '[u]pon a successful millage, the district shall simultaneously authorize the

construction of a southwest Little Rock high school and a west Little Rock middle school' and that the 'second priority of the district' will be the improvements necessary  to 'create and maintain relative equal facilities throughout the district '. (Doc. 6, para. 212) " The motion also stated (Doc. 6, para. 212):  "If for some reason the southwest Little Rock's construction is delayed, the west Little Rock school construction shall also be delayed, pending resolution of the reasons for delay.". An appended outline of projected expenditures included funding of the Southwest High School,  west middle school, and McClellan/Cloverdale projects.  (Doc. 6, para. 213; Doc. 26, para. 213)  The LRSD board was ousted on January 25, 2015.

Then Superintendent Baker Kurrus testified in the March 2016 motions hearing that  LRSD would provide a new Middle School in West Little Rock (in stages) (Hearing transcript at 198-201); a new "world class" southwest-area high school to replace McClellan and J.A. Fair (at 198, 204-05, 207, 210-11); and, later, a replacement for Cloverdale Middle school, by substantial rehabilitation of the McClellan building when it was vacated. (At 218-19, 317-18) Superintendent Kurrus testified that Cloverdale Middle School was the only school identified as "critical" in the Fanning Howey study and, in his opinion, was "the worst" school in the LRSD, (At 267, 316) Mr. Kurrus testified that "we are at full throttle on the [southwest high project] right now."  (At ----) He testified three times that the west middle school and southwest-area high school projects could be completed without seeking a millage increase. (At 205-06, 282, 338) He testified that the LRSD has plenty of money. (At 314 [court recognizes this position])

Taking the Kurrus testimony at face value, the court found the southwest-area high school project to be "on top of this bunk bed," "first" and "full steam ahead." (At 471)  The court noted Mr. Kurrus's  pledge that the final payment to LRSD of settlement funds from "the school case" was "earmarked for the southwest Little Rock high school" and stated: "It's a a big chunk of that project. And three cheers for doing that." (At 472)  The court viewed acceleration on the west Little Rock

13

project by use of the Leisure Arts facility as reasonable because it was coupled with "meanwhile moving full steam ahead, as he (Mr. Kurrus) says, on the southwest Little Rock  high school . . . ." (At 471)

Mr. Kurrus underestimated that the construction costs of the west middle school would be $350,000 to $400,000 (At 200) for Phase I and "20 million give or take" for Phase II (At 201). The actual costs are Phase I  $642,742 (Change Order,  Exhibit 19)  and Phase II $33,355,803 (Change Order No. PA-003, Exhibit 20) LRSD exhibits in the hearing contained no notes or other documentation supporting Mr. Kurrus's revenue and costs testimony.

Subsequent Events

Plaintiffs deposed LRSD Chief financial Officer Kelsey Bailey on April 4, 2017. (Key Exhibit 20) Mr. Bailey came to the view that additional funding beyond that identified in the hearing would be needed when "we start[ed] getting some real numbers in"   – about "a year ago" (at 53-54), which would be in April 2016.  In deposition, Defendant Key recalled the funding issue arising  "probably last summer." (Exhibit 22 at 81) Mr. Key noted discussion of two options. The first was "restructuring debt that would not require a vote of the people . . . "; however, this would not be adequate to fund the McClellan/Cloverdale project. (At 81-82) The second option was extension of the millage . (At 82) Mr. Bailey also described a contingency plan possibility allowing completion of  the high school, but not the McClellan/Cloverdale piece without a vote of the citizens. ( Key exhibit 20 at 34-35)

LRSD made no status report on these matters, despite their obvious relevance, in view of the content of the March hearing and ruling, until October 2016. See Doc. 77.  In the interim, Phase I of the Pinnacle View Middle School, in a white neighborhood, was completed in July 2016. (Bailey dep. At 47-48) The sixth grade program functions in 2016-17.

The report began by discussing revenues and costs in general terms. It then stated : "That confluence of events left LRSD unsure about its ability to fund a first-class high school and, even if

LRSD could pay for the new high school, there would would be very little left to fund needed improvements in other schools in the district." (At 1-2) LRSD did not describe in specifics the alternative funding option, or mention the inability to fund the critical McClellan/Cloverdale project, absent the voters' approval of a millage extension,  which the report stated, it would pursue. The report was  silent as to Phase II of the Pinnacle View project; LRSD offered no reasons why this project would be unaffected by the "confluence of events" regarding costs and revenues.

In his deposition, Superintendent Michael Poore discussed the condition of high school and middle school facilities at length.  (Exhibit 57 at 105-114)  He identified many shortcomings of McClellan High School: "The lack of windows is the number one thing"; "there's . . . something like a four to six inch  gap on the floor level that opens up into the other classrooms" "creat[ing] a disturbance . . ."; "There's a whole wing at McClellan where students exit out of a classroom and they're right outside . . . exposed to the elements"; "Lighting is poor in that campus "; "Looks like a barrack"; (At 106) Finally, "hallways are more narrow than what a normal high school would be." (At 110) Mr. Poore ranked the middle school facilities from most challenged to the best, as follows: Cloverdale/Dunbar, Henderson, Mann, Pulaski Heights, Mablevale, Forest Heights STEM, Pinnacle View. (At 107) This order largely proceeds from heavily minority to more white enrollment in a white neighborhood.  "Cloverdale has a lot of similarities to McClellan in terms of some of the same issues" (At 107); also at 108, lines 16-20). Dunbar has "had some roof leaks that have come in and impacted that basement level." "Lighting at Dunbar is inadequate in a lot of parts of the building." (At 108) At Henderson, "[l]ighting is . . . just dark . . . whenever you walk through, in terms of especially the hallways." "The concrete floors . . . kind of create again a barrack type feel as you walk through it, rather than a school." (At 113) "Pulaski Heights [is] . . . an older building  . . . but in terms of just how the space looks and stuff, [he] thought it was in pretty good shape."  (At 107)

The Report of Plaintiffs' facility expert, John Poros,  dated March 10, 2017, discusses

Henderson Middle School, Wilson Elementary School, McClellan High School, and Cloverdale

Magnet Middle School,  as follows (Key Exhibit 19 at 73):

Henderson, Wilson, McClellan, and Cloverdale are schools which need either massive renovation, construction of new facilities, or in the case of Cloverdale, demolition. These schools have had upgrades, but a lack of maintenance over the years has taken its toll. Almost all of the components in these buildings need an upgrade, and at Cloverdale, there is a failure of structural walls.

Henderson requires replacement doors, windows, and finishes. Classrooms receive no natural light and much of the casework and equipment is old and needs replacement. Wilson is a building that has been added to and renovated, but in a piecemeal way that makes further renovation difficult with major changes. Most of the interior finishes and doors in McClellan are broken and worn requiring replacement, There also code problems with some of the corridors and most of the classrooms do not receive any natural light. Cloverdale is the worst case, with exterior walls that are failing, dark exterior corridors, fraying asbestos tile, and finishes that are completely worn out. Complete replacement of the school would be recommended.

More recently, "the [LRSD] plans on the McClellan campus would be only to – mostly likely

only keep auditorium and the two gyms. Everything else will pretty much be demolished and rebuilt."

( Key Exhibit 18,, K. Bailey dep. At 67)

LRSD  (Doc. 131) does not discuss actual progress on the Southwest-area high school project.

This is understandable. LRSD's Exhibits 12 and 13 at the March 2016 Hearing were schedules of the

steps needed to complete the Southwest High School in time for the start of the 2019-20 school year.

Plaintiffs secured an updated version of the schedule by FOIA. (Exhibit 62) It provides for "schematic

design" work in the period August -November of 2017 to  secure "Approval of Schematic Design and

Cost Estimate." On December 14, 2016 LRSD reported that "the SWLRHS project has not developed

to the point of 'schematic design.' " (Exhibit 21) The schedule provides for preparation of

"construction documents" in the period December 2017 through April 2018."  It states: "Construction –

start May  2017."  (Exhibit 21) <u>LRSD offered nothing to suggest adherence to this schedule, when it</u>

<u>was plainly in its interest to do so.</u> It is well-known that construction is not underway.

In contrast, Pinnacle View Phase II is "scheduled to finish this summer" (Key Exhibit 19 ,

Bailey dep. At 33); ". . . that project is pretty much complete." (At 36)

16

In deposition, Superintendent Poore stated that employing the optional funding approach for the Southwest High school project could take a year. (Exhibit 57 at 55) On May 10, 2017 after the negative millage extension vote , he not only reiterated this point, but also , publicly, seemingly questioned whether the LRSD should even pursue this path to a new Southwest-area high school. (Exhibit 60 at 2)

<u>Racial Discrimination in the the Providing of Facilities</u>

The factual summary evidences racial discrimination in the provision of facilities from multiple perspectives. Properly construed at this stage, the record establishes, at minimum, genuine issues of material fact regarding each of these outcomes.

[a] The post-unitary picture, overall, shows the LRSD's success in white neighborhoods in constructing new schools and reconfiguring an excellent facility, with an associated large increase in white enrollment and a large decrease in African American population. [b] The plans to properly serve more than 2,000 students in southwest Little Rock, neighborhoods, with largely African American and Hispanic populations, have come to grief. More than 1,000 are left in two schools, where, there is agreement , one should be entirely torn down (Cloverdale) and the other (McClellan) should be largely destroyed. [c] The coupling of the Pinnacle View projects with the Southwest-area high school project , with its later concomitant effect on Cloverdale, the system's "worst school" was a critical element of the court's March 2016 ruling. As noted, the southwest pledges have turned to dust. [d] The Don Roberts School, in a white neighborhood at the western border of the LRSD, evolved into the LRSD version of "Mercedez Benz" construction. [e] Superintendent Poore's description of middle school facilities portrays a racially discriminatory pattern. LRSD leaders have in effect argued that west Little Rock parents do not want their children to attend Henderson Middle School. Superintendent Poore's description of the School illuminates the matter; it is a dimly lit, barracks-like structure. [f] From the data above, the approximate expenditure total for Don Roberts, Forest Heights STEM Academy, and

Pinnacle View Phases I and II  is $91,600,000, without including the substantial cost for equipping Pinnacle View Phase II.

These facts show equal protection racial discrimination violations from multiple perspectives. "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it it is true, that the law bears more heavily on one race than another." Washington v. Davis, 426 U.S. ,229, 242 (1976); Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 280 (1979) (consideration of totality of [relevant] legislative actions"); Rogers v. Lodge, 458 U.S. 613, 618 (1982) ; United States v. Board of School Comm'rs, 474 F.2d 81, 84 (7thCir. 1973) ("Although it might not be possible to infer the requisite discriminatory intent from any one instance or example in the record, it is clear that the district court found a purposeful pattern of racial discrimination based on the aggregate of many decisions of the board and its agents.") Davis v. School District of the City of Pontiac, 443 F.2d 573, 576 (6thcir. 1971) ("Although, as the District court stated, each decision considered alone might not compel the conclusion that  the Board of Education intended to foster segregation, taken together, they support the conclusion that a purposeful pattern of discrimination has existed in the Pontiac system for at least 15 years.") Finally, the pattern shown is not "explainable on grounds other than race . . . ."Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252, 266 (1977).

[2.] LRSD Segregates its Faculty

Plaintiffs contend that LRSD purposefully assigns a disproportionately high number of white teachers to the schools with disproportionately high numbers of white students. The pattern at the elementary level is particularly striking.

The operation of the LRSD has included cabinet meetings of  high level administrators. From time to time in the period from 2004 through 2013, participants expressed the need to employ white teachers in  schools in neighborhoods with higher proportions of  white students to make them

attractive to white parents. Persons making such comments included Superintendent Roy Brooks and Associate Superintendent  for elementary schools Dr. Sadie Mitchell, African American persons, and Associate Superintendent Dennis Glasgow, a white person.  Particular schools mentioned included Don Roberts Elementary, Forest Park Elementary, Fulbright Elementary, Jefferson Elementary, Pulaski Elementary, and Pulaski Heights Middle School, as well as stipulation magnet schools. (Exhibit 46, Declaration of Dr. Karen DeJarnette ,para. 4). Data for the 2014-15 and 2016-17 school years evidences the placement of faculty in accord with these views.

In 2014-15, the racial make-up of the faculty serving LRSD's elementary schools included 257 African American teachers (31%) , 560 white teachers (67.6%), and 12 other teachers  (1.4%) for a total of 819 persons. (Doc. 26, para. 119)

In 2014-15, the number and percentage of white teachers in the 5 LRSD elementary schools with the highest proportions of white student enrollment was  as follows: Forest Park Elementary, white students 75.5%, white faculty 24 of 25 teachers (96%); Fulbright Elementary, white students 42.2%, white faculty 33 of 34 (97.1%); Jefferson Elementary, white students 70.4%, white faculty 20 of 25 (80%); Pulaski Heights Elementary,  white students 47.4%, white faculty 17 of 20 (85%); Don Roberts Elementary, white students 55.8%, white faculty 46 of 49 (93.9%).  (Doc. 6, para. 120; Doc. 26,  para. 120)

In 2014-15, the racial make-up of the faculty serving the 6 LRSD middle schools consisted of 211 black persons, 48.3 % of the total pool of 437 persons, 219 white persons (50.1%), and 7 other persons (1.6%). (ADE  on line faculty data for 2014-15 )

In 2014-15: the Pulaski Heights Middle School, in a predominantly white neighborhood,  had the largest proportion of white enrollment of schools serving middle school grades, 38.4%; 48 of its 70 teachers were white (68.6%). The proportions of white student enrollment and white faculty members for the other 5 middle schools were as follows: Cloverdale – students 3.1%, faculty 42.7%; Dunbar –

students 6.1%, faculty 50.7%; Henderson – students 6.0%, faculty 41.3%; Mablevale – students 4.0%, faculty 53.7%; and Mann – students 21.3%, faculty 46.3%. The STEM Academy began operation, on a selective admission basis in 2014-15, at the behest of Superintendent Suggs in a predominantly white neighborhood. (Exhibit 46, para. 5) Its white enrollment was  27.0 percent in  grades K to 8; 41 of 59 of its teachers were white persons (69.5%).   (ADE on line student enrollment and faculty composition data for 2014-15)                ,

In 2016-17, the racial make-up of the faculty serving LRSD's elementary schools includes 239 African American teachers (30.6%) , 525 white teachers (67.2%), and 17 other teachers  (2.2%), a total of 781 persons. (ADE on line data base for 2016-17)

In 2016-17, the number and percentage of white teachers in the 5 LRSD elementary schools with the highest proportions of white student enrollment was  as follows: Forest Park Elementary, white students 73.6%, white faculty 25 of 26 teachers (96.2%); Fulbright Elementary, white students 39.3%, white faculty 33 of 34 (97.1%); Jefferson Elementary, white students 71.7%, white faculty 19 of 23 (82.6%); Pulaski Heights Elementary,  white students 50.0%, white faculty 14 of 18  (77.7); Don Roberts Elementary, white students 55.8%, white faculty 46 of 49 (93.9%).  (ADE on line student enrollment and faculty composition data  for 2016-17 provided by LRSD)

In 2016-17, the Franklin Elementary School had a student enrollment 5.2 % white. Franklin alone had the same number of African American faculty members as the foregoing 5 schools combined, 12. (ADE on line student enrollment and faculty composition data for 2016-17)

In 2016-17, the racial make-up of the faculty serving the 6 LRSD middle schools consisted of 189 black persons, 43.4 % of the total pool of 435 persons, 238 white persons (54.7%), and 8 other persons (1.8%). ( ADE  on line faculty data for 2016-17 )

In 2016-17: the Pulaski Heights Middle School, in a predominantly white neighborhood,  had the largest proportion of white enrollment of schools serving middle school grades, 38.8%; 43 of its 64

teachers were white (68.6%). The proportions of white student enrollment and white faculty members for the other 5 middle schools were as follows: Cloverdale – students 2.1%, faculty 43.9%; Dunbar – students 4.8%, faculty 53.6%; Henderson – students 4.5%, faculty 43.0%; Mablevale – students 5.2%, faculty 56.7%; and Mann – students 14.8%, faculty 43.3%.  In 2016-17, The STEM Academy continued  on a selective admission basis  in a predominantly white neighborhood. Its white enrollment has risen to 35.1% percent in  grades K to 8; 36 of its 48 teachers are white persons (75%).   (ADE on line student enrollment and faculty composition data for 2016-17 provided by the LRSD)

Courts have identified faculty segregation violations outside the dual system context.   These decisions include United States v. School District 151 of Cook County, Illinois, 404 F.2d 1125, 1132 (7thCir. 1968); and Booker v.  Special District No. 1, Minneapolis, 351 F.Supp.799, 808-09 ( D.Minn.).

LRSD does not argue that faculty segregation is absent. Instead, the District  posits, without offering a further factual basis, that "LRSD's collective bargaining agreement with its teachers, resulted in the pattern of teacher assignments which exists today" – not intentional discrimination. (Doc. 26 at 33) This gambit fails for two reasons. First, Plaintiffs have by Dr. DeJarnette's declaration  (Doc. 46, para. 4) , identified evidence establishing that the existing faculty segregation is intentional. Moreover, the patterns cited are ones "unexplainable on grounds other than race . . . ." Village of Arlington Heights v. Metro. Housing Development Corp., 429 U.S. 252, 266 (1977).  Second, LRSD offers no support for the argument that a contractual  agreement entered by its public officials with its teachers, public employees, repeatedly and openly facilitating the segregation of faculties would provide a defense to a Fourteenth Amendment claim. See United States v. School District 151 of Cook County, Illinois, supra, 425 F.2d at  1129 (Element of preliminary injunction approved by Court  of Appeals provided: " If voluntary transfers or new hiring would not attain either the ultimate or the intermediate objective, the defendants were ordered to reassign presently employed  teachers to reach the objective even though their contracts may have been executed for the 1968-69 or the 1969-70 school year.");

Booker , supra, 351 F.Supp. at  809, conclusion of law 14.

[3.] Educational Neglect on a Massive Scale

In July 2014, the State Board of Education classified 6 LRSD schools as in "academic distress" based upon three years of results on the Arkansas Benchmark tests. These schools were Baseline Elementary, Cloverdale Middle School, Henderson Middle School, Hall High School, J.A. Fair High School,  and  McClellan High School.  The proportions of African American and Hispanic students in these schools in 2013-14, as shown by records of the LRSD were as follows:  Baseline 46.1%AA, 49.0%H;  Cloverdale 74.9%AA,  21.4%H;  Henderson  83.9%AA, 9.5%H;  Hall 73.6%AA,  18.7%H; Fair 84.7%AA,  8.1%H; and McClellan 89.9%AA, 6.3%H. (Exhibit 73)

On October 14, 2014, a sub-committee of the State Board of Education held a meeting to discuss  the LRSD schools in academic distress. Long-time LRSD Assistant Superintendent for Educational Accountability Dennis Glasgow made a presentation.  He described much of the educational program in the LRSD schools as poorly implemented. He also in several remarks directly linked this reality to failures on the part of high level administrators in the LRSD.  (Exhibit 38)

Mr. Glasgow's remarks included (emphasis added):

"Of course, those of us who have been with the district for a long time realize the predicament we are in now. We have realized this was coming for a long time.  We have tried a number of things. We have implemented various programs. We have implemented various  programs, had various initiatives , we have had after school tutoring, we have had a number of things,  but as has been true throughout much of my career, unless you really pay attention to what you are trying to implement, it is either going on the shelf or it will dissolve over time. So, we tried to think, how can we do something that would make a difference ,where the central office can pay attention  to it and stay on it,  for the full duration, whatever it takes  for several years until we make sure that school improvement can be made.  So we have a very strong accountability aspect to this . I  think most people will agree there is not one silver bullet that is a program. There is no program that you can bring and put in a school that will make it turn around., that just won't happen because programs are implemented by teachers, teachers are supervised by principals, principals are supervised by central office, unless all those rungs of the ladder pay attention and have  a common desire and focus for improvement, it is not going to happen."

". . . . Now we have taken a lot of actions . . . , but none of them were a focus that was from the superintendent all the way down to the schools, and none of them had an accountability process embedded in it that is going to make sure that it works, and so that is what we have now."

" <u>In many cases, we at the district level have let our schools down because we didn't support them, we did support them with all kinds of training, but our support was not focused enough and I don't think we stuck to it all the way from the beginning to end and that is what we intend to do now.</u> "

As noted, inadequate student progress was measured by results on the Arkansas Benchmark exams.  These exams had less rigorous standards for measuring student proficiency than other assessment systems used in Arkansas school districts, the PARC, the ACT Aspire, and the National Assessment of Educational Progress  (NAEP) (periodically for a sample of students). (Exhibit  46, Declaration of Dr. DeJarnette, para. 13)

[4.] <u>Properly Construed the Facts Show Recreation of a Systemic Discriminatory System</u>

Supreme Court decisions establish that the communicative power of school-based discrimination is an important causal factor in the creation of the discriminatory system addressed in <u>Brown v. Board of Education</u> and later decisions. [a] See <u>Brown v. Board of Education</u> , 347 U.S. 483, 494  (1954) (". . .generat[ion] [ of] a feeling of inferiority as to their status in the community . . .); (quoting Kansas district court: "The impact is greater when it has the sanction of law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group.");  [b] <u>Swann v. Charlotte-Mecklenburg Board of Education</u>, 402 U.S.1, 19 (1971) (racial identification of schools "by reference to"  "the racial composition of teachers and staff" or "the quality of school buildings and equipment" );  [c] <u>Wright v. Council of City of Emporia</u>, 407 U.S. 451 (1972) (at 461: ". . . the existence of [discriminatory] purpose may add to the discriminatory effect of the action by intensifying the stigma of implied racial inferiority"; at 466-67 ("[i]f the establishment of an Emporia school district is not enjoined, the black students in the county will watch as nearly one-half the total number of white students in the county abandon the county schools for a substantially whiter system." . . . . The message of this action coming when it did, cannot have escaped the negro children in the county . . . ."); [d] <u>Keyes v. School District No. 1</u>, 413 U.S. 189, 196  (1973) (in determining what is "a segregated school,"  "community and administration attitudes toward the school" are among the factors which

"must be taken into consideration" ); <u>Freeman v. Pitts</u>, 118 L. ed.2d 108, 135 (1992) ("and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good faith commitment to the whole of the court's decree and to those provisions of the law and the constitution that were the predicate for judicial intervention in the first place. ); <u>LRSD v.State of Arkansas</u>, 664 F.3d at 745 (quoting this language from <u>Freeman</u>).

The practices discussed communicate to all the unfortunate, repulsive messages spawned by racial discrimination in a school system. The post-unitary pattern of school construction communicates that the white community, white neighborhoods, and white students are deemed more important  and deserving by school authorities and employees. The staffing of the elementary schools communicates to white parents that they and their children are deemed more worthy. The make-up of the staff  must be, at minimum, an irritant for an African American parent coming to school for a conference ,or a parent-teacher meeting, as well as a circumstance causing an older African American student to wonder why the teachers here "don't look like me."  Some will perceive a message questioning the worthiness and ability of African American teachers as a group. Associate Superintendent  Glasgow confessed to the role of system administrators in producing the well-publicized pattern of  student achievement leading to academic distress designations, a pattern  quite likely to foster negative stereotypes as to the capabilities of African American students. The LRSD touted the positive effect on student achievement of strong facilities. The weakness of the facilities at Cloverdale, McClellan, and Henderson, three of the schools classified as in academic distress,  have been discussed

Overall, the facts show openly to all that in the LRSD school system "the once disfavored race" remains so. The white community, white neighborhoods, and white students are favored. The right of each plaintiff articulated in <u>Brown II</u> is at issue.

[5.] <u>Plaintiffs' Standing as Shown by the Opposition to the LRSD Motion</u>

Section III of the Plaintiffs' response to the LRSD summary judgment motion establishes

beyond any doubt the plaintiffs' standing to pursue the claims set forth in the Amended Complaint.

That response, as well as the declaration of Dr. Karen DeJarnette,  make  clear other elements of the

system which serve to reintroduce the discriminatory system and its message that there is a disfavored

race in the community.

<u>Conclusion</u>

Mr. Key's Motion for Summary Judgment should be denied.

Respectfully submitted,

<u>/s/ Shawn G. Childs</u>
John W. Walker
Ark Bar Doc.64046
Shawn G. Childs
Ark. Bar Doc.99058
JOHN W. WALKER, P.A.
1723 Broadway
Little Rock, Arkansas  72206
501-374-3758
501-374-4187 (facsimile)
Email:  johnwalkeratty@aol.com
schilds@gabrielmail.com

Robert Pressman
22 Locust Avenue
Lexington, MA  02421
781-862-1955
Email: ehpressman@verizon.net

Austin Porter
PORTER LAW FIRM
323 Center Street
Little Rock, Arkansas
501-244-8200
Email: aporte5640@aol.com

OF COUNSEL:
Gale B. Stewart – AR Doc.76120
1723 Broadway

Little Rock, Arkansas 72206
501-374-3758
501-374-4197 (facsimile)
Email: letchworth1942@comcast.net

ATTORNEYS FOR THE PLAINTIFFS

## CERTIFICATE OF SERVICE

I, Shawn G. Childs, certify that on May 17, 2017, a copy of the foregoing paper has been electronically filed with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:


Lee Rudofsky

lee.rudofsky@arkansasag.gov


Rosalyn L. Middleton

rosalyn.middleton@arkansasag.gov


Patrick Hollingsworth

Patrick.hollingsworth@arkansasag.gov


Christopher Heller

heller@fridayfirm.com


Khayyam Eddings

keddings@fridayfirm.com