**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**EASTERN DIVISION**

| | |
|---|---|
| PARENT PLAINTIFF LAKEISHA DOE, *et al.* | |
| Plaintiffs, | Brief in Support of Plaintiffs' Response in Opposition to Separate Defendant Poore's Motion for Summary Judgment |
| v. | Case No.  4:15CV0623-DPM |
| MICHAEL POORE, in his official capacity as Superintendent of the Little Rock School District, *et al.* | |
| Defendants, | |

## <u>Introduction</u>

The Plaintiffs challenge constitutional violations caused by the actions of the Defendants.  These actions include:  1) providing disproportionately white student populations the greatest access to high quality educational resources and top-end facilities in an effort to recruit, retain and privilege white students of the Little Rock School District (hereinafter LSRD) to the detriment of Plaintiffs, who are all black; 2) employing disciplinary practices that target Plaintiffs on the basis of race; 3) discriminatory faculty staffing; and 4) racial gerrymandering of attendance zones. Relief is sought against Defendants in their official capacities on federal-law grounds.  Plaintiffs' federal claims concern racial discrimination.  Defendants err regarding the effective date of the earlier determination of unitary status and controlling case law renders Defendant Poore's repetitive "same race" argument without merit.

Plaintiffs next provide an overview of their claims.  In each instance, Plaintiffs show Defendants are not entitled to judgment as a matter of law because there are genuine issues of material fact in this matter.

## I.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment when the movant shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." F.R.C.P. 56 (c).  *See also Nichols v. Tri-National Logistics, Inc.,* 809 F.3d 981, 985 (8th Cir. 2016). The Court must view the evidence in the light most favorable to the nonmoving party and make all reasonable inferences in that party's favor. *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 686 (8th Cir. 2012), *rehearing and rehearing en banc denied* June 8, 2012 (citation omitted).  In a summary judgment context, a court neither weighs competing evidence nor resolves credibility issues. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 Ct. 2505 (1986).

## There are Genuine Issues of Material Facts Regarding Plaintiffs' Fourteenth Amendment Claims

Plaintiffs claim that LRSD has allocated high-quality educational resources and top-end facilities to disproportionately white student populations in an effort to privilege, recruit and retain white students with a concomitant racially discriminatory impact on Plaintiffs, who are all black.

### a.   Elements of an Equal Protection Racial Discrimination Claim

The Equal Protection Clause of the Fourteenth Amendment prohibits States

from denying any person equal protection of the laws, "which is essentially a direction that all persons similarly situated should be treated alike." *Stevenson v. Blytheville Sch. Dist. #5,* 800 F. 3d 955, 970 (8th Cir. 2015). A facially neutral law, policy, or practice will be "reviewed under strict scrutiny only if it can be proved that [it] was motivated by a racial purpose or object, or it is unexplainable on grounds other than race." *See Friends of Lake View Sch. Dist. Incorporation No. 25 v. Beebe,* 578 F. 3d 753, 762 (8th Cir. 2009)(internal citations and quotations omitted).

A plaintiff does not have to prove that the discriminatory action "rested solely on a racially discriminatory purpose," but rather "[that] there is proof that a discriminatory purpose has been a motivating factor in the decision." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265-66 (1977)(internal citations and quotations omitted). "[A] sensitive inquiry into such circumstantial and direct evidence of intent as may be available" is required. *Vill. of Arlington Heights*, 429 U.S. at 266 (non-exhaustive identification of forms of evidence probative of discriminatory intent).

Plaintiffs rely upon the following principles regarding proof of racially discriminatory purpose relevant in this sensitive inquiry.

### 1. Disparate Impact is Relevant to a Claim of Racial Discrimination

"[D]isproportionate impact is *not irrelevant*, but is not the sole touchstone of an invidious racial discrimination." *Washington v. Davis,* 426 U.S. 229, 242 (1977)(emphasis added). It follows that this Court may take into account the disproportionately white student population of LRSD's high-quality educational programs and top-end facilities and other disparate racial effects as indicators of

intentional segregation and discrimination.

> ### 2. Knowledge of Disparate Impact is Relevant to a Claim of Racial Discrimination

A Court may also take into account the fact that a defendant to an equal protection claim knew that the discriminatory conduct would have a disparate impact on a particular racial group.  *See Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 465 (1979)("Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance in a school is system is one factor among many others which may be considered by a  court in determining whether an inference of segregative intent should be drawn.")(internal citations and quotations omitted.)

> ### 3. Substantive Departures in Norms in Connection with a Decision or Action is Relevant to a Claim of Racial Discrimination

"Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. at  267.

> ### 4. Racially Segregated Faculty Patterns Are Probative of Overall Discriminatory Intent

Decisions in school desegregation cases find a faculty segregation violation based upon the make up of the faculty by race to be probative of intentional discrimination in other practices.  Courts reason that districts control faculty assignments.  *Davis v. School District of City of Pontiac*, 443 F.2d 573 (6th Cir. 1971), *citing* United States v. School District 151 of Cook County, 301 F.Supp.  201, 229-30 (N.D. Ill. 1969); *Booker v. Special School District No. 1*, 351 F.Supp. 799

(D.Minn.1972).

### 5. *Discriminatory Purpose May be Inferred from the Totality of Relevant Facts*

"Necessarily, an invidious discriminatory purpose may often be inferred from *the totality of the relevant facts*, including the fact, if it is true, that the law bears more heavily on one race than another." *Washington v. Davis*, 426 U.S. at  242 (emphasis added); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 280 (1979) (consideration of "totality of [relevant] legislative actions "); *Rogers v. Lodge*,  458 U.S. 613, 618 (1982); *United States v. Board of School Comm'rs*, 474 F.2d 81, 84 (7thCir. 1973) ("Although it might not be possible to infer the requisite discriminatory intent from any one instance or example in the record, it is clear that the district court found a purposeful pattern of racial discrimination based on the aggregate of many decisions of the Board and its agents."); *Davis v. School District of the City of Pontiac*, 443 F.2d at  576 (6th Cir. 1971)("Although, as the District Court stated, each decision considered alone might not compel the conclusion that the Board of Education intended to foster segregation, taken together, they support the conclusion that a purposeful pattern of discrimination has existed in the Pontiac school system for at least 15 years.")

Plaintiffs' allegations, contained in the Amended Complaint, of comprehensive, system-wide discrimination cover many areas addressed in pre-existing case law.  *See e.g. Morgan v. Kerrigan*, 509 F.2d 580, 582 n. 1 (1st Cir. 1974)(citing 14 decisions); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 18-19 (1971) (discussing many elements of a school system, such as student

assignment, faculty, staffing, staff quality, transportation, extracurricular activities, organization of sports activities.)

All of the facts discussed in the Amended Complaint and Section III(b)(1) of this Response *should be considered together, in totality,* or, in other words, in the aggregate in determining the Defendants' Motions.  LRSD has failed to address Plaintiffs' allegations and the evidence in this matter in the aggregate and, instead, has wrongfully analyzed the facts and evidence alleged in isolation.

b. **The Evidence in this Matter Shows that There Are Genuine Issues of Material Facts Regarding Plaintiffs' Fourteenth Amendment Claim**s

The evidence gathered in this matter demonstrates there are genuine issues of material fact regarding Plaintiffs' Fourteenth Amendment Claims.  Plaintiffs challenge the Defendants' policy and practice of taking affirmative actions to privilege, recruit and retain white students to the detriment of black students, including Plaintiffs.

The student plaintiffs, and their parents on their behalf, assert their Fourteenth Amendment Equal Protection Clause right to be educated in "a system of public education freed of racial discrimination." *Brown v. Board of Education*, 349 U.S. 294, 299 (1955).

*1)  Disparate Impact*

The evidence in this matter demonstrates how the discriminatory practices of the LRSD have had a disparate impact on the Plaintiffs, whom are all black students in the LRSD, as opposed to their white counterparts.

Plaintiffs next discuss the totality of actions favoring white students.

     i.  LRSD has Provided Disproportionately White Student Populations the Greatest Access to Top-End Facilities

   The evidence in this matter demonstrates LRSD has allocated top-end facilities in a manner that provide its white student population with disproportionately high access to LRSD's top end facilities.  This misallocation is particularly troubling considering LRSD has previously noted the importance of quality facilities in education by stating the following:

> The Little Rock School District recognizes the positive relationship that exists between school conditions and student achievement and behavior. Facility condition may have a stronger effect on student performance than the influence of family background. Socioeconomic status, school attendance and behavior combined. Students are more likely to prosper when their environment is conducive to learning. Well-designed and maintained facilities send a powerful message to kids about the performance a community places on education.
>
> Students and staff thrive in an orderly, clean and safe environment. Classrooms that are well ventilated, suitably lighted, and properly maintained actually facilitate learning. Poor air quality, on the other hand, negatively affects alertness and results in increased student and teacher absences, which can have a corresponding impact on student achievement. Moreover, appropriate facilities maintenance extends the life span of older facilities and maximizes the useful life of newer facilities. Thus, a facilities maintenance plan contributes to both the instructional and financial well-being of an education organization and its community.

(Doc. 6 ¶ 80, Doc. 26 ¶ 80).

### *Pinnacle View Middle School and the Southwest Little Rock High School*

   LRSD has treated the Pinnacle View Middle School project, which is substantially complete, as a priority over the Southwest Little Rock High School project in an attempt to privilege recruit and retain white students.  Exhibit 4 at 33.

Baker Kurrus was named LRSD superintendent by ADE Commissioner Johnny Key on May 6 2015, four months after the LRSD Board implemented a policy requiring construction of the new middle school in West Little Rock and the high school in Southwest Little Rock be authorized simultaneously and for any delay in the construction of either school to result in a delay in the construction of the other "pending resolution of the reasons for the delay."  Exhibit 3 at 6-8.  This policy also declared "construction of the Southwest Little Rock High School shall be the district's first priority."  Exhibit 3 at 6-7.  Kurrus was aware of this policy when it passed.  Exhibit 2 at 100.

Kurrus knowingly broke with this policy as superintendent by moving forward on the construction of the West Little Rock middle school before even breaking ground on the Southwest Little Rock high school.  Exhibit 4 at 33.  Kurrus's successor, Michael Poore, further broke with this policy by continuing construction of the West Little Rock middle school, while simultaneously declaring that the construction of the Southwest Little Rock high school was delayed due to budgetary issues.  Exhibit 4 at 33; Exhibit 5.

Even in light of the money allegedly saved by purchasing the Leisure Arts Building as a location for Pinnacle View Middle School, LRSD should not have committed to spend additional resources to make the school operational if it had cause to believe it could not construct the high school in Southwest Little Rock in accordance with the timeline memorialized in the Southwest Little Rock high school Design Work Plan.  Exhibit 8.

Instead, LRSD should have taken one of three actions:  1) structure any contractual arrangements regarding Pinnacle View to allow for a pause in the event of an actual or anticipated delay in construction of the Southwest Little Rock High School; 2) not have agreed to invest any additional resources into the new middle school in West Little Rock, beyond the purchase price of the Leisure Arts Building, unless and until LRSD was certain that it could construct and complete the Southwest Little Rock high school in accordance with the timeline memorialized in the Southwest Little Rock High School Design Work Plan or in a manner that reflected the preexisting policy that construction of the Southwest Little Rock sigh school was LRSD's highest priority; or 3) exercise its right to suspend the construction of Pinnacle View Middle School in accordance with AIA Doc. A 133-2009, Article 10.3 and AIA Doc. A201-2007, Article 14.3.  Exhibits 9 and 10.

Kurrus and Poore broke with the aforementioned LRSD Board policy in an intentional effort to privilege, recruit and retain LRSD's white student population, who disproportionately have access to Pinnacle View Middle School.  LRSD's student population was approximately 65% black and 18% white during 2015-2016 school year.  Exhibit 6.  However, the projected student population of Pinnacle View Middle School is 40% black and 40% white.  Exhibit 7 at 30.  Meanwhile, ground has not been broken on the Southwest Little Rock high school, which is projected to consist of a student population that will be overwhelmingly black.  Exhibit 7 at 37, 90-1.

*Failure to Address Need for New Elementary in Zone 5*

LRSD has not taken any steps to address the need for at least one new elementary school in Zone 5 because it does not comport with LRSD's goal of privileging, recruiting and retaining white students.

Defendant Johnny Key has testified that LRSD decided to convert the office building at the Pinnacle View site into a sixth grade classroom space, even though the sixth graders will be educated in the adjacent warehouse with the seventh and eighth graders this Fall, because Kurrus was worried about losing students from Fulbright, Terry and Roberts elementary schools to private schools and charter schools. Exhibit 22 at 72. Terry had a smaller white student population in 2015-2016 (55 white students, 14% of total school population) than Roberts (506 white students, 56% of total school population) and Fulbright (224 white students, 40% of the total school population). Exhibit 23.

Terry is located in Zone 5, which has the largest deficiency of elementary capacity of any zone in LRSD. Exhibit 24. According to an LRSD study, Zone 5 has 1,683 more 5-10 year olds than it does elementary capacity (505). Exhibit 24. Meanwhile, Fulbright and Roberts are located in Zone 4, which has 673 more 5-10 year olds than it does elementary capacity (2,122); less than half that of Terry. Exhibit 24.

This study was prepared by then-superintendent Kurrus. Exhibit 25 at 71. Defendant Key testified that he has been aware of this shortage since the Fall 2016. Exhibit 22 at 56. He also testified that Defendant Poore provided the study to him, which means Poore was also aware of this shortage. Exhibit 22 at 56. Yet, in spite of Kurrus, Key and Poore's knowledge of the great deficiency in elementary capacity

in Zone 5, there are no plans to construct a new elementary school in Zone 5. Exhibit 26.

LRSD moved rapidly to address the needs of the disproportionately white student population matriculating to the sixth grade in the area surrounding Pinnacle View, while completely neglecting the needs of the similarly situated, less white student population matriculating to elementary in Zone 5, because LRSD was intent on privileging, recruiting and retaining white students.

### *Don Roberts Elementary*

LRSD notes that as mentioned in the 1998 Revised Plan "the Stephens (Elementary School) was rebuilt and the Don Roberts Elementary School was eventually constructed in west Little Rock." (Doc.131 at 9 ) The Plan had not addressed the size, cost, or amenities of either school, or the precise location of the school in the west. (Doc.3107 at 11)

Stephens opened in 2000; construction cost was $9,053,316 and square footage 77,987. (Exhibit ---,  DF 000625)  Enrollment totaled in that year 327 and 545 in 2001-02, 94% African American each year. (Exhibit ---, ODM Enrollment Report, Dec. 20, 2012 at 21) ODM identified its capacity as 646. (At 29)

A west elementary school was identified as a future project in the LRSD's year 2000 millage campaign. (Exhibit ---, LRSD School Board minutes, 10-14-2004) LRSD documents provided cost estimates as follows: "West Ele. $10,770,000" 3/10/2000 (Exhibit ---,); "West Elementary Total"  "$10,500,000"  3/17/00." (Exhibit  ----); "Land Purchase West Ele." "$460,000" 3/17/00 (Exhibit . ---)

Subsequent documentation shows the following regarding the Roberts School: completion date: 8/16/2010; area 148,000; Total Cost $28,744,373 (Exhibit ---, DF 000548); see also Exhibit --- ("Cost of construction is estimated at $30,000,000"; also showing State approval) The cost of the land for the 18.7 acre Roberts site was $5,288,438. (Exhibit ---, DF 000258])--- not $460,000. The cost to equip the School for its opening was $2,605,419 (Exhibit ---, DF 000259-262) Its capacity is 895 (Exhibit ---, ODM Report at 29) Roberts' enrollment in 2010-11 was 702, including 69.4% white and 21% African American pupils (Exhibit ---, ODM at 20) White pupils were 22.2% of LRSD elementary level pupils in 2010-11. (Exhibit ---, ODM Report at 22)

LRSD answered that it "generally agrees with the description of the Don Roberts school set out in paragraph 68 of the Amended Complaint." (Doc.26, para. 68) Plaintiffs there alleged:

> The Roberts facility is beyond state of the art. In addition to its huge site with multiple play areas for use of the School, the building is marked by larger classrooms; multiple common areas; a wet lab in every classroom to enhance the study of science; natural light from windows throughout the building; a huge cafetorium with a stage and large screens, facilitating use for multiple purposes; two large well-equipped art and music labs; an ample gymnasium with access to technology which has been used for the training of physical education staff and even a climbing wall; a library of such high quality that even state-of-the-art does not do it justice and which compares favorably to the nearby branch public library; an 'East lab'(state of the art computer

system to enhance the study of geography); an area with telescopes; ample offices for administrators, counselors and school nurses; and air conditioning of the entire facility. See photographs of the Roberts School, including the library, attached to the complaint, as well as a photograph of the Franklin School. (Exhibit 2)

The Don Roberts school is located "in the northwest corner of the school district, near the district line." (Doc. 6, para. 67; Doc. 26, para. 67) See <u>Swann v. Charlotte-Mecklenburg Board of Education,</u> 419 U.S. 1, 20-21 (1971) (impact of location of new schools on racial make-up of enrollment  and neighborhoods). The racial make-up of the Don Roberts School faculty has been as follows:  2014-15  49 white teachers, (93.8%) 3 African American teachers;  2015-16  47 white teachers (94%)) 3 African American teachers;  2016-17  49 white teachers (96.1%),  2 African American. (ADE on-line compilation of data submitted each year by LRSD) See <u>Keyes v. School District No.1</u> , 413 U.S. 189, 196 (1973) ("What is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors such as the racial and ethnic composition of faculty and staff and the community and administration attitudes toward the school, must be taken into consideration.")

### *Secondary Schools with the Smallest White Student Population Percentage Have Worse Facilities than those with the Highest White Student Population Percentage*

John Poros, Associate Professor in the School of Architecture at Mississippi State University, has produced a report clearly demonstrating that the secondary

schools with the highest white student populations are provided higher quality facilities than the secondary schools with the lowest white student populations.

Prof. Poros examined select LRSD schools, including:  1) two schools with the highest white-middle-school-aged student population percentages, namely Pinnacle View (41%) and Forest Heights (40%); 2) Central, the high school with the highest white-student population percentage (29%); 3) two middle schools with the lowest white-student population percentage, namely Cloverdale (2%) and Henderson (4%); and 4) McClellan, the high school with the lowest white-student population percentage (3%).  Exhibits 35, 1 and 37.

Prof. Poros did not examine all LRSD schools because of time and financial constraints.  Still, Prof. Poros visited half of LRSD's schools with middle-school-aged students and 40% of LRSD's high schools, which is a fair sampling.  Prof. Poros does not make an analysis of the racial demographics of the schools because he is neither a demographer nor a social scientist.

Prof. Poros found that "the building condition is excellent at Pinnacle View" and that Forest Heights had been "remodeled or mostly reconstructed…to very good condition."  Exhibit 37 at 72.  As mentioned above, Pinnacle View and Forest Heights's have white-middle-school-aged student population percentages that are at or just above 40%.  Exhibits 35 at 1.

In contrast, Prof. Poros found Henderson is in "need [of] massive renovation" and "requires replacement doors, windows, and finishes…[with] [c]lassrooms [that] receive no natural lights and much of the case work equipment is old and needs to be replaced."  Exhibit 37 at 73.  He also explained: "Cloverdale is the worst case, with

14

exterior walls that are failing, dark exterior corridors, fraying asbestos tile, and finishes that are completely worn out.  Complete replacement of the school would be recommended."  Exhibit 37 at 73.  LRSD's Director of Maintenance and Operations, Wayne Adams, referred to Cloverdale when he testified, "I would hope that we would replace that facility.  Exhibit 44 at 22.  As mentioned above, Henderson and Cloverdale have white-middle-school-aged student population percentages that are below 5%.

Similarly, Prof. Poros found Central High School to be "very well maintained and updated", despite its old age, with "more educational equipment than some of the other schools" he examined.  Exhibit 37 at 71-72.  As mentioned above Central has a 29% white-student population percentage, which is well above the district average of 18%.  Exhibits 1 and 38.  In contrast, Prof. Poros found McClellan High School to be in "need either of massive renovation [or] construction of new facilities."  Exhibit 37 at 73.  Mr. Adams agrees that "a good portion of McClellan should be removed and replaced…"  Exhibit 44 at 20.  As mentioned above McClellan has a 3% white-student population-percentage.  Exhibit 1.

These disparities in the conditions of the secondary schools with the highest and lowest white-student population-percentages suggest that LRSD has disproportionately allocated resources to ensure that the whiter secondary schools receive top-end facilities to the detriment of students at the least white secondary schools, who are left to be educated in squalor.

     ii.  LRSD Provides Advanced Educational Programs and Resources in a Discriminatory Fashion

*Literacy Facilitators, Math Facilitators and Testing Coordinators*

LRSD has discriminatorily allocated its math and literacy facilitators at the secondary level.

The only secondary school that was budgeted to have a full-time math and literacy facilitator during the 2016-2017 is Pinnacle View Middle School, which, as mentioned above, has a white student population percentage that is more than double the district average.  Exhibit 27 at 169, 170.  Indeed, Pinnacle View has the highest white population of any LRSD secondary school.  Exhibit 27.  No other secondary school has either a math or literacy facilitator.  Exhibit 27.  The only secondary school that had a full-time testing coordinator during the 2014-2015, 2015-2016 and 2016-2017 school years was Central High School, which had the highest white student population percentage (29%) of any LRSD high school.  Exhibit 1.  This despite LRSD having had two middle schools, Cloverdale and Henderson, and three high schools, Hall, J.A. Fair and McClellan, that were in academic distress.  Exhibit 28.  Unsurprisingly, all of these schools are still in academic distress with the exception of J.A. Fair.  Exhibit 29.  All of LRSD's academically distressed schools have white student population percentages that are lower than the aforementioned district average.  Exhibit 29.

Here we have similarly situated secondary students treated differently precisely because LRSD seeks to privilege, recruit and retain white students.  This discriminatory allocation of literacy facilitators, math facilitators and testing coordinators despite the great need evident in the academically distressed schools constitutes a denial of Equal Protection.

### *Forest Heights STEM*

Through 2013-14, the LRSD operated the Forest Heights Middle School (grades 6 to 8) at the edge of the Heights neighborhood, north of I- 630. (Doc. 6, para. 81; Doc. 26, para. 81 ) ("located north of Interstate 630")  This neighborhood is predominantly white. (Exhibit  46, DeJarnette Dec. para. 5)  "In the period from August 11, 2006 through January 31, 2014, the LRSD completed at least 14 facility projects at this school site." (Doc. 6,, para. 82; Doc. 26, para. 82)  LRSD's Answer "states that the construction and renovation projects at Forest Heights Middle School between 2006 and 2014 resulted in everything being replaced except the cafeteria, gymnasium and music room." (Doc. 26, para. 82) An LRSD compilation of data on facility projects identifies the cost of projects completed at the Forest Park site between 2006 and 2014 to be approximately $7,666,372.  (Key Exhibit 16 at DF 000578-79); see also Michael Poore deposition, Exhibit  57  at  107 (second best middle grade facility; only new Pinnacle View facility ranked as superior).

In 2013-14, the total enrollment of Forest Heights Middle School was 580, 490 African American students (84.5%), 50 white students (8.6%), and 40 other students (6.9%).  There were 169 African American students  in each of the sixth and seventh grades. (Doc. 6 , para. 82 ; Doc. 26, para. 83) "These students would have been able to move on to the seventh and eighth grades in the school in 2014-15, had its longstanding grade structure and mode of organization continued without change" (Doc. 6 at 83), absent one or more students not being promoted.

"Prior to the the 2014-15 school year, the LRSD converted the Forest Heights facility to a 'STEM Academy,' serving kindergarten through (grade) eight." (Doc. 6, para. 84; Doc. 6, para.84)  Superintendent Dexter Suggs, an African

American,  was the initial proponent of this action. (Exhibit 70 at 2-3)  The change was  later approved by a 4 to 3 vote of the School Board, with 3 white members and one African American member in support, and 3 African American members opposed. (Exhibit 70 at 5)

With the conversion, the number of grades served in the facility increased by six. However, in 2014-15, the total African American enrollment decreased by 92 (from 490 to 398). In contrast, the total white  enrollment increased by 165 (from 50 to 215). The number of African American pupils in grades six and seven  in 2013-14 totaled 338. Yet, the African American enrollment in grades seven and eight in 2014-15 totaled only 139, a reduction of 199 students. (Exhibits 71)  "The LRSD spent an additional $1,800,000 to prepare the Forest Heights building to serve as the STEM Academy in 2014-15." (Doc. 6, para. 85; Doc.26, para. 85) (admitting that "roughly correct"))

In 2014-15, the total enrollment of the STEM Academy was 696, 398 African American  students (57.1%),  215 white students (30.9%), and 83 other students (12.0%). In grades 6 through eight, there were 196 African American students (66%), 72 white students (24.2%), and 29 other students (9.8%). (Exhibit 71)

In the next two school years, the number and the proportion of white students in  the STEM Academy as a whole, and in grades 6 to 8 separately, grew and  those for African pupils fell. By 2016-17, the total enrollment  was 687, 349 African American students (50.8%),  241 white students (35.1%), and 97 other

students (14.1%). In grades 6 through 8, there were 133 African American students
(47.2%), 114 white students (40.4%), and 35 other students (12.4%).  (Exhibit 71)

<u>The Selective Admission System Employed for Admitting Students to</u>
<u>the Program</u>

The LRSD employed a selective admission system for the STEM Academy,
requiring that students "qualify." (Exhibit 58 at  1-2; see also  at 5 ["Your child <u>MUST</u>
meet all criteria for placement in Forest Heights STEM Academy."]; and  Doc. 26,
para. 84)  The process at all grade levels required completion of an "Optional
Enrollment Request Form." (Exhibit  58 at 3-4)  Completion of a separate STEM
Academy form was also required. (Exhibit 58 at 5)

"All children applying for admission to Kindergarten . . . [must]l participate in
a screening process for kindergarten. . . . Students (were) expected to demonstrate
gross motor, listening, and speaking skills, as well as age appropriate behaviors. "
The process required a one-to-one, twenty minute session with a district staff
member, with a waiting area  available for parents.  (Exhibit 58 at 8) The screening
consisted of "counting, dots, blocks, standing on one leg, those kind of things . . .
developmental screening." (Exhibit 56, Linda Young Dep. At 20)

The process above the kindergarten level was more extensive. LRSD's
Answer states that "(the District) considered applicants based on their interest in
attending such a school, their grades, their standardized test scores and their report
cards. . . ." (Doc. 26 at 84; Exhibit 58 at 6-7) LRSD gauged student interest based
upon responses to a 10-part "Student Interest Survey, " developed by District
administrators. (Exhibit 58  at  9;  L. Young dep. At  43) The LRSD also utilized

information from a "Recommendation Form," to be completed by a Principal,
teacher, or counselor." (Exhibit 58 at 10-13) A "shadow zone" played a role in
selection for the program. "It's an area around a school that is used in the student
assignment process." A "certain number, a certain percentage" of students living
within the zone "were given preference in the computerized selection process."
(Exhibit 58, [L. Young dep. At 33-34)

Superintendent Suggs "provided a list of criteria that were to be used" in the
selection process.(Exhibit 58, L. Young dep. At 39; at 27 (decision to use Benchmark
test made by Mr. Suggs)) There was no "rubric" for use in evaluating student-
applicants' responses in the interest survey in a consistent manner. (At 44)  There
was no written guidance on how to combine evaluation of each category of
information to make a decision as to an applicant.  (Exhibit 58, L. Young dep. At 50)

The number of special education students in Forest Heights Middle School in
2013-14 was 107. Special education students in the "middle grades" of the STEM
Academy totaled 14 in 2014-15.  (Exhibit 72; see also Exhibit 46, para. 11)

Superintendent Suggs, an African American, initiated the process yielding the
STEM Academy in the Forest Heights facility. He identified one of the  two middle
school locations with the highest concentrations of white residents in the
surrounding area (with Pulaski Heights being the other) – not the location of
Cloverdale, Dunbar,  Henderson,  Mablevale,  or Mann. He urged selective admission
for the program and provided standards for evaluating applicants, some amorphous
and some likely to have a racial impact (test scores and the "shadow zone.") The
result: a very large reduction in the number of African American students attending

one of the system's best facilities, accompanied by a very large increase in the number of white students enrolled.

Superintendent Suggs' initiatives regarding the reading recovery program and the LRSD's program evaluation efforts were also adverse to African American students. (Exhibit 46, Dec. of Dr. DeJarnette , paras. 3, 6-7)

<u>Little Rock School District Racially Discriminates in its Allocation of Resources to its High School Football Programs</u>

The LRSD allocates fewer resources to the high school football program of J.A. Fair, which is 88% black than it does to football programs with a greater percentage of white students such as Little Rock Central.  Fair is 80% free or reduced lunch and the players on its football team are representative.  The coaching staff of its football (and baseball) teams often had to pay for food for away games greater than 50 miles away because J.A. Fair had a weaker booster program than schools such as Little Rock Central.  (Exhibits 45 and 47).

iii.	LRSD Segregates its Faculty

Plaintiffs contend that LRSD purposefully assigns a disproportionately high number of white teachers to the schools with disproportionately high numbers of white students. The pattern at the elementary level is particularly striking.

The operation of the LRSD has included cabinet meetings of  high level administrators. From time to time in the period from 2004 through 2013, participants expressed the need to employ white teachers in  schools in neighborhoods with higher proportions of  white students to make them attractive to white parents. Persons making such comments included Superintendent Roy

Brooks and Associate Superintendent  for elementary schools Dr. Sadie Mitchell, African American persons, and Associate Superintendent Dennis Glasgow, a white person.  Particular schools mentioned included Don Roberts Elementary, Forest Park Elementary, Fulbright Elementary, Jefferson Elementary, Pulaski Elementary, and Pulaski Heights Middle School, as well as stipulation magnet schools. (Exhibit 46, Declaration of Dr. Karen DeJarnette ,para. 4). Data for the 2014-15 and 2016-17 school years evidences the placement of faculty in accord with these views.

In 2014-15, the racial make-up of the faculty serving LRSD's elementary schools included 257 African American teachers (31%) , 560 white teachers (67.6%), and 12 other teachers  (1.4%) for a total of 819 persons. (Doc. 26, para. 119)

In 2014-15, the number and percentage of white teachers in the 5 LRSD elementary schools with the highest proportions of white student enrollment was as follows: Forest Park Elementary, white students 75.5%, white faculty 24 of 25 teachers (96%); Fulbright Elementary, white students 42.2%, white faculty 33 of 34 (97.1%); Jefferson Elementary, white students 70.4%, white faculty 20 of 25 (80%); Pulaski Heights Elementary,  white students 47.4%, white faculty 17 of 20 (85%); Don Roberts Elementary, white students 55.8%, white faculty 46 of 49 (93.9%). (Doc. 6, para. 120; Doc. 26,  para.  120)

In 2014-15, the racial make-up of the faculty serving the 6 LRSD middle schools consisted of 211 black persons, 48.3 % of the total pool of 437 persons, 219 white persons (50.1%), and 7 other persons (1.6%). (ADE  on line faculty data for 2014-15 )

In 2014-15: the Pulaski Heights Middle School, in a predominantly white neighborhood,  had the largest proportion of white enrollment of schools serving middle school grades, 38.4%; 48 of its 70 teachers were white (68.6%). The proportions of white student enrollment and white faculty members for the other 5 middle schools were as follows: Cloverdale – students 3.1%, faculty 42.7%; Dunbar – students 6.1%, faculty 50.7%; Henderson – students 6.0%, faculty 41.3%; Mablevale – students 4.0%, faculty 53.7%; and Mann – students 21.3%, faculty 46.3%. The STEM Academy began operation, on a selective admission basis in 2014-15, at the behest of Superintendent Suggs in a predominantly white neighborhood. (Exhibit 46, para. 5) Its white enrollment was  27.0 percent in  grades K to 8; 41 of 59 of its teachers were white persons (69.5%).   (ADE on line student enrollment and faculty composition data for 2014-15)              ,

In 2016-17, the racial make-up of the faculty serving LRSD's elementary schools includes 239 African American teachers (30.6%) , 525 white teachers (67.2%), and 17 other teachers  (2.2%), a total of 781 persons. (ADE on line data base for 2016-17)

In 2016-17, the number and percentage of white teachers in the 5 LRSD elementary schools with the highest proportions of white student enrollment was as follows: Forest Park Elementary, white students 73.6%, white faculty 25 of 26 teachers (96.2%); Fulbright Elementary, white students 39.3%, white faculty 33 of 34 (97.1%); Jefferson Elementary, white students 71.7%, white faculty 19 of 23 (82.6%); Pulaski Heights Elementary,  white students 50.0%, white faculty 14 of 18 (77.7); Don Roberts Elementary, white students 55.8%, white faculty 46 of 49

(93.9%).  (ADE on line student enrollment and faculty composition data  for 2016-17 provided by LRSD)

In 2016-17, the Franklin Elementary School had a student enrollment 5.2 % white. Franklin alone had the same number of African American faculty members as the foregoing 5 schools combined, 12. (ADE on line student enrollment and faculty composition data for 2016-17)

In 2016-17, the racial make-up of the faculty serving the 6 LRSD middle schools consisted of 189 black persons, 43.4 % of the total pool of 435 persons, 238 white persons (54.7%), and 8 other persons (1.8%). ( ADE  on line faculty data for 2016-17 )

In 2016-17: the Pulaski Heights Middle School, in a predominantly white neighborhood,  had the largest proportion of white enrollment of schools serving middle school grades, 38.8%; 43 of its 64 teachers were white (68.6%). The proportions of white student enrollment and white faculty members for the other 5 middle schools were as follows: Cloverdale – students 2.1%, faculty 43.9%; Dunbar – students 4.8%, faculty 53.6%; Henderson – students 4.5%, faculty 43.0%; Mablevale – students 5.2%, faculty 56.7%; and Mann – students 14.8%, faculty 43.3%.  In 2016-17, The STEM Academy  continued  on a selective admission basis in a predominantly white neighborhood. Its white enrollment  has risen to 35.1% percent in  grades K to 8; 36 of its 48 teachers are white persons (75%).  (ADE on line student enrollment and faculty composition data for 2016-17 provided by the LRSD)

Courts have identified faculty segregation violations outside the dual system context.  These decisions include <u>United States v. School District 151 of Cook County, Illinois</u>, 404 F.2d 1125, 1132 (7thCir. 1968); and <u>Booker v.  Special District No. 1, Minneapolis</u>, 351 F.Supp.799, 808-09 ( D.Minn.).

LRSD does not argue that faculty segregation is absent. Instead, the District posits, without offering a further factual basis, that "LRSD's collective bargaining agreement with its teachers, resulted in the pattern of teacher assignments which exists today" – not intentional discrimination. (Doc. 26 at 33) This gambit fails for two reasons. First, Plaintiffs have by Dr. DeJarnette's declaration  (Doc. 46, para. 4) , identified evidence establishing that the existing faculty segregation is intentional. Moreover, the patterns cited are ones "unexplainable on grounds other than race . . . ." <u>Village of Arlington Heights v. Metro. Housing Development Corp.</u>,  429 U.S. 252, 266 (1977).  Second, LRSD offers no support for the argument that a contractual agreement entered by its public officials with its teachers, public employees, repeatedly and openly facilitating the segregation of faculties would provide a defense to a Fourteenth Amendment claim. See <u>United States v. School District 151 of Cook County, Illinois, supra</u>, 425 F.2d at  1129 (Element of preliminary injunction approved by Court  of Appeals provided: " If voluntary transfers or new hiring would not attain either the ultimate or the intermediate objective, the defendants were ordered to reassign presently employed  teachers to reach the objective even though their contracts may have been executed for the 1968-69 or the 1969-70 school year."); <u>Booker</u> , <u>supra</u>, 351 F.Supp. at  809, conclusion of law 14.

<u>LRSD Manipulated Central High School's Attendance Zone to Give White
Students a Better Chance of Attending Central High School</u>

Decisions have long addressed the manipulation of attendance zones to
promote segregation. *Taylor v. Board of Education*, 294 F.2d 36, cert. denied, 368
U.S. 940 (1961); *United States v. School District 151 of Cook County, Illinois, supra*,
404 F.2d at 1129; and *Arthur v. Nyquist*, 573 F.2d 134 (2nd. 1978).  Plaintiffs allege
that employees and officers of the LRSD manipulated high school attendance zones
to concentrate white high school students in Central High School. Doc. 6, ¶¶ 98-
104.   LRSD does not challenge Plaintiffs' allegation that "[i]n every school year
since 2004-05, Central High School has enrolled more white pupils than the four
other high schools combined." Doc. 6, ¶ 100; Doc. 100 at 10.

This contention rests upon multiple factual prongs supported by evidence
including:  1) Central's attendance zone containing a non-contiguous area that
effectively enhances the white student population of Central as opposed to the less-
white Hall High School (Exhibit 15); and 2) placement of an exceptionally high
number of portable classrooms at Central facilitating the concentration of white
high school students at that location (Exhibit 16). *See Columbus Board of Education
v. Penick*, 443 U.S at 461-62 ns 9-10 (1979)( "discontinuous attendance areas and
boundary changes"); *Spangler v. Pasadena City Board of Education*, 311 F.Supp. 501,
(use of portables promotes segregation); *Arlington Heights*, 429 U.S. At 267
("substantive departure").

Defendant Poore has admitted that the LRSD superintendent and the
members of the LRSD Board of Directors designed and implemented the Central

High School's attendance zone.  Exhibit 14 at 5.  Both LRSD's act of implementing Central's racially gerrymandered attendance zone and omission of not eliminating Central's racially gerrymandered attendance zone are both in furtherance of LRSD's goal to privilege, recruit and retain white students.

### 2)  Knowledge of Disparate Impact

LRSD is the custodian of the data tracking the racial makeup of LRSD schools, special programs and disciplinary actions.  It follows that LRSD knew of the racial disparities detailed in the Amended Complaint and Section II(b)(1) of this Response. For example, former LRSD Superintendent Baker Kurrus, previously testified that he knew the then-forthcoming Pinnacle View Middle School would have a white student population percentage of about 42%, which is more than twice that of the district average.  Exhibit 7 at 36, 48.

Defendants also knew that LRSD's white students were disproportionately more likely than LRSD's black students, such as Plaintiffs, to have access to LRSD's high quality educational resources and top-end facilities.  For example, Defendants produced a report that demonstrates black students are vastly underrepresented in high school gifted and talented programs.  Exhibit 17.

### 3)  Racial Purpose

#### i.  Former LRSD Superintendent Baker Kurrus's Words Evidence Racial Discrimination

In addition to the totality of the circumstances surrounding LRSD's allocation of high quality educational resources and top-end facilities indicating racial purpose, Kurrus's testimony further demonstrates that LRSD's disparate allocation of resources is an effort to privilege, retain and recruit white students.

On March 22, 2016, Kurrus was asked, under oath, "Do you remember…you thought that 40 percent was the tipping point in Little Rock for white kids to stay in the school district?" to which Kurrus eventually admitted, "[W]hat I said was, if we can get back to what you agreed and what most people agreed was a fair way to do things, which was to try to hit 60/40 either way, then you begin to build a community-based school district, and that's my desire."  Exhibit 7 at 237-38.  When asked if he had any plans to bring that about Kurrus replied "I'm doing the best I can every day."  Exhibit 7 at 237-38.

At the time, white students consisted of less than 20% of the LRSD student population despite whites consisting of 52% of the general population of Little Rock. Exhibit 6; Exhibit 18.  Whites were, and still are, underrepresented in the LRSD due, in large part, to a desire of white parents not to have their children educated in schools with a significant black student population.  Even as a school board member, Kurrus emphasized the need for LRSD to "achieve a racially diverse school district." Exhibit 32 at 3.

Kurrus's desire to have a 100% increase in the white student population of the LRSD motivated Kurrus to take several actions as a school board member and, more importantly, superintendent to privilege, retain and recruit white students to the detriment of the LRSD's black student population.

LRSD Associate Superintendent of Accountability, Dennis Glasgow, also made representations suggesting that the Pinnacle View project is an effort to recruit, retain, and privilege white students.  On March 22, 2016, Glasgow sent an e-mail to ADE explaining some of the systemic changes being implemented by LRSD.  Exhibit

30.  Glasgow mentions that LRSD was "[b]uilding WLR middle school [now Pinnacle View] to increase and diversify enrollment in the district…"  Exhibit 30.  This e-mail tacitly admits that one of the primary purposes of the Pinnacle View project was to increase LRSD's white student population.  Mr. Glasgow's reference to this project as a "systemic change[]" is evidence that the Pinnacle View project is tantamount to an official LRSD policy and practice to recruit, retain and privilege white students.  Exhibit 30.  This e-mail was sent on the same day Kurrus testified about his aforementioned desired LRSD racial balance.

Kurrus made several misrepresentations to the Court so as to convince the Court not to thwart his goal of privileging the white student population of West Little Rock.  Kurrus testified that he would provide a new middle school in West Little Rock (Exhibit 7 at 198-201); a new "world class" southwest-area high school to replace McClellan and J.A. Fair (Exhibit 7 at 198, 204-05, 207, 210-11); and, later, a replacement for Cloverdale Middle School, by substantial rehabilitation of the McClellan building when it is vacated. (Exhibit 7 at 218-19, 317-18).  Kurrus testified that Cloverdale Middle School was the only school identified as "critical" in a Fanning Howey study and, in his opinion, was "the worst" school in the LRSD.  Exhibit 7 at 267, 316.  He promised its relocation in a rehabilitated McClellan building.   Exhibit 7 at 263.

Kurrus *underestimated* that the construction costs of the west middle school would be $350,000 to $400,000 (Exhibit 7 at 200) for Phase I and "20 million give or take" for Phase II(Exhibit 7 at 201).  However, the *actual* costs of construction of the

west middle school, now Pinnacle View, is $750,000 for Phase I and $33,355,803 for Phase II.  Exhibits 19 and 20.

Kurrus's repetitive assurances that LRSD would have the financial resources necessary to complete the west middle school project and the southwest-area high school project were also erroneous.  Pinnacle View Middle School opened on schedule for sixth graders.  Exhibit 1.  In contrast, Poore's Status Report on facilities filed on October 13, 2016 states that LRSD is "unsure about its ability to fund a first-class high school in Southwest Little Rock" and that construction could not begin on schedule absent voter approval of an extension of the period for repaying existing bonded indebtedness.  Exhibit 5 at 2-3.  Importantly, the Status Report contains no questioning of the ability to complete Phase II of the west middle school project with available revenue.

Mr. Kurrus testified that "we are full throttle on the [southwest high project] right now." (Exhibit 7 at 281).  He testified three times that the west middle school and southwest-area high school projects could be completed without seeking a millage increase. (Exhibit 7 at 205-06, 282, 338).  He testified that the LRSD has plenty of money. (Exhibit 7 at 314).

True to form, as of March 8, 2017, LRSD had not begun the "Schematic Design" phase of the "Southwest Little Rock High School Design Work Plan," which was originally scheduled to begin no later than July 1, 2016.  Exhibit 21.  As of March 8, 2017, LRSD had expended just $380,528.99 on the Southwest Little Rock high school project, which pales in comparison to the $34,067,500 expended on the Pinnacle View project.  Exhibit 31.

Kurrus and Poore's privileging of white students in contravention with LRSD policy has had a negative impact on the Plaintiffs, not to mention other black LRSD students, who would have been more likely to access high-quality educational resources and top-end facilities if the money used to privilege, recruit and retain white students had, instead, been used to improve the educational resources and quality of the facilities of the school district writ large.

ii.   Defendant Did Not Have Substantial Justification for Acting with a Racial Purpose

Defendant Poore implies that LRSD's efforts to offer special benefits to existing or potential white LRSD students were conferred in an effort to stem "the loss of LRSD white students to private schools [which Judge Richard Arnold described] as a 'significant impediment to any effort to achieve desegregation.'" Def. Poore Br. at 39.  However, LRSD's misallocation of resources in an effort to achieve a diverse student body does not pass constitutional muster because, instead of focusing on diversity writ large, LRSD has narrowly focused on privileging, recruiting and retaining white students on the basis of their race. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,* 551 U.S. 701, 793 (2007)(Kennedy, A., concurring)("If those students were considered for a whole range of their talents and school needs with race as just one consideration, *Grutter* would have some application.")  Kurrus's testimony solely indicated that he desired for the LRSD white student population percentage to be higher and the black student population percentage to be lower, which was reflected in his actions before, during and after his testimony.

Even more problematic is the fact that LRSD did not engage in the aforementioned actions "with the objective of offering an equal educational opportunity to all of their students", but rather to reward the discriminatory impulses of a disproportionately large number of white parents who withdrew their children from LRSD by offering said parents easier access to high-quality educational resources and top-end facilities in exchange for their return to, or staying put in, the LRSD. *Id.* at 791 (Kennedy, A., concurring). This misallocation of resources to disproportionately white student populations has presented a burden to Plaintiffs, who are less likely to have access to the high-quality educational programs and top-end facilities purposefully targeted to white students on the basis of their race.

> iii. The presence of black administrators and officers is not fatal to Plaintiffs' claims of racial discrimination.

Defendant Poore argues Plaintiffs have not demonstrated intentionally discrimination because they "do not explain…what would motivate a school district which has been led by black educators to seek to intentionally discriminate against black and other minority students." Def. Poore Br. at 35. First, this argument does not reflect the current reality that LRSD is governed by a single white male, Johnny Key, serving as the Board of Directors and another white male, Michael Poore, serving as the Superintendent.

LRSD's argument that a majority black Board of Directors and a black superintendent creates a presumption against finding racial discrimination is foreclosed by controlling decisions of the Supreme Court and the Court of Appeals for the Eighth Circuit. *Castaneda v.Partida*, 430 U.S. 482, 499-500, 501-04 (Marshall,

J. concurring)(1977) (A Latino person can discriminate against Latinos in grand jury selection "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group"); *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998) (citing *Castaneda* in a Title VII sexual harassment context in which the Court rejected a defense based upon the defendant being the same sex of victim); *Ross v. Douglas County*, 234 F.3d 391, 396  (8th Cir. 2000) ("[W]e have no doubt that as a matter of law, a black male could discriminate against another black male 'because of such individuals race.'").

## II.     <u>Plaintiffs Have Standing to Bring Claims</u>

"Standing requires (1) an injury that is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) that the injury be fairly traceable to the challenged action of the defendant, and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Duit Constr. Co. v. Bennett,* 796 F. 3d 938, 940 (8th Cir. 2015)(citing *Turkish Coalition of Am., Inc. v. Bruininks,* 678 F.3D 617, 621 (8th Cir. 2012))(quotations omitted.)

### a.  *Injury*

LRSD's discriminatory practices have resulted in injuries to Plaintiffs.

Plaintiffs attending Cloverdale and Henderson, the middle schools with the lowest white-student population percentages, have been injured by being educated in schools "which need either massive renovation, construction of new facilities, or in the case of Cloverdale, demolition."  Exhibit 37 at 73.  This while the school with

the highest white-middle-school-aged student population percentages, Pinnacle View and Forest Heights, are in excellent or very good condition.  Exhibit 37 at 72 ; Exhibit 35 at 1.

Plaintiffs Auxzavion and Amoryea Love attended Cloverdale Fall 2016 and Henderson Sring 2017.  Exhibit 33 at 5 ; Exhibit 39 at 5-6.  Plaintiff Eshawn Fisher (Edward Doe) attended Henderson during the 2013-2014 and 2014-2015 school years.  Exhibit 40 at 7.  Plaintiff Jaylen Lampkin (Johnny Doe) attended Cloverdale Spring 2013.  Exhibit 34 at 4.

The over $33 million used to construct Pinnacle View in an attempt to privilege, recruit and retain white students could have been used to undertake the massive renovations needed at Henderson or relocate Cloverdale students.  It also could have been used to begin construction on the new Southwest high school, which would replace the poor facilities at McClellan.  Exhibit 22 at 82.  Meanwhile, Mr. Fisher's only traditional public school option, McClellan, is also in need of "massive renovation [or] construction of new facilities."  Exhibit 37 at 73; Exhibit 40 at 5.

Plaintiffs attending Henderson and Cloverdale have been injured by the discriminatory allocation of math facilitators and literacy facilitators to Pinnacle View, especially since Henderson and Cloverdale are classified as being in academic distress.  Exhibit 29.  Meanwhile, Mr. Fisher was injured by the discriminatory allocation of a testing facilitator to Central High School, especially given his lack of preparedness for high school and McClellan being classified as being in academic distress.  Exhibit 40 at 46.  Mr. Fisher attended McClellan Spring 2016.  Exhibit 40 at

5-6.  Plaintiff Lyric Louden (Lisa Doe) has also recently attended McClellan.  Exhibit 41 at 8.  Finally, Plaintiffs Lazerus Pettus and Dezury Ashford (Dennis Doe) were also injured by the lack of a testing facilitator at J.A. Fair, which was classified as being in academic distress during the 2015-2016 school year.  Exhibit 42 at 7; Exhibit 43 at 8; Exhibit 28.

Mr. Pettus also complained about J.A. Fair being too small, which is in contrast with the "generous" main corridor and "very large class rooms" of Central. Exhibit 42 at 25; Exhibit 37 at 65, 68.

Ms. Amoryea Love is in imminent danger of being injured by Central High School's racially gerrymandered attendance zone because she is zoned to go to Hall High School in the Fall.  Exhbiit 39 at 7.  The westernmost non-contiguous portion of Central's attendance zone is closer to Hall than it is to Central.  Exhibit 15.  But for LRSD maintaining Central's racially gerrymandered attendance zone, Ms. Love would be slotted to go to a more diverse, well-resourced Hall.

Several of the Plaintiffs have had direct contact with LRSD's discriminatory disciplinary practices.  Plaintiff Dezury Ashford (Dennis Doe) was once sent home for the amorphous charge of "refus[ing] to follow simple directions" twice.  Exhibit 13.  Mr. Auxzvion Love has complained about being the target threats of disciplinary action and actual disciplinary action at Henderson.  Exhibit 33 at 7. Mr. Lampkin has complained about being subject to disciplinary action for responding to a teacher's disrespectful comments towards him and being suspended for talking back as result of said disrespectful comments.  Exhibit 34 at 6, 7.  Mr. Fisher complained about being bullied by LRSD staff, a wrongful attempt to refer him to the juvenile justice

system and a sanction for having marijuana that belonged to another student. Exhibit 40 at 7, 10, 30, 42.  Mr. Pettus has been suspended and testified that LRSD staff regularly treats black students, himself included, more strictly than white students.  Exhibit 42 at 12, 20-22.  Ms. Amoryea Love complained about teachers at Henderson having an excessive focus on discipline.  Exhibit 39 at 5-6.  In contrast, Mr. Ashford noted "multiple things that white kids do and get away with" like talking back and cussing out teachers; he even cited an example.  Exhibit 43 at 57-58.

Ms. Amoryea Love also noted that she wanted to enroll in pre-AP classes at Henderson, but was not allowed to by LRSD.  Exhibit 39 at 6.  Mr. Fisher complained about not being taught at Henderson and, as result, being behind on his studies once he arrived at McClellan.  Exhibit 40 at 35, 37-40, 46.  Mr. Pettus spoke of being removed from an AP class and placed in a regular class because there was no permanent teacher to teach the course at J.A. Fair.  Exhibit 42 at 49.  Mr. Ashford spoke of experiencing harsh treatment in an AP class at Central, in which he was the only black student, because he was black; he now does not have any AP classes.  Exhibit 43 at 39, 44.

It is evident that Plaintiffs injuries are plentiful.  Defendants do not claim that any of the plaintiffs have represented that LRSD has allocated top-end facilities, high quality educational resources and disciplinary infractions equally across racial lines during the last fifteen (15) or even three (3) years.  In fact, Mr. Pettus has represented that he "feel[s] it's a lot of discrimination going on in some parts of the Little Rock School District."  Exhibit 42 at 13.  He went on to explain, "I'm pretty sure

if I was white I wouldn't have went to Fair in the first place, I would have been at Parkview or Central.  Exhibit 43 at 41.  He later stated, "...white kids have better opportunities."  Exhibit 43 at 52.

LRSD's discriminatory policies and practices violate Plaintiffs' right to be educated in "a system of public education freed of racial discrimination", which is guaranteed by the Fourteenth Amendment Equal Protection Clause. *Brown v. Board of Education*, 349 U.S. 294, 299 (1955).

### b.  Traceability

Defendants have targeted top end facilities and high quality educational resources to disproportionately white student populations to the detriment of the Plaintiffs, who have facilities and educational resources of lesser quality due to LRSD's discriminatory allocation of resources.  Plaintiffs' exposure to LRSD's disciplinary practices is also a direct result of LRSD's targeting of black children, such as the Plaintiffs, for disciplinary actions.  The fact that Plaintiffs' injuries are allowed to exacerbate, instead of being remedied by the resources currently being poured into the disproportionately white Pinnacle View Middle School, is fairly traceable to the Defendants' unlawful acts and omissions.  Finally, but for the discriminatory allocation of top-end facilities and high-quality educational resources as well as the discriminatory disciplinary practices, Plaintiffs would not have sustained the injuries detailed in this Response.

### c.  Redressibility

The Plaintiffs' request for relief includes:  1) an order preliminarily enjoining the Defendants from opening a LRSD middle school in West Little Rock (Pinnacle

View is not yet open to seventh and eighth graders); 2) adoption and Court approval

of a constitutionally adequate facilities plan for the LRSD; and 3) an injunction

ending the unconstitutional policies and practices in the LRSD alleged in the

Amended Complaint with relief addressing areas including school facilities,

computer capacity and high school attendance zones.  (Doc. 6, Request for Relief  ¶¶

a, c.)  This relief would ensure that Plaintiffs will finally have a school district in

which resources will be mobilized to improve the quality of facilities and

educational resources for all LRSD students equally, instead of a select few

disproportionately white student populations.  Also, this relief would prospectively

ensure Plaintiffs will have not be relegated to inferior facilities because of their race.

Finally, this relief will ensure Plaintiffs have just as much of a chance to succeed

academically as their white counterparts.

## V.  Plaintiffs' Claims Are Not Time-Barred

a.    *Equitable Tolling Applies to Plaintiffs' Claims*

Although Poore is correct that three years is the statute of limitations for §

1983 claims, he neglects to mention in his brief that the statute of limitations may be

tolled for such claims.   Federal courts apply the tolling laws of the same states (the

place of injury) as they apply statutes of limitations. *See Bd. of Regents of the Univ. of*

*the State of N.Y. v Tomanio*, 446 U.S. 478, 484, 100 S.Ct. 1790 (1980) (Section 1983

claim); and   Under Arkansas law, there is a savings statute that is applicable to the

present case.  A statute of limitations may be tolled equitably under the following

circumstances:

(a) If any person entittled to bring action under any law of this state is under twenty-one (21) years of age or insane at the time of the accrual of the state action,        that person may bring the action within three (3) years next after attaining full age,      or within three (3) yearas next after the disability is removed.

Ark. Code Ann. 16-56-116(a).   It is undisputed that the minor plaintiffs are all under 21 years of age. The earliest incident of racial discrimination that Plaintiffs allege in their Amended Complaint occurred on ?   Plaintiffs allege other acts of discrimination such as ? (give dates).   Therefore, because of equitable tolling, Plaintiffs are not time barred from seeking relief from any of the incidents of race discrimination claims alleged in this lawsuit. *See Hankins v Selig,* 2009 U.S. Dist. LEXIS 93787 *14-15 (E.D. Ark. , October 7, 2009) (applying Ark. Code Ann. 16-56-116 to Section 1983 claims).

b.    *The Continuing Violations Doctrine Applies to Plaintiffs' Claims*

Considered to be an exception to a statute of limitations, the continuing violations doctrine is applied when a civil rights claim arises from not a single act, but multiple acts in which the same violation is repeated.   The limitations period starts again with each new violation.   The clock starts to run not from the earliest act, but from the latest act in the continuing violation. *See Rural Water System 1 v. City of Sioux Center*, 967 F Supp. 1483, 1508 (N.D. Iowa 1997) (citing *Varner v. National Super Markets, Inc.*, 94 F.3d 1209, 1214 (8th Cir. 1996)).

In the present case, Plaintiffs allege that Defendants committed a series of discriminatory acts from ? to the date of the filing of the Complaint, which is within the three-year statute of limitations.   Because genuine issues of material fact exist as to whether Plaintiffs have presented evidence of continuing violations, the Court

should deny summary judgment. *Rural Water System 1*, 967 F.Supp at 1508 (declining to grant summary judgment for untimeliness even though first alleged violation of federal law occurred nine years prior to assertion of §1983 claim).

          c.     *Prior Settlement Does Not Prevent Claims Predating 2007*

All of the allegations raised by Plaintiffs are from after September 13, 2002, the date at which Judge Bill Wilson, Jr. held that LRSD had achieved unitary status regarding all aspects of its desegregation plan with the lone exception of academic programs implemented to improve achievement of African American students.  Plan Section 2.7.1 (Annual Assessment of Effectiveness of Academic Programs Implemented to Improve achievement of African-American students)]. *LRSD v.PCSSD*, 237 F.Supp. 2d 988, 1088 (E.D. Ark. 2002); *see Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 250-51 (1991)(requiring showings of discrimination in post-unitary period).  Defendant Michael Poore wrongfully claims LRSD achieved unitary status in 2007, when Judge Wilson found unitary status regarding Plan Section 2.7.1.  [Motion, Doc. 99 at 1].  In fact, a school district may achieve unitary status incrementally; such was the case in the LRSD. *Freeman v. Pitts*, 118 L Ed. 2d 108, 122, 134-35 (1992).

## VI. Defendants Engaged in Racial Discrimination Against Plaintiffs Pursuant to Unconstitutional Policies and Customs

In *Monell v. Dep't of Soc. Servs*, the United States Supreme Court held that there is no *respondeat superior* liability under § 1983 for municipalities.  Although the word "persons" in the statute includes municipalities, the liability of municipalities is limited to conduct which "implements or executes a policy,

statement, ordinance, regulation, or decision officially adopted or promulgated by municipal officers." Municipalities "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." 436 U.S. 658, 690-91 (1978). Municipal "policy" is not simply a written directive that policymakers issue that explicitly violated constitutional provisions (such as the official pregnancy leave policy in *Monell*). Instead, "policy" in this context includes ad hoc decisions made by policymakers that may be either formal or informal. *See Spell v. McDaniel*, 824 F.2d 1380, 1385-86 (4th Cir. 1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752 (1988).

A local government may be held liable for constitutional violations if an unlawful act was taken by an official with final policymaking authority. *See Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 109 S.Ct. 2702 (1989). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 924 (1988), quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300 (1986) (plurality opinion). Indeed, a municipality may be held liable for a single unconstitutional act in such circumstances. *Pembaur*, 474 U.S. at 1299. Plaintiffs agree that in Arkansas the school board is the final policymaker for a school district. *Ark. Code Ann § 6-13-620.*

In order to prove the existence of an unconstitutional custom, a plaintiff must

show : "1) [t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the government's employees; 2) [d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and 3) [t]hat plaintiff was injured by acts pursuant to the governmental entity's custom, i.e. that the custom was a moving force behind the constitutional violation." *Thelma D. ex. rel. Delores A v. Board of Educ. of City of St. Louis*, 934 F.2d 929, 932-33 (8th Cir. 1991), quoting *Jane Doe A v. Spec. Sch. Dist. of St. Louis*, 901 F.2d 642. 646 (8th Cir. 1990).

Whether as a policy or as a custom, Plaintiffs allege that Defendants recreated a racially discriminatory system of public education since the LRSD was declared unitary status on October 11, 2002, and February 23, 2007.  As described elsewhere in this brief by Plaintiffs, high-ranking school officials, including superintendent Dexter Suggs and Baker Kurrus, discriminated against black students by, *inter alia*, doing the following: (1) favoring white communities  and white students in providing resources for facilities; (2) substantially reducing black enrollment at the top-notch Forest Heights school upon its conversion to a STEM program; (3) prioritizing the building of a state-of-the art Pinnacle View Middle School which draws an above-average percentage of white students over a new "Southwest High School" in a heavily-black part of Little Rock; and (4) segregation of faculty members.  The LRSD Board of Education (including Key and his predecessors pursuant FRCP 25) exercised their authority to direct or condone these racially discriminatory acts through board resolutions or deliberate indifference.  *See Ark. Code Ann. § 6-13-620. Cf. Keyes v. Sch. Dist.,* 413 U.S. 189, 208, 93 S.Ct. 2686, 2697

(1973) (holding implicitly that policies and practices of the kind discussed here and in the response to Key's motion for summary judgment establish a segregated system of public education).

## VII. <u>Conclusion</u>

The Plaintiffs have demonstrated that Defendants are not entitled to judgment as a matter of law as there are genuine issues of material fact in this matter.

Respectfully submitted,

<u>/s/ Shawn G. Childs</u>
John W. Walker
Ark Bar Doc.64046
Shawn G. Childs
Ark. Bar Doc.99058
JOHN W. WALKER, P.A.
1723 Broadway
Little Rock, Arkansas  72206
501-374-3758
501-374-4187 (facsimile)
Email:  johnwalkeratty@aol.com
        schilds@gabrielmail.com

Robert Pressman
22 Locust Avenue
Lexington, MA  02421
781-862-1955
Email: ehpressman@verizon.net

Austin Porter
PORTER LAW FIRM
323 Center Street
Little Rock, Arkansas
501-244-8200
Email: aporte5640@aol.com

OF COUNSEL:
Gale B. Stewart – AR Doc.76120
1723 Broadway
Little Rock, Arkansas 72206
501-374-3758
501-374-4197 (facsimile)
Email: letchworth1942@comcast.net

ATTORNEYS FOR THE PLAINTIFFS

## CERTIFICATE OF SERVICE

I, Shawn G. Childs, certify that on May 17, 2017, a copy of the foregoing paper has been electronically filed with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

Lee Rudofsky

lee.rudofsky@arkansasag.gov

Rosalyn L. Middleton

rosalyn.middleton@arkansasag.gov

Patrick Hollingsworth

Patrick.hollingsworth@arkansasag.gov

Christopher Heller

heller@fridayfirm.com

Khayyam Eddings

keddings@fridayfirm.com

/s/ Shawn G. Childs

Shawn G. Childs