**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 1 3 2002

JAMES W. McCORMACK, CLERK
By: _____
DEP. CLERK



# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### LITTLE ROCK DIVISION

| | |
|---|---|
| LITTLE ROCK SCHOOL DISTRICT | PLAINTIFF |
| V.  No. 4:82CV00866 WRW/JTR | |
| PULASKI COUNTY SPECIAL SCHOOL DISTRICT NO. 1, ET AL. | DEFENDANTS |
| MRS. LORENE JOSHUA, ET AL. | INTERVENORS |
| KATHERINE KNIGHT, ET AL. | INTERVENORS |

## MEMORANDUM OPINION

AO 72A

## INDEX

|  |  | Page |
|---|---|---|
| I. | Introduction | 1 |
| II. | The Long History Of Desegregation Litigation In Pulaski County | 11 |
| | A. 1956 Through 1973 | 11 |
| | B. 1973 Through 1982 | 13 |
| | C. Interdistrict Litigation And Interdistrict Relief | 16 |
| | D. The 1990 Settlement Agreement And Settlement Plans | 20 |
| | E. LRSD's Implementation Of Its Desegregation Obligations Between 1991 And 1995 | 24 |
| | F. Joshua's Request For An Interim Award Of Attorney's Fees For Performing Monitoring Activities After The 1990 Settlement | 33 |
| | G. LRSD's First Attempt To End Federal Court Jurisdiction | 36 |
| | H. The Perplexing Final Resolution Of Joshua's Request For Still More Attorneys' Fees From LRSD | 38 |
| | I. Final Approval Of Revised Desegregation And Education Plan | 45 |
| | J. LRSD's Implementation Of Its Obligations Under The Revised Plan | 46 |
| | K. LRSD Seeks Unitary Status Based Upon Its Substantial Compliance With The Revised Plan | 50 |
| III. | Relevant Provisions Of Revised Plan | 52 |
| | A. LRSD's Obligation Of Good Faith | 55 |
| | B. LRSD's Obligations Regarding Student Discipline | 55 |
| | C. LRSD's Obligations To Improve And Remediate The Academic Achievement Of African-American Students | 56 |
| | D. LRSD's Obligations Regarding Extracurricular Activities, Advanced Placement Courses, And Guidance Counselors | 56 |
| | E. LRSD's Obligations To Develop Remedies, Where Appropriate, For Racial Disparities In Programs And Activities | 57 |
| | F. Procedure For Raising Compliance Issues | 57 |
| | G. Duration Of Revised Plan | 59 |
| | H. Procedure For Seeking Unitary Status | 59 |
| | I. Effect Of LRSD's Failure To Meet "Specific Goals" In The Revised Plan | 60 |
| IV. | Controlling Principles Of Law | 60 |
| | A. The Evolving Concept of Unitary Status | 60 |
| | B. Applicable Standard For Determining If LRSD Is Unitary | 69 |
| | C. Burden Of Proof | 72 |
| | D. Meaning Of "Substantial Compliance" | 75 |
| | E. The Metaphysics Of Using The "Achievement Gap" As A Factor In Deciding Unitary Status | 77 |

V.     Findings Of Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
       A.     Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
       B.     Student Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
       C.     Extracurricular Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114
       D.     Advanced Placement Courses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
              Promote Participation and Remove Barriers . . . . . . . . . . . . . . . . . . . 123
              Identify and Encourage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132
              Assist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135
       E.     Guidance And Counseling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136
       F.     Academic Achievement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138
       G.     Program Assessment/Program Evaluation . . . . . . . . . . . . . . . . . . . . . . 150

VI.    Conclusions Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
       A.     Unitary Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
       B.     Burden Of Proof . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
       C.     Substantial Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160
       D.     Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161
       E.     Student Discipline . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161
       F.     Academic Achievement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
       G.     Partial Unitary Status . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165
       H.     Time To Fly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

VII.   Compliance Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

VIII.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

AO 72A

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION**

LITTLE ROCK SCHOOL DISTRICT                                          PLAINTIFF


V.                              No. 4:82CV00866 WRW/JTR


PULASKI COUNTY SPECIAL SCHOOL
DISTRICT NO. 1, ET AL.                                             DEFENDANTS


MRS. LORENE JOSHUA, ET AL.                                         INTERVENORS


KATHERINE KNIGHT, ET AL.                                           INTERVENORS


**MEMORANDUM OPINION[1]**

**I. Introduction[2]**

On December 12, 1990, the Eighth Circuit Court of Appeals approved the "Pulaski

County School Desegregation Case Settlement Agreement," as revised September 28, 1989;

separate Settlement Plans for the Little Rock School District ("LRSD"), the North Little Rock

School District ("NLRSD"), and the Pulaski County Special School District ("PCSSD"), dated

---

[1] It was my good fortune to have The Honorable Joe Thomas Ray, U. S. Magistrate Judge, assigned to this case with me. I would be sorely remiss if I did not acknowledge, here and now, the prodigious effort and talent he has brought to this project. As authors are wont to say, "any errors, however, are mine alone."

[2] As a Bryan Garner disciple (beginners' class), I generally favor putting all substantive legal analysis in the text and citing the supporting cases in footnotes. However, so many issues in this case beg for digressions that I have been unable to resist the temptation to include substantive legal analysis in some of the footnotes.

AO 72A

January 31, 1989; and a separate Interdistrict Settlement Plan.[3] *LRSD v. PCSSD*, 921 F.2d 1371 (8th Cir. 1990). At that time, both the district court and the Eighth Circuit believed that this historic settlement created the "benchmark for the future path of this case," *Appeal of LRSD*, 949 F.2d 253, 255 (8th Cir. 1991), and "a sure guide for ending this dispute and getting the parties out of court." *LRSD v. PCSSD*, 769 F. Supp. 1491, 1494 (E.D. Ark. 1991), *order vacated*, 949 F.2d 253 (8th Cir. 1991).

In the years following the Eighth Circuit's approval of the parties' final settlement of this case, all three Pulaski County school districts implemented their respective Settlement Plans under the supervision of the district court and the Office of Desegregation Monitoring ("ODM").[4] Subsequently, the district court and Eighth Circuit established guidelines for allowing the parties

---

[3]Each of the Settlement Plans for the individual school districts contained their respective desegregation obligations. In addition, the Interdistrict Settlement Plan contained the interdistrict desegregation obligations for all three school districts. These Settlement Plans had been agreed to by the parties and approved by the Court, making them "consent decrees." In their pleadings, the parties sometimes refer to these Settlement Plans as "desegregation plans."

The three individual Settlement Plans for LRSD, NLRSD, and PCSSD, and the Interdistrict Settlement Plan were submitted to the district court for approval during early 1989. However, because they were not approved by the Eighth Circuit until December 12, 1990, *LRSD v. PCSSD*, 921 F.2d 1371 (8th Cir. 1990), the parties and the district court generally have referred to these settlement documents as the 1990 Settlement Agreement, the 1990 Settlement Plans, and the 1990 Interdistrict Settlement Plan. In contrast, the Eighth Circuit has usually referred to these settlement documents as the 1989 settlement agreement and 1989 settlement plan or plans. *Appeal of LRSD*, 949 F.2d 253, 254 (8th Cir. 1991) ("We recognized, however, that the approved plans, which we shall call the 1989 plan or plans, would need some modification because of the passage of time"). Regardless of the terminology used, the parties, the district court, and the Eighth Circuit are all referring to the *same settlement documents*. In the interest of consistency, I will refer to those documents in this opinion as the 1990 Settlement Agreement, the 1990 Settlement Plan or Plans, and the 1990 Interdistrict Settlement Plan.

[4]The Eighth Circuit directed the district court to create and staff the ODM with the personnel it "shall deem appropriate" to help ensure compliance with all aspects of the 1990 Settlement Agreement and the four separate Settlement Plans. *LRSD*, 921 F.2d at 1388.

to make agreed changes to the details of the Settlement Plans, as long as they did not affect the "major substantive commitments to desegregation" embodied in those Plans. *Appeal of LRSD*, 949 F.2d at 256; *see also LRSD*, 769 F. Supp. 1491; *LRSD v. PCSSD*, 769 F. Supp. 1483 (E.D. Ark. 1991), *order vacated*, 949 F.2d 253 (8th Cir. 1991).

Between 1991 and 1996, LRSD worked toward implementing its desegregation obligations under the settlement documents. On May 1, 1992, the district court entered an Order (docket no. 1587) approving certain changes to LRSD's 1990 Settlement Plan and the Interdistrict Settlement Plan. A copy of LRSD's modified settlement plan and interdistrict plan, referred to as "LRSD's May 1992 Desegregation Plan" and the "May 1992 Interdistrict Desegregation Plan," were attached to the court's May 1, 1992 Order.

By 1996, it had become apparent to the parties and the district court that some of the desegregation obligations imposed on LRSD by the settlement documents might never be successfully implemented, regardless of LRSD's best efforts. Accordingly, on September 25, 1996, Judge Wright entered a Memorandum Opinion (docket no. 2821) in which she "invite[d] the parties to modify the parts of the [settlement] plan that are ineffective or unworkable." As a result, in late 1996 and 1997, LRSD and the Joshua Intervenors ("Joshua")[5] entered into

---

[5]On January 3, 1984, minor petitioners, comprising a group of African-American public school children enrolled in the three Pulaski County school districts, filed a "Petition to Intervene" (docket no. 452). The Petitioners sought intervenor status "for themselves and the other Black public school children of Pulaski County through their parents and next of friends . . . ." Mrs. Lorene Joshua was the lead named parent and next of friend for her three minor school children.

On May 24, 1984, the Eighth Circuit entered an Order (docket no. 565) that, in effect, granted the Petition to Intervene. Thereafter, the district court and the parties began referring to these intervenors simply as "Joshua." Because the intervenors represent the group of all African-American school children in the Pulaski County public schools, I will sometimes use the plural pronoun "they" to refer to Joshua. On occasion, the Eighth Circuit has elected to consider

-3-

protracted negotiations to modify various aspects of LRSD's Settlement Plan. These negotiations bore fruit in the January 16, 1998 Revised Desegregation and Education Plan (the "Revised Plan"), which LRSD and Joshua *jointly* submitted to the district court for approval on January 21, 1998 (docket nos. 3107 and 3136).[6]

On April 10, 1998, the district court entered an Order (docket no. 3144) approving the Revised Plan,[7] which it viewed as "an entirely new consent decree or settlement agreement between LRSD and Joshua."[8] Unlike LRSD's 1990 Settlement Plan, as modified by the May 1992 Desegregation Plan, the Revised Plan included a section establishing a specific procedure

---

"Joshua" to be only the first named intervenor, Mrs. Lorene Joshua, and properly used the singular pronoun "she" to refer to "Joshua." *LRSD v. PCSSD*, 56 F.3d 904, 914 (8th Cir. 1995). Either pronoun usage is correct, as long as the reader understands how the Court is defining "Joshua."

[6]According to the explicit language of the Revised Plan, it "shall supersede and extinguish all prior agreements and orders" in this case "and all consolidated cases related to the desegregation" of the LRSD with the following exceptions:

> a.  The Pulaski County School Desegregation Case Settlement Agreement as revised on September 28, 1989 ("Settlement Agreement");
> b.  The Magnet School Stipulation dated February 27, 1987;
> c.  Order dated September 3, 1986, pertaining to the Magnet Review Committee;
> d.  The M-to-M Stipulation dated August 26, 1986; and,
> e.  Orders of the district court and court of appeals interpreting and enforcing sections a. through d. above to the extent not inconsistent with this Revised Plan.

[7]During the hearings on unitary status, the Revised Plan was introduced into evidence as CX 871.

[8]In its April 10 Order, the district court concluded, in the alternative, that, even if the Revised Plan was considered to be a "modification" of LRSD's May 1992 Desegregation Plan, rather than "an entirely new consent decree," it still should be approved under the test for seeking modification of a consent decree established by the Court in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992). *See also LRSD v. PCSSD*, 56 F.3d at 914; *LRSD*, 921 F.2d at 1387.

-4-

and time schedule under which LRSD might achieve unitary status:

SECTION 11: Unitary Status.

At the conclusion of the 2000-01 school year, the district court *shall* enter an order releasing LRSD from court supervision and finding LRSD unitary with regard to all aspects of school operations *provided that LRSD has substantially complied with its obligations set forth in this Revised Plan.* In anticipation of release, LRSD shall issue a report on March 15, 2001 indicating the state of LRSD's compliance with the Revised Plan. Any party challenging LRSD's compliance bears the burden of proof. *If no party challenges LRSD's compliance, the above-described order shall be entered without further proceedings.*

(Emphasis added.) Because none of the parties appealed the district court's April 10 Order approving the Revised Plan, it became a *final consent decree*, which now governs LRSD's desegregation obligations and establishes the path that LRSD must follow to achieve unitary status and release from federal court supervision.[9]

On March 15, 2001, LRSD filed a Request for Scheduling Order and Compliance Report

---

[9]In most school desegregation cases, a federal court's jurisdiction depends on the existence of constitutional violations by the school district. Once the school district complies with all of its obligations under the Constitution, it achieves "unitary status," and the federal court's jurisdiction ends. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971).

In *Green v. County School Bd. of New Kent County*, 391 U.S. 430, 435-38 (1968), the Court identified the following areas of a school district's operations that must be carefully examined in determining whether it has successfully converted "to a unitary system in which racial discrimination [has been] eliminated root and branch": (1) student assignment; (2) faculty and staff assignment; (3) transportation; (4) extracurricular activities; and (5) facilities. These so-called *Green* factors establish the floor for a school district's compliance with its constitutional obligations under the Fourteenth Amendment. Thus, in all school desegregation cases, a school district's compliance with the *Green* factors is a condition precedent to unitary status.

Importantly, the Revised Plan required LRSD to comply with not only the *Green* factors, but also a host of other desegregation obligations that went well beyond the constitutional floor established by the Court in *Green*. Thus, in this case, the question of unitary status turns on whether LRSD has substantially complied with its desegregation obligations under the Revised Plan.

-5-

(docket no. 3410),[10] pursuant to Section 11 of the Revised Plan, seeking "an order finding LRSD unitary with regard to all aspects of school operations." On June 25, 2001, Joshua filed an Opposition to LRSD's Compliance Report (docket no. 3447), which vigorously challenged LRSD's contention that it was entitled to a declaration of unitary status and argued that LRSD was not in "substantial compliance" with certain of its desegregation obligations under the Revised Plan.

On July 5 and 6, August 1 and 2, and November 19 and 20, 2001, my colleague and predecessor in this case, United States Chief District Judge Susan Webber Wright, conducted five and one-half days of evidentiary hearings to develop the facts surrounding what Joshua believed were their three strongest grounds[11] for challenging LRSD's request for unitary status: first, that LRSD had not acted in good faith in implementing its desegregation obligations (§ 2.1 of the Revised Plan); second, that LRSD was not in substantial compliance with its obligations regarding student discipline (§§ 2.5 through 2.5.4 of the Revised Plan); and third, that LRSD was not in substantial compliance with its obligations to implement programs, policies, and procedures designed to improve the academic achievement of African-American students (§§ 2.7, 2.7.1, and 5.1-5.8 of the Revised Plan).

In a scheduling conference on December 11, 2001, Judge Wright designated the week of January 28, 2002, to hear no more than five additional days of testimony regarding the last three

---

[10]During the hearings on unitary status, the Final March 15, 2001 Compliance Report was introduced into evidence as CX 870.

[11]In a telephone conference with counsel on June 29, 2001, Judge Wright made it clear that counsel for Joshua should present his strongest arguments and evidence first, followed by subsidiary arguments and evidence (docket no. 3461 at 54-55).

areas of the Revised Plan in which Joshua claimed LRSD had failed to substantially comply with its obligations: advanced placement courses (§§ 2.6 and 2.6.2 of the Revised Plan); extracurricular activities (§§ 2.6 and 2.6.3 of the Revised Plan); and guidance counseling (§ 2.6.1 of the Revised Plan) (docket no. 3597 at 31-37).[12] Judge Wright made it clear that, after she had heard the testimony concerning these last three areas of LRSD's alleged noncompliance, she would decide the question of unitary status. *Id.* at 36-37.

On January 3, 2002, after presiding over this case with great perseverance and distinction for eleven years,[13] Judge Wright determined that it was the "appropriate time to reassign this case to another judge with minimal disruption to the parties and to allow a smooth transition" (docket no. 3569). That same day, the case was assigned to me by random selection (docket no. 3570).[14]

On March 15, 2002, one year to the day after submitting its Request for Scheduling Order and Compliance Report, LRSD filed a Motion for an Immediate Declaration of Unitary Status

---

[12]Judge Wright also ruled that Joshua could present non-cumulative evidence regarding: (a) LRSD's lack of good faith in implementing its obligations regarding advanced placement courses, extracurricular activities, and guidance counseling; and (b) the ways in which LRSD's failure to substantially comply with its obligations regarding advanced placement courses and guidance counseling adversely impacted the academic achievement of African-American students.

[13]In *LRSD v. NLRSD*, 148 F.3d 956, 967 (8th Cir. 1998), the Court recognized the expertise Judge Wright had gained during her many years of service in this case:

> In reaching this conclusion, we are mindful that Judge Wright has been responsible for administering and interpreting the settlement agreement for some time now, ever since 1990, when she took over this case. Our review of the District Court's interpretation of the settlement agreement is, as a formal matter, de novo. But we still think it appropriate to pay some heed to the reasoned determinations of the experienced District Judge, who faces decisions in this case every month, if not every week.

[14]Of course, the five days of evidentiary hearings that Judge Wright had scheduled for the week of January 28, 2002, were cancelled.

-7-

AO 72A

(docket no. 3580) and Supporting Memorandum Brief (docket no. 3581). On May 9, 2002, I entered a fourteen-page Order (docket no. 3598) explaining to the parties my understanding of the current status of the case. Because the passing of the baton is a key factor in any relay race, the May 9 Order noted:

> Judge Wright, my immediate predecessor in this case, has done an outstanding job of narrowing the issues and establishing a schedule that should allow me to conduct no more than five additional days of evidentiary hearings on the four remaining issues and then be in a position to decide the LRSD's Motion for an Immediate Declaration of Unitary Status. For that reason, the Court intends to pick up where Judge Wright left off, without disturbing the schedule that was established and agreed to by the parties and the Court during the December 11, 2001 hearing.

May 9, 2002 Order at 12 (docket no. 3598) (footnote omitted). In a telephone conference with counsel on May 14, 2002, I rescheduled for July 22-26, 2002, the last five days of evidentiary hearings on the question of whether LRSD had substantially complied with its obligations under the Revised Plan. In an Order (docket no. 3600) entered the next day, I set forth the schedule adopted during the May 14 telephone conference.

On May 30, 2002, Joshua filed their Response in Opposition to LRSD's Motion for an Immediate Declaration of Unitary Status (docket no. 3604). On June 7, 2002, LRSD filed a Reply Brief in Support of Motion for an Immediate Declaration of Unitary Status (docket no. 3607).

During the week of July 22, I completed the evidentiary hearings to develop the facts relevant to the determination of whether LRSD is entitled to a declaration of unitary status. Thus, the record is now complete, and the issue of unitary status is ready for decision.

During the last eight months, I have spent many an hour trying to educate myself on the significant rulings and agreements that have shaped the current contours of this twenty-year-old

-8-

AO 72A

case.[15] I have also read a ground-slide load of cases to gain an understanding of the evolution of school desegregation litigation during the last five decades and to grasp the issues a court must resolve in deciding whether a school district has achieved unitary status. I have learned that desegregation cases are invariably complex, involve difficult-to-understand jargon, and frequently generate book-length appellate decisions, with seemingly obligatory concurring and dissenting opinions. Of course, I have found none of these discoveries to be surprising. After all, the issue of desegregation goes to both the heart of the Fourteenth Amendment's promise of "equal protection" and the dark soul of what was, in many parts of the country in the 1950's, a *de jure* segregated public school system that only grudgingly gave ground to integration--after most school districts had exhausted all available means of delay.

In 1954, the Supreme Court rendered its landmark decision in *Brown v. Board of Education*, 347 U.S. 483, 495 (1954) ("*Brown I*"), holding that "in the field of public education the doctrine of 'separate but equal' has no place" and that segregation of public education is a denial of "equal protection of the laws."[16] Three years later, Little Rock suddenly found itself at the epicenter of this country's first major school desegregation effort.

In early August of 1957, LRSD school officials (including the school board) were prepared to implement a plan to admit a small number of African-American students to Central High School. Arkansas's Governor, Orval Faubus, ostensibly supported that plan, which, if

---

[15]This action was filed on November 30, 1982, as the last in a long line of desegregation cases, dating back to 1956. *See infra,* note 18. The pleadings in this case alone now occupy hundreds of feet of file space in the Clerk's office.

[16]The next year, the Court explicitly directed the lower federal courts to accomplish desegregation "with all deliberate speed." *Brown v. Board of Education,* 349 U.S. 294, 301 (1955) ("*Brown II*").

-9-

implemented with the support of the State, may well have led to the peaceful integration of Central. As it turned out, however, just as school started, Faubus called out the Arkansas National Guard to prevent the "Little Rock Nine" from entering Central.[17]

Faubus, who was known as somewhat of a moderate up to that time, shamelessly fanned the flames of racism under the rubric of "state's rights," "interposition," and the like. Thus, Little Rock became the first great legal battleground in the long struggle to desegregate this country's public school system, a distinction that has left lasting wounds in this community. One can only wonder how the history of school desegregation might have been different if the first southern governor to squarely face the dictates of *Brown I* had done his plain, sworn constitutional duty.

In view of the historical importance of this case, I believe I should review the long and winding path trod by LRSD in carrying out its constitutional duty, under *Brown I* and its progeny, to rid the Little Rock school system, to the extent practicable, of the vestiges of *de jure* segregation. Without at least some understanding of that history, it is impossible to appreciate the deep passions this case still stirs in the litigants, lawyers, and judges who have been involved in almost five decades of continuous, unremitting school desegregation litigation in Pulaski County.[18]

_____

[17]Faubus, of course, cited public safety concerns as his reason for mobilizing the National Guard. He claimed "secret intelligence reports" indicated that dangerous outside agitators were at work in Little Rock, but these reports were never substantiated. In fact, the evidence now available suggests that the white mob which confronted the "Little Rock Nine" was mobilized by Faubus' own demagoguery, rather than by unidentified "outside agitators." And, of course, other demagogues of a like mind were quick to pitch in. R. Reed, *Faubus: The Life And Times Of An American Prodigal* (1997).

[18]In 1956, the plaintiffs in *Aaron v. Cooper*, 143 F. Supp. 855 (E.D. Ark. 1956), filed suit against LRSD to force it to desegregate pursuant to the Court's holding in *Brown I*. In 1964, the plaintiffs filed *Clark v. Board of Educ. of LRSD* as a continuation of the desegregation action

-10-

AO 72A

## II.  The Long History Of Desegregation Litigation In Pulaski County

### A.    1956 Through 1973

In *LRSD v. PCSSD,* 584 F. Supp. 328, 331-32 (E.D. Ark. 1984), the late and distinguished United States District Judge Henry Woods, the first judge to preside over this case, chronicled in great detail the history of desegregation in Pulaski County.  In his scholarly decision, Judge Woods described:  the operation of LRSD in 1930, when it was a *de jure* segregated school district operating under the "separate but equal" doctrine;[19] the Court's decision in *Brown I,* which overturned *Plessy v. Ferguson*; the court-ordered implementation of a plan to admit a small number of African-American students to Little Rock Central High School in September of 1957;[20] Governor Faubus' use of Arkansas National Guard troops at Central to place it "off limits" to African-American students and the subsequent removal of those troops after the issuance of an injunction by United States District Judge Ronald Davies in *Aaron v. Cooper,* 156 F. Supp. 220

---

commenced against LRSD in *Aaron v. Cooper.  See* Judge William Overton's July 9, 1982 Memorandum and Order in *Clark,* a copy of which, marked Exhibit 1, is attached to LRSD's Memorandum Brief in Support of Motion for an Immediate Declaration of Unitary Status (docket no. 3581).  On November 30, 1982, LRSD initiated this action against the PCSSD, NLRSD, and the Arkansas Board of Education seeking the consolidation of all three school districts in Pulaski County as the appropriate interdistrict desegregation remedy.  Thus, LRSD has been involved continually in federal desegregation litigation for forty-six years.

[19]*Plessy v. Ferguson,* 163 U.S. 537 (1896), *overruled by Brown I,* 347 U.S. 483 (1954).

[20]*See Aaron v. Cooper,* 143 F. Supp. 855 (E.D. Ark. 1956).  As discussed *supra* at note 18, *Aaron* was filed in 1956 to force LRSD to desegregate pursuant to the Court's holding in *Brown.*  United States District Judge John E. Miller entered a decree on August 27, 1956, approving LRSD's plan of gradual school integration beginning with senior high school classes in the fall term of 1957.  The Eighth Circuit subsequently affirmed that decision.  *Aaron v. Cooper,* 243 F.2d 361 (8th Cir. 1957).

-11-

(E.D. Ark. 1957);[21] the nine courageous African-American students entering Central on September 23, 1957, in the face of a large, threatening mob of whites; and, finally, President Eisenhower dispatching troops to Central to ensure the safety of the African-American students and to enforce Judge Davies' desegregation order.[22]

Judge Woods also traced desegregation plans advanced by LRSD in "the decade of 1960 in a good faith effort to provide a solution to continuous litigation" and the failure of those plans in "the hysterical political atmosphere of that period." *LRSD*, 584 F. Supp. at 334. In 1966, the Eighth Circuit approved LRSD's "freedom of choice" desegregation plan, which remained in effect through the 1968-69 school year. *Clark v. Board of Education of LRSD*, 369 F.2d 661 (8th Cir. 1966). Significantly, in its decision, the Court noted LRSD's good faith commitment to desegregation:

> Many of the problems encountered are not of the Board's making or choosing and, we believe, the Board has evidenced a genuine desire to follow the commands of the *Brown* case to ultimately place into effect a non-racially operated school system.

---

[21]In 1957, the Eighth Circuit assigned Judge Davies, of Fargo, North Dakota, to preside over *Aaron*. On September 21, 1957, Judge Davies issued an injunction ordering Governor Faubus, the Adjutant General of the State of Arkansas, and Lieutenant Colonel Marion E. Johnson of the Arkansas National Guard, and their officers, agents, and employees to cease and desist "obstructing or preventing, by means of the Arkansas National Guard, or otherwise, Negro students, eligible under said plan of school integration to attend the Little Rock Central High School, from attending said school . . . ." *Aaron v. Cooper*, 156 F. Supp. at 222. *See also Cooper v. Aaron*, 358 U.S. 1, 9-10 (1958).

[22]Scenes of angry mobs of white protesters confronting the nine African-American students as they entered Central and, later, troops of the 101st Airborne Division rolling across the Broadway Bridge to restore order in Little Rock are still deeply etched in the minds of many Arkansans.

-12-

AO 72A

*Id.* at 666.[23]

In *Green v. County School Board of New Kent County*, 391 U.S. 430, 439-40 (1968), the Court held that school districts such as LRSD, which were the product of *de jure* segregation, could not satisfy their constitutional obligations under "freedom of choice" plans. Therefore, LRSD formulated a new desegregation plan for the 1969-70 school year that was based on geographic attendance zones. However, because segregated housing patterns created a number of racially identifiable schools under the plan, the Eighth Circuit found it to be unconstitutional. *Clark v. Board of Education of LRSD*, 426 F.2d 1035, 1043 (8th Cir. 1970).

In the 1971-72 school year, LRSD began crosstown busing to achieve racial balance in grades 6 through 12. *Clark v. Board of Directors of LRSD*, 328 F. Supp. 1205, 1209, 1214 (E.D. Ark. 1971, *rev'd in part*, 449 F.2d 493 (8th Cir. 1971). The following school year, crosstown busing was used to achieve racial balance in grades 4 and 5. *Clark v. Board of Education of LRSD*, 465 F.2d 1044, 1046 (8th Cir. 1972). Finally, during the 1972-73 school year, all LRSD schools and all LRSD grade levels were racially balanced.

## B.    Events Leading To Initiation Of This Action

On July 9, 1982, United States District Judge William R. Overton entered a Memorandum and Order in *Clark* which contained many of the findings that underpinned LRSD's subsequent

---

[23]Likewise, in *Cooper*, 358 U.S. at 9, the Supreme Court acknowledged that LRSD was prepared to implement the plan, approved by Judge Miller in *Aaron*, 156 F. Supp. 220, to gradually integrate senior high school classes in the fall term of 1957. However, LRSD was prevented from following that plan by the flagrantly unlawful actions of Governor Faubus, which the Supreme Court noted "had not been requested by the school authorities, and [were] entirely unheralded." *Cooper*, 358 U.S. at 9.

-13-

AO 72A

decision to file this action.[24]   In many respects, Judge Overton's decision was a ringing endorsement of LRSD for successfully implementing its school desegregation plan over the last nine years.   For example, Judge Overton explicitly found: (1) "no evidence of vestiges of discrimination in the district policies or practices"; (2) "the district has done an admirable job in the task of desegregation"; and (3) *the Little Rock School District has operated in compliance with court decrees for nine years as a completely unitary desegregated school system and isolated complaints of discrimination without persuasive specific evidence to the contrary do not detract from that record.*"   July 9, 1982 Memorandum and Order at 16 (docket no. 3581) (emphasis added).[25]

Although Judge Overton found that LRSD was operating "as a completely unitary desegregated school system," he made a number of findings that raised serious questions about the future prospects for LRSD remaining an integrated school district.   For example, Judge Overton found that: (1) in the years after the desegregation of LRSD elementary schools in 1973-74, "there has been a steady trend of increasing black enrollment and decreasing white enrollment

---

[24]As indicated previously, a copy of Judge Overton's July 9, 1982 Memorandum and Order is attached as Exhibit 1 to LRSD's Memorandum Brief in Support of Motion for an Immediate Declaration of Unitary Status (docket no. 3581).

[25]Eleven years later, Judge Wright, in describing the operation of LRSD in the years *before* it filed this action, observed that many believed desegregation litigation in the LRSD "[had] been brought to a successful conclusion and the Little Rock school system seemed to have entered a period of relative tranquility and complete self-management." *See* Judge Wright's Statement to LRSD Board of Directors and Counsel on March 19, 1993, attached as Exhibit 1 to Joshua's August 1, 1996 Memorandum in Opposition to LRSD's Motion to End Federal Court Jurisdiction (docket no. 2730).

-14-

AO 72A

in the elementary schools . . . and [to a lesser extent] in the upper grades";[26] (2) despite LRSD's efforts to modify student assignment plans to correct the growing disparity in the black-white student ratio in elementary schools, "[a]ll of the persuasive evidence indicates the school district will have enrollment which is essentially all black, particularly in the elementary grades, within the next few years"; and (3) by the fall of 1981, LRSD faced a host of problems surrounding the school attendance plan, including a "significant disparity in the black-white ratio at the various elementary schools," complaints of black parents "that their children were being bused across the city to attend all black classes," and the defeat of "the last two millage increase proposals . . . by the electorate . . . [creating] severe financial problems and an eroding financial base." July 9, 1982 Memorandum and Order at 1-6, attached as Exhibit 1 to LRSD's Memorandum Brief in Support of Motion for an Immediate Declaration of Unitary Status (docket no. 3581).

In an effort to retain and supplement the shrinking pool of white students, Judge Overton approved the Partial K-6 Plan,[27] which created twelve K-6 neighborhood schools and retained fourteen paired schools with grades K-3 at one site and grades 4-6 at another. Eight of the twelve neighborhood schools were racially balanced, and four were virtually all black. Under the plan,

---

[26]In the fall of 1971, 42% of the students in LRSD were black. In each year from 1971 through 1981, the number of black students increased, while the number of white students decreased. In the fall of 1981, 76% of elementary students and 55% of high school students were black. *See LRSD*, 584 F. Supp. at 335. In the December 16, 1981 Report prepared by the Desegregation Assistance Team from Stephen F. Austin University, the authors concluded that, if existing trends continued, 90% of the students entering the first grade in LRSD in the fall of 1989 would be black. *See* Stephen F. Austin Report at 19, attached as Exhibit 2 to LRSD's Memorandum Brief in Support of Motion for an Immediate Declaration of Unitary Status (docket no. 3581).

[27]This was a shorthand reference for LRSD's desegregation plan for children attending kindergarten through the sixth grade.

-15-

Booker Junior High School became an intermediate school; a magnet school was to be created west of University Avenue; and a committee was appointed to ensure that the four virtually all black schools would be treated equally. *See* July 9, 1982 Memorandum and Order at 6-11.[28]

Finally, Judge Overton noted that LRSD had taken a number of steps to address the problems that confronted it. First, LRSD had commissioned a study and report by a "Desegregation Assistance Team" at Stephen F. Austin University on its desegregation efforts and the challenges it faced in the future.[29] Second, LRSD had begun investigating "the possibility of seeking an interdistrict remedy through legal proceedings against the adjacent County School District and [had] hired a law firm to pursue that remedy." *See* July 9, 1982 Memorandum and Order at 6.

## C.    Interdistrict Litigation And Interdistrict Relief

On November 30, 1982, LRSD filed this action--a new case[30]--against PCSSD, NLRSD, the State of Arkansas, and the Arkansas Department of Education ("ADE") seeking consolidation of the three Pulaski County School Districts as the most appropriate and effective desegregation remedy for all three school districts. In its Complaint (docket no. 10), LRSD alleged that PCSSD

---

[28]Judge Overton's July 9 decision approved LRSD's Partial K-6 plan as a "stop gap" student assignment plan for elementary grades. The Eighth Circuit later affirmed that decision in *Clark v. Board of Educ. of LRSD*, 705 F.2d 265 (8th Cir. 1983).

[29]As indicated, *supra* at note 26, this report, entitled "Building on a Generation of Accomplishment Maintaining and Strengthening Desegregation in Little Rock" (hereinafter referred to as the "Austin Report"), is attached as Exhibit 2 to LRSD's Memorandum Brief in Support of Motion for an Immediate Declaration of Unitary Status (docket no. 3581).

[30]Because this action involved claims for relief and remedies that were different from those involved in *Clark*, it was considered to be a new case and was randomly assigned to the Honorable Henry Woods.

-16-

and NLRSD engaged in "a series of intradistrict constitutional violations with interdistrict effects" and that the State of Arkansas and Arkansas Department of Education (hereinafter referred to collectively as the "State/ADE"), through funding and other state action, "operated, maintained and/or condoned a racially segregated structure of public education under color of state law."

After conducting a trial on the merits of the claims asserted in LRSD's Complaint, Judge Woods entered a Memorandum Opinion setting forth detailed findings of fact and conclusions of law to support his determination that each of the three Defendants had violated the Constitution by creating "racial isolation between and among the districts" that had caused six specific "interdistrict effects." *LRSD*, 584 F. Supp. at 349-51.[31] Judge Woods noted that, at a later date, he would conduct a hearing to take evidence regarding the precise nature of the remedy that should be fashioned to cure the interdistrict effects of "substantial interdistrict segregation." *Id.* at 352-53.

During the subsequent remedial hearings, PCSSD advanced a plan that retained the three autonomous school districts and relied on the development of specialty or magnet schools to attract students from one district to another. *LRSD v. PCSSD*, 597 F. Supp. 1220, 1222-23 (E.D. Ark. 1984). NLRSD advanced a plan that retained the three autonomous school districts, transferred certain geographic areas from PCSSD to LRSD and from LRSD to PCSSD, and depended heavily on the use of majority to minority transfers ("M to M transfers") to achieve racial balance. *Id.* at 1223. Although not advancing a specific plan, Joshua used testimony from

---

[31]Judge Woods made 105 specific findings of fact and drew 14 conclusions of law to support his determination of the issue of liability. On appeal, the Eighth Circuit affirmed *all* of those findings of fact and conclusions of law. *LRSD v. PCSSD*, 778 F.2d 404, 429-34 (8th Cir. 1985).

-17-

AO 72A

two expert witnesses to suggest three options: (1) altering boundary lines in accordance with the NLRSD plan; (2) altering boundary lines to transfer other geographic areas among all three districts; or (3) transferring certain geographic areas to LRSD and having all of the remaining area of PCSSD consolidated with NLRSD. *Id.* at 1223-24. LRSD advanced a plan that involved the county-wide consolidation of all three school districts. *Id.* at 1224-25.

After considering all of the evidence, Judge Woods concluded that "a countywide interdistrict remedy must be utilized to correct the countywide interdistrict violation found to exist and that this is the only manner of placing the victims of this discrimination in the position they would have occupied absent the discrimination." *Id.* at 1225.[32] Judge Woods also concluded that the State/ADE: (a) failed to discharge its affirmative duty to encourage desegregation, which had an interdistrict effect on LRSD, PCSSD, and NLRSD; and (b) had "remedial responsibilities with respect to this case." Judge Woods noted that the "precise nature of [the State/ADE's] financial and oversight responsibilities must await further refinement of the consolidation plan and development of a budget for such consolidated district." *Id.* at 1228.

PCSSD, NLRSD, and the State/ADE appealed Judge Woods' decisions in *LRSD*, 584 F. Supp. 328, and *LRSD*, 597 F. Supp. 1220. The Eighth Circuit, sitting *en banc*, affirmed Judge Woods' finding on liability for interdistrict constitutional violations by PCSSD, NLRSD, and the State/ADE, but reversed his remedy of consolidation[33] on the ground that, while the interdistrict violations of the Constitution called for an interdistrict remedy, consolidation of the three school

---

[32]Thus, the cat had been belled--for the time being.

[33]The cat was not long belled.

-18-

AO 72A

districts was *not* required. *LRSD v. PCSSD*, 778 F.2d 404, 429-34 (8th Cir. 1985).[34]

Rather than remanding the case to the district court for further findings and a detailed remedial decree, the Court spelled out its own interdistrict remedy.[35] *Id.* at 434-36. Although this interdistrict remedy allowed LRSD, NLRSD, and PCSSD to remain autonomous, it called for, among other things: changing boundaries between PCSSD and LRSD; revising attendance zones so that each school would reasonably reflect the racial composition of its district within a permitted variance of plus or minus 25% of the minority race; encouraging intradistrict and interdistrict M to M transfers; and creating a limited number of magnet or specialty schools. *Id.* at 435-36. The principles of the interdistrict remedy outlined in the majority opinion later became the basis for the desegregation plans that were implemented in each of the three Pulaski County school districts.

LRSD proceeded to develop a "controlled choice" desegregation plan, which was approved by Judge Woods on February 27, 1987 (docket no. 739). Under this plan, LRSD was divided into two attendance zones of approximately equal racial balance. Students were assigned to schools so that each grade at each school reflected the racial balance within that attendance

---

[34]Judge Woods later wrote an article in the *Arkansas Law Review* critiquing the Eighth Circuit's decision. Judge Henry Woods and Beth Deere, *Reflections on the Little Rock School Case*, 44 Ark. L. Rev. 971 (1991).

[35]In a separate opinion, Judge Richard S. Arnold made the following observation about the remedy fashioned by the majority:
> The District Court (though we are today disagreeing with some of its conclusions) is presided over by a scholarly and distinguished judge. That court, not this one, is in the best position to write a decree. Instead, a decree today springs full-grown from the brow of this Court, a decree that will, I dare say, startle all the parties to this case, including even those (if there are any) who like what they see.

*LRSD*, 778 F.2d at 437 (Arnold, J., concurring in part and dissenting in part).

zone. After a student was assigned to a school, the student's parents could request reassignment to another school within their attendance zone. That request would be granted so long as each school would remain within a range of plus or minus 12.5% of the black student population at the school. The plan also provided for eight magnet schools (four elementary, two junior high, and two high schools), with seats reserved for students of each of the three Pulaski County school districts. The target racial composition of the magnet schools was 50%-50%. Finally, the plan established a Magnet Review Committee, with representatives of each of the three districts, along with a non-voting member representing Joshua and the Knight Intervenors.[36] The controlled choice plan was implemented beginning with the 1987-88 school year (docket no. 670).

While the controlled choice plan was intended to create racial balance, it resulted in many central and east Little Rock schools having fewer than fifty white students. For that reason and others, Judge Woods later found the plan to be "ill-conceived." *LRSD v. PCSSD*, 716 F. Supp. 1162, 1188 (E.D. Ark. 1989), *rev'd.*, 921 F.2d 1371 (1990). LRSD submitted a new desegregation plan for the 1988-89 school year, which all parties agreed would be a "stabilizing year" to allow LRSD to carefully plan for the 1989-90 school year and beyond. *Id.* With that understanding, Judge Woods approved LRSD's proposed desegregation plan for the 1988-89 school year. *Id.*

**D.    The 1990 Settlement Agreement And Settlement Plans**

After long and difficult negotiations that began in 1988, LRSD, PCSSD, NLRSD, Joshua, and the State/ADE agreed to a global settlement of all aspects of this case. In the spring of 1989,

---

[36]The Knight Intervenors are members of the LRSD Classroom Teachers Association.

-20-

AO 72A

the parties submitted the following final settlement documents[37] to Judge Woods: (a) The Pulaski County School Desegregation Case Settlement Agreement,[38] which, among other things, fixed the State/ADE's total financial liability to the three school districts to be an amount "not to exceed $129,750,000";[39] and (b) separate comprehensive "Settlement Plans" for LRSD, NLRSD, and PCSSD and a comprehensive "Interdistrict Settlement Plan."[40] Judge Woods rejected each of the four separate Settlement Plans[41] and the 1990 Settlement Agreement,[42] as submitted;

---

[37]See footnote 3, *supra*, for an explanation of the terminology I will use in referring to these settlement documents.

[38]A copy of the 1990 Settlement Agreement is attached to LRSD's and Joshua's "Joint Motion" seeking approval of that agreement (docket no. 1174).

[39]The 1990 Settlement Agreement contained detailed provisions governing the State/ADE's role in funding and implementing the separate LRSD, NLRSD, PCSSD, and Interdistrict Settlement Plans. Among other things, the State agreed to pay the three school districts a total of not more than $129,750,000. All of the parties agreed to release all claims against each other and to dismiss this case, with prejudice, as to each party.

[40]As indicated previously, these four Settlement Plans contained the detailed desegregation obligations that LRSD, PCSSD, and NLRSD contractually agreed to implement under the district court's supervision. *See* footnote 3, *supra*.

[41]Judge Woods refused to approve the Settlement Plans because he believed they were "facially unconstitutional" and outside the mandate of the Eighth Circuit:
> In LRSD's proposed plan almost one-fourth of the elementary schools are contemplated to be all black. The entire mandatory busing burden at the elementary level for desegregation purposes falls on black children. . . . All of the historically "black" schools lie east of University Avenue, and all are proposed to be all-black incentive schools.
> Double funding is promised for the all-black schools. Yet it is impossible to determine from the submissions how the funds will be spent.

*LRSD*, 716 F. Supp. at 1169.

[42]Judge Woods refused to approve the 1990 Settlement Agreement because it was "contingent upon legislative approval and a legislative appropriation to fund it. I cannot in good conscience accept this bill as having passed." *LRSD*, 716 F. Supp. at 1164.

-21-

ordered the parties to implement a more comprehensive plan known as the Tri-District Plan; appointed Eugene Reville to the position of Metropolitan Supervisor; and conferred upon Mr. Reville a wide array of powers over all three school districts that, in many respects, closely resembled consolidation--the remedy the Eighth Circuit had previously rejected. *LRSD*, 716 F. Supp. at 1164-69.

Shortly after Judge Woods entered his decision, the Arkansas Legislature passed a bill funding the over $100,000,000 that the State/ADE was obligated to pay to the three school districts under the 1990 Settlement Agreement. Based on this new development, the parties resubmitted the Settlement Agreement to Judge Woods for approval. On December 11, 1989, Judge Woods entered an Order which added certain new conditions to the Settlement Agreement; approved it, as modified; and directed the parties to carry out its terms. *LRSD v. PCSSD*, 726 F. Supp. 1544, 1549-51 (E.D. Ark. 1989). Judge Woods' December 11 Order also specifically disapproved that portion of the Settlement Agreement which called for LRSD to pay $2,000,000 of the $3,150,000 in attorneys' fees that the parties had agreed to pay to Joshua's counsel. *Id.* at 1554-56.[43]

Each of the school districts and Joshua appealed the district court's decisions to the Eighth Circuit, which reversed and remanded the case with instructions to approve the 1990 Settlement Agreement and the four Settlement Plans, as submitted by the parties. *LRSD*, 921 F.2d 1371. In reaching that decision, the Court made a number of important rulings that have had a profound

---

[43]Under the terms of the 1990 Settlement Agreement, Joshua's counsel was to be paid attorneys' fees of $3,150,000, which the parties agreed should be allocated as follows: LRSD: $2,000,000; the State/ADE: $750,000; PCSSD: $300,000; and NLRSD: $100,000. *LRSD*, 921 F.2d at 1390.

-22-

influence on future developments in the case.

First, the Court noted that the appeal arose from settlements agreed to by all the parties (a "most important fact") and that "[t]he law strongly favors settlements" which should be "hospitably" received:

> This may be especially true in the present context--a protracted, highly divisive, even bitter litigation, any lasting solution to which necessarily depends on the good faith and cooperation of all the parties, especially the defendants.

*Id.* at 1383. As further support for that conclusion, the Court made the following observation:

> This is, after all, no ordinary litigation. The NAACP Legal Defense and Educational Fund, its lawyers and its predecessors, have vigorously prosecuted this case and its ancestors for more than 30 years. Absent an extremely good reason--and we have been given none--we are reluctant to disregard their judgment as to what is best for their own clients.

*Id.* at 1386.

Second, the Court explicitly recognized the important role of future monitoring in the case and the need for it to continue "*for a long time*": "In the present case, for example, any remedy will necessarily require some judicial supervision--monitoring, at least--for a long time." *Id.* at 1383 (emphasis added). The Court also emphasized the importance of the district court ensuring that "the settlement plans [are] scrupulously adhered to," that monitoring is done effectively, and that appropriate action is taken if the parties do not live up to their commitments." *Id.* at 1386.

Third, the Court recognized that "a necessary condition of our holding that the plans are not facially unconstitutional is that the parties' compliance with them will be carefully monitored." *Id.* at 1388. Therefore, the Court directed the creation of the ODM "to be headed by a Monitor appointed by the District Court, with such additional personnel as the District Court shall deem appropriate." *Id.*

-23-

AO 72A

Finally, the Court reversed Judge Woods' decision on attorneys' fees and awarded counsel for Joshua $3,150,000, the full amount of attorneys' fees provided for under the Settlement Agreement. These attorneys' fees were allocated and payable among the parties as follows: LRSD ($2,000,000);[44] State/ADE ($750,000); PCSSD ($300,000); and NLRSD ($100,000). *Id.* at 1390.

In an Order entered July 6, 1990, Judge Woods concluded that, because he was "unable to successfully implement a plan to bring equity to the children of this county under the restrictions imposed by the Court of Appeals," the time had come "for another judge to assume the burden of this litigation since it is my unalterable decision to recuse." *LRSD v. PCSSD*, 740 F. Supp. 632, 636 (E.D. Ark. 1990). Later that day, the case was reassigned, by random selection, to the Honorable Susan Webber Wright (docket no. 1373).

**E.    LRSD's Implementation Of Its Desegregation Obligations Between 1991 And 1995**

Section IV of the Settlement Agreement explicitly provided that the State/ADE "conditions this settlement upon its dismissal from this Litigation with prejudice in accordance with the terms of Attachment A." Attachment A was a "Release of All Claims Against the State," pursuant to which all parties to this litigation released all claims they might have against the State/ADE relating "to racial discrimination or segregation in public education in the three school districts in Pulaski County, Arkansas or to the violation of constitutional or other rights of school children based on race or color in the three school districts in Pulaski County, Arkansas." Attachments B, C, and D were *identical releases* that ran in favor of  LRSD, PCSSD, and

---

[44]The State/ADE agreed to advance LRSD's share of these attorneys' fees, which were to be deducted from payments the State/ADE owed LRSD under Section VI of the Settlement Agreement. *LRSD*, 921 F.2d at 1390.

-24-

NLRSD. Finally, Attachments A, B, C, and D each contained the same language providing that this action (LR-C-82-866) "is to be dismissed with prejudice" as to the State/ADE, LRSD, PCSSD, and NLRSD. *Thus, the Settlement Agreement expressly provided for the dismissal of this case, with prejudice, "except that the Court may retain jurisdiction to address issues regarding implementation of the Plans."* Attachments A, B, C, and D to the Settlement Agreement (docket no. 1174) (emphasis added).

On the date the Eighth Circuit entered its decision approving the 1990 Settlement Agreement and Settlement Plans, only the State/ADE had moved to be dismissed, with prejudice, as a party to this action.[45] Thus, one of Judge Wright's first rulings in this case was a January 18, 1991 Order that: (1) dismissed the State/ADE as a party to this action "pursuant to the terms of the parties' settlement agreement"; and (2) converted the Office of Metropolitan Supervisor to the ODM, which she "vested with the authority to monitor the school districts' compliance with the settlement plans and settlement agreement, including any future modification of, or addition to, such plans and agreements" (docket no. 1418). Ann Marshall, Arma Hart, Polly Ramer, and Linda Bryant, all of whom previously worked for Mr. Reville in the Office of Metropolitan Supervisor, were allowed to "continue in their present positions subject to the later approval of

---

[45]In its December 12, 1990 decision approving the 1990 Settlement Agreement and four separate Settlement Plans, the Eighth Circuit directed the district court to "enter a fresh order dismissing the State as a party pursuant to the terms of the parties' settlement agreement." *LRSD*, 921 F.2d at 1394. Under the explicit language of the Settlement Agreement, LRSD, PCSSD, and NLRSD were each entitled to the entry of a similar order dismissing them, with prejudice, as parties to this action. For reasons that are not apparent from a review of the record, LRSD waited until November 30, 1995, to move for an order dismissing this case with prejudice (docket no. 2573). *See* discussion *infra* at pp. 31-32. On January 26, 1998, Judge Wright entered an Order (docket no. 3109) pursuant to which LRSD was dismissed, with prejudice, as a party to this action and the case was administratively terminated (docket no. 3110).

-25-

the court-appointed monitor."

In a Memorandum Opinion entered February 28, 1991 (docket no. 1442), the district court made it clear that, even though the State had now been dismissed as a party, it remained obligated to comply with its settlement obligations, which "when understood in conjunction with the language in both the Eighth Circuit's order of December 12, 1990, and this Court's order of January 18, 1991, also obligate the State to continue funding the ODM" by making the annual contribution of $200,000 required in Judge Woods' June 27, 1989 Order.[46] Likewise, LRSD, NLRSD, and PCSSD were required to continue their annual funding of the ODM on a per pupil pro-rated basis. On April 5, 1991, Judge Wright entered a Memorandum and Order (docket no. 1459) that appointed Ms. Ann Marshall Desegregation Monitor, at an annual salary of $98,000.[47]

---

[46]In an Order entered August 18, 1993 (docket no. 1947), Judge Wright emphasized that, while the State/ADE was no longer a formal party in this action, "it is the law of the case that the Court retains jurisdiction to ensure that the parties, including the State, comply with the terms of the settlement agreement as well as the settlement plans." In an Order entered December 10, 1993 (docket no. 2045), Judge Wright held that the State agreed not only to the obligations contained in the 1990 Settlement Agreement, but also to the obligations contained in the May 31, 1989 letter from its counsel, H. William Allen, which is referred to in Section III of the 1990 Settlement Agreement as the "Arkansas Department of Education monitoring plan." In their pleadings, the parties often refer to this latter document as "the Allen letter."

[47]The first budget Judge Woods approved for the Office of Metropolitan Supervisor was for fiscal year July 1, 1989, to June 30, 1990. That budget totaled $353,710.24 and included Mr. Reville's salary of $98,500, plus the salary and overhead for four other employees (docket no. 1246). Over the next ten years, the budget for the ODM more than doubled to reach $784,188 for fiscal year 2000-01. The staffing of the ODM also more than doubled to reach ten employees.

As indicated previously, under the 1990 Settlement Agreement, the State/ADE was required to pay $200,000, annually, as its share of the cost of the ODM. The balance of the ODM budget was paid by LRSD, PCSSD, and NLRSD on a pro-rata basis that was calculated based upon the percentage of students in Pulaski County who attended each of the three school districts.

For example, the ODM's 2000-01 fiscal year budget of $784,188 was allocated among the parties as follows:

-26-

During the first few months of 1991, LRSD, PCSSD, NLRSD, and Joshua entered into negotiations that resulted in numerous modifications to the 1990 Settlement Plans. It was the parties' position that they were authorized to make those changes based upon language in the Eighth Circuit's December 12, 1990 decision providing that the parties were "free, by agreement, to modify the settlement plans . . . subject, of course, to the approval of the District Court." *LRSD*, 921 F.2d at 1393 n. 15. Subsequently, the parties submitted the modified Settlement Plans to the district court for approval.

On June 21, 1991, Judge Wright entered a Memorandum and Order rejecting all of the

---

$784,188
- 200,000 (State/ADE payment)
$584,188

| | | | |
|---|---|---|---|
| LRSD's share | (47.64% of total Pulaski County enrollment) | = | $278,307.16 |
| PCSSD's share | (35.36% of total Pulaski County enrollment) | = | 206,568.88 |
| NLRSD's share | (17.00% of total Pulaski County enrollment) | = | 99,311.96 |
| | | | $584,188.00 |

On September 28, 2001, Judge Wright entered an Order (docket no. 3522) approving the ODM's budget for the current fiscal year, which is $707,071. This budget included a 5% pay raise for all employees, which totaled $21,042. Ms. Marshall's salary increased from $111,131 to $116,688 (docket no. 3509).

Since the creation of the ODM, the district court has approved the following budgets:

1.      1989-90 $353,710.24 (docket no. 1246)
2.      1990-91 $293,833.74 (docket nos. 1391 & 1405)
3.      1991-92 $591,557.52 (docket no. 1497)
4.      1992-93 $578,060.81 (docket nos. 1822 & 1836)
5.      1993-94 $646,617.00 (docket nos. 2055 & 2155)
6.      1994-95 $661,768.00 (docket nos. 2359 & 2380)
7.      1995-96 $631,273.00 (docket nos. 2567 & 2599)
8.      1996-97 $730,756.00 (docket nos. 2852 & 3001)
9.      1997-98 $730,716.00 (docket nos. 3158 & 3167)
10.     1998-99 $751,639.00 (docket nos. 3158 & 3167)
11.     1999-00 $764,872.00 (docket nos. 3361 & 3364)
12.     2000-01 $784,188.00 (docket nos. 3361 & 3364)
13.     2001-02 $707,071.00 (docket nos. 3509 & 3522)

Thus, in the twelve years since its creation, the ODM has requested that LRSD, PCSSD, NLRSD, and the State/ADE pay for budgets totaling $7,932,228.57. As the largest of the three school districts, LRSD has been required to pay approximately 35% of the total cost of the ODM.

-27-

AO 72A

"legion of proposed modifications" to the Settlement Plans on the ground that they fell "outside the narrow realm of modifications and adjustments deemed permissible by the Eighth Circuit [in its December 12, 1990 decision]." *LRSD*, 769 F. Supp. at 1483, 1489.[48]

On July 15, 1991, the district court entered a lengthy Memorandum and Order denying the parties' motion to reconsider its rejection of their proposed modifications to the 1990 Settlement Plans. *LRSD*, 769 F. Supp. 1491. In doing so, Judge Wright made it clear that: (a) she disagreed with the parties' position that the Settlement Plans are "fluid, open to continual and considerable revision as long as the parties agree and the changes are not facially unconstitutional"; and (b) she viewed the Eighth Circuit's approval of the Settlement Plans as being "akin to establishing a benchmark . . . a sure guide for ending this dispute and getting the parties out of court." *Id.* at 1494. LRSD, NLRSD, PCSSD, and Joshua appealed on the ground that the district court's decisions "confined them within limits that are too narrow, and that all of their proposed changes, being constitutional, workable, and fair, should have been approved."

---

[48]Among the changes the parties sought to make in the four 1990 settlement plans were the following: (1) deleting from PCSSD's settlement plan major portions of the section on special education, especially concerning handicapped children; (2) eliminating provisions in PCSSD's settlement plan addressing issues related to black students being disciplined disproportionately; (3) removing several programs from PCSSD's settlement plan aimed at improving student achievement; (4) deleting from PCSSD's settlement plan the parties' agreement to abide by fourteen "guiding principles" which apply to the "process of permanent plan development"; (5) eliminating from LRSD's settlement plan science and social studies as core areas emphasized in remediation programs at the secondary level; (6) changing LRSD's settlement plan to limit the four-year-old program originally scheduled for all schools by 1993-94 to only eleven schools, with a promise that a "long-range implementation plan will be developed for additional four-year-old classes"; (7) changing LRSD's settlement plan to delay the development of parent home study guides and computer managed instructional technology for tracking student progress; (8) changing LRSD's settlement plan by eliminating staff positions for program specialist and specialist for alternative classrooms; and (9) changing the interdistrict plan to reduce from six to four the number of interdistrict schools planned for the future. *LRSD*, 769 F. Supp. at 1484-87.

-28-

*Appeal of LRSD*, 949 F.2d at 255.

In affirming in part and reversing in part, the Eighth Circuit noted that "[t]here is much in the District Court's opinions with which we agree," including the observation that the 1989 settlement "should indeed be a benchmark for the future path of this case." *Id.* However, the Court went on to hold that the district court was "too strict with itself" in not allowing the parties to modify details of those settlement plans that did not affect the three school districts' "major substantive commitments to desegregation":

> The desegregation obligations undertaken in the 1989 plan are solemn and binding commitments. The essence and core of that plan should not be disturbed.
>
> . . . If a question is truly one only of detail, not affecting the major substantive commitments to desegregation, the District Court has the authority to consider it.

*Id.* at 256.[49] Finally, to provide guidance to the district court, the Eighth Circuit set forth seven elements that form the "essence and core" of the Settlement Plans and from which there can be "*no retreat*":

> It may be helpful for us to state those elements of the 1989 plan that we consider crucial, and with respect to which no retreat should be approved. They are as follows: (1) double funding for students attending the incentive (virtually all-black) schools; (2) operation of the agreed number of magnet schools according to the agreed timetable; (3) operation of the agreed number of interdistrict schools according to the agreed timetable; (4) intradistrict desegregation of PCSSD according to the agreed timetable; (5) the agreed effort to eliminate achievement disparity between the races; (6) the agreed elements of early-childhood education, at least in the incentive schools; and (7) appropriate involvement of parents.

---

[49] As indicated *supra* at footnote 3, the district court and the parties generally have referred to the 1989 settlement documents as the 1990 Settlement Agreement and the 1990 Settlement Plans because the Eighth Circuit did not approve those settlement documents until December 12, 1990. Regardless of the year used to reference these documents, the Eighth Circuit and the district court are referring to the *same Settlement Agreement and Settlement Plans*.

-29-

*Id.* (emphasis added).

On May 1, 1992, Judge Wright entered an Order approving most of the proposed modifications to LRSD's 1990 Settlement Plan and the Interdistrict Settlement Plan, which the parties referred to as "LRSD's May 1992 Desegregation Plan" and the "May 1992 Interdistrict Desegregation Plan." Judge Wright attached copies of both of these Plans to her May 1, 1992 Order (docket no. 1587).

LRSD's implementation of its obligations under the 1992 Plans did not always go smoothly. For example, on March 19, 1993, Judge Wright delivered a strong statement to LRSD's School Board and attorneys explaining the importance of LRSD fully and completely implementing its desegregation obligations under the Settlement Plans:

> Since the time of victory by the Little Rock School District in this case, when the Court of Appeals granted almost every facet of relief requested by Little Rock, the Little Rock School District has shown a tendency to drag its feet and act as if it had lost, rather than won, the litigation which it instituted.

> The Little Rock School District and the other school districts are in court because the Little Rock School District won its case and won the relief it requested. Yet the major complainer, the chief whiner, the number one barrier to a legitimate declaration of a unitary desegregated school system is the victorious complaining party, the Little Rock School District. The biblical reference, in a different context, is to the effect that if you ask, you will receive. Well, you asked, you got it, and it is the basic job of this Court to see that you receive it in full measure.

> \*   \*   \*

> I have never seen, heard or read of a case in which the victors conducted themselves like the vanquished -- until now. If we have to have two full hearings a month, in which Board members are required to be present, then we will do so. We will do everything that is required to see that you take the medicine to achieve the cure that you asked the Federal Courts to give you.

Judge Wright's Statement to LRSD Board members and Counsel at 2-3 and 6, attached as

-30-

Exhibit 1 to docket no. 2730.[50]

Between 1991 and 1996, almost all of the district court's Orders involving LRSD related to the following issues: the approval of LRSD's annual budgets (docket nos. 1759, 1897, 1958, 2216, 2280, 2319, and 2709); LRSD's closing of certain elementary schools (docket nos. 1926 and 2351); and LRSD's designation and construction of the interdistrict and magnet schools called for under the Settlement Plans (docket nos. 1550, 1832, 1848, 1895, 2225, and 2329). During this period of time, the Eighth Circuit also entered several important decisions that: (1) extended school district millages under the 1990 Settlement Agreement, *LRSD v. PCSSD*, 971 F.2d 160 (8th Cir. 1992); (2) upheld the new zoning plan for electing school board members for LRSD and PCSSD, *LRSD v. PCSSD*, 56 F.3d 904 (8th Cir. 1995); and (3) clarified language in the 1990 Settlement Agreement regarding the State's funding obligations to LRSD, PCSSD, and NLRSD, *LRSD v. PCSSD*, 83 F.3d 1013 (8th Cir. 1996).

On November 30, 1995, LRSD filed a Motion for Order of Dismissal (docket no. 2573), requesting the district court to dismiss this case, with prejudice, pursuant to Attachment B to the 1990 Settlement Agreement.[51] Attachment B stated, in pertinent part:

> It is further understood and agreed that the litigation now pending in United States District Court for the Eastern District of Arkansas, Western Division, entitled *Little Rock School District v. Pulaski County Special School*

---

[50]In *People Who Care v. Rockford Board of Education*, 246 F.3d 1073, 1078 (7th Cir. 2001), Judge Posner observed that "state and local officials are under no duty to love the chains that federal judges, however justifiably, fasten upon them." In this case, it is more than a little ironic that LRSD has forged each link in the chains that have bound it for the last thirteen years.

[51]As indicated previously, Attachment B is a fully executed Release pursuant to which all parties agreed to release any and all claims they had against LRSD arising from or relating to this litigation.

-31-

*District No. 1, et al.*, No. LR-C-82-866 and cases consolidated therein and their predecessors (including, but not limited to, *Cooper v. Aaron*, *Norwood v. Tucker*, and *Clark v. Board of Education of Little Rock School District* (the "Litigation") is to be dismissed with prejudice as to the LRSD and the former and current members of its board named in the Litigation. This dismissal is final for all purposes except that the Court may retain jurisdiction to address issues regarding the implementation of the Plans.

Attachment B to the 1990 Settlement Agreement (docket no. 1174). In seeking that relief, LRSD

acknowledged that the dismissal would *not* affect the district court's jurisdiction to address issues

regarding the implementation of its desegregation obligations or to conduct proceedings to

enforce the terms of the Settlement Agreement or the terms of the Settlement Plans.

On March 11, 1996, the district court entered a Memorandum and Order (docket no. 2640)

denying LRSD's Motion for Order of Dismissal on the ground that:

> The LRSD has frequently exhibited indifference or outright recalcitrance towards its commitments and has been slow to implement many aspects of its agreements (although some improvements have been made). Therefore, the Court finds that an order of dismissal should be deferred in order to ensure compliance with the plans and the agreement. Even had the LRSD acted in good faith throughout the years, the logistics and complexity of this case are such that this Court's monitoring function would be impaired by entering an order of dismissal at this time.

LRSD appealed that decision to the Eighth Circuit.

On December 15, 1997, the Court reversed and remanded the case to the district court

with instructions to enter an order dismissing the case with prejudice, as provided for under the

terms of the 1990 Settlement Agreement. *LRSD v. PCSSD*, 131 F.3d 1255 (8th Cir. 1997). In

reaching this decision, the Court stated the following:

> Although we can well understand the frustration the district court has experienced over the years in carrying out our instructions, we conclude that the District's motion should have been granted. As we held in our 1992 decision, the terms of the settlement agreement became the law of the case. *See Little Rock*

-32-

AO 72A

*School District*, 971 F.2d at 165. As the agreement specifically provides, the district court is permitted (and indeed must, in order to comply with our instructions), to retain jurisdiction to address issues regarding the implementation of the desegregation plans. Moreover, the desegregation plaintiffs may bring proceedings to enforce the terms of the settlement agreement and the terms of the desegregation plans. In short, the entry of such an order would do nothing to relieve the three districts of their continuing obligation to honor their commitments as set forth in the settlement agreement and the plans.

*Id.* at 1257-58 (footnote omitted).

On January 26, 1998, the district court entered an Order (docket no. 3109) that dismissed *this case* and "cases consolidated herein, including, but not limited to, *Cooper v. Aaron, Norwood v. Tucker,* and *Clark v. Board of Education of LRSD*," *with prejudice*, as to LRSD and "its current and former board members named in this litigation." The district court also entered a Memo to the File (docket no. 3110) stating that, because the Plaintiff in this case was dismissed with prejudice, "the Clerk is instructed to administratively terminate this case," but to "keep the case files open and in their current location in the Clerk's office" so that the Court can continue to perform its ongoing duties regarding the supervision and implementation of the desegregation plans.

**F.      Joshua's Request For An Interim Award Of Attorneys' Fees For Performing Monitoring Activities After The 1990 Settlement**

On November 22, 1995, counsel for Joshua moved for an interim award of attorneys' fees and costs in the amount of $805,611.81 for monitoring work performed after the Eighth Circuit approved the settlement of this case on December 12, 1990 (docket no. 2565). Counsel for Joshua later reduced the amount of this request to $795,301.81 (docket no. 2791) and argued that it should be apportioned among the three Pulaski County school districts as follows: LRSD: 75% to 80%; NLRSD: 5% to 10%; and PCSSD: 15% to 20%--with the final percentages totaling

-33-

AO 72A

100% (docket no. 2792).

LRSD filed a Response and Supporting Memorandum of Law (docket nos. 2636 and 2637) challenging Joshua's right to be awarded *any* attorneys' fees or costs for post-settlement monitoring activities. LRSD argued that, as a part of the consideration for LRSD paying Joshua's counsel $2,000,000 in attorneys' fees in connection with the 1990 settlement, Joshua's counsel had specifically agreed, on the record, that they would *not* seek future fees from LRSD for monitoring activities during the life of the settlement plans. In support of its position, LRSD relied upon the following colloquy between counsel and the Eighth Circuit appellate panel during oral argument in *LRSD*, 921 F.2d 1371:

NORMAN CHACHKIN, ATTORNEY FOR JOSHUA INTERVENORS:

> I just want to make one other observation and Mr. Heller can confirm this. Although it is not written into the settlement agreement we are happy to confirm it here and to be bound by it. The agreement between Little Rock and Joshua was that the fee payment from the Little Rock School District would also cover out of the court monitoring activities by the attorneys for Joshua during the life of the settlement plans so long as it wasn't necessary to go back to court. *If the settlement plans go forward as Mr. Walker suggested, the parties are committed to a monitoring system and committed to working together to ease any implementation problems and avoid any difficulties. That's going to take attorney time. We have committed to Little Rock that we will not seek any fees from them for those activities unless it is necessary to go back to court for enforcement purposes and in that instance we'll simply be free to make an application if we think we're entitled to it.*

JUDGE RICHARD S. ARNOLD:

> Alright, thank you. Now, Mr. Heller, you are recognized.

-34-

CHRIS HELLER, ATTORNEY FOR LRSD:

*    *    *

I'd like to confirm what Mr. Chachkin said about the agreement. *Because of the responsibilities assigned to the Joshua Intervenors in our settlement plans, there is significant work for them to do over the next six or seven years, and our agreement on the fees did contemplate that there would [be] no further payment for that work.*

(Emphasis added.)

In a Memorandum Opinion and Order (docket no. 2821) filed on September 23, 1996, Judge Wright concluded that LRSD and Joshua contractually agreed that the $2,000,000 in attorneys' fees paid by LRSD in connection with the 1990 settlement also covered all monitoring activities performed by Joshua's counsel during the life of the Settlement Plans. Therefore, Judge Wright ruled that Joshua's counsel was not entitled to recover any attorneys' fees from LRSD for performing monitoring activities.

On October 3, 1996, Joshua's counsel filed a Motion for Reconsideration of Fee Petition (docket no. 2833) and supporting Memorandum of Law (docket no. 2834), in which he urged the district court to award attorneys' fees under the "bad faith" exception to the general rule that, absent a statute or enforceable contract, litigants must pay their own attorneys' fees. On March 24, 1997, Judge Wright entered an Order (docket no. 2959) denying Joshua's Motion for Reconsideration.

On April 22, 1997, counsel for Joshua filed a Notice of Appeal (docket no. 2966) of the district court's March 24, 1997 Order denying his request for interim attorneys' fees. I will return to discuss the final resolution of this issue later in this decision.

-35-

AO 72A

## G.   LRSD's First Attempt To End Federal Court Jurisdiction

On May 17, 1996, LRSD filed a Motion to End Federal Court Jurisdiction (docket no. 2665) and supporting Brief (docket no. 2666). In these pleadings, LRSD argued that: (1) it was only required to implement its desegregation obligations under its Settlement Plan and the Interdistrict Settlement Plan for six years; (2) it had implemented the Settlement Plan, beginning with the 1990-91 school year, and "the six year term of the Plans will expire at the end of the 1995-96 school year"; and (3) "LRSD has implemented in good faith many desegregation plans for more than three decades. LRSD was a substantially unitary school district in 1982, but it nevertheless filed this interdistrict litigation in a good faith effort to maintain a biracial public school system in Little Rock. A recent and exhaustive audit of LRSD's desegregation obligations shows that LRSD is in substantial compliance with the Plans." Docket no. 2665.

On August 1, 1996, Joshua filed a Memorandum Opposing LRSD's Motion to End Federal Court Jurisdiction (docket no. 2730) in which they challenged LRSD's contention that the 1990 Settlement Plans called for a six-year implementation period. In support of their position, Joshua pointed out that no provision in any of the settlement documents limited LRSD's implementation of its desegregation obligations to six years. Joshua also argued that LRSD had failed to discharge its burden of establishing "the requisite implementation of the court-approved settlement."

On September 23, 1996, Judge Wright entered a Memorandum and Order (docket no. 2821) denying LRSD's Motion to End Federal Court Jurisdiction on the grounds that: (1) the 1990 Settlement Agreement and Settlement Plans do not contain any provision that allowed LRSD to terminate "its duty to comply with the settlement plans after . . . six years;" and (2)

-36-

LRSD failed to provide sufficient evidence that it had "substantially complied" with its obligations under the Settlement Plans. The district court went on to urge LRSD and Joshua to modify "the parts of the plan that are ineffective or unworkable" so that LRSD could better position itself to argue that it is entitled to unitary status and relief from court supervision:

> Instead of presenting substantial evidence of its compliance with its goals as set forth in the plan, the LRSD submits arguments that it has achieved unitary status because data from the LRSD compares favorably with data from districts which have been declared unitary. The Court would be inclined to agree with the LRSD with respect to many of these arguments if the LRSD were not contractually bound by the plan which it voluntarily adopted.
>
> The Court has encouraged the parties to consider modifying those parts of the plan that are ineffective or unworkable. The Court has provided the parties with the testimony of experts to assist in the modification process. Instead, the LRSD has used the testimony of these experts to ask the Court to end Court jurisdiction without first proceeding with plan modifications. The Court cannot so easily relieve the district of its contractual obligations.
>
> **Once again the Court invites the parties to follow procedures to modify the parts of the plan that are ineffective or unworkable.**

Docket no. 2821 at 12 (emphasis in original).

On December 6, 1996, LRSD filed a Motion for Approval of Plan Development Period (docket no. 2878) that requested Judge Wright: (1) to allow a six to nine month period for LRSD to concentrate its efforts to develop plan modifications to improve education and desegregation within the district; (2) to allow LRSD to use the ODM as a consultant to participate in the development of plan modifications in areas such as budget development, staff development, student assignments, and resolution of discipline issues; and (3) to withhold any further monitoring of the LRSD desegregation plan during this six to nine month period. In support of its Motion, LRSD noted that the Knight Intervenors, PCSSD, and NLRSD supported its request.

-37-

AO 72A

On December 18, 1996, Joshua filed a Response (docket no. 2891) that did not oppose LRSD's request for an interval of time to develop a new desegregation plan, but expressed reservations about ODM, "as an arm of the court," participating in the negotiations between the parties. Joshua also urged Judge Wright to appoint additional monitors to work on a matter of particular concern to them--the alleged "ill-treatment of class members."

On December 27, 1996, Judge Wright entered an Order (docket no. 2901) granting LRSD's Motion. In this Order, Judge Wright held that: (1) LRSD "will benefit from a temporary hiatus from monitoring and from the expertise of the ODM, in order to develop proposed modifications to the LRSD desegregation plan"; and (2) ODM can advise LRSD and other parties during the negotiations for plan modifications and ODM can "participate in negotiations as a facilitator," but "ODM cannot be a negotiator for any party." Judge Wright also denied Joshua's request to hire "additional monitors to handle complaints about mistreatment of class members." December 27, 1996 Order at 3 (docket no. 2901).

## H.    The Perplexing Final Resolution Of Joshua's Request For Still More Attorneys' Fees From LRSD

On September 26, 1997, LRSD filed a Motion for Approval of Revised Desegregation and Education Plan (docket no. 3049) and a supporting Memorandum Brief (docket no. 3050). After Joshua objected to a number of provisions in the proposed revised plan, LRSD and Joshua engaged in extensive negotiations to develop a revised plan which *both parties* could support.

As part of these negotiations, LRSD and Joshua took up the still unresolved issue of Joshua's request for $795,301 in attorneys' fees for performing post-settlement monitoring

-38-

AO 72A

activities, which was pending on appeal to the Eighth Circuit.[52] On January 21, 1998, LRSD and

Joshua filed a Joint Motion for Approval of LRSD's Revised Desegregation and Education Plan

(docket no. 3107) in which they *admitted* that ongoing negotiations were taking place on the

attorneys' fees issue: "Joshua has agreed that they will request that the Court of Appeals for the

Eighth Circuit hold their two pending appeals in abeyance, and LRSD and Joshua have further

agreed that they will attempt to resolve Joshua's past, present, and future claims for attorneys'

fees and costs by mediation." January 21, 1998 Joint Motion at 2 (docket no. 3107). *See also*

Renewed Joint Motion for Approval of LRSD's Revised Desegregation and Education Plan filed

on March 23, 1998 (docket no. 3136).

On February 27, 1998, the Eighth Circuit entered a Mandate (docket no. 3125) which

granted "the stipulation of the parties for dismissal of the appeal" of Judge Wright's March 24,

1997 Order denying Joshua's request for interim attorneys' fees. The entry of this voluntary

Judgment dismissing Joshua's appeal of the attorneys' fees issue strongly suggests that, sometime

prior to February 27, 1998, LRSD and Joshua arrived at a settlement of that issue.

In a letter agreement dated June 10, 1998,[53] LRSD and Joshua formally documented their

---

[52]As indicated previously, on April 22, 1997, Joshua appealed Judge Wright's Order denying their requested interim attorneys' fees (docket no. 2966). At the time the parties entered into these negotiations, that appeal was still pending before the Eighth Circuit.

[53]The *first time* this letter agreement became part of the record in this case was on March 15, 2002, when LRSD attached it as Exhibit 7 to its Memorandum Brief in Support of Motion for an Immediate Declaration of Unitary Status (docket no. 3581). Thus, before her decision to step down in this case, Judge Wright was never made aware of the facts surrounding the agreement that LRSD would pay Joshua's counsel $700,000 in attorneys' fees for past monitoring work, plus $48,333.33 per year for three years of future monitoring work. Furthermore, absent LRSD's decision to make the June 10, 1998 letter part of the record, I would have very likely missed the troubling implications associated with the confluence of agreements on both the Revised Plan and the issue of Joshua's past and future attorneys' fees. Therefore, my

-39-

settlement of all past and future claims for attorneys' fees and costs as follows:

> LRSD will make the following payments [to counsel for Joshua] for past fees and costs: $100,000.00 on or before June 30, 1998; $100,000.00 on or before August 31, 1998; and $500,000.00 on or before October 31, 1998. *For fees and costs incurred for implementing and monitoring the Revised Desegregation and Education Plan, LRSD will reimburse your firm up to $48,333.33 per year for three years beginning July 1, 1998.*

> The payments described in this letter will constitute full and complete payment in satisfaction of all past or future claims for attorney's fees and costs except as specifically set forth in the Revised Desegregation and Education Plan.

June 10, 1998 letter agreement, attached as Exhibit 7 to LRSD's Memorandum Brief in Support

of Motion for an Immediate Declaration of Unitary Status (docket no. 3581) (emphasis added).[54]

Although not directly relevant to the issue of unitary status, I can think of no good

explanation for LRSD's decision to voluntarily pay Joshua's counsel an additional $700,000 in

attorneys' fees for performing monitoring work for which Judge Wright had ruled he was *not*

entitled to be paid *anything* from LRSD. On top of this, one of Joshua's own attorneys,

Mr. Chachkin, previously had *admitted* during oral argument before the Eighth Circuit that the

attorneys' fees paid under the 1990 Settlement Agreement *included* future attorneys' time

---

raising this issue now, *based upon facts that were not known to Judge Wright while she presided over this case*, should in no way be construed as a criticism of Judge Wright for not raising this issue earlier. As I have emphasized, it was LRSD's decision to file its counsel's June 10, 1998 letter as an exhibit to its March 15, 2002 Memorandum Brief in Support of Motion for an Immediate Declaration of Unitary Status that alerted me to this issue.

[54] As indicated previously, Joshua's counsel argued to Judge Wright that LRSD should be allocated 75% to 80% of his $795,301 in attorneys' fees associated with performing past monitoring activities (docket no. 2792). If those attorneys' fees had been allocated on that basis, LRSD would have been responsible for paying Joshua's counsel between $596,475 and $636,240. I am at a loss to understand why LRSD would agree, in the June 10, 1998 letter, to voluntarily pay Joshua's counsel $700,000, almost $100,000 *more* than the median amount Joshua's counsel originally sought to recover from LRSD for his post-settlement monitoring work.

-40-

expended in connection with monitoring activities.[55] It appears to me that Judge Wright's well-reasoned Memorandum Opinion (docket no. 2821) denying Joshua's Request for an Interim Award of Attorneys' Fees and her subsequent Order (docket no. 2959) denying Joshua's Motion for Reconsideration placed LRSD in an excellent position to prevail on Joshua's appeal of the district court's rulings to the Eighth Circuit. Holding what seemed to be the winning hand on appeal, I find it passing strange that LRSD would voluntarily agree to pay Joshua's counsel an additional $700,000 for post-settlement monitoring work when, as stated above, one of Joshua's other attorneys *admitted* this work was already included in the $2,000,000 LRSD paid to Joshua's counsel under the 1990 Settlement Agreement.

I find it somewhat discomforting that LRSD and Joshua had a meeting of the minds on an essentially new desegregation settlement plan at the same time their attorneys were discussing the settlement of Joshua's counsel's request for a large interim award of attorneys' fees. However, I know of *no facts* establishing that the simultaneous negotiation of those two unrelated issues did not take place at arms length or involved a *quid pro quo*.

From the inception of this case, Joshua's counsel has fought hard for his clients and has a well-documented record of zealously protecting their interests. I also recognize that Joshua's counsel has manned the barricades of civil rights litigation in Arkansas for over four decades and that he has a reputation for never yielding on matters of principle. Accordingly, while I do not conclude that anything improper occurred in the simultaneous negotiation of these two unrelated issues, I do have a real concern about the public's perception of the timing of these events--which I fear has raised troubling questions and lingering doubts.

---

[55]*See supra*, pp. 34-35.

-41-

AO 72A

I also find it unsettling that, going forward, LRSD agreed to pay Joshua's counsel "up to $48,333.33 per year for three years beginning July 1, 1998," for "fees and costs incurred for implementing and monitoring the Revised Desegregation and Education Plan." June 10, 1998 letter agreement, attached as Exhibit 7 to docket no. 3581. At a minimum, all of the terms and conditions of such an unusual arrangement should have been spelled out in writing, with a clear statement regarding the duties, if any, that Joshua's counsel owed to LRSD, the party paying his fees for monitoring the implementation of the Revised Plan, and whether, under this arrangement, LRSD and Joshua's counsel entered into an attorney-client relationship. In any case, at least one thing is clear from the June 10, 1998 letter agreement: In exchange for being paid $4,027.78 per month by LRSD, Joshua's counsel specifically agreed to undertake the obligation of monitoring all aspects of LRSD's implementation of the Revised Plan.

Subsequently, Joshua's counsel submitted to LRSD periodic "Statements for Legal Services Rendered" for attorneys' fees incurred in connection with his work "implementing and monitoring" the Revised Plan.[56] *See* Exhibit 8 to docket no. 3581. According to Joshua's counsel's periodic statements for legal services, LRSD paid him a total of $124,861.15, which was billed in the following installments: July, 1998, through October, 1998: $16,111.12; November, 1998, through October, 1999: $48,333.33; November, 1999: $4,027.78; December, 1999: $4,027.78; January, 2000, through May, 2000: $20,138.90; June, 2000: $4,027.78; July, 2000: $4,027.78; August, 2000, through September, 2000: $8,055.56; October, 2000: $4,027.78;

---

[56]As discussed *infra* at pp. 57-59, at no point between the district court's approval of the Revised Plan on April 10, 1998, and the filing of LRSD's Compliance Report on March 15, 2001, did Joshua's counsel ever raise any of the compliance issues that are now before me, pursuant to §§ 8.2 through 8.2.5 of the Revised Plan.

-42-

November, 2000: $4,027.78; December, 2000: $4,027.78; and January, 2001: $4,027.78. *See* Exhibit 8 to docket no. 3581.[57] Thus, for each month between July, 1998, and January, 2001, LRSD paid Joshua's counsel $4,027.78 for attorneys' fees incurred "monitoring" LRSD's implementation of the Revised Plan.

For good reason, there is a widespread public perception that this case has become a decades-old cottage industry--and a large one at that--for lawyers. Over ten years ago, in Judge Woods' decision to step down from this case, he decried "the many appeals perfected in this case, some of which have accomplished nothing but enrichment of the participating attorneys," and called the lawyer fees paid by the three districts "grossly exorbitant." *LRSD*, 740 F. Supp. at 635. Since that time, things appear to have changed little, with all three school districts paying substantial annual attorneys' fees to their own lawyers and substantial annual payments to the ODM, whose requested annual budget for the last several years has been in the range of $700,000. At the same time, the threat of paying large future attorneys' fees to Joshua's counsel hangs like the sword of Damocles above the heads of all the parties.[58]

---

[57]The record fails to contain an explanation of why Joshua's counsel did not submit "Statements for Legal Services Rendered" for the months of February through June, 2001.

[58]As everyone knows, Arkansas is one of the poorest states in the country and has always had difficulty finding funds for public education. Although LRSD is better off than many school districts in the State, it is by no means affluent. Like other school districts, it struggles each year to make ends meet. For example, during the last few years, the Arkansas Democrat-Gazette has reported on the need for the repair or renovation of the basic infrastructure in many LRSD schools and on school teachers who have been forced to purchase pencils and other basic school supplies for their students.

By my calculations, since 1990, counsel for Joshua has been paid $3,974,861 ($3,150,000 + $700,000 + $124,861). Over that same period of time, I would guess LRSD, PCSSD, and NLRSD have paid their own attorneys a total of at least $4,000,000. If my estimate is correct, that means, since 1990, the attorneys for all parties in this case have been paid at least $8,000,000. As indicated, *supra* at footnote 47, the ODM has submitted budgets totaling $7,932,228.57.

-43-

All members of the professional group, who have directly benefitted from the perpetuation of this case, are placed on notice that I intend to monitor closely the costs associated with this action.  Being born and raised in Scott County, one of the poorest counties in Arkansas, I understand the meaning of being careful with a dollar, and I expect the professional group to keep that important point fixed in their minds from here on out.

---

Thus, since 1990, the "professional group" in this case probably has been paid close to $16,000,000.

Counsel for LRSD, Joshua, and the staff of the ODM know that LRSD grapples annually with funding and budget issues.  They also know that the approximately $16,000,000 paid to them since 1990 has come from funds earmarked for the school children of this district.  In making this observation, I in no way mean to imply that lawyers and monitors have not been necessary to ensure that LRSD, NLRSD, and PCSSD properly implemented and "scrupulously adhered to" their desegregation obligations under the Settlement Plans.  My only point is that I would have hoped this "professional group" would have kept uppermost in their minds that every penny paid to them for their work in this case is one less penny available to help in the education of a child.  Thus, I would have also hoped that the "professional group" would have been as frugal and judicious as possible in the expenditure of their time or budgeted funds.  One of the ways the attorneys could have kept this covenant with the district's school children would have been to discount their normal hourly billing rates.  In the case of the ODM, it might have foregone raises and minimized staff and office space requirements in the interest of bringing this case to a close as economically as possible.

My review of the pleadings since 1990 has dashed all such utopian hopes.  For example, Judge Woods cited the "grossly exorbitant" lawyer fees paid by the three school districts as the "principal reason for [their] poor financial situation" and noted that LRSD's attorneys had billed "31 days in a 30-day month."  *LRSD*, 740 F. Supp. at 635.  Similarly, Judge Wright noted in her September 23, 1996 Memorandum Opinion denying Joshua's motion for interim attorneys' fees that their counsel was attempting to bill his time at the rate of $250 per hour, which she found was not "reasonable."  September 23, 1996 Memorandum Opinion at footnote 6 (docket no. 2821).  Likewise, the staff and budget for the ODM has more than doubled since 1989, even though the more streamlined obligations of the Revised Plan approved in early 1998 would seem to have required less monitoring of LRSD's implementation of those obligations.  Similarly, for the last few years, it appears NLRSD has been unitary and has required very little in the way of monitoring by the ODM.  Thus, I would have expected annual *reductions* in the staff and budget for the ODM, beginning in 1998, and continuing through the current fiscal year.  That has not happened.

-44-

## I.    Final Approval Of Revised Desegregation And Education Plan

On April 10, 1998, Judge Wright entered a Memorandum Opinion and Order (docket no.

3144) approving the Revised Plan.  Importantly, Judge Wright held that the Revised Plan

constituted a "new consent decree or settlement agreement" between LRSD and Joshua:

The LRSD and Joshua have agreed that, if approved, the proposed Plan:

shall supersede and extinguish all prior agreements and orders in the *Little Rock School District v. Pulaski County Special School District*, U.S.D.C. No. LR-C-82-866, and all consolidated cases related to the desegregation of the Little Rock School District ("LRSD") with the following exceptions:
   a.    The Pulaski County School Desegregation Case Settlement Agreement as revised on September 28, 1989 ("Settlement Agreement");
   b.    The Magnet School Stipulation dated February 27, 1987;
   c.    Order dated September 3, 1986, pertaining to the Magnet Review Committee;
   d.    The M-to-M Stipulation dated August 26, 1986; and,
   e.    Orders of the district court and court of appeals interpreting and enforcing sections a. through d. above to the extent not inconsistent with this Revised Plan.

*Based upon this provision, this Court considers the LRSD Proposed Revised Plan an entirely new consent decree or settlement agreement between the LRSD and Joshua.*

April 10, 1998 Memorandum Opinion and Order at 3 (docket no. 3144) (emphasis added).

Alternatively, Judge Wright concluded that, even if the Court considered the Revised Plan

as a modification to the 1990 Settlement Plan,[59] she would still approve the Revised Plan because

---

[59] As indicated *supra* at p. 27, LRSD and Joshua agreed to certain changes in LRSD's 1990 Settlement Plan and the Interdistrict Settlement Plan.  In a forty-four page Order entered on May 1, 1992 (docket no. 1587), Judge Wright approved most of those proposed modifications which were incorporated in the "LRSD May 1992 Desegregation Plan" and the "May 1992 Interdistrict Desegregation Plan."  Judge Wright's April 10, 1998 Memorandum Opinion fails to mention those Plans, which were the operative consent decrees LRSD was operating under at the time she entered her decision.

-45-

AO 72A

the parties had satisfied the standard for modifying a consent decree established by the Court in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992), and *LRSD*, 56 F.3d at 914. In reaching this conclusion, Judge Wright noted that LRSD had implemented certain aspects of the 1990 Settlement Plan so successfully that the district court had withdrawn supervision over those areas.[60] However, the court also recognized that some goals in the 1990 Settlement Plan "[were] out of date for the current situation that exists in the LRSD and other specific, rigid goals in the 1990 Plan . . . may never be met, regardless of the amount of effort and good faith put forth by the LRSD." April 10, 1998 Memorandum Opinion and Order at 6 (docket no. 3144) (footnotes omitted). One such group of potentially unreachable goals cited by Judge Wright were the "goals in the 1990 Plan regarding achievement disparities [which] may never be met regardless of the effort put forth by LRSD." *Id. See* Testimony of Dr. Herbert J. Walberg at 17-25 (docket no. 2692); Testimony of Dr. David J. Armor at 18-39 (docket no. 2693); and Testimony of Dr. Gary Orfield at 25-31 (docket no. 2768).

J.    **LRSD's Implementation Of Its Obligations Under The Revised Plan**

Between April 10, 1998, and March 15, 2001, the date LRSD filed its Request for Scheduling Order and Compliance Report seeking unitary status, *LRSD and Joshua filed no substantive pleadings addressing any problems arising from LRSD's implementation of its obligations under the Revised Plan.* In fact, only three documents dealing with LRSD's

---

[60]In an Order entered on March 27, 1996 (docket no. 2648), Judge Wright released LRSD from Court supervision and monitoring in the areas of Multicultural Curriculum (LRSD May 1992 Desegregation Plan, docket no. 1587 at 63-80), Vocational Education (LRSD May 1992 Desegregation Plan, docket no. 1587 at 98-105), and Computerized Transportation System (LRSD May 1992 Desegregation Plan, docket no. 1587 at 227-28). *See also* February 9, 1996, Stipulation for Order (docket no. 2626).

-46-

implementation of the Revised Plan were filed during that period of time.

First, on August 11, 1999, the ODM filed a lengthy Report (docket no. 3289) on LRSD's preparations for implementation of the Revised Plan. This Report reviewed the status of LRSD's implementation of *all aspects* of the Revised Plan, including the following areas that have special relevance to Joshua's opposition to LRSD's pending request for unitary status: Extracurricular Enrichment Activities (pp. 12-16); Learning Environment (pp. 20-22); Mathematics (pp. 27-31); Program Assessment (pp. 42-43); Reading and Language Arts (pp. 44-48); Remediation (pp. 49-52); and Student Discipline (pp. 67-71). The ODM's "Summary and Conclusions" that followed each section of the Report indicated that, overall, LRSD was doing a satisfactory job of implementing the Revised Plan.

Second, on April 18, 2000, LRSD filed a 129-page Interim Compliance Report (docket no. 3356 dated March 15, 2000). Although LRSD was *not* obliged to file this Report, it voluntarily did so for two stated reasons: (1) "to help the District assess its progress toward full compliance and to reassure the court, the parties, and the community of the District's good faith efforts to be in total compliance with the Revised Plan"; and (2) "[t]he District hopes to receive comments and suggestions from interested persons as to the District's compliance with the Revised Plan and the format and content of this status report." Interim Compliance Report at 1 (docket no. 3356). The Interim Compliance Report set forth in detail all of the programs, policies, and procedures that LRSD was implementing in accordance with its obligations under the Revised Plan.

The ODM did *not* file any comments or objections to anything contained in LRSD's Interim Compliance Report. Likewise, nothing contained in that Report caused Joshua's counsel,

-47-

who was being paid $4,027.78 per month by LRSD to monitor its implementation of the Revised Plan, to raise any compliance issues. Finally, no "interested party" raised any questions concerning whether, based on the programs, policies, and procedures described in the Interim Compliance Report, LRSD was in substantial compliance with its obligations under the Revised Plan. This silence, it seems to me, speaks rather eloquently.

Third, on June 14, 2000, the ODM filed a 127-page Report of Disciplinary Sanctions in the LRSD (docket no. 3366).[61] The introduction to this Report contained a broad disclaimer of what was *not* being evaluated:

> This document neither evaluates the district's discipline policies and procedures nor determines how the policies are followed at various schools. Moreover, the report does not measure the effectiveness of any program, training or practices the district may have instituted to address the need for all students to be disciplined fairly and equitably, regardless of their race or sex. While the disciplinary procedures are represented by the data are legitimate and important areas of inquiry, we have not examined them here. We do provide some additional information to explain the district's general approach to discipline and to set the context for our findings, but our report focuses on the LRSD's own records and what they reflect.

Report of Disciplinary Sanctions at 1 (docket no. 3366).[62] Furthermore, because LRSD maintained disciplinary records on only "suspensions and expulsions," the Report was limited to an examination of LRSD's raw data, broken down by race and sex, for students who were

---

[61]The ODM prepared this Report as part of its ongoing monitoring of the way all three Pulaski County school districts imposed disciplinary sanctions on students. In previous years, the ODM had prepared similar Reports on NLRSD and PCSSD. Thus, the ODM's June 14 Report was not triggered by or related to anything in LRSD's March 15, 2000 Interim Compliance Report.

[62]By failing to evaluate and examine the many important areas covered by this disclaimer, the ODM substantially reduced the usefulness of its Report and made it virtually impossible to draw any conclusions from the Report that were not based on pure speculation.

-48-

AO 72A

suspended or expelled from each elementary school, junior high school, and high school during six school years, 1993-94 through 1998-99.

While the data compiled in the Report revealed that a disproportionate number of African-American male students were suspended or expelled at many schools, the lack of specific facts surrounding each suspension and expulsion (*e.g.*, a description of the conduct giving rise to the disciplinary sanction, race of teacher or administrator issuing disciplinary sanction, socioeconomic background of student, etc.) made it impossible to determine, without speculation, the reason for this disparity.[63] Additionally, because LRSD administrators assigned many of the suspended or expelled students to alternative education programs[64] but failed to maintain records documenting which suspended and expelled students were sent to those programs, it was impossible to determine from the Report how many days of school each of the suspended and expelled students actually missed. Finally, because the Report did not include any data for the 1999-00 school year, it was impossible to determine if converting LRSD's junior high schools to middle schools improved behavior problems and reduced the number of suspensions and expulsions. However, the Report made it clear that this change could affect future data:

> Beginning with the 1999-2000 school year, the district made a fundamental commitment to improving students' performance, both academically and

---

[63]The preface to the Report made it clear that the disproportionate number of African-American students suspended or expelled from school is a nationwide phenomenon. The Report also pointed out that the way students behaved in school was affected by a host of factors that were beyond the influence of school personnel, "such as home environment, family values, and the level of socialization prior to starting school. . . ." Report at 6. Finally, the Report observed that: "Another aspect of discipline that requires note is the tremendous increase in the number of single-parent households in our society. . . . This deficiency is particularly significant for adolescent males who live with only their mothers." Report at 7.

[64]*See* Report at 10-12.

AO 72A

behaviorally, by converting to a middle school system (grades 6-8). Studies have shown that the grade 6-8 configuration is developmentally appropriate. The teaming practiced in middle schools is to provide a nurturing environment in which students can learn and also find help with the physical and emotional changes they are experiencing. Because the discipline data for 1999-2000 were not available at the time we prepared this report, we could not assess whether discipline and sanctions have changed in ways that might be attributable to the middle school approach.

Report at 126.

In the Report's "Conclusions," the ODM made two primary criticisms of LRSD's disciplinary practices: (1) it had not maintained and compiled "comprehensive data on all the discipline sanctions [which] may leave some problems uncovered, as well as thwart assessment of the extent to which the district is preventing racial discrimination in disciplinary actions overall"; and (2) "[w]hile the report data do not reflect overall serious behavior problems in LRSD, African-American males are being disciplined in disproportionately high numbers." Report at 125. The ODM also offered seven "ideas . . . as suggestions for improving disciplinary procedures for all students in LRSD, while also reducing the over-representation of black students in disciplinary actions." Report at 127.

## K.    LRSD Seeks Unitary Status Based Upon Its Substantial Compliance With The Revised Plan

On March 15, 2001, LRSD filed a Request for Scheduling Order and Compliance Report (docket no. 3410) and requested the court to declare it "unitary with respect to all aspects of school operations." On June 25, 2001, Joshua filed their Opposition to LRSD's Compliance Report (docket no. 3447) in which they argued LRSD was not entitled to unitary status under the Revised Plan.

On March 15, 2002, LRSD filed the pending Motion for an Immediate Declaration of

-50-

Unitary Status (docket no. 3580) and Supporting Memorandum Brief (docket no. 3581).  On May 30, 2002, Joshua filed their Response in Opposition to LRSD's Motion for Immediate Declaration of Unitary Status (docket no. 3604).  On June 7, 2002, LRSD filed its Reply Brief (docket no. 3607).

As indicated previously, under §11 of the Revised Plan, LRSD was entitled to the entry of an order declaring it unitary if no party challenged its substantial compliance with the Revised Plan.  Because Joshua chose to challenge LRSD's "substantial compliance," § 11 of the Revised Plan imposed on them the burden of proof on that issue.  Joshua's counsel has acknowledged that the Revised Plan imposed on his clients the burden of proving that, as of March 15, 2001,[65] LRSD was not in substantial compliance with its obligations under the Revised Plan.  See Transcript of Proceedings on June 29, 2001, at 26 (docket no. 3461), and Transcript of Proceedings on July 9, 2001, at 26 (docket no. 3464).

---

[65]In its October 3, 2001 Order (docket no. 3515), the district court required LRSD to elect between two options:

Option 1:

(A)    Present evidence concerning the LRSD's activities with respect to the Revised Plan beyond the date of March 15, 2001; and

(B)    Produce the e-mails requested by Joshua beyond that date.

Option 2:

(A)    Present evidence concerning the LRSD's activities with respect to the Revised Plan up to the date of March 15, 2001, and not beyond; and

(B)    Correspondingly, the LRSD would have no obligation to produce the e-mails requested by Joshua beyond that date.

LRSD filed a Response to the October 3, 2001 Order (docket no. 3517) objecting "to being forced to select from the two options offered by the Court." Subsequently, LRSD advised Judge Wright that, without waiving its objections, it selected "Option 2." Therefore, any evidence of LRSD's "compliance activities" that took place after March 15, 2001, cannot be considered in deciding the question of unitary status.

-51-

### III. Relevant Provisions Of Revised Plan

In Joshua's Opposition to LRSD's Compliance Report (docket no. 3447), they include a "Seriatim Response to District's March 15, 2001 Compliance Report" in which they list compliance problems or concerns with the following sections of the Revised Plan: § 2.1 (LRSD's obligation of good faith); §§ 2.1.1, 2.2, 2.2.1, 2.2.2, 2.2.3, 2.2.4, 2.2.5, and 2.2.7 (LRSD's obligations regarding faculty and staff); § 2.3 (LRSD's obligations regarding student assignment); § 2.4 (LRSD's obligations regarding special education and related programs); §§ 2.5, 2.5.1, 2.5.2, 2.5.3, and 2.5.4 (LRSD's obligations regarding student discipline); §§ 2.6, 2.6.1, 2.6.2, and 2.11.1 (LRSD's obligations regarding extracurricular activities, advanced placement courses, and guidance counseling); § 2.7 and § 5 (LRSD's obligations regarding improving African-American academic achievement); § 2.8 (parental involvement); and § 3.6 (school construction and closing).

Importantly, Joshua's Opposition to LRSD's Compliance Report was careful to note that their concerns regarding LRSD's compliance with faculty and staff, student assignment, special education and related programs, parental involvement, and school construction and closing were based primarily on "information and belief" or involved "generalized suspicions" regarding LRSD's future actions. After filing that Opposition, Joshua conducted considerable discovery to develop the facts to support their challenges to LRSD's request for unitary status.

As indicated previously, before beginning the evidentiary hearings on Joshua's Opposition to LRSD's request for unitary status, Judge Wright instructed Joshua's counsel to present his argument beginning with his strongest first and proceeding to his weakest (docket no. 3461 at 54-55). During a hearing on July 9, 2001, which took place after the completion of the first two days

-52-

AO 72A

of testimony on July 5 and 6, 2001, Joshua's counsel stated that LRSD's three most serious areas of noncompliance under the Revised Plan were its failure to meet its obligations regarding: (1) good faith; (2) improvement of academic achievement for African-American students;[66] and (3) improvement of the racial disparity in student discipline (docket no. 3464 at 26-29). During the evidentiary hearings on August 1 and 2, 2001, Joshua completed calling all of their witnesses on the issues of LRSD's alleged substantial noncompliance with those three areas of the Revised Plan. At the beginning of the fifth day of evidentiary hearings on November 19, 2001, Judge Wright noted, on the record, that counsel for Joshua had "rested his case" on the first three areas of LRSD's alleged noncompliance (docket no. 3558 at 14-15). After Judge Wright denied LRSD's Motion for Directed Verdict, it presented its case on November 19 and 20 (docket nos. 3558 and 3559).

On December 11, 2001, Judge Wright conducted a hearing to schedule the remaining days of evidentiary hearings on Joshua's Opposition to LRSD's request for unitary status (docket no. 3560). During this hearing, Judge Wright agreed to allow Joshua and LRSD no more than five days to present additional testimony on what Joshua's counsel identified as the last three areas of LRSD's alleged noncompliance with the Revised Plan: (1) advanced placement courses; (2) extracurricular activities; and (3) guidance counseling. Judge Wright also agreed to allow Joshua to present non-cumulative testimony regarding: LRSD's alleged failure to comply with its overall obligation of good faith regarding its implementation of programs, policies, and procedures

---

[66]Part of Joshua's argument that LRSD had failed to substantially comply with its obligation to improve the academic achievement of African-American students included the contention that LRSD had failed to make the annual "assessments" of the academic programs implemented to improve the achievement of African-American students as required by § 2.7.1 of the Revised Plan.

-53-

regarding *advanced placement courses, extracurricular activities,* and *guidance counseling*; and how LRSD's programs, policies, and procedures governing *advanced placement courses, extracurricular activities,* and *guidance counseling* had adversely affected the academic achievement of African-American students.

I conducted the final three days of evidentiary hearings on those issues, beginning on July 22, 2002. At no point during those hearings, or during the six previous days of evidentiary hearings, did Joshua present *any evidence or arguments* to support the contentions in their Opposition to LRSD's Compliance Report (docket no. 3447) that LRSD was not in substantial compliance with its obligations regarding faculty and staff (§§ 2.1.1, 2.2-2.2.5, and 2.2.7); student assignment (§ 2.3); special education and related programs (§ 2.4); parental involvement (§ 2.8); and school construction and closing (§ 3.6). Joshua's failure to present *any evidence* to support their contention regarding LRSD's alleged failure to substantially comply with those sections of the Revised Plan requires a finding that they have abandoned those arguments. In any case, Joshua clearly failed to maintain their burden of proving that LRSD failed to substantially comply with any of those particular sections of the Revised Plan.

Thus, the determination of LRSD's request for unitary status turns on whether Joshua has maintained their burden of proving by a preponderance of the evidence that LRSD has failed to substantially comply with the following obligations imposed on it under the Revised Plan: (1) good faith as set forth in § 2.1; (2) student discipline as set forth in §§ 2.5 through 2.5.4 and 2.12.2; (3) academic achievement of African-American students as set forth in §§ 2.7, 2.7.1, 5.1 through 5.8, and 2.12.2; (4) extracurricular activities as set forth in §§ 2.6, 2.6.3, and 2.12.2; (5) advanced placement courses as set forth in §§ 2.6, 2.6.2, and 2.12.2; and (6) guidance counseling

-54-

as set forth in § 2.11.1. The provisions of the Revised Plan containing LRSD's obligations in these six disputed areas, along with other provisions of the Revised Plan that are relevant to the resolution of the issue of unitary status, are summarized below.

## A.    LRSD's Obligation Of Good Faith

The first obligation imposed on LRSD was to act in "good faith." Because of the importance of this obligation to the question of unitary status, § 2.1 of the Revised Plan ought, in fairness, to be quoted in its entirety:

> LRSD shall in good faith exercise its best efforts to comply with the Constitution, to remedy the effects of past discrimination by LRSD against African-American students, to ensure that no person is discriminated against on the basis of race, color or ethnicity in the operation of LRSD and to provide an equal educational opportunity for all students attending LRSD schools.

## B.    LRSD's Obligations Regarding Student Discipline

Sections 2.5 through 2.5.4 set forth LRSD's obligations regarding student discipline. Section 2.5 obligated LRSD to implement programs, policies, and/or procedures "designed to ensure that there is no racial discrimination with regard to discipline." Section 2.5.1 required LRSD to "strictly adhere to the policies set forth in the Student Rights and Responsibilities Handbook to ensure that all students are disciplined in a fair and equitable manner," and § 2.5.2 required LRSD to "purge students discipline records after the fifth and eighth grades of all offenses, except weapons offenses, arson and robbery." Section 2.5.3 established the position of "ombudsman," who was responsible for "acting as an advocate on behalf of students involved in the discipline process, investigating parent and student complaints of race-based mistreatment and attempting to achieve equitable solutions." Finally, § 2.5.4 obligated LRSD to "work with students and their parents to develop behavior modification plans for students who exhibit

-55-

frequent misbehavior."

**C.    LRSD's Obligations To Improve And Remediate The Academic Achievement Of African-American Students**

Section 2.7 contained LRSD's core obligation regarding the academic achievement of

African-American students:

> LRSD shall implement programs, policies and/or procedures designed to improve and remediate the academic achievement of African-American students, including but not limited to Section 5 of this Revised Plan.

Very significantly, nowhere in this section or any other section of the Revised Plan does LRSD

assume any obligation to narrow or close the academic achievement gap between white students

and African-American students.

In order to determine the effectiveness of LRSD's academic programs designed to

improve African-American achievement, Section 2.7.1 obligated LRSD to "assess the academic

programs implemented pursuant to Section 2.7 after each year." If the results of those

assessments "[reveal] that a program has not and likely will not improve African-American

achievement, LRSD shall take appropriate action in the form of either modifying how the

program is implemented or replacing the program."

**D.    LRSD's Obligations Regarding Extracurricular Activities, Advanced Placement Courses, And Guidance Counselors**

Section 2.6 required LRSD to "implement programs, policies and/or procedures designed

to promote participation and to ensure that there are no barriers to participation by qualified

African-Americans in extracurricular activities, advanced placement courses, honors and enriched

courses and the gifted and talented program." Section 2.6.1 and 2.11.1 required LRSD to

implement training programs to assist teachers and counselors in "identifying and encouraging

-56-

AO 72A

African-American students to participate in honors and enriched courses and advanced placement courses" and required guidance counselors to "work with students in an effort to provide more equity in academic honors, awards, and scholarships." Section 2.6.2 obligated LRSD to "implement programs to assist African-American students in being successful in honors and enriched courses and advanced placement courses."

**E.    LRSD's Obligations To Develop Remedies, Where Appropriate, For Racial Disparities In Programs And Activities**

Section 2.12.2 provided that "LRSD shall implement policies and procedures for investigating the causes of racial disparities in programs and activities and developing remedies where appropriate." Joshua made no mention of LRSD's alleged failure to substantially comply with Section 2.12.2 in their June 25, 2001 Opposition to LRSD's Compliance Report (docket no. 3447). However, nearly a year later, in their May 30, 2002 Opposition to LRSD's Motion for an Immediate Declaration of Unitary Status (docket no. 3604), Joshua argued for the first time that this section of the Revised Plan obligated LRSD: (1) to develop remedies for the racial disparity in student discipline under Section 2.5 (docket no. 3604 at 17, paragraph (26)); and (2) to "devise a remedy" directed at decreasing "the racial gap in achievement" (docket no. 3604 at 36, paragraph (58)). In LRSD's Reply Brief in Support of Motion for Immediate Declaration of Unitary Status (docket no. 3607 at 1-3), it raised a host of arguments against allowing Joshua to apply § 2.12.2 to its obligations regarding student discipline and academic achievement. I will address and resolve those arguments, *infra*, in my Findings of Fact and Conclusions of Law.

**F.    Procedure For Raising Compliance Issues**

Section 8.2 sets forth a detailed procedure for "Raising Compliance Issues" which a party was required to follow as a prerequisite to "requesting the district court to exercise jurisdiction

-57-

with regard to a compliance issue." First, a party raising a compliance issue was required to provide the "LRSD superintendent or his designee" with timely written notice of the specifics surrounding the alleged noncompliance so that LRSD could conduct a "reasonable investigation" and provide the complaining party with a "written response within a reasonable amount of time not to exceed fifteen days from receipt of the written notice" (§§ 8.2.1 through 8.2.3). Second, if the complaining party was not satisfied with LRSD's written response, the party "shall . . . submit the compliance issue to ODM . . . for facilitation of an agreement between the parties." Only if the dispute "remains unresolved after good faith attempts at facilitation by ODM" could the complaining party "seek resolution of the issue before the district court" (§§ 8.2.4 and 8.2.5). Finally, § 8.3 of the Revised Plan provides the following:

> Before the end of the transition period, LRSD shall develop and/or identify the programs, policies and/or procedures to be implemented in accordance with this Revised Plan and provide them to Joshua. Joshua shall have a right to invoke the process described in Section 8.2 if LRSD fails to adopt programs, policies and/or procedures required by this Revised Plan; adopts facially deficient programs, policies and/or procedures; or, fails to implement the programs, policies and/or procedures adopted in accordance with this Revised Plan.

As indicated previously, in LRSD's Interim Compliance Report (docket no. 3356), filed almost a full year before its March 15, 2001 Compliance Report, LRSD explicitly sought "comments and suggestions from interested persons as to the District's compliance with the Revised Plan and the format and content of this status report." Interim Compliance Report at 1. Importantly, under the June 10, 1998 letter agreement between LRSD and Joshua, counsel for Joshua expressly assumed responsibility for monitoring the implementation of LRSD's obligations under the Revised Plan "for three years beginning July 1, 1998," in exchange for being paid attorneys' fees of $4,027.77 per month by LRSD. The record is undisputed that

-58-

AO 72A

Joshua's counsel never raised any compliance issues under § 8.2 of the Revised Plan. The record is also undisputed that the first time Joshua raised any of the specific compliance issues now before the court was when they filed their Opposition to LRSD's Compliance Report (docket no. 3447) on June 25, 2001. Thus, Joshua's counsel unquestionably failed to comply with the obligation he agreed to undertake--at considerable expense to LRSD--to faithfully monitor the implementation of the Revised Plan and to call to LRSD's attention, *in a timely fashion*, any compliance problems.

## G.    Duration Of Revised Plan

The term of the Revised Plan was three school years, beginning with the 1998-99 school year and ending on the last day of classes of the 2000-01 school year (§ 9). The 1997-98 school year and the first semester of the 1998-99 school year was defined as a "transition period," during which LRSD was to operate under the May 1992 Desegregation Plan and Interdistrict Plan (docket no. 1587) to the extent they were not inconsistent with the Revised Plan. The ODM was to devote all of its time during the transition period to monitoring "LRSD's preparation for implementation of this Revised Plan and act[ing] as a resource for LRSD in that process" (§ 10). Thus, LRSD began operating under the Revised Plan during the spring semester of the 1998-99 school year.

## H.    Procedure For Seeking Unitary Status

As indicated previously, § 11 *required* the district court, at the conclusion of the 2000-01 school year, to issue an order "releasing LRSD from court supervision and finding LRSD unitary with regard to all aspects of school operations provided that LRSD was in substantial compliance with its obligations set forth in this Revised Plan." LRSD was required to file a Report on March

-59-

AO 72A

15, 2001, "indicating the state of LRSD's compliance with the Revised Plan." Thereafter, any party "challenging LRSD's compliance [bore] the burden of proof" and, if no challenges were forthcoming, the district court would be required to enter an order  granting unitary status "without further proceedings" (§ 11).

## I.    Effect Of LRSD's Failure To Meet "Specific Goals" In The Revised Plan

In footnote 2 of the Revised Plan, LRSD and Joshua agreed that, by identifying "specific goals in this Revised Plan," it was *not* the intention of the parties "to create an obligation that LRSD shall have fully met the goal by the end of the plan's term." This footnote also provides that "LRSD's failure to obtain any of the goals of this Revised Plan will not be considered a failure to comply with the plan if LRSD followed the strategies described in the plan and the policies, practices and procedures developed in accordance with the plan." The need for the inclusion of this footnote appears to have flowed, in part, from the district court having previously construed "goals" stated in LRSD's 1990 Settlement Plan to be binding "obligations" that had to be met before LRSD could achieve unitary status.[67]

### IV.  Controlling Principles Of Law

## A.    The Evolving Concept of Unitary Status

In *Green*, 391 U.S. at 437-38, the Court held that school boards "operating state-compelled dual systems were . . . clearly charged with the affirmative duty to take whatever steps

---

[67]For example, in the district court's April 10, 1998 Memorandum Opinion approving the Revised Plan (docket no. 3144), Judge Wright observed that "there are certain goals in the 1990 Plan which are out of date for the current situation that exists in LRSD and other specific, rigid goals in the 1990 Plan which expert testimony indicates may never be met, regardless of the amount of effort or good faith put forth by LRSD." The district court specifically noted that the "goals in the 1990 Plan regarding achievement disparities may never be met regardless of the effort put forth by the LRSD." *Id.* at footnote 7.

AO 72A

might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." According to the Court, a school district has achieved "unitary status" when it is devoid of racial discrimination with regard to: (1) student assignment; (2) faculty and staff; (3) transportation; (4) extracurricular activities; and (5) facilities. *Id.* at 435. Thus, disparities in these five areas of a school district's operations are *per se vestiges* of *de jure* segregation, which must be "disestablished" before a school district can become unitary. For the next two decades, the *Green* factors became the litmus test used by federal courts to determine if a school district had achieved unitary status.

In *Board of Education of Oklahoma City v. Dowell*, 498 U.S. 237 (1991), the Court expanded the framework for deciding if a school district had achieved unitary status. The Court began by noting the split among the circuits regarding the meaning of "unitary," with some lower courts interpreting that term to mean a school district which had met the mandates of *Green*,[68] and others construing it to describe any school district that had a desegregated student assignment plan, without regard to whether it was the result of a court-imposed desegregation order.[69] *Dowell* at 245. The Court ended this battle over semantics by noting that:

> [I]t is a mistake to treat words such as "dual" and "unitary" as if they were actually found in the Constitution. The constitutional command of the Fourteenth Amendment is that "[n]o State shall . . . deny to any person . . . the equal protection of the laws." Courts have used the term "dual" to denote a school system which has engaged in intentional segregation of students by race, and "unitary" to describe a school system which has been brought into compliance with the command of the Constitution. We are not sure how useful it is to define these terms more precisely, or to create subclasses within them.

---

[68] *See United States v. Overton*, 834 F.2d 1171, 1175 (5th Cir. 1987), and *Vaughns v. Board of Education of Prince George's County*, 758 F.2d 983, 988 (4th Cir. 1985).

[69] *Dowell v. Board of Education of Oklahoma City*, 890 F.2d 1483, 1490 (10th Cir. 1989).

-61-

*Id.* at 245-46.

Relying on *United States v. Swift & Co.*, 286 U.S. 106 (1932), the Tenth Circuit in *Dowell* had held that a desegregation decree could not be lifted or modified absent a "grievous wrong evoked by new and unforeseen conditions." *Id.* at 240 (quoting *Dowell*, 890 F.2d at 1490). The Court, in finding the Tenth Circuit's reliance on *Swift* to be misplaced, emphasized the important distinction between a consent decree in an antitrust case, which by its terms remained effective "in perpetuity," and a consent decree entered in a school desegregation case:

> From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination.

> \* \* \*

> Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs. [Citations omitted.] The legal justification for displacement of local authority by an injunctive decree in a school desegregation case is a violation of the Constitution by the local authorities. Dissolving a desegregation decree after the local authorities have operated in compliance with it for a reasonable period of time properly recognizes that "necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination. *See Milliken v. Bradley [Milliken II]*, 433 U.S. at 280-82." *Spangler v. Pasadena City Bd. of Education*, 611 F.2d at 1245 n. 5 (Kennedy, J., concurring).

*Id.* at 247-48.

In reversing and remanding the case for a determination of whether the desegregation consent decree should be terminated, the Court provided the district court with the following guidance:

> *The District Court should address itself to whether the Board had complied in good faith with the desegregation decree since it was entered,* and whether the vestiges of past discrimination had been eliminated *to the extent practicable.*

-62-

> In considering whether the vestiges of *de jure* segregation had been eliminated as far as practicable, the District Court should look not only at student assignments, but "to every facet of school operations–faculty, staff, transportation, extra-curricular activities and facilities." *Green*, 391 U.S. at 435. *See also Swann*, 402 U.S. at 18 ("[E]xisting policy and practice with regard to faculty, staff, transportation, extra-curricular activities, and facilities" are "among the most important indicia of a segregated system").

*Id.* at 249-50 (emphasis added). Thus, the Court made it clear that, in addition to a careful analysis of the *Green* factors, a district court must determine whether the school district has complied in good faith with the desegregation decree.

In *Freeman v. Pitts*, 503 U.S. 467 (1992), the Court held that a district court may relinquish its supervision and control over those aspects of a school system in which there has been compliance with a desegregation decree even if other aspects of the system remain in noncompliance and require continued federal supervision. The Court explained the rationale for its holding as follows:

> Partial relinquishment of judicial control, where justified by the facts of the case, can be an important and significant step in fulfilling the district court's duty to return the operations and control of schools to local authorities. In *Dowell*, we emphasized that federal judicial supervision of local school systems was intended as a "temporary measure." 498 U.S. at 247. Although this temporary measure has lasted decades, the ultimate objective has not changed–to return school districts to the control of local authorities. Just as a court has the obligation at the outset of a desegregation decree to structure a plan so that all available resources of the court are directed to comprehensive supervision of its decree, so too must a court provide an orderly means for withdrawing from control when it is shown that the school district has attained the requisite degree of compliance. A transition phase in which control is relinquished in a gradual way is an appropriate means to this end.

*Id.* at 489-90. The Court also noted that "the *Green* factors need not be a rigid framework" and that the partial relinquishment of judicial supervision is consistent with the district court's exercise of its "equitable discretion":

-63-

> By withdrawing control over areas when judicial supervision is no longer needed, a district court can concentrate both its own resources and those of the school district on the areas when the effects of *de jure* discrimination have not been eliminated and further action is necessary in order to provide real and tangible relief to minority students.

*Id.* at 493.

In deciding the question of unitary status, the district court in *Freeman* had considered not only the *Green* factors, but also an additional factor: the quality of education being offered to white and black students, with specific emphasis on programs designed to improve the academic achievement of black students. *Id.* at 482-83. The Court, in affirming the district court's consideration of this additional factor, stated the following:

> It was an appropriate exercise of its discretion for the District Court to address the elements of a unitary system discussed in *Green*, to inquire whether other elements ought to be identified, and to determine whether minority students were being disadvantaged in ways that required the formulation of new and further remedies to ensure full compliance with the court's decree.

*Id.* at 492. Thus, the Court recognized that the *Green* factors are not the only disparities which may be classified as vestiges of *de jure* segregation. Depending on the circumstances of a particular case, the trial court may exercise its discretion to consider other factors, as long as it makes clear findings which establish the *causal link* between each such additional factor and the prior system of *de jure* segregation.

Finally, the Court set forth the following guidelines, which should be followed in deciding whether the incremental withdrawal of federal supervision is appropriate:

> Among the factors which must inform the sound discretion of the court in ordering partial withdrawal are the following: [1] whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; [2] whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and [3] whether the school district has demonstrated, to the

-64-

AO 72A

public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

In considering these factors, a court should give particular attention to the school system's record of compliance. A school system is better positioned to demonstrate its good-faith commitment to a constitutional course of action when its policies form a consistent pattern of lawful conduct directed to eliminating earlier violations.

*Id.* at 491.[70] Thus, the Court concluded that the district court's ultimate inquiry must be whether the constitutional violator has complied in good faith with the desegregation decree since it was entered, and whether the vestiges of *de jure* segregation have been eliminated *to the extent practicable*. *Id.* at 492.

In moving the test for unitary status away from the unqualified *Green* standard that charged a school district with the "affirmative duty to eliminate racial discrimination root and branch" to the more easily achievable standard of eliminating the vestiges of *de jure* segregation "to the extent practicable," the Court in *Freeman* appeared to recognize two important points. First, because racism still remains a most regrettable part of the nation's social fabric, no amount of federal supervision of a school district can *eliminate* racial discrimination.[71] Second, in

---

[70] In *Liddell v. Board of Educ.*, 149 F.3d 862, 868-69 (8th Cir. 1998), the Court applied the *Freeman* factors in affirming the lower court's decision that the Special School District of St. Louis County had achieved partial unitary status in the operation of the vocational education program in the county schools.

[71] As the Court noted in *Coalition to Save Our Children v. State Bd. of Educ. of Delaware*, 901 F. Supp. 784, 823 (D. Del. 1995):

[A]s the years have passed since *Brown I and II* [citations omitted], it has become apparent that the school desegregation process has been unable to eliminate or overcome racial discrimination in the "myriad factors of human existence" outside the school environment . . . .

In *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 22 (1971), the Court stated in more general terms the same proposition:

-65-

qualifying a school district's duty to eliminate the vestiges of past discrimination "to the extent practicable," the Court strongly implied that the duration of federal supervision over a school district should have some reasonable limit.

In *Hull v. Quitman County Board of Education*, 1 F.3d 1450, 1454 (5th Cir. 1993), the Court made the following observation regarding the importance of the Court's decisions in *Freeman* and *Dowell*:

> This court used to evaluate termination of desegregation decrees under the global inquiry whether the school district had achieved "unitary" status. *Freeman* and *Dowell* make clear, however, that there is no longer magic in the phrase unitary status, which had spawned much uncertainty and a conflict among the circuits. Following *Freeman*, the lower courts have discretion to terminate a desegregation case if a school board has consistently complied with a court decree in good faith and has eliminated the vestiges of past discrimination to the extent "practicable." *Freeman* created a framework in which equitable decrees will not remain in effect perpetually and school districts can be returned to local control.

(Internal citations omitted.)  Another court has observed that "[i]n *Freeman* and *Dowell* the Supreme Court has reminded district courts of their duty to recognize that education policy is to be determined through the democratic process." *Keyes v. Congress of Hispanic Educators*, 902 F. Supp. 1274, 1281-82 (D. Colo. 1995).

In *Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) ("*Jenkins III*"), the Court again emphasized that federal supervision of local school districts "was intended as a temporary measure to remedy past discrimination" and that finite limits restrict a federal court's exercise of its constitutional authority in school desegregation cases.  In *Jenkins III*, the State of Missouri appealed two district court orders that required the State: (1) to fund salary increases for virtually all instructional and

---

One vehicle can carry only a limited amount of baggage.  It would not serve the important objective of *Brown I* to seek to use school desegregation cases for purposes beyond their scope . . . .

-66-

non-instructional staff within the Kansas City, Missouri Metropolitan School District ("KCMSD"); and (2) to continue to fund remedial "quality education programs" because student achievement levels were still "at or below national norms at many grade levels." *Id.* at 73. The State argued that funding for teachers' salaries was beyond the scope of the district court's remedial authority and that, under *Freeman*, it had achieved partial unitary status with respect to the quality education programs already in place. The district court rejected both of those arguments, and the Eighth Circuit affirmed. *Id.* at 81 (citing *Jenkins v. Missouri*, 11 F.3d 755 (8th Cir. 1993)). Subsequently, the Eighth Circuit denied rehearing, *en banc*, with five judges dissenting. *Id.* (citing *Jenkins v. Missouri*, 19 F.3d 393 (8th Cir. 1994)).[72]

The Supreme Court, in reversing, stated the following:

> The District Court's pursuit of the goal of "desegregative attractiveness" results in so many imponderables and is so far removed from the task of eliminating the racial identifiability of the schools within the KCMSD that we believe it is beyond the admittedly broad discretion of the District Court. In this posture, we conclude that the District Court's order of salary increases, which was "grounded in remedying the vestiges of segregation by improving the desegregative attractiveness of the KCMSD," App. to Pet. for Cert. A-90, is

---

[72]The desegregation plan ordered by the district court in *Jenkins* has been described as "the most ambitious and expensive remedial program in the history of school desegregation." *Jenkins*, 19 F.3d at 397 (Beam, J., dissenting from denial of rehearing *en banc*). Justice Kennedy, in *Jenkins II*, described some of KCMSD's high school amenities, which included: a 2,000 square foot planetarium; green houses and vivariums; broadcast-capable radio and television studios with an editing and animation lab; a temperature controlled art gallery; a 3,500-square-foot dust-free diesel mechanics room; 1,875-square-foot elementary school animal rooms for use in a zoo project; and swimming pools. *Missouri v. Jenkins*, 495 U.S. 33, 77 (1990) (Kennedy, J., concurring).

The five Eighth Circuit Judges who dissented from the denial of rehearing *en banc* in *Jenkins* noted that, even though "KCMSD students have in place a system that offers more educational opportunity than anywhere in America," the district court was "not satisfied that the District has reached anywhere close to its maximum potential because the District is still at or below national norms at many grade levels." *Jenkins*, 19 F.3d at 403. The dissent concluded that the case "as it now proceeds, involves an exercise in pedagogical sociology, not constitutional adjudication." *Id.* at 404.

-67-

AO 72A

simply too far removed from an acceptable implementation of a permissible means to remedy previous legally mandated segregation.

Similar considerations lead us to conclude that the District Court's order requiring the State to continue to fund the quality education programs because student achievement levels were still "at or below national norms at many grade levels" cannot be sustained.

*Id.* at 100 (internal citations omitted).[73]

Following the remand of *Jenkins III* to the district court, Judge Clark provided a succinct analysis of the Supreme Court's gradual change in direction in school desegregation cases, as chronicled by its decisions in *Dowell*, 498 U.S. 237, *Freeman*, 503 U.S. 467, and *Jenkins III*, 515 U. S. 70:

No longer must the Court eliminate the vestiges of segregation "root and branch." *See Green* [citation omitted]. Instead the Court must only assess whether everything "practicable" has been done to eliminate the vestiges of the prior discrimination and further, the Court may grant unitary status in incremental stages. The clear standard articulated in recent unitary status cases by the Supreme Court requires that defendants must show that they have "complied in good faith with the desegregation decree since it was entered" and that the "vestiges of past discrimination have been eliminated to the extent practicable." [Citations omitted.]

*Jenkins v. State of Missouri*, 959 F. Supp. 1151, 1155 (W.D. Mo. 1997), *aff'd*, 122 F.3d 588 (8th Cir. 1997).

Finally, in *Coalition to Save Our Children v. State Bd. of Educ. of Delaware*, 90 F.3d 752, 760 (3rd Cir. 1996), the Third Circuit found that the Court's holdings in *Freeman* and *Jenkins* were intended to create "a reasonable limit on the duration of . . . federal supervision." In support of that conclusion, the Court stated the following:

---

[73]The Supreme Court also criticized the district court for failing to make the "careful fact-finding and detailed articulation of findings" necessary for a determination of partial unitary status. *Jenkins*, 515 U.S. at 100.

-68-

We are keenly aware that, for as long as we have imposed federal supervision on local school boards, those bodies have suffered the loss of their defining function--control over their own schools. Thus, in the present matter the citizens of the New Castle school districts have been denied for nearly 20 years what the Court has described as the "vital national tradition" of "local autonomy of school districts." *Freeman*, 503 U.S. at 490, (quoting *Dayton Board of Educ. v. Brinkman*, 433 U.S. 406 (1977)).

\* \* \*

In sum, we cannot reconcile the prospect of indefinite federal supervision of local school districts with the ultimate purpose of that supervision--to foster the creation of autonomous, racially balanced school systems. Accordingly, we remain attentive to the Supreme Court's repeated instructions that such supervision be "temporary" and "transitional."

*Id.* at 760-61.

## B.    Applicable Standard For Determining If LRSD Is Unitary

In *Dowell*, the Court recognized that a school district under federal supervision "is entitled to a rather precise statement of its obligations." *Dowell*, 498 U.S. at 246. In most school desegregation cases, that "precise statement" comes in the form of a desegregation plan formulated and imposed by the district court. *E.g. Keyes*, 902 F. Supp. at 1274; *Tasby v. Woolery*, 869 F. Supp. 454 (N.D. Tex. 1994). In fact, as noted earlier, in the early stages of this case, Judge Woods formulated and imposed just such a desegregation plan that called for consolidation of all three Pulaski County school districts. *LRSD*, 597 F. Supp. at 1220. On November 7, 1985, the Eighth Circuit reversed Judge Woods' decision and formulated its own desegregation plan, which the three school districts were required to implement. *LRSD*, 778 F.2d at 404.

All of that changed on December 12, 1990, when the Eighth Circuit approved the 1990 Settlement Agreement, the separate Settlement Plans for LRSD, PCSSD, and NLRSD, and the Interdistrict Settlement Plan. Together, these settlement documents spelled out each of the three

-69-

school district's desegregation obligations, which included all of the *Green* factors, plus a host of additional obligations that each of the school districts *voluntarily agreed to implement*. Thus, under the original 1990 settlement documents, LRSD could only achieve unitary status by implementing *all* of the desegregation obligations contained in its 1990 Settlement Plan and the Interdistrict Settlement Plan.

In 1992, LRSD and Joshua requested the district court to enter an Order approving certain modifications to LRSD's 1990 Settlement Plan and the Interdistrict Settlement Plan. The district court approved these modifications which became known as LRSD's May 1992 Desegregation Plan (docket no. 1587) and the May 1992 Interdistrict Desegregation Plan (docket no. 1587). For the next six years, LRSD's path to unitary status required it to implement and comply with *all* of the desegregation obligations contained in those two documents.

On January 21, 1997, LRSD and Joshua filed a Joint Motion for Approval of the Revised Plan (docket no. 3107). The Revised Plan included sections addressing each of the *Green* factors: (1) student assignment (§§ 2.3, 3, and 4); (2) faculty and staff (§§ 2.2-2.2.7); (3) transportation (§§ 3.2.7 and 4.7); (4) extracurricular activities (§§ 2.6 and 2.6.3); and (5) facilities (§§ 2.9-2.10). The Revised Plan also included other desegregation obligations that went beyond *Green's* constitutional floor for a school district to become unitary. Examples of the areas in which LRSD voluntarily assumed these additional desegregation obligations were as follows: (1) student discipline (§§ 2.5-2.5.4); (2) advanced placement courses (§§ 2.6 and 2.6.2); and (3) guidance counseling (§§ 2.6.1 and 2.11.1).

Finally, the Revised Plan included sections addressing each of the seven desegregation obligations that the Eighth Circuit in *Appeal of LRSD*, 949 F.2d 256, held were "crucial, and with

-70-

respect to which no retreat should be approved": (1) double funding of incentive schools (§§ 3.6 and 5.5); (2) the Revised Plan does not affect the Magnet School Stipulation and related orders (§ 1.1.b. and e.); (3) the Revised Plan does not materially change LRSD's and PCSSD's obligations regarding the operation of interdistrict schools (§ 4); (4) the Revised Plan does not affect the previously implemented intradistrict desegregation of PCSSD according to the previously agreed timetable; (5) with regard to the disparity in achievement, the Revised Plan provided for implementing programs, policies, and procedures designed to improve and remediate African-American achievement (§§ 2.7, 2.7.1, and 5); (6) with regard to early-childhood education, the Revised Plan required LRSD to maintain the HIPPY[74] program, to keep at least 720 seats in the four-year-old program at their current locations or in the same general area, and to maintain the early childhood program at Rockefeller Incentive School (§§ 3.3.a and 5.1); and (7) the Revised Plan required LRSD to implement programs and policies over the next three years to promote and encourage parental and community involvement and support in the operation of LRSD and the education of LRSD students (§§ 2.8 and 5.7).

On April 10, 1998, Judge Wright entered an Order (docket no. 3144) approving the Revised Plan. Because none of the parties appealed that Order, it became a final consent decree which now governs LRSD's desegregation obligations and controls the question of whether LRSD is entitled to a declaration of unitary status. Thus, LRSD and Joshua have *contractually agreed* on the desegregation obligations that LRSD must comply with, including the specific standard that must be applied to determine if LRSD is entitled to a declaration of unitary status: LRSD is entitled to an Order "releasing LRSD from supervision and finding LRSD unitary with

---

[74]HIPPY stands for Home Instruction Program for Pre-School Youngsters.

-71-

regard to all aspects of school operations provided LRSD has *substantially complied* with its obligations set forth in this Revised Plan" (emphasis added).[75] *See* § 11 of Revised Plan.

## C.    Burden Of Proof

In its *en banc* decision in *Jenkins v. State of Missouri*, 216 F.3d 720, 725 (8th Cir. 2000), the Court held that:

> [O]nce there has been a finding that a defendant established an unlawful dual school system in the past, there is a presumption that current disparities of the sort listed in *Green* are the result of the defendant's unconstitutional conduct . . . . Therefore, the burden of proving unitariness rests on the constitutional violator.

Thus, in a case in which a school district has been determined to be a "constitutional violator," it clearly has the burden of proving that it is in constitutional compliance with each *Green* factor and otherwise is entitled to unitary status. In *Jenkins*, however, the majority opinion went on to hold that KCMSD also had the burden of proof on the issue of minority student achievement and the achievement gap.[76]

*In this case, LRSD has never been adjudicated to be a "constitutional violator."* [77]

---

[75] As indicated previously, the Revised Plan contained provisions covering all of the *Green* factors, as well as a number of other desegregation obligations that LRSD voluntarily agreed to implement. During the evidentiary hearings conducted by Judge Wright to develop the facts relevant to the issue of unitary status, she noted that: "[I]t has occurred to me that more likely than not, just more likely than not, if all we were looking at were the Constitution, that is the *Green* factors, Little Rock is probably unitary" (docket no. 3463, transcript of July 6, 2001 evidentiary hearing at 533).

[76] Judge Loken, who was joined by Judge Beam and Judge Bowman, wrote a vigorous dissent arguing that "[b]y shifting the burden of proof on an ancillary issue such as student achievement, the district court created a regime of federal court supervision that will seemingly never end." *Jenkins*, 216 F.3d at 744.

[77] As discussed previously, in Section II.B., on July 9, 1982, United States District Judge William R. Overton entered a lengthy Memorandum Opinion in *Clark v. Board of LRSD* holding that LRSD had "done an admirable job in the task of desegregation" and that it "had operated in compliance with court decrees for nine years as a completely unitary desegregated school system

-72-

AO 72A

LRSD voluntarily filed this action, *as Plaintiff*, against PCSSD, NLRSD, and the State/ADE to compel consolidation of the three Pulaski County School Districts and to require the State/ADE to pay for its role in causing many of the interdistrict effects that resulted in LRSD becoming a predominantly black school district and NLRSD and PCSSD remaining predominantly white school districts. *In every sense, LRSD was the prevailing party in this case.* Under the 1990 Settlement Agreement, it was the primary beneficiary of over $129,000,000 in payments by the State/ADE, and under the four Settlement Plans, LRSD substantially increased the pool of available white students and avoided becoming what the December 16, 1981 Austin Report[78] predicted would be a virtually all black school district by the late 1980's or early 1990's.

Accordingly, as I have repeatedly emphasized, this is *not* a typical school desegregation case. Under the 1990 settlement documents, LRSD voluntarily agreed to a host of desegregation obligations that included and went well beyond the *Green* factors. The Eighth Circuit has recognized on numerous occasions that the parties' settlement documents are contracts that bind them to discharge the obligations contained in those agreements. *LRSD*, 83 F.3d at 1017. In *Knight v. PCSSD*, 112 F.3d 953, 955 (8th Cir. 1997), the Court characterized the settlement documents in this case as "a particularization of federal law applicable to these parties." In the same vein, the Court later referred to "the terms of the settlement agreement [becoming] the law

---

and isolated complaints of discrimination without persuasive specific evidence to the contrary do not detract from that record" (docket no. 3581, Exhibit 1 at 16). Judge Overton's decision was later affirmed by the Eighth Circuit in *Clark v. Board of LRSD*, 705 F.2d 265 (8th Cir. 1983). Thus, based on Judge Overton's July 9, 1982 decision, it appears that, if LRSD had sought unitary status at that time, it would have been granted. Instead, as Judge Overton noted in his decision, LRSD was concerned it would become an all black resegregated school district because its pool of available white students had been decreasing for several years. To avoid that outcome, LRSD filed this action seeking consolidation of all three Pulaski County school districts.

[78]*See* Stephen F. Austin Report at 19 (docket no. 3581, Exhibit 2).

-73-

of the case." *LRSD*, 131 F.3d at 1258.

On April 10, 1998, Judge Wright entered an Order (docket no. 3144) approving the Revised Plan, which was *not* appealed and is now a *final consent decree that represents the law of the case*. Under § 11 of the Revised Plan, LRSD was entitled to a finding that it was unitary, after the 2000-01 school year, absent a party challenging LRSD's "substantial compliance" with its desegregation obligations. Furthermore, § 11 explicitly provided that the party challenging LRSD's "substantial compliance" had the "burden of proof."

LRSD's and Joshua's voluntary agreement to allocate the burden of proof in this manner was entirely fair and appropriate in light of the fact that: (1) LRSD had never been determined to be a "constitutional violator" in this action; (2) most of the desegregation obligations LRSD voluntarily agreed to undertake in the Revised Plan went beyond the constitutionally mandated *Green* factors;[79] (3) LRSD had been operating under the 1990 Settlement Plan for eight years, a "long time";[80] and (4) the Revised Plan was structured in such a way that LRSD was "presumed" to be unitary after it filed its March 15, 2001 Compliance Report, unless another party challenged its "substantial compliance" with the Revised Plan.

Joshua's counsel has acknowledged on numerous occasions that his clients have the "burden of proof of showing 'that LRSD has [not] substantially complied with its obligations set

---

[79]Several courts have held that a school district, even if it has been adjudicated to be a constitutional violator, should not be allocated the burden of proof regarding alleged disparities that are not *Green* factors, *i.e.*, *per se* vestiges of *de jure* segregation. *Coalition to Save Our Children v. State Bd. of Educ. of Delaware*, 90 F.3d 752, 776-77 (3rd Cir. 1996); *Keyes v. Congress of Hispanic Educators*, 902 F. Supp. 1274, 1282 (D. Colo. 1995).

[80]As indicated previously, in approving the global settlement of this case in 1990, the Eighth Circuit observed that the desegregation remedy called for under the settlement documents "will necessarily require some judicial supervision--monitoring at least--for a long time."

-74-

forth in [the] Revised Plan.'" Joshua's Opposition to LRSD's Motion for Immediate Declaration of Unitary Status at 48 (docket no. 3604); *see also*: (1) Joshua's counsel's statement that "the district court has given us and by agreement we accept the burden of proof" (docket no. 3464, transcript of July 9, 2001 scheduling conference at 26, lines 14-17); and (2) Judge Wright's ruling that, under § 11 of the Revised Plan, Joshua is the "challenging party" and has the burden of proving that LRSD was not in "substantial compliance," as of March 15, 2001 (docket no. 3461, transcript of June 29, 2001 telephone conference at 26, lines 11-21).

As indicated previously, during the nine days of hearing evidence on LRSD's Motion for an Immediate Declaration of Unitary Status (docket no. 3580), Joshua challenged LRSD's substantial compliance with the following specific provisions of the Revised Plan: (1) § 2.1 (good faith); (2) §§ 2.5-2.5.4 and 2.12.2 (student discipline); (3) §§ 2.7, 2.7.1, 5.1-5.8, and 2.12.2 (academic achievement of African-American students); (4) §§ 2.6 and 2.6.3 (extracurricular activities); (5) §§ 2.6 and 2.6.2 (advanced placement courses); and (6) §§ 2.11-2.11.1 (guidance counseling). Thus, in accordance with § 11 of the Revised Plan, Joshua has the burden of proving LRSD's substantial noncompliance in each of those six areas.

## D.    Meaning Of "Substantial Compliance"

The Revised Plan does not define "substantial compliance," and LRSD and Joshua disagree over the meaning of that phrase. In LRSD's Memorandum Brief in Support of Motion for Immediate Declaration of Unitary Status at 12 (docket No. 3581), it argues that the Court's holding in *Cody v. Hillard*, 139 F.3d 1197, 1199-1200 (8th Cir. 1998), stands for the proposition that "a party to a consent decree substantially complies with the decree so long as the party's noncompliance does not cast doubt on [the party's] future compliance with the Constitution."

-75-

Joshua argues that LRSD has misconstrued the Court's holding in *Cody* (docket no. 3604 at 48).

The underlying consent decree in *Cody* was imposed by the district court in a South Dakota prison reform case. After operating under the consent decree for eleven years, prison officials moved for its termination. The district court, without conducting any hearings, entered an order dissolving the consent decree and stating in a conclusory manner that "the defendants have conscientiously and in good faith complied substantially with its [the consent decree's] terms." *Id.* at 1199. The Eighth Circuit held that the district court's bare bones decision to dissolve the consent decree was inadequate:

> The record indicates that there have been failures in the past to comply with the decree and supplemental orders, and that there are still at least some violations of the decree. The district judge's order does not give us enough information to determine whether he ignored the evidence of past and present violations *or whether he considered any violations inconsequential in the context of substantial compliance.* If the conditions Powitz complained of constitute violations of the consent decree, the district court must exercise its discretion in determining *whether those violations were serious enough to constitute substantial noncompliance and to cast doubt on defendants' future compliance with the Constitution.*

*Id.* (emphasis added).

While I believe *Cody* is helpful in construing the meaning of "substantial compliance," as that phrase is used in the Revised Plan, I disagree with LRSD's interpretation of that case. The Court in *Cody* made it clear that, in order to determine if a party is in "substantial compliance" with a consent decree, the trial court must examine whether any of the alleged violations of the consent decree "were serious enough to constitute substantial noncompliance" *and* "to cast doubt on defendants' future compliance with the constitution." The Court in *Cody* also recognized that a party can be in "substantial compliance" with a consent decree even if it has committed violations that are "inconsequential" in light of the party's overall performance.

-76-

AO 72A

Thus, under the Court's holding in *Cody,* I am required to examine whether any of LRSD's failures to comply with the Revised Plan in the six challenged areas are "serious enough": (1) to constitute "substantial noncompliance"; and (2) "to cast doubt" on LRSD's "future compliance with the constitution."[81] I also must make detailed Findings of Fact regarding each of the six areas of the Revised Plan in which Joshua contends LRSD has failed to substantially comply with its desegregation obligations.

### E.     The Metaphysics Of Using The "Achievement Gap" As A Factor In Deciding Unitary Status.

As indicated earlier, in *Jenkins III,* 515 U.S. at 73, the Court relieved the State of Missouri of the obligation of continuing "to fund the [KCMSD] quality education programs because student achievement levels were still 'at or below national norms at many grade levels' . . . ." The lower court had imposed that obligation on the State based upon a generalized finding that the academic achievement gap between African-American and white students in KCMSD was a vestige of *de jure* segregation. The Court made it clear that, to sustain such a result, the district court must make a much more specific and precise finding regarding the *causal link* between the achievement gap and the system of *de jure* segregation that was in place decades earlier:

> The basic task of the District Court is to decide whether the reduction in achievement by minority students attributable to prior *de jure* segregation has been remedied to the extent practicable. . . . Although the District Court has determined that "[s]egregation has caused a system wide reduction in achievement in the schools of the KCMSD," 639 F. Supp. at 24, *it never has identified the incremental effect that segregation has had on minority student achievement or the specific goals of the quality education program.*

*Jenkins III* at 101 (emphasis added). The Court went on to provide the following guidance on

---

[81]The second prong of this test is already incorporated under LRSD's "good faith" obligations contained in § 2.1 of the Revised Plan.

-77-

how the minority student achievement gap should figure into the "remedial calculus" of a school

desegregation case:

> Just as demographic changes independent of *de jure* segregation will affect the racial composition of student assignments [citations omitted] so too will numerous external factors beyond the control of the KCMSD and the State affect minority student achievement. *So long as these external factors are not the result of segregation, they do not figure into the remedial calculus. [Citations omitted.] Insistence upon academic goals unrelated to the effects of legal segregation unwarrantably postpones the day when the KCMSD will be able to operate on its own.*

*Id.* (emphasis added).

Thus, under the test established by the Court in *Jenkins III,* the gap in minority student

achievement must be causally linked by expert testimony and other evidence which is sufficiently

specific to allow the trial court to identify "the incremental effect that segregation has had on

minority student achievement." *Id.* at 101. Five years later, Judge Gibson, in his concurring

opinion in *Jenkins v. State of Missouri,* 216 F.3d 720, 732 (8th Cir. 2000), succinctly stated this

proposition as follows:

> In fact, *Jenkins III* neither "authorizes" nor forbids [a lower court finding the minority student achievement gap is a] vestige [of *de jure* segregation]; rather, it tells us to look at the evidence in the case to determine what part of the gap (if any) was caused by the constitutional violation.

Sociologists and educators have recognized for over a decade that there are a host of

factors, completely unrelated to the effects of *de jure* segregation, that also are responsible for the

minority student achievement gap. Some of these other factors include low birth weight, poverty,

whether the student is raised by a single parent, parental interest and involvement, and peer

influence. Complicating this issue still further is the fact that the achievement gap "exists across

the country in prior segregated school districts and school districts that have not discriminated

-78-

AO 72A

against minority students."[82]

All of this raises an obvious question and serious problem: How does a trial court go about determining, with *any* degree of precision, the percentage of the achievement gap (assuming there is any) that is causally related to *de jure* segregation (which ended many decades earlier)--after somehow excluding the host of other socioeconomic factors that are universally recognized as also contributing to the achievement gap? Reviewing the reported cases in which brave souls have undertaken this task puts one in mind of trying to nail jelly to a wall.

For example, after *Jenkins III* was remanded, the trial court conducted a three-week hearing on the State of Missouri's Motion for Declaration of Unitary Status. *Jenkins v. State of Missouri*, 959 F. Supp. 1151 (W.D. Mo. 1997). Significantly, the trial court did *not* analyze and make specific findings of fact to support the conclusion that the African-American student achievement gap in the KCMSD was causally linked to the *de jure* system of education that had ended decades earlier. Instead, the trial court engaged the *presumption* that the disparity in academic achievement between African-American and white students was the result of *de jure* segregation.

Most of the testimony during the three-week hearing was provided by expert witnesses who battled over the extent, if any, that the achievement gap in the KCMSD (after excluding socioeconomic and other factors) was actually the result of *de jure* segregation, which the trial court referred to as the "race effect." Ultimately, the trial court accepted the expert testimony of Dr. William Trent, who concluded that 4% to 9% of the *initial variance* in African-American and white student test scores could be explained by the "race effect" and 2% to 4% by lower teacher

---

[82]The interplay among all of these factors was discussed at length by the trial court in *Jenkins v. State of Missouri*, 959 F. Supp. 1151, 1158-64 (W.D. Mo. 1997).

-79-

AO 72A

expectations for African-American students. *Id.* at 1158 and 1164. The trial court then took the high end of both of these ranges and concluded that 13% of the initial achievement gap was due to the "race effect." The trial court also concluded, with no supporting analysis, that another 13% should be added to account for the increase in the achievement gap as African-American children progress through the KCMSD. Thus, the trial court held that, taken together, 26% of the achievement gap in KCMSD was attributable to racial discrimination. *Id.* at 1165. The trial court's decision was later affirmed by a three-judge panel of the Eighth Circuit in *Jenkins v. State of Missouri*, 112 F.3d 588 (8th Cir. 1997).

After several careful readings of the trial court's decision in *Jenkins*, 959 F. Supp. 1151, I am still struck by what appears to me to be the largely speculative conclusion that 26% of the achievement gap in the KCMSD is attributable to the "race effect." I nowise understand why the trial court decided to use the high end of both the 4% to 9% and the 2% to 4% ranges to calculate the 13% initial achievement gap attributable to the "race effect." If the trial court had used the lower end of those ranges, the effects attributable to racial discrimination would have been only 6%. Likewise, choosing simply to double the initial 13% "race effect," to account for the increase in the achievement gap as African-American children progress through the KCMSD, creates at least the appearance that the trial court pulled a number from thin air. I am afraid that, try as I might to follow the trial court's reasoning, I am left with the distinct impression that it was forced to "guess" in arriving at these percentages because Dr. Trent, the expert witness, was also "guessing" in his testimony that attempted to calculate--nay, divine--the percentage of the KCMSD achievement gap, if any, that was the result of racial discrimination.[83]

---

[83]The trial court's decision also does not appear to square with the Court's admonition in *Freeman*, 503 U.S. 467, 494, that the putative vestiges of discrimination must be "traceable, in

In his dissent in *Jenkins v. State of Missouri*, 216 F.3d 720, 735-36 (8th Cir. 2000), Judge

Beam made a strong argument against a trial court ever accepting an academic achievement gap

as a vestige of *de jure* segregation which must be eliminated or narrowed before a school district

can achieve unitary status:

> As a threshold matter, I note that any evidence that such a vestige exists
> in KCMSD is dubious at best. Even a cursory examination of the bases for
> Dr. Trent's opinions reveal them to be nothing more than guesses and speculation.
> This court's reliance on a black-white achievement gap to measure lingering
> effects of invidious segregation runs contrary to the finding of every other Circuit
> Court that has considered the issue. *See United States v. City of Yonkers*, 197
> F.3d 41, 54-55 (2d Cir. 1999); *People Who Care v. Rockford Bd. of Educ.*, 111
> F.3d 528, 537-38 (7th Cir. 1997); *Coalition to Save Our Children v. State Bd. of
> Educ.*, 90 F.3d 752, 776-77 (3d Cir. 1996). In fact, Dr. Trent's testimony on this
> purported phenomenon was rejected by the First Circuit. *See Wessmann v.
> Gittens*, 160 F.3d 790, 804 (1st Cir. 1998). Similar evidence based upon
> Dr. Trent's methodology was held inadmissible under *Daubert* standards by the
> Seventh Circuit. *See People Who Care*, 111 F.3d at 537. Nonetheless, this court
> clings to the claimed existence of such a vestige of discrimination.

Judge Beam also pointed out the conundrum created for KCMSD in being required to narrow the

achievement gap as a prerequisite for attaining unitary status:

> The undisputed evidence offered at the 1997 hearing shows that non-
> minority and minority students respond equally to effective teaching and
> innovative educational techniques. The implemented and to-be-implemented
> programs at KCMSD will, according to the testimony, raise the test scores of all
> KCMSD students without regard to race. This laudable and sought after
> educational result occurs because, as the Supreme Court noted in *Jenkins III*, a
> "rising tide lifts all boats." [Citation omitted.] In other words, under the current
> plan all KCMSD students will improve at the same rate in normalized curve

---

a proximate way, to [a] prior [constitutional] violation." I do not believe the Supreme Court's
decisions in *Freeman* and *Jenkins* permit a trial court to "presume" that the achievement gap
between African-American and white students must be the result of *de jure* segregation. Rather,
those two decisions, read together, clearly require the trial court to base such a determination on
specific facts that: (1) establish a direct causal link between the achievement gap and the prior
system of *de jure* segregation; and (2) demonstrate the portion of that achievement gap that is
attributable to *de jure* segregation, after excluding all of the other factors that contribute to the
achievement gap.

-81-

equivalents (NCEs). Clearly then, the evidence shows that the presently approved court educational plan, by itself, will not impact the achievement gap. Without influence from factors well beyond the control of KCMSD, the approach now championed by the class and the court will only serve to make the goal unattainable. In short, when the gap is eliminated, if it ever is, it will not be because of federal court supervision of curriculum and classroom instruction. It will be because of societal changes that are not achievable through use of the remedial power and authority of the federal courts.

*Id.* at 738 (footnotes omitted).

In *People Who Care v. Rockford Board of Education*, 246 F.3d 1073 (7th Cir. 2001), Judge Posner, writing for a three-judge panel, reversed the lower court and found that the Rockford school district was unitary. In reaching that decision, Judge Posner rejected the argument that the minority student achievement gap in the Rockford public schools was a vestige of *de jure* segregation dating back to an earlier period in Rockford's history:

> Yet it is obvious that other factors besides discrimination contribute to unequal educational attainment, such as poverty, parents' education and employment, family size, parental attitudes and behavior, prenatal, neonatal, and child health care, peer-group pressures, and ethnic culture. Some of these factors may themselves be due to or exacerbated by discrimination, but not to discrimination by the Rockford school board. The board has no legal duty to remove those vestiges of societal discrimination for which it is not responsible. Insofar as the factors that we have mentioned, rather than unlawful conduct by the Rockford school board in years past, are responsible for lags in educational achievement by minority students, the board has no duty that a federal court can enforce to help those students catch up. It may have a moral duty; it has no federal constitutional duty.
>
> No effort has been made by the plaintiffs, despite our warnings, to partition, however crudely, the lag in achievement that is due to the school board's past illegalities and the lag that is due to other factors, factors for which the school board bears no federal legal responsibility.

*Id.* at 1076-77. *Accord Coalition to Save Our Children v. State Board of Education of Delaware*, 90 F.3d at 779 ("As humans, we acknowledge with melancholy the fact that many socioeconomic factors militate against a complete level playing field in our society. As judges, however, we are

-82-

AO 72A

powerless to alter formidable social, economic and demographic forces and conditions over which no legal precept has control").

In this case, the original remedy in *LRSD v. PCSSD*, 778 F.2d 404, 434-36 (8th Cir. 1985), made *no mention* of any desegregation obligations related to narrowing or eliminating the minority student achievement gap in any of the three Pulaski County school districts. Under the 1990 Settlement Agreement and its 1990 Settlement Plan, LRSD *voluntarily agreed* to eliminate the achievement gap between African-American and white students "on norm-referenced and criterion-referenced tests."[84]   Later, this goal was also included in LRSD's May 1992 Desegregation Plan (docket no. 1587 at 1), which contained certain jointly agreed to modifications to LRSD's 1990 Settlement Plan. *See* discussion *supra* at pp. 27-30.

In May of 1996, Judge Wright took testimony from three nationally recognized expert witnesses on various desegregation obligations contained in LRSD's 1990 Settlement Plan, as revised by its May 1992 Desegregation Plan. Each of those experts offered testimony on the issue of LRSD's obligation to eliminate the academic achievement gap. *See* Testimony of Herbert J. Walberg, Ph.D. (docket no. 2692 at 33-86); David J. Armor, Ph.D. (docket no. 2693 at 18-39); and Gary Orfield, Ph.D. (docket no. 2768 at 25-31). Together, the testimony of these experts made it clear that, regardless of the effort put forth by LRSD, it was unlikely this gap could be substantially narrowed, much less eliminated, within the foreseeable future.

LRSD attempted to use the testimony developed during these hearings to support its May 17, 1996 Motion to End Federal Court Jurisdiction (docket no. 2666). On September 23,

---

[84]The Eighth Circuit later held that "*the agreed effort* to eliminate achievement disparity between the races" was one of the "crucial elements" of LRSD's 1990 Settlement Plan from which "no retreat should be approved." *Appeal of LRSD*, 949 F.2d 253, 256 (8th Cir. 1991) (emphasis added).

-83-

1996, Judge Wright entered a Memorandum and Order (docket no. 2821) denying LRSD's Motion to End Federal Court Jurisdiction. In this Memorandum and Order, Judge Wright urged LRSD and Joshua to use the expert testimony developed during the May 1996 hearings as a basis for modifying "the parts of the plan that are ineffective or unworkable" so that LRSD could put itself in a better position to achieve unitary status and release from court supervision.

On January 21, 1998, LRSD and Joshua filed their Joint Motion for Approval of the Revised Plan (docket no. 3107). In contrast to LRSD's 1990 Settlement Plan, as modified by its May 1992 Desegregation Plan, the Revised Plan did *not* obligate LRSD to narrow or eliminate the achievement gap. Rather, under § 2.7, LRSD was obligated only to implement "policies, programs and procedures designed to improve and remediate the academic achievement of African-American students . . . ." Under § 2.7.1, it also was obligated to make annual assessments of the academic programs implemented to remediate and improve African-American achievement in order to determine the effectiveness of those programs.

In this case, no court has ever determined generally, or with the specificity required in *Jenkins III*, what portion, if any, of the minority student achievement gap in LRSD is causally linked as a vestige of *de jure* segregation. Furthermore, Joshua has failed to introduce *any evidence* to establish that: (1) the achievement gap is causally linked to the system of *de jure* segregation which existed in LRSD decades earlier; and (2) the portion of the achievement gap which is attributable to *de jure* segregation, after excluding all of the socioeconomic factors that also have contributed to that gap. Rather, Joshua has raised the achievement gap issue as part of their challenge to LRSD's substantial compliance with §§ 2.7 and 2.7.1 of the Revised Plan. Therefore, my task is far easier than the one Judge Clark faced after the Supreme Court reversed

-84-

and remanded *Jenkins III*; for I must only decide the narrow question of whether Joshua has met their burden of proving that LRSD has failed to substantially comply with its obligations to implement policies, programs, and procedures designed to improve and remediate the academic achievement of African-American students under § 2.7 and to make the annual assessment of those policies, programs, and procedures to determine their effectiveness, as required by § 2.7.1.

## V. Findings Of Fact

As I have previously explained, the question of unitary status turns on whether Joshua has sustained its burden of proving that LRSD failed to substantially comply with its obligations in one or more of the six challenged areas of the Revised Plan:[85] (1) good faith (§ 2.1); (2) student discipline (§§ 2.5 through 2.5.4 and § 2.12.2); (3) extracurricular activities (§§ 2.6 and 2.6.3); (4) advanced placement courses (§§ 2.6 and 2.6.2); (5) guidance and counseling (§§ 2.11 and 2.11.1); and (6) academic achievement of African-American students (§§ 2.7, 2.7.1, 5.1 through 5.8 and § 2.12.2).[86] My Findings of Fact, organized according to the areas of the Revised Plan that have been challenged, are set forth below.[87]

---

[85]CX 871.

[86]The only challenged provisions of the Revised Plan that address one of the *Green* factors are §§ 2.6 and 2.6.3 governing LRSD's obligations regarding "extracurricular activities." With regard to the other *Green* factors (student assignment, faculty and staff, transportation, and facilities), the record appears to be clear that LRSD is unitary. This undoubtedly explains why Joshua has *not* challenged LRSD's compliance with any of the provisions of the Revised Plan that address the other *Green* factors. Therefore, in deciding the question of unitary status, "extracurricular activities" is the only *Green* factor that I must consider.

[87]The transcripts of the nine days of evidentiary hearings on unitary status have the following docket numbers: 3462 (July 5, 2001 hearing, Tr. 1-273); 3463 (July 6, 2001 hearing, Tr. 274-557); 3493 (August 1, 2001 hearing, Tr. 558-812); 3494 (August 2, 2001 hearing, Tr. 813-956); 3558 (November 19, 2001 hearing, Tr. 1-297); 3559 (November 20, 2001 hearing, Tr. 298-591; 3664 (July 22, 2002 hearing, Tr. 1-282); 3665 (July 23, 2002 hearing, Tr. 283-550); and 3666 (July 24, 2002 hearing, Tr. 551-817). Because of pagination breaks in the 2,364 pages

A.    **Good Faith**

1.    The Little Rock School Board ( the "Board") enacted fifteen specific policies related to the obligation of good faith.[88] Together, these policies committed LRSD to fighting all forms of discrimination (gender, ethnicity, and race, age, religion, and handicapped/disability). Joshua has not challenged the facial adequacy of the Board's policies and regulations enacted to implement the obligation of good faith contained in § 2.1.[89]

2.    Section 8.2, *et seq.*, contained a three-step procedure for resolving, in a timely and expeditious manner, any compliance issues that might arise during the three-year term of the Revised Plan. The first step in this procedure called for the complaining party to bring the compliance issue to the attention of LRSD. If the complaining party and LRSD could not resolve the issue, it was to be submitted to the ODM for facilitation. If that failed, the issue was to be presented to the Court.[90]

---

of testimony taken during these evidentiary hearings, my Findings of Fact will identify relevant testimony using *both* the date of the hearing and the corresponding transcript page number. Readers interested in locating these transcripts in the record should refer to this footnote to find the corresponding docket number.

[88]See Section III.A., *supra*, at 55.

[89]The Board identified each of the fifteen "policies" enacted under the Revised Plan with the following seemingly random capital letters: AC, ACA, ACB, ACBB, ACBE, ACC, ACD, ACE, ACF, ACG, AD, ADA, ADB, ADC, ADD. *See* CX 719 at Section A. This coding system made the testimony about Board policies very hard to follow.

I prefer plain English to codes and jargon. However, this case has taught me that not all educational administrators share my views on English usage. For example, until I encountered this case, I was unaware that: (a) when data is separated it must be referred to as "disaggregated data"; (b) data presented over time must be called "longitudinal data"; and (c) students' scores that are in the same range on a standardized test must be referenced as a "cohart of data." Perhaps the legal profession is not the only discipline that should purge most of its esoteric jargon.

[90]*See* Section III.F., *supra*, at 57-59.

-86-

3.      During the term of the Revised Plan, Joshua raised only five compliance issues pursuant to the procedure outlined in § 8.2, *et seq.*  Each of those issues was resolved without requiring Court intervention.  *See* LRSD's March 15, 2001 Compliance Report (the "Final Compliance Report") at 166.[91]  In the nine days of hearings on unitary status, Joshua did *not* raise any of those five previously resolved compliance issues.  Instead, Joshua asserted six *new* compliance issues, none of which had been raised and pursued on a timely basis under § 8.2, *et seq.*, of the Revised Plan.

4.      Mr. Baker Kurrus, the current President of the Board, testified that the Board reserved time for Joshua to appear at each Board meeting held during the term of the Revised Plan.  TR. July 24, 2002, at 750-51.  The minutes of the Board's meetings for the 1998-99, 1999-2000, and 2000-01 school years were introduced into evidence as CX 739.  According to those minutes, the Board held seventy meetings during the three-year term of the Revised Plan.  However, Joshua appeared and addressed the Board on only three occasions:

(a)      On July 22, 1999, Joshua's attorney addressed the Board and raised various general concerns regarding LRSD's implementation of its obligations under the Revised Plan.  CX 739, minutes of July 22, 1999 Board meeting at 2.  Mr. Kurrus testified that then Little Rock School Superintendent, Dr. Les Carnine, worked with Joshua to resolve those concerns.  Tr. July 24, 2002, at 753.  Joshua failed to raise any of those concerns again at either a Board meeting or pursuant to § 8.2 of the Revised Plan.  *See* CX 739 and Final Compliance Report at 166.

(b)      During the November 10, 1999 Board meeting, Joshua's counsel appeared to support parents and community members opposed to LRSD closing Mitchell Elementary School.  CX 739, minutes of November 10, 1999 Board meeting at 2.  According to Mr. Kurrus, the Board subsequently decided not to close Mitchell Elementary.  Tr. July 24, 2002, at 762.

(c)      During a Board meeting on January 25, 2001, Joy Springer, a legal assistant for Joshua's counsel, advised the Board that: (a) some issues still remained to be

---

[91]Docket no. 3410, CX 870.

-87-

addressed regarding LRSD's implementation of the Revised Plan; and (b) Joshua hoped for a dialogue with LRSD administrators and the Board about those issues before taking any legal action. CX 739, minutes of January 25, 2001 Board meeting at 3. After January 25, 2001, Joshua's counsel neither appeared again before the Board, nor raised any compliance issues pursuant to § 8.2 of the Revised Plan. *See* CX 739 and Final Compliance Report at 166. These facts create at least the appearance that LRSD administrators and Joshua were able to resolve the compliance issues alluded to by Ms. Springer during the January 25, 2001 Board meeting.

5.    In July of 1998, LRSD began paying Joshua's counsel $4,027.78 per month to monitor its compliance with the obligations contained in the Revised Plan. *See* docket no. 3581, Exhibits 7 and 8; Tr. July 24, 2002, at 754-56. During almost the full three-year term of the Revised Plan, Joshua's counsel submitted invoices to LRSD for his performance of monitoring work, and, pursuant to those invoices, LRSD paid Joshua's counsel a total of $124,861.15. *Id.* at Exhibits 7 and 8. Mr. Kurrus's testimony made it clear that, in exchange for being paid that money, LRSD expected Joshua's counsel to bring to its attention, *on a timely and ongoing basis,* any compliance issue which, if left unresolved, might result in Joshua challenging LRSD's right to a declaration of unitary status under § 11 of the Revised Plan:

> Q.    I thought a minute ago you said you weren't aware we were trying to be cooperative.
>
> A.    No, I was aware–I guess what I was going to say was that we have a settlement agreement. It's a written document, and it details very specifically the things that are to be done in the event we seek unitary status or if you have an objection to that. *We agreed to pay money for that. That's why we paid that money, Your Honor, is because it was a continuing obligation of monitoring and work and a process whereby you [referring to Joshua's counsel] on behalf of your clients were going to step forward and tell us what we were doing wrong. That's the process that I relied on.*

Tr. July 24, 2002, at 763 (emphasis added).

6.    I find that the purpose for LRSD retaining Joshua's counsel to monitor its

-88-

compliance with the Revised Plan and for including a procedure in § 8.2 , *et seq.*, for raising and resolving compliance issues, in a timely and expeditious manner, *was to avoid any last minute surprises under § 11.*[92]  I further find that LRSD reasonably relied on Joshua's counsel to bring to its attention, *in a timely and expeditious manner*, any compliance issues so that they could be resolved pursuant to the procedure contained in § 8.2, *et seq.*, of the Revised Plan.

7.    On March 15, 2000, LRSD filed the Interim Compliance Report,[93] which set forth in detail all of the policies, programs, and procedures that it had implemented to comply with its obligations under the Revised Plan.  *This Interim Compliance Report unquestionably put Joshua's counsel on notice of each of the six alleged compliance problems that are now before me.*  Although the Interim Compliance Report solicited responses from all interested parties, Joshua elected not to respond.

8.    Based upon my review of the record, it does not appear that Joshua raised *any* of the six compliance issues now before me until several months *after* LRSD filed its Final Compliance Report on March 15, 2001.  Furthermore, it appears that LRSD's first notice of the substance of those alleged compliance problems was its receipt of Joshua's "Opposition to LRSD's Compliance Report" (docket no. 3447), which was filed on June 25, 2001.

9.    Section 11 of the Revised Plan did *not* expressly require an issue to be raised pursuant to § 8.2, *et seq.*, before it may be asserted as a ground for denying LRSD unitary status. However, read together, the intent of §§ 8.2 and 11 was for Joshua to use the procedure outlined

---

[92]Alas, as the great Scottish poet Robert Burns noted in "To A Mouse": "The best-laid schemes o' mice an' men/Gang aft agley,/An' lea'e us nought but grief an' pain/For promis'd joy!"

[93]Docket no. 3356, CX 869.

in § 8.2 to raise compliance issues, on a timely basis, so that an effort could be made to resolve them *before* LRSD filed its Final Compliance Report. This is especially true in light of LRSD's having paid Joshua's counsel over $4,000 per month to monitor its ongoing compliance with the Revised Plan. Thus, I find that Joshua's failure to raise any of the alleged compliance issues now before the Court, until *after* LRSD filed its Final Compliance Report, is one factor that I should weigh in deciding whether LRSD's alleged shortcomings in those areas rise to the level of substantial noncompliance.

10.     Section 2.1.1 of the Revised Plan obligated LRSD to hire a "desegregation and/or education expert approved by Joshua" to assist in "the development of the programs, policies, and procedures to be implemented in accordance with [the] Revised Plan and to assist LRSD in devising remedies to problems concerning desegregation or racial discrimination which adversely affect African-American students." In the summer of 1998, with the approval of Joshua, LRSD hired: (a) Dr. Terrence Roberts, the co-chair of the Psychology Department at Antioch University in Los Angeles and one of the "Little Rock Nine," the first group of African-American students admitted to Central High School in 1957 (Tr. July 24, 2002, at 615-16); and (b) Dr. Steven Ross, a professor of education research at the University of Memphis (Tr. July 23, 2002, at 539).

11.     Dr. Roberts described the work that he performed for LRSD as follows:

> Since that time [the summer of 1998] I have been actively involved in doing review of policy and procedure. I have looked at programs that have been developed, offered commentary on those programs. I have developed training programs for staff, including teachers, bus drivers, security personnel, counselors, and others. And I also have been involved in training a group of trainers to carry on a program that I developed for the district.

Tr. July 24, 2002, at 619-20. Although Dr. Roberts testified that he did not participate in LRSD's weekly Compliance Committee meetings, he "regularly got reports from what the committee was

-90-

doing, so I had comments, minutes, that sort of thing." *Id.* at 621.

12.    Most of Dr. Roberts' work focused on creating a program called "Coping With Difference," which was designed to assist LRSD in implementing its desegregation obligations. *Id.* at 627. He directly trained hundreds of LRSD employees under that program, and also qualified a number of LRSD employees as trainers so that, in his absence, they could continue to teach "Coping With Difference" to other LRSD employees. *Id.* at 645-46.

13.    Dr. Roberts trained guidance counselors regarding issues of diversity so that they could better perform their jobs. *Id.* at 621. He also "spent a lot of time" working with Dr. Bonnie Lesley, the Associate Superintendent of Curriculum and Instruction. *Id.* at 622. Among other things, Dr. Roberts helped write a program designed to increase the number of African-American students in pre-AP and AP courses. *Id.* at 630, 638-39; CX 869 at 33.

14.    During his testimony, Dr. Roberts was critical of LRSD administrators whose interest "was in meeting the letter of the law, that the real concern was about dotting the I's and crossing the T's of every single thing in that plan." *Id.* at 630. He described this approach as a "compliance mentality" and stated that it diminished LRSD's focus on the more important issue of"attitudes toward people who are different." *Id.* at 631. While I can understand an educator such as Dr. Roberts being surprised by LRSD's "compliance mentality," it is one of the bedrock principles of school desegregation litigation that a school district can only emerge from federal court supervision after it has carefully dotted all the I's and crossed all the T's necessary to establish that it is operating in a unitary and constitutional fashion.

15.    Having operated continuously under federal court supervision for over four decades, LRSD unquestionably has developed something of a "compliance mentality." This

AO 72A

inevitable negative by-product of long-running school desegregation cases no doubt played a role in the Supreme Court reaching a series of decisions,[94] in the 1990's, that made it easier for school districts to achieve unitary status, regarding part or all of their operations. Only after a school district has become unitary can administrators and teachers focus their full efforts away from "compliance" and back to the task at hand: providing children with the best possible education and developing creative programs to address the host of challenges now confronting educators in this district and across the country.

16.     Finally, Dr. Roberts testified that, during his address to the Board in October of 1999, he stated that LRSD had a tremendous amount of energy directed toward making sure that it met all of the criteria listed in the Revised Plan. *Id.* at 646-47. He also testified that he told the Board his work was being well received, the process was moving along as planned, and LRSD had the potential for becoming a model school district for the entire country. *Id.* at 647.

17.     On January 11, 2001, the Board further documented its commitment to comply with the Constitution by adopting the "Covenant for the Future" (the "Covenant"). In the Covenant, the Board promised to continue to exercise its best efforts to: (a) improve the academic achievement of all students; (b) comply with the Constitution and ensure that no person is discriminated against on the basis of race, color, or ethnicity in the operation of LRSD; and (c) provide equitable educational resources, programs, and opportunities in a non-discriminatory environment for all students attending LRSD schools. *See* Final Compliance Report (docket no. 3410) at 1; and CX 719, Policy AB.

18.     Joshua introduced evidence of complaints of discrimination made by African-

---

[94]*See* discussion, *supra*, at 60-69.

-92-

American parents and students to administrators or principals in an effort to show that LRSD did not act in good faith in responding to those complaints.[95] In every instance, the LRSD principal or administrator who received and investigated those complaints was an African-American. Furthermore, Mr. James Washington, the Ombudsman, made it clear in his testimony that he thoroughly investigated all allegations of race-based mistreatment that were brought to his attention by parents or students. Finally, LRSD's policies, regulations, and training programs clearly conveyed to all administrators, principals, and teachers that racial discrimination would not be tolerated.

19.    The isolated and anecdotal evidence presented by Joshua's witnesses regarding discrimination they experienced or perceived to exist during the term of the Revised Plan failed to prove that LRSD was not in substantial compliance with the obligation of good faith contained in § 2.1 of the Revised Plan. Based upon my review of the record and consideration of all of the testimony, I find that race-based mistreatment of students is neither accepted nor tolerated by LRSD. In this regard, Dr. Marian Lacey, an African-American and LRSD's Assistant Superintendent of Secondary Schools, forcefully testified that, if race-based mistreatment by a teacher was brought to the attention of a school principal, the principal would investigate that allegation and, if substantiated, take appropriate action against the teacher. I credit her testimony. Tr. July 24, 2002, at 804-05.

20.    I find that Dr. Roberts was correct in his observation that LRSD focused a great

---

[95]This testimony was introduced through: (a) three parents of children in LRSD: Romona Horton (Tr. July 23, 2002, at 287-317); Avis Thames (*id.* at 439-44); and Pamela Mercer (*id.* at 444-63); and (b) four former LRSD students: Crystal Mercer (*id.* at 317-28); Justin Mercer (*id.* at 328-97); Chris Payne (*id.* at 399-416); and D. J. Thames (*id.* at 417-39). Later, in this opinion, I make specific findings of fact regarding the testimony of those witnesses.

deal of effort on dotting the I's and crossing the T's regarding its compliance with the Revised Plan. There can be no question that LRSD administrators, principals, and teachers took their responsibilities under the Revised Plan seriously and exercised their best efforts to comply with each section of that document. Tr. November 19, 2001, at 188-91, 193; Tr. August 1, 2001, at 672-74. I also find that the Board implemented policies and regulations designed to: (a) fully implement all of the desegregation obligations contained in the Revised Plan; (b) comply with the Constitution; (c) remedy the effects of past discrimination against African-American students; and (d) ensure that no person was discriminated against on the basis of race, color, or ethnicity.

21.     I recognize the crucial importance of finding that LRSD discharged the obligation of good faith contained in § 2.1 of the Revised Plan. In essence, it means that LRSD can be trusted, in the future, to operate the Little Rock school system in compliance with the Constitution, without the need for federal court supervision of those areas in which I decide it is unitary. In finding that LRSD can be trusted in the future to comply with the Constitution, I take comfort from the words of Judge Wollman in his concurring opinion in *Appeal of LRSD*, 949 F.2d 253, 259 (8th Cir. 1991):

> On the other hand, we should remember that this is not 1954 or 1957--or even 1985, for that matter--and the time has come to cease excoriating the leaders of the present for the sins of their forebears and to vouchsafe them some credit for the efforts they have made to comply with the several decrees that have been entered in this long-standing case.

22.     Since the parties reached the historic settlement of this case in 1989, I find that, overall, LRSD has established a good record of acting in good faith to implement and comply with its desegregation obligations under the various settlement plans and to operate the Little Rock school system in compliance with the Constitution. I further find that LRSD has

substantially complied with its obligations under § 2.1 of the Revised Plan and that, in the future, it can be trusted to follow the Covenant and the Constitution.

**B.      Student Discipline**

1.       Sections 2.5 through 2.5.4 of the Revised Plan imposed certain obligations on LRSD regarding student discipline. [96]  The Board enacted the following policies and regulations to implement LRSD's obligations under §§ 2.5 through 2.5.4:  AC (nondiscrimination); ACB (nondiscrimination on the basis of ethnicity and race); JRAA and JRAA-R (purging student discipline records); and JI (student rights and responsibilities as set forth in the Student Handbook).  *See* CX 719.  Joshua has not challenged the facial adequacy of any of the Board policies and regulations on student discipline.  Joshua also has not challenged LRSD's compliance with its obligations to purge student discipline records, after the fifth and eighth grades, as required by § 2.5.2 of the Revised Plan.

2.       LRSD *voluntarily* prepared a Compliance Plan dated June 10, 1999, which outlined how it intended to go about implementing its obligations under each section of the Revised Plan.  *See* CX 544.  The Compliance Plan: (a) identified the title of each LRSD administrator who had overall responsibilities for implementing each section of the Revised Plan; (b) identified the Board policies that had been or were to be enacted to implement each section of the Revised Plan; and (c) set forth the procedures and programs that had been developed, to date, under each section of the Revised Plan.  LRSD also prepared a Compliance Handbook dated

---

[96]*See* Section III.B., *supra*, at 55.  According to the ODM's June 14, 2000 Report on Disciplinary Sanctions in LRSD (docket no. 3366), a Committee composed of teachers, administrators, parents, representatives of Joshua and Knight Intervenors, a member of the ODM staff, and Dr. Linda Watson, the Assistant Superintendent of Disciplinary Hearings, formulated the disciplinary recommendations contained in §§ 2.5 through 2.5.4 of the Revised Plan.  *Id.* at 10-11.

AO 72A

July, 1999. *See* CX 545.[97] The Compliance Handbook was prepared to inform LRSD personnel and the public about how LRSD planned to comply with the Revised Plan. *See* CX 562.

3.      In his questioning of several LRSD administrators, Joshua's counsel suggested that he and the ODM did not receive copies of the Compliance Plan and Compliance Handbook until several months after they were prepared in June and July of 1999. Tr. July 5, 2001, at 77-78, 208; Tr. August 1, 2001, at 586-87. The witnesses strongly disagreed with that suggestion and testified that they believed LRSD had provided Joshua's counsel and the ODM with copies of the Compliance Plan and Compliance Handbook shortly after they were prepared. Tr. July 5, 2001, at 77-78, 208; Tr. July 6, 2001, at 358-60; Tr. August 1, 2001, at 586-87.

4.      As indicated previously, beginning July 1, 1998, LRSD paid Joshua's counsel $4,027.78 per month to monitor its compliance with the obligations contained in the Revised Plan. Docket no. 3581, Exhibits 7 and 8. The record reflects that Joshua's counsel and his support staff had free access to LRSD's administrative offices and schools and routinely received copies of any requested documents related to the Revised Plan. Thus, Joshua's counsel had primary responsibility for keeping himself informed of LRSD's compliance efforts and activities. Because LRSD hired and paid Joshua's counsel to perform monitoring work, his duty to ensure that LRSD fully complied with the Revised Plan went considerably beyond passively waiting for school administrators to keep him informed.

5.      In a letter dated May 12, 1999 (CX 554), Joshua's counsel asked Dr. Les Carnine, the Superintendent of LRSD, to provide him with copies of all policies, programs, and procedures being developed to comply with LRSD's obligations under the Revised Plan. Dr. Carnine

---

[97]The Revised Plan did *not* require LRSD to prepare either the Compliance Plan or the Compliance Handbook.

-96-

testified that he instructed the other LRSD administrators: (a) to provide Joshua's counsel and the ODM with any documents they requested and to provide them with copies of data and other information created regarding LRSD's compliance with its obligations under the Revised Plan; and (b) to share with Joshua the Compliance Plan created on June 10, 1999. Tr. July 6, 2001, at 358-59.

6.      In a letter dated August 25, 1999 (CX 559), Joshua's counsel asked Mr. Junious Babbs, the Associate Superintendent of Administrative Services, to provide him with a copy of LRSD's Compliance Handbook. On August 30, 1999, Mr. Babbs wrote Joshua's counsel a letter (CX 562) which enclosed the Compliance Handbook and stated the following: (a) "The major impetus for the handbook is LRSD's desire to show our commitment to desegregation plan compliance and to get information about the plan to all district employees . . . . Every principal and department head was charged with that [compliance] responsibility throughout the district through his or her presentations on the handbook"; and (b) "[Because] your [Joshua's counsel's] insight and direction serves as an important resource in this process, we appreciate input that you wish to provide."

7.      The ODM also was fully aware that, in the first half of 1999, LRSD was developing and implementing its plans for complying with the desegregation obligations contained in the Revised Plan. The ODM was charged with monitoring LRSD's compliance efforts under the Revised Plan. In light of the ODM's ongoing monitoring responsibilities and frequent contact with LRSD administrative staff, it had an independent responsibility to obtain copies of the Compliance Plan and Compliance Handbook and to immediately bring to the attention of LRSD any problems it had with the approach to compliance outlined in those

-97-

documents. Mr. Babbs testified that he personally mailed a copy of the Compliance Handbook to the ODM. Tr. July 5, 2001, at 77-78.

8.    Thus, by at least late August, if not sooner, both Joshua and the ODM had received copies of the Compliance Plan and the Compliance Handbook. Significantly, the record contains *no evidence* that, after reviewing the Compliance Plan and Compliance Handbook, either Joshua or the ODM raised *any questions or concerns* about the adequacy of LRSD's proposed framework for complying with its obligations under the Revised Plan. Furthermore, the ODM's August 11, 1999 Report on LRSD's Preparation for Implementation of Its Revised Desegregation and Education Plan included a *favorable* review of LRSD's proposed approach to compliance with its obligations regarding student discipline. *See* Docket no. 3289 at 67-71.

9.    A review of the exhibits introduced into evidence during the hearing on unitary status reveals the following correspondence from Joshua's counsel to LRSD administrators regarding compliance issues related to student discipline: (1) CX 561: Mr. Walker's August 26, 1999 letter to Dr. Carnine regarding the duties of Ombudsman; (2) CX 564: Mr. Walker's September 27, 1999 letter to Mr. Babbs regarding the role of the Ombudsman; (3) CX 565: Ms. Springer's October 3, 2000 letter to Dr. Carnine regarding LRSD's support of the Ombudsman; (4) CX 567: Ms. Springer's November 8, 2000 letter to Dr. Carnine regarding a white female student at Cloverdale Middle School who used a curse word to refer to an African-American teacher; and (5) CX 568: Ms. Springer's November 8, 2000 letter to Dr. Carnine requesting information on LRSD's "Continued Instruction Centers and/or short-term suspension centers." These letters represent the only evidence in the record of Joshua's counsel raising any compliance issues regarding student discipline before June 25, 2001, the date Joshua filed their

-98-

Opposition to LRSD's Compliance Report (docket no. 3447).

10.    None of the foregoing letters raised or referred to any of the compliance problems regarding student discipline that Joshua is now raising in connection with §§ 2.5 through 2.5.4 of the Revised Plan.[98]  On top of this, as indicated previously, Joshua failed to raise any of those issues pursuant to the complaint resolution procedure contained in § 8.2, *et seq.*, of the Revised Plan.  Thus, LRSD's first notice that Joshua challenged its substantial compliance with its obligations regarding student discipline appears to have been its receipt of their Opposition to LRSD's Compliance Report on or about June 25, 2001.

11.    According to the Compliance Plan, Mr. Babbs was responsible for monitoring the implementation of LRSD's obligations regarding student discipline. CX 544 at 6-8.  Mr. Babbs also served on and chaired LRSD's "Compliance Committee," which was composed of *Ms.* Sadie Mitchell,[99] Associate Superintendent of School Services; Mr. Brady Gadberry, Associate Superintendent of School Operations; and Dr. Bonnie Lesley, Associate Superintendent of Curriculum and Instruction.  Tr. July 5, 2001, at 11-18.

---

[98]For example, in these letters, Joshua's counsel made no mention of African-American students receiving a disproportionate number of suspensions and expulsions (information which Joshua's counsel had known about for years) or the contention that this over-representation was the result of LRSD teachers and administrators allegedly engaging in systematic racial discrimination in disciplining students.  Likewise, these letters fail to mention anything about LRSD's alleged failure to comply with § 2.5.4 of the Revised Plan, which required school teachers and administrators to develop behavior modification plans for students who exhibit frequent misbehavior.

[99]During the hearings on unitary status, Ms. Mitchell testified on three separate occasions. Tr. August 1, 2001, at 564; Tr. August 2, 2001, at 848; and Tr. July 22, 2002, at 253.  Although the Court Reporter identified her as "Dr. Sadie Mitchell" during her first two appearances as a witness, Ms. Mitchell testified that the highest degree she received was a "Masters in Elementary Education." Tr. August 1, 2001, at 565.  Thus, I have referred to her as *Ms.* Mitchell, rather than *Dr.* Mitchell.  If the Court Reporter was correct (in my experience they are almost infallible) and I am wrong, I apologize to *Dr.* Mitchell for my mistake.

AO 72A

12.    According to Mr. Babbs, the Compliance Committee generally met once a week, and Joshua's counsel and the ODM were *not* invited to attend those meetings. Tr. July 5, 2001, at 47-49. I find it reasonable that Joshua's counsel and the ODM were not invited to those meetings, especially since Joshua's counsel and the ODM had free access to LRSD personnel, who were under instructions to meet with them and provide them with any requested information or documents regarding LRSD's implementation of or compliance with its obligations under the Revised Plan.[100]

13.    The Compliance Committee made its recommendations to LRSD's Cabinet, which was composed of Dr. Carnine, the four Associate Superintendents, all of the Assistant Superintendents, and other key employees selected by Dr. Carnine and referred to as "Directors." Tr. August 2, 2001, at 899. The Cabinet also was charged with the responsibility for ensuring that LRSD implemented its obligations under the Revised Plan. Tr. August 1, 2001, at 590-91; Tr. August 2, 2001, at 900-01. Finally, LRSD created an even larger committee composed of all building principals, support staff, and department heads, which was charged with the responsibility for ensuring that, at each school, all of the provisions in the Revised Plan were implemented. Tr. July 5, 2001, at 19-20 and 45-46.

14.    During his testimony, it was apparent that Mr. Babbs relied heavily on Ms. Mitchell; Dr. Watson, the Assistant Superintendent for Student Hearings; and Mr. Washington, the Ombudsman, to ensure that the sections of the Revised Plan dealing with student discipline were properly implemented. Tr. July 5, 2001, at 180-214. Dr. Watson and Mr. Washington worked in Mr. Babbs' department and reported directly to him. *Id.* at 12-13.

---

[100]    *See* discussion, *supra*, at 96-97.

-100-

Mr. Babbs, Ms. Mitchell, Dr. Watson, and Mr. Washington are all African-Americans.

15.    I recognize the possibility that members of a minority might discriminate against members of their own race. However, based on their character, demeanor, and testimony, I find that Mr. Babbs, Ms. Mitchell, Dr. Watson, and Mr. Washington would never tolerate any form of racism by anyone, regardless of their color.

16.    Mr. Babbs was not able to provide substantive answers to many of Joshua's counsel's questions regarding student discipline and often suggested that Joshua's counsel seek the requested information from Ms. Mitchell, Dr. Watson, or Mr. Washington. *See* Tr. July 5, 2001, at 180-87. In my initial review of his testimony, I was troubled by how little Mr. Babbs seemed to recall about the specific details of LRSD's implementation of its obligations under §§ 2.5 through 2.5.4. However, my review of the testimony of Ms. Mitchell (Tr. August 2, 2001, at 848-95), Dr. Watson (*id.* at 896-933), and Mr. Washington (*id.* at 934-49 and Tr. November 19, 2001, at 15-24) revealed that each of them could and did provide detailed answers to each of Joshua's counsel's questions regarding LRSD's implementation of and compliance with its obligations under §§ 2.5 through 2.5.4. In short, Ms. Mitchell, Dr. Watson, and Mr. Washington impressed me not only with their obvious competence, but also with their detailed knowledge of the actions taken by LRSD to comply with its obligations under the Revised Plan. Therefore, I find that Mr. Babbs' sometimes vague testimony was more than offset by the insightful and detailed testimony of Ms. Mitchell, Dr. Watson, and Mr. Washington--I credit their testimony.

17.    The steps LRSD took to comply with each section of the Revised Plan were documented in the Interim Compliance Report and the Final Compliance Report. During his questioning of several witnesses, Joshua's counsel tried to suggest that the Final Compliance

-101-

Report somehow was incomplete or inadequate because it failed to include the compliance measures described in the Interim Compliance Report. Those suggestions, however, are explained fully by the "Introduction" to the Final Compliance Report, which stated:

> To avoid duplication, the Interim Compliance Report is hereby incorporated by reference. The programs, policies and procedures implemented by the District and identified in the Interim Compliance Report will not be repeated in this report. Where there is nothing new to report, this report will simply refer the reader to the Interim Compliance Report. This report assumes that the reader is familiar with the Interim Compliance Report.

Docket no. 3410 at iv. Thus, the Interim Compliance Report and the Final Compliance Report *must be read together* to fully understand all of the steps taken and measures implemented by LRSD to comply with its obligations under the Revised Plan.

18. Section 2.5 of the Interim Compliance Report summarized the positive results of the programs implemented during the 1998-99 school year to address student discipline. Docket no. 3356 at 13-15. The Interim Compliance Report also noted that LRSD filled the position of Ombudsman in February of 1999 and that the goals for that position were developed after receiving input from the ODM, Joshua, and the community. *Id.* at 15-16. Finally, the Interim Compliance Report stated that Pupil Services Teams at each school were responsible for developing behavior modification plans for each student who frequently misbehaved. *Id.* at 16.

19. The Final Compliance Report noted that, during the 1997-98 school year, LRSD had 6,138 suspensions and 109 expulsions. Docket No. 3410 at 24. After LRSD conducted staff development/training programs on student discipline, improved the student discipline reporting system for each school, and developed a comprehensive approach to instruction and behavior issues, the number of suspensions and expulsions during the 1998-99 school year fell by 15% to 5,311 suspensions and only one expulsion. *Id.*; Docket No. 3356 at 13. Furthermore, during the

-102-

AO 72A

first semester of the 1999-2000 school year, LRSD suspensions fell to 1,839, from 2,350 during the first semester of the 1998-99 school year--a 22% reduction. Docket No. 3356 at 14. LRSD also established eight alternative learning centers for students in grades 3 through 12 who had serious behavior problems. The creation of these new centers was cited as one of the primary reasons for the reduction in the expulsion rate from 119 during the 1997-98 school year to 1 during the 1998-99 school year. *Id.* at 14-15. Students who were suspended were often transferred to one of the alternative learning centers so that they could remain in a school environment while serving their suspensions.[101]

20.     The Final Compliance Report also noted that, after implementing the Revised Plan during the 1998-99 school year, suspensions continued to fall from 5,311 during 1998-99 to 4,923 during the 1999-2000 school year. Docket no. 3410 at 24-26. When broken down by race, suspensions for African-American students fell from 5,341 during the 1997-98 school year to 4,274 during the 1999-2000 school year, a reduction of 20%. *Id.* at 24. White student suspensions fell from 906 during the 1997-98 school year to 652 during 1999-2000, a reduction of 28%. However, *according to my calculations*, the proportion of suspensions issued to African-American students during the 1997-98 school year (5,341/6247 = 85.5%) and the 1999-2000

---

[101]The ODM's June 14, 2001 "Report on Disciplinary Sanctions in LRSD" (docket no. 3366) criticized LRSD for not maintaining centralized records to document the number of suspended students who served their suspensions in these alternate learning centers or who received "in-school suspensions" that allowed the students to remain in school and not fall behind in their lessons, school assignments, and tests. Docket no. 3366 at 12. While it would have been better for LRSD to maintain more detailed statistics that reflected the number of in-school and out-of-school suspensions, and the number of students receiving out-of-school suspensions who were transferred to alternative learning centers, there is nothing in the record to call into question LRSD's assertion that most of the students who received out-of-school suspensions were allowed to serve those suspensions in an alternative learning center or other specialized school environment that allowed them to continue their educations, without falling behind in their classwork.

AO 72A

school year (4,274/4926 = 86.76%) remained almost the same. *Id.* Finally, the Final Compliance Report noted the important role of the Ombudsman in the student discipline process and the efforts made by LRSD to make the public more aware of the position. As a result, the Ombudsman was contacted by over 358 parents or students during the 1999-2000 school year. *Id.* at 25-26.

21.     Both the Interim Compliance Report and the Final Compliance Report provided only a general summary of data regarding suspensions and expulsions. For example, the Interim Compliance Report did not mention the large racial disparity between the number of African-American and white students who receive suspensions and expulsions. Rather, the entire focus of the data in the Interim Compliance Report was on the significant reduction in the *overall number* of suspensions and expulsions. Detailed disciplinary data was available to LRSD that would have allowed it to report the racial breakdown of suspensions and expulsions in the Interim Compliance Report. It concerns me that LRSD failed to present that data. Likewise, the Final Compliance Report should have contained a more detailed breakdown of disciplinary sanctions by race, which should have included the calculations necessary to show that, during the 1997-98, 1998-99, and 1999-2000 school years, African-American students received approximately 85% of the suspensions and expulsions. LRSD should have recognized that failing to address--head on--the large discrepancies in student discipline between African-American and white students would not place it in a particularly favorable light with anyone who knows how to use a calculator.

22.     LRSD generated and maintained detailed disciplinary records that would have allowed it to present a clearer picture of the racial breakdown of disciplinary sanctions issued

AO 72A

during the three-year term of the Revised Plan. For example, Dr. Watson testified that she prepared detailed quarterly discipline reports that were later compiled into an annual report format. Tr. November 19, 2001, at 55-56. Dr. Watson also testified that these annual reports, which were introduced into evidence as CX 678-681, were provided to Joshua's counsel on a regular basis. *Id.* at 62-63; CX 682. Finally, Dr. Watson testified that she used these annual reports, which were broken down by school and catalogued the nature of the conduct giving rise to the suspensions or expulsions, to identify schools with discipline problems so that she could follow up with principals to work out solutions. *Id.* at 64-71; CX 684 and 685.

23. The record contains no evidence that Joshua's counsel ever complained to LRSD about the inadequacy of the disciplinary data set forth in the Interim Compliance Report and the Final Compliance Report. While LRSD should have provided a more in-depth analysis of the available disciplinary data in those Reports, I find that Joshua's counsel had access to LRSD's detailed annual reports on disciplinary sanctions and was well aware that African-American students historically had received a disproportionate number of suspensions and expulsions. Therefore, I cannot find that the data concerning student discipline presented in the Interim and Final Compliance Reports misled Joshua.

24. The ODM's June 14, 2000 Report on Disciplinary Sanctions in LRSD (docket no. 3366) does *not* support Joshua's position that LRSD failed to substantially comply with its obligations under §§ 2.5 through 2.5.4 of the Revised Plan. First, the lengthy disclaimer on the first page of the Report made it clear that the ODM did *not* attempt to: (1) "evaluate the district's discipline policies and procedures nor determine how the policies are followed at various schools"; or (2) "measure the effectiveness of any program, training, or practices the district may

-105-

have initiated to address the need for all students to be disciplined fairly and equitably, regardless of their race or sex." Docket no. 3366 at 1. Second, the ODM acknowledged in the Preface of the Report that *numerous factors outside the control of teachers and administrators can affect how students behave in schools*, including the following: (1) "home environment, family values, [and] the level of socialization prior to starting schools" (*id.* at 6); and (2) the absence of a male role model, a factor that was "particularly significant for adolescent males who live with only their mothers" (*id.* at 7). Third, the ODM acknowledged that the disproportionate disciplining of African-American school students was a nationwide phenomenon. *Id.* at 7-8. Finally, the Report did not attempt to develop or explore the specific facts surrounding *any* of the suspensions of African-American students in order to determine if there was a reasonable basis for believing that racial discrimination played a role in some percentage or number of those suspensions.

25.    In view of the many things that the ODM's Report on Disciplinary Sanctions admittedly did *not* purport to do, the only statistically supportable conclusion that fairly can be drawn from that document is that, between 1993-94 and 1998-99, African-American students (particularly males) in almost every LRSD school received a disproportionate number of suspensions and expulsions in comparison to their white counterparts. *Id.* at 87, 107, 121. Comparing the suspension data for the 1997-98 school year with the 1998-99 school year, the first year of LRSD's implementation of the Revised Plan, reveals that, at the elementary, junior high, and high school levels, the total number of suspensions for African-American male and female students *declined*. *Id.* at 86, 106, 120. Comparing the same data for those two school years for LRSD's white male students reveals the following: the number of suspensions *declined* in the elementary schools, *remained the same* in the junior high schools, and *increased* in the high

-106-

schools. Finally, comparing the same data for those two school years for LRSD's white female students reveals that: the number of suspensions *declined* in the elementary and junior high schools, but *increased* in the high schools.[102]

26.    The ODM's Report on Disciplinary Sanctions did *not* contain an analysis of the specific facts associated with a statistically significant random sampling of African-American student suspensions, which would have allowed the ODM to create the factual predicate necessary to express an opinion on what role, if any, that race may have played in the punishment of African-American students. Although one might assume this would have led the ODM not to use the data in the Report to hazard a guess on a subject of such complexity, the Report concluded that, because "African-American males are being disciplined in disproportionately high numbers," LRSD "has certainly not eliminated nor even abated racial discrimination in suspensions . . . ." *Id.* at 125. I must reject the last conclusion out-of-hand because it is no wise supported--factually or statistically. It is a far-reaching conclusion, but is purely speculative.

27.    The ODM's Report on Disciplinary Sanctions contained seven specific recommendations to "improve disciplinary procedures for all students in LRSD, while reducing the over-representation of black students in disciplinary actions." *Id.* at 127. In her testimony, Ms. Mitchell made it clear that, after LRSD received the Report, it followed *all* of the ODM's recommendations:

> The Court:    I have a question . . . . Did you follow any of the recommendations that ODM made in the report?
>
> The Witness: *Yes, ma'am, all of them.*

---

[102]I have set forth this information based upon my own analysis of the data. Nowhere in the ODM's Report are these three seemingly relevant conclusions mentioned.

-107-

Tr. August 2, 2001, at 882 (emphasis added). Dr. Watson also testified that both LRSD's Compliance Committee and the Cabinet Committee directed her to address *all* of the ODM's recommendations contained on page 127 of the Report. *Id.* at 902-04.[103]

28.    Although the data in the Report on Disciplinary Sanctions only goes through the 1998-99 school year, the Final Compliance Report reflects that suspensions continued to decline during the 1999-2000 school year. Docket no. 3410 at 24. In fact, the number of suspensions of African-American students dropped 21% from the 1997-98 school year through the 1999-2000 school year--a decrease of over 1,100 suspensions. *Id.* Overall expulsions dropped from 109 during the 1997-98 school year to 3 in the 1999-2000 school year. *Id.* Thus, after LRSD implemented the policies, programs, and procedures designed to comply with its obligations under §§ 2.5 through 2.5.4 of the Revised Plan, the total number of expulsions and suspensions of African-American students was *substantially reduced* during each school year between 1997-98 and 1999-2000.

29.    During the 1997-98 through 1999-2000 school years, African-American students made up approximately 68% of LRSD.[104] Thus, African-American students unquestionably were over-represented in the disciplinary sanctions data contained in both the Interim Compliance

---

[103]In response to follow-up questions from Joshua's counsel, Ms. Mitchell specifically confirmed that LRSD implemented the first three of the ODM's recommendations. Tr. August 2, 2001, at 883-85. Joshua's counsel then turned his questioning to other subjects, without following-up regarding the last four recommendations. Thus, Ms. Mitchell and Dr. Watson provided strong and consistent testimony that LRSD followed *all* of the ODM's recommendations which were contained in the June 14, 2000 Report on Disciplinary Sanctions.

[104]According to the ODM's March 29, 2000 Report entitled "1999-00 Enrollment and Racial Balance in LRSD" (docket no. 3351), African-American students comprised the following percentages of total student enrollment during each of those three years: 1997-98: 67% (16,913/24,886); 1998-99: 68% (16,913/24,006); 1999-2000: 68% (17,055/25,116). Docket no. 3351 at C-12.

-108-

Report and the Final Compliance Report. However, as Dr. Watson pointed out during her testimony, "over representation" does not necessarily reflect "disparate treatment." Tr. August 2, 2001, at 916. Likewise, as Judge Wright observed: "Not every disproportionate figure means that there has been race discrimination." *Id.* at 889.

30.    A total suspension index has been developed and used to measure the extent to which African-American students are disproportionately suspended and expelled. This index is calculated by dividing the percentage of African-American students suspended and expelled by the percentage of African-American students in the total population. Thus, proportionate discipline of African-American students yields a total suspension index of 1.00.[105] Between the 1998-99 and 2000-01 school years, LRSD's total suspension index ranged from 1.31 to 1.25. CX 743; Docket no. 2226, Exhibit 17. Based on my own calculations, LRSD's total suspension index remained essentially constant at 1.26 during each school year between 1997-98 and 1999-2000. Final Compliance Report at 24.

31.    According to data from the Office of Civil Rights, the national total suspension index for 1998[106] was 2.24, and the suspension index for all Arkansas schools was 2.16.[107] Thus, after implementing the Revised Plan in the spring semester of the 1998-99 school year, LRSD's

---

[105]*See Hoots v. Pennsylvania*, 118 F. Supp. 2d 577, 607-09 (W.D. Pa. 2000), for a more detailed discussion of the derivation and use of a total suspension index in evaluating disciplinary disparities between African-American and white students.

[106]This was the most recent data available at the time of the hearings.

[107]*See* LRSD's Memorandum Brief in Support of Motion for Unitary Status; Docket no. 3581 at 28. Other courts have declared school districts unitary despite a total suspension index significantly *higher* than that of LRSD. *See Coalition To Save Our Children v. State Bd. of Educ. of Delaware*, 901 F. Supp. 784, 817 (D. Del. 1995) (total suspension index of 1.81) and *Hoots*, 118 F. Supp. 2d at 608 (total suspension index of 1.50).

-109-

total suspension index remained well *below* both the statewide and national averages. In light of this fact, the record does not contain *any* statistical support for Joshua's argument that the over-representation of African-American students in disciplinary sanctions, standing alone,  is sufficient to establish that LRSD engaged in systematic racial discrimination in violation of its obligations under § 2.5 of the Revised Plan.

32.    Joshua also failed to offer any direct testimony or other evidence to prove that the disproportionate number of suspensions received by African-American students was the result of discrimination. In fact, not a single current or former LRSD student testified that he or she had been discriminated against in the imposition of discipline.

33.    It is universally recognized that a host of racially neutral socioeconomic factors account for much of the nationwide racial disparity in student discipline. Arkansas Department of Health and U. S. Census data supports that conclusion in the City of Little Rock, the State of Arkansas, and throughout the United States. *See* CX 716 and 717. Joshua presented no statistical data on discipline that took into account the socioeconomic differences between African-American and white students in LRSD.

34.    I am not naive enough to believe that the disproportionate number of suspensions received by African-American students in LRSD can be explained, in every instance, by socioeconomic factors. However, in this case, it was Joshua's burden to prove that, after the implementation of the Revised Plan,  the disproportionate number of suspensions received by African-American students was the result of systematic discriminatory treatment by LRSD teachers and administrators. By failing to call any witnesses to offer testimony to establish that

-110-

the racial disparity in suspensions and expulsions was the result of discrimination--systematic[108] or otherwise--Joshua failed to meet their burden of proof on that issue.

35.    Finally, the administrators charged with the overall responsibility for implementing the sections of the Revised Plan dealing with student discipline provided strong, credible testimony that LRSD substantially complied with its obligations under §§ 2.5 through 2.5.4. Dr. Watson testified that: (a) LRSD developed a number of new alternative learning environments to allow students with behavior problems to remain in an educational setting (Tr. November 19, 2001, at 49-55); (b) each school was required to develop strategies for reducing the number of suspensions and expulsions (*id.* at 48; CX 677); (c) LRSD offered teachers training in classroom management and effective discipline (*id.* at 45-46; CX 676); (d) LRSD provided training to students in conflict resolution and peer mediation and provided group counseling and case management (*id.* at 46); and (e) students who violated the code of conduct in the Student Rights and Responsibility Handbook (the "Handbook") were subjected to aggressively escalating forms of discipline, beginning with lesser sanctions, including behavior modification plans, before the imposition of suspensions or expulsions (*id.* at 46).

36.    Dr. Watson testified that she believed strict adherence to the Handbook[109] was the

---

[108]I use the phrase "systematic discrimination" to emphasize that Joshua was required to prove more than random or isolated incidents of racial discrimination in discipline perpetrated by a few rogue teachers or administrators. Of course, as I have indicated, Joshua failed to prove even random or isolated incidents of racial discrimination in discipline, much less systematic discrimination.

[109]LRSD prepared a separate Handbook for elementary school, middle school, and high school. *See, e.g.,* CX 668-70. The Handbooks were provided to all students at the beginning of the school year, and instructional time was used to teach students the Handbook. Tr. November 19, 2001, at 33. The Handbook was race-neutral and outlined: (a) the behavior that was prohibited; (b) the consequences of engaging in that behavior; and (c) the process for appealing a disciplinary sanction. *See, e.g.,* CX 670 at 12-49.

-111-

AO 72A

most effective way to ensure that no racial discrimination occurred in the imposition of student discipline. Tr. November 19, 2001, at 24-25, 33-37; Interim Compliance Report at 13-16. As the Assistant Superintendent for Student Hearings, Dr. Watson was in a good position to make certain that, in imposing discipline, schools strictly adhered to the Handbook. Dr. Watson testified that: (a) each year LRSD included parents, students, teachers, administrators, and representatives of Joshua in the process of revising the Handbook (Tr. November 19, 2001, at 33-34); (b) LRSD provided training to students, teachers, and administrators on the provisions of the Handbook and parents were asked to sign a "parent contract" that stated they had read the Handbook and agreed to ensure their child complied with it (*id.* at 33-34; CX 661-670); and (c) LRSD hired Mr. Washington to fill the position of Ombudsman and charged him with responsibility for investigating parent or student complaints of racial discrimination in student discipline (*id.* at 26-27).

37.     Dr. Watson was responsible for monitoring each school's compliance with the Handbook. She or another hearing officer working under her direction reviewed every long-term suspension and expulsion and all short-term suspensions that were appealed. Tr. November 19, 2001, at 35-37 and 54. If Dr. Watson determined that a school had failed to follow the Handbook, the suspension or expulsion was expunged from the student's record, and the student was returned to school. *Id.* at 26-27, 35-37.

38.     Dr. Watson testified that, based on her experience as a hearing officer, African-American students were being suspended more than white students because they were engaged in behavior requiring suspensions under the Handbook. Tr. November 19, 2001, at 83-84. She also testified that she believed socioeconomic factors were the probable explanation for the

disproportionate number of African-Americans being suspended. *Id.* at 84. Finally, Dr. Watson testified that, in her investigation of those teachers who had a tendency to refer more students for disciplinary sanctions, she discovered that "it was African-American teachers that were suspending more African-American students." Tr. August 2, 2001, at 930.

39.     Mr. Washington, whose job as Ombudsman required him to investigate numerous student and parent complaints of racial discrimination in discipline, provided the following compelling testimony on whether such alleged discrimination was the cause for the over-representation of African-American students in disciplinary matters:

> Q.     Finally, Mr. Walker asked you about the over representation of black students among students suspended and expelled. Based on your experience as an Ombudsman and your experience in the District, do you have any reason to believe that the over representation of African-Americans in discipline has resulted from any systematic discrimination by the Little Rock School District?
>
> A.     No, sir, I have no reason to believe that that is true.

Tr. November 19, 2001, at 21.

40.     Section 2.5 of the Revised Plan required LRSD to implement "programs, policies and/or procedures designed to ensure that there is no racial discrimination with regard to student discipline." The only way LRSD could have achieved *proportional discipline* between African-American and white students would have been to impose disciplinary quotas, something that was not required under the Revised Plan and that, in fact, would have been in direct conflict with § 2.5. As the Court noted in *People Who Care v. Rockford Board of Education*, 111 F.3d 528, 538 (7th Cir. 1997):

> Racial disciplinary quotas violate equity in its root sense. They entail either systematically overpunishing the innocent or systematically underpunishing the guilty. They place race at war with justice. They teach schoolchildren an unedifying lesson of racial entitlement. And they incidentally are inconsistent

-113-

with another provision of the decree, which requires that discipline be administered without regard to race or ethnicity.

*See Keyes v. Congress of Hispanic Educators*, 902 F. Supp. 1274, 1304 (D. Colo. 1995) ("[i]f a student's conduct violates the discipline policy, it is expected that he or she will be disciplined regardless of the potential disparate effect on the racial/ethnic statistics"). *See also* Ark. Code Ann.§ 6-18-506(c) ("[e]very school district board of directors in this state shall hold its pupils strictly accountable for any disorderly conduct in school, on the school grounds, in a school bus, or at any school function").

41.    Finally, Dr. Watson monitored implementation of the behavior modification plans referred to in § 2.5.4. In appropriate cases, she reversed suspensions and sent students back to school with instruction that the school prepare a behavior modification plan. Tr. November 19, 2001, at 135-36. Although Joshua's counsel suggested in his questioning of witnesses that LRSD could have done a better job of monitoring students with behavior modification plans, Joshua failed to present any evidence that a single student should have been given a behavior modification plan but was not.

42.    For the above reasons, I find that Joshua has not sustained the burden of proving that LRSD failed to substantially comply with its obligations regarding student discipline contained in §§ 2.5 through 2.5.4 of the Revised Plan. I further find that LRSD substantially complied with its obligations under those sections of the Revised Plan.

## C.    Extracurricular Activities

1.    Sections 2.6 and 2.6.3 imposed specific obligations on LRSD regarding extracurricular activities.[110]  The Board adopted and implemented the following policies and

---

[110]*See* Section III.D., *supra*, at 56.

-114-

regulations pursuant to §§ 2.6 and 2.6.3: JBA (nondiscrimination in programs and activities); JBA-R (a regulation requiring each school to develop and implement a plan for nondiscrimination in programs and activities); JJ (student participation in co-curricular/extracurricular activities); JJ-R (a regulation requiring schools to develop plans for improving any racial disparities that are identified in co-curricular/extracurricular activities); and JJIB-R1 and JJIB-R2 (regulations requiring all high schools and middle schools to develop plans for improving any racial disparities identified in interscholastic athletic or spirit groups). *See* CX 719. Joshua has not challenged the facial adequacy of any of the Board policies and regulations regarding extracurricular activities.[111]

2.      In his questioning of LRSD administrators, Joshua's counsel implied that the Revised Plan obligated LRSD to ensure *racial proportionality* among participants in all extracurricular activities. Among other things, Joshua's counsel stated that African-American athletes are over-represented in "basketball, football, and track, and under represented in such mundane sports--I will call them mundane, as volleyball, baseball, soccer, hockey, golf."[112] Tr. July 5, 2001, at 219. I was baffled by Joshua's counsel's extensive questioning of witnesses about the under and over-representation of African-American and white athletes in various sports.

---

[111]Extracurricular activities allow students to explore areas of interest that complement and enrich the curriculum. These activities include athletics, clubs and organizations such as Student Council, Y-Teens, and Beta Club. Co-curricular activities are activities that offer learning experiences through group or individual activities at schools or public events, including band, orchestra, choir, or debate. Final Compliance Report at 27. Unless I indicate otherwise, I will use the term "extracurricular activities" to encompass *both* extracurricular *and* co-curricular activities.

[112]I feel sure that Joshua's counsel meant no offense to those of us who grew up playing and loving some of those so-called *mundane* sports. In fact, I thought baseball was still widely regarded as our "national pastime."

To the best of my knowledge, no secondary schools in Arkansas play *hockey*. Perhaps, instead of hockey, Joshua's counsel meant to say tennis and swimming, two sports that he later alluded to in his questioning of witnesses.

-115-

Surely, Joshua's counsel is not suggesting that the Revised Plan obligated LRSD to mandate, for example, that white students participate in football and that African-American students participate in soccer.

3.      I am willing to take judicial notice of the fact that students of all races tend to gravitate toward those sports they have grown up playing and that they enjoy—this is beyond question. Section 2.6 of the Revised Plan only obligated LRSD to promote African-American participation in extracurricular activities and to ensure there were no barriers to their participation. Nothing in § 2.6 of the Revised Plan required LRSD to force students to participate in sports that they did not enjoy playing and for which they may have had no aptitude in order to satisfy some nebulous notion of proportionate representation.

4.      Joshua had the burden of proving that LRSD failed to substantially comply with its obligation to promote the participation of African-American students in extracurricular activities or failed to remove barriers to their participation in those activities. I find that, as long as LRSD substantially complied with those two obligations, the fact that African-American athletes may have gravitated toward football, basketball, and track and that white athletes may have gravitated toward soccer, baseball, swimming and tennis is irrelevant.

5.      Mr. Ray Gillespie, an African-American, served as LRSD's Athletic Director during the term of the Revised Plan, and testified by deposition. Tr. July 22, 2002, at 6.[113] Mr. Gillespie, in response to questions from Joshua's counsel, described four "incidents" involving LRSD coaches and athletes: (1) a white coach "choking" an African-American athlete (*id.* at 9); (2) a white coach selling uniforms to white and African-American athletes (*id.* at

---

[113]Docket no. 3650.

-116-

14-15); (3) an altercation at football practice between an African-American coach and an African-American athlete (*id.* at 16-17); and (4) only "allegations" that a white coach slapped an African-American athlete (*id.* at 27). In each instance, the LRSD coach was disciplined, and the principal who investigated the incident and made the disciplinary recommendation was an African-American. *Id.* at 24-25. Finally, Mr. Gillespie's testimony does not suggest that the actions of the coaches in these isolated incidents were racially motivated or that LRSD failed to respond appropriately after learning of their misconduct--nor do these incidents come close to establishing any kind of pattern.

6.    In Section VI of the Final Compliance Report, LRSD discussed the positive results of its efforts to encourage more African-American students to participate in extracurricular activities. For example, during the 1998-99 school year, African-American participation in extracurricular activities increased 76%, and, the following school year, it increased an additional 26%. During the 1999-2000 school year, 62% of LRSD's African-American students participated in an extracurricular activity. Final Compliance Report at 27.

7.    LRSD also was able to significantly increase the number of African-American students participating in co-curricular activities. According to the Final Compliance Report, during the 1998-99 school year, there was a 9% increase in the number of African-American students participating in co-curricular activities and a 30% increase during the 1999-2000 school year. At the close of the 1999-2000 school year, 66% of LRSD's African-American students had participated in a co-curricular activity. Final Compliance Report at 27.

8.    In his questioning of several LRSD administrators, Joshua's counsel tried to suggest that transportation was a barrier which prevented some African-American students from

-117-

participating in extracurricular activities. Ms. Mitchell, the Associate Superintendent for School Services, testified emphatically that, upon request, transportation was made available to permit African-American students to participate in extracurricular activities as required by § 2.6.3 of the Revised Plan. Tr. July 22, 2002, at 266. The following information contained in the Final Compliance Report strongly supported Ms. Mitchell's testimony: (1) through December 7, 2002, LRSD averaged 74.3 extracurricular activity bus runs per day--29.1 for high school students and 45.2 for middle school students; and (2) although LRSD did not maintain records of the students taking advantage of transportation services because the number and type of activities varied so much day-to-day, "no extracurricular activity transportation request made by an eligible student has been denied." Final Compliance Report at 29. Finally, during the hearing, Joshua did not call any parent, student, or other witness to testify that lack of transportation prevented a child from participating in an extracurricular activity.

9.    One of Joshua's witnesses, Mrs. Romona Horton, testified that, in one year, it cost approximately $2,000 for her daughter to participate as a cheerleader at Central High School. These costs included cheerleading camp, attending cheerleading competitions, and uniforms. There was no evidence that Mrs. Horton could not afford the cost for her daughter to participate in cheerleading. Tr. July 23, 2002, at 313.

10.    Dr. Marian Lacey, the Assistant Superintendent of Secondary Schools, testified that students who can afford to pay the costs associated with participating in extracurricular activities are required to do so. However, each school principal had a discretionary activity fund that could be used to assist students who could not afford to pay those costs. According to Dr. Lacey, the principal's activity fund was supplemented by fundraisers sponsored by clubs,

-118-

donations, and the proceeds raised by the sale of cokes, popcorn, etc., at games and other events. Principals used their discretionary funds to assist students in buying uniforms, shoes, paying for the cost of cheerleading camp, and other expenses that were necessary to allow the students to participate in extracurricular activities. Tr. July 24, 2002, at 775-76. The principal of J. A. Fair High School, Ms. Cassandra Norman, testified that she has used her discretionary activity fund to assist students to pay for items that were necessary to allow them to participate in extracurricular activities. Tr. July 22, 2002, at 88. Significantly, there was no testimony or other evidence that any LRSD student was denied the opportunity to participate in an extracurricular activity because he or she could not afford the costs.

11.     Joshua cited the unavailability of orchestra and quiz bowl at McClellan and Fair High Schools as evidence that LRSD had failed to comply with its obligation to encourage African-American students to participate in extracurricular activities. The principals at both of those schools, Mr. Jodie Carter and Ms. Norman, testified that such activities were not available because of lack of student interest. Tr. July 22, 2002, at 88 and 269; Tr. July 23, 2002, at 474, 492-93.

12.     Joshua tried to suggest that orchestra and quiz bowl were not offered at McClellan and Fair because LRSD failed to provide the sponsors to develop student interest in participating in those activities. However, Mr. Carter testified that it was each school principal's responsibility to obtain sponsors for extracurricular activities (Tr. July 23, 2002, at 480) and that LRSD made stipends available to pay sponsors for extracurricular activities, as long as they were supported by sufficient student interest (*id.* at 521-22). Neither Mr. Carter nor Ms. Norman asked their immediate supervisor, Dr. Lacey, to assist them in obtaining sponsors for extracurricular activities

-119-

at their high schools.  Tr. July 22, 2002, at 92; Tr. July 23, 2002, at 479, 524.  The following testimony by Mr. Carter made it clear that it was lack of student interest--not LRSD's failure to encourage student participation or lack of willingness to find sponsors--that resulted in certain extracurricular activities not being offered at McClellan:

> Q.   Now, I asked you the other day about extracurricular activities, and I think you said that your kids [referring to students at McClellan High School] participate generally; right?
>
> A.   Yeah, on choice.  Whatever they--
>
> Q.   And they're encouraged to participate?
>
> A.   Well, we make our daily announcements as part of the district requirements.  We post up if kids would like to participate in certain events, sign up with--sign up in the office.  If you get enough interest, we get sponsors to say, we've got 15, 16 kids who have signed up.  Would you sponsor this club or this organization.
>
> Q.   And that's a point I wanted to make with respect to Mr. Walker's chicken and egg problem.  Just as advanced placement courses are determined by student interest, isn't participation--isn't the availability of some extracurricular activities determined by student interest?
>
> A.   Yes.
>
> *   *   *
>
> Q.   And you're not aware of any barriers to participation in extracurricular activities at McClellan, are you?
>
> A.   Not that I'm aware of.

Tr. July 23, 2002, at 521-22.

13.   Ms. Mitchell, one of LRSD's top administrators and the parent of a daughter who graduated recently from Central High School, provided persuasive testimony that: (1) the racial imbalances in extracurricular activities within LRSD were the product of the diverse talents and

-120-

AO 72A

abilities of LRSD students and the choices they made regarding the extracurricular activities that interest them the most; and (2) LRSD had fully complied with its obligations to encourage African-American students to participate in extracurricular activities and to remove barriers that might otherwise reduce that participation. Tr. July 22, 2002, at 268-69, 279.

14.    Joshua called a brother and a sister who were recent graduates of Central to testify about their personal experiences participating in extracurricular activities. The sister testified that a white male sponsor had not selected her to participate on Central's mock trial team. However, she provided no evidence that she was not selected because of her race. Tr. July 23, 2002, at 322-23. Her brother testified that, as a sophomore, he tried out and was selected for Central's mock trial team but was later placed on the "B" team, even though he believed he was better than the white students who comprised the "A" team. Tr. July 23, 2002, at 355-58, 360-61.[114] Because he decided not to try out for the mock trial team in his junior and senior years, there is no way to determine if he would have made the "A" team in one or both of those years. Finally, although in his direct testimony he complained that Central's newspaper staff was "overwhelming white" (Tr. July 23, 2002, at 362), he acknowledged on cross-examination that this situation changed after an African-American student was selected to serve as editor of the newspaper (*id.* at 390). While I in no way doubt the sincerity of the testimony of these two students regarding their experiences at Central, I find their perceived difficulties or disappointments with extracurricular activities did not result from LRSD's failure to ensure there were no barriers to their participation in those activities.

---

[114]Ms. Mitchell testified that her daughter, an African-American, was recruited to participate on Central's mock trial team and traveled to New Mexico for competition. After that trip, she decided she was more interested in other activities and left the mock trial team. Tr. July 22, 2002, at 279.

15.    Joshua also presented anecdotal evidence from one African-American student at J. A. Fair High School regarding the conduct of his trigonometry and calculus teacher and his football coach. First, the student testified that his math teacher refused his request for a letter of recommendation to Arkansas Governor's School because the teacher did not believe he "[was] smart enough to attend." Tr. July 23, 2002, at 404. After the student brought the matter to the attention of Ms. Norman, the Principal at Fair, the teacher apologized to the student. Another teacher at Fair wrote a letter of recommendation for the student, and he was later selected to attend Governor's school in the area of math. *Id.* at 405. Second, the student testified that the white football coach at Fair cursed him for missing a blocking assignment during a game against Magnolia High School, but did not curse the white quarterback when he "threw a couple of interceptions." *Id.* at 407. He also testified that, in general, the football coach was harder on African-American players than white players. *Id.* at 407-08. On cross-examination, the student acknowledged there were only three white players on the team. *Id.* at 414. I find this testimony to constitute anecdotal and subjective evidence that carries little weight in support of Joshua's argument that LRSD failed to substantially comply with its obligations regarding extracurricular activities.

16.    For the above reasons, I find that Joshua has not sustained the burden of proving that LRSD failed to substantially comply with the obligations relating to extracurricular activities contained in §§ 2.6 and 2.6.3 of the Revised Plan. I further find that LRSD substantially complied with its obligations under those sections of the Revised Plan.

**D.    Advanced Placement Courses**

1.    The Revised Plan imposed on LRSD three separate obligations regarding AP

-122-

courses: (a) "to promote participation and to ensure that there are no barriers to participation by qualified African-Americans in . . . advanced placement courses . . ." (§ 2.6); (b) to implement training programs "designed to assist teachers and counselors in identifying and encouraging African-American students to participate in honors and enriched courses and advanced placement courses" (§ 2.6.1); and (c) "to assist African-American students in being successful in honors and enriched courses and advanced placement courses" (§ 2.6.2).[115]  The Board demonstrated its permanent commitment to the obligations contained in §§ 2.6, 2.6.1, and 2.6.2 by adopting IHCC ("Pre-Advanced Placement and Advanced Placement Courses Grades 6-12"). *See* CX 719. I will make specific findings of fact regarding each of those three separate obligations related to advanced placement courses.

Promote Participation and Remove Barriers

2.      Board regulation IHCC-R sets forth the following criteria for identifying qualified African-American students to participate in AP courses: high standardized test scores; critical and creative thinking skills; self-motivation; "B" average or above in regular classes; high interest in content areas; ability to perform independent study with a high degree of motivation; and a high level of task commitment. CX 719, Policy IHHC-R.  However, the Final Compliance Report made it clear that LRSD encouraged middle schools and high schools to "open admission to all Pre-AP and AP courses and then to require attendance, good behavior, and acceptable performance . . . to stay in the course, rather than to deny admission to any motivated student who wishes to try a more challenging curriculum." Final Compliance Report at 30.  Thus, even if an African-American student did not meet the "identifying criterion" set forth in Policy IHCC-R, he

---

[115]*See* Section III.D., *supra*, at 56.

AO 72A

or she was still allowed to enroll in a pre-AP or AP class as long as there was some evidence of the necessary motivation and commitment.  Tr. July 22, 2002,  at 86.

3.      LRSD's "open admission" policy for all pre-AP and AP courses had an important safeguard for students:  the teachers of those courses were required to monitor the "attendance, good behavior, and acceptable performance (including effort, not just a minimum grade)" of the students as a condition for their remaining in those classes.  Final Compliance Report at 30.  In other words, rather than rigorously enforcing an exclusionary selection criteria, LRSD followed a policy that gave highly motivated students, who may have lacked requisite standardized test scores or grades, the chance to succeed in a more academically challenging curriculum.  In striking the balance between the competing interests of increasing African-American enrollment in pre-AP and AP courses and the risk that some of those students might not be successful, I find that it was reasonable and appropriate for LRSD to favor a policy of inclusion, rather than exclusion.

4.      In August of 1998, LRSD formed a committee to study the best way for it to implement its obligation to increase African-American enrollment in advanced placement courses.  Tr. November 20, 2001, at 374.  According to Dr. Lesley's testimony, this committee reviewed African-American test scores on the SAT-9 to determine how many of those students were in the top quartiles and possessed the academic preparation necessary to perform well in AP courses.  *Id.* at 374-75.  The Committee determined that LRSD could not significantly increase the enrollment of African-American students in AP courses if it "didn't start developing a pipeline and develop the talent of children early in their schooling, so that they would be well prepared when they got to the eleventh grade to start taking those advanced placement classes."

-124-

AO 72A

*Id.* at 375.

5.      As a means of building this pipeline, LRSD began the implementation of pre-AP classes, beginning in the sixth and seventh grades. Tr. July 24, 2002, at 668. According to the testimony of Dr. Lesley, "children are identified and encouraged and supported and prepared to take the advanced placement courses when they get to be juniors and seniors." *Id.*

6.      LRSD has been successful in increasing the enrollment of African-American students in both pre-AP and AP courses. Almost 60% of the students in middle school pre-AP courses are African-American. Tr. July 24, 2002, at 668-69. Over 40% of the high school pre-AP students are African-American. *Id.* at 669. As a result, LRSD has added almost 600 African-American students to its AP enrollment at the junior and senior class level in high school. *Id.*

7.      LRSD used annual curriculum catalogues to alert students and parents to the availability and importance of taking pre-AP courses in the middle schools. Tr. November 20, 2001, at 385; CX 714, Tab 2 at 31-32. LRSD also stressed the importance of middle school students enrolling in pre-AP math and foreign language courses by the eighth grade. Without taking those advanced classes in middle school, they would not be able to take as many AP courses in high school. Tr. November 20, 2001, at 385-86.

8.      LRSD administrators also emphasized the importance of pre-AP courses to LRSD principals and counselors. Tr. November 20, 2001, at 386-91. The middle school curriculum catalogue published for principals, assistant principals, and counselors stated the following:

> Pre-AP courses are major priorities for the [LRSD] and all available such courses must at least be offered to the students and taught if at all possible. Our goal is that increasing numbers of our students be enrolled in one or more advanced courses each year.

*Id.* at 391; CX 714, Tab 2 at 32. As a result of these efforts, LRSD's enrollment of African-

-125-

AO 72A

American students in pre-AP classes has continued to grow. Tr. November 20, 2001, at 403-04; CX 870 at 37.

9.    LRSD also has implemented the "SMART" Program as a means of increasing the participation of African-American students in advanced placement courses.[116] Tr. July 24, 2002, at 678. The SMART Program was developed to address the concern that not enough African-American students were prepared to take algebra I in the eighth grade. *Id.* If a student failed to take algebra I in the eighth grade, he or she was not able to take AP calculus in high school. *Id.* Therefore, one of LRSD's goals was to get as many African-American students as possible to take algebra I in the eighth grade. *Id.* The SMART Program, which is free to participants, teaches critical algebra skills to approximately 200 students each summer. *Id.* During the term of the Revised Plan, more than 95% of the students in the SMART Program were African-American. *Id.* at 738. The students who attended the SMART Program were "mentored and tracked during the school year to make sure they [were] doing their work and staying involved and doing well in algebra in the eighth grade." *Id.* at 678. LRSD administrators who evaluated the SMART Program determined that it was very successful. *Id.*

10.    Dr. Lesley testified that LRSD recognized the lack of African-American teachers in pre-AP and AP classes might be discouraging African-American students from enrolling in those courses. Tr. July 24, 2002, at 671-72. LRSD addressed this potential barrier in two ways: first, it participated in the "Teachers of Color" program, which was developed by the College Board and supported by the University of Arkansas at Little Rock ("UALR"); and, second, it instructed principals to encourage more African-American teachers to become AP teachers and

---

[116]Funding for the SMART Program was provided through a grant from the National Science Foundation. Tr. July 24, 2002, at 678.

AO 72A

to avoid the practice of having one teacher handle all of the pre-AP and AP sections. *Id.* at 671, 695. By taking both of these steps, LRSD provided greater opportunity to African-American teachers to teach pre-AP and AP courses and to encourage them to become qualified to teach such courses.

11.     The actual determination of who taught pre-AP and AP classes at each middle school and high school was made by the principal, subject to LRSD's labor agreement with its teachers. Tr. July 22, 2002, at 90; Tr. July 23, 2002, at 518. Ms. Norman, the African-American principal at J. A. Fair High School since 1999, testified that two out of eight AP teachers at Fair were African-American. Tr. July 22, 2002, at 46. Mr. Carter, the African-American principal at McClellan High School for the last fourteen years, testified that eleven teachers taught AP courses at McClellan, of whom eight were white and three were African-American. This roughly approximated the overall racial composition of African-American teachers at McClellan. Tr. July 23, 2002, at 517. Mr. Jim Mosby, the African-American principal at Southwest Middle School from 1997-98 through 2001-02, testified that all of his core subject teachers taught at least one pre-AP course, in addition to teaching regular courses. Tr. July 24, 2002, at 571.

12.     Dr. Michael Faucette, a 1975 African-American graduate of Central High School, provided extensive testimony on behalf of Joshua regarding problems he perceived in AP courses and extracurricular activities at Central. Dr. Faucette received a Bachelors Degree in Spanish literature from the University of California Berkeley, a Bachelors Degree in history and historicism in literature from the University of Washington, a Masters Degree in Italian literature from the University of Washington, and a Ph.D. in romance languages from the University of Washington. Tr. July 22, 2002, at 166-69. In the fall of 1998, Dr. Faucette returned to Central,

-127-

AO 72A

where he taught ninth and twelfth grade sections of English during the 1998-99 through 2001-02 school years. *Id.* at 171-72.

13.    Dr. Faucette testified that during the term of the Revised plan: (a) the number of pre-AP and AP English courses taught by African-Americans at Central increased from none during the 1998-99 school year to four during the 2000-01 school year (Tr. July 22, 2002, at 176-80); and (b) the English Department at Central had eight white teachers and eight African-American teachers (*id.* at 175, 178, 180). Central's Principal, Mr. Howard,[117] did not select Dr. Faucette to teach an AP English course. *Id.* at 177.

14.    While Dr. Faucette believed that more African-American teachers at Central should have been involved in teaching AP and honors English courses (Tr. July 22, 2002, at 174-80), he admitted that: (a) he did not know how many sections of *other* AP and honors courses were taught by African-American teachers (*id.* at 215-17); and (b) he did not know the total number of African-American students at Central taking AP and pre-AP courses or how those numbers had increased during the term of the Revised Plan (*id.* at 227-28). Dr. Faucette also acknowledged that Principal Howard was responsible for deciding which teachers should be assigned to AP and honors courses (*id.* at 219-20), and that the LRSD labor agreement with the Classroom Teachers Association required Principal Howard to consider a teacher's experience and seniority in selecting teachers for such courses. *Id.* at 218.

15.    Dr. Faucette had sharply worded disagreements and conflicts with numerous African-American and white members of the faculty at Central. Tr. July 22, 2002, at 224-34 and 243. Dr. Faucette's relationship with Principal Howard became so bad that Dr. Faucette called

---

[117]As indicated previously, Mr. Howard is an African-American.

-128-

on Dr. Lacey, Principal Howard's immediate supervisor, for assistance. *Id.* at 243. In a letter to Dr. Lacey, Dr. Faucette stated the following:

> Please do not trivialize my request by asking me to talk to Mr. Howard. I'm afraid to interact with him because of his erratic, irrational, and dishonest behavior.

*Id.* at 243-44. The conflict between Dr. Faucette and Principal Howard escalated to a point where Dr. Faucette retained the services of Joshua's counsel, Mr. Walker, to act as his attorney. *Id.* Dr. Faucette filed two formal grievances against Principal Howard, both of which were *denied* after a full hearing. *Id.* at 245-46.

16.    Obviously, Dr. Faucette is an extremely intelligent teacher, whose courses appear to have been well received by Central students. His testimony established that there was a relatively small number of African-Americans teaching or taking AP and honors English courses at Central. However, Dr. Faucette had no knowledge of the total number of African-American teachers and students who were teaching or taking AP and honors courses at Central or how those numbers had increased during the term of the Revised Plan. I find that Dr. Faucette's frequent conflicts with other members of the faculty and staff at Central, which ran the gamut from the school principal to the school librarian, clouded the objectivity of his testimony regarding the progress that was made during the term of the Revised Plan in increasing the number of African-American teachers and students at Central involved in AP and honors courses. Essentially, Dr. Faucette's testimony established that, if he had been principal at Central between 1998 and 2001, he would have operated the school differently. While it might be interesting to speculate about how Central would have operated under Dr. Faucette's direction and leadership, that larger question has nothing to do with whether LRSD substantially complied with its obligations under § 2.6 of the Revised Plan.

-129-

AO 72A

17.     Joshua presented anecdotal evidence from one African-American student at Central who claimed he was treated unfairly by an AP teacher. Tr. July 23, 2002, at 341. His complaint was investigated by Principal Howard; Dr. Marian Lacey, the Assistant Superintendent for School Services; and Mr. Washington, the Ombudsman. Tr. July 24, 2001, at 778. Principal Howard, Dr. Lacey, and Mr. Washington, all of whom are African-American, concluded that there was no evidence of race-based mistreatment by the AP teacher. *Id.* at 779-80. I have no reason to believe the conclusion reached by these three administrators was erroneous or did not reflect their best good faith efforts to investigate the allegations of race-based discrimination raised by the student.

18.     Ms. Norman, the principal at J. A. Fair, testified that she was aware of student complaints about an AP English IV teacher. Tr. July 22, 2002, at 53. However, her testimony made it clear that most of those complaints arose from the rigor of the course: "[T]hey wanted the easy way, and that is to get out of the class." *Id.* at 54. The complaints Ms. Norman heard were from *both* African-American *and* white students and focused on the subjectivity of the teacher's grading. *Id.* at 59. With regard to complaints by African-American students of racial bias in grading, Ms. Norman testified as follows:

> Q.     Ms. Norman, as the principal at Fair High School, you have authority to respond to any complaints of racial discriminatory treatment brought to your attention?
>
> A.     Yes.
>
> Q.     And did you investigate and take action on all such complaints that were brought to your attention?
>
> A.     Yes.

*        *        *

-130-

Q.      Right.  And if you believed in your mind also that it was a racial issue, would you take appropriate action against the teacher or counselor?

A.      Sure.

*Id.* at 85-86.  I find that Ms. Norman would not have tolerated or allowed race-based mistreatment of African-American students at J. A. Fair High School.

19.      Joshua's counsel devoted considerable time to cross-examining LRSD administrators about the Hall High University Studies Program.[118]   The thrust of Joshua's criticism of the University Studies Program was that: (a) students are required to pay tuition to UALR in order to receive college credit for those courses, which creates a barrier to participation by African-American students; and (b) an insufficient number of African-American students participated in that program.

20.      LRSD developed the Hall High University Studies Program in partnership with UALR.  It allowed Hall High students to earn both high school and college credit while taking courses at Hall that were co-taught by teachers at Hall and UALR.  Tr. July 22, 2002, at 107; Tr. July 24, 2002, at 725-27.  The requirements for admission to the University Studies Program were developed by UALR--not Hall High School.  Tr. July 24, 2002, at 727-28.  In order to receive college credit from UALR, students were required to pay tuition of approximately $150 per course.  Tr. July 22, 2002, at 114.

21.      During the 1999-2000 school year, 58% of the students participating in the University Studies Program were African-American.  The percentage dropped to 35% during the 2000-01 school year.  Final Compliance Report at 46.  African-American students comprised 71%

---

[118]The University Studies Program is *not* the same as the AP program.  Tr. July 24, 2002, at 725.  In addition to offering students the opportunity to participate in the University Studies Program, Hall offers AP courses at no cost to its students.  *Id.* at 733; CX 705 at tab 15.

-131-

of Hall's student body during the 1999-2000 school year and 72% during the 2000-01 school year. Final Compliance Report at 17. Joshua presented no evidence that any African-American student had, in fact, been denied admission to the University Studies Program because he or she was unable to pay the tuition. Dr. Lacey testified that, in at least one instance, LRSD solicited a private donation to pay the tuition for an African-American student who was unable to pay to take a course offered through the University Studies Program. Tr. July 24, 2002, at 802.

### Identify and Encourage

22.    Dr. Lesley was responsible for implementing a training program designed to assist teachers and counselors in identifying and encouraging African-American students to participate in advanced placement courses, as provided for under § 2.6.1 of the Revised Plan. Tr. November 19, 2001, at 192; Tr. November 20, 2001, at 371. Each year, LRSD provided teachers and counselors with training in identifying and encouraging African-American students to enroll in pre-AP and AP courses. Interim Compliance Report at 35-38; Final Compliance Report at 34-35; Tr. November 20, 2001, at 375. The above-cited pages of the Interim Compliance Report and Final Compliance Report detail the specific programs and training that LRSD provided to teachers and counselors.

23.    Dr. Lesley testified that she spent time working directly with counselors to assist them in identifying and encouraging African-American students to participate in pre-AP and AP courses. TR. July 24, 2002, at 693-94. In her testimony, she emphasized that improving African-American enrollment in advanced placement courses was an important priority for LRSD and that all necessary effort was expended to increase that enrollment. *Id.* Finally, Dr. Lesley testified that teachers at each school were trained regarding the district's policy of identifying and

-132-

AO 72A

encouraging the enrollment of African-American students in pre-AP and AP courses and, after their training, they were required to make sure the faculty and staff in their schools knew about that policy. *Id.* at 689-90. The district's curriculum directors also trained teachers regarding those policies. *Id.*

24. Ms. Pat Watson, the head counselor at Hall High School, testified that training was provided each year on the criteria for identifying qualified African-American students and encouraging them to take pre-AP and AP courses. Tr. July 22, 2002, at 102, 121-22. The counselors at Hall encouraged African-American students to enroll in pre-AP and AP courses. *Id.* at 122. Ms. Watson testified that, in her opinion, Hall had been successful in increasing the number of African-American students in AP classes. *Id.* at 122.

25. All middle school and high school students received encouragement to take pre-AP and AP courses. The course selection form that students were required to complete and have signed by their parents stated in bold print that: "The LRSD Strategic Plan, the Revised Desegregation and Education Plan, and NSF Project Plan, as well as the Quality Index for the Campus Leadership Plan, all require increasing percentages of students taking and being successful in as many pre-AP and AP courses as possible." *See* CX 815. The form also advised students "to take the most rigorous courses possible, regardless of career plan." *Id.* Additionally, the High School Curriculum Catalogue advised students that pre-AP and AP courses were open to any student motivated to take on the challenge. Final Compliance Report at 30.

26. The data contained in the Final Compliance Report indicated that LRSD was successful in identifying qualified African-American students and encouraging them to enroll in pre-AP and AP courses. For example, the number of AP courses taken by African-American

-133-

students increased 69% from 1997-98 through 2001.  Final Compliance Report at 37.  The number of high school pre-AP courses taken by African-American students increased 16% from 1999-2000[119] to 2000-01.  Final Compliance Report at 40.  The number of middle school pre-AP courses taken by African-American students increased by 19% from 1999-2000 to 2000-01.  Final Compliance Report at 41.  If the middle school students now enrolled in pre-AP courses elect to take AP courses in high school, the number of African-American students taking AP courses will continue to increase.  For example, in 2001, there were 438 African-American sixth graders in pre-AP English but only 142 African-American seniors taking AP English IV.  Final Compliance Report at 38-42.  If these middle school students continue to challenge themselves, the number of African-American students taking AP English IV will triple by 2006-07.

27.    McClellan and Fair High Schools, both of which had a large enrollment of African-American students, offered fewer AP classes than LRSD's other high schools.[120]  Tr. July 22, 2002, at 46; Tr. July 23, 2002, at 501, 506.  The reason was because fewer students in McClellan and Fair were objectively qualified or subjectively motivated to take AP courses.  LRSD high school students may register for *any* of the courses listed in the high school curriculum catalogue.  Tr. July 22, 2002, at 86-87; Final Compliance Report at 30.  However, as a general rule, at least fifteen students had to register for a course before it was offered.  Tr. July 23, 2002, at 515-16.  Mr. Carter, McClellan's principal, testified that: "[W]ith the number of [students] that were not able to perform in AP successfully, we were not able to have enough

---

[119]This was the first year classes were identified as "Pre-Ap."  *See* Final Compliance Report at 39.

[120]During the 2000-01 school year, 90% of McClellan's students were African-American and 80% of Fair's students were African-American.  Final Compliance Report at 17.

-134-

of those classes." *Id.* at 475. After noting that 90% of McClellan's students were performing below grade level, Mr. Carter candidly stated that "kids who are low achievers, even with a lot of encouragement, they may tend to avoid the tough road, and it's a tough task that we all are struggling with, but particularly in my place." *Id.* at 510. Similarly, approximately 80% to 85% of Fair students were also performing below grade level. Tr. July 22, 2002, at 44. Ms. Norman testified that the reason more AP courses were not offered at Fair was because not enough students enrolled. *Id.* at 86-87. I find that differences in the number of AP classes offered at various LRSD high schools resulted from differences in students' interests, motivation, and abilities to perform well in AP courses--not from a failure by LRSD to encourage qualified students to enroll in those courses.

Assist

28.    LRSD provided programs to assist African-American students in being successful in pre-AP and AP courses. Interim Compliance Report at 39-41; Final Compliance Report at 30-35 and 44-46. Ms. Norman testified that after-school tutoring and other programs were available at Fair to assist African-American students in pre-AP and AP courses. Tr. July 22, 2002, at 87, 91. Mr. Carter also testified that, in addition to after-school tutoring, he instituted a mentoring program at McClellan and worked with pre-AP and AP teachers to develop strategies to assist African-American students to be successful. Tr. July 23, 2002, at 491-92, 494, 523. Mr. Mosby, the principal at Southwest Middle School, testified that, among other programs, Southwest offered an after-school tutoring program with the capacity for 150 students, although only seventy or eighty students regularly took advantage of the program. Tr. July 24, 2002, at 564-67.

29.    In his questioning of LRSD administrators, Joshua's counsel suggested that

-135-

AO 72A

African-American students were failing pre-AP and AP courses at an unacceptably high rate. However, Joshua came forward with no evidence to support that suggestion. The vast majority of African-American students made a "C" or above in pre-AP and AP classes. Final Compliance Report at 44-46; Tr. July 23, 2002, at 519-20. Mr. Carter testified that the failure rate for African-American students in AP courses at McClellan was not high. Tr. July 23, 2002, at 476. Likewise, Mr. Mosby monitored the grades of African-American students in pre-AP courses at Southwest Middle School and testified that the success rate was "pretty good," although he wanted to see the students doing even better. Tr. July 24, 2002, at 570-71. I find the testimony of Mr. Carter and Mr. Mosby to be particularly significant because their schools, McClellan and Southwest, educate some of the most disadvantaged students in LRSD. Tr. July 23, 2002, at 464-65; Tr. July 24, 2002, at 571.

30.     For the above reasons, I find that Joshua has not sustained their burden of proving that LRSD failed to substantially comply with its obligations contained in §§ 2.6, 2.6.1, and 2.6.2 of the Revised Plan. I further find that LRSD substantially complied with its obligations under those sections of the Revised Plan.

E.     **Guidance And Counseling**

1.     Section 2.11 of the Revised Plan provided that LRSD "shall implement programs, policies and/or procedures designed to ensure that there is no racial discrimination in the provision of guidance and counseling services." Section 2.11.1 goes on to provide that: "Guidance counselors shall work with students in an effort to provide for more equity in academic honors, awards and scholarships."

2.     The Board enacted the following policies to implement LRSD's obligations

-136-

regarding guidance and counseling: AC (nondiscrimination); ACB (nondiscrimination on the basis of ethnicity and race); and JB (equal educational opportunity). *See* CX 719. Joshua did not challenge the facial adequacy of the Board's policies adopted to implement the obligations contained in §§ 2.11 and 2.11.1 of the Revised Plan.

3.      The number and dollar amount of scholarships received by African-American students attending LRSD schools leave little doubt that counselors worked hard to ensure equality. During the 1998-99 school year, 49% of the 301 scholarships awarded went to African-American students. These scholarships totaled $3,256,207 and represented 47% of the total dollar amount of scholarships awarded during that year. For the 1999-2000 school year, African-American students received a total of 185 scholarships, which represented 56% of the total scholarships received. The value of those 185 scholarships totaled $3,716,358, which represented 58% of the total dollar amount of scholarships awarded during that year. Final Compliance Report at 160-61.

4.      The data contained in the Final Compliance Report reflected that it will take time for LRSD to increase the number of African-American honor graduates. For example, over a two-year period, the percentage of African-American honor graduates has remained at approximately 30%, with a small 2% rise in the 1999-2000 school year. The percentage of white honor graduates over the same two-year period averaged 61%.[121] However, LRSD's new graduation and honor diploma requirements do not take effect until the graduating class of 2004. *See* CX 870 at 30. The number of minority honor graduates should increase as more African-

---

[121]Final Compliance Report at 161-62.

American students benefit from their growing enrollment in pre-AP and AP courses.[122]    Final Compliance Report at 161.

5.    Joshua called two students to testify regarding guidance and counseling services and equity in academic honors, awards, and scholarships.  The first student, a recent Central graduate testified that he was in the process of obtaining a scholarship to attend Amherst College and that his counselor was not assisting him in that process.  Tr. July 23, 2002, at 329-30.  However, the student did not testify that he had asked his counselor for any assistance in obtaining the scholarship from Amherst.  The second student, who graduated from J. A. Fair, testified that Alabama A&M awarded him an academic scholarship to attend that school and that his counselor did not assist him in getting that scholarship.  *Id.* at 401.  However, this second student stated that his counselor did help him to get numerous private scholarships.  *Id.* at 409 and 415.  Joshua offered no testimony from any witness to establish that any counselor ever refused a student's request for assistance in obtaining a scholarship.

6.    For the above reasons, I find that Joshua has not sustained their burden of proving that LRSD failed to substantially comply with its obligation contained in §§ 2.11 and 2.11.1 of the Revised Plan. I further find that LRSD substantially complied with its obligations under those sections of the Revised Plan.

**F.    Academic Achievement**

1.    Section 2.7 of the Revised Plan required LRSD to implement "programs, policies and/or procedures designed to improve and remediate the academic achievement of African-

---

[122]The grades in AP courses have a heavier weighting than grades in regular courses. For example, an "A" in an AP course has a weighting of 5.0, while an "A" in a regular course has a weighting of 4.0.

-138-

AO 72A

American students . . . ." The Board enacted the following policies under this section of the Revised Plan: IA (academic content standards and benchmarks); IAB (purpose of the curriculum); IABC (student learning outcomes); IABCE (educational alignment); IFA (curriculum monitoring); IGBE (comprehensive intervention/follow-up remediation); IGCA (summer school); IIA (instructional materials); IKA (grading systems); IKAB (student progress reports to parents); and IKF (general education graduation requirements). CX 544 at 26-32. Joshua has not challenged the facial adequacy of the Board's policies adopted to implement the obligations embodied in § 2.7.

2.     Almost 70% of the students in LRSD are African-American. Since this action was filed in 1985, African-American students have lagged far behind LRSD's white students in their academic achievement, as measured by standardized test scores. For example, among college-bound LRSD students, the average composite ACT score for African-American students in 1997-98, 1998-99, and 1999-2000 was approximately 17.2, while in each of those years the average composite ACT score for white students was approximately 5 points higher. Final Compliance Report at 48.

3.     During those same years, the size of the achievement gap was even larger when scores were compared on the Stanford Achievement Test (SAT-9), which LRSD administered to *all* LRSD students in grades 5, 7, and 10. For example, a comparison of the scores of African-American and white fifth graders on the reading section of the SAT-9, between 1997-98 and 2000-01, reveals that each group performed at the following percentiles:[123]

---

[123]Because the SAT-9 is a nationwide test, it is scored using national percentile rankings. *See* Final Compliance Report at 104.

| | 1997-98 | 1998-99 | 1999-2000 | 2000-01 | % Change |
|---|---|---|---|---|---|
| African-American students | 22 | 27 | 24 | 29 | 32% |
| White students | 68 | 69 | 71 | 72 | 6% |

Final Compliance Report at 104.

4.      While African-American students' scores over that period of time increased from the 22nd percentile to the 29th percentile, a 32% increase, I hardly find that a cause for celebration-- after all, performing at the 29th percentile in reading means that, nationally, over 70% of the fifth graders taking the test outscored LRSD's African-American fifth graders. Furthermore, in each of those years, there was an over 40 percentile difference between the performance of LRSD's African-American and white fifth graders. The reading results for tenth grade students on the SAT-9, over the same period of time, confirms an equally large achievement gap:

| | 1997-98 | 1998-99 | 1999-2000 | 2000-01 | % Change |
|---|---|---|---|---|---|
| African-American students | 25 | 25 | 23 | 24 | -4% |
| White students | 63 | 65 | 62 | 66 | 5% |

Final Compliance Report at 113. The SAT-9 test results in mathematics for grades 5, 7, and 10 reveal the same large disparity between test scores for African-American and white students. Final Compliance Report at 133-34.

5.      Beginning with the 1998-99 school year, LRSD administered the State Benchmark Exam to all students in grades 4, 6, and 8. This test, which is only administered to Arkansas students, is designed to measure performance in the areas of literacy and mathematics. The tests are scored and reported according to four performance levels: below basic, basic, proficient, and advanced. The ADE's long-term goal is to have 100% of the State's students at or above the

-140-

"proficient" level in both literacy and mathematics. Final Compliance Report at 56.

6.    During the term of the Revised Plan, LRSD's fourth, sixth, and eighth graders posted scores on the Benchmark Exam that revealed a large gap between the number of African-American and white students performing at or above the "proficient" level. For example, for fourth and eighth graders, the following percentages of students were performing at or above the proficient level in literacy and math:

Grade 4 Literacy[124]

|  | 1998-99 | 1999-2000 |
| --- | --- | --- |
| African-American students | 20% | 30% |
| White students | 62% | 66% |

Grade 4 Mathematics[125]

|  | 1998-99 | 1999-2000 |
| --- | --- | --- |
| African-American Students | 8% | 15% |
| White students | 53% | 61% |

---

[124]*See* Final Compliance Report at 103.

[125]*See* Final Compliance Report at 131.

-141-

Grade 8 Literacy[126]

|  | 1999-2000 |
|---|---|
| African-American students | 8% |
| White students | 32% |

Grade 8 Mathematics[127]

|  | 1999-2000 |
|---|---|
| African-American students | 2% |
| White students | 28% |

7.    During the term of the Revised Plan, LRSD implemented many dozens of programs "designed to improve and remediate the academic achievement of African-American students," as required by § 2.7. During her testimony, Dr. Lesley unequivocally stated that all of the curriculum changes made under the Revised Plan were designed specifically to improve African-American achievement:

> Every change we have made has been to improve African-American achievement. You [Joshua's counsel] said over and over that white kids in the District do well already, so there would be no reason to change unless we wanted to change the achievement for African-American students.

Tr. November 20, 2001, at 498.

8.    Dr. Lesley also testified that, under § 2.7, LRSD made significant changes in "Language Arts [grades] K-12, Mathematics [grades] K-12, and Science [grades] K-12." *Id.* at 513. Many of the most important programs implemented under § 2.7 are described in the Interim Compliance Report at 41-69 and 93-135, as well as in the Final Compliance Report at 51-148.

---

[126]The first time the Benchmark Exam was given to eighth graders was the spring of 2000. This makes it difficult to draw any conclusions from the data--except that the percentage of students, both African-American and white, who were proficient in literacy and math was dishearteningly low. *See* Final Compliance Report at 111.

[127]*See* Final Compliance Report at 132.

-142-

Finally, in discharging its obligations under § 2.7, LRSD also:  (a) adopted research-based teaching strategies designed to be effective in improving African-American achievement (Tr. November 19, 2001, at 195-210); and (b) provided principals and teachers with in-depth professional development (*id.* at 207-10).

9.     The implementation of the new curriculum, which was developed pursuant to § 2.7, began in the spring semester of 1999 and was not fully implemented until the fall of 2000. Tr. November 20, 2001, at 518.  Thus, at the time LRSD filed its Final Compliance Report on March 15, 2001, it had very little testing data available to gauge the effectiveness of those curriculum changes in improving the academic achievement of African-American students.

10.     As a predominantly African-American school district, LRSD's top priority must be to continue its efforts to design and implement programs aimed at improving the academic achievement of African-American students until those efforts are successful.  I find from the testimony of LRSD's current administrators and Board members that the school district has, in fact, committed itself to do all that it can to improve the academic achievement of African-American students.  I further find from the testimony of LRSD's top administrators and Board members that LRSD accepts, as a matter of basic equity and fairness, the obligation to improve the academic achievement of African-American students, regardless of how long that task may take. Finally, and most importantly, I find that LRSD can be trusted to discharge that obligation, without the need for supervision by the Court.

11.     In cross-examining LRSD administrators regarding § 2.7, Joshua's counsel repeatedly attempted to elicit testimony that, because LRSD had not *eliminated* the achievement gap between African-American and white students, it had failed to substantially comply with that

-143-

section. The fundamental flaw in Joshua's approach to proving LRSD's failure to substantially comply with § 2.7 was best captured in Joshua's counsel's examination of Dr. Les Carnine, who served as LRSD's Superintendent during most of the term of the Revised Plan:

> Q.    Isn't it fair to say that you instituted more than 100 programs that were supposed to address the subject of remediation of achievement disparities?
>
> A.    Again, Mr. Walker, not disparities. We talked about remediation, but we did not [talk about] the disparity issue, in our plan.
>
> \*   \*   \*
>
> Q.    Did you commit to adopt programs by which to narrow the educational gap in achievement between African-American and other students? Did you not agree to do that?
>
> \*   \*   \*
>
> A.    I would say yes, that we adopted programs to remediate African-American achievement.
>
> Q.    What did--
>
> A.    We believe that by doing so would, in fact, help us, in fact, close the gap.
>
> \*   \*   \*
>
> THE COURT [Judge Wright]: And in his defense [referring to Dr. Carnine], I am not trying to take his side in this matter, I am trying to be a fair Judge, but in his defense, Section 2.7 of this plan requires the District to "implement programs, policies and/or procedures designed to improve and remediate the academic achievement of African-American students." . . . And so, what he is going to testify--what he wants to testify to is not reducing the disparity, but increasing African-American achievement. And I am going to--based on the language of the plan, I am going to let him stick to that.

Tr. July 6, 2001, at 374-77.

12.    The original desegregation remedy in *LRSD v. PCSSD*, 778 F.2d 404, 434-36 (8th Cir. 1985), did not mention any obligations related to narrowing or eliminating the achievement

-144-

gap between African-American and white students. Rather, LRSD *voluntarily agreed* to eliminate that achievement gap as one of the obligations in the 1990 Settlement Agreement and Settlement Plan.[128]

13.     As discussed previously, the Eighth Circuit, in reviewing Judge Wright's decision prohibiting the parties from making certain modifications to the 1990 Settlement Agreement and Settlement Plan, identified seven crucial elements "with respect to which no retreat should be approved." *Appeal of LRSD*, 949 F.2d 253, 256 (8th Cir. 1991).[129] One of those crucial elements was the agreed "*effort*" to eliminate the achievement gap. *Id.* (Emphasis added.) Nothing in the Eighth Circuit's decision suggested that the "*effort*" to eliminate the achievement gap must be successful in order for LRSD to be declared unitary and released from court supervision. Therefore, I reject Joshua's argument that the Court's decision in *Appeal of LRSD* and the 1990 Settlement Agreement required LRSD to eliminate the achievement gap.

14.     In May of 1996, Judge Wright conducted three days of evidentiary hearings during which Dr. Walberg, Dr. Armor, and Dr. Orfield, three nationally recognized experts in desegregation litigation, testified.[130] According to both Dr. Walberg and Dr. Armor, the current socioeconomic differences between African-Americans and whites make it impossible to eliminate the achievement gap. Dr. Armor offered the following sobering testimony in support

---

[128]This obligation was also retained in the May 1992 Desegregation Plan (docket no. 1587 at 1), which was in effect until Judge Wright approved the Revised Plan on April 10, 1998.

[129]*See* discussion in Section II.E., *supra*, at 29.

[130]*See* discussion, *supra*, at 83-84. Judge Wright called Dr. Armor and Dr. Walberg as court-appointed experts. The testimony of these three expert witnesses can be found at docket nos. 2692 (May 13, 1996 hearing), 2693 (May 14, 1996 hearing), 2694 (May 15, 1996 hearing), and 2768 (May 30, 1996 hearing).

of that conclusion:

> Q.     Doctor Armor, if I understood correctly yesterday, did you testify that, to your knowledge, there's no desegregation plan that has ever overcome the achievement gap between black and white students, that you're aware of?
>
> A.     That I'm aware of, yes.
>
> Q.     And I think you also testified that making the achievement gap zero is virtually impossible?
>
> A.     Well, impossible as long as there are socioeconomic differences between black and white families that exist today in this country.

Tr. May 15, 1996, at 152-53. Dr. Walberg went on to explain that:

> [A]s an educational psychologist, I would like to have all students learn as much as they possibly can. But given the fact that students spend only about ten percent of their time in school, to say that a school district can remove the achievement gap between blacks and whites, I think, is too much. I think it's making a promise that can't be kept.
>
> If 90 percent of the students' time is outside of the school, where there are many other factors that affect the students' learning and capacity to learn, I think that it's an impossible promise to keep.

Tr. May 13, 1996, at 33. The fact that the achievement gap exists in school districts throughout the United States, including those never found to have operated segregated school systems, strongly supports the proposition that socioeconomic factors are the root cause for most, if not all, of the achievement gap.[131]

15.     In a Memorandum and Order entered on September 23, 1996 (docket no. 2821), Judge Wright urged Joshua and LRSD to use the expert testimony developed during the May 1996 hearings as a basis for modifying "the parts of the plan that are ineffective or unworkable"

---

[131]Researchers have also found that the achievement gap exists at the time children begin their academic careers. *See Berry v. School Dist. of the City of Benton Harbor*, 195 F. Supp.2d 971, 980 (W.D. Mich. 2002) (citing Dr. Armor's testimony).

-146-

so that LRSD could put itself into a better position to achieve unitary status and release from court supervision. This resulted in Joshua and LRSD entering into lengthy negotiations to substantially modify the May 1992 Desegregation Plan. *See* docket no. 2901. The Revised Plan, which represented the final results of those negotiations, was *jointly* submitted to Judge Wright for approval on January 21, 1998 (docket no. 3107). In LRSD's and Joshua's joint brief in support of their request for Judge Wright to approve the Revised Plan, they *agreed* that, by its own terms, the Revised Plan satisfied the requirements of the Eighth Circuit in *Appeal of LRSD*, and did not require retaining any of the terms and conditions of the 1990 Settlement Plan or the 1992 Desegregation Plan. *See* docket no. 3108.[132] On April 10, 1998, Judge Wright entered a Memorandum and Order approving the Revised Plan (docket no. 3144).

16.    Joshua's counsel *knew* that, under § 2.7 of the Revised Plan, the parties had agreed to change LRSD's obligation from *eliminating* the achievement gap to "implement[ing] programs, policies and/or procedures designed to improve and remediate the academic achievement of African-American students." In her April 10 Memorandum and Order, Judge Wright held that the Revised Plan constituted a "new consent decree or settlement agreement," between Joshua and LRSD. Alternatively, Judge Wright held that, if the Revised Plan was a modification to the 1990 Settlement Plan, she approved it because the parties had satisfied the standard for modifying a consent decree established in *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992), and *LRSD*, 56 F.3d at 904 (8th Cir. 1995). None of the parties appealed Judge Wright's April 10, 1998 Order approving the Revised Plan, *making it final and the law of*

---

[132]Section 1.1 of the Revised Plan explicitly set forth the prior agreements, stipulations, and orders that remained in effect. These agreements did *not* include either LRSD's 1990 Settlement Plan or the 1992 Desegregation Plan.

-147-

*the case.*

17.   On March 19, 2001, LRSD and the ADE entered into an Agreement (CX 548) that arose from LRSD having filed, four days earlier, its Final Compliance Report, along with a request that Judge Wright declare LRSD unitary with regard to all of its operations. Under § 4.1 of that Agreement, the State forgave and released LRSD from any obligation to repay the first $15,000,000 in loans advanced to LRSD pursuant to § VI.B. of the 1990 Settlement Agreement.[133] Section 4.2. provided that, with regard to the remaining balance of $5,000,000, the State would forgive LRSD's obligation to repay those funds "if the LRSD obtains a final order granting it complete unitary status and release from federal court supervision on or before July 1, 2004."

18.   The March 19, 2001 Agreement between LRSD and ADE appears to have recognized the same reality that, three years earlier, led Joshua and LRSD to agree to the language

---

[133]Section VI.B.(6) of the 1990 Settlement Agreement provided the following:

> LRSD and the State will establish a joint escrow account into which all principal and interest due on loans made under this agreement will be paid. If at any time between the date of this agreement and December 31, 2000, the composite scores of LRSD black students (excluding special education students) on a standardized test agreed upon by the State and LRSD are 90% or greater of the composite scores of LRSD white students (excluding special education students), the escrowed funds will be paid to LRSD and any outstanding loans will be forgiven. If the 90% goal is not reached by December 31, 2000, the escrow funds will be paid to the State and any outstanding loans will continue to be repaid according to the schedule set forth in this agreement. The intent of this subsection is that LRSD will receive twenty million dollars plus any accrued interest if its goal of increasing student achievement as described in this subsection is reached and that the State will be repaid in full amount of all loans plus interest if LRSD does not reach its goal.

*See* 1990 Settlement Agreement, attached to docket no. 1174.

-148-

contained in § 2.7 of the Revised Plan, *i.e.*, it was unrealistic to require LRSD to essentially eliminate the achievement gap between African-American and white students. Because almost 70% of the students in LRSD are African-American, Joshua is the most immediate and direct beneficiary of the March 19, 2001 Agreement. I find that the March 19, 2001 Agreement between the ADE and LRSD is unrelated to the question of whether LRSD has substantially complied with its obligations under the Revised Plan. It is important, too, that Joshua did *not* raise that issue as part of its challenge to LRSD's request for an immediate declaration of unitary status.

19.     Under the Revised Plan, I find that LRSD was *not* obligated to eliminate the achievement gap between African-American and white students. The uncontroverted evidence proves that, in compliance with the obligations contained in § 2.7 of the Revised Plan, LRSD designed and implemented many dozens of programs aimed at improving and remediating the academic achievement of African-American students. Joshua failed to offer any testimony that the implementation of those programs failed to substantially comply with that obligation. The test score results contained in the Interim and Final Compliance Reports reveal that, at least so far, these programs appear to have had some success in improving African-American achievement in some grade levels, but not in reducing the overall achievement gap. Because reducing or eliminating the achievement gap was *not* one of the obligations LRSD agreed to in § 2.7, the test score results--while far from where they need to be--fail to prove that LRSD has not lived up to its obligations under § 2.7.

20.     For the above reasons, I find that Joshua has not sustained their burden of proving that LRSD failed to comply substantially with its obligations under § 2.7 of the Revised Plan. I further find that LRSD substantially complied with its obligations under that section of the

Revised Plan.

G.     **Program Assessment/Program Evaluation**

1.     Section 2.7.1 of the Revised Plan required LRSD to assess annually *each* of the academic programs promulgated pursuant to § 2.7, in order to determine if those programs, in fact, were improving African-American achievement.[134] If the assessment of a program revealed that it was not effective in improving African-American achievement, LRSD was required to modify or replace the program. I find that the purpose of § 2.7.1 was to make sure that the programs promised under § 2.7 *actually worked* to improve the academic achievement of African-American students. I further find that LRSD's substantial compliance with § 2.7.1 was *crucial* to its commitment to improve the academic achievement of African-American students; for, without performing a rigorous annual assessment of each of the many dozens of programs implemented under § 2.7, it would be impossible to determine which programs were working and should be continued and which programs were not working and should be discontinued, modified, or replaced with new programs.

2.     According to the Compliance Plan (CX 544), the Board enacted the following policies under § 2.7.1 of the Revised Plan: IFB (new initiatives); IL (testing programs); and IM

_____

[134]The following testimony by Dr. Carnine makes it clear that LRSD understood that § 2.7.1 required it to assess *each program* implemented under § 2.7 on an annual basis:

Q.     All right then. But then, how can you, since you made the commitment to determine the effectiveness of your academic programs, one-by-one, if you have specific programs, you came up with a lot of programs, didn't you?
A.     That's correct.
Q.     Each one of them had to be assessed, didn't it?
A.     Each one of them had to be looked at, that's correct.
Q.     Not looked at.
A.     Yes, assessed.

Tr. July 6, 2001, at 395.

-150-

(program evaluation). The Interim Compliance Report also identified the following additional policies the Board enacted under § 2.7.1: IGC (pilot programs); IGBA (grant-funded projects); IGB (educational research); and IHBEA (English as a second language). *Id.* at 52. Joshua has not challenged the facial adequacy of the Board's policies enacted under § 2.7.1.

3.    Under § 2.7.1 of the Interim Compliance Report, LRSD discussed at length its plan for "assessing" the programs implemented under § 2.7.[135] This plan consisted entirely of administering numerous tests to students in various grade levels and then comparing those test scores with past test results to gauge how the programs were working to improve African-American achievement.[136] *See* Interim Compliance Report at 56-58. In addition to this "Assessment Plan," § 2.7.1 of the Interim Compliance Report noted that LRSD was preparing *"evaluations"* on some of the key programs designed to improve African-American achievement, in order to provide a more in-depth look at the effectiveness of those programs. The following key programs were targeted for an "evaluation": Pre-K-3 Literacy Program Success For All; the implementation of the new curriculum in English language arts, mathematics, and science in the middle schools; the National Science Foundation project aimed at improving African-American

---

[135]In §§ 2.7 and 5.1 through 5.4 of the Interim Compliance Report, LRSD identified almost 100 programs that it had implemented to "improve and remediate the academic achievement of African-American students." At certain grade levels, it appears students were exposed to *multiple* programs aimed at improving their literacy and math skills.

[136]The Final Compliance Report lists seven different tests that LRSD administered each year as part of this assessment process. LRSD prepared a chart for the 2000-01 school year that reflected the testing schedule for the administration of those tests. *See* CX 701 at tab 45. This chart revealed, for example, that third graders were given four separate standardized tests and that eighth graders were given nine separate standardized tests. In my admittedly non-professional opinion, administering that many different tests for "assessment purposes" only serves to create conflicting data and substantially reduces the amount of time available for students to learn.

-151-

achievement in math and science; and the implementation of the School Improvement Plan. *See* Interim Compliance Report at 53-54. Thus, in order to comply with its obligations under § 2.7.1, LRSD *acknowledged* in the Interim Compliance Report that it was required: (a) to use *both* the testing data *and* the "program evaluations" to determine the effectiveness of the key academic programs implemented pursuant to § 2.7; and (b) to modify or eliminate those programs which the testing data and evaluations revealed were not effective in improving African-American achievement.

4.    Dr. Lesley, the Associate Superintendent for Instruction, defined an "assessment" as something that is "dynamic, it is interactive, it's ongoing, it happens frequently, and it is a measurement, along with the analysis that you would make of whatever results are available." Tr. November 19, 2001, at 242. Dr. Lesley defined a "program evaluation" as "more long term, [it] may consider observations or measurements in addition to test scores, and is guided by a set of research questions that are usually provided by whoever the consumer is of that report." *Id.* at 242-43. Dr. Lesley admitted that, even though § 2.7.1 of the Revised Plan does not use the phrase "program evaluation," LRSD interpreted that section of the Revised Plan to include an obligation to perform some program evaluations. Tr. August 1, 2001, at 706-07.

5.    During the term of the Revised Plan, LRSD had a Program Review and Evaluation Department ("PRE") that operated under the direction of Dr. Kathy Lease, who reported directly to Dr. Lesley.[137]    PRE was responsible for preparing *written* evaluations on the programs identified in the Interim Compliance Report. Tr. August 1, 2001, at 710. The programs that were

---

[137]The testimony and exhibits conclusively demonstrated that Dr. Lesley and Dr. Lease did not get along with each other, to put it mildly. Tr. July 6, 2001, at 365. *See* e-mails at CX 620, CX 648, and CX 653.

to receive an "evaluation" were aimed at improving the academic achievement of African-American students. Tr. July 6, 2001, at 383-84. Dr. Lesley testified that, by the end of November 2000, it was her opinion that no one in PRE had the expertise to prepare program evaluations. Tr. August 1, 2001, at 710.

6.      The Interim Compliance Report explicitly recognized that the program evaluations were being made "*so that the academic progress of African-American students can be determined and then program modifications or abandonment can occur.*" *See* Interim Compliance Report at 53 (emphasis added). Thus, at least as early as March 15, 2000, LRSD went on record as recognizing that effective and timely *written evaluations* of the key programs implemented under § 2.7 were *essential* in order for LRSD to accurately assess the effectiveness of those programs and to make the determinations required under § 2.7.1 regarding whether the programs should be changed or eliminated.

7.      In February of 2001, only one month before the March 15, 2001 deadline for filing LRSD's Final Compliance Report, the Board enacted Policy IL (evaluation of instructional programs).[138] Policy IL recognized the crucial importance of program evaluations in providing "valuable insights into how programs are operating, the extent to which they are serving the intended purpose of increasing student achievement, the strengths and weaknesses, the cost effectiveness, and directions for the future." CX 719. Because program evaluations analyze data and information over a substantial period of time to reach conclusions and recommendations regarding the effectiveness of a particular program, they are typically time consuming and

---

[138]To the extent that LRSD was required to prepare evaluations on various programs designed to improve the academic achievement of African-American students as part of its obligation under § 2.7.1, it was a little late in the day for the Board to be getting around to enacting a policy on how those evaluations should be prepared.

-153-

expensive to prepare. Tr. November 19, 2001, at 239. *See also* Tr. July 6, 2001, at 426.

8.      The Final Compliance Report did *not* contain a separate discussion of the annual assessments LRSD performed on each program implemented under § 2.7, the results of those assessments, or how each program was continued, modified, or eliminated based upon the results of the assessment. Rather, LRSD elected to scatter references to program assessments throughout its discussion of §§ 5.1 through 5.6.1 of the Revised Plan. Thus, to dig out how LRSD complied with the assessment obligations imposed on it under § 2.7.1, one must comb through eighty-one pages of data and information that is largely unrelated to that inquiry.[139]

9.      The Final Compliance Report's discussion of "Program Evaluations" begins by quoting the language in § 2.7.1, a clear indication that LRSD viewed that section as requiring it to prepare those evaluations as part of its assessment obligation. Final Compliance Report at 148. This discussion then proceeds to describe the program evaluations that LRSD prepared for the programs that are identified or listed on that page.[140]

10.     During the hearings on unitary status, LRSD took the position that § 2.7.1 only obligated it to perform program "assessments" and that it was *not* required to perform *any* program "evaluations." Dr. Lesley testified that preparing program evaluations was "very expensive." Tr. November 20, 2001, at 339. Based on the amount of time, effort, and money that LRSD expended on preparing program evaluations and its efforts to document the preparation of those program evaluations in both the Interim and Final Compliance Reports, the record is clear that LRSD viewed those program evaluations as an integral part of the assessment process

---

[139]*See* Final Compliance Report at 66-147.

[140]*See* docket no. 3410 at 148, or CX 870 at 148.

-154-

described in § 2.7.1.

11.     Dr. Lesley testified at length about her view of what § 2.7.1 required LRSD to do in assessing the effectiveness of the programs implemented to improve African-American achievement.  Tr. November 19, 2001, at 215-91.  According to Dr. Lesley, LRSD's K-12 Assessment Plan consisted entirely of administering a number of different tests to students in each grade level and then using those scores to assess, on an ongoing basis, which programs seemed to be working.  *Id.* at 234-36, 239-42.

12.     Dr. Lesley testified that the programs designed to improve African-American achievement under § 2.7 were not fully implemented until the fall of 2000.  Tr. November 20, 2001, at 345-46.  Thus, prior to filing LRSD's Final Compliance Report on March 15, 2001, Dr. Lesley appears to have had the benefit of only two semesters of relevant testing data to use in assessing the effectiveness of each of the dozens of programs implemented under § 2.7. During the term of the Revised Plan, the composite test scores of African-American students at each grade level was highly variable, with those scores deviating up and down, not only between semesters but also within the same semester, depending upon whether the tests being compared were SAT-9s, DRAs, ALTs, or CRTs.[141]  I have grave reservations about anyone this side of Solomon being wise enough to use two or three semesters' worth of erratic composite test scores to make reliable decisions about which remediation programs for LRSD's African-American students were actually working and which were falling short.

13.     Dr. Carnine's testimony casts considerable doubt on the reliability of Dr. Lesley's

_____

[141]*See* Final Compliance Report at 55-56 for a discussion of the numerous tests administered to assess student achievement.  SAT-9 stands for Stanford Achievement Test (ninth edition); DRA stands for Developmental Reading Assessment; ALT stands for Achievement Level Test; and CRT stands for Criteria Referenced Test.

-155-

"dynamic" assessment approach to making semester-to-semester decisions about the effectiveness of particular remediation programs and whether they should be modified or discontinued:

Q.    Well, you promised here to make annual assessments.

A.    And did we do that?  The answer is yes.

Q.    Do you have writings to reflect that you did it?

A.    We did assessments.  *Now, the recommendations of whether we discontinue a program could not be made for at least until you have three years of data.*

Tr. July 6, 2001, at 401 (emphasis added).  The semester-to-semester assessment of test scores for African-American students undoubtedly provided LRSD with some useful information about the effectiveness of some of those remediation programs.  However, the assessment obligation imposed by § 2.7.1 required LRSD to do more than just look at two or three semesters of testing data as the basis for determining the overall effectiveness of each of the dozens of programs implemented under § 2.7, much less whether some of those programs should be eliminated or modified.  I find that the much more in-depth and analytical program evaluations, which LRSD agreed to prepare on certain key remediation programs identified in the Interim Compliance Report, were an *integral and essential part* of LRSD's obligation under § 2.7.1.

14.    The evidence introduced during the unitary status hearings overwhelmingly established that, as of March 15, 2001, the date the Final Compliance Report was filed with the Court: (1) PRE had prepared only *draft evaluations* of *some* of the programs in question; (2) none of those evaluations had been approved by the Board; (3) in the fall of 2000, LRSD presented the Board with evaluations of the Pre-K-3 Literacy Program, the National Foundation Project, and the implementation of the middle school curriculum, but the Board tabled approval of each of

-156-

those evaluations because of serious problems with their form and content; and (4) in February of 2001, only a few weeks before the deadline for filing the Final Compliance Report, LRSD formed a new Research Committee and charged it with the responsibility of preparing and finalizing the evaluations on at least some of the programs listed on page 148 of the Final Compliance Report. The Final Compliance Report's discussion of "Program Evaluations" on page 148 fails to disclose *any* of the foregoing facts. "When one has to eat crow, one should take big bites." It would have been far better for LRSD to candidly set forth in the Final Compliance Report that it had dropped the ball in preparing the program evaluations outlined in the Interim Compliance Report, rather than presenting a misleading picture of the actual status of those program evaluations.

15.    During Joshua's counsel's cross-examination of Dr. Carnine about the shortcomings in the preparation of the program evaluations identified in the Interim Compliance Report and the Final Compliance Report, Dr. Carnine provided the following candid testimony:

> Q.    My question was have those reports [referring to draft program evaluations] that were insufficient, according to you, been updated by your professional staff in a form where that update is reflected in a new document? And that is yes or no.
>
> A.    I don't know.
>
> Q.    That's fine. Now, how then can you say that you have a sufficient assessment or evaluation if you cannot say that the document has been updated that was deficient in the first place? How can you say that?
>
> A.    *With difficulty.*
>
> Q.    Yes, sir. Thanks for that concession.

Tr. July 6, 2001, at 391 (emphasis added). *See also* testimony of Junious Babbs, Tr. July 5, 2001, at 118-120.

-157-

16.     After discovering the serious problems with LRSD's incomplete and inadequate draft evaluations, Dr. Lesley sent several e-mails to other top administrators making it quite clear that LRSD had failed to carry out its obligation to prepare timely and reliable evaluations to assist in determining the effectiveness of the key remediation programs implemented by LRSD to improve the academic achievement of African-American students.  These e-mails remove any doubt about whether Dr. Lesley understood the magnitude of the problem that the inadequate and incomplete evaluations posed for LRSD in trying to argue that it had substantially complied with its obligations under § 2.7.1 of the Revised Plan.  The relevant language from several of the most important of these e-mails are set forth below:

> From:  Bonnie Lesley
> To:     Members of LRSD's Compliance Committee
> Date:   Thursday, March 1, 2001, at 1:25 p.m.:
> "We have yet another *serious* problem concerning program evaluation. I received on Monday afternoon a copy of the draft of the mathematics program evaluation that Kathy has apparently asked John Nunnery to do.  I have these urgent concerns: (1) The draft contains **numerous** errors of fact and interpretation . . . . (3) The draft is not aligned with what Dennis and I wrote for the Compliance Report--so if Nunnery's report is submitted and it doesn't 'jive' with the Compliance Report, we are going to look like fools again. (4) The Nunnery report makes many of the same errors that PRE made originally.  It is based on wrong assumptions; it is devoid of context; it is incomplete in its data analysis; the interpretations are not informed by what we are doing this year; etc. . . . It makes NO sense to me, given the last year's events, to allow Kathy Lease to continue overseeing the program evaluation requirements for this district . . . .  There are serious legal and financial implications in all this.  Otherwise, I would just let it go.  You have my concerns.  You have my recommendation."

See CX 587.

-158-

From:   Bonnie Lesley
To:     Mona Briggs
Date:   Wednesday, May 16, 2001, at 4:51 p.m.
    "It will not be my decision about what to do about replacing Kathy . . . .
I think we have to give up on the idea of program evaluation. We do not have the
resources or expertise to do it, and I don't want to reopen the wounds that have
been inflicted over the past two years."

*See* CX 588.

From:   Bonnie Lesley
To:     Junious Babbs
Date:   Wednesday, June 13, 2001, at 5:36 p.m.
    "Attached is the draft of my response to Joy Springer [Joshua's counsel's
legal assistant]. Please give me your feedback and suggestions asap. As I reflect
on her oral questions and the one about test score analysis, I suspect that she is
working on the program evaluation issue. I tried to evade it as best I could."

*See* CX 589.

From:   Bonnie Lesley
To:     Kenneth James, Junious Babbs, Sadie Mitchell, and Chris Heller
Date:   Wednesday, June 20, 2001, at 1:07 p.m.
    "Ms. Springer has requested copies of the program evaluations that have
been completed by the District as identified on p. 148 of the March 15, 2001
Compliance Report. . . .' So--what now? Maybe the key word is 'completed.'
None have been 'completed.' Could we say that the program evaluations are
summarized in the Compliance Report, pp. ____? Aargh!"

*See* CX 616.

From:   Bonnie Lesley
To:     Linda Austin
Date:   Wednesday, May 30, 2001, at 1:59 p.m.
    "No. Dr. Carnine told me that I was not to even say the words 'program
evaluation,' and I assured him I would not. I can't attend a meeting [of the
Research Committee], therefore, it seems to me. I am hoping that we kill this
sucker [the Research Committee] when Dr. James [the new Superintendent] gets
on board."

*See* CX 642.

From: Bonnie Lesley
To:    kjeduc
Date:  Tuesday, May 1, 2001, at 5:08 p.m.

"Here's another issue that I invite you to start thinking about. Our assessment program has been extremely controversial. We test too much, in almost everyone's opinion; the scores are not necessarily used for improvement; and some of the testing is inappropriate. . . . I've been very concerned about our program for three years, so I welcome the opportunity to discuss with you some needed changes."

*See* CX 657.

17.    The quotes from the above e-mails are *stout,* and no amount of bobbing and weaving can obscure this.

18.    I find, for the foregoing reasons, that Joshua has sustained its burden of proving that LRSD failed to substantially comply with its obligations under § 2.7.1 of the Revised Plan.

## VI. Conclusions Of Law

### A.    Unitary Status

In Section IV.A. and B., *supra,* at 60-72, I discuss the applicable legal standard for determining if LRSD is unitary. I incorporate by reference that discussion as my Conclusions of Law on unitary status.

### B.    Burden Of Proof

In Section IV.C., *supra,* at 72-75, I discuss the burden of proof in this case. I incorporate by reference that discussion as my Conclusions of Law on that issue.

### C.    Substantial Compliance

In Section IV.D., *supra,* at 75-77, I discuss the meaning of "substantial compliance" as that phrase is used in the Revised Plan. I incorporate by reference that discussion as my Conclusions of Law on the meaning of "substantial compliance."

**D.      Good Faith**

1.      In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Court limited municipal liability under § 1983 by holding that, in order for tortious conduct to be actionable against a municipality, it must be based on the municipality's "official policy." This requirement was "intended to distinguish acts of the *municipality* from acts of *employees* of the municipality." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). LRSD's argument that, in deciding the question of good faith, I should apply *Monell* and look only "to the 'official policy' of LRSD" is without merit.[142]

2.      In the Revised Plan, LRSD and Joshua agreed on a *remedy* that, by its very terms, called for the active participation and involvement of the Board, top LRSD administrators, school principals, counselors, and teachers. Courts have recognized that, in a § 1983 action, a *municipality* may use the *Monell* doctrine to limit its liability. However, there is *no* authority to support LRSD's effort to extend that doctrine by arguing that the behavior of its administrators, principals, and teachers, who were charged with the duty of actually implementing the desegregation remedy, should *not* be deemed to bind it on the crucially important question of its good faith. LRSD's position is a real stretch, to say the least.

**E.      Student Discipline**

1.      Joshua bore the burden of proving that LRSD failed to comply with §§ 2.5 through 2.5.4 of the Revised Plan, which together set forth LRSD's obligations to ensure that there was no racial discrimination with regard to student discipline. The plain language of the Revised Plan did *not* require LRSD to reduce or eliminate the racial disparity in the percentage of suspensions

---

[142]*See* LRSD's Proposed Findings of Fact and Conclusions of Law (docket no. 3662) at 50-52.

and expulsions between African-American and other students. The only way to ensure proportional discipline is through racial disciplinary quotas--something that was not required under the Revised Plan. My previous discussion of disciplinary quotas, contained in Section V.B., *supra*, at 95, is incorporated by reference as my Conclusions of Law on that issue.

2.      Section 2.12.2 of the Revised Plan provided that "LRSD shall implement policies and procedures for investigating the cause of racial disparities in programs and activities and developing remedies where appropriate." Joshua argued that, during the term of the Revised Plan, that section obligated LRSD to investigate and determine the cause of the racial disparity in discipline. There is no dispute that LRSD did *not* investigate the cause of the racial disparity in discipline under § 2.12.2.

3.      Joshua did not raise this argument in their Opposition to LRSD's Compliance Report (docket no. 3447) filed on June 25, 2001. Rather, Joshua raised § 2.12.2 for the first time on May 30, 2002, in their Opposition to LRSD's Motion for an Immediate Declaration of Unitary Status (docket no. 3604). Therefore, LRSD contends this argument is untimely and should not be considered. Because the Joshua Intervenors are a class composed of all African-American school children in the Pulaski County school districts, I conclude that their counsel's delay in raising that argument should not prevent me from reaching the merits of whether § 2.12.2 applies to student discipline and, if so, whether LRSD failed to substantially comply with its obligations under §§ 2.5 and 2.12.2.

4.      As a threshold matter, I conclude that student discipline is neither a "program" nor an "activity" within the meaning of those two words as they are used in § 2.12.2. During the term of the Revised Plan, none of the parties interpreted § 2.12.2 to apply to student discipline.

-162-

Furthermore, even if student discipline was a "program" or "activity," traditional rules of contract interpretation lead me to reject Joshua's newly asserted contentions regarding the meaning of that provision. Section 2.12.2 called for the implementation of "remedies where appropriate," while § 2.5, *et seq.*, set forth Joshua's agreed "remedy" related to student discipline. Thus, the specific remedy regarding student discipline set forth in § 2.5, *et seq.*, is controlling and limits the application of the more general obligation contained in § 2.12.2.

5.       Second, traditional contract principles bar Joshua from arguing, at this late date, that LRSD violated § 2.12.2. Joshua's current interpretation of that section was never brought to the attention of LRSD during the term of the Revised Plan. Joshua knew no later than March 15, 2000,[143] that LRSD was not "investigating" the racial disparity in student discipline. Joshua's silence precludes it from now arguing that § 2.12.2 required such an investigation. *See United States v. City of Fort Smith*, 760 F.2d 231, 233-34 (8th Cir. 1985) ("[w]e note that, for purposes of enforcement, consent decrees are to be construed as contracts"); *Southern Pipe Coating, Inc. v. Spear & Wood Manufacturing Co.*, 363 S.W.2d 912, 914 (Ark. 1963) ("one party to a contract who, with knowledge of a breach by the other party, continues to accept benefits under the contract, and suffers the other party to continue in performance thereof, waives the right to insist on the breach"); *Stevens v. West Pontiac-GMC, Inc.*, 647 S.W.2d 492, 493 (Ark. App. 1983).

**F.       Academic Achievement**

1.       In Section V.F., *supra*, at 147-49, I discuss the Eighth Circuit's decision in *Appeal of LRSD*, 949 F.2d 253 (8th Cir. 1991), and conclude that nothing in that decision required LRSD

---

[143]On that date, LRSD filed the Interim Compliance Report.

to eliminate the academic achievement gap before it could be released from federal court supervision. I incorporate by reference that discussion as my Conclusions of Law on the scope and meaning of the requirement that LRSD make the agreed "*effort*" to eliminate the achievement gap.

2.      Joshua also argued that § 2.12.2 of the Revised Plan imposed on LRSD the obligation to investigate the racial disparity in academic achievement under § 2.7. I conclude that argument is without merit for the same reasons I stated in Section VI.E., paragraphs 4-5, *supra*, at pages 162-63.

3.      Finally, other courts have recognized that the academic achievement gap, which is a nationwide phenomenon, should not prevent a school district from being declared unitary, unless there is evidence this achievement gap was caused by *de jure* segregation. *See, e.g., Berry v. School District of City of Benton Harbor*, 195 F. Supp.2d at 971, 996 (W.D. Mich. 2002) ("I find no basis for concluding that the remaining gaps result from prior segregation in the BHASD. As a consequence, those achievement gaps are not properly the subject of this court's continuing jurisdiction"); *Coalition to Save Our Children v. State Board of Education of Delaware*, 901 F. Supp. 784, 819 (D. Del. 1995), *aff'd* 90 F.3d 752 (3rd Cir. 1996) ("[b]ecause the environment outside school is so strong, cumulative, and varied, schools cannot overcome such environmental differences among children"); *Keyes v. Congress of Hispanic Educators*, 902 F. Supp. 1274, 1300 (D. Colo. 1995) ("[t]here are too many variables, including societal and socio-economic factors, to infer causation from prior unconstitutional conduct"); *Tasby v. Woolery*, 869 F. Supp. 454, 477 (N.D. Tex. 1994) ("[t]he Court is unable to find that the achievement gap in the DISD is a vestige of the prior segregated school system"). Joshua failed to present evidence to establish what part,

if any, of the academic achievement gap was the result of LRSD having been a *de jure* segregated school system. In *People Who Care v. Rockford Board of Education*, 246 F.3d 1073, 1076-77 (7th Cir. 2001), the Court recognized the plethora of "other factors" that go into the creation of the achievement gap:

> The reality is that until minority students achieve parity of educational achievement with the white students in the Rockford Public Schools, the plaintiffs will contend that the minority students are victims of the unlawful discrimination of an earlier period in Rockford's history. Yet it is obvious that other factors besides discrimination contribute to unequal educational attainment, such as poverty, parents' education and employment, family size, parental attitudes and behavior, prenatal, neonatal, and child health care, peer-group pressures, and ethnic culture. Some of these factors may themselves be due to or exacerbated by discrimination, but not to discrimination by the Rockford School Board. The board has no legal duty to remove those vestiges of societal discrimination for which it is not responsible. Insofar as the factors that we have mentioned, rather than unlawful conduct by the Rockford School Board in years past, are responsible for lags in educational achievement by minority students, the board has no duty that a federal court can enforce to help those students catch up. It may have a moral duty; it has no federal constitutional duty.

Finally, Joshua offered no evidence to prove that LRSD's alleged noncompliance under § 2.7 caused or contributed to the academic achievement gap.

## G.    Partial Unitary Status

1.    In Section IV.A., *supra*, at 63-66, I discuss *Freeman v. Pittman*, 503 U.S. 467 (1992), which recognized that a district court may *partially relinquish* its supervision and control over a school system in those areas in which there has been compliance with a desegregation decree, even if other aspects of the system remain in noncompliance and require continued federal supervision. That discussion is incorporated by reference as my Conclusions of Law on the standard for granting a school district partial unitary status.

2.    In paragraph 5 of LRSD's Motion for an Immediate Declaration of Unitary Status

-165-

(docket no. 3580), it moved for summary judgment on all sections of the Revised Plan that were listed by Joshua in their Opposition to LRSD's Compliance Report (docket no. 3447) but that Joshua later failed to support with any argument or evidence during the hearings on the question of unitary status.[144]  In paragraph 6 of LRSD's Motion for Immediate Declaration of Unitary Status, it argued that, under the plain language of § 11 of the Revised Plan, it was entitled to a declaration of unitary status on those sections of the Revised Plan that Joshua has never challenged.[145]

3.     Joshua's Response in Opposition to LRSD's Motion for an Immediate Declaration of Unitary Status (docket no. 3604) did not address the merits of LRSD's request for summary judgment on those sections of the Revised Plan on which Joshua failed to present any evidence of noncompliance by LRSD.  Furthermore, Joshua did not challenge LRSD's Statement of Material Facts Not in Dispute, which was filed in support of its Motion for an Immediate Declaration of Unitary Status.  In LRSD's Reply Brief (docket no. 3607), it cited Joshua's failure to present any evidence or arguments regarding LRSD's alleged noncompliance with those sections of the Revised Plan and argued, for that reason, that it was entitled to summary judgment.

4.     Section 11 of the Revised Plan unquestionably obligated Joshua to identify the sections of the Revised Plan under which they believed LRSD had not substantially complied with its obligations.  By the time Judge Wright began the unitary status hearing on July 5, 2001, Joshua had narrowed their challenge to *six specific areas* of the Revised Plan under which they claimed LRSD had failed to substantially comply with its obligations.  All of the evidence that

---

[144]The sections in question are identified and discussed, *supra*, at 52.

[145]*See also* LRSD's Memorandum Brief in Support of Motion for Immediate Declaration of Unitary Status (docket no. 3581) at 30-33.

-166-

Joshua presented during the nine days of evidentiary hearings on unitary status focused on those six areas.[146]

5.    I conclude, under the plain language of § 11, that LRSD is entitled to a declaration of unitary status on all sections of the Revised Plan that Joshua *did not challenge* in their Opposition to LRSD's Compliance Report.  I further conclude, as a matter of law, that LRSD is entitled to summary judgment on those sections of the Revised Plan that Joshua identified in their Opposition to LRSD's Compliance Report but later failed to support with any evidence or arguments during the nine days of testimony on unitary status.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

6.    In my previous findings, I have determined that Joshua failed to prove that LRSD did not substantially comply with its obligations in five of the six challenged areas of the Revised Plan: (1) good faith; (2) student discipline; (3) extracurricular activities; (4) advanced placement courses; and (5) guidance counseling.  I have also found, in those five challenged areas, that the evidence established LRSD substantially and satisfactorily complied with its obligations.  During the twelve years since the Eighth Circuit approved the 1990 Settlement Agreement and Settlement Plans, LRSD has consistently demonstrated its good faith commitment to the various judicially approved settlement decrees under which it has operated.  LRSD has also demonstrated to the parents and students it has served and the public in general that it is committed to complying with

---

[146]Those six areas and the specific section of the Revised Plan that Joshua challenged and supported with evidence and argument during the unitary status hearings are set forth in the first paragraph of Section V, *supra*, at 85.  All other sections of the Revised Plan were either never challenged by Joshua or were identified by Joshua in its initial Opposition to LRSD's Motion for an Immediate Declaration of Unitary Status (docket no. 3604) but later abandoned.

-167-

the Constitution in the operation of the Little Rock school system. Therefore, I conclude that LRSD should be declared unitary in those five challenged areas of the Revised Plan, and that LRSD can be trusted to operate in those five areas in a constitutional fashion, without the need for continuing federal court supervision.

7.     Finally, the evidence demonstrated that LRSD has *not* substantially complied with its obligations in only one of the challenged areas of the Revised Plan--the academic achievement of African-American students. Specifically, LRSD failed to substantially comply with its obligations under § 2.7.1, which required it to assess each year the academic programs implemented under § 2.7 "in order to determine the effectiveness of the academic programs in improving African-American achievement." I conclude that the court should continue supervision and monitoring of LRSD's compliance with this crucially important section of the Revised Plan in order to ensure that LRSD has in place an effective assessment program that will allow it to identify and improve those programs that are most effective in remediating the academic achievement of African-American students.

8.     Thus, I conclude that LRSD should be granted *partial unitary status* regarding all aspects of its operations under the Revised Plan, *except for its obligations under § 2.7.1*. With regard to § 2.7.1, LRSD shall remain under the continuing supervision and monitoring of the court, consistent with the compliance remedy set forth in Section VII.

## H.     Time To Fly

1.     Joshua has *not* challenged LRSD's compliance with the sections of the Revised Plan addressing student assignment.[147] Thus, under § 11 of the Revised Plan, LRSD is deemed

---

[147]*See* § 3.1, *et seq.*, of the Revised Plan.

-168-

to be unitary regarding its student assignment plan. Nevertheless, in LRSD's Proposed Findings of Fact and Conclusions of Law (docket no. 3662), it requests that, *after I declare it unitary in all aspects of its operations*, I should grant it *permission* to do the following:

> [M]aintain its intradistrict race-based student assignment policies through the 2003-04 school year. In addition, the LRSD shall be permitted to allow students assigned pursuant to an intradistrict race-based policy during the 2003-04 school year to remain in that assignment until completion of that organizational level (Pre-K/elementary school, middle school or high school). The Court's decision in this case does not affect interdistrict transfers between the LRSD, PCSSD and NLRSD.

LRSD's Proposed Findings of Fact and Conclusions of Law at 63 (footnote omitted).

2.       I find it more than a little confusing for LRSD to argue that it is entitled to an immediate declaration of unitary status regarding all aspects of its operations, but request in the last paragraph of its Proposed Findings of Fact and Conclusions of Law that I issue what amounts to an advisory opinion on how it should deal with its student assignment plan through the 2003-04 school year. That request makes it appear LRSD has been in the federal nest for so long that it is reluctant to use its wings. Because LRSD is unitary with regard to its student assignment plan, *it must begin making its own decisions*, guided by the Constitution, applicable case law, and its best professional judgment, on whether any changes should be made in student assignments through the 2003-04 school year and beyond.

3.       In Joshua's Comments on LRSD's Proposed Findings of Fact and Conclusions of Law (docket no. 3668), it correctly points out that LRSD appears to be suggesting that it plans to change student assignment policies. *Id.* at 10. In LRSD's Response to Joshua's Comments (docket no. 3672), it denies that it is contemplating such a change. I do not know why LRSD elected to open this can of worms in its Findings of Fact and Conclusions of Law, but I consider

-169-

its statement that it does *not* intend to change its student assignment policy as its way of trying to "close the can." I cannot emphasize enough the importance of LRSD making constitutionally sound decisions regarding *all aspects* of its future operations. If it fails to do so, LRSD will find itself back in federal court engaged in protracted and expensive litigation that will funnel off scarce educational resources and distract teachers and administrators from their primary mission of delivering the best possible education to the school children of Little Rock.

## VII. Compliance Remedy

Because LRSD failed to substantially comply with the crucially important obligations contained in § 2.7.1, it must remain under court supervision with regard to that section of the Revised Plan until it: (a) demonstrates that a program assessment procedure is in place that can accurately measure the effectiveness of each program implemented under § 2.7 in improving the academic achievement of African-American students; and (b) prepares the program evaluations identified on page 148 of the Final Compliance Report and uses those evaluations as part of the program assessment procedure contemplated by § 2.7.1 of the Revised Plan. The details of this compliance remedy are set forth below:

A. For the entire 2002-03 school year and the first semester of the 2003-04 school year, through December 31, 2003, LRSD must continue to assess each of the programs implemented under § 2.7 to improve the academic achievement of African-American students. LRSD now has over three years of testing data and other information available to use in gauging the effectiveness of those programs. I expect LRSD to use *all* of that available data and information in assessing the effectiveness of those programs and in deciding whether any of those programs

-170-

should be modified or eliminated.

B.      LRSD must maintain written records regarding its assessment of each of those programs. These written records must reflect the following information: (a) the written criteria used to assess each program during the 2002-03 school year and the first semester of the 2003-04 school year; (b) the results of the annual assessments of each program, including whether the assessments resulted in program modifications or the elimination of any programs; and (c) the names of the administrators who were involved with the assessment of each program, as well as at least a grade level description of any teachers who were involved in the assessment process (*e.g.*, all fourth grade math teachers; all eighth grade English teachers, etc.).

C.      LRSD must use Dr. Nunnerly or another expert from outside LRSD with equivalent qualifications and expertise to prepare program evaluations on each of the programs identified on page 148 of the Final Compliance Report. I will accept all program evaluations that have already been completed by Dr. Nunnerly or someone with similar qualifications and approved by the Board.[148] All program evaluations that have not yet been completed on the remaining programs identified on page 148 of the Final Compliance Report must be prepared and approved by the Board as soon as practicable, but, in no event, later than March 15, 2003. In addition, as these program evaluations are prepared, LRSD shall use them, as part of the program assessment process, to determine the effectiveness of those

---

[148]The testimony during the unitary status hearings on July 22-24, 2002, failed to establish how many of those program evaluations have now been completed and approved by the Board.

-171-

programs in improving African-American achievement and whether, based on the evaluations, any changes or modifications should be made in those programs. In addition, LRSD must use those program evaluations, to the extent they may be relevant, in assessing the effectiveness of *other related programs*.

D.   Joshua must monitor LRSD's compliance with § 2.7.1 and must *immediately* bring to the attention of LRSD *all* problems that are detected in its compliance with its obligations under § 2.7.1, as those obligations are spelled out in this Compliance Remedy. Thereafter, Joshua and LRSD *must* use the "Process for Raising Compliance Issues" set forth in § 8.2, *et seq.*, of the Revised Plan to attempt to resolve those compliance issues. If those efforts are unsuccessful, Joshua must present the issues to me for resolution, as required by § 8.2.5. Any such presentation must be timely.

E.   The ODM must also monitor LRSD's compliance with § 2.7.1 and help to ensure that LRSD fulfills its obligations, as specified in this Compliance Remedy.

F.   On or before March 15, 2004, LRSD must file a Compliance Report which documents its compliance with its obligations under § 2.7.1. Any party, including Joshua, who wishes to challenge LRSD's substantial compliance with § 2.7.1, as specified above, may file objections with the court on or before April 15, 2004. Thereafter, I will decide whether LRSD has substantially complied with § 2.7.1, as specified in this Compliance Remedy, and should be released from all further supervision and monitoring.

## VIII. Conclusion

In *Keyes v. Congress of Hispanic Educators,* 902 F. Supp. 1274, 1307 (D. Colo. 1995), the district court, in granting the Denver School District's motion for unitary status, made the following observation:

> Thousands of pages have been written by scores of federal judges attempting to articulate guiding principles under the broad constitutional concept announced in *Brown v. Board of Education,* 347 U.S. 483 (1954). What has been demonstrated most clearly is that courts using the adversary system were not designed to accomplish institutional reform. The Supreme Court has recognized in its most recent relevant opinions that the framers of the Constitution put their faith in the people and the democratic process to determine and provide for the general welfare.

In *Belk v. Charlotte-Mecklenburg Board of Education,* 269 F.3d 305, 356 (4th Cir. 2001), the Court, in affirming the district court's decision granting unitary status to the Charlotte-Mecklenburg School District, echoed the same sentiment:

> No decisions are more sensitive and difficult than those involving public schools, and no process is more wrenching than that of matching limited resources to a limitless array of educational needs. But these challenges are better met by communities than by courts and, after thirty-five years of sporadic judicial supervision, the time has come to conclude. If not now, when? Each child is a human being to educate. If this essential task of education has become too daunting for democracy, then I know not who we are or what we shall become.

The time has arrived for substantial control of LRSD to be returned to the hands of the citizens of this community and for LRSD to be declared *partially unitary,* with regard to all aspects of its operations under the Revised Plan, *except for § 2.7.1.* Going forward, the court will continue to monitor and supervise LRSD only in connection with its implementation of the Compliance Remedy outlined above.

As a final caveat, I want to caution the Board that it must be careful in how it uses its newly restored wings. Just as Icarus could not resist the temptation to fly too close to the sun,

-173-

causing his waxen wings to melt, the Board must keep the Constitution in sight at all times in making future decisions regarding the operation of the Little Rock school system. Otherwise, LRSD will find itself embroiled in another round of costly litigation, with the possibility of still more court supervision and monitoring. I do not want this, and I assume LRSD does not.

IT IS THEREFORE ORDERED that LRSD be and it is hereby declared *partially unitary* with regard to all aspects of its operations, because it has substantially complied with all sections of the Revised Plan, save for those obligations contained in § 2.7.1.

IT IS FURTHER ORDERED that LRSD must implement the compliance remedy described in Section VII in order to bring itself into substantial compliance with its obligations under § 2.7.1 and that Joshua and the ODM must monitor that compliance.

IT IS FURTHER ORDERED that all federal supervision and monitoring of LRSD is terminated forthwith, save for the continuing supervision and monitoring of LRSD's obligations under § 2.7.1 of the Revised Plan.

DATED this _13TH_ day of September, 2002.

_____
UNITED STATES DISTRICT JUDGE

THIS DOCUMENT ENTERED ON
DOCKET SHEET IN COMPLIANCE
WITH RULE 58 AND/OR 79(a) FRCP
ON 9/13/02 BY _____

F I L E   C O P Y

bm

UNITED STATES DISTRICT COURT
Eastern District of Arkansas
U.S. Court House
600 West Capitol, Suite 402
Little Rock, Arkansas 72201-3325


September 13, 2002



* * MAILING CERTIFICATE OF CLERK * *


Re:   4:82-cv-00866.



True and correct copies of the attached were mailed by the clerk to the
following:


        Richard W. Roachell, Esq.
        Roachell Law Firm
        Post Office Box 17388
        Little Rock, AR   72222-7388

        James M. Llewellyn Jr., Esq.
        Thompson & Llewellyn, P.A.
        412 South Eighteenth Street
        Post Office Box 818
        Fort Smith, AR   72902-0818

        William P. Thompson, Esq.
        Thompson & Llewellyn, P.A.
        412 South Eighteenth Street
        Post Office Box 818
        Fort Smith, AR   72902-0818

        Colette Dodson Honorable, Esq.
        Arkansas Attorney General's Office
        Catlett-Prien Tower Building
        323 Center Street
        Suite 200
        Little Rock, AR   72201-2610

        Dennis R. Hansen, Esq.
        Arkansas Attorney General's Office
        Catlett-Prien Tower Building
        Suite 300
        323 Center Street
        Suite 200
        Little Rock, AR   72201-2610

        John W. Walker, Esq.
        John W. Walker, P.A.
        1723 Broadway

Little Rock, AR   72206-1220

Christopher J. Helier, Esq.
Friday, Eldredge & Clark
Regions Center
400 West Capitol Avenue
Suite 2000
Little Rock, AR   72201-3493

John Clayburn Fendley Jr., Esq.
Friday, Eldredge & Clark
Regions Center
400 West Capitol Avenue
Suite 2000
Little Rock, AR   72201-3493

Office of Desegregation Monitor
One Union National Plaza
124 West Capitol
Suite 1895
Little Rock, AR   72201

Norman J. Chachkin, Esq.
NAACP Legal Defense & Educational Fund, Inc.
99 Hudson Street
Suite 1600
New York, NY   10013

Stephen W. Jones, Esq.
Jack, Lyon & Jones, P.A.
TCBY Tower
425 West Capitol Avenue
Suite 3400
Little Rock, AR   72201-3472

M. Samuel Jones III, Esq.
Wright, Lindsey & Jennings
200 West Capitol Avenue
Suite 2200
Little Rock, AR   72201-3699

Sharon Carden Streett, Esq.
Streett Law Offices
Post Office Box 250418
Little Rock, AR   72225-0418

press

James W. McCormack, Clerk

Date: _____9/13/02_____          BY: _____